UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| BUERGOFOL GMBH, | 4:22-CV-04112-KES |
| Plaintiff, | |
| vs. | ORDER GRANTING IN PART AND DENYING IN PART THE MOTION FOR PROTECTIVE ORDER |
| OMEGA LINER COMPANY, INC., | |
| Defendant. | |

Plaintiff, Buergofol GmbH, alleges that defendant, Omega Liner Company, Inc., is infringing two of its patents. Docket 1. Omega moves for a protective order under Federal Rule of Civil Procedure 26(c)(1). Dockets 35, 37-1. Buergofol opposes Omega's proposed protective order, and requests that the court enter Buergofol's proposed protective order. Docket 49 at 28-29; Docket 37-3.

## BACKGROUND

There are three provisions on which the proposed protective orders differ:

(1) Omega's proposed order contains a patent prosecution bar (Paragraph 8);

(2) Omega's proposed order contains a provision (Paragraph 7.4) requiring that, prior to disclosing information designated as "Highly Confidential – Attorney's Eyes Only" to an expert, that party must first disclose information about that expert to the opposing party, who then has 7 days to object in writing to such disclosure; and

(3) Buergofol's proposed order contains a provision (Paragraph 11) requiring that, before a person receives protected information, they sign a form acknowledging and agreeing to be bound by the protective order and that this signed form be provided to opposing counsel. Docket 37-1 ¶¶ 7.4, 8; Docket 37-3 ¶ 11.

## DISCUSSION

### I.    A Patent Prosecution Bar for Darien Wallace Is Warranted

Protective orders in a patent infringement action are governed by the Federal Rules of Civil Procedure. 60 Am. Jur. 2d *Patents* § 761 (Feb. 2023). Rule 26 allows a court to enter a protective order for good cause "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense[.]" Fed. R. Civ. P. 26(c)(1). The party seeking the protective order has the burden to demonstrate good cause exists. *Miscellaneous Docket Matter No. 1 v. Miscellaneous Docket Matter No. 2*, 197 F.3d 922, 926 (8th Cir. 1999). Protective order provisions "specifying that designated confidential information may be used only for purposes of the current litigation" are "generally accepted as an effective way of protecting sensitive information while granting trial counsel limited access to it for purposes of the litigation." *In re Deutsche Bank Trust Co. Ams.*, 605 F.3d 1373, 1378 (Fed. Cir. 2010).

There may be some circumstances, however, "in which even the most rigorous efforts of the recipient of such information to preserve confidentiality in compliance with the provisions of such protective order may not prevent inadvertent compromise[,]" such as "when trial counsel also represent[s] the same client in prosecuting patent applications before the [Patent and Trademark Office (PTO)]." *Id.* at 1378-79. In such circumstances, a "patent prosecution bar," which bars counsel involved in the litigation from being involved in the prosecution of patents dealing with the same subject matter, may be necessary. *Id.* at 1377-78.

In *Deutsche Bank*, the Federal Circuit established the standard for whether a patent prosecution bar is warranted. *Id.* But district courts have applied different

interpretations of this standard. Under one interpretation, which appears to be applied by most district courts, the moving party must first "show, on a counsel-by-counsel basis, that there is an unacceptable risk of inadvertent disclosure of confidential information." *Eon Corp. IP Holdings, LLC v. AT&T Mobility LLC*, 881 F. Supp. 2d 254, 255 (D.P.R. 2012); *CFGenome, LLC v. Streck, Inc.*, 2018 WL 2463071, at *2 (D. Neb. June 1, 2018). "The risk of inadvertent disclosure is based on whether counsel is involved in 'competitive decisionmaking.' " *Eon Corp*, 881 F. Supp. 2d at 255 n.3 (citing *Deustche Bank*, 605 F.3d at 1378). If this first step is satisfied, then the court must "balance that risk against the potential harm to the non-movant." *Eon Corp.*, 881 F. Supp. 2d at 255.

Under a second interpretation, courts first assess whether "the proposed prosecution bar 'reasonably reflect[s] the risk presented by the disclosure of proprietary competitive information.' " *Id.* at 256 (quoting *Applied Signal Tech., Inc. v. Emerging Mkts. Commc'ns, Inc.*, 2011 WL 197811, at *2 (N.D. Cal. Jan. 20, 2011)). The reasonableness of the proposed order is determined by "the information at issue, the scope of activities that would be prohibited and their subject matter, and the duration of the bar." *Id.* If the proposed bar is deemed reasonable, then the court balances the risk presented by the disclosure "against the potential injury to the party deprived of its counsel of choice." *Id.* (quoting *Applied Signal Tech*, 2011 WL 197811, at *2).

Other courts have adopted a less rigid approach because "[t]he outcome of the Court's assessment would be the same regardless" of "the subtle differences in the way that courts have conducted the analysis." *Carlson Pet Prods. Inc. v. N. States Indus., Inc.*, 2019 WL 2991220, at *4-9 (D. Minn. July 9, 2019) (applying a

3

standard that appears to blend both above interpretations); *Realtime Adaptive Streaming LLC v. Adobe Sys. Inc.*, 2019 WL 11717183, at *7-8 (C.D. Cal. May 14, 2019) (discussing the two primary interpretations and deciding that "a middle approach is appropriate"); *see also Northbrook Digital, LLC v. Vendio Servs., Inc.*, 625 F. Supp. 2d 728, 735 (D. Minn. 2008) (considering, in a pre-*Deutsche Bank* decision, the recurring "themes" in patent bar decisions).

Buergofol urges this court to apply the first interpretation because "it is clear" that this interpretation is applied in the Eighth Circuit. Docket 49 at 12-13. Although the Eighth Circuit has not weighed in on the correct interpretation, district courts in the Eighth Circuit tend to apply the first interpretation. *See CFGenome, LLC*, 2018 WL 2463071, at *2 ("[O]ur sister courts within the Eighth Circuit have followed the first interpretation[.]"). According to Buergofol, then, if this court applies the second interpretation, it would be applying "incorrect law." Docket 49 at 12-13.

But at least one court within the Eighth Circuit has not applied the first interpretation. *See Carlson Pet Prods.*, 2019 WL 2991220, at *4-9 (applying a more blended approach). And although the court may generally find the decisions of district courts within the Eighth Circuit persuasive, it is not bound by those decisions, and ultimately, "the determination of whether a protective order should include a patent prosecution bar is a matter governed by Federal Circuit law," not Eighth Circuit law. *Deutsche Bank*, 605 F.3d at 1378; *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 274 F.R.D. 576, 579 (E.D.Va. 2010) (applying Federal Circuit precedent to patent prosecution bar dispute "because . . . any appeal would lie to the Federal Circuit").

4

Omega appears to argue for a "less mechanical" approach, where the court considers whether Buergofol's attorneys are competitive decisionmakers; whether there is proprietary, competitive information at risk of disclosure; whether there is risk to Omega if a bar is not granted; whether Buergofol is harmed if a bar is granted; and whether the proposed bar is reasonable. *See* Docket 38 at 7-15. Although Buergofol claims that Omega's approach is "incorrect law," there is in fact little difference between Omega's approach and Buergofol's own actual analysis. *See* Docket 49 at 12-26 (Buergofol arguing that their attorneys are not competitive decisionmakers, that Omega has no proprietary competitive information at risk of disclosure, and that its right to chosen counsel outweighs the risk of potential harm to Omega).

The court will follow the less mechanical approach taken in *Carlson Pet Products,* where the court considered two "threshold questions": (1) are litigation counsel "engaged in competitive decisionmaking," and (2) "will this case involve the exchange of information that presents a risk of inadvertent use by competitive decision-makers?" 2019 WL 2991220, at *4. If those questions are both answered in the affirmative, then the court "must determine whether the duration of the bar, the scope of activities it prevents, and the subject matter covered by it are reasonably tailored to the risk of inadvertent use." *Id.* at *5. Finally, the court will consider whether Buergofol's "concerns that it will be harmed by the inclusion of a patent-prosecution bar and unreasonably denied counsel of its choice . . . outweigh the risk of inadvertent use." *Id.* This approach is consistent with the analysis in each party's briefing, and it considers all the factors the Federal Circuit identified in *Deutsche Bank. See* 605 F.3d at 1378-81.

5

### A. Competitive Decisionmaking

Counsel is engaged in competitive decisionmaking when their "activities, association, and relationship with a client . . . involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." *Deutsche Bank*, 605 F.3d at 1378 (quoting *U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1468 n.3 (Fed. Cir. 1984)). Determining whether an attorney is engaged in competitive decisionmaking is a fact-based inquiry, and involvement in patent prosecution is not per se competitive decisionmaking. *Id.* at 1379-80. For example, attorneys with "patent prosecution duties that involve little more than reporting office actions or filing ancillary paperwork, such as sequence listings, formal drawings, or information disclosure statements[,]" or who conduct "high-altitude oversight of patent prosecution, such as staffing projects or coordinating client meetings, but have no significant role in crafting the content of patent applications or advising clients on the direction to take their portfolios[,]" are unlikely to be engaged in competitive decisionmaking. *Id.* More substantial involvement in patent prosecution, however, may qualify as competitive decisionmaking. This may include:

> obtaining disclosure materials for new inventions and inventions under development, investigating prior art relating to those interventions, making strategic decisions on the type and scope of patent protection that might be available or worth pursing for such inventions, writing, reviewing, or approving new applications or continuations-in-part of applications to cover those inventions, or strategically amending or surrendering claim scope during prosecution.

*Id.* at 1380.

6

### 1. Buergofol and Omega Are Competitors

Buergofol argues that their litigation attorneys cannot be engaged in competitive decisionmaking because Buergofol and Omega are not competitors. Docket 49 at 14-15. Buergofol makes film that is used in liners, Omega makes liners, and Omega used to purchase film from Buergofol for those liners. *Id.* Thus, Buergofol contends that Buergofol and Omega are merely supplier and customer, not competitors. *Id.* at 15.

Buergofol is correct that "[t]he mere fact that the two parties happen to be adverse in a legal sense in litigation does not make those two parties 'competitors' " for purposes of a competitive decisionmaking analysis. *Id.* at 14; *Northbrook Digital*, 625 F. Supp. 2d at 739 (holding that a "shared interest in a single patented technology" is insufficient to establish parties are competitors). But the conception of "competitor" advanced by Buergofol is too narrow. For this, the court finds *Northbrook Digital* instructive. There, the court found that "Northbrook [was] more like a supplier to Vendio than a competitor, because Northbrook and Vendio [did] not compete in the same output market (i.e., the market for internet advertising and marketing services.)" *Northbrook Digital*, 625 F. Supp. 2d at 739-40. Northbrook sold patent licenses; Vendio sold advertising and marketing services. *Id.* at 738. The parties thus "s[old] entirely different products to entirely different customers." *Id.*

But the *Northbrook Digital* court also found that "there [was] a very limited sense in which Vendio and Northbrook compete[d] in the *input market* of intellectual property used for internet advertising and marketing." *Id.* at 739-40. Essentially, they competed over a single customer—Vendio—because Vendio could

choose to deliver advertising and marketing services either "by using methods covered by Northbrook's patents" or "by using confidential methods developed in house by Vendio and *not* covered by Northbrook's patents." *Id.* at 740. The court reasoned that if Vendio's software and methods were not covered by Northbrook's patents, "but *could* be covered by claims in patents issued to Northbrook in the future if Northbrook knew enough about Vendio's operations to draft claims to cover Vendio's software and methods[,]" then "Vendio would be eliminated as Northbrook's competitor in the single-customer (Vendio) input market . . . ." *Id.* And the court held that "this elimination of Vendio would be unfair, because . . . it would have been possible only because Northbrook had access to Vendio's confidential software and business methods." *Id.*

The same is true here. Omega asserts that it "has worked with a new film supplier to develop various highly confidential information relating to the inner and outer film."[1] Docket 57 at 9; Docket 36 ¶ 5. If the filters Omega is now using are "not covered by the claims of [Buergofol's] asserted patents, but *could* be covered by claims in patents issued to [Buergofol] in the future if [Buergofol] knew enough about" Omega's current film "to draft claims to cover" this film, this would remove Omega's new film supplier as a competitor for Omega's business. *See Northbrook Digital*, 625 F. Supp. 2d. at 740. And it "would be unfair, because . . . it

---

[1] Buergofol claims that this assertion must be "false" because Omega does not have the technical expertise or appropriate facilities to make film. *See* Docket 49 at 19-20. But Buergofol's assessment relies entirely on information it learned about Omega and its facilities in 2017-2018. *See id*; *see generally* Docket 51. It puts forward no evidence of Omega's current capabilities, or lack thereof, to support its accusation that Omega is making false representations to the court. *See* Docket 49 at 20.

would have been possible only because [Buergofol] had access to" the new film that Omega claims it has developed with a new supplier. *See id;* Docket 57 at 9; Docket 36 ¶ 5.

Other courts have similarly held that patent prosecution bars may be necessary even where the parties are not direct competitors. *See, e.g.*, *Blackbird Tech LCC v. Serv. Lighting & Elec. Supplies, Inc.*, 2016 WL 2904592, at *4 (D. Del. May 18, 2016) ("For Blackbird to seek to hold defendants liable for improperly competing in the marketplace [by infringing its patent] and turn around and say it in no way competes with Defendants is too convenient, and other courts have similarly given little weight to such arguments."); *ST Sales Tech Holdings, LLC v. Daimler Chrysler Co.*, 2008 WL 5634214, at *6 (E.D. Tex. Mar. 14, 2008 ("[I]t is somewhat disingenuous to argue [Plaintiff] is not Defendants' competitor simply because [Plaintiff] is in the business of acquiring and enforcing patents while Defendants manufacture and design automobiles. Plaintiff and Defendants all seek to utilize, in one manner or another, intellectual property as part of a business model for pecuniary gain."). The court thus finds that Buergofol and Omega are competitors.

### 2. Omega Has Not Demonstrated that Lester Wallace and Elizabeth Hertz Are Engaged in Competitive Decisionmaking

Omega argues generally that because Buergofol's litigation counsel provide patent prosecution services to Buergofol, they therefore are competitive decisionmakers. *See* Docket 38 at 11-12. But in *Deutsche Bank* the Federal Circuit expressly rejected such a categorical approach to determining who is a competitive decisionmaker. 605 F.3d 1373 at 1379 ("Because patent prosecution is not a one-

dimensional endeavor and can encompass a range of activities, it is shortsighted to conclude that every patent prosecution attorney is necessarily involved in competitive decisionmaking. . . . The facts, not the category must inform the result."). Omega puts forward no facts showing that either Elizabeth Hertz or Lester Wallace is engaged in competitive decisionmaking. Thus, these attorneys will not be subjected to a patent prosecution bar.

### 3. Darien Wallace Is Engaged in Competitive Decisionmaking

Buergofol's remaining attorney, Darien Wallace, asserts that he has "never drafted the content of a specification of a patent application for Buergofol" and has "never had a significant role in crafting the content of Buergofol's patent applications or advising Buergofol on the direction to take its patent portfolio." Docket 54 ¶ 3. But according to Franz Schleicher, Buergofol's owner, Darien Wallace "oversee[s] the patent prosecution of Buergofol's counterpart U.S. applications" and plays an important role in deciding "how best to draft U.S. claims that are equivalent to German language claims . . . ." Docket 50 ¶¶ 8, 9. Although Darien Wallace attempts to downplay his role in Buergofol's U.S. patent strategy, Schleicher makes clear that Darien Wallace plays an "important" role in patent prosecution for Buergofol by "ensur[ing] that Buergofol receives strong patents in the United States after the parent patent applications have first been filed with the European Patent Office or German Patent Office." Docket 50 ¶ 7. Darien Wallace also meets in-person with Schleicher and other Buergofol management "regularly," and Schleicher prefers to discuss "patent and legal issues" with Darien Wallace because he speaks German. *See* Docket 50 ¶ 8; Docket 49 at 25.

10

From Schleicher's description of Darien Wallace's involvement, the court finds that Darien Wallace is not in the category of those involved in patent prosecution whose "duties . . . involve little more than reporting office actions or filing ancillary paperwork." *Deutsche Bank*, 605 F.3d at 1379. Instead, he is "shap[ing] the content of . . . patent application[s]" by deciding "how best to draft U.S. claims[.]" *Id.* at 1380; Docket 50 ¶ 9. And Darien Wallace is not involved merely in the "high-altitude oversight of patent prosecution, such as staffing projects or coordinating client meetings[.]" *Deutsche* Bank, 605 F.3d at 1379-80. Rather, Darien Wallace meets "regularly" with Buergofol's owner and management to discuss "patent and legal issues," and Buergofol's owner relies on Darien Wallace's guidance given Darien Wallace's language abilities, his comparative patent law expertise, and his understanding of Buergofol's technology. Docket 50 ¶ 8; Docket 49 at 25; *see British Telecomms. PLC v. IAC/InteractiveCorp*, 330 F.R.D. 387, 393 (D. Del. 2019) ("[T]he less [attorneys] have been engaged in regular direct contact with the company's decisionmakers, the more likely the courts have been to find that the attorneys could have access to confidential information without undue risk of inadvertent disclosure."). Thus, the court concludes that Darien Wallace is engaged in competitive decisionmaking.

### B. This Case Involves Proprietary Competitive Information

Because the court has concluded that Darien Wallace is engaged in competitive decisionmaking, it must now determine whether this case will involve proprietary competitive information that "is relevant to the preparation and prosecution of patent applications before the PTO." *Deutsche Bank*, 605 F.3d at 1381. "[F]inancial data and other sensitive business information, even if deemed

11

confidential, would not normally be relevant to a patent application and thus would not normally be expected to trigger a patent prosecution bar." *Id.* But "information related to new inventions and technology under development, especially that not already the subject of pending patent applications, may pose a heightened risk of inadvertent disclosure by counsel involved in prosecution-related competitive decisionmaking[.]" *Id.* "[T]he information must be truly confidential and not able to be ascertained through reverse engineering or other means." *Karl Storz Endoscopy-Am. v. Stryker Corp.*, 2016 WL 3129215, at *2 (N.D. Cal. June 2, 2016) (collecting cases).

Omega claims that this case involves "highly confidential technical information" about the film developed with Omega's new film supplier. Docket 36 ¶ 7; Docket 38 at 12. This information includes: (1) the chemical composition of the layers in the film; (2) the chemical composition of the UV resin used in the liners; (3) the processes used to manufacture the film; (4) the processes used to manufacture the liners; (5) and the conditions within the manufacturing plant. Docket 36 ¶ 7; Docket 38 at 12-13.

Buergofol argues Omega has no proprietary information relating to film because "Omega is not competing with Buergofol in the business of developing and manufacturing blown extruded film." Docket 49 at 18. But as described above, this argument is based on outdated analyses of Omega's capabilities from 2017 and 2018. *See supra* at 8 n.1. And even if Omega is not currently manufacturing film, "information related to new inventions and technology under development, especially that not already the subject of pending patent applications" is exactly

12

the kind of information that needs to be protected against inadvertent disclosure. *Deutsche Bank,* 605 F.3d at 1381.

Next, Buergofol argues that any of Omega's information relating to film is not proprietary because it can be reverse engineered. Docket 49 at 21-23. According to Tobias Goth, the head of sales at Buergofol, Buergofol can "easily test ('reverse engineer') film produced by other suppliers to determine the number of layers of the film, the thickness of each layer, the type of polymer in each layer . . . , the additives to the polymers, and other physical characteristics of the film." Docket 51 ¶ 12. In support of this assertion, Buergofol has provided a report of tests it ran on a film sample obtained during a visit to Omega in 2018.[2] *Id.* at 12-17. Because Buergofol has put forward evidence that it can test film to obtain the information that Omega claims is proprietary, and because Omega did not respond to Buergofol's argument that the chemical composition of the film can be reverse engineered, the court concludes that the chemical composition of the film is not the kind of proprietary information that would trigger a patent prosecution bar.

Finally, although Buergofol concedes that "detailed technical information relating to the chemical composition and characteristics of UV resin may well be proprietary Omega information," it maintains that such "information is not at issue in this case and is not the subject of any production requests by Buergofol."

---

[2] Because this document is in German, the court cannot verify that it contains the information that Goth claims it does. But Omega has not challenged Goth's assertion, or the authenticity or accuracy of the report.

Docket 49 at 17-18. Omega counters that "Buergofol's litigation counsel could acquire this information through future discovery requests . . . ." Docket 57 at 8.

Buergofol's complaint demonstrates that UV resin is at issue in this case. In Count 1 Buergofol alleges that Omega is "infring[ing] claim 1 of the '882 Patent because the Omega Liner embodies each and every element recited by claim 1." Docket 1 ¶ 35. Further, "[t]he insertion tube of claim 1 of the '882 Patent is recited to comprise three portions: 1) 'an inner tubular film,' 2) 'a carrier material' that is 'impregnated with a reactive plastic resin,' and 3) 'an opaque external tubular film.' " *Id.* ¶¶ 35, 36 (quoting Docket 1-1 at 14); *see id.* ¶ 11 (describing the resin in the second layer as "UV curable resin"). UV resin, then, is part of Buergofol's infringement claim, and is at issue in this case. The court thus finds that information about UV resin is the kind of proprietary information that can trigger a patent prosecution bar.

Buergofol does not argue the information about the processes used to manufacture liners or the conditions within the manufacturing plant is not proprietary information. The court concludes that the information put forward by Omega, except for information about the chemical composition of film, is proprietary technical information. *See* Docket 36 ¶ 7.

### C. The Proposed Patent Prosecution Bar, with Some Modifications, Reasonably Reflects the Risk of Inadvertent Disclosure

Because the court answered the first two question in the affirmative, it must now determine whether the subject matter covered by the bar, the scope of activities it prevents, and its duration are reasonably tailored to the risk of inadvertent use. *Carlson Pet Prods. Inc.*, 2019 WL 2991220, at *5.

14

### 1. Subject Matter

Omega's proposed patent prosecution bar covers "materials designated 'Highly Confidential – Attorneys' Eyes Only' that are directed to non-public technical information, excluding financial information or non-technical business information[.]" Docket 37-1 ¶ 8. The proposed bar appropriately excludes financial information or non-technical information. *See Deutsche Bank*, 605 F.3d at 1381. To reasonably reflect the risk of inadvertent disclosure, however, the proposed bar should be modified to clarify that information that can be obtained through reverse engineering, such as the chemical composition of film discussed above, is also excluded from the category of non-public technical information.

The proposed bar would prevent prosecution of

> any patent application relating to the subject matter of this action, including without limitation the patents asserts in this action and UV cured-in-place pipe (CIPP) liners, including without limitation the patents asserted in this action and any patent or application claiming priority to or otherwise related to the patents asserted in this action, before any foreign or domestic agency, including the United States [PTO].

Docket 37-1 ¶ 8. Defining the scope of the subject matter that the prosecution bar covers as "relating to the subject matter of this action" is "circular and vague" without further limitation or definition. *Eon Corp. IP Holdings*, 881 F. Supp. 2d at 258 (finding that such language allows the bar's subject-matter scope to be defined later by the information produced in discovery). The court will thus narrow the subject matter by limiting it to UV CIPP liners and the processes and materials used to make UV CIPP liners. *See Front Row Techs, LLC v. NBA Media Ventures, LLC*, 125 F. Supp. 3d 1260, 1290 n.16 (D.N.M. 2015) ("The Court may modify or even replace the parties' proposed prosecution bars.").

15

### 2. Scope of Activities

The court finds that the scope of activities prohibited by the proposed patent prosecution bar reasonably reflects the risk of inadvertent disclosure. It prohibits those subjected to the bar from "prepar[ing], prosecut[ing], or assist[ing] in the preparation or prosecution" of covered patent applications, and it specifically excludes from its prohibitions challenges to a patent before a domestic or foreign agency, including challenges through a reissue protest, ex parte reexamination, or inter partes reexamination. Docket 37-1 ¶ 8. This a narrower bar than many that completely prohibit an attorney from participating in post-grant review proceedings. *See British Telecomms.*, 330 F.R.D. at 396-99 (collecting cases where post-grant review is excluded from bar, included in bar, or partially included and partially excluded).

### 3. Duration

Finally, the court considers the proposed duration of the proposed patent prosecution bar. Omega proposes that the bar start when the covered information "is first received by the affected individual and shall end two (2) years after final termination of this action." Docket 37-1 ¶ 8. The court finds that two years is a reasonable duration. *See Front Row Techs.*, 125 F. Supp. 3d at 1291 ("District courts throughout the country have approved [a 2-year] duration."). The court finds, however, that any bar should expire two years after a final judgment from this court. *See Eon Corp IP Holdings*, 881 F. Supp. 2d at 258 ("[T]he bar's duration should not be determined by this case's future life in the courts of appeals."); *Carlson Pet Prods.*, 2019 WL 2991220, at *7 (rejecting proposed order where the

16

bar terminated 3 years after the conclusion of any appeals and imposing bar that terminated 1 year after final judgment from district court).

> ### D. The Harm to Buergofol Does Not Outweigh the Risk of Inadvertent Disclosure

Finally, the court must determine whether the harm to Buergofol from being denied the counsel of its choice outweighs the risk of inadvertent disclosure. To make this determination

> the court should consider such things as the extent and duration of counsel's past history in representing the client before the PTO, the degree of the client's reliance and dependence on that past history, and the potential difficulty the client might face if forced to rely on other counsel for the pending litigation or engage other counsel to represent it before the PTO.

*Deutsche Bank*, 605 F.3d at 1381.

Omega argues that Buergofol "will not suffer any significant harm" because "[s]ince at least October 24, 2013, Buergofol has primarily used Dority & Manning, P.A. . . . to handle its U.S. patent applications" at the PTO and Dority "has at least one pending patent application filed on August 30, 2021[,] titled 'Tubular Liner for the Rehabilitation of a Sewer Pipe[.]'" Docket 38 at 16. Omega claims that the Dority firm has filed "at least 12 patent applications on behalf of Buergofol, one of which resulted in one of the patents in this lawsuit[.]" *Id.* Another firm, Lewis Kohn & Walker LLP, has also filed and prosecuted at least one United States application, and this patent appears related to the subject matter of the patents in this matter. *Id.*; *see* Docket 37 ¶ 18; Docket 37-7 ("polymeric multilayer film"). According to Omega, the only United States patent application filed by Imperium Patent Works, Darien Wallace's firm, "is for food packaging machines" that was filed on February

10, 2020, and "appears to be unrelated to the subject matter of the present lawsuit." Docket 38 at 16-17.

Buergofol does not dispute Omega's description of its representation in United States patent applications. Docket 49 at 25-29. But it argues that "no attorney at these [other] firms has the unique qualifications of [Darien Wallace]." *Id.* at 26. These qualifications include that Darien Wallace "has lived and worked in Germany, speaks excellent German to discuss patent and legal issues with Buergofol's management who do not speak good English, [and] regularly travels to Munich where [Darien Wallace] can meet with Buergofol's management in person," among other qualifications. *Id.* at 25. Buergofol does not state how long Darien Wallace has been overseeing prosecution of its United States patents. *See id.* at 25-26; Docket 50; Docket 54.

Darien Wallace's "unique qualifications" demonstrate that Buergofol will likely suffer some harm if he is not able to continue prosecuting patents on its behalf in the United States. But the degree of this harm is lessened by his patent prosecution of Buergofol being of an unknown duration and having only filed a single United States patent application, which is unrelated to the subject matter of this dispute. Additionally, imposing a patent prosecution bar would not prohibit Darien Wallace from continuing to represent Buergofol in United States patent prosecutions. He could continue to do so, as long as he no longer represented Buergofol in this litigation. *See Front Row Techs.*, 125 F. Supp. 3d at 1295 ("A prosecution bar would force [the attorneys] to make a choice: either prosecute patents in this family of patents, or litigate the patents at issue, but not both." (internal quotations omitted)).

18

And Buergofol has not made any argument about how it would be harmed if Darien Wallace is not permitted to represent it in this litigation. This case is still in its early stages, and Buergofol has asserted that this is a "small," "relatively simple" case where the "technical issues pertaining to the structure and composition of the films used by Omega are not exceedingly complicated." Docket 33 at 5, 14, 33; *See U.S. Steel Corp.*, 730 F.2d at 1468 ("Because the present litigation is extremely complex and at an advanced stage . . . forcing [plaintiff] to rely on newly retained counsel would create an extreme and unnecessary hardship."); *Front Row Techs.*, 125 F. Supp. 3d at 1295 (imposing patent prosecution bar even where attorneys had represented party in that case for over five years and the case involved a "highly specialized area with a very steep learning curve" (internal quotations omitted)). The court thus finds that any harm to Buergofol is outweighed by the risk of inadvertent disclosure, and a patent prosecution bar, as proposed by Omega and modified by this order, will be imposed in this case.

## II.    Omega Has Not Shown Good Cause for Its Proposed Section 7.4

Paragraph 7.4 of Omega's proposed order outlines a procedure for a producing party to approve or object to the disclosure of information it has designated as "Highly Confidential – Attorneys' Eyes Only" to the receiving party's experts. Docket 37-1 ¶ 7.4. Under this provision, prior to disclosing information to an expert, the receiving party must make a written request to the producing party with significant information about the expert's work in the past five years. Docket 37-1 ¶ 7.4(a). Then, the producing party has 7 days to object to the disclosure "detail[ing] the grounds on which it is based." Docket 37-1 ¶ 7.4(b). The parties

19

must then meet-and-confer within 7 days of the objection being made, through direct, voice-to-voice dialogue, to try and resolve the issue. Docket 37-1 ¶ 7.4(c). If no resolution is reached, then the party seeking disclosure may file a motion with the court to permit such disclosure. *Id.*

As the party seeking to include this provision, the burden is on Omega to show that there is "good cause" for it. *Gen. Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d 1204, 1212 (8th Cir. 1973). Good cause requires more than "stereotypical and conclusory statements" about the harm that will result absent the requested provision. *Miscellaneous Docket Matter No. 1*, 197 F.3d at 926; 8A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2035 (3d ed. 2023) ("The courts have insisted on a particular and specific demonstration of fact, as distinguished from stereotypes and conclusory statements, in order to establish good cause.").

In its initial brief, Omega argued only that this section should be included in a protective order "to adequately protect the confidential information that will be exchanged during discovery." Docket 38 at 19. In its reply brief, it claims that without this provision "Buergofol could hire a direct competitor of Omega as a technical expert, and Omega would have no time to object to the disclosure of highly confidential information to this competitor[.]" Docket 57 at 11. Buergofol counters that this provision "is totally unnecessary" and "is undesirable because it introduces delay, is cumbersome, includes unnecessary rules, and there is no such provision in most protective orders entered . . . in district court in South Dakota and more widely in patent cases in the Eighth Circuit." Docket 49 at 6.

The court finds that Omega has not met its burden of showing that good cause exists for such a provision. Its justification for such an order, particularly in its opening brief, is "stereotypical and conclusory." *See Gen. Dynamics Corp.*, 481 F.2d at 1212. The risk of harm it articulates in its reply brief still falls short of a "particular and specific demonstration of fact" because such generalized speculation that confidential information could be disclosed to a competitor-expert could be made in nearly any case between competitors. Additionally, considering the parties' current difficulties in resolving even minor discovery disputes, the court finds that the inclusion of such a provision would produce unnecessary and harmful delay. *See* Fed. R. Civ. P. 1.

**III.    There is Good Cause for Requiring a Signed "Acknowledgment and Agreement to Be Bound" Prior to Receiving Protected Information**

The final disputed provision comes from Buergofol's proposed protective order, which provides that:

> For any person required by the terms of this Protective Order to sign and execute the "Acknowledgement and Agreement To Be Bound" . . . prior to receiving Protected Material, Outside Counsel of Record for the Receiving Party shall communicate to Outside Counsel of Record for each other party to this lawsuit a copy of the "Acknowledgment and Agreement To Be Bound[,]" properly executed by the person, prior to the Protected Material being disclosed to the person.

Docket 37-3 at 14. Although Buergofol identifies this as a disputed provision, Docket 49 at 5, it does not appear that Omega actually opposes it. Omega did not address it in its initial brief, and its reply brief suggests that it views this provision as an insufficiently protective alternative to its proposed Paragraph 7.4 Docket 57 at 11. Omega's proposed order also includes a similar provision requiring an

21

expert to sign the Acknowledgment and Agreement To Be Bound prior to receiving "Highly Confidential – Attorneys' Eyes Only" information. Docket 37-1 ¶ 7.3(b).

The court finds there is good cause for this provision, as proposed at Paragraph 11 of Buergofol's proposed order. Requiring individuals to acknowledge and agree to be bound by the protective order prior to receiving protected information helps to ensure that such information is not misused, and it does so in a non-burdensome way.

## CONCLUSION

For the foregoing reasons, it is

ORDERED that the motion for protective order (Docket 35) is granted in part and denied in part. Omega's motion to include a patent prosecution bar, at Paragraph 8 of its proposed order, is granted, as modified by this order. Omega's motion to include Paragraph 7.4 of its proposed order is denied. Paragraph 11 of Buergofol's proposed order will also be included in the protective order. The court will separately enter a protective order that tracks the modifications indicated by this order.

Dated June 7, 2023

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE