UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| BUERGOFOL GMBH,<br><br>                    Plaintiff,<br><br>vs.<br><br>OMEGA LINER COMPANY, INC.,<br><br>                    Defendant. | Civil Action No.: 22-cv-04112-KES<br><br>**BUERGOFOL'S OPPOSITION<br>TO OMEGA'S MOTION TO<br>COMPEL (Dkt. 175)** |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ............................................................... 1

    A.  Abusive Conduct In The Meet-and-Confer—A Now-Familiar Pattern ....... 1

    B.  Off-Topic Diatribes Shall Be Ignored ........................................... 4

II.    LEGAL STANDARDS ......................................................... 5

    A.  Service Of Overbroad Discovery Is A Form Of Discovery Abuse, Violates Rule 26(g), Wastes Time, And Warrants Sanctions ....................................... 5

    B.  The Court Has A Duty Under Rule 26(b)(2)(C), Independent Of The Litigants, To Prevent Overbroad Discovery .................................... 6

    C.  "Implicit" Narrowing Of A Discovery Request By Email .......................... 6

    D.  A "Facially Overbroad" Discovery Request Requires No Further Response From An Objecting Party Other Than An Objection ..................................... 7

    E.  The Responding Party Need Not Produce Documents Outside Its Possession, Custody Or Control ....................................................... 7

III.    ARGUMENT ........................................................................ 8

    A.  RFP 70 and RFP 88 - Omega's Facially Overbroad Requests Demand Production Of Documents Outside Buergofol's Possession, Custody Or Control ....................................................................... 8

        i.   Facially Overbroad - Buergofol Stands On Its Objection ..................... 10

        ii.  Buergofol Is Not Obligated To Produce Documents Outside Its Possession, Custody And Control .......................................... 11

    B.  RFP 103 - Omega's Demand To Produce "The Second BASF Analysis Of The Sudpack Film" ...................................................... 14

    C.  ROG 8 and RFP 85 - Omega's Demand To Produce "The Offer To License" The '269 Patent ............................................... 18

    D.  Omega's Demand That Buergofol Reproduce Email In "Native Format" ... 21

    E.  RFP 22 - Omega's Demand To Produce What Omega Calls "Buergofol's Document Retention Policies" ...................................................... 27

    F.  Omega's Demand That Buergofol Disclose The Manner Of Its Searches ...................................................................... 29

IV.    OMEGA'S MOTION IS UNTIMELY ................................................. 30

V.    CONCLUSION ................................................................ 30

# TABLE OF AUTHORITIES

**Cases**                                                                                                        **Pages(s)**

*Al Noaimi v. Zaid*,
   283 F.R.D. 639, 641 (D. Kan. 2012) ..................................................................... 8
*Bethea v. Comcast*,
   218 F.R.D. 328, 329 (D. D.C. 2003) ............................................................... 19, 28
*Bombardier Recreational Prods., Inc. v. Arctic Cat, Inc.*,
   2014 WL 10714011, 2014 BL 458702 (D. Minn. Dec. 5, 2014) ........................ 29
*Buergofol GmbH v. Omega Liner Co.*,
   No. 4:22-cv-04112-KES, 2023 BL 243100 (D.S.D. July 13, 2023) .................... 6
*Cardenas v. Dorel Juvenile Group, Inc.*,
   232 F.R.D. 377 (D. Kan. 2005) .............................................................................. 7
*Clark v. Unum Grp.*,
   No. 4:20-cv-04013-KES, 2021 WL 4134520, 2021 BL 343570 (D.S.D. Sept. 10,
   2021) ...................................................................................................................... 8
*Copperhead Agric. Prods., LLC v. KB AG Corp.*,
   No. 4:18-cv-04127-LLP, 2019 BL 477020 (D.S.D. Dec. 10, 2019) ................... 22
*Cotracom Commodity Trading Co. v. Seaboard Corp.*,
   189 F.R.D. 655 (D. Kan. 1999) ........................................................................ 7, 10
*Craigville Tel. Co. v. T-Mobile USA, Inc.*,
   No. 19-cv- 7190, 2022 WL 1499908, 2022 BL 165173 (N.D. Ill. May 12, 2022).. 10
*Diamond Servs. Mgmt. Co. v. C&C Jewelry Mfg., Inc.*,
   No. 19-cv-7675, 2021 WL 4258800, 2021 BL 359130 (N.D. Ill. May 11, 2021).. 11
*FastVDO LLC v. AT&T Mobility LLC*,
   No. 16-cv-385-H, 2016 BL 351930 (S.D. Cal. Oct. 20, 2016) ........................... 20
*Fish v. Air & Liquid Sys. Corp.*,
   2017 U.S. Dist. LEXIS 24188, 2017 WL 697663 (D. Md. Feb. 21, 2017) .......... 29
*Fleck v. Neurosurgical & Spinal Surgery Assocs.*,
   No. 10-cv-5072, 2012 BL 115842 (D.S.D. May 9, 2012) ..................................... 7
*Gondola v. USMD PPM, LLC*,
   No. 15-mc-411, 2016 WL 3031852, 2016 BL 169910 (N.D. Tex. May
   27, 2016) ............................................................................................................... 6
*Hartman v. Sunbelt Rentals, Inc.*,
   No. 4:21-cv-3328, 2022 Us Dist Lexis 213738, 2022 BL 424123 (D. Neb. Nov.
   28, 2022) ............................................................................................................... 6
*Holick v. Burkhart*,
   No. 16-cv-1188-JTM, 2017 WL 3723277, 2017 BL 302981 (D. Kan. Aug. 29,
   2017) ................................................................................................................. 7, 10
*In re Pork Antitrust Litig.*,
   No. 18-cv-1776, 2022 WL 972401, 2022 BL 113346 (D. Minn. Mar. 31, 2022) .... 8
*Kickapoo Tribe of Indians of Kickapoo Reservation in Kansas v. Nemaha Brown
Watershed Joint Dist. No. 7*
   294 F.R.D. 610 (D.Kan. 2013) .............................................................................. 8
*Kiobel v. Royal Dutch Petroleum Co.*,
   No. 02-cv-7618-KMW, 2009 WL 1810104, 2009 BL 187023 (S.D.N.Y. June
   25, 2009) ............................................................................................................... 6

*Lipari v. United States Bancorp N.A.*,
    No. 07-cv-2146, 2008 WL 4642618, 2008 BL 235057 (D. Kan. Oct. 15, 2008) .... 7
*McAllister-Lewis v. Goodyear Dunlop Tires N. Am., Ltd.*,
    No. 4:14-cv-04103-LLP, 2015 WL 5794697, 2015 BL 322384, at *5 (D.S.D.
    Oct. 1, 2015) ...................................................................................................... 8
*Muhammad v. Jenkins*,
    No. 19-cv-7970-JAK, 2021 WL 5911684, 2021 BL 486329 (C.D.
    Cal. Sept. 8, 2021) ............................................................................................ 19
*Naerebout v. IBP, Inc.*,
    No. 91-cv-2254-L, 1992 WL 754399 (D. Kan. Aug. 19, 1992) .......................... 10
*N.U. v. Wal-Mart Stores, Inc.*,
    No. 15-cv-4885-KHV, 2016 WL 3654759, 2016 BL 220272 (D. Kan. July 08,
    2016) ................................................................................................................... 6
*Rembrandt Patent Innovations, LLC v. Apple Inc.*,
    No. 14-cv-05094-WHA, 2016 WL 427363, 2016 BL 31804 (N.D. Cal. Feb.
    04, 2016) ........................................................................................................... 20
*Robinson v. Moskus*,
    491 F. Supp. 3d 359 (C.D. Ill. 2020) .................................................................. 8
*Schmelzer v. IHC Health Servs.*,
    No. 2:19-cv-00965-TS-JCB, 2022 WL 16646456, 2022 BL 395544 (D. Utah
    Feb. 10, 2022) .................................................................................................... 5
*United States v. Int'l Union of Petroleum & Indus. Workers*,
    870 F.2d 1450, 1452 (9th Cir. 1989) ................................................................. 7
*Vlsi Tech. LLC v. Intel Corp.*,
    No. 18-mc-80193-NC, 2019 BL 592407 (N.D. Cal. Jan. 18, 2019) .................... 20
*Whatley v. Canadian Pac. Ry.*,
    No. 1:16-cv-74, 2021 BL 179740 (D.N.D. May 14, 2021) ................................. 29
*Wi-Lan, Inc. v. Acer, Inc.*,
    No. 2:07-cv-473-TJW, 2010 WL 4118625, 2010 BL 246190 (E.D. Tex. Oct.
    18, 2010) ........................................................................................................... 20

**Statutes and Rules**

35 U.S.C. § 102 ...................................................................................................... 4

Fed. R. Civ. P. 26(b)(1) ....................................................................................... 5-6

Fed. R. Civ. P. 26(b)(2)(C) ................................................................................. 6, 26

Fed. R. Civ. P. 26(f) ....................................................................................... 21-22, 24

Fed. R. Civ. P. 26(g) ........................................................................................ 5-6, 30

Fed. R. Civ. P. 34 ............................................................................................. 6-7, 30

Fed. R. Civ. P. 34(a)(1) ................................................................................... 7, 10, 12

Fed. R. Civ. P. 34(b)(1)(A) ................................................................................... 10

Fed. R. Civ. P. 34(b)(2)(E) .............................................................................. 21-22, 24

D.S.D. Civ. LR 37.1 ............................................................................................... 1

Plaintiff Buergofol GmbH ("Buergofol") files this opposition to Omega's "Motion To Compel Buergofol's Document Production And Response To Interrogatory" (Dkt. 175) and papers in support (Dkts. 176-178).

## I.   INTRODUCTION

### A.  Abusive Conduct In The Meet-and-Confer—A Now-Familiar Pattern.

Is counsel required to sit through a string of personal attacks on his character, honesty, and professional integrity, with the attacks going on for two hours, just to fulfill this Court's LR 37.1 requirement?  The so-called "meet-and-confer" of July 6, 2023 upon which Omega bases this motion to compel was one accusation attacking the integrity and honesty of Buergofol's counsel after another, after another, after another.  These disrespectful accusations went on and on for approximately two hours.  And those baseless accusations are repeated in Omega's memorandum, which resembles a rant of grievances.

What is presented in Omega's opening memorandum as having transpired at the July 6 meet-and-confer is factually inaccurate, woefully incomplete, and distorted.  It misrepresents what really happened and leaves out all of the unprofessional conduct perpetrated by Omega's counsel, Mr. Michael Neustel.  Mr. Neustel was antagonistic, bullying, contemptuous, and disrespectful.

What in fact occurred at the July 6 meet-and-confer is as follows.  In a now-familiar pattern, Omega's counsel Mr. Neustel is ignorant of facts that are central to the particular discovery dispute at hand.  Due to that ignorance, Mr. Neustel makes a false statement of fact that an item of information or document responsive to an Omega discovery request exists.  Generally, Buergofol's attorneys know immediately that the statement is false.  And usually, Mr. Neustel himself has previously been informed (before the meet-and-confer) of such by Buergofol's counsel.  This ignorance of the facts does not stop Mr. Neustel from

asserting the falsehood.  For example, a request for production might be an overly broad request for production that calls for Buergofol to produce the overbroad class of "All documents relating to any of the Patents-In-Suit or any Related Patent."  Mr. Neustel believes he has learned about a reference to a document in this overbroad class and comes to think that Buergofol is in possession of the document.  Based on that, Mr. Neustel makes the false statement in the meet-and-confer that he (Mr. Neustel) knows that "the XYZ document" exists.

Next, in a now familiar second sentence of Mr. Neustel's interrogation, he typically levels the accusation that Buergofol has failed to produce "the XYZ document."  The accusation usually starts with the word "so," as in "So, you are withholding the XYZ document."  This specific sequence of events has happened so many times in so many meet-and-confers, and with such constancy and repetition, that the pattern of speech employed by Mr. Neustel is now familiar.  These accusatorial meet-and-confers do not serve the purpose of the rule.  Nearly all of the time, Buergofol's counsel, Darien Wallace, is not withholding "the XYZ document" because no such document exists.  Buergofol's counsel responds, once again, that Buergofol has produced all responsive documents in Buergofol's possession, custody or control that are not being withheld on the basis of privilege, work product, or trade secrets.  But Omega's counsel ignores the answer, and proceeds to interrogate Buergofol's counsel as in a police interrogation or quasi-30(b)(6) deposition of counsel, insisting that Buergofol's counsel answer questions about Buergofol's counsel's work product or Buergofol's counsel's superior knowledge of the facts of the case.  Then Omega's counsel demands that Buergofol's counsel reveal what has been done to search for "the XYZ document."  The long interrogation by Omega's counsel is a waste of time because Buergofol's counsel has no obligation to, and refuses to, teach

Omega's counsel about the facts of the case.

Through this interrogation exercise, the actual overbroad discovery request at issue is not being "clarified."  There is no conferring about the overbreadth of the discovery request.  What is going on is an attempt by Omega's counsel to conduct fact discovery, referred to by some courts as "discovery on discovery," by taking the deposition of opposing counsel.  Each of Mr. Neustel's questions generally includes a snide barb or insult directed at opposing counsel, implying discovery misconduct on the part of Buergofol's counsel, Darien Wallace.  For an example of the insulting accusations leveled at Buergofol by Mr. Neustel, see the raft of letters and emails by Mr. Neustel containing falsehoods and misrepresentations attached to Omega's motions papers. (*See* Dkt. 176-1, 176-2, 176-3, 176-4, 176-5, 176-6, 176-7, 176-8, 176-9, 176-10, 176-11, 176-13)

Through this abuse carried out in the name of a "meet-and-confer," Buergofol's counsel will repeatedly object to opposing counsel's conduct, and will repeatedly ask for it to stop.  Buergofol's counsel will often state that the attempted interrogation is improper for a meet-and-confer, and that Buergofol's counsel is under no obligation to teach Omega's counsel about the facts of the case.  The other Omega and Buergofol attorneys in attendance at the meet-and-confer conferences can testify to Mr. Wallace's protestations.  Many times Buergofol's counsel not only knows that Omega's counsel is incorrect as to the facts, but also has a good idea of why Omega's counsel's conclusion is incorrect.  Omega's counsel has usually misread a document and/or has applied faulty logic.  The meet-and-confer usually has little to do with any other attorney because is it Darien Wallace who conducted and oversaw Buergofol's document production.  The other attorneys in attendance (Michelle Breit, Monte Bond, Lester Wallace, Elizabeth Hertz) are more or less useless passive participants to the meet-and-confer, billing their clients and wasting their

respective clients' money with little or nothing to add.  The episode of course does not resolve Mr. Neustel's "discovery dispute" because Mr. Neustel insists on the production of documents and/or information that Buergofol either does not possess or is not obligated to produce.  The same familiar pattern then repeats for the next item on Mr. Neustel's long laundry list of discovery dispute grievances.  Mr. Neustel starts by making a false statement of fact, then levels an accusation against Darien Wallace, and then proceeds to interrogate Darien Wallace in an attempt to perform fact discovery.  In the so-called meet-and-confer of July 6, there were dozens of such grievances and accusations raised by Mr. Neustel.

    **B.  Off-Topic Diatribes Shall Be Ignored.**

The first ten pages of Omega's memorandum are offensive, off-topic, and replete with factual inaccuracies.  They are apparently presented in an attempt to smear and disparage Buergofol's counsel in order to gain a litigation advantage.  ***Such papers should not be filed in the docket of a Federal Court because it denigrates the Court.***

Buergofol simply responds by stating that all of Omega's arguments are baseless and erroneous, for one reason or another.  For example, Buergofol did not "conceal prior art" that was then "uncovered" by Omega in some great act of lawyering or sleuthing.  To the contrary, upon application of just a little common-sense, it is evident that Buergofol, as one of the original pioneers of UV-CIPP film technology in the world, was making UV-CIPP films for years before the time of conception of the inventions of the patents-in-suit.  So of course Buergofol had made "prior" films.  (Buergofol is a German company that makes film only in Germany, and the films that were sold or used in public outside the United States were not "prior art" films according to pre-AIA 35 U.S.C. § 102.  Omega's multiple references to "2012 prior art Sudpack film" are fallacious because the film is not "prior art" and cannot be used to invalidate the patents-in-suit.)  Omega did not "uncover" anything

hidden or somehow improperly concealed.  To the contrary, it would be shocking had

Buergofol not made prior films.  The fact that a prior films may have been made, of course,

does not mean that any claim in either patent-in-suit is invalid.  To the contrary, both

patents-in-suit are valid, and both patents are infringed by the infringer, Omega.  Buergofol

will, at the appropriate time, gladly dispense with each and every one of Omega's attempted

defense arguments, but not in this opposition to a motion to compel.  The first ten pages of

Omega's memorandum do not pertain to the Omega's discovery requests (RFPs 70, 72, 73,

85, 88, 103 and ROG 8) that are the subject of the present motion.  The subject of this

motion is the actual discovery requests that were served, their propriety under the Federal

Rules of Civil Procedure, and the propriety of Buergofol's objections, responses and

production.  Accordingly, this opposition ignores the diatribes on pages 1-10 of Omega's

memorandum.  Buergofol submits that the Court should ignore them as well.

## II.    LEGAL STANDARDS

### A.  Service Of Overbroad Discovery Is A Form Of Discovery Abuse, Violates Rule 26(g), Wastes Time, And Warrants Sanctions.

The service of overbroad discovery requests by an attorney is discovery abuse.

Rule 26(g) requires that an attorney sign every discovery request "in the attorney's own

name."  Pursuant to Rule 26(g), by signing the discovery request, the attorney certifies that

the request is not overbroad and is consistent with Rule 26(b)(1).  As one court explained,

"The tactic of issuing . . . document requests that unreasonably ask a responding party to . . .

produce nearly every document in its system in hopes to later negotiate a more reasonable

and narrow set of requests is a ***waste of time and money*** between the parties. Additionally,

such tactics unnecessarily clog the courts . . .."  *Schmelzer v. IHC Health Servs.*, No. 2:19-

cv-00965-TS-JCB, 2022 WL 16646456, 2022 BL 395544 (D. Utah Feb. 10, 2022)

(emphasis added).  The "burden created by undisciplined requests" is precisely what the "reasonable particularity" requirement of Rule 34 was designed to protect against. *Id.* "***After-the-fact haggling*** over how to narrow discovery requests slows case progression and ***wastes attorney time***, the parties' time and money, and court resources." *Hartman v. Sunbelt Rentals, Inc.*, No. 4:21-cv-3328, 2022 Us Dist Lexis 213738, 2022 BL 424123 (D. Neb. Nov. 28, 2022) (emphasis added)  "Rule 26(g) is intended to deter and curb discovery abuses."  "Pursuant to Rule 26(g)(3), if an attorney's certification violates Rule 26(g) without substantial justification, sanctions are mandatory."  *Kiobel v. Royal Dutch Petroleum Co.*, No. 02-cv-7618-KMW, 2009 WL 1810104, 2009 BL 187023 (S.D.N.Y. June 25, 2009).

### B. The Court Has A Duty Under Rule 26(b)(2)(C), Independent Of The Litigants, To Prevent Overbroad Discovery.

The Court has a duty, independent of the litigants, to limit discovery that it determines is not proportional to the needs of the case.  The Court must do this "even in the absence of a motion."  "[U]nder Rules 26(b)(1) and 26(b)(2)(C)(iii), a court can—***and must***—limit proposed discovery that it determines is not proportional to the needs of the case . . . the court must do so even in the absence of a motion." *N.U. v. Wal-Mart Stores, Inc.*, No. 15-cv-4885-KHV, 2016 WL 3654759, 2016 BL 220272 (D. Kan. July 08, 2016) (emphasis added); *Gondola v. USMD PPM, LLC*, No. 15-mc-411, 2016 WL 3031852, at *3, 2016 BL 169910 (N.D. Tex. May 27, 2016); Rule 26(b)(2)(C)(iii).

### C. "Implicit" Narrowing Of A Discovery Request By Email.

A discovery request can be "implicitly" narrowed by incorporating a narrowing definition from an extraneous meet-and-confer email.  *Buergofol GmbH v. Omega Liner Co.*, No. 4:22-cv-04112-KES, 2023 BL 243100 (D.S.D. July 13, 2023) (holding that a limitation from a meet-and-confer email was "implicitly incorporated" into a document

production request).

### D. A "Facially Overbroad" Discovery Request Requires No Further Response From An Objecting Party Other Than An Objection.

"The party resisting facially overbroad or unduly burdensome discovery need not provide specific, detailed support.  A court requires no further response . . .." *Fleck v. Neurosurgical & Spinal Surgery Assocs.*, No. 10-cv-5072, 2012 BL 115842 (D.S.D. May 9, 2012).  A request may be overly broad "on its face" if it is couched in such broad language as to make arduous the task of deciding which of numerous documents may conceivably fall within its scope. *Cardenas v. Dorel Juvenile Group, Inc.*, 232 F.R.D. 377 (D. Kan. 2005).  Cases are legion which hold that "a party resisting facially overbroad or unduly burdensome discovery need not provide specific, detailed support." *Cotracom Commodity Trading Co. v. Seaboard Corp.*, 189 F.R.D. 655, 665 (D. Kan. 1999).  "It is well settled that a party resisting *facially* overbroad or unduly burdensome discovery need not provide specific, detailed, or evidentiary support." *Lipari v. United States Bancorp N.A.*, No. 07-cv-2146-CM, 2008 WL 4642618, 2008 BL 235057 (D. Kan. Oct. 15, 2008).  In the case of a "facially overbroad" request, the resisting party need only object. *Holick v. Burkhart*, No. 16-cv-1188-JTM, 2017 WL 3723277, 2017 BL 302981 (D. Kan. Aug. 29, 2017) ("Because the request is facially overbroad, the burden does not shift to the party seeking to resist the discovery").

### E. The Responding Party Need Not Produce Documents Outside Its Possession, Custody Or Control.

A responding party need not produce documents pursuant to Rule 34 that are outside its possession, custody or control. Rule 34(a)(1).  Regarding the issue of control, the party seeking production of documents bears the burden of proving that the opposing party has such control. *United States v. Int'l Union of Petroleum & Indus. Workers*, 870

F.2d 1450, 1452 (9th Cir. 1989); *McAllister-Lewis v. Goodyear Dunlop Tires N. Am., Ltd.*, No. 4:14-cv-04103-LLP, 2015 WL 5794697, 2015 BL 322384, at *5 (D.S.D. Oct. 1, 2015); *Kickapoo Tribe of Indians of Kickapoo Reservation in Kansas v. Nemaha Brown Watershed Joint Dist. No. 7*, 294 F.R.D. 610, 613-14 (D.Kan. 2013).

Whether a party has control over documents is based on whether the party has a "legal right to obtain" responsive documents on demand. *Clark v. Unum Grp.*, No. 4:20-cv-04013-KES, 2021 WL 4134520, 2021 BL 343570, at *13 (D.S.D. Sept. 10, 2021); *Al Noaimi v. Zaid*, 283 F.R.D. 639, 641 (D. Kan. 2012)  In addition to the "legal right to obtain" standard, some courts have applied a "practical ability to obtain" standard.  *See, e.g., Robinson v. Moskus*, 491 F. Supp. 3d 359, 364 (C.D. Ill. 2020) (Seventh Circuit rejected "practical ability" standard).  The Eighth Circuit has never decided whether the "legal right" or "practical ability" standard should govern, but the "practical ability to obtain" standard has moved closer to the "legal right" standard as some courts have recharacterized the "practical ability to obtain" standard as the "practical ability to **demand**" or "capable of obtaining upon **demand**." *See In re Pork Antitrust Litig.*, No. 18-cv-1776-JRT, 2022 WL 972401, 2022 BL 113346, at *18-19 (D. Minn. Mar. 31, 2022) (result under "legal right" and "practical ability" standard is the same if responding party has no ability to demand or force third party to turn over documents).

## III.   ARGUMENT

### A.   RFP 70 and RFP 88 - Omega's Facially Overbroad Requests Demand Production Of Documents Outside Buergofol's Possession, Custody Or Control.

RFP 70 is facially overbroad and reads as follows.

All documents relating to any of the Patents-in-Suit or any Related Patent, including all documents that reference or discuss any of the Patents-in-Suit or any Related Patent.

By using the omnibus phrasing "All documents relating to," the request calls for the production of all documents "relating to" the following: U.S. Patent No. 9,657,882, U.S. Patent No. 8,794,269, all foreign counterpart patents and patent applications of the '882 Patent and the '269 Patent, including EP25824520, EP11730556, DE102010023764, DE2021006048, DE102013102394, DE102013109052, DE102014103237, DE102014103243, DE202014011441, EP2777925 and further including (according to Omega's counsel) all documents "***relating*** to" "administrative proceedings ***related*** to any ***related*** patent."  This grossly overbroad request, by its literal terms, calls for Buergofol to produce "all documents" on the docket of the present *Buergofol v. Omega*, 4:22-cv-4112-KES case, which of course relates to the '882 Patent and the '269 Patent.  The grossly overbroad request, by its literal terms, calls for Buergofol to produce (according to Omega's counsel) Buergofol's pre-suit investigation conducted in anticipation of asserting the '882 Patent and the '269 Patent against Omega in this lawsuit.  In a patent case, the pre-suit investigation conducted in anticipation of litigation is not discoverable, and is protected by the work product doctrine.  RFP 70 therefore impermissibly calls for the production of vast amounts of undiscoverable work product with the associated huge burden of placing those documents on a privilege log.

Because an overly broad request for production of documents can, in this District of South Dakota court, be "implicitly" narrowed in the meet-and-confer process, such as by reference to an extraneous email, Buergofol's counsel has very carefully made sure by email correspondence with Omega's counsel that Omega counsel has not narrowed RFP 70 in any way, explicitly or implicitly.

Buergofol objected to the "facially overbroad" RFP 70, pointing out for example that RFP 70 "calls for the production of all documents in the present case, because the

present case relates to the patents-in-suit":

> Buergofol objects to this request as being facially overbroad. It broadly calls for the production of all documents in the present case, because the present case of course relates to the patents-in-suit. It also broadly calls for production of "all documents" "relating to" other patents that are not in suit. Buergofol also objects to this request to the extent it calls for the production of privileged and work product information. Buergofol will not endeavor to produce documents in response to this facially overbroad request.

### i.   Facially Overbroad - Buergofol Stands On Its Objection.

Under the law, when a facially overbroad request such as RFP 70 is served, the responding party need only object—no further response is required. "A party resisting facially overbroad or unduly burdensome discovery need not provide specific, detailed support." *Cotracom*, 189 F.R.D. at 665. "Such a request violates the basic principle of Federal Rule of Civil Procedure 34(b)(1)(A) that document requests 'must describe with reasonably particularity each item or category of items' to be produced." *Naerebout v. IBP, Inc.*, No. 91-cv-2254-L, 1992 WL 754399, at *10 (D. Kan. Aug. 19, 1992). "A court requires no further response when inadequate guidance exists to determine the proper scope of a request for discovery." *Cotracom*, 189 F.R.D. at 666. "Because the request is facially overbroad, the burden does not shift to the party seeking to resist the discovery." *Holick v. Burkhart*, No. 16-cv-1188-JTM, 2017 WL 3723277, 2017 BL 302981, at *7 (D. Kan. Aug. 29, 2017)

In the case of RFP 70, Buergofol as the party victimized by the facially overbroad request, is not required to go on a fool's errand, guessing as to which documents of an impermissibly and outrageously large number of responsive documents are the appropriate ones to produce. Neither Buergofol nor the Court is obligated to re-write a request that is overly broad on its face. *Craigville Tel. Co. v. T-Mobile USA, Inc.*, No. 19-cv- 7190, 2022 WL 1499908, 2022 BL 165173 (N.D. Ill. May 12, 2022) (". . . it is not the

Court's role to tailor or re-write the discovery request."); *Diamond Servs. Mgmt. Co. v. C&C Jewelry Mfg., Inc.*, No. 19-cv-7675, 2021 WL 4258800, 2021 BL 359130 (N.D. Ill. May 11, 2021) ("The Court agrees that the request for '[a]ll communications' related to a 2019 piece of litigation between West and plaintiffs is overbroad, and the Court is not in a position to re-write or reform the request to ensure relevance and proportionality.") Buergofol stands on its "facially overbroad" objection and will not attempt to produce "all documents" within the literal scope of the facially overbroad discovery request.

### ii. Buergofol Is Not Obligated To Produce Documents Outside Its Possession, Custody And Control.

Buergofol does not have possession of all documents in all "file histories" of all the so-called "Related Patents," and also does not have custody or control of such documents. As counsel for Omega was repeatedly told in the meet-and-confer, Buergofol has produced all documents of all file histories (for the Patents-in-Suit and the Related Patents) that are in Buergofol's possession, custody or control, except for any documents protected by privilege, work product, or trade secret protection. Nonetheless, Omega is asking the Court to issue an order to compel Buergofol to try to obtain various documents and file histories that Omega wants. In its memorandum, Omega states that "according to German counsel" there are documents maintained by the German Patent Office relating to a German cancellation proceeding "that only Buergofol, as a party to the proceedings, has a right to obtain" (Dkt. 178, 11:24-12:11). Omega's counsel, in the July 6 meet-and-confer, impugned the integrity of Buergofol's counsel Darien Wallace insinuating that Omega could not obtain certain documents (see page 12 of Omega's memorandum listing docs D4, D13, N4, N5, D33, D34, D35, D36) because Darien Wallace was withholding them, and that Darien Wallace's statement was untrue that Buergofol had produced all of the file

history, cancellation proceeding, and opposition proceeding papers in its possession, custody or control.  And in its memorandum, Omega implies that these documents can only be obtained by Buergofol "as a party to the proceedings," and that the Court should therefore compel Buergofol "to obtain them from its foreign counsel or the respective foreign patent offices." (Dkt. 178, 12:12-16).

Buergofol's response is three-fold.  First, public documents that are available from a foreign patent office are not under the "control" of Buergofol, within the meaning of "possession, custody or control" of Rule 34(a)(1).  Omega can obtain the public documents just as well as Buergofol can.  Accordingly, Buergofol has no obligation to make a special effort or special order in order to do Omega's counsel's work and obtain documents for Omega.  In Omega's brief, Omega lists several exhibits from foreign patent proceedings that Omega was purportedly not able to acquire, even with the efforts of "Omega's German counsel." (Dkt. 178, 11:24-12:11)  These are the documents listed above and demanded by Omega at the July 6 meet-and-confer: D4, D13, N4, N5, D33, D34, D35, D36.  It is demonstrably untrue that Omega could not have obtained these documents on its own, with or without the assistance of "Omega's German counsel," because Buergofol's U.S. attorney, Darien Wallace, anonymously and as an ordinary member of the public simply downloaded the documents from the European Patent Office website without notifying anyone that he was associated with Buergofol.  Omega's statement that "only Buergofol, as a party to the proceedings, has a right to obtain" these exhibits is false. (*See* Dkt. 178, 12:1-2)

Second, at the time Omega wrote its memorandum (Dkt. 178) asking this Court to compel Buergofol to produce the listed exhibits, Omega's counsel was at that very time in possession of most of the documents because Buergofol had already produced them, complete with Buergofol production numbers.  The production numbers are as follows:

BUERGOFOL'S OPPOSITION TO OMEGA'S     12
MOTION TO COMPEL (Dkt. 175)                                      4:22-cv-04112-KES

**D4** (BF6658-6661; BF7086-7091; BF13246-13251); **D13** (BF6634-6639; BF7092-7097; BF13366-13371); **D33** (BF6506-6508; BF7098-7100; BF13435-13437); **D34** (BF6505; BF7101; BF13438); **D35** (BF6515; BF7102; BF13439); **D36** (BF6510; BF7103; BF13440). There are three sets of production numbers because Buergofol actually produced these same documents to Omega three times, the first time way back on May 14, 2023.  Thus, Omega's statement that "no documents have been produced by Buergofol relating to Buergofol's cancellation proceeding" is false. (*See* Dkt. 178, 11:21-22)  As to documents N4 and N5, Buergofol did not initially produce these documents to Omega with the others because Buergofol did not have copies of these documents, so documents N4 and N5 were not in  Buergofol's "control."  As a favor to Mr. Neustel, counsel for Buergofol after the July 6 meet-and-confer obtained the documents N4 and N5 and sent copies of them to Mr. Neustel with an email dated 7/29/23 8:12 PM bearing the production numbers BF7104-7108 for N4 and BF7109-7111 for N5.  (The issue of the exhibits from the German cancellation proceeding should be moot considering that on August 10, 2023, Buergofol again produced the exhibits demanded in Omega's memorandum (D4, D13, N4, N5, D33, D34, D35, D36) along with all of the exhibits D1-D62 and N1-N5.)

Third, although there may be documents in other foreign patent offices (other than EP and DE) for foreign patent applications and/or patents corresponding to the '269 Patent, Buergofol does not have possession of these documents.  Buergofol has no ownership interest in any of these foreign patent applications, and Buergofol has no desire or need to obtain these documents.  Buergofol doesn't even know the extent of these foreign patent applications.  The publicly-accessible EPO website lists counterparts of the '269 Patent in Australia, China, Japan, South Africa and other countries.  To the extent these documents exist, they are just as accessible to Omega's counsel as they are to Buergofol's counsel.  As

such, they are not in the possession, custody or control of Buergofol, and Buergofol's

counsel has no obligation to do the work of Omega's lawyers to obtain publicly available

documents that Omega's lawyers should obtain for themselves.

Omega in its memorandum attempts to represent that Loparex is under the "control"

of Buergofol by virtue of a sentence in an assignment document that requires Loparex "to

execute all instruments and documents required . . . for litigation regarding the Letters

Patents . . .." (Dkt. 178, 13:7-9)  Omega argues that this sentence puts Loparex under the

control of Buergofol such that Buergofol "has the right to request the documents from

Loparex," and therefore Buergofol should be "compelled to request the file histories from

Loparex." (Dkt. 178, 13:18-20).  This argument by Omega is erroneous.  The sentence in

the assignment requires Loparex "to execute" documents—nothing more.  It does not

require Loparex to search for and produce documents.  The assignment language is

standard patent assignment language that applies to the transfer of title to a patent and

provides that if some entity, such as a defendant/infringer, were to contest the transfer of

title to Buergofol, Loparex would then be obligated to execute a document (such as a

declaration or supplemental assignment document) to defeat any argument that Buergofol

somehow did not obtain title to the patent from Loparex.  This provision gives Buergofol

no right to obtain any documents from Loparex.  Loparex is a company entirely separate

from Buergofol, and there is no contractual or other relationship between the companies

that would give Buergofol the "legal right" to demand that Loparex give Buergofol any

paperwork, file history, or any other information.

## B.  RFP 103 - Omega's Demand To Produce "The Second BASF Analysis Of The Sudpack Film."

RFP 103 is as follows:

All documents constituting or relating to any communications regarding EBS wax within an outer layer of film.

Buergofol made several objections to RFP 103, including most notably that fully complying with RFP 103 would involve disclosing Buergofol's trade secrets about how Buergofol currently manufacturers its films, and that Omega as an infringer and defendant in a patent infringement action has no legitimate litigation need to discover "all documents" regarding EBS wax within an outer layer of all types of Buergofol films.  The request is overbroad with respect to time because it requests not just information relevant to the time in 2012 when the invention of the '882 Patent was made, but rather the request calls for production of Buergofol's manufacturing information over the past 11 years including about how Buergofol currently manufacturers its films, which is not relevant to any of Omega's claims or defenses.  Although how Omega currently manufactures its liners is relevant to issues in the case because the current manufacturing constitutes infringement, Buergofol's film manufacturing is not relevant to any litigation issue.

Moreover, RFP 103 is overly broad in that it calls for the production of trade secrets in a business to which this litigation does not pertain, Buergofol's food packaging business.  Only about 1% of Buergofol's business pertains to film for UV CIPP liners.  The trade secret information sought by RFP 103 is not limited to UV CIPP films, but rather extends to food packaging films which constitute about 99% of Buergofol's business.  In addition, if Buergofol were ordered to search through all of its information and documents for "All documents . . .  relating to any communication regarding EBS wax within an outer layer of film," that search would be unduly burdensome, and would not be proportionate to the needs of the case.  The objections are only summarized in the limited space available here.  For a complete exposition of the objections, see Dkt.

176-19, pp. 6-8.  For the reasons of trade secret and undue burden, Buergofol did not produce documents in response to RFP 103, and moved the Court for a protective order relieving Buergofol of any obligation to respond to the request.

Notwithstanding the above objections due to the request's overbreadth, Buergofol has agreed to produce all non-privileged, non-work product, and non-trade secret communications pertaining to an email exchange and episode whereby Buergofol personnel, including Dr. Kurt Stark, were discussing and considering film made by Sudpack.  Buergofol has produced all known (non-privileged, non-work-product) emails and documents pertaining to what Omega contends is the "2012 Sudpack film" and the "BASF analysis" of Sudpack film.  (The "BASF analysis" BF2602-2605 is not even responsive to RFP 103 because it does not mention EBS wax, does not test for EBS wax, and has nothing to do with EBS wax.  Yet Omega fails to disclose this to the Court and seeks to compel production of the fictitious "second BASF analysis" based on RFP 103.) Those emails and documents were produced as BF2568-2585, BF2600-2611.  Because the Sudpack film is not Buergofol film, disclosures regarding Sudpack film and EBS wax purportedly in the Sudpack film does not implicate disclosure of any Buergofol trade secrets about Buergofol's films, so Buergofol has agreed to produce all responsive non-privileged, non-work product documents.

Omega's counsel Mr. Neustel, based on an apparent misreading of the documents already produced, has concluded that "Buergofol acquired and had tested a sample of inner film made by Sudpack in 2012," which Omega in its brief refers to as "the 2012 Sudpack film." (See Dkt. 178, 13:23-24)  Omega's counsel goes on to assert that Dr. Stark requested "a second analysis" of the 2012 Sudpack film.  The Court is to note that these are just statements of Mr. Neustel, and are not necessarily true.

In the July 6 meet-and-confer, Mr. Neustel attempted to do fact discovery by interrogating Buergofol's attorney Darien Wallace about Darien Wallace's knowledge of the facts, asking if Buergofol would produce something called "***the*** second BASF analysis of the 2012 Sudpack film."  Buergofol's counsel, having no need to answer an interrogatory, respectfully declined to answer.  In response to RFP 103, Buergofol's counsel stated that Buergofol had produced all non-privileged, non-work-product documents regarding EBS wax in an outer layer of film (other than Buergofol's film after the priority dates of the patents-in-suit), and that would also include EBS wax in the outer layer of Sudpack film.

Now in this motion to compel, Omega moves the Court to order Buergofol to produce "***the*** second BASF analysis of the 2012 Sudpack film requested by Dr. Kurt Stark." (Dkt. 178, 15:7-8) (emphasis added)  Not only does Omega request an order compelling Buergofol to produce this imaginary analysis, but Omega also moves the Court to order Buergofol to ask BASF, a third party, to produce the imaginary "second BASF analysis."  Omega reasons, "To the extent Buergofol claims the second analysis of the 2012 Sudpack film is in the possession of BASF, it must obtain it from BASF since it provided the sample(s) and requested the analysis." (Dkt. 178, 14:23-15:1).  But Buergofol has never stated that BASF is in the possession of any such analysis.

Issuing the order that Omega has requested would be pointless.  Ordering the production of an analysis document that is not in the possession, custody or control of Buergofol will not cause the analysis document to be produced.  Contrary to the false statements of Mr. Neustel, Buergofol has no knowledge that there ever was a "second BASF analysis."  Mr. Neustel's conjecture that there existed "the second BASF analysis" is nothing but Mr. Neustel's conjecture based on a misreading of documents.

### C.  ROG 8 and RFP 85 - Omega's Demand To Produce "The Offer To License" The '269 Patent.

ROG 8 is as follows:

Describe all facts and circumstances relating to any ownership or licensing interests in any Patent-in-Suit or offer to license any Patent-in-Suit, including, but not limited to, the identification of all individuals or organizations who have ever owned, licensed, or been offered a license to any Patent-in-Suit, the identification of any license, settlement, or other agreements, including any draft agreements, relating to the ownership or licensing of any Patent-in-Suit, the dates of any ownership, licensing, or offers, and the amounts of any royalties or other payments exchanged, and identify each person with knowledge of the foregoing and all documents relating to the foregoing.

RFP 85 is as follows:

All documents relating to any licensing of, or effort, offer, request, or refusal to license, any right, title, or interest in any of the Patents-in-Suit or any Related Patent, including any license or settlement agreement.

With regard to ROG 8 and RFP 85, Omega's motion concentrates on a so-called "offer to license the '269 Patent." (Dkt. 178, 15:9-16:9)  Omega argues that Buergofol should be compelled to provide a complete answer to Omega's ROG 8 regarding "the offer to license" the '269 Patent and to produce all documents relating to "the offer to license" the '269 Patent.  This is another example of Omega's counsel's now-familiar practice of asserting that a particular document exists and then accusing Buergofol's counsel of improperly withholding that document.  Omega's counsel, for some reason, cannot fathom that there may never have existed any "offer to license the '269 Patent" and that no "offer to license the '269 Patent" was ever made.  Buergofol, without waiving any work product protection, represents to the Court that "the offer to license the '269 Patent" to which Omega refers never existed.  With regard to Omega's RFP 85 concerning licensing efforts and offers, Buergofol stated in the meet-and-confer of July 6 and continues to state here that Buergofol has produced all non-privileged and non-work product documents in its possession, custody or control that are responsive to the request.  Moreover, Buergofol has

already answered Omega's ROG 8 completely.  Buergofol stated:

> Buergofol acquired the ownership of the '269 Patent from Loparex Germany GmbH & Co., KG through an assignment document executed on August 10, 2022, which is recorded with the U.S. Patent and Trademark Office at reel/frame 060769/0531. The ownership rights in the '269 Patent were acquired in anticipation of this legal action, which was initiated five days following the execution of the assignment document. As part of the negotiations to acquire the '269 Patent, Buergofol and Loparex negotiated the terms of a license that Buergofol would grant back to Loparex. However, no license agreement was ever entered into by Buergofol and Loparex, and Loparex has no license to the '269 Patent.

(Dkt. 176-23, 9:10-18).  Buergofol's interrogatory answer does not state that Buergofol "offered to license" the '269 Patent, nor that Buergofol made any "licensing efforts."  Yet Omega's counsel refers repeatedly in Omega's memorandum to "*the* offer to license" the '269 Patent. (Dkt. 178, pp. 15-16)  Again, Omega's counsel simply asserts that a particular event occurred and that particular documents exist, and then accuses Buergofol's counsel of improperly withholding information and documents.

The Court cannot acquiesce to Omega's request to compel the production of particular information or documents that have not been shown to exist, such as "*the* offer to license" to which Omega's counsel refers. *Muhammad v. Jenkins*, No. 19-cv-7970-JAK, 2021 BL 486329, at *4 (C.D. Cal. Sept. 8, 2021) ("A mere suspicion that additional documents must exist is an insufficient basis to grant a motion to compel."); *Bethea v. Comcast*, 218 F.R.D. 328, 329 (D. D.C. 2003) (requesting party's suspicion that responding party failed to produce responsive documents does not justify compelled inspection).

Importantly, Buergofol has formally objected to both ROG 8 and RFP 85 based on the work product doctrine.  Omega repeatedly acknowledges that Buergofol purchased the '269 Patent from Loparex just five days before filing this lawsuit, so obviously the arrangements to acquire the '269 Patent were made in anticipation of litigation. (*See* Dkt. 178, 13:5-6)  Buergofol properly and timely answered ROG 8, in pertinent part, by

objecting to producing information on "all draft arrangements that were part of the pre-litigation preparation in anticipation of this legal action and to the extent that the draft arrangements were never finalized in a binding agreement.  Such draft arrangements were part of the pre-litigation preparation and negotiations undertaken in anticipation of this legal action." (Dkt. 176-23, 7:25-8:3)  Buergofol stands on its work product doctrine objection to producing information, draft arrangements and documents relating to acquiring a patent to assert in litigation against an infringer.  Any such documents and communications that were created in anticipation of litigation are withheld, and are not produced, and are properly listed on Buergofol's privilege log.  The patent acquisition plans and negotiation strategy of Buergofol's attorneys in acquiring a patent to assert against an infringer is clearly protected by the work-product doctrine, especially as to aspects of the transaction that were merely contemplated by Buergofol counsel, were never agreed upon, and did not materialize.  Information and documents related to purchasing a patent for litigation purposes are work-product protected. *See FastVDO LLC v. AT&T Mobility LLC*, No. 16-cv-385-H, 2016 BL 351930 (S.D. Cal. Oct. 20, 2016) (documents related to purchase of patent for litigation purposes were work-product protected); *Vlsi Tech. LLC v. Intel Corp.*, No. 18-mc-80193-NC, 2019 BL 592407 (N.D. Cal. Jan. 18, 2019) (emails and documents related to patent purchase agreement prepared in anticipation of litigation were work-product protected); *Wi-Lan, Inc. v. Acer, Inc.*, No. 2:07-cv-473-TJW, 2010 WL 4118625, 2010 BL 246190, at *4 (E.D. Tex. Oct. 18, 2010) (report prepared during due diligence to purchase patents for potential litigation was protected work product); *Rembrandt Patent Innovations, LLC v. Apple Inc.*, No. 14-cv-05094-WHA, 2016 WL 427363, 2016 BL 31804, at *10 (N.D. Cal. Feb. 04, 2016) (documents prepared in acquiring patent for litigation were protected by work-product immunity).

### D.  Omega's Demand That Buergofol Reproduce Emails In "Native Format."

Omega is not entitled to its requested "order compelling Buergofol to produce all emails, complete email strings, and all attachments to all emails in native format." (Dkt. 178, 19:10-12).  In this case, there was no Rule 26(f) agreement between the parties to produce documents in native format.  Moreover, both parties have already produced the entire document production in this case in PDF format.  Over the course of this litigation, Buergofol and its attorneys have spent a tremendous amount of time producing emails in response to Omega's requests for production of documents, and it would be onerous, cumulative, duplicative, and not proportional to the needs of the case to require Buergofol to redo any of its production.  Contrary to Omega's representations, Buergofol is under no legal obligation whatsoever under the Federal Rules of Civil Procedure to produce anything in so-called "native format."  Omega's memorandum cites no authority that would compel Buergofol to produce emails in so-called "native format."

To the contrary, Omega appears to mischaracterize Rule 34(b)(2)(E) regarding "native format" by representing to the Court that "Buergofol refused in violation of Fed. R. Civ. P. 34(b)(2)(E), which requires ESI to be produced as kept in the ordinary course of business and in the form it is ordinarily maintained." (Dkt. 178, 18:9-10)  What Rule 34(b)(2)(E) actually states is that if a request "does not specify a form for producing electronically stored information, a party must produce it in a form or forms in which it is ordinarily maintained *or in a reasonably usable form or forms*." Rule 34(b)(2)(E) (emphasis added).  It is well known that electronic email files are seldom produced in litigation in their native form and that they are almost always produced in a printed-out PDF form, with production numbers added to the lower right corner of each PDF page. That is the standard and accepted "reasonably usable form" in which documents are

produced.  Omega has also produced all of its documents in PDF form, and none in "native

format."  Note that Rule 34(b)(2)(E)(iii) in fact states, "A party need not produce the same

electronically stored information in more than one form."  Buergofol has already produced

its documents in standard PDF form.  Legal authority in this district does not require parties

to re-produce their ESI in native format where there was no Rule 26(f) agreement to do so

and the party seeking to compel native-format production presents only mere speculation of

possible production wrongdoing by the responding party. *See Copperhead Agric. Prods.,*

*LLC v. KB AG Corp.*, No. 4:18-cv-04127-LLP, 2019 BL 477020, at *12 (D.S.D. Dec. 10,

2019) (court refused to compel defendants to re-produce their ESI in native format).

   In an attempt to justify an order that would compel Buergofol to re-produce

documents, Omega implies that Buergofol's document production is deficient, that

Buergofol is improperly withholding documents, and that due to this impropriety the Court

should order Buergofol to produce "native format" files so that Omega can examine the

native files and uncover Buergofol's deception.  Omega accuses Buergofol of producing

"emails and email strings that appear incomplete and/or converted to Word format and

edited, or without attachments." (Dkt. 178, 16:12-13).  However, Omega has no basis for

its accusations, which are mere speculation.  Omega's attempts to cast dispersions on the

completeness and professionalism of Buergofol's document production are baseless and

not to be believed.  Buergofol explains in brief fashion below how each of Omega's eight

(8) criticisms purportedly justifying "native format" production is without merit.

   1)  Omega implies that Buergofol is withholding an .eml file attachment to the

email of BF2601.  This is not true.  The file that is the .eml attachment, when rendered by

MS Outlook, shows no message content.  The file is probably corrupted, and consistent

with being corrupted is only 10.5KB.  The file, in PDF format, has been produced as

BF7113.  Buergofol's attorney Darien Wallace did not produce the corrupted, empty .eml file earlier along with Buergofol's original production because the file basically does not exist and contains no content, as is evident by looking at BF7113. (Declaration of Wallace, ¶3, Exh A)  The .eml file is basically an empty file.

2)  Omega mentions a "missing email" that is alleged to be prior to an email from Dr. Schleicher ("Re"), and Omega further implies that something is being improperly withheld from Omega with the statement, "The initial email in the email thread was not produced, so the produced email thread was truncated." (Dkt. 178, 17:12-14).  However, the email that Omega asserts is "missing" is in fact not "missing," but rather is document #34 on Buergofol's first revised privilege log served on June 12, 2023, and document #13 on Buergofol's original privilege log served on March 31, 2023.  The email was not produced because it is attorney-client privileged.

3)  Omega references another so-called "Missing Third Email" or "second reply email" ("Re-3") that Omega implies is being improperly withheld.  Omega states, "In addition to the initial email not being produced, the second reply email ("Re-3") is missing . . .." (Dkt. 178, 17:18-20).  Consistent with this, Omega's attorney Mr. Neustel in the July 6 meet-and-confer asserted that he knew that the so-called "second reply email" existed at one time due to Mr. Neustel's understanding of the "Re" subject lines and how Buergofol's email programs must have operated.  Buergofol's response at the meet-and-confer, and here in this opposition, is that Mr. Neustel does not know what he is talking about, and that Buergofol is not in possession, custody or control of the alleged "second reply email."  Buergofol submits that Mr. Neustel in fact does not actually know how emails were generated by the systems used by the various Buergofol employees, nor does Mr. Neustel know that the so-called "third reply email" "Re-4" could not have been created

without there ever having been the so-called "second reply email" "Re-3."  Consequently,

Mr. Neustel does not know how each of the emails in the string were in fact generated.

Omega and Mr. Neustel simply have no knowledge that any such "second reply email"

ever existed, nor do Omega and Mr. Neustel have any information indicating that

Buergofol is now in possession, custody or control of any such email.  To the contrary,

Buergofol's attorney Darien Wallace, after diligent searching and investigation, represents

that to the best of his knowledge that Buergofol is not in possession, custody or control of

any such "second reply email." (Declaration of Wallace, ¶4)

      4)  Omega implies that Buergofol's attorney Darien Wallace nefariously edited

emails by copying and pasting emails into a word processing program, deleting portions of

the emails, and then converting the edited emails into PDF format for production.  Omega

states that this is "particularly concerning," implying unethical conduct by Darien Wallace.

(Dkt. 178, 18:4-5)  Thus, the unprofessional, baseless accusations against Darien Wallace

by Mr. Neustel continue.  Omega then accuses Buergofol of violating Rule 34(b)(2)(E) by

arguing that the Rule requires emails to be produced in "native format." (Dkt. 178, 18:9-10)

To the contrary, Buergofol has done nothing whatsoever improper and has produced emails

in PDF form, as is standard practice in litigation in the United States.  Buergofol's attorney

has not "edited" any email in any improper fashion whatsoever.  The attempted smear by

Mr. Neustel of Darien Wallace is offensive and unprofessional.  Moreover, Omega has

misrepresented the law to the Court.  Omega's document requests at issue did not request

production of any document in so-called "native format," there was no Rule 26(f)

agreement to produce documents in native format, and Buergofol is under no obligation to

produce documents in native format.  Rather, according to Rule 34(b)(2)(E)(ii), Buergofol

is free to produce documents in standard PDF form, which is "a reasonably usable form."

5)  Omega attempts to blame Buergofol for producing an email (BF2652-2653) in a form such that images embedded in the email appear as "low-resolution images" that Omega's attorneys cannot read to their satisfaction.  Omega then states that "Buergofol refused to produce the email files in their native format or a higher resolution" and that for this reason Buergofol should be compelled to produce the email in native format. (Dkt. 178, 18:17-18).  Buergofol's response is two-fold.  First, Buergofol properly produced the email of BF2652-2653 in its actual form and resolution because the actual email includes embedded, low-resolution screenshot images, and those screenshot images in the original emails were not of the highest resolution.  They were, after all, screenshots. The screenshots are of other emails.  Second, it would appear that Omega's lawyers are so lacking in attention to detail and diligence that they have not recognized that the actual emails pictured in the screenshots, about which Omega complains, were in fact produced in very high and readable quality only a couple of pages earlier at BF2650 in Buergofol's document production.  Absolutely nothing has been concealed by Buergofol.  Omega has no reason to demand native-format production of the email of BF2652-2653.

6)  Omega next misrepresents that there is an unproduced email attachment to the email BF2601. (Dkt. 178, 18:22-19:2)  However, this is the same issue treated in 1) above. As stated above, the file is a corrupted .eml file, which has been produced as BF7113. Buergofol is not in possession of any uncorrupted version of this file.  There is no basis for stating that Buergofol is in possession, custody or control of any such uncorrupted file.

7)  Omega represents that Buergofol failed to produce "the Excel file" that was referenced in an email dated August 26, 2020 from Dr. Gruetzner to Dr. Boutrid (BF2581).  This statement by Omega is false.  The Excel file, in rendered form, is a part of the body of the original email of BF2581.  In addition, Buergofol has reprinted the

Excel file again, and produced it to Omega again, as BF7112. It is evident by comparing the Excel table of BF7113 and the Excel table in the email of BF2581 that they are identical. (Declaration of Wallace, ¶5, Exh B)

8) Omega represents that so-called "UBE Data Sheets" were referenced as being attached to the email BF2600 and implies that Omega needs a "native format" version of the email BF2600 so that Omega can detect evidence of the concealed "UBE Data Sheets." This is yet another baseless accusation by Omega. Omega's attempt to discredit Buergofol's document production is belied by the fact that the UBE data sheets were produced as BF2606-BF2611. The data sheets appear only a few pages after the production of the body of the email BF2600 (and after the first attachment to the email).

In summary, Buergofol is under no legal obligation to produce documents in a second form that Buergofol has already produced in PDF form. Imposing such a requirement on Buergofol would not be proportional to the needs of this case. Omega's flimsy proposed grounds for compelling Buergofol to re-produce emails a second time in native format are erroneous and unsupported by legal authority. Rule 26(b)(2)(C) requires the Court to limit the scope of discovery of ESI if the discovery sought is unreasonably cumulative or duplicative. Where documents have already been produced in PDF, re-producing those documents in native format is unreasonably cumulative and duplicative. The burden or expense of such additional discovery serves only the purpose of metadata production and outweighs any potential benefits. *See Diesel Machinery, Inc. v. Manitowoc Crane Group*, No. 9-vc-4087-RAL, 2011 WL 677458, 2011 BL 39609, at *3 (D.S.D. Feb. 16, 2011). As explained above, Omega's justification for compelling Buergofol to undertake duplicative production generally results from the failure by Omega's counsel to read and understand the documents that have already been produced.

**E.  RFP 22 - Omega's Demand To Produce What Omega Calls "Buergofol's Document Retention Policies."**

With regard to RFP 22, Omega asserts that "Buergofol did not file any objections," but then reproduces Buergofol's objections, which were that Buergofol would produce responsive documents "to the extent any responsive document exists, to the extent that production of the documents do not reveal attorney-client privileged or work product information." (Dkt. 178, 19:19-20:8)  With regard to RFP 22, Buergofol has produced all responsive, non-privileged, non-work-product documents.  This was stated to Omega's counsel at the meet-and-confer on July 6, 2023.  Any litigation hold notices are listed on Buergofol's privilege log.

Omega has no basis for including RFP 22 in its motion to compel.  RFP 22 is not an interrogatory.  Buergofol has no obligation to explain to Omega why no more responsive documents have been produced.  This is another example of Omega's counsel's practice of asserting that particular documents exist and then accusing Buergofol's counsel of improperly withholding those particular documents.  In the now-familiar pattern, Omega's counsel Mr. Neustel is ignorant of facts surrounding this particular discovery issue.  Due to that ignorance, Mr. Neustel has made false statements of fact regarding the circumstances of the discovery issue and regarding the existence of particular documents.  For example, Omega's memorandum states, "Buergofol has stated that it does not retain documents for more than two years." (Dkt. 178, 20:10-11)  This statement by Omega's counsel is false.  Buergofol never stated that no document is retained for more than two years.  Yet Omega has the audacity to "put Buergofol on notice" that Buergofol's responses to RFPs 6, 7, 9, 10, 11 and 12 are false because they purportedly state that Buergofol retains no document for more than "two years." (Dkt. 178, 21:7-9)  None of RFPs 6, 7, 9, 10, 11 or 12 relates to documents in general.  This is just another example of

the accusatorial manner of Mr. Neustel, who uses accusations based on false statements in an attempt to turn requests for production of documents into deposition questioning.

The next accusation made with regard to RFP 22 is that Buergofol would be guilty of spoliation of evidence if Omega's discovery confirms that Buergofol has a 10-year document retention policy. (Dkt. 178, 21: 10-17)  This accusation is also based on a falsehood.  The fact that a document no longer exists is not evidence of spoliation. If Buergofol had discarded all of its documents in 2020 prior to anticipating litigation against Omega, then there would be no spoliation regardless of whether Buergofol did or did not have a 10-year general document retention policy.  Then Omega makes a second false statement to advance its spoliation hypothetical.  Buergofol's response to Omega's ROG 7 does not state, as Omega contends, that Buergofol contemplated litigation against Omega in 2019 (so as to push back the date for retaining documents to 2019).  Instead, Buergofol's response states that Dr. Stark informed Omega in 2019 that it was infringing the '580 Patent (at the time owned by Loparex); the interrogatory answer does not state that Buergofol contemplated litigation against Omega in 2019.

But most importantly, Omega's argument about spoliation does not establish that any particular document exists relating to Buergofol's current general document retention policy (if indeed Buergofol has any document retention "policy").  And without a showing that particular documents exist, the Court may not grant a motion to compel production of those documents.  The Court may not grant Omega's request to compel the production of a document that has not been shown to exist, such as a nonexistent document that describes a Buergofol document retention policy. *Bethea v. Comcast*, 218 F.R.D. 328, 329 (D. D.C. 2003) (requesting party's suspicion that responding party failed to produce responsive documents does not justify compelled inspection).

### F.  Omega's Demand That Buergofol Disclose The Manner Of Its Searches.

Omega, in Section H of its memorandum, makes a slew of misrepresentations and false statements.  These are too numerous to address individually in the 30 pages allowed for this opposition.  ***Buergofol will, at the hearing on this motion, gladly explain to the Court in as much detail as desired how and why each and every accusation Omega makes regarding Buergofol's document review and production (Dkt. 178, Section H) is baseless***.  Based on the false statements and misrepresentations, Omega then attempts to impugn the integrity of Buergofol's counsel in how he carried out Buergofol's document production.  Omega states, in pertinent part, that Omega "has good cause to believe that Buergofol's representations regarding its production of documents are inaccurate." (Dkt. 178, 24:22-24).  Using this shameless smear tactic, Omega attempts to induce the Court to order disfavored "discovery on discovery," namely to order Buergofol to disclose Omega's desired information about "the manner and methods employed by Buergofol to search for responsive information and documents."  Buergofol, in responding to Omega's RFPs and to Omega's interrogation at the July 6 meet-and-confer was under no obligation to explain to Omega's counsel how Buergofol's counsel may have gone about searching for documents.  Omega is attempting to engage in "discovery on discovery."  "Discovery into another party's discovery process is disfavored." *See Fish v. Air & Liquid Sys. Corp.*, 2017 U.S. Dist. LEXIS 24188, 2017 WL 697663, at *17 (D. Md. Feb. 21, 2017) (collecting cases); *see also Bombardier Recreational Prods., Inc. v. Arctic Cat, Inc.*, 2014 WL 10714011, 2014 BL 458702, at *17 (D. Minn. Dec. 5, 2014); *Whatley v. Canadian Pac. Ry.*, No. 1:16-cv-74, 2021 BL 179740, at *11 (D.N.D. May 14, 2021)  While most courts acknowledge that "discovery on discovery" can be appropriate under certain circumstances, those circumstances are limited to times when one party's discovery compliance has reasonably

been drawn into question, or there is an adequate factual showing for an inquiry.  Here, Section H of Omega's brief has drawn nothing into question or made the requisite showing about Buergofol's document production.  The majority if not all of the issues raised stem from Omega counsel's ignorance of facts, poor reading of documents, erroneous assumptions, and faulty logic.  Omega's counsel, over and over, erroneously concludes that documents exist that Buergofol's counsel believes, and is often quite certain, simply never existed.  There is nothing deficient about Buergofol's document production.

Under Rule 26(g), an attorney's signature on a response to a Rule 34 request for production of documents certifies that to the best of the attorney's knowledge formed after reasonable inquiry all responsive documents have been produced that are not withheld on the basis of privilege or work product.  "[T]he signature certifies that the lawyer has made a reasonable effort to assure that the client has provided all the information and documents available to him that are responsive to the discovery demand." Rule 26(g) Advisory Committee note, 1983 amendment.  Counsel for Buergofol, Darien Wallace, has duly signed Buergofol's responses to Omega's document production requests.

## IV.    OMEGA'S MOTION IS UNTIMELY

The subject matter for this motion arose at the latest at the meet-and-confer on July 6, 2023.  The scheduling order provides, "Motions to compel discovery should be filed within 14 days after the subject matter of the motion arises." (Dkt. 136, 8:1-2) Omega filed this motion on July 26, more than 14 days after the subject matter arose.  If the Court does not apply the 14-day deadline to Omega's motion, Buergofol requests that the deadline also be waived for Buergofol's future motions to compel.

## V.    CONCLUSION

Omega's grievance-filled motion to compel has no merit and should be DENIED.

Dated this 16th day of August, 2023

**DAVENPORT, EVANS, HURWITZ
& SMITH, L.L.P.**

By  /s/ Elizabeth S. Hertz
     Elizabeth S. Hertz
     P.O. Box 1030
     206 West 14th Street
     Sioux Falls, SD 57101-1030
     Phone (605) 357-1263
     Fax (605) 335-3639
     Email ehertz@dehs.com

     Attorneys for Plaintiff Buergofol

**IMPERIUM PATENT WORKS LLP**
Darien K. Wallace
T. Lester Wallace
P.O. Box 607
315 Ray Street
Pleasanton, CA 94566
Phone (925) 550-5067
Fax (925) 835-5804
Email darien@imperiumpw.com
     lester@imperiumpw.com

Attorneys for Plaintiff Buergofol
*Pro Hac Vice*