UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| BUERGOFOL GMBH, | Civil Action No.: 22-cv-04112-KES |
| Plaintiff, | |
| vs. | **BUERGOFOL'S REPLY IN SUPPORT OF BUERGOFOL'S MOTION TO COMPEL SUBSURFACE TO COMPLY WITH SUBPOENA AND FOR SANCTIONS** |
| OMEGA LINER COMPANY, INC., | |
| Defendant. | |

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................ 1

    A.  It Is Omega (Not Subsurface) That Is Obstructing Buergofol's Discovery
       Attempts To Obtain Liner Samples For Testing ........................................ 1

    B.  Omega's Attempt To Substitute Subsurface's Production Obligations
       Under The Subpoena With Inadequate Production From Omega ............... 3

II.   ARGUMENT ...................................................................................... 6

    A.  The Liner Samples Requested By RFP 18 Are Needed In Order To
       Prepare Buergofol's Infringement Contentions .......................................... 6

    B.  RFPs 1-10 Seek Relevant Documents Such As Documents Indicating The
       Location Of Subsurface's Installations Which Will Lead To Evidence Of
       What Film Was Used To Make The Installed Liner ................................... 9

    C.  There Is No Legal Rule That Precludes Buergofol From Discovering The
       Installation Documents From Subsurface Requested By RFPs 1-10 ........ 12

    D.  RFPs 1-8 Also Bear On The Issue Of Damages – Buergofol Has The
       Right To Recover Damages Caused By All Joint Tortfeasors ................... 14

    E.  Subsurface Must Be Compelled To Produce Documents Identifying
       Subsurface's Customers As Requested By RFPs 14 and 16 ..................... 18

    F.  Subsurface Must Be Compelled To Produce The "Liner Information
       Sheets" Requested By RFP 12 ................................................................. 19

    G.  RFP 17 Is Not Overbroad - Any Mention Of "Buergofol" In Subsurface
       Files Is Very Likely Related To Infringement Of Buergofol Patents And
       To Issues In This Litigation ..................................................................... 24

III.   CONCLUSION .............................................................................. 26

## TABLE OF AUTHORITIES

**Cases**                                                                    **Pages(s)**

*Birdsell v. Shaliol,*
    112 U.S. 485, 488-89 (1884) ................................................................. 17
*California Inst. Of Tech. v. Broadcom Ltd.,*
    25 F.4th 976 (Fed. Cir. 2022) ........................................................... 16
*Dowagiac Mfg. Co. v. Deere & Webber Co.,*
    284 F. 331 (8th Cir. 1922) ................................................................ 17
*Glenayre Electronics, Inc. v. Jackson,*
    443 F.3d 851 (Fed. Cir. 2006) ........................................................... 17
*Goss Inter. Americas, Inc. v. MAN Roland, Inc.,*
    2008 WL 3823705, 2008 BL 175656 (D.N.H. 2008) ........................................ 15
*Hanson v. Alpine Valley Ski Area, Inc.,*
    718 F.2d 1075 (Fed. Cir. 1983) ......................................................... 16
*Haworth, Inc. v. Herman Miller, Inc.,*
    998 F.2d 975 (Fed. Cir. 1993) ........................................................... 13
*Itex, Inc. v. Westex, Inc.,*
    No. 05-cv-6110, 08-cv-1224, 2011 WL 856583, 2011 BL 60853 (N.D. Ill.
    Mar. 9, 2011) ......................................................................... 17-18
*Joy Technologies, Inc. v. Flakt, Inc.,*
    772 F. Supp. 842 (D. Del. 1991) ........................................................ 13
*Monsanto Co. v. David,*
    516 F.3d 1009 (Fed. Cir. 2008) ......................................................... 16
*Shockley v. Arcan, Inc.,*
    248 F.3d 1349, 1364 (Fed. Cir. 2001) .................................................. 17
*Stickle v. Heublein, Inc.,*
    716 F. 2d 1550 (Fed. Cir. 1983) ........................................................ 16


**Statutes and Rules**

Fed. R. Civ. P. 26(b) .......................................................................... 13

Fed. R. Civ. P. 26(b)(5) ....................................................................... 25

35 U.S.C. § 271 ................................................................................ 23

35 U.S.C. § 287(a) ............................................................................. 1

Plaintiff Buergofol GmbH ("Buergofol") files this "Buergofol's Reply In Support Of Buergofol's Motion To Compel Subsurface To Comply With Subpoena And For Sanctions" in response to "Subsurface Inc.'s Response  In Opposition To Buergofol's Motion To Compel Subsurface To Comply With Subpoena And Sanctions" ("Opposition," Dkt. 185) filed by Subsurface, Inc. ("Subsurface").

I.   **INTRODUCTION**

   A.  **It Is Omega (Not Subsurface) That Is Obstructing Buergofol's Discovery Attempts To Obtain Liner Samples For Testing.**

The real entity seeking to prevent Buergofol's discovery by subpoena is not Subsurface, but rather is the infringing defendant Omega.  Omega has obstructed Buergofol's discovery attempts to obtain evidence that each of the couple thousand liners that Omega has sold since 2017 exhibits characteristics that fall within the scope of the claims of at least one of the patents-in-suit.  To date in this litigation, Omega has not produced even a single sample of a liner made by Omega.  Omega has made meritless objections to producing physical samples of all liners that Omega has made or sold.  For example, Omega continues to refuse to produce samples of liners until Buergofol meets the fictitious burden to "***prove compliance*** with the patent marking requirements of 35 U.S.C. § 287(a)" before Omega will produce samples of any liners made before the filing date of this case. (*See*, *e.g.*, Dkt. 155-4, 30:14-15)  So Buergofol must prevail on the marking issue at trial or by winning a motion for summary adjudication on this issue ***before*** Omega will produce the requested liner samples—obviously a meritless objection. The lodging of a legally frivolous objection, and then taking advantage of the Court's delay in deciding discovery motions, is a delay tactic that Omega employed to hold off production of samples of liners.

Omega has recently responded to Buergofol's requests for production of liner samples by stating that Omega "will produce" liner samples "based on the pipe liner diameter that Omega made after August 15, 2022, to the extent the Omega Liner is in Omega's possession, custody, or control . . . once notified of availability." (Dkt. 188-2, 6:12-15)  Despite the "will produce" statement, Omega has in fact produced not one liner sample.  But Buergofol anticipates that Omega will, after more delay, begrudgingly produce some liner samples, but the production will be less than a dozen physical liner samples (with different diameters) from among the couple thousand that Omega has sold. One of the excuses that Omega will invariably use is that Omega is no longer in possession of samples of the liner that Omega made in the past.  Anticipating this reason and failure to produce the needed liner samples, Buergofol has sought to obtain liner samples from Subsurface, to whom Omega has sold the majority of its liners.  RFP 18 of the subpoena (Dkt. 155-1, Subpoena Attachment A, ¶18) is a request for Subsurface to produce "a physical sample of each OMEGA LINER that was ever in the possession, custody or control of Subsurface."

Now Omega is doing everything it can to prevent Buergofol from obtaining the requested liner samples from Subsurface.  Note that the arguments in Subsurface's Opposition are not those of a subpoenaed non-party operating at arms length from Omega. Subsurface is not presenting any independent legal arguments by attorneys who were not, or are not, representing Omega in this case.  Subsurface's Opposition (Dkt. 185) was filed by Caren Stanley of the Vogel Law Firm, who originally represented Omega in this case. Ms. Stanley withdrew from representing Omega and entered an appearance (Dkt. 184) in this case to represent Subsurface just before filing the Opposition.  However, Subsurface's Opposition was prepared by Michelle Breit, as evident from her declaration in support of

the Opposition. (Dkt. 188)  Ms. Breit has not entered an appearance on behalf of Subsurface; she represents Omega.  It is improper for the Court to consider Omega's objections, which were not timely and proper objections made by Subsurface under the Federal Rules of Civil Procedure, in deciding this motion to compel Subsurface.

In addition, Omega's objections to Buergofol's receiving liner samples from Subsurface are based on ignoring important facts and misapplying the law.  The Court is urged to reject Omega's specious objections to compelling Subsurface to produce the requested discovery that Buergofol requires in order to prove infringement by those of the couple thousand liners that embody each of the claim elements of at least claim 1 of the '269 Patent and/or the '882 Patent.  Omega's obstruction of discovery has already significantly harmed Buergofol.  Buergofol should have received the samples ***by March 13, 2023***.  By the late date this motion is decided which at the very earliest will be ***mid-September***, Buergofol will have been delayed by more than six months in its efforts to test whether individual installed liners fall within the scope of the claims of either of the patents-in-suit.  It takes time to do testing.  Buergofol's infringement contentions are due by October 23, 2023 (which was already postponed from July 21, 2023), leaving insufficient time to test a representative sampling of the couple thousand unique installed liners, which were each custom made for a particular installation project.

### B.  Omega's Attempt To Substitute Subsurface's Production Obligations Under The Subpoena With Inadequate Production From Omega.

Subsurface's Opposition is long and meandering, and only starts addressing the actual requests for production at page 17.  Buergofol therefore summarizes the Opposition here in order to expose its ploy of misdirection, which is useful to keep in mind when reading through the many pages of the Opposition.  Buergofol served a subpoena (Dkt.

155-1) on Subsurface requesting the production of *documents*.  The nineteen RFPs of the subpoena are not requests for information, but rather are requests for documents and things (i.e., samples).  Had the discovery process been efficient, Subsurface would simply have produced the requested documents and things, and that would be it.  But Subsurface, at the direction of Omega's lawyers, decided to stonewall and to refuse to produce even a single document.  Buergofol received an objection letter from Subsurface dated March 13, 2023, claiming, among other things, that the documents Buergofol requested by subpoena are not relevant and, to the extent the information in the documents is relevant, Subsurface was not required to produce the information because there exists a legal rule that prohibits a subpoena-issuing party (here Buergofol) from subpoenaing the production of documents from a non-party customer (here Subsurface) unless the subpoena-issuing party first seeks production of the documents from the opposing-party manufacturer.  Due to these excuses, Subsurface did not produce even a single document.  Subsurface's stonewalling forced Buergofol to go through the meet-and-confer process, to suffer the associated delay, and to prepare and file the motion to compel (Dkt. 153) that is now before the Court.  Only *after* the motion to compel Subsurface was filed on July 3 did a different party, Omega, on July 20-27 begrudgingly produce the so-called "invoices" that are announced over and over again in Subsurface's Opposition.  But at the time of the filing of the motion to compel, no "invoices" had been produced.  Subsurface in its Opposition repeatedly refers to the "invoices" that it has "already produced," arguing that Buergofol is entitled to no documents whatsoever from Subsurface and that any installation "information" Buergofol might be entitled to has "already" been provided to Buergofol in the form of the "invoices."  According to the Opposition, the combination of 1) the invoices that are "already provided" by Omega, and 2) certain illusory samples of liners that Omega

promises to produce in the future, is the only "information" that Buergofol is entitled to receive.  Subsurface's Opposition mentions the belatedly produced "invoices" no less than six times, always suggesting that Subsurface can get away with producing no documents because the "invoices" that Omega belatedly produced are a substitute for the actual documents requested by RFPs 1-19.

However, the belatedly produced "invoices" and the promise to produce samples are inadequate, and are no substitute for producing the actual documents and things requested by subpoena.  The "invoices" do not provide all of the information of the documents specifically requested of Subsurface by subpoena, and that is why Omega attempts to substitute the "invoices" for the actual documents called for by RFP 1-19.  As to the "samples" requested by RFP 18, Omega's counsel's nebulous promise to do a partial production of representative samples, at some time in the future, with Omega's qualification "to the extent the Omega Liner is in the Omega's possession . . . " is inadequate.  Buergofol's subpoena has properly requested a sample of each liner *in the possession of Subsurface*, and Buergofol specifically put Subsurface on notice, in writing, multiple times, to retain samples responsive to RFP 18 as installations are performed and not to spoliate evidence.  Subsurface should have the samples.  The samples that should be in the possession of Subsurface (not Omega) are simply to be produced.  Omega's nebulous promise is an attempt to evade the full scope of RFP 18 by providing a worthless, unenforceable future promise by Omega's counsel to provide partial samples, rather than all samples as requested from Subsurface by subpoena.  In summary, Omega's "invoices" and Omega's promise to produce samples are inadequate and do not provide Buergofol all of the information Buergofol has properly sought from Subsurface through RFPs 1-19 of the subpoena.  The Court should recognize the attempted ploy to substitute Subsurface's

obligation to produce all requested documents and things with the production by Omega (not Subsurface) of only some of the requested information.

## II.    ARGUMENT

### A.  The Liner Samples Requested By RFP 18 Are Needed In Order To Prepare Buergofol's Infringement Contentions.

The main argument in the Opposition for justifying Subsurface's refusal to produce responsive documents is that Buergofol does not need this discovery to prove infringement. (*See* Dkt. 185, 20:13-18)  On page 20 of the Opposition, Subsurface (actually Omega's counsel) argues that Buergofol can identify each of the infringing liners using just the few cherry-picked inner and outer film samples that Omega produced in 2022. (Dkt. 185, 20:17-18)  But the non-party Subsurface has no business telling Buergofol what discovery Buergofol needs to prove Buergofol's infringement case. Moreover, the argument is incorrect for at least two reasons.

First, all of the elements of the recited liners cannot be proven with only film. Both the '269 Patent and the '882 Patent have claims reciting liners that include inner film, outer film, and carrier material saturated with resin between the inner and outer films.  Characteristics of the inner film, outer film and resin are also recited.  Buergofol's infringement contentions must show that individual Omega liners combined the recited inner film, outer film and carrier material with resin in the recited manner.  Just relying on individual inner and outer film samples does not prove that a specific inner film and a specific outer film were combined in any particular manner with a support material and resin to make a patented liner.  Omega has not stipulated that all types of inner film that Omega has ever received were made into liners that included the recited outer film and carrier material with resin.  A roll of inner film (even with the recited characteristics) that

was never made into a liner does not infringe.  For these reasons, Buergofol cannot prove infringement of the patented liners using film samples alone.  Buergofol needs samples of complete liners.

Second, from the few cherry-picked inner and outer film samples that Omega produced in 2022, it is not possible to identify which of the thousands of liners included film with the same characteristics as the cherry-picked samples.  Thus, the statement starting at line 13 of page 20 of the Opposition is false that Buergofol just has to test the few samples that Omega has already produced.  For example, claim 1 of the '269 Patent recites that the inner film comprises at least five layers, including an external layer comprised of an olefin having a VICAT softening point of at least 100C.  In addition, claim 1 of the '882 Patent recites that the inner film has a coating of migrating compound over an external side of the film facing the carrier material.  Buergofol's infringement contentions must show that individual Omega liners embody all of the elements of claim 1 of the '269 Patent and/or claim 1 of the '882 Patent.  Thus, Buergofol must show that each particular liner includes the recited outer film, support material with resin, and inner film with either or both: at least five layers with an external olefin layer exhibiting the recited VICAT temperature or a coating of migrating compound over an external side of the inner film facing the support material.  This cannot be accomplished by testing a few film samples because each liner is custom made for a particular installation project, and the inner film layers and composition have varied over the years, even for inner film of the same diameter.

The few cherry-picked samples that Omega produced in 2022 are insufficient to prove infringement.  For example, in 2022, Omega produced a 36" inner film sample but no 36" outer film sample.  The sample of 36" inner film cannot be tested to show an

infringing liner because there is no proof that the 36" inner film was ever made into a liner. Even if Omega were to stipulate that the 36" inner film was made into a liner with the recited outer film and carrier material with resin, there is no way of knowing which of the thousands of liners were made with 36" inner film identical to that of the 2022 sample. Moreover, all of the 36" liners made by Omega between 2018 and today did not include 36" inner film identical to that of the 2022 sample. Buergofol knows for a fact that Omega made 36" liner in 2018 that included 36" inner film having 5 layers, yet Omega's 2022 sample of 36" inner film has 3 layers. Omega has purchased film from Buergofol, Sudpack, Raven and Viaflex, and each of those films is likely to have variations in its structure and composition. For example, it is likely that at least some of the larger diameter inner film (42", 48", 54", 60") used by Omega to make liners included 5 or more layers, whereas none of the few, cherry-picked inner film samples produced by Omega in 2022 included more than 3 layers. The few inner film samples that Omega produced in 2022 didn't even include the sizes 42", 48" or 60". Therefore, the statement in the Opposition that the characteristics of Omega's liners can be determined from the few film samples that Omega has already produced is false.

Finally, and most importantly, all of the same sized inner film supplied by the same film manufacturer and used over the years by Omega to make liners did not include the same number of layers, the same amount of migrating compound in an external layer, or an external layer comprising an olefin exhibiting the same VICAT softening point. Whether a particular liner embodies all of the claim elements of the patents-in-suit can only be proven to a certainty by testing a sample of that particular liner. Considering that Omega has made a couple thousand unique liners between 2017 and today, Buergofol has the right to test at least a representative sampling of liners (e.g., a couple of samples per

size per year) that includes each possible diameter of liner made during each period (e.g., 2018, 2019, 2020, 2021, 2022, 2023 for 150-200 total liner samples) to obtain evidence for Buergofol's infringement contentions.  Considering that Omega probably has not retained a complete set of liner samples for each year, each missing liner sample that Subsurface produces pursuant to RFP 18 will provide needed evidence of whether the particular liner embodies the claim elements of at least one of the patents-in-suit.  The Opposition states that Subsurface has installed 400 liners in 2023 alone and has been retaining liner samples, so at least 2-3 liner samples for each liner size during 2022 and 2023 are probably available for producing.

Buergofol's infringement contentions are due October 23, 2023 (which was already postponed from July 21, 2023).  By the time this motion is decided and Subsurface is compelled to produce the 150-200 liner samples, Buergofol will probably no longer have sufficient time to test all of the liners and prepare infringement contentions.  As a sanction for Omega's obstruction of discovery by refusing to produce the requested liner samples and baselessly objecting to Subsurface producing the requested liner samples, Buergofol should be permitted to argue in summary adjudication that the remaining unproduced liner samples and samples that Buergofol did not have time to test exhibit infringing characteristics similar to those of the smaller sampling of liners that Buergofol will have been able to test before Buergofol's infringement contentions are due.  A monetary sanction for delaying Buergofol's discovery of liner samples will not rectify the delay to Buergofol's case preparation.

**B.  RFPs 1-10 Seek Relevant Documents Such As Documents Indicating The Location Of Subsurface's Installations Which Will Lead To Evidence Of What Film Was Used To Make The Installed Liner.**

In its motion to compel, Buergofol set forth "a threshold showing of relevance"

for RFPs 1-10. (Dkt. 154, 8:17-12:19)  Subsurface responds in the Opposition without

directly trying to rebut Buergofol's threshold showing of relevance, but rather Subsurface

merely states over and over in various ways that Buergofol either does not need the

requested documents, that Buergofol should first seek the information sought from

Omega before asking Subsurface for it, or that Buergofol can glean the information

sought from documents Omega has already provided or has promised to provide.  These

statements by Subsurface do not rebut Buergofol's showing of relevance, but merely

argue that Buergofol does not need the requested documents.  Subsurface, however,

concludes its discussion of RFPs 1-10 with the statement that "despite Buergofol's

repeated references to 'installation,' Buergofol has provided no explanation—not one—

as to how Subsurface's documents related to its installation bear on proof of Omega's

infringement." (Dkt. 185, 21:11-3).  But Buergofol's threshold showing of relevance in

its motion to compel was the explanation.  Buergofol also provided several examples.

But notwithstanding its prior threshold showing, Buergofol provides a further

"explanation" of clear and obvious relevance of documents requested by RFPs 1-10,

specifically with respect to the relevance of the documents for proving "Omega's

infringement" of the patents-in-suit.  RFP 2 requests Subsurface to produce, for each and

every installation of any OMEGA LINER that was installed by Subsurface after January

1, 2018, documents sufficient to identify the "location of the installation."  RFP 6

requests Subsurface to produce, for each and every installation of any OMEGA LINER

that was installed either in whole or in part by Subsurface after January 1, 2018,

documents sufficient to identify any ". . . culvert identifying MRM and highway number,

culvert location station information and highway number, or culvert identification

number RELATING TO the installation."

These requests are seeking documents that indicate the location of each installation.  Using such location information pertaining to an individual liner, Buergofol will be able to go to the physical location of the culvert, and will be able to find and inspect the installed liner.  It is noted that the liner manufacturer Omega, presumably because as a mere manufacturer it does not know where Subsurface installed the liner, has not provided Buergofol information in discovery on the structure and composition of the outer film of each individual liner.  Indeed, despite Omega being the liner manufacturer, Omega has vaguely represented in response to an interrogatory that Omega does not have sufficient records to state what the structure and composition of the outer film of each liner was.  But if Buergofol were to have location information on each individual liner installation, then Buergofol would be able to inspect each culvert and the outer film of the liner as it sits in the culvert.  The Court should know that the outer film of a liner remains intact and in place in the culvert after liner installation.  After liner installation, the inner film of a liner is removed, but the outer film remains in place as part of the installed liner.

Buergofol has, without the benefit of location information supplied by either Omega or Subsurface in discovery, already located an installed liner and successfully inspected it.  In this way, Buergofol confirmed the structure and composition of the outer film of the installed liner.  In addition to installation location information, other information sought by RFPs 1-10, such as the diameter of the liner and the date of the liner's installation are usable to make determinations about what the inner film of the liner either definitely was, or most likely was.  This determination involves using the installation information together with other information known to Buergofol.

Accordingly, the installation location information (from documents requested in RFPs 2

BUERGOFOL'S REPLY IN SUPPORT
OF MOTION TO COMPEL SUBSURFACE
AND FOR SANCTIONS

11

4:22-cv-04112-KES

and 6) for each individual liner is highly relevant to the issue of proving Omega's

infringement in making that particular individual liner.  In fact, if Omega and Subsurface

might claim not to have sufficient records to be able to admit what the outer film of each

individual liner was, Buergofol would nevertheless be able to answer this question itself

by using the installation location information to go to the physical location of each

installed liner and to inspect the actual outer film.  This is but one aspect of how the

documents requested by RFPs 1-10 are relevant to proving Omega's infringement.

### C.   There Is No Legal Rule That Precludes Buergofol From Discovering The Installation Documents From Subsurface Requested By RFPs 1-10.

As outlined above, the Opposition does not try to dispute the relevance of the

documents the production of which is called for in RFPs 1-10.  Rather than contesting

relevance, the Opposition argues that: 1) Buergofol is not permitted pursuant by

"established law" to obtain the requested documents from Subsurface (the customer)

because Buergofol must first seek to obtain the information from Omega (the

manufacturer), and/or 2) Buergofol should not be permitted to obtain the requested

documents from Subsurface because "Omega has already produced invoices showing all

its sales of pipe liners, including sales to Subsurface."  The Opposition faults the "Legal

Standards" section of Buergofol memorandum (Dkt. 154, 5:14-8:15) for not citing what it

calls "established law" and a "holding" that before using a subpoena to obtain

information from a nonparty customer, the subpoena-issuing party "must seek" the

information from its litigation opposing party.

Buergofol's response is two-fold.  First, contrary to what is stated in the

Subsurface Opposition, there is no legal rule that requires an issuing party to seek "the

information" first from its litigation opposing party before using a subpoena to obtain

documents from a non-party.  There is no such rule.  The Opposition cites opinions

including *Joy Technologies* and *Haworth*.  But none of the cited opinions holds that there

exists any such rule.  The Haworth[1] case, for example, stands for the unremarkable

proposition that under Rule 26(b), a court "may" limit discovery if it determines the

discovery sought is available from some other source that is more convenient, less

burdensome, or less expensive.  No special rule is being announced.  That the district

court in the Haworth fact pattern used its discretion to limit discovery establishes no

special "rule" that a customer in a patent case cannot be subpoenaed for documents

before the information is sought from a manufacturer.  Likewise, the Joy[2] opinion from

the District of Delaware does not establish any special rule.  In Joy, the subpoenaing

party (Joy) and the manufacturer (Flakt) were "fierce competitors" and the court stated

that it was not convinced that Joy could not get the information it sought from Flakt.  Had

third party discovery from Flakt's customers been permitted at that particular time in that

particular litigation, there apparently existed a danger of damaging a manufacturer-

customer relationship.  Importantly, in the Joy opinion there is announced no rule, nor is

there announced any holding, that Joy could not obtain information from the non-party

customers if the information was not forthcoming in discovery from the manufacturer

Flakt.  The Court stated that it was not convinced that Joy could not get the information

from Flakt.  The present Buergofol situation is entirely different in that Buergofol has

already sought the information from Omega in discovery, and Omega has already failed

to produce it, has limited what little information it has belatedly produced, and has

actually in certain respects represented (for example, in an interrogatory answer) that it

---

[1] *Haworth, Inc. v. Herman Miller, Inc.*, 998 F.2d 975 (Fed. Cir. 1993).
[2] *Joy Technologies, Inc. v. Flakt, Inc.*, 772 F. Supp. 842 (D. Del. 1991).

does not have information sufficient to provide detailed information regarding individual liners.  The invoice information that Omega belatedly produced is limited, and does not reveal all the information that the documents subpoenaed from Subsurface would reveal.  For example, installation project name, installation PCN number, location information, etc., is not provided by the limited invoice information that Omega has now belatedly produced.  So in the present case the time is ripe for Buergofol to obtain the requested documents from the installer.  Moreover, in the present Buergofol situation the issuing party (Buergofol) and the manufacturer (Omega) are not "fierce competitors" in the liner business.  They are not competitors at all.  Buergofol does not make liner.  Also important is that there is no danger of disturbing any manufacturer-customer relationship as was a concern in the *Joy* case.  In the present Buergofol situation, the manufacturer Omega and the so-called "customer" Subsurface are actually owned and controlled by the very same people, Gary Strom and Brandon Strom, and there is zero chance that the Omega-Subsurface relationship will be disrupted.  That a court in a different case, under a different fact pattern, decided to limit discovery has nothing to do with whether Subsurface should not be compelled to comply with the subpoena (Dkt. 155-1) at this particular time, in this particular case.

### D.  RFPs 1-8 Also Bear On The Issue Of Damages – Buergofol Has The Right To Recover Damages Caused By All Joint Tortfeasors.

Omega's counsel argues that Subsurface need not respond to discovery requests relating to sales of infringing liners because Omega's theory of Buergofol's recoverable reasonable-royalty damages excludes the economic value that a customer realizes by using a patented article. (Dkt. 185, p. 22)  However, Subsurface is not entitled to withhold documents that are responsive to Buergofol's subpoena based on an

interpretation of a damages theory that Omega might hope later to advance in the underlying litigation.  Omega's counsel has not established that Omega will prevail with its misapplication of the "economic value" theory to the circumstances of this case.  Nor is it clear exactly how Omega's counsel has extended the holding of the obscure *Goss v. MAN* decision in New Hampshire to preclude all discovery by a patentee/plaintiff into infringing sales of its patented product by customers of the infringer/defendant. Subsurface's sale of patented liners is infringing conduct, and the sales price received from the infringing sales is a factor in the "full compensation" that Buergofol is entitled to recover from any one of the joint tortfeasors.  The argument on pages 22-25 of the Opposition relating to "economic value" or "value to the end user" is misplaced and merely a pretext for Subsurface's failure to produce relevant, responsive documents.

The Opposition states that Buergofol makes the identical argument as the patentee in *Goss Inter. Americas, Inc. v. MAN Roland, Inc.*, 2008 WL 3823705, 2008 BL 175656 (D.N.H. 2008). (Dkt. 185, 22:16)  That is incorrect.  Buergofol is seeking evidence to support a "full compensation" theory of reasonable-royalty damages, whereas the court in *Goss v. MAN* determined that the patentee Goss was not entitled to damages that also included the "economic value" created by an infringer using the patented article. Omega's counsel also relies on *Goss v. MAN* for the proposition that the infringing conduct of a non-party is never a factor in reasonable-royalty damages. (Dkt. 185, 25:13-25)  This too is incorrect.  The court in *Goss v. MAN* found only that damages to recover the economic value realized by an infringing customer who uses the patented article (such as the cost savings realized by using the invention) can be recovered only by joining the infringing customer and bringing a claim against that customer. *Goss v. MAN*, 2008 BL 175656, at *3.  But the court in *Goss v. MAN* did not rule that each joint

tortfeasor is **not** jointly and severally liable for the full amount of damages suffered by the patentee from conduct of all joint tortfeasors in making the infringing device, using the infringing device, selling the infringing device and reselling the infringing device.

Under an "economic value" theory of damages, the patentee attempts to recover the economic value realized by the infringer by using the patented article. Buergofol is not pursuing this damages theory. In *Goss v. MAN*, the patentee of a printing press sought to recover a portion of the profits (economic value) that a customer of the printing press achieved by printing a Sunday newspaper. The economic value of using the patented printing press in the newspaper business was irrelevant to determining a reasonable royalty for the printing press. The decisions relied upon by the court in *Goss v. MAN* and by Omega's counsel are also limited to the inapplicable "economic value" theory. *See, e.g.*, *Stickle v. Heublein, Inc.*, 716 F. 2d 1550 (Fed. Cir. 1983) (economic value of making taco shells using a patented taco-shell fryer is not recoverable); *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075 (Fed. Cir. 1983) (economic value of making snow in a ski area using a patented snowmaking apparatus is not recoverable); *Monsanto Co. v. David*, 516 F.3d 1009 (Fed. Cir. 2008) (economic value of crops grown using patented seeds is not recoverable as infringement damages); *California Inst. Of Tech. v. Broadcom Ltd.*, 25 F.4th 976 (Fed. Cir. 2022) (economic value that a patented chip added to a smartphone was not recoverable as infringement damages; hypothetical royalty negotiations must remain at chip-level instead of device-level). All of these cases are distinguishable from Buergofol's damages theory which relates solely to the value of the patented liner and not to any economic value created by using the liner or installing the liner. Buergofol seeks only the highest price at which the infringing liners are sold to the end customers and not the associated labor costs for installation.

Under the "full compensation" theory of reasonable-royalty damages, "parties that make and sell an infringing device are joint tort-feasors with parties that purchase an infringing device for use or resale. Each joint tort-feasor is liable for the full amount of damages (up to a full single recovery) suffered by the patentee." *Birdsell v. Shaliol*, 112 U.S. 485, 488-89 (1884); *Dowagiac Mfg. Co. v. Deere & Webber Co.*, 284 F. 331, 337 (8th Cir. 1922); *Shockley v. Arcan, Inc.*, 248 F.3d 1349, 1364 (Fed. Cir. 2001).  Each joint tortfeasor is liable for the full amount of damages suffered by the patentee. *Birdsell*, 112 U.S. at 488-89; *Dowagiac*, 284 F. at 337.  The customers are just as liable as the manufacturers are in the event of an infringement finding. *Itex, Inc. v. Westex, Inc.*, No. 05-cv-6110, 08-cv-1224, 2011 WL 856583, 2011 BL 60853, at *4 (N.D. Ill. Mar. 9, 2011); *Glenayre Electronics, Inc. v. Jackson*, 443 F.3d 851, 872 (Fed. Cir. 2006).

Omega's counsel misinterprets *Itex* to hold that a customer's downstream sales are irrelevant to the calculation of royalties under the *Georgia-Pacific* framework. (Dkt. 185, 23:26-29)  In *Itex*, the defendant Westex made infringing fabrics and sold them to customers who used the infringing fabrics to make garmets.  The downstream sales of infringing fabric ***were relevant*** to the analysis of the hypothetical licensing royalty rate.  What was not relevant in calculating the reasonable royalty on sales of the infringing fabrics were the customers' downstream sales *of finished garmets*, rather than just fabrics.  The value of the work done by the customers to convert raw fabric into clothing was not commensurate in scope with the patent, which covered only fabric. *Itex,*2011 BL 60853, at *3.  But *Itex* holds that customers who purchase infringing articles and resell them are just as liable as the manufacturer of the infringing articles. The length of the distribution chain does not impact the size of the patentee's full single recovery or "full compensation" because the entire value along the distribution chain of

the patented article is considered in the hypothetical negotiation of the reasonable royalty, and the patentee may recover the full amount of damages from any of the joint tortfeasors. *Itex,* 2011 BL 60853, at *4.  However, once a patentee recovers "full compensation" that also accounts for the infringing resale by a non-party joint tortfeasor, the patentee is precluded from suing that joint tortfeasor for infringement damages because the patentee has already recovered a full single recovery from the other joint torfeasor(s).

Therefore, Buergofol's reasonable royalty calculation will include the value of the resale of liners (not installation services) by Subsurface to end customers, such as departments of transportation.  Buergofol will be precluded from suing Subsurface and the end customers for selling or using infringing liners after Buergofol receives its "full single recovery" from Omega in this case.  Thus, Buergofol requests that the Court compel Subsurface to produce documents responsive to RFP 5.

### E.  Subsurface Must Be Compelled To Produce Documents Identifying Subsurface's Customers As Requested By RFPs 14 and 16.

With respect to RFPs 14 and 16, the Opposition argues that Buergofol has failed to make a threshold showing that information identifying the entities that received and/or purchased liner from Subsurface is relevant to any issue in the case. (Dkt. 185, 28:3-13) But Buergofol has shown that the identity of the entities who received liners from Subsurface is relevant to proving infringement because it can be used to obtain additional information, evidence of the structure and composition of installed liners, the identities of witnesses who possess still other information about the liners, the names of installation projects, installation locations, and installation dates.

The entity that received a liner can, for example, be contacted by telephone and interviewed about details of the Omega liners the entity received.  Buergofol has, for

example, contacted legal counsel for the South Dakota Department of Transportation

(SD DoT).  In one liner installation example, the name of the entity that received the liner

was used to identify a witness and to obtain photographs of the liner.  From this and other

information, a copy of the installer's Liner Information Sheet was obtained.  That in turn

listed other information about the liner.  The name of the entity that received the liner in

other instances was searched using on-line internet searching tools.  The name of the

entity that received the liner led to discovery of the presence of specific identifiable

Omega/Subsurface personnel onsite at the installation, and to Omega/Subsurface

equipment and vehicles at the installation, and to a dated photograph of the OMEGA

LINER shipping crate.  In another installation instance, the name of the entity that

received the liner was used to search a database of government culvert relining contracts

awarded to installer companies and from that database to learn the locations of multiple

other installations carried out by that same installer.  The name of that installer listed,

together with the name Omega, revealed that the installed liner was made by Omega.

This database information also listed the sales price at which each individual OMEGA

LINER was sold to the government, along with other relevant specifics about the liner

such as the liner length, diameter, installation location, and installation date.  The price at

which the liner was sold to the government is obviously higher than the price at which

Omega sold the liner to Subsurface.  The ways in which the identities of entities who

received liner from Subsurface can be, and has been, used to obtain relevant information

about individual acts of likely infringement are far too numerous to list here in this reply

paper.

**F.  Subsurface Must Be Compelled To Produce The "Liner Information Sheets" Requested By RFP 12.**

*To the extent that there exist no liner samples from Omega's early years, Buergofol must rely on other information, including installer and installation site information, to establish what the structure of the liners must have been.  Some of this installer and installation site information is contained on the "Liner Information Sheets."*

RFP 12 requests Subsurface to produce "Each and every "Omega Liner  Liner Information Sheet" in the possession, custody or control of Subsurface."  In Subsurface's response dated March 13, 2023 (Dkt. 155-2), to Buergofol's subpoena, Subsurface responded with objections to each of Buergofol's requests, except for RFP 12.  In response to RFP 12, Subsurface responded with a "Response" as opposed to with "Objections" as follows:

> Response to Request No. 12 (Omega Liner Information Sheet).
> Subject to the General Objections, Subsurface **will produce** copies of any "Omega Liner Information Sheet" that it locates after a reasonable search.

(Dkt. 155-2, 3:23-25) (emphasis added)  Subsurface did not raise any objection based on privilege, work product or trade secret protection.  Subsurface did not raise any objection based on undue burden or relevance.  Instead, Subsurface responded on March 13, 2023, that "Subsurface will produce . . .."  Subsurface waived all objections based on undue burden, relevance, trade secret, privilege, or work product.  However, Subsurface never produced a single Liner Information Sheet.  A month after the Liner Information Sheets should have been produced, at the meet-and-confer for this motion on April 14, 2023, Subsurface attempted to retract its agreement to produce Liner Information Sheets.

Now in Subsurface's Opposition, Omega argues that Subsurface is justified in

withholding responsive documents for which Subsurface made no objection to producing simply because another entity, Omega, had filed a motion for a protective order.  But Omega's proposed protective order does not concern Liner Information Sheets in the possession of Subsurface.  Omega's motion for a protective order Dkt. 81 provides no justification for Subsurface's failure to produce the Liner Information Sheets that it promised to produce.  The Opposition argues that Subsurface should not be compelled to produce the Liner Information Sheets because doing so would cause an undue burden **on Omega**; it would purportedly take "**Omega representatives**" 150 hours to produce the sheets. (Dkt. 185, 8:1-4)  But of course an objection based on undue burden to Omega is irrelevant to this motion because (1) Subsurface did not object based on undue burden, and (2) the burden to Subsurface of retrieving all of the Liner Information Sheets in its possession is certainly less than the 150-hour figure that was fabricated by Omega.  Subsurface has made no showing that printing all of the Liner Information Sheets to PDF that are stored on Subsurface's computers would take more than a couple of hours.  The fact that it might take more effort to retrieve Liner Information Sheets that might currently be available only in paper form is not a justification for refusing to produce what Buergofol believes to be several thousand Liner Information Sheets that are electronically stored.

In the Opposition, Subsurface now belatedly states that it "cannot easily locate" Liner Information Sheets because, in the ordinary course of business, Subsurface does not retain those Liner Information Sheets that Omega includes with the pipe liners. (Dkt. 186, ¶9)  Subsurface claims that the Liner Information Sheets that Omega includes with liners are in piles of other papers or stapled to empty delivery boxes.  Subsurface must make the minimal effort to look through piles of papers to identify and copy the Liner

Information Sheets because this minimal effort was not considered an undue burden at the time that Subsurface responded to the subpoena on March 13, 2023. Moreover, Subsurface must print out all Liner Information Sheets that are attached to emails or stored on computers over which Subsurface has possession, custody or control. In addition, Subsurface must have retained all Liner Information Sheets since at least February 27, 2023 when it was served with the subpoena, otherwise it would be spoliating evidence, regardless of whether Subsurface retains those Liner Information Sheets that Omega includes with liners in the ordinary course of business.

The real reason that Subsurface is withholding the Liner Information Sheets for which no objection to production was made is to hide evidence of infringement. The Opposition now raises the two tardy objections "that the sheets include *confidential* customer information that is not *relevant* to the parties' claims and defenses." (Dkt. 185, 8:3-4) (emphasis added) These late objections for relevance and confidentiality do not appear in the subpoena response of March 13, 2023..

First, Subsurface did not raise any relevance objection. Obviously, the information on the Liner Information Sheets is highly relevant to proving infringement, otherwise Omega's attorneys would not be putting so much effort into withholding the information. Omega's attorneys have even offered to perform the extra work to generate documents that contain some of the information included on the Liner Information Sheets simply in order to withhold the damaging information about where the bodies are buried (installations where infringing liners are buried). Omega's attorney, Michael Neustel, offered to

> "produce the relevant information included on the Liner Information Sheets in a spreadsheet generated from Omega's electronic records. Omega will make itself available to meet and confer with Buergofol to clarify the relevant information on

the Liner Information Sheets which Buergofol seeks in order for Omega to prepare the spreadsheet."

(Dkt. 188-2, 5:17-20)  Consequently, Subsurface has no relevance objection.

Second, Subsurface did not raise any objection to producing the Liner Information Sheets based on confidentiality.  Omega may not now raise a confidentiality objection for Subsurface.  Subsurface argues that Subsurface and Omega are operated at arms length as entirely separate entities. (Dkt. 185, 3:18-19; 13:20)  Confidentiality is not an objection like privilege or work-product for which Omega can seek to protect documents in the possession of a non-party, such as Subsurface.  The Liner Information Sheets that Omega has provided to the non-party Subsurface are no longer confidential to Omega, and Subsurface did not object that the Liner Information Sheets contain confidential information.  In addition, Subsurface has not described which information on the Liner Information Sheets it is that Omega considers to be confidential.  Buergofol contends that no information on the Liner Information Sheets is confidential.  The sheets indicate the "client name", the "project name" and the "street address."  This information indicates which installer company installed Omega's infringing liner at which project, including the location of the project.  The installer infringed the patents-in-suit under 35 U.S.C. 271 by "using" the infringing liner identified in the remainder of sheet.  (The Opposition incorrectly implies that only a party can be an infringer. Dkt. 185, 12:8-11  All joint tortfeasors are infringers, regardless of whether they are joined as parties.)  The fact that a particular installer company installed Omega liner at a particular project was not kept confidential, especially considering that nearly all of the projects were performed for public entities that awarded each project to the particular installer after a public bidding process.  The fact that the particular installer installed Omega liner was also not kept

confidential.  The information that Omega is trying to hide by making an improper confidentiality objection on behalf of Subsurface is the linking of Omega to thousands of public projects, located in multiple states, which would take years for Buergofol to compile on its own.

Finally, the general protective order (Dkt. 131) in this case covers protected material of non-parties, such as Subsurface. (*See* Dkt. 131, Section 10)  If the Liner Information Sheets truly contained confidential business information that has been withheld from the public (which they do not), then the Liner Information Sheets could be produced with the legend "CONFIDENTIAL" to prevent public disclosure.  So even if the sheets had contained confidential information, confidentiality was not a valid basis for Subsurface unilaterally to refuse to produce the promised Liner Information Sheets.

### G.  RFP 17 Is Not Overbroad - Any Mention Of "Buergofol" In Subsurface Files Is Very Likely Related To Infringement Of Buergofol Patents And To Issues In This Litigation.

RFP 17 calls for the production of all documents that contain to the word "Buergofol."  As Buergofol states in the motion to compel, RFP 17 is narrow and very specific.  Unless Subsurface was aware of infringement issues with Buergofol's patents, there are very few reasons why any document in the possession of Subsurface prior to the date of filing of this litigation should have included the word "Buergofol."  Indeed, if a Subsurface document in existence then did include the word "Buergofol," that document very likely pertains to patent infringement issues and is potentially of extreme importance and relevance.  On other hand, if Subsurface did not have knowledge or concern about Buergofol due to patent issues, then it is unlikely that many responsive documents exist in Subsurface's files and records.  Those that do exist would most likely pertain to the ordering of Buergofol film by Subsurface in the early days of Omega, and Buergofol

requests production of those relevant documents.  For documents in Subsurface files that were created or communicated after the date of the filing of the complaint, any such documents in Subsurface's possession would certainly relate to patent infringement and issues pertaining to the present *Buergofol v. Omega* litigation.  All such documents are relevant, and may be extremely important.  RFP 17 is therefore not overbroad at all.  It is of the perfect scope.  Subsurface's complaint that it would take time to search its documents to identify responsive documents is of no consequence, and does not make RFP 17 overly broad or an undue burden.  Of course there is some burden associated with responding to any request for production of documents of a subpoena.  But responding to RFP 17 would require only a simple search for a single word in the files of Subsurface's email server and hard drives.

Subsurface's Opposition actually includes the statement that the "state of mind" of the non-party Subsurface is not relevant to any issue in this case (Dkt. 185, 29:1-5).  For that reason, Subsurface presumably contends that RFP 17 does not call for relevant documents.  Subsurface's attempted argument in Buergofol's view does not pass the red-face test.  Suppose, for illustrative purposes, that there is a document in existence in Subsurface files, written by Gary Strom of Subsurface, indicating Gary Strom's personal "state of mind" that he thinks the Omega liners that he is causing Subsurface to purchase infringe the "Buergofol" '882 Patent, and he in the document explains why he thinks that, references Dr. Schleicher's notice email in which Dr. Schleicher puts Omega on notice of infringement, and writes in the document how he has decided with other conspirators to ignore Dr. Schleicher and the patent infringement issue and to continue to instruct Omega to make liners that infringe the '882 Patent.  Suppose, for argument purposes, such a document revealing Gary Strom's "state of mind" exists in Subsurface's files.  The same

Gary Strom is an owner and principal of Omega, the defendant in this litigation.  Of course the document revealing Gary Strom's "state of mind" would be highly relevant to issues in this patent infringement case.  Subsurface's argument that the state of mind of the non-party Subsurface is not relevant is ridiculous.  It is indeed very difficult to image how a document in Subsurface's possession that mentions the word "Buergofol" could not be relevant to multiple issues in this case.  Every single document responsive to RFP 17 is relevant, and potentially highly relevant.  It is of no moment in this patent infringement action, for relevance purposes, whether or not Buergofol's complaint pleads induced infringement.

Notably, ***Subsurface has not provided a privilege log*** under Rule 26(b)(5) as have other non-parties who have been subpoenaed by Omega in this litigation.  Omega has argued strenuously that those non-parties that Omega has subpoenaed must produce detailed privilege logs, complete with specifically labeled columns.  Because Subsurface has not provided any privilege log of any kind, if Subsurface is withholding responsive documents on the basis of privilege then Buergofol and the Court are not able to identify the withheld documents.  Nor are Buergofol and the Court able to consult the information in the log to assess whether any assertion by Subsurface of privilege or work product is appropriate.  Buergofol maintains that non-party Subsurface, due it is failure to produce a privilege log pursuant to Rule 26(b)(5), is not permitted to withhold responsive documents on the basis of privilege or work product.  The Court should compel the production of all documents responsive to RFP 17.

## III.    CONCLUSION

Most importantly, it is imperative that Subsurface be compelled to produce the liner samples requested by RFP 18.

Buergofol's motion to compel should be GRANTED.


Dated this 23rd day of August, 2023

**DAVENPORT, EVANS, HURWITZ**
**& SMITH, L.L.P.**

By  /s/ Elizabeth S. Hertz
     Elizabeth S. Hertz
     P.O. Box 1030
     206 West 14th Street
     Sioux Falls, SD 57101-1030
     Phone (605) 357-1263
     Fax (605) 335-3639
     Email ehertz@dehs.com

     Attorneys for Plaintiff Buergofol

**IMPERIUM PATENT WORKS LLP**
Darien K. Wallace
T. Lester Wallace
P.O. Box 607
315 Ray Street
Pleasanton, CA 94566
Phone (925) 550-5067
Fax (925) 835-5804
Email darien@imperiumpw.com
     lester@imperiumpw.com

Attorneys for Plaintiff Buergofol
*Pro Hac Vice*