UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| BUERGOFOL GmbH,<br><br>        Plaintiff,<br><br>vs.<br><br>OMEGA LINER COMPANY, INC.,<br><br>        Defendant. | Case No. 4:22-cv-04112<br><br>**REPLY BRIEF IN SUPPORT OF OMEGA'S MOTION TO STRIKE BUERGOFOL'S OPPOSITION TO OMEGA'S MOTION TO COMPEL (DKT. 195) AND TO SANCTION COUNSEL FOR ABUSIVE LITIGATION CONDUCT** |

Defendant Omega Liner Company, Inc. ("Omega"), by and through its undersigned attorneys of record, submits this reply brief in support of its Motion to Strike Buergofol's Opposition to Omega's Motion to Compel and to Sanction Counsel for Abusive Litigation Conduct. Because Buergofol's filings speak for themselves, because Buergofol's characterizations of the meet and confer interactions is inaccurate, and because Omega's concerns regarding Buergofol's litigation conduct have proven well-founded, Omega's motion to strike Buergofol's opposition to its motion to compel and for the Court to craft appropriate sanctions to address Buergofol's litigation conduct should be granted.

## ARGUMENT

### I. Buergofol's brief in opposition to motion to compel speaks for itself and should be stricken.

Resisting Omega's motion to strike, Buergofol contends that "not one passage of Buergofol's Opposition . . . is identified that would warrant striking." (Dkt. 223, p. 1). The

1

particular passages of Buergofol's opposition that form the basis of the motion to strike are in fact specifically referenced in Omega's brief.  (*See* Dkt. 214, p. 6).  At any rate, not only does the tenor of Buergofol's opposition brief speak for itself, but Buergofol's opposition to the present motion contains many of the same allegations previously put before the Court.  (*See,* Dkts. 195, 223).  Thus, rather than reiterating the problematic portions of Buergofol's opposition to Omega's motion to compel (and also Buergofol's opposition to the present motion), Omega will simply rely on the judgment of the Court to weigh the appropriateness of the tone and tenor of Buergofol's submissions.

> **II.   Buergofol's counsel's characterizations of meet-and-confer interactions is inaccurate, and relief governing future interactions is therefore appropriate.**
>
> **A.   Buergofol's counsel has admitted to the language used during meet and confer discussions.**

Buergofol's counsel does deny using the language cited as the basis for Omega's motion for sanctions. (Dkt. 223, pp. 6-7).  Omega simply responds that Buergofol's counsel not only admitted, in writing, to one of the primary allegations forming the basis of Omega's motion to strike and which Buergofol's counsel denies, but that its further attempts to parse language and split hairs are not persuasive.  (*See* Dkt. 215-6 ("Just calling your objection 'stupid' was gracious."); *see also* Dkt. 223, p. 2 ("Buergofol's counsel has not responded in kind by writing responses to Mr. Neustel's endless accusatorial letters."); *id.*, p. 5 ("[T]he Opposition brief correctly states that 'Mr. Neustel is ***ignorant of facts*** that are central . . .")).

### B. Omega's position regarding Buergofol's failure to conduct an adequate pre-suit investigation is well-founded.

Buergofol characterizes Omega's contentions that Buergofol violated Federal Rule of Civil Procedure 11 by failing to conduct an adequate pre-suit investigation as an unsupported "highly personal and offensive" accusation that explains and excuses the "unprofessional discord" in this case. (Dkt. 223, pp. 2-3, 5). As an initial matter, Omega, understanding the weight of the Rule 11 sanctions, has provided Buergofol the detailed facts and evidence supporting Omega's concerns regarding the adequacy of Buergofol's pre-suit investigation. (Dkts. 176-4, 176-6, 176-8; *see* Dkt. 223, p. 2 ("Making a Rule 11 accusation against another attorney in Federal Court, *and then not being able to back it up*, is conduct so unbecoming and extreme as to warrant admonishment from the Court.")). To date, Buergofol has not responded in writing to explain why Omega's contentions regarding the adequacy of its pre-suit investigation are inaccurate, incomplete, or ill-founded. (Neustel Decl., ¶ 2). Furthermore, while Buergofol urges a "proper hearing before the Court on this important and serious matter" and faults Omega for not yet bringing the motion, numerous discovery motions have of course been pending before the Court specifically related to information and documents demonstrating Buergofol's knowledge of the invalidity of the '882 and '269 Patents – and thus the adequacy of Buergofol's pre-suit investigation. (Dkt. 223, pp. 2-3).

### C. Buergofol's counsel has since admitted to several facts characterized as "false."

Buergofol's opposition cites to several "false statements" or allegations regarding the deletion of an email in an email string, the 2020 test of the 2012 Sudpack film, the second BASF analysis, the written document retention policies, and the German and European cancellation proceedings, seemingly arguing that the positions that Omega has taken on these issues was unjustified, and that its conduct during meet-and-confer discussions and the tone used in its brief in opposition to Omega's motion to compel are therefore appropriate. (Dkt. 223, pp. 12-15). However, as to many of these issues, Buergofol's counsel has either since admitted that Omega's counsel's concerns about these topics were in fact well-founded, or the Court found as such and granted Omega the relief it requested during the September 18, 2023, motions hearing. Thus, Buergofol's contention that Omega acted improperly or unfairly by pressing these issues with its counsel misses the mark.

### *Admitted Removal of Email from Production*

First, Buergofol contends that, "at [a] meet and confer, Mr. Neustel accused Mr. Wallace of using a Word processing program to remove 'the second reply email (Re-3")' from the email string after Dr. Schleicher's email 'AW:RE-2' of 8/18/20 at 4:20 p.m. and Dr. Stark's email 'Re-4' of 8/18/20 at 4:34 p.m." (Dkt. 223, p. 12). Buergofol contends that Omega's counsel unfairly accused Buergofol's counsel of tampering with evidence and should be sanctioned for "baselessly impugning the integrity of Mr. Wallace." (*Id.*). And yet, at the September 18, 2023, hearing, the following exchange took place:

4

| | |
|---|---|
| Mr. D. Wallace: | Producing the native format forces me to prove my innocence. I didn't do anything wrong. I produced, in PDF form, the emails as they are. . . . |
| | *There's another email before that they're saying a missing email in the string. Of course it's missing because it's privileged. It was an email to Thomas Schleif, who is the German patent prosecutor for Buergofol.* |
| The Court: | Which email are you talking about in connection with that? |
| Mr. Dr. Wallace: | This is the original email is missing they claimed. |
| The Court: | Oh, the one that Dr. Schleicher was responding to? |
| Mr. D. Wallace: | Right. |
| The Court: | So that's the August 18, 2020. |
| Mr. D. Wallace: | I don't have the dates in mind, but that was the – when they're saying the original email is missing, that was a privileged email. . . . |
| Mr. D. Wallace: | *The rules say that I only have to produce documents as they're kept in the ordinary course of business. When I get a long string, I shouldn't have to look through there and find the privileged documents and then have to put in a placeholder and say where those documents are on a privilege log.* |
| The Court: | *Well, you're wrong. . . .* With regard to the three other emails, the 9/2/20 email from Dr. Stark to Abdel Boutrid, the 8/18/20 reply email of Dr. Schleicher, and the emails with BASF, I am going to grant the motion to compel those in native format. You do not have to produce anything that is attorney work-product or privileged. As Mr. Bond indicated, put in a sheet of paper saying, "This has been omitted because it's privileged." |

(Hearing Transcript, September 18, 2023 (hereinafter "HT"), pp. 195-96, 200 (emphasis added); *see also* Dkt. 233 (ordering Buergofol to "produce these three emails in native format with indications of any portion of the email not produced pursuant to a valid claim of privilege")). Ultimately, not only did Buergofol's counsel admit to deleting an email from the production, but, in compelling Buergofol's counsel to produce the emails in native format,

the Court also found Omega's counsel's concerns about the email production to be well-founded.

### *Admitted Test of Sudpack Film & BASF Analysis*

Next, Buergofol contends that, "[d]uring the meet and confer, [Omega's counsel] made the false statement that there existed a '2012 Sudpack film sample that Buergofol tested in 2020,'" and that Omega's counsel acted unprofessionally by asserting that Buergofol had intentionally not produced the 2012 Sudpack film sample Buergofol testified in 2020. (Dkt. 223, pp. 12-13). Relatedly, Buergofol contends that, "[a]t the meet and confer, [Omega's counsel] made the statement that there existed a second BASF analysis," and that he proceeded to unfairly "impugn Mr. Wallace's integrity, insinuating that Mr. Wallace was deliberately concealing this 'second BASF analysis.'" (*Id.*, p. 13). Buergofol now argues that Omega's counsel's questions during the July 6, 2023, meet and confer discussion were "for lack of a better word, 'dumb' because they are based on willful, blind, or stubborn ignorance." (*Id.*, p. 14).

It is important to review the background of the dispute regarding Request for Production 103, which requested "[a]ll documents constituting or relating to any communications regarding EBS wax within an outer layer of film." (Dkt. 176-18, p. 7). At least by 2012, Sudpack manufactured and sold inner film to Impreg for use in CIPP liners sold in the United States. (Dkt. 176-8, Attachment 1, Bates No. BF2601). On October 14, 2014, Buergofol received a sample of Sudpack's 2012 inner film ("2012 Sudpack Film") used in a

6

CIPP liner by Impreg. (*Id.*). On July 2, 2020, representatives from BASF visited Abdel Boutrid at Buergofol's headquarters in Siegenburg where they discussed additives, such as EBS wax, used in BASF's polyamides. (*Id.*, p. 1). During the meeting, BASF also received a sample of the 2012 Sudpack film for testing by BASF to determine the type of polyamide that Sudpack used. (*Id.*, Attachment 3, Bates No. BF2602). On August 3, 2020, BASF did a first analysis of the 2012 Sudpack film and determined that "[t]he only suitable material for [the polyamide outer layer] is Ultramid C33LN from BASF SE." (*Id.*, Attachment 3, Bates Nos. BF2602-BF2605). On August 26, 2020, BASF informed Buergofol that *all* versions of BASF's ULTRAMID® brand polyamide had the additive EBS wax. (*Id.*, Attachment 5, Bates No. BF2572). But then, on September 2, 2020, after meeting between Dr. Stark and Dr. Schleicher, Dr. Stark emailed Abdel Boutrid, "We now absolutely need the [second] analysis of the [2012] Sudpack sample form BASF . . . Why? Because the sample is from Impreg in 2012, and that would be before our patent applications." (*Id.*, Attachment 1, BF2601). In other words, Dr. Stark, realizing the potential invalidity of the '882 Patent, requested a second analysis of the 2012 Sudpack film to determine if the presence of EBS wax could be detected, which would confirm that the 2012 Sudpack film is prior art to the '882 Patent. (*Id.*). Neither the complete email thread, the response(s) by Abdel Boutrid to Dr. Stark, nor the second BASF analysis of the 2012 Sudpack film requested by Dr. Stark were produced by Buergofol. (*Id.*, p. 3).

Omega met and conferred with Buergofol's counsel regarding this topic. During a July 6, 2023, meet-and-confer discussion, Omega asked Buergofol's counsel whether they would produce the second BASF analysis of the 2012 Sudpack film that Dr. Stark requested, but Buergofol refused to respond. (Dkt. 176, ¶ 14(f), (g)). When Omega asked if the second analysis of the 2012 Sudpack film was still in Buergofol's possession, custody, or control, Buergofol's counsel stated, "[W]e do not have to respond to that question." (*Id.*, ¶ 14(g)).

While Buergofol now faults Omega's counsel for pressing for answers to these questions, the September 18, 2023, colloquy between Buergofol's counsel and the Court on these questions is quite telling:

| | |
|---|---|
| Mr. D. Wallace: | And just as an aside, there was a misrepresentation there of what the document – what the email said. The email doesn't say that there was a test in 2020 of a Sudpack film from 2012. We dispute that. So we shouldn't be forced to produce something that there's no basis for saying it even exists. |
| The Court: | Does it exist? Did BASF conduct a second analysis? |
| Mr. D. Wallace: | No. They didn't even produce a first analysis. There was no first analysis of a 2012 film in 2020. |
| The Court: | I'm not talking about that. I'm talking about did BASF produce a first analysis – |
| Mr. D. Wallace: | No. |
| The Court: | - regardless of what year it was? |
| Mr. D. Wallace: | No. What the film was? Yes. There was a film testified in 2020. True. |
| The Court: | Okay. *Did they do a second test in 2020 of any year film?* |
| Mr. D. Wallace: | *No. But the statement here is that the first test was of a 2012 film and then they did a second test of 2012. The test that was in 2020 wasn't of a 2012 film. It was of a contemporary film from 2020.* |
| The Court: | *Okay. But the whole gist of 103 is "Give us the documents for a second BASF analysis of Sudpack film." And you're telling me, as an officer of the Court, there was no second analysis.* |
| Mr. D. Wallace: | *Of that Sudpack film, there wasn't even a first one.* |

8

| | |
|---|---|
| The Court: | *I'm asking was there a second analysis —* |
| Mr. D. Wallace: | *There was no second.* |
| The Court: | *- 2020?* |
| Mr. D. Wallace: | *No.* |
| The Court: | So here's the big problem, again, with how you responded to Request for Production. You object based on trade secrets. You say it's an unrelated area. This has to do with a food film, and then you object it's an overbroad time frame. It should be limited to 2012 when the '882 Patent was made. It should not include documents for the last 11 years. And then at the end you say, well, there never was a second test.<br>*I want you to file a new response to Request for Production Number 103 that says clearly and unequivocally there was no second analysis by BASF of any Sudpack film in 2020, because that's what you're telling me here today in the courtroom.* |
| Mr. D. Wallace: | Yes, Your Honor. *As a general matter, I thought, under the rules, there's only an obligation to say whether you're withholding something based on an objection, but there's no obligation to say whether there is a document or not.* |
| The Court: | When you make objections and then you say there's no — really there's no documents, it leaves the receiving party guessing: Are there documents? Are they withholding documents pursuant to my objection? I don't know.<br>So I want you give a clear answer to this Request for Production saying there was no second BASF analysis of Sudpack film in 2020, and then there's nothing to compel. |

(HT, pp. 186-89 (emphasis added)); *see also* Dkt. 233 (ordering Buergofol to "file an amended response to the request making unequivocally clear that BASF conducted no second analysis of *any* Sudpack film" (emphasis added)). On September 25, 2023, Buergofol served the following supplemental response to Request for Production No. 103:

> In response to the Court's order from the bench on September 18, 2023 (Dkt. 223, hearing transcript p. 188-189), Buergofol provides the following revised answer regarding "the second BASF analysis of the 2012 Sudpack film" (See Dkt. 178, 14:11-22). No such "second BASF analysis of the 2012 Sudpack film" ever existed, so the non-existent second BASF analysis cannot be produced.

9

> Buergofol is not in the possession, custody, or control of any "second BASF analysis of the 2012 Sudpack film."

(Neustel Decl., ¶ 3, Ex. L). Of course, by limiting this response to the *2012* Sudpack film, Buergofol's response does not fully respond to Request for Production 103 and also contradicts not only its prior comments at the September 18, 2023, hearing, but also the Court's orders. (*See* HT, pp. 188-89; Dkt. 233).

### *Ambiguity Regarding Document Retention Policies*

Buergofol then asserts that Omega unfairly questioned its counsel regarding its document retention policies. (Dkt. 223, pp. 14-15). In its Request for Production No. 22, Omega requested Buergofol to produce documents relating to Buergofol's document retention policies. Buergofol responded on March 31, 2023, stating that it would produce the policies if not privileged or protected. (Dkt. 176-17). Buergofol did not file any objections to Request for Production No. 22 and stated the following:

> REQUEST FOR PRODUCTION NO. 22:
> Documents sufficient to describe all Buergofol electronic data and document retention policies.
>
> RESPONSE TO REQUEST FOR PRODUCTION NO. 22:
> Buergofol will produce documents sufficient to described Buergofol electronic data and document retention policies, to the extent any such "policies" exist, to the extent any responsive document exists, to the extent that production of the documents do not reveal attorney-client privileged or work product information.

(Dkt. 176-17, p. 8).

10

Omega's concerns about this response were well-founded. In response to other discovery requests, Buergofol stated that it does not retain documents for more than two years. (*See* Dkt. 176-15, at Request for Production Nos. 6,7, 9, 10, 11, and 12). However, Buergofol previously submitted a Declaration of Abdel-Kader Boutrid, Buergofol's "Head of Research and Development," in which Mr. Boutrid attached a "quality control image" of one of the inner films Buergofol delivered to Omega, which was generated on May 9, 2018. (Dkt. 67, ¶ 7; Dkt. 67-2.). Furthermore, according to declarations of Buergofol employees submitted to the European Patent Office on October 16, 2015, Buergofol keeps paper records for ten years and thereafter in electronic form:

> At Buergofol GmbH, order confirmations, delivery notes, invoices, and other documents are kept in paper form for 10 years in accordance with the statutory storage obligation and then generally destroyed. The corresponding data records, which include the essential information such as order number, order date, customer, contact person for the customer, net invoice amount, etc., are then only available in electronic form in our system.

(Dkt. 176-3, p. 1). Because Buergofol contemplated patent litigation against Omega by at least 2019 (*see* Dkt. 176-23), if Buergofol in fact had a ten-year document retention policy, it would have had documents at that point going back to at least 2009 – meaning that it would have documents before the prior art sales that Omega has identified. (Dkts. 176-1, -2, -3, -4, -5). It is apparent then that the terms of Buergofol's document retention policies is critically important.

In fact, as to this issue, at the September 18, 2023, hearing, the Court took Buergofol's counsel to task on the ambiguity of its responses to Omega's requests for production, particularly as it relates to its document retention policy and search for records:

| | |
|---|---|
| The Court: | So I just want to clarify something. In Request for Production 6, Buergofol's response was "We object and say there are no documents." They you say you have a document retention policy that only goes back two years. Then you say you'll produce documents after a reasonable search. To me, that answer leaves me, if I'm Omega – I have no idea whether you have responsive documents or not. What is it? What is your position? |
| Mr. D. Wallace: | Those production documents go back to 2018. The Request for Production is things older than 2013. So in those production documents, there's nothing. But obviously there's – |
| The Court: | But your answer doesn't say that. Your answer doesn't say that. Your answer doesn't say, "Well, we only have documents back to 2018." |
| | . . . |
| Mr. D. Wallace: | So going back to Request for Production 6 and 7, which was for old information, there is no production information, those production documents. There is no ERP system. There is no emails. So we looked what we could find, and there is nothing. So that's actually moot. |
| The Court: | Okay. So for 6 and 7, I'm going to order Buergofol to file revised answers under oath to the Request for Production making clear that you've searched; that you don't have any documents. Because I read your answers as you've given them, and to me it is ambiguous about whether there are documents or not documents. All these "I'm asserting this objection, but I'm asserting this objection but, but then we'll produce whatever we find," it leaves the person who made the request guessing what's out there, if anything. So I want you to tell them what you just told me in a revised answer, which is "We checked. We don't have any information prior to 2018. We have no emails prior to 2014. There is no ERP system." |

12

(HT, pp. 140-141, 145; *see also* HT, pp. 203-205 (recognizing that Request for Production No. 22 relating to production of Buergofol's document retention policies had already been addressed)). In fact, the Court ordered that, to clarify these and other related issues, Omega can take a document custodian(s) deposition take place within 30 days in the form of a 30(b)(6) deposition. (HT, 168; *see also* Dkt. 234 (ordering that "Buergofol shall make available a document custodian(s) for Omega to depose on subjects agreed upon by the parties but to include at a minimum Buergofol's document retention policy whether that is formal or informal, how documents are stored, where they are stored, and how they are searched)).

### *Admitted Non-Production of Documents from German Cancellation Proceeding*

Buergofol finally faults Omega for stating that "no documents have been produced by Buergofol relating to Buergofol's cancellation proceeding filed against the German counterpart to the '269 Patent" and for accusing Mr. Wallace "of withholding these documents and misrepresenting that Buergofol had produced the documents from the opposition and cancellation proceedings relating to the German and European counterparts to the '269 Patent."[1] (Dkt. 223, p. 15). However, as became clear during the September 18, 2023, hearing, Buergofol's counsel admitted that documents filed in the German proceedings

---

1.  Omega's Request for Production Nos. 70 and 88 sought documents relating to the patents-in-suit and related patents, including foreign counterpart applications and administrative proceedings relating to any related patent. (Dkt. 176-16, -17). On April 19, 2012, Buergofol filed a cancellation proceeding with the German Patent Office against German Patent No. DE202010016048UI, which is the German counterpart application to the '269 Patent. (Dkt. 176-4). Also, on January 30, 2015, Buergofol filed an opposition with the European Patent Office against European Application No. EP11730556A, which is the European counterpart application to the '269 Patent. (*Id.*).

that were duplicative of the documents filed in the European proceeding were not produced as documents from the German cancellation proceeding because "they're the same documents":

> Mr. D. Wallace: Your Honor, Buergofol's German patent counsel prepared the German cancellation proceeding documents, and he gave them a D number for "dechant."[2]  And then that was, I believe, in 2012.  And then he submitted the identical documents to the European Patent Office and gave them E numbers, for "Europe." They are the identical documents.  And I have produced all of them.  In the briefs, there was mention of six documents.  They have, for example, N numbers and D numbers.  The N was assigned by the German patent counsel as nonimportant, but I produced those as well; but all of the long list, not just those six documents, but all of documents I have already produced.  Those are the exhibits that opposing counsel just said that they are not able to get.  I gave it to them.  They have them, so they can't say they didn't get them.  I did get them from the European Patent Office website, but they're the same documents.
> Also, the file from the European Patent Office from the proceedings – so not the attachments, but the file – I've produced that.  The documents from the German Patent Office, the cancellation proceeding, the file, I've also produced that.  There's nothing more to produce.

(HT, pp. 176-77).  In response, Omega's counsel indicated that Omega merely wants to ensure that they have in their possession "the actual documents that were filed in Germany":

> Mr. Neustel: I'll make it quick, Your Honor. . . . Darien may be correct.  We don't know whether or not they have all the exhibits from the German cancellation.  Because as he said, he downloaded it from the European Patent Office.  So the documents he downloaded

---

2. This appears to be a typo in the transcript, as Mr. Wallace is recalled to have stated that the documents were marked "D" for "Deutschland," not "dechant."

14

> from the European Patent Office website are for the European opposition. They're not for the German cancellation. . . .
> So all we're asking for is just what they filed in Germany, the actual documents that were filed in Germany. So that's what we want, just so that we know that that is the proper documents, I guess.
> And then there's also other filings in the German cancellation proceeding that are definitely not available at the EPO website. So we want to make sure we have all of those.

(HT, pp. 177-178). Finding Omega's position to be reasonable and well-grounded, the Court granted Omega's motion to compel Buergofol to produce all documents from the German cancellation proceedings. (HT, p. 178; *see also* Dkt. 233 (ordering Buergofol "to produce all documents filed in the German cancellation proceeding")). Thus, ultimately, as to this and the many other issues that Buergofol characterizes as "false statements," Buergofol's counsel has either since admitted that Omega's counsel's concerns about these topics were in fact well-founded, or the Court found as such and granted Omega the relief it requested during the September 18, 2023, motions hearing.

## **CONCLUSION**

For the foregoing reasons, Omega's motion to strike Buergofol's opposition to its motion to compel and for the Court to craft appropriate sanctions to address Buergofol's litigation conduct should be granted.

Dated this 28th day of September, 2023.

                                      DENEVAN FALON JOYCE PROF. LLC

                                      */s/ Meghann M. Joyce*

By:   Shannon R. Falon
        Meghann M. Joyce
        100 S. Dakota Ave, Second Floor
        Sioux Falls, SD 57104
        Telephone:  605. 219.9465
        Email:   shannon@denevanfalon.com
                        meghann@denevanfalon.com

        Michael S. Neustel *(admitted pro hac vice)*
        Michelle G. Breit *(admitted pro hac vice)*
        NEUSTEL LAW OFFICES, LTD
        2534 South University Drive, Suite 4
        Fargo, ND 58103
        Telephone: 701.281.8822
        Email:   michael@neustel.com
                        michelle@neustel.com

        *Attorneys for Defendant Omega Liner Company, Inc.*