UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| BUERGOFOL, GMBH,<br><br>Plaintiff,<br><br>vs.<br><br>OMEGA LINER COMPANY, INC.,<br><br>Defendant. | CIV. 22-CV-04112-KES<br><br>**BUERGOFOL'S SURREPLY IN OPPOSITION TO DEFENDANT'S MOTION TO STAY PENDING *INTER PARTES* REVIEW** |

Plaintiff Buergofol GmbH ("Buergofol") submits the following surreply in opposition to the motion to stay pending *inter partes* review (Dkt. 246) and supporting briefs (Dkts. 247, 270) filed by Omega Liner Company, Inc. ("Omega").

## **INTRODUCTION**

Omega filed a motion for an immediate stay (Dkt. 246) of these proceedings pending the institution and resolution of two *Inter Partes* Reviews (IPRs) of the two patents-in-suit. Buergofol opposed (Dkt. 265) the imposition of an immediate stay of this case and requested that a stay not begin until Buergofol has received the court-ordered production from Subsurface of what Buergofol believed would be about 400 samples of "wet liner" that Omega sold to Subsurface since Subsurface was subpoenaed for the samples in February. Buergofol filed its opposition on October 24, 2023. On October 25, 2023, Buergofol's counsel traveled to Fargo, North Dakota, to pick up the anticipated 400 "wet liner" samples. However, Subsurface produced no "wet liner" samples, and counsel for Omega and Subsurface refused to allow Buergofol's counsel to pick up any of the hardened liner samples (with UV-cured resin) that Subsurface made available for inspection. On October 27, 2023, Omega filed its reply arguing

that a stay should be imposed immediately and before Buergofol can obtain samples of the UV CIPP liners in the possession of Subsurface. Omega asserts that Buergofol relies on the "false premise" that Buergofol needs to obtain the samples before the stay issues. (Dkt. 270, 1:11-13) Buergofol submits this surreply to rebut Omega's false statements (i) that Buergofol does not need liner samples to prove infringement, (ii) that the several pieces of inner film produced so far by Omega are all that is needed to prove that each of the approximately 2000 liners manufactured by Omega infringes at least one of the patents-in-suit, and (iii) that Subsurface has complied with the order (Dkt. 227) of Magistrate Judge Duffy to permit Buergofol to pick up the "wet liner" samples that Subsurface has been collecting since being subpoenaed and to transport those "wet liner" samples for further testing at an alternate location. Buergofol also files this surreply to request an order compelling Omega to retain a "wet liner" or "dry liner" sample of each Omega liner it sells during the stay, considering that Subsurface will likely not produce any "wet liner" samples.

## ARGUMENT

**I.     Buergofol Needs Samples Of Liner To Prove That Liner Infringes.**

Omega claims that Buergofol's testing needs are satisfied because Omega has "already produced samples of [its] 30-inch, 33-inch, 36-inch, 54-inch, and 60-inch inner film." (Dkt. 270, 5:9-10). Omega appears to be referring to the sixteen samples of inner and outer film it produced in 2022 and the five additional so-called "representative samples" it produced in August of 2023. (Dkt. 270, 9:12-17). However, the patented product for both the '882 Patent and the '269 Patent is a UV-CIPP liner, not simply one of the inner film or outer film components of the liner. While an inner film is a component of the patented product, it is just one of the claim elements. In order to prove infringement, Buergofol must show that all of the claim elements existed

together in each infringing liner. The mere existence of an inner film that exhibits the recited Vicat softening point or the recited coating of a migrating compound does not prove that the film was used to make a liner that also included the other claim elements, such as the recited outer film, a support material and a UV-curable resin.

Buergofol cannot prove that Omega made a complete liner using each film sample from the current discovery, especially considering that Omega has refused to admit that the inner film from any particular delivery was combined with outer film from any particular delivery and with support material and resin to make a UV-CIPP liner. For example, in response to the order (Dkt. 228) of Magistrate Judge Duffy regarding Buergofol's Requests for Admission Nos. 1-2, Omega denied that it made liner that included an amount of inner film from the roll of film from which it obtained the OMEG-00001 sample and an amount of outer film from the roll from which it obtained the OMEG-00013 sample. (Declaration of Elizabeth Hertz, ¶2, Exh. A) So if Buergofol tests the inner film sample OMEG-00001 and determines that it exhibits the recited Vicat softening point or the recited coating of a migrating compound, Omega could still claim that Buergofol cannot prove that any Omega liner infringes any of the patents-in-suit. In other words, a piece of film alone cannot be used to prove infringement. The film samples that Omega has produced do not prove that any particular liner of the approximately 2000 liners manufactured by Omega so far infringes either of the patents-in-suit. Buergofol needs samples of liners to prove that particular Omega Liners infringe.

In addition, each different delivery of film used to make a liner could have a different structure and composition. Thus, each different delivery of inner film could have a different Vicat softening point or a different amount of migrating compound. Omega has even refused to admit that a film sample and the rest of the film from the same delivery have the same structure

and composition. (Dkt. 116, pp. 9-10; Dkt. 238, 35:3-11, 84:23-85:10)  For example, Omega restricted its court-ordered answer of RFA No. 1 to be applicable only to 24-inch inner film *from the same roll* as opposed to all 24-inch inner film from the same delivery (received on August 24, 2022). (Hertz decl., ¶2, Exh. A)  So if Buergofol tests an inner film sample from one roll and determines that it exhibits the recited Vicat softening point or the recited coating of a migrating compound, Omega could argue that Buergofol still cannot prove that any Omega liner made from a different roll of the same inner film delivered on the same day infringes any of the patents-in-suit.  A liner sample and not just film is needed to prove infringement.

Omega certainly does not admit that films of different diameters have the same structure and composition, such as the same amount of migrating compound, polyethylene layers with the same Vicat softening point, or even the same number of layers.  Discovery so far has shown that Omega has made liner having the following diameters: 8", 10", 12", 15", 18", 20", 21", 24", 27", 30", 36", 42", 48", 54", 60", 66", 74".  Even if Omega were to admit that all of the inner film of a particular diameter has the same structure and composition (which Omega has not admitted), Buergofol would still need at least one sample liner of each of these diameters to prove that all Omega Liners of that diameter infringe.

The statement in Omega's reply that Buergofol does not need liner samples to prove infringement is simply false.

## II. Buergofol Needs Samples Of "Wet Liner" Or "Dry Liner" As Opposed To Cured Liner Or Just Pieces Of Film To Prove Infringement.

The pieces of film that Omega has produced are insufficient to prove that any particular liner infringes either of the patents-in-suit.  To understand why Buergofol's ability to test Omega's liners has been limited based on the current state of discovery, it is necessary to consider the "states" in which a UV-CIPP liner exists.  At the hearing on September 18, 2023,

Page | 4

Omega's counsel described three states of a liner: dry, wet, and cured. (Dkt. 238, 13:7-14:4). A dry liner contains an inner film, an outer film, and a support material (e.g., fiberglass) between the inner and outer film. A wet liner is created when a UV-curable resin is introduced between the inner and outer films and is held in place by the support material. The claims of the patents-in-suit read on a wet liner. A cured liner is the "inner pipe" created after a UV light source is drawn through an inflated wet liner, hardening the resin between the films. Although a cured liner provides most of the information needed to show infringement of the '882 Patent, some critical information can be lost during the curing process. When UV light initiates an exothermic reaction that hardens the resin and can increase the temperature of the liner to above 100°C (Dkt. 1-3, p. 35 of 46), much of the coating of migrating compound (such as EBS wax) is melted, vaporized and/or absorbed into the cured resin/fiberglass due to the heat from the exothermic reaction and from the UV light source. So even if the inner film is not pulled away but stays on the sample of cured liner, the coating of migrating compound will have been partially removed from the outer side of the inner film. A coating of migrating compound on the outer side of the inner tubular film, however, is a claim element that must be shown to prove infringement. As a result, testing a cured liner will not necessarily prove infringement even if the wet liner before curing infringed the '882 Patent because it had a discernible coating of migrating compound.

To show infringement, Buergofol needs samples of "wet liner" or "dry liner" as opposed to cured liner or just pieces of film.

### III.   Subsurface Has Not Yet Complied With The Court's Order (Dkt. 227) To Permit Buergofol To Pick Up "Wet Liner" Samples.

Buergofol anticipated receiving samples of wet liner from Subsurface on October 25, based on representations[1] made at the hearing on September 18 as to what Omega and

---

[1] At the hearing on September 18, 2023, Omega's attorney, Michelle Breit, stated that Omega and

Subsurface understood the subpoena to be requesting. The Court also interpreted the subpoena to be requesting wet liner. (Dkt. 238, 35:16-21; 46:12-13; 54:8-19) ("Given what you've all described in terms of how messy *wet samples* are . . . I'm not sure that they would be allowed to be sent through the mail . . . If you want to try to have them sent to a different facility, like if you need to do lab testing . . . you'll have to foot the expense for any transportation.") However, upon arriving at the storage unit in Fargo designated by Subsurface, Buergofol's counsel discovered that Subsurface had instead retained pieces of cured liner instead of wet liner. (Dkt. 273, ¶3) Of the 162 items Subsurface retained pursuant to the subpoena, 96 were cured liner with hardened resin between inner and outer film. (There were also 4 pieces of inner film with no resin, one piece of inner film with a piece of outer film attached via tape, 56 pieces of cured resin with no inner film, and 5 pieces of outer film with neither inner film nor cured resin.) Furthermore, several of the 96 samples of cured liner were smaller than the six-inch squares sought by the subpoena. (Dkt. 273, ¶3) A six-inch square was specified for a reason; Buergofol requires at least that size to conduct testing. Moreover, Omega's counsel, Michael Neustel, who was present on Subsurface's premises when Buergofol's counsel attempted to pick up the liner samples from Subsurface, insisted on taking a portion of each liner sample that Subsurface was to produce to Buergofol. (Dkt. 273, ¶4) But if Omega takes half of each sample, then Buergofol will receive even fewer samples that are at least six-inch squares and large enough to test. In

---

Subsurface had collaborated on how to respond to the subpoena on Subsurface. Ms. Breit stated that she had "assisted in the preparation of the opposition to the motion since Omega had all of the exposure to what was going on in the case … and Subsurface didn't have that exposure, or their counsel, or some of the expertise that we had." (Dkt. 238, 6:10-15) She then offered to make an appearance on behalf of Subsurface, which the Court declined. (Dkt. 238, 6:16-18) Ms. Breit explained her understanding of what the subpoena requested as follows: "So…Buergofol is arguing now that it needs samples, not of the inner and outer liner but *a sample of every wet liner* with the resin that Subsurface has ever had in its possession or that it has in its possession going forward." (Dkt. 238, 13:19-23) Thus, Omega and Subsurface understood the subpoena to be requesting the production of "wet liner."

addition to all of these anticipated deficiencies in Subsurface's compliance with the court-ordered production, Buergofol has yet to be allowed to take even a single liner sample from Subsurface for testing. (Dkt. 273, ¶4)  Finally, it is clear from Omega's reply brief that Omega's counsel never intended to allow Subsurface to comply with the court-ordered production of the samples of wet liner by moving for the immediate begin of a stay.  Omega is attempting to gain a tactical advantage by using an immediate stay to prevent Buergofol from picking up the Subsurface samples until the stay is lifted more than 18 months from now.  Omega argues, "Buergofol further argues that if it waits eighteen months until the stay is lifted to receive the Subsurface samples, the samples will somehow be 'lost' . . .." (Dkt. 270, 5:15-16)

Even if Buergofol had been allowed to pick up the 96 samples of cured liner with film on October 25, testing those samples of hardened resin with inner film will not conclusively show that the inner film did not include the recited coating of migrating compound (infringing the '882 Patent) before the resin was cured because much of the migrating compound could have melted and been absorbed into the resin of the hardened liner.  Thus, Subsurface has not complied with the Court's order to allow Buergofol to pick up samples of wet liner for testing.

IV. **Buergofol Requests An Order Compelling Omega To Retain A Dry Liner or Wet Liner Sample Of Each Liner Omega Sells During The Stay.**

Buergofol subpoenaed Subsurface for evidence of Omega's infringement because for many months Omega refused Buergofol's discovery requests based on specious objections, such as patent marking, failure to identify each infringing product, sales of infringing products to customers purportedly being confidential, etc.  Nevertheless, Buergofol also served discovery requests on Omega for liner samples.  Buergofol's Requests for Production 30 and 32 dated June 19, 2023, request production of samples of dry liner and wet liner, respectively. (Hertz decl., ¶3, Exh. B)  Buergofol asked for each sample to be a 6-inch wide ring of the tubular liner.

In its responses on July 19, 2023, Omega agreed to produce a representative physical sample of dry liner and wet liner for each liner diameter, and Buergofol's counsel was to arrange for pick-up "once notified of availability" by Omega. (Hertz decl., ¶4, Exh. C)  Omega did not object that the cost of retaining the 6-inch wide rings of tubular liner samples would be excessive. However, Omega has not followed through on the promises made in its discovery responses; Omega has yet to provide notice that any samples are available. Based on other information made available through discovery, it would appear that Omega has manufactured and sold about 250 liners since June 19, 2023 (when RFPs 30 and 32 were served), but has not provided notice of the availability of samples for any of the 250 liners.

Obtaining samples of wet liner (or dry liner) from Omega would obviate the need to obtain the samples of wet liner from Subsurface.  Omega, however, has made great efforts to prevent Buergofol from obtaining evidence of infringement.  Omega produced a single sample of wet liner and dry liner after the hearing on September 18, and now argues that testing that single liner will provide all the evidence that is needed to prove whether each of the more than 2000 liners manufactured by Omega since 2017 in multiple diameters (e.g., 8", 10", 12", 15", 18", 21", 24", 27", 30", 36", 42", 48", 54", 60", 66", 74") infringes one or both of the patents-in-suit.[2] Omega's reply asserts, "Buergofol has all of the samples and information it requires to determine which of Omega's liners allegedly infringe at least one of the patents-in-suit." (Dkt. 10, 10:3-4)

---

[2] The assertion in Omega's reply that Buergofol has "received a significant number of samples of Omega's liners" is false. (Dkt. 270, 9:1)  First, pieces of film are not samples of liner and cannot be used to prove that any particular liner infringed.  Second, the samples obtained from Mark Livesay and John Williamson before the lawsuit was filed were not produced by Omega, are not linked to any specified liner serial number, and cannot be used to show that any of the other more than 2000 Omega liners infringes.  Omega has produced only a single sample of dry and wet liner.

Omega's assertion is clearly false, and staying the case should be delayed until Buergofol is permitted to pick up the liner samples that have been ordered to be produced, that have been promised, and to which Buergofol is entitled. Subsurface should be ordered to allow Buergofol's attorney, by November 14, to pick up the 96 samples of cured liner with inner film and 5 samples of inner film without cured liner inspected on October 24, without Subsurface reducing the size of any of the samples to smaller than a 6-inch square (to share the sample with Omega).

Omega should be ordered to allow Buergofol's counsel to pick up from Omega's facility in Canton, by November 14, samples of wet liner or dry liner for each of the liner diameters manufactured by Omega since Buergofol's discovery request was served on June 19, 2023. Discovery so far has shown that since June 19 Omega has made liner having the following diameters: 8", 10", 12", 18", 21", 24", 27", 30", 36", 42", 48", 54", 66". Thus, Buergofol's counsel should be permitted to pick up from Omega's facility in Canton, by November 14, the aforementioned 13 samples of wet liner or dry liner, identified by wet-out liner serial number.

Finally, if a stay is to be ordered, Buergofol requests that the order also compels Omega to retain a six-inch square sample of wet liner or dry liner of each liner it makes or sells during the stay. Retaining 6-inch square samples should not be excessively costly considering that Omega did not object to the cost of producing the larger 6-inch wide rings of tubular liner in response to Buergofol's RFPs 30 and 32. This evidence of infringement requested by RFPs 30 and 32 will likely be lost during the stay if Omega is not compelled to retain the samples, considering that Omega has argued in its motion for a stay that Buergofol has no need for these samples, and Omega will likely not retain the requested samples during the stay unless ordered to do so.

## **CONCLUSION**

Buergofol consents to a stay of this lawsuit going into effect after November 14, 2023, if (1) Subsurface is ordered to allow Buergofol's counsel to pick up from Subsurface's facility in Fargo, North Dakota, by November 14, the 96 samples of cured liner with inner film and the five samples of inner film without cured liner inspected on October 24, without Subsurface reducing the size of any of the samples to smaller than a 6-inch square, (2) Omega is ordered to allow Buergofol's counsel to pick up from Omega's facility in Canton, South Dakota, by November 14, samples of wet liner or dry liner identified by their wet-out liner serial number of at least the following diameters: 8", 10", 12", 18", 21", 24", 27", 30", 36", 42", 48", 54", 66", and (3) Omega is ordered to retain a 6-inch square sample of wet liner or dry liner of each liner Omega makes or sells during the stay.  If an immediate stay were to be imposed without implementing these measures, evidence of infringement would likely be lost, Buergofol would be unduly prejudiced, and the immediate stay would present a clear tactical disadvantage to Buergofol.

Dated this 6th day of November, 2023

          **DAVENPORT, EVANS, HURWITZ & SMITH, L.L.P.**

By  */s/ Elizabeth S. Hertz*
    Elizabeth S. Hertz
    P.O. Box 1030
    206 West 14th Street
    Sioux Falls, SD 57101-1030
    Phone (605) 357-1263
    Fax (605) 335-3639
    Email ehertz@dehs.com
     *Attorneys for Plaintiff*

And

**IMPERIUM PATENT WORKS LLP**
Darien K. Wallace
T. Lester Wallace
P.O. Box 607
315 Ray Street
Pleasanton, CA 94566
Phone (925) 550-5067
Fax (925) 835-5804
Email darien@imperiumpw.com
      lester@imperiumpw.com
  *Admitted Pro Hac Vice*