UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| BUERGOFOL GmbH,<br><br>        Plaintiff,<br><br>vs.<br><br>OMEGA LINER COMPANY, INC.,<br><br>        Defendant. | Case No. 4:22-cv-04112<br><br>**OMEGA'S SUR-SURREPLY BRIEF IN RESPONSE TO BUERGOFOL'S SURREPLY [DKT. 275]** |

## INTRODUCTION

Buergofol's "surreply" (Dkt. 275) is nothing more than an improper motion to compel seeking discovery it has not requested through the formal discovery process. Should Buergofol sincerely have issues regarding Omega's discovery responses, Buergofol needs to pursue a meet-and-confer with Omega – which it has not done – instead of surreptitiously embedding an improper motion to compel within a surreply regarding a motion to stay.

Moreover, Buergofol's surreply fails to identify (or address) any new arguments or evidence set forth in Omega's reply brief that would justify a surreply. Rather, Buergofol's surreply brief itself improperly introduces new arguments it should have made in its opposition brief.

Additionally, Buergofol failed to inform the Court of Omega's November 3, 2023 letter, which directly responded to Buergofol's position that a stay should be conditioned on requiring Omega to collect a sample from every liner produced during the pendency of the stay. (Exhibit P.) Omega clarified in this omitted letter that Buergofol does not need samples from every liner, that obtaining such samples over an 18-month stay would incur a cost exceeding $1.5 million for

1

Omega, and it was implausible to believe that Buergofol would expend approximately 5,000,000 Euros to test each sample. (*Id.*)

Lastly, Buergofol's surreply does not challenge Omega's request for a stay nor does it present any valid reason to defer the imposition of the stay. Instead, Buergofol's surreply attempts to file a new inappropriate motion to compel in an effort to impose a considerable and unjust financial strain on Omega throughout the duration of the 18-month stay.

Buergofol's surreply is improper and should be stricken.

## ARGUMENT

A.    **Buergofol's Surreply is Improper.**

Buergofol admitted in its motion for leave to file a surreply that a surreply is appropriate only when the prior reply brief "contained new information for which the opportunity to respond is needed." (Dkt. 272.)  However, Omega's reply brief (Dkt. 270) does not include any new information for which the opportunity to respond is needed and only addressed the issues raised by Buergofol's opposition brief. (Dkt. 265).  In fact, Buergofol's surreply brief fails to identify any new arguments or new evidence in Omega's reply brief.  (Dkt. 275.)

"[S]ur-replies are not permitted simply to give a party a chance to rehash a previously-presented point, or to permit a party to present an argument that should have been presented previously." *Combs v. Cordish Companies, Inc.*, 2015 WL 5096174, at *7 (W.D. Mo. Aug. 28, 2015). However, that is exactly what Buergofol has done with its surreply.

Worse, Buergofol's surreply improperly raises new arguments and even includes three new motions to compel discovery.  This is an improper use of a surreply and should be rejected. *Aga v. Meade County*, 2022 WL 3716000, at *8 (D.S.D. Aug. 29, 2022) ("The court will not consider this argument as plaintiffs have not had an opportunity to respond."); Cf *Boddicker v. Esurance Inc.*, 770 F. Supp. 2d 1016, 1024 (D.S.D. 2011) ("Courts generally do not allow parties to make

new arguments on motions for reconsideration that could have been raised in the original pleadings."). For all these reasons, Buergofol's surreply should be stricken.

Buergofol has failed to identify the "new information for which the opportunity to respond is needed" in Omega's reply brief, and thus, Buergofol's surreply brief should be stricken. *Atuahene v. South Dakota State Univ.*, No. 07-cv-4099-KES, 2009 WL 1586952, at *8 (D.S.D. June 4, 2009).

B.   **Buergofol's Argument I: Requested Liner Samples Already Produced.**

Buergofol first complains that "Buergofol cannot prove that Omega made a complete liner using each film sample from the current discovery." (Dkt. 275, 3:5-6.)  However, June 19, 2023 – ten months after filing the lawsuit – is the first time Buergofol requested "[o]ne representative physical sample" liner from Omega.  (Dkt. 276-2, Request for Production Nos. 30 and 32.)  In response, Omega produced one representative physical sample of a dry liner and one representative physical sample of a wet liner in response to Request for Production Nos. 30 and 32.  (Dkt. 270-2.)  Buergofol has never requested a meet-and-confer regarding Omega's production in response to Request Nos. 30 and 32.

Buergofol then complains about Omega's first amended responses to Buergofol's Requests for Admissions Nos. 1-2.  (Dkt. 275, pp. 3-4).  As with Request for Production Nos. 30 and 32, Buergofol has never requested a meet-and-confer with Omega regarding Omega's first amended responses to Request for Admissions Nos. 1-2.  Furthermore, Buergofol has never filed a motion with Judge Duffy seeking compliance with Judge Duffy's order or a motion for sanctions because of Omega's first amended responses to Requests for Admissions Nos. 1-2.

After 12 months of discovery, Buergofol's frustration that it "cannot prove that Omega made a complete liner using each film sample from the current discovery" (Dkt. 275, 3:5-6) is a result of its own actions or inaction, which does not justify the filing of an improper surreply

seeking, for the first time, additional discovery or foregoing the local rules requiring a meet and confer.

C.      **Buergofol's Argument II: Buergofol Never Requested "Wet Liners".**

Buergofol complains that "[t]o show infringement, Buergofol needs samples of "wet liner" or "dry liner" as opposed to cured liner or just pieces of film." (Dkt. 275, 5:18-19.) As discussed in the prior section, Omega already produced a representative sample of a dry liner and a representative sample of a wet liner as sought by the requests for production. (Dkt. 270-2.) As of this filing, Buergofol has never requested a meet-and-confer regarding Omega's production of representative liners.

While Buergofol does not mention Subsurface in Section II of its surreply, to the extent Section II is intended to be directed at the cured sample liners produced by Subsurface, Buergofol's subpoena never requested any "wet liner" or a "dry liner" from Subsurface. (Dkt. 85-4, p. 11, *see* Request No. 18.) Request No. 18 in Buergofol's subpoena to Subsurface merely requested a sample liner that included the resin – with no requirement that the resin be cured or uncured. (Dkt. 85-4, p. 11, *see* Request No. 18.)

Judge Duffy's order on September 18, 2023 also does not require the production of "wet liners" by Subsurface. (Dkt. 227.) Tellingly, Buergofol's surreply does not even allege it requested a "wet liner" or a "dry liner" from Subsurface in its subpoena.

Buergofol then argues that "testing a cured liner will not necessarily prove infringement." (Dkt. 275, 5:16.) However, Buergofol does not provide any evidence to support this claim, such as a declaration by its expert. Furthermore, Buergofol fails to explain how a cured liner with all the liner components (including the chemicals that make up each) in place cannot be tested. To the contrary, Buergofol represented to the Court during the September 18, 2023 hearing that it could test cured samples and was already in the process of obtaining samples of cured liners from

4

Subsurface's customers. (Dkt. 238, Hearing Tr. at 35-39 (the outer film on a one-inch sample from installed (cured) liners can be tested but the inner film cannot because it is not there.) Additionally, Buergofol fails to explain how a "wet liner" with wet resin sticking directly adjacent to the outer surface of the inner film would be better for testing than a cured liner (e.g., they fail to explain how they would remove the wet resin coating the inner film without also removing any alleged migrating compound).  Finally, if a cured liner is not helpful to Buergofol's infringement case, why did a number of Buergofol's document requests in its subpoena to Subsurface focus on the installed liner (e.g. "the date or dates of the installation," "the location of installation," "the diameter installed," the "length of the OMEGA LINER installed" and the "culvert location" – *see e.g.,* Request Nos. 1-4, 6).  (Dkt. 85-4.). Again, after 12 months of discovery Buergofol does not have the wet liners for all Omega's liners it now claims it must have, that is a result of its own failure to properly and timely seek them through discovery.

**D.      Buergofol's Argument III: Subsurface Has Complied with the Court's Order.**

Buergofol complains that it "anticipated receiving samples of wet liner from Subsurface on October 25."  (Dkt. 275, 5:22.)  However, Buergofol's subpoena never requested any "wet liner" from Subsurface.  (Dkt. 85-4.)  Tellingly, Buergofol's surreply does not even allege it requested a "wet liner" from Subsurface with the subpoena.  Instead, it inappropriately extrapolates from unrelated statements by Omega's counsel – not Subsurface's counsel – at the September 18, 2023 hearing to support an unfounded expectation of acquiring 400 "wet liner" samples. Buergofol provides no support for its statement that it "anticipated 400 'wet liner' samples" from Subsurface. (Dkt. 275, 1:12.)

Judge Duffy's order on September 18, 2023 also does not require the production of "wet liners" by Subsurface.  (Dkt. 227.)  Judge Duffy's order merely required that "Subsurface must make available at their place of business or any reasonably convenient location all samples of

5

Omega liners within their possession." (*Id.*) There was no requirement by the Court that Subsurface produce "wet liners."

Buergofol admits that Subsurface complied with the Court's order by allowing the inspection of the liners it had in its possession. During the October 25th inspection, the parties discussed a cutting protocol so Subsurface would retain one-half of the sample and Buergofol would be able to test the other half of the sample. (Stanley Decl., ¶¶4, 5.) The parties agreed that they would formalize a cutting protocol in writing and determine a date as to when Buergofol's expert (or other representative) could be present to monitor the cutting of the samples. (*Id.*, ¶4, 5.) Buergofol fails to explain why this in no longer adequate or why it requires the entire sample, especially since it has already claimed it could test a one-inch sample. (Dkt. 238 at p. 35 (The sample is, like, an inch big, and they [the customers] don't care.)

Buergofol falsely claims that during the October 25th inspection that "counsel for Omega … refused to allow Buergofol's counsel to pick up any of the hardened liner samples." (Dkt. 275, 1:13-15). This statement is false as confirmed by Subsurface's counsel present at the inspection. (Stanley Decl., ¶8.)

Buergofol also falsely claims that "Omega's counsel, Michael Neustel, who was present on Subsurface's premises when Buergofol's counsel attempted to pick up the liner samples from Subsurface, insisted on taking a portion of each liner sample that Subsurface was to produce to Buergofol." (Dkt. 275, 6:14-17.) This statement is false as confirmed by Subsurface's counsel present at the inspection. (Stanley Decl., ¶9.)

While Buergofol complains in its surreply that it hasn't received the Subsurface samples for testing, it fails to mention that it has been two weeks since the October 25th inspection and Buergofol has not reached out once to Subsurface regarding any proposed dates as to when its

6

expert could be present during the cutting of the samples.  (*Id*., ¶6.)  On November 6, 2023, *Subsurface's counsel* emailed Buergofol's counsel regarding the cutting protocol and to get some proposed dates to cut the samples.  (Exhibit O.)  To the knowledge of Omega's counsel, Buergofol's counsel has not responded to Subsurface's November 6th email.

Finally, if Buergofol truly has any problems with Subsurface's compliance with Judge Duffy's order, Buergofol has not met-and-conferred with Subsurface to the knowledge of Omega's counsel.  Furthermore, Buergofol has not filed a motion to enforce compliance or for sanctions against Subsurface.

### E. Buergofol's Argument IV: Improper Motions to Compel Should Be Stricken.

Buergofol's Section IV is not a surreply arguing against the motion to stay, but instead is an improper motion to compel seeking discovery from Omega and third-party Subsurface relating to liners with resin.  For the first time, Buergofol now demands that it needs a sample from every "wet liner" Omega makes during the stay.

Buergofol's opposition brief doesn't even use the word "wet" once and definitely doesn't request relief from the Court to require Omega to keep a sample of every "wet liner" made during the stay. (Dkt. 265.)  If "wet liners" made by Omega during the 18-month stay were truly important to Buergofol, it should have requested such relief in a cross-motion when it filed its opposition brief.

Buergofol's true motivation for its three motions to compel in Section IV is merely to cause further undue financial burden on Omega and Subsurface.  All three of Buergofol's motions to compel should be stricken or disregarded for the following reasons.

#### 1. Improper to Include New Motions to Compel in Surreply.

The Court should deny Buergofol's new motions to compel because it is improper to file a motion to compel in a surreply.  Buergofol provides no legal authority to support including a new

7

motion to compel in a surreply or any legal authority for the extraordinary relief it is seeking. It is well-established that Court's will not allow new arguments to be made in a reply brief or a surreply brief – it is unheard of and completely improper for a party to include a *new motion to compel* in a surreply brief.

Buergofol's motion to compel should be stricken as being improper and beyond the scope of what is allowed with a surreply.

### 2. Buergofol Has Not Met-and-Conferred Prior to Motion to Compel.

As discussed in the previous sections, Buergofol has received the physical samples of liners it has requested from Omega. (*Supra* Sections C-D.) To the extent Buergofol believes it is entitled to more physical samples, Buergofol needs to first meet-and-confer regarding the alleged discovery dispute(s) – which Buergofol has not done.

This Court has already denied two of Buergofol's prior motions to compel for failure to meet-and-confer. (Dkt. 143, 180.) Buergofol's new motions to compel included in its surreply for the first time should also be stricken because it has not met-and-conferred with Omega (or Subsurface).

### 3. Buergofol's 1st Motion to Compel – Subsurface Sample Liners.

Buergofol's first motion to compel demands that "Subsurface should be ordered to allow Buergofol's attorney, by November 14, to pick up the 96 samples of cured liner … without Subsurface reducing the size of any of the samples to smaller than 6-inch square (to share the sample with Omega)." (Dkt. 275, 9:3-6.) However, Buergofol fails to inform the Court that Buergofol's counsel agreed during the October 25th inspection to evenly cut each of the samples 50/50 with one-half going to Buergofol and the other half remaining with Subsurface. (Stanley Decl., ¶4.)

Prior to the inspection, Subsurface repeatedly informed Buergofol that the sample liners would need to be cut so the parties would each receive a portion of every sample liner. (Dkts. 266-1, 266-2.)  Prior to the inspection, Subsurface also informed Buergofol that "[d]uring the inspection, we will collaboratively establish cutting and marking protocols to cut out testing samples to ensure accurate tracking and authentication in the future." (Dkt. 266-2, p. 2; *see also* Dkt. 266-1, p. 2.)

Furthermore, during the October 25th inspection, Buergofol's counsel agreed to a cutting protocol where Buergofol and Subsurface would each be provided with half of the sample liners in Subsurface's possession at a later date when Buergofol's counsel and/or expert could be available to monitor the cutting of the samples. (Stanley Decl., ¶4.)  The parties agreed that they would formalize a cutting protocol in writing and determine a date as to when Buergofol's expert (or other representative) could be present to monitor the cutting of the samples. (*Id.*, ¶4, 5.) Buergofol has never responded to Subsurface's November 6th letter or proposed any return dates as to when they would be available to monitor the cutting of the sample liners. (*Id.*, ¶6.)

Buergofol's improper motion to compel against Subsurface should be denied.

### 4.      Buergofol's 2nd Motion to Compel – RFP Nos. 30 and 32.

Buergofol's second motion to compel demands that "Omega should be ordered to allow Buergofol's counsel to pick up from Omega's facility in Canton, by November 14, samples of wet liner or dry liner for each of the liner diameters manufactured by Omega since Buergofol's discovery request was served on June 19, 2023." (Dkt. 275, 9:7-9.)

However, Buergofol's Request for Production No. 30 only requests "<u>One representative physical sample</u> of each OMEGA DRY LINER" and Request for Production No. 32 only requests "<u>One representative physical sample</u> of each OMEGA LINER that was made after August 15, 2022." (Dkt. 276-2.)  On September 14, 2023, Omega produced "one representative physical

9

sample" of Omega's dry liner and wet liner as discussed in Section B above and as shown in the September 14, 2023 service letter.  (Dkt. 270-2.)

In addition, Buergofol failed to inform the Court of Omega's November 3, 2023 letter addressing Buergofol's alleged confusion as to whether it was to pick up Omega's representative samples of dry and wet liners.  Buergofol sent an email on October 27, 2023 where they alleged they were confused about not being notified of when to pick up Omega's representative sample dry and wet liners.  (Exhibit Q.)  On November 3, 2023, Omega's counsel responded indicating that Omega had already produced the representative sample dry and wet liners by Omega shipping them directly to Buergofol's counsel instead of having them picked up by Buergofol.  (Exhibit P.)  As of this filing, Buergofol has not responded to Omega's November 3, 2023 letter.

Finally, Buergofol has never requested a meet-and-confer regarding Request for Production Nos. 30 and 32.

Buergofol's improper motion to compel with respect to presumably Request for Production Nos. 30 and 32 should be denied.

**5.      Buergofol's 3rd Motion to Compel – Sample of Each Liner Made During Stay.**

Buergofol's third motion to compel seeks the extraordinary requirement of having the Court compel Omega "to retain a six-inch square sample of wet liner or dry liner of each liner it makes or sells during the stay." (Dkt. 275, 9:14-16.)  Including this motion to compel in a surreply is improper, as previously discussed in Section E1.  Additionally, Buergofol has not provided any legal authority to support its remarkable demand.

Regardless, Omega has already produced one representative physical sample of Omega's dry liner and one representative physical sample of Omega's wet liner responding to Request for Production Nos. 30 and 32.  Buergofol has never requested a meet-and-confer regarding Omega's production in response to these discovery requests.

In addition, Buergofol knew about Omega's discovery production months before filing its opposition brief, yet Buergofol's opposition brief does not request that Omega should be forced to needlessly collect a sample of every liner it makes during the 18 month stay period.  (*See* Dkt. 265.)  Buergofol's opposition brief merely requests that "[n]o stay should begin until Buergofol has received samples of the approximately 400 Omega liners that Subsurface has installed." (Dkt. 265, 4:12-15, 5:1-6, 10:8-12.)  The reason for Buergofol's new request is obvious – to inflict undue financial pain on Omega during the stay.

Furthermore, Buergofol failed to inform the Court of Omega's November 3, 2023 letter directly addressing Buergofol's request for samples of every liner made during the stay as a condition for a proposed stipulation to stay the lawsuit.  (Exhibit P.)  It appears that Buergofol wants to unduly financially burden Omega further during the stay by requiring Omega to cut a six-inch sample of every liner it manufactures during the 18-month stay period which <u>would cost Omega over $1.5 Million</u>.  (*Id*.)

Buergofol fails to inform the Court of the following which was included in Omega's November 3, 2023 letter:

***Buergofol Has No Need for a Sample of Every Liner Made.***  Buergofol has no need for a sample of every liner made by Omega.  As Buergofol knew prior to filing the lawsuit, Omega does not make the film that goes into its liners and instead purchases the film from film suppliers.  The best and least burdensome way for Buergofol to confirm the structure and composition of film used in Omega's liners is for Buergofol to seek that information directly from Omega's film suppliers which there are only two of other than Buergofol (Viaflex and Sudpack).  However, Buergofol has never contacted nor served a subpoena on either of Omega's film suppliers.

Buergofol also knew prior to filing the lawsuit that Omega does not make the resin used in its liners and instead purchases the resin from a resin supplier. While Buergofol now argues for the first time in its surreply that the resin in "wet liners" (with resin) is important to prove infringement, Buergofol has never served a single discovery request relating to the resin used in Omega's liners or the identity of Omega's resin supplier. Moreover, Buergofol argued at the September 18, 2023 hearing that it did not need wet liners with resin. (Dkt. 238 at 35 "It's true the resin is nasty stuff, and we don't need that, but we need dry liner.") Why Buergofol has not sought *any* information from Omega's film suppliers or resin supplier is a mystery. Buergofol made the tactical decision, at least for the time being, not to seek the information regarding the composition and structure of the films, resin and other parts in Omega's liners from the manufacturers of those products. Thus, it has only itself to blame for any lack of evidence to prove infringement. Not anything Omega or Subsurface have done.

***Omega Has Produced a Significant Number of Representative Samples.*** As outlined in Omega's Reply Brief (see Dkt. 270, pp. 8-10), Omega has already provided a substantial number of representative physical samples, encompassing inner film, outer film, and wet/dry liners. Buergofol has tested these samples and has repeatedly asserted that all these samples infringe at least one of the patents-in-suit. (e.g., Dkt. 66, 12:6-24 to 13:1-10; Dkt. 160-2, 5:25-26.)

***5,000,000 Euros Cost to Buergofol to Test 1,000 Samples.*** Buergofol has stated to the Court that "the analytical testing of each inner film sample to determine the identity of the migrating compound on the external side of the inner film costs 5,000 Euros." (Dkt. 66, 13:24 – 14:1-2) (emphasis in original.) It is not realistic to believe Buergofol will actually test the samples it is requesting to be preserved during the stay at a cost of over 5 Million Euros (€5,000 x 1,000+ liners).

***$150,000 Out-Of-Pocket Cost to Collect 1,000 Samples.***  There are substantial burdens and financial implications associated with collecting samples from each of the anticipated 1,000+ liners just during the estimated 18-month stay period, with the potential for more if an appeal arises, including expenses related to the material costs for each of the samples, labor costs associated with the sample collection process, storage expenses, and other associated costs. (Exhibit P.)  Omega's preliminary estimate indicates that the cost of obtaining samples from each of the liners made during an 18-month stay period would be approximately $150,000.  (*Id.*)

***$1,350,000 in Lost Sales to Collect 1,000 Samples.***  A requirement to obtain samples from every liner manufactured would inevitably hinder Omega's liner production capacity, resulting in a reduction in the overall number of liners manufactured by Omega and, consequently, leading to lost sales for Omega. (*Id.*)  Omega's preliminary estimate indicates that the lost sales during an 18-month stay would be approximately $1,350,000.  (*Id.*)

***Substantial Expert and Legal Fees to Omega.***  Given Buergofol's recent assertions to the Court that Subsurface's sample collection was inadequate despite following Buergofol's subpoena instructions (Dkt. 272, p. 3), Omega would need to have its expert involved in the collection of samples to ensure proper sampling and preservation. Omega's expert charges $650 per hour, so the expected expert fees would be quite substantial.  There would also be substantial attorney fees involved relating to the collection of samples.

Omega's out-of-pocket costs to take samples from every liner produced during an 18-month stay, which Buergofol has no need for, would easily exceed $1,500,000 thereby significantly and unduly burdening Omega.  (Exhibit P.)  Furthermore, since it would cost Buergofol over 5,000,000 Euros to test each of the 1,000+ liner samples, it is not realistic to believe Buergofol would even test more than a few of the 1,000+ samples.

13

While Buergofol has no need to take a sample of every liner, Omega offered to take a sample of every liner if Buergofol would pay for Omega's costs to collect the samples. (*Id*., p. 2.) Tellingly, Buergofol never responded to Omega's offer.

Buergofol's improper motion to compel Omega to collect a sample of every liner made during the stay – that Buergofol has no need for, that Buergofol will not test more than a few samples of and which would cost Omega over $1.5 Million – should be denied.

**F.     Buergofol Should Pay Omega's Attorneys' Fees for Sur-Surreply.**

Buergofol ought to be responsible for Omega's legal fees incurred due to requirement of preparing this sur-surreply. The surreply presented by Buergofol is essentially an inappropriate motion to compel, submitted with an improper motive. It fails to address any purportedly new argument or new evidence in Omega's preceding reply brief, which is a necessary condition for filing a surreply.

Omega is once again compelled to incur additional legal fees to rectify the unfounded and erroneous assertions made by Buergofol, unnecessarily inflating Omega's litigation costs. Consequently, Buergofol should be held accountable for the attorney fees Omega has accrued in responding to Buergofol's groundless surreply.

## CONCLUSION

Buergofol's surreply does not identify any new arguments or evidence presented in Omega's reply brief and therefore should be stricken by the Court. At a minimum, Buergofol's improper motions to compel should be stricken as improper motions within a surreply.

Dated this 9th day of November, 2023.

                                          DENEVAN FALON JOYCE PROF. LLC

                                        /s/ *Meghann M. Joyce*
BY:   Meghann M. Joyce
        Shannon R. Falon
        100 S. Dakota Avenue, Second Floor
        Sioux Falls, SD 57104
        Telephone:  605.219.9465
        Email:   meghann@denevanfalon.com
                      shannon@denevanfalon.com

        Michael S. Neustel *(admitted pro hac vice)*
        Michelle G. Breit *(admitted pro hac vice)*
        Monte M. Bond *(admitted pro hac vice)*
        NEUSTEL LAW OFFICES, LTD
        2534 South University Drive, Suite 4
        Fargo, ND 58103
        Telephone: 701.281.8822
        Email:   michael@neustel.com
                      michelle@neustel.com
                      monte@neustel.com

        *Attorneys for Omega Liner Company, Inc.*