UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| BUERGOFOL GMBH, <br><br> Plaintiff and <br><br> Counter Defendant, <br><br> vs. <br><br> OMEGA LINER COMPANY, INC., <br><br> Defendant and <br><br> Counter Claimant. | 4:22-CV-04112-KES <br><br> ORDER <br><br> DOCKET NO. 307 |

**INTRODUCTION**

This matter is before the court on the first amended complaint of plaintiff Buergofol GMBH ("Buergofol") alleging that defendant Omega Liner Company, Inc. ("Omega") violated two patents owned by plaintiff regarding pipe liners. Docket No. 163.

Omega has counterclaimed seeking the court's declaration that the patents are invalid, unenforceable, and that Omega has not infringed them. Docket No. 179.  Omega also asserts counterclaims for fraud, negligent misrepresentation, and breach of contract under the United Nations Convention on Contracts Article 42.  Id.   Jurisdiction is premised on the presence of a federal question.  28 U.S.C. § 1331.

Now pending is Buergofol's motion to prevent Omega from interfering with production by a third party, Subsurface, Inc. Docket No. 307 The motion was referred to this magistrate judge for determination pursuant to 28 U.S.C. § 636(b)(1)(A). <u>See</u> Docket No. 320. Omega opposes the motion. Docket No. 332.

**FACTS**

On February 27, 2023, Buergofol served third party Subsurface, Inc. (one of Omega's customers) with a subpoena *duces tecum* seeking production of documents, information, or objects. Docket No. 155, ¶ 3; Docket No. 155-1. Request 18 made in the subpoena sought a "physical sample of each OMEGA LINER that was ever in the possession, custody or control of Subsurface, where the physical sample is of a size of at least six inches square, and where the sample includes the constituent resin of the OMEGA LINER." Docket No. 155-1 at p. 11.

Subsurface interposed a number of objections to the subpoena and Buergofol ultimately filed a motion to compel Subsurface to produce. Docket Nos. 85-3, 85-4 & 153. A hearing was held on this motion and a number of other matters on September 18, 2023.

At that hearing, the court granted in part and denied in part Buergofol's motion to compel. The court ordered that:

> Subsurface must produce any liner information sheets within their possession. Subsurface must make available at their place of business or any other reasonably convenient location all samples of Omega liners within their possession. After inspection, if Buergofol wishes to transport those samples for further testing at an alternate location, Buergofol must do so at its own expense.

2

> Production of documents and tangible things by Subsurface pursuant to Buergofol's subpoena shall be subject to the protective order issued by the district court and classified as confidential documents. Buergofol shall not contact any customers identified in the information sheets without prior advance consultation with Omega."

Docket No. 227.

The court further elaborated on potential testing of liner samples: "production under the Federal Rules of Civil Procedure means you make it available and let the person inspect it. . . . It does not require you to actually package those up. . . . If you want to try to have them sent to a different facility, like if you need to do lab testing or something like that, I expect the parties to work that out and come to a cooperative agreement between them. But [Buergofol will] have to foot the expense for any transportation." Docket No. 238 at p. 54. The court asked if Subsurface, Omega or Buergofol had any questions about the court's resolution of Docket No. 153. Id. No one asked any questions about the testing protocol. Id. at pp. 54-56.

Representatives, including lawyers, of Omega, Subsurface and Buergofol met at Subsurface's facility on October 25, 2023, at which time Subsurface produced for inspection 162 samples of Omega liner that Subsurface had retained. Docket No. 308 at p. 2. Of these, 96 samples were pieces of hardened cured liner with inner film attached and 56 were pieces of cured liner with no film attached. Id. "There were also 4 pieces of inner film with no cured liner attached and 1 piece of inner film with a piece of outer film attached with tape." Id.

3

Buergofol wanted to take at least some of the samples, in their entirety, with them. Subsurface objected. Id. Subsurface suggested the parties reconvene at a later date and Subsurface employee(s) would cut each sample in half (special equipment was required to split the samples), mark each half, and Buergofol would be allowed to take half of each sample with it and Subsurface would retain the other half. Id.

It is not entirely clear that Buergofol agreed to this half-and-half arrangement on October 25, but what is clear is that it later refused to accept anything less than the 6" x 6" sample called for by its subpoena. Id. at p. 3. Buergofol agreed that Subsurface could retain any part of the sample left over, if any, after Buergofol took its 6" x 6" sample. Docket No. 309-2 at p. 3. Omega asserts that Buergofol's testing method is destructive, affecting the sample so that it will no longer be in its same condition and state once testing is performed. See generally Docket No. 332.

Neither party informs the court what the sizes of the samples are. There are photos of the samples laid out on a concrete floor, but it is difficult to gauge the size of the samples from these photos. See Docket No. 309-1. Certainly, there are a few samples that would yield two halves that were large enough to equal 36 square inches (6" x 6"), but it is also clear some of that samples are not large enough so that half of the sample would yield the same surface area as a 6" x 6" sample.

Buergofol asserts that an unspecified "number" of the samples are smaller than 6" x 6". Docket No. 308 at p. 2. Omega contrarily asserts that

4

more than half of the samples are 12" x 6" or larger, which would result in a 6" x 6" sample for Buergofol if the samples were cut in half. Docket No. 332 at p. 30.

Also, neither party informs the court whether there is a minimum size necessary for effective testing and, if so, what that size is. Prior to the instant motion being filed, Omega inquired of Buergofol whether Buergofol's expert believed a larger sample size was required than what Subsurface was offering (half). Docket No. 309-2 at p. 3. Omega suggested that its own expert and Buergofol's expert could confer with each other and establish a suitable testing protocol. Id. No response to this specific inquiry from Buergofol is in the record. Instead, Buergofol mulishly insisted on its right to minimum 6" x 6" samples because that was what the subpoena to Subsurface requested.

Allowing Buergofol to first extract a 6 " x 6" sample and let Subsurface retain the remainder would result in a "number" of the samples being taken entirely by Buergofol with no portion of the sample remaining in Subsurface's possession. Docket No. 332 at p. 30. As with so many of the issues in this lawsuit, the parties are at a stalemate and seek the court's intervention.

## DISCUSSION

Buergofol's motion is styled as arising under Rule 37 for Omega's asserted violation of the court's order at the September 18 hearing. Docket No. 307. Interestingly, Buergofol also asserts in its motion that it is under no obligation to engage in "cooperative testing" or a joint protocol for testing with Omega. Docket No. 336 at p. 11 (p. 8 of the brief). But that is exactly wrong

because *this court specifically ordered* the parties to "work that out and come to a cooperative agreement between them" if any testing were to be done. Docket No. 238 at p. 54. Buergofol's insistence on the right to unilaterally take samples and embark on testing without any involvement of Omega is directly contrary to this court's unobjected to, unappealed order from the September 18 hearing.

Several courts have applied destructive testing analysis to tests which, while destructive, nevertheless leave a remainder of the item or substance intact. Mirchandani v. Home Depot, U.S.A., Inc., 235 F.R.D. 611, 612-13 (D. Md. 2006) (involving testing of only one of two safety bolts in a ladder); Ostrander by Ostrander v. Cone Mills, Inc., 119 F.R.D. 417, 418-20 (D. Minn. 1988) (involving testing of only a fragment of sleepwear, leaving some of the fabric intact and undisturbed).

Eighth Circuit case law is sparse on the subject of whether and under what circumstances to allow destructive testing. Generally, courts have analyzed four factors:

> (1) whether the testing is reasonable, necessary and relevant to proving the [party's] case;
>
> (2) whether the [opposing party's] ability to present evidence at trial will be hindered, or whether [the opposing party] will be prejudiced in some other way;
>
> (3) whether there are any less prejudicial alternative methods to obtain the sought after evidence; and
>
> (4) whether there are adequate safeguards to minimize prejudice to the [opposing party], particularly [to the opposing party's] ability to present evidence at trial.

6

White v. Cooper Tools, Inc., No. Civ. 06-4272, 2010 WL 1418244, at *2-3 (D.S.D. Apr. 6, 2010) (citing Conway v. Kaz, Inc., Civ. Action No. 09-CV-10065-DT, 2009 WL 3698561, at *2 (E.D. Mich. 2009)); Mirchandani, 235 F.R.D. at 614.

Here, the court finds the testing proposed by Buergofol is reasonable, necessary and relevant. Presumably, the tests Buergofol will conduct on the samples will make it more or less likely that the liner Omega sold to Subsurface infringes on Buergofol's patents.

Without safeguards, Omega's ability to present evidence at trial will be hindered and Omega will be prejudiced. If Buergofol is able to take some samples of Omega liner entirely and take all but a small part of other samples, it may present expert evidence at trial that these samples infringed Buergofol's patents. Without a corresponding part of the same sample to test itself, Omega will be hampered in trying to refute such evidence. Omega will also be powerless to prove that the sample upon which Buergofol's evidence is based actually originated from Subsurface.

There is a less prejudicial alternative. If the parties could agree upon a third-party laboratory or expert to conduct the testing, the entirety of the samples could be sent to this third party. The court acknowledges that the course of this lawsuit and the conduct of the parties makes this possibility remote. But it is another solution to the conundrum of how or whether to split the samples.

Buergofol's proposal—to take a 6" x 6" sample of every sample—does not contain enough safeguards for the reasons stated above. That approach would result in Buergofol receiving the entirety of some samples and leaving a very little portion of other samples.

In Ostrander, plaintiffs brought a products liability suit alleging the defendants' sleepwear was unreasonably dangerous because of its flammability. Ostrander, 119 F.R.D. at 418. Defendants sought permission to perform destructive testing of two 3.5-inch by 10-inch sections from the garments, which would still leave samples of the garments untouched for use at trial or for plaintiffs to test. Id. at 418-19. Defendants asserted the testing was necessary to determine whether the flammability stemmed from the material itself, or from chemicals accumulated in laundering the sleepwear. Id. The court granted defendant's motion, characterizing the issue of flammability to be "critical," and defendant's proposed testing pivotal to that issue. Id. at 419-21. The court observed that the plaintiffs had already done their own testing and that the "defendants should be granted the same opportunity." Id. at 419.

Similarly, in Mirchandani, the court allowed plaintiffs to perform destructive testing of one of two safety bolts from a ladder where no other alternative other than testing would suffice, where defendants had an equal opportunity to examine and test the ladder and bolts, and where defendants had videotaped evidence that the ladder could be safely climbed with the existing bolts. 235 F.R.D. at 614-17.

Buergofol asserts that restrictions and safeguards on destructive testing are called for only when the item being tested is a "singular object" which is a "unique physical item at the center of the case." Docket No. 336 at pp. 11, 15-17 (pp. 8, 12-14 of the brief). Buergofol suggests that such concerns are misplaced here where Buergofol will only be taking a portion of the item, not the entire item, because the entire pipe liner is quite huge. Id. at p. 13 (p. 10 of the brief). Neither party has indicated whether Subsurface has samples of Omega liner separate and apart from the samples it has produced for inspection to Buergofol. If these are the only samples retained by Subsurface then—by Buergofol's own admission since some of the samples are smaller than 6" x 6"—giving Buergofol samples that are a minimum of 6" x 6" will result in some of the samples being entirely "consumed" by Buergofol. Therefore, the court concludes that restrictions and safeguards on testing *are* warranted in this case.

Buergofol also argues that the Omega liners themselves (from which the samples were taken) were very large and that both Omega and Subsurface *could* have cut their own samples out of the liners and kept them for themselves so that Subsurface could turn over the samples at issue here with no disadvantage to either Omega or Subsurface. Id. at pp. 13-14 (pp. 10-11 of the brief). However, there is no evidence in the record that Omega and Subsurface availed themselves of the opportunity to take separate samples for themselves. Nor is there any evidence that Subsurface or Omega actually have any samples other than the ones Subsurface has made available. Buergofol

9

states that the Omega liners themselves have now been installed inside renovated pipes and "cannot be removed." Docket No. 336 at p. 18 (p. 15 of the brief). The possibility exists that the samples in Subsurface's possession are the only samples of the Omega liners left.

Furthermore, apart from the issue of scarcity, there is a very good reason for the testing protocol proposed by Subsurface. By marking each half of each sample with an identical mark and giving Buergofol only half of the sample, it will be possible once Buergofol makes known the results of its testing of that sample for Subsurface or Omega to conduct their own testing of that very same sample and either confirm or refute Buergofol's test results. It was for all of the above reasons that this court originally ordered the parties to cooperate with each other to come up with a mutually agreeable testing protocol if testing was contemplated. Docket No. 238 at p. 54. Finally, the court notes that Buergofol has not produced any evidence that halving the samples will, in any cases, result in samples too small for testing.

## CONCLUSION

Based on the foregoing facts, law and analysis, this magistrate judge hereby

DENIES Buergofol's motion to prohibit Omega from interfering with Subsurface's production [Docket 307]. In furtherance of the order issued by the court on September 18, 2023, the court further

ORDERS The parties may confer and agree upon a third-party laboratory or expert that is mutually agreeable to all parties to conduct the testing. In the

10

event of such agreement, Subsurface must tender all its samples of Omega liners to the agreed-upon third party for testing. The parties are entitled to have their own representatives or experts or both present during the testing. It is further

ORDERED that if the parties cannot reach agreement within 14 days as to a mutually agreeable third-party laboratory or expert for the testing, Subsurface is ordered to mark each half of each sample in the manner previously discussed and agreed to by the parties. Subsurface is then ordered to provide to Buergofol one half of each sample and Buergofol will be free to conduct whatever testing it desires on its half of each sample. In such case, Omega is hereby also granted permission to conduct destructive testing of the other half of each sample. Subsurface is, therefore, ordered to produce the retained half of each sample to Omega if Omega requests it. All parties may be present at the time and place for the cutting and marking of the samples. In the event Buergofol and Omega conduct testing of their own, prior to such testing each party shall notify the other party in this case of the time, place, manner, conditions, and scope of the testing along with the identity of the lab or persons who will conduct the test. Furthermore, after such testing, the party who conducted the test shall immediately disclose to all other parties the results of the testing.

**NOTICE OF RIGHT TO APPEAL**

Pursuant to 28 U.S.C. § 636(b)(1)(A), any party may seek reconsideration of this order before the district court upon a showing that the order is clearly

11

erroneous or contrary to law. The parties have fourteen (14) days after service of this order to file written objections pursuant to 28 U.S.C. § 636(b)(1)(A), unless an extension of time for good cause is obtained. See FED. R. CIV. P. 72(a); 28 U.S.C. § 636(b)(1)(A). Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Id. Objections must be timely and specific in order to require review by the district court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

    DATED this 8th day of February, 2024.

                                          BY THE COURT:

                                          */s/ Veronica L. Duffy*

                                          VERONICA L. DUFFY
                                          United States Magistrate Judge