# EXHIBIT C:

*May 8, 2024, Letter from Attorneys for Omega Liner Company*

 THE EVOLUTION OF PATENT LAW

May 8, 2024

*Via Federal Express*

Kathleen Bucholtz
Associate General Counsel
C/O Lois Wetzel
U.S. DEPARTMENT OF HOMELAND SECURITY
Office of Associate Chief Counsel
610 South Canal Street, Room 767
Chicago, Illinois 60607-4523

> Re: *Buergofol GmbH v. Omega Liner Company, Inc.*, Civil Action 4:22-cv-04112 (D.S.D.); Subpoena Duces Tecum for CBP Records for Buergofol, Saertex, Brandenburger, Sudpack, Reline, Impreg, Light Stream, Huhtamaki, International Pipe Lining, Monte Vista; Your File No.: CO-2024-00297/LEW

Dear Ms. Bucholtz:

We are in receipt of your letter dated January 22, 2024 regarding the above referenced matter, your File No.: CO-2024-00297/LEW. Thank you for your response and the information provided. We note, however, that you request that we provide certain information "at least ten (10) working days prior to the scheduled production date" pursuant to 19 C.F.R. § 103.22(d). Since the production date set out in the original subpoena was April 26, 2024, the 10-day requirement could not be met so we sent a letter extending the date to May 31, 2024. See my letter of May 2, 2024. This should provide adequate time to provide the requested information and for you to reach your decision. If more time is required, please contact me by email or the number provided below.

Enclosed please find true and correct copies of the Summons and Original Complaint in the above referenced civil action pending in United States District Court for the District of South Dakota pursuant to 19 C.F.R. § 103.22(c). Attached hereto as Exhibits A and B respectively. This section of the statute also calls for "a summary of the documents or testimony sought and its relevance to the proceeding." *Id.* This explanation is set forth below.

## A.    The Underlying Litigation and Technology at Issue.

Buergofol GmbH ("Buergofol") is a foreign national with its principal place of business in Germany. It does not maintain any offices in the United States. Omega Liner Company Inc. ("Omega") is a domestic company located in Sioux Falls, South Dakota.

Buergofol instituted suit against Omega for infringement of two patents--United States Patent Nos. 9,657,882 ("the '882 Patent") and 8,794,269 ("the '269 Patent"). *See* Ex. B. Both patents are generally related to muti-layer inner tubular films used for cured-in-place-pipe liners or "CIPP liners" for renovating sewer pipes. (*See e.g.*, excerpts from the '269 Patent attached as Exhibit C at Col. 1:8-64.) The CIPP liner is inserted into the damaged sewer pipe and the resin within the


Telephone: 701-281-8822
Fax: 701-237-0544
Website: www.neustel.com

Neustel Law Offices, LTD
2534 South University Drive, Suite 4
Fargo, North Dakota 58103


Monte M. Bond
(Of Counsel)
monte@neustel.com

CIPP liner is hardened in place with the application of, for instance, ultra-violet light. (*Id.*) This is also referred to a "trenchless" sewer repair since the pipe can be repaired in place without digging a trench to expose the damaged pipe.[1] Omega has in the past purchased various films from Buergofol for use in its CIPP liners. It stopped making those purchases in 2019.

## B.   Patents and Omega's Claims of Invalidity, Unenforceability and Breach of Warranty.

Buergofol obtained the '269 Patent from Loparex, GmbH five (5) days before bringing suit against Omega. Buergofol has always owned the '882 Patent. The '269 and '882 Patents claim to have respective effective application filing dates of June 15, 2010 and March 11, 2013 and both were issued in 2014. Omega has counterclaimed that the '269 and '882 Patents are invalid, unenforceable and is bringing a claim against Buergofol for breach of warranty of noninfringement based on the sales of films from Buergofol to Omega that Buergofol now accuses of infringement.

### 1.  Invalidity.

Assuming the claimed effective filing dates are correct, the '269 and '882 Patents were filed prior to the implementation of the America Invents Act (AIA). As pre-AIA patents, the '269 and '882 Patents are subject to the pre-AIA patents laws such as 35 U.S.C. 102. For instance, under this statute:

> A person shall be entitled a patent unless …(b) the invention was . . . in public use or on sale **in this country**, more than one year **prior to the date of the application** for patent in the United States."

Pre-AIA 35 U.S.C. § 102(b) (emphasis added). As a result, if an invention is sold in this country more than one year prior to the date of the application for the patent, the patent is invalid for failure to submit the application during the one-year grace period. Pre-AIA 35 U.S.C. § 102(b) is referred to as the "on sale bar" or the "public use bar" and constitutes a loss of the rights to seek a patent notwithstanding the novelty of the invention. *See e.g.*, *BASF Corp. v. SNF Holding*, 955 F.3d 958, 963 (Fed. Cir. 2020). "A patent is invalid under the on-sale bar if, before the filing date, the invention was both: (1) the subject of a commercial sale or offer for sale and (2) "ready for patenting." *GS Cleantech Corp. v. Adkins Energy LLC*, 951 F.3d 1310, 1318 n.7 (Fed. Cir. 2020) (citations omitted).

The "critical dates" for the '269 and '882 Patents are one year prior to Buergofol's claimed earliest effective application dates or June 15, 2009 and March 11, 2012 respectively. Sales and shipments made before these dates of the products alleged to infringe are "prior art sales" that invalidate these patents. To date, Omega has been able to identify prior art sales of films by Buergofol of products it is accusing of infringement to Light Stream, Saertex, Sudpack and Brandenburger. Omega is alleging that these prior art sales invalidate the '269 and '882 Patents under pre-AIA 35 U.S.C. § 102(b). Omega has reason to believe Buergofol also made prior art sales to Reline, Impreg,

---

[1] A general demonstration of the installation of a CIPP liner can be viewed at the following: https://www.youtube.com/watch?v=CpclcAcCexw.

Omega Exhibit C (p. 2 of 59)

International Pipe Lining, and Monte Vista. If proven, any one of these prior art sales would invalidate the '269 and '882 Patents. But Buergofol claims it does not have any record of these sales. And since Buergofol is a German company, Omega does not have full access to its records provided for under the discovery rules of Federal Rules of Civil Procedure or a fully effective way to confirm Buergofol's claims of lack of information. Finally, Huhtamaki Films is the original owner of the '269 Patent and prior art sales and shipments by Huhtamaki Films are relevant to the invalidity of at least the '269 Patent.

## 2. Unenforceability.

Additionally, a patent may be found unenforceable based on inequitable conduct before the USPTO. "Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent." *U.S. Water Servs., Inc. v. Novozymes A/S*, 843 F.3d 1345, 1352 (Fed. Cir. 2016). "A finding of inequitable conduct as to any single claim renders the entire patent unenforceable..." *Id.* "Inequitable conduct occurs when a patentee breaches his or her duty to the [USPTO] of candor, good faith, and honesty." *Id.*

"To prevail on a claim of inequitable conduct, the accused infringer must prove that the patentee acted with the specific intent to deceive the PTO." *Therasense, Inc. v. Becton, Dickinson and Co.,* 649 F.3d 1276, 1290 (Fed. Cir. 2011). Inequitable conduct also requires a finding of but-for materiality, meaning that if an applicant fails to disclose prior art to the PTO, the "PTO would not have allowed a claim had it been aware of the undisclosed prior art." *Id.* at 1291. If the prior art sales from German companies were known to the named inventors on the patents and not disclosed to the USPTO, it could render the patents unenforceable.

## 3. Breach of Warranty under the United Nations Convention on Contracts for the International Sale of Goods ("CISG") Treaty.

The CISG "applies to contracts of sale of goods between parties whose places of business are in different States" when the states are contracting states under the CISG. The United States and Germany are both contracting states under the CISG. Through multiple purchase order agreements executed between June 2017 through May 2019, Buergofol sold inner film and outer film to Omega, which Omega used to manufacture UV CIPP liners that were sold in the United States, and which Buergofol has accused of infringing the patents-in-suit. Each of the purchase order agreements for inner film and outer film between Buergofol and Omega are contracts of sale of goods between parties whose places of business are in different contracting states under the CISG. Article 42 of the CISG provides: "(1) The seller must deliver goods which are free from any right or claim of a third party based on industrial property or other intellectual property, of which at the time of the conclusion of the contract the seller knew or could not have been unaware, provided that the right or claim is based on industrial property or other intellectual property; (a) under the law of the State where the goods will be resold or otherwise used, if it was contemplated by the parties at the time of the conclusion of the contract that the goods would be resold or otherwise used in that State; or (b) in any other case, under the law of the State where the buyer has his place of business." Pursuant to Article 42, paragraph 1 of the CISG, Buergofol warranted that the inner film provided under the purchase order agreements described above would be delivered to Omega free of any right or claim of any third party based upon industrial property or other intellectual

3

property, such as patent infringement. If sales occurred between businesses in different states bringing in the application of the CISG, then the warranties under the CISG govern those transactions.

### C. The Documents Sought.

Omega seeks "all documents and things that relate to the importation of goods into the United States from January 1, 2000 to December 31, 2014" from or to the companies identified in the subpoena. Specifically, Omega is seeking evidence that will support its claims that the inventions of the '269 and '882 Patents were "on sale" or in "public use" in the United States prior to their critical dates. This includes information that will show the importation of liners or films or foils into the United States by or to the companies identified in the subpoena as "shippers" of the goods or "recipients" of the goods.

It is our understanding that an importer must provide the following information:

- Entry Manifest (CBP Form 7533) or Application and Special Permit for Immediate Delivery (CBP Form 3461) or other form of merchandise release required by the port director,
- Evidence of right to make entry,
- Commercial invoice or a pro forma invoice when the commercial invoice cannot be produced,
- Packing lists, if appropriate,
- Other documents necessary to determine merchandise admissibility.

Importing into the United States *A Guide for Commercial Importers* at p. 12 (https://www.cbp.gov/sites/default/files/documents/Importing%20into%20the%20U.S.pdf). It is our understanding that Customs and Border Patrol maintains these records, or the information contained in them.

Omega is agreeable to limiting its request to the manifests, applications, other forms of merchandise release, commercial invoices, pro forma invoices, and packing lists or the information these documents contain in document form or as electronically stored information (ESI) for each of the companies identified in the subpoena as "shippers" of the goods or "recipients" of the goods. These will hereinafter be referred to as the "Import Records."

Additionally, Omega seeks these records from January 1, 2000, to December 31, 2014. That is because Buergofol, in attempting to invalidate the '269 Patent in Germany when it was still owned by Huhtamaki Films, identified its own sales to Sudpack in 2002 as prior art that would invalidate that patent, i.e., Buergofol claimed its products from 2002 contained every element of the claims of the '269 Patent. In other words, its sales of products from 2002 constituted invalidating prior art under pre-AIA 35 U.S.C. § 102(b). The date range was chosen to capture the importation and sales of this admitted prior art in the United States.

Finally, Omega seeks documents or other information that would render the Import Records self-authenticating under Fed. R. Evid. 902.

4

### D.     The Relevance of the Import Records Sought.

To prove invalidity of the patents under pre-AIA 35 U.S.C. § 102(b), Omega must prove that the invention was on sale **in this country** more than one year **prior to the date of the application** for patent in the United States. But the sale or offer of sale need not occur in the United States. It has long been held that an "invention" can be "on sale in this country" under pre-AIA 35 U.S.C. §102(b) based on activity occurring outside the United States. "An offer of sale originating in a foreign country, directed to a consumer in the United States, can establish an on-sale bar." *Aguayo v. Universal Instruments Corp.*, 356 F. Supp. 2d 699, 742-43 (S.D. Tex. 2005) (product manufactured in Holland and shipped to Canada was on sale in this country because "the offer to sell and acceptance of the [product] occurred and were exchanged within the United States."); *see also, Hamilton Beach Brands, Inc. v. Sunbeam Products, Inc.,* 726 F.3d 1370, 1375-76 (Fed. Cir. 2013) (foreign supplier's confirmation of purchase order was invalidating activity under pre-AIA on-sale bar where the buyer "listed on the purchase order its facility in Tennessee as the shipping address and its office in Virginia as the billing address."); *In re Caveney,* 761 F.2d at 673-74, 677 (Fed. Cir 1985) ("offer from England" was "directed to" a buyer at "its place of business in the United States" and the invention was ultimately shipped to the United States).

Further, the offer of sale and the transfer of ownership can occur in a foreign country and still constitute a sale under pre-AIA 102(b) if the product was sold "for use in the United States." *Caterpillar Inc. v. Int'l Trade Comm'n,* 837 Fed. Appx. 775, 778 (Fed. Cir. 2020) (in affirming the finding of invalidity based on prior art sales where the offer of sale and transfer of title to a company in the United States occurred in Italy since the product was sold "for use in the United States" and therefore constituted "commercial activity directed to the United States.") *See also, Link Treasure Ltd. v. Baby Trend, Inc.*, 809 F. Supp. 2d 1191, 1200 (C.D. Cal. 2011) (finding sales involving a foreign company and directed to a California company constituted prior art sales under Section 102(b).)

Buergofol is a German company and does not maintain offices in the United States. Thus, its sales can constitute prior art sales under pre-AIA 35 U.S.C. § 102(b) if those sales or "commercial activity" regarding them were directed to the United States. The Import Records demonstrating the importation of Buergofol's films into the United States are therefore highly relevant to claims that the '269 and '882 Patents are invalid under pre-AIA 35 U.S.C. §102(b). The Import Records sought demonstrate that those films, and thus the sale of them, were directed to the United States and constitute prior art sales under pre-AIA 35 U.S.C. §102(b). For instance, Buergofol made sales directly to Light Stream, a California Company no longer in business and to Saertex a German company. And, Buergofol was the exclusive provider of films for use in CIPP liners made by Saertex who subsequently imported and sold those CIPP liners in the United States. *Id.* Thus, the Import Records for Buergofol and Saertex are evidence showing prior art sales of Buergofol's products in the United States. The same is true for Buergofol's sales to other German companies, such as Brandenburger and Sudpack. Moreover, Sudpack is a supplier of film products to Omega. *Id.* That which infringes, if earlier, invalidates. *See e.g., Upsher-Smith Laboratories v. Pamlab, L.L.C,* 412 F.3d 1319, 1322 (Fed. Cir. 2005) ("A century-old axiom of patent law holds that a product which would literally infringe if later in time anticipates if earlier.")(internal quotations omitted). So, if the films from the foreign suppliers and manufacturers made their way to the

United States, the Import Records would be evidence of a prior art sale under pre-AIA 35 U.S.C. §102(b).

Additionally, those same records would also be evidence of "prior public use" in the United States under pre-AIA 35 U.S.C. §102(b). *ART+COM Innovationpool GmbH v. Google LLC*, 712 F. App'x 976, 980 (Fed. Cir. Oct. 20, 2017) ("Public use under pre-AIA § 102(b) includes any use of the claimed invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor.") Because the films are for use in CIPP liners to be installed (used) in the United States, the Import Records would be evidence of a prior public use in the United States under pre-AIA 35 U.S.C. §102(b).

The Import Records are also highly relevant to Omega's claims that the patents-in-suit are unenforceable for inequitable conduct. The records would indicate prior art sales were made in the United States and the number and extent of sales over the relevant time period would indicate whether one or more of the inventors had knowledge of the sales and failed to disclose them to the USPTO.

Finally, the Import Records are highly relevant to Omega's claims for breach of warranty under the CISG. The Imports Records will at a minimum demonstrate that the sales occurred between businesses in different "States" and could also indicate terms of the sale.

### E. The Need for the Import Records Cannot Be Overstated.

These highly relevant Import Records are only available from Customs and Border Patrol. Omega has sought these and related records from Buergofol as well as other information regarding the prior art sales. Buergofol claims it does not have any records prior to 2014. And Light Stream is no longer in business.

Further, Buergofol is challenging the authenticity of the few documents Omega has been able to obtain indicating the existence of prior art sales and chain of custody of the films that were sold to, for example, Light Stream and Saertex.

Additionally, Saertex, Brandenburger, Sudpack, Reline, Impreg, and International Pipe Lining are not parties to the action pending in South Dakota and they are German companies. Even though Germany is a signatory to the Hague Convention, it does not require third party witnesses to produce records for use in a civil action in Federal Court in the United States. *See e.g.*, https://www.disputeresolutiongermany.com/2013/08/compelling-german-third-party-witnesses-to-testify-in-us-litigation/. Therefore, there is no way to compel the production or records from these third-party companies located in Germany.[2]

---

[2] While Germany recently amended its laws and now allows some pretrial access to documents for actions outside its borders, it is limited to parties to the action. *See e.g.*, https://www.gibsondunn.com/germany-amends-implementing-act-to-the-hague-evidence-convention-no-longer-forbidding-pre-trial-discovery-of-documents/

6

Omega Exhibit C (p. 6 of 59)

Having exhausted the avenues available to it, Omega is now seeking the highly relevant Import Records from Customs and Border Patrol. Without this information it may not be possible to marshal sufficient evidence to challenge the patents in suit which are clearly invalid under pre-AIA 35 U.S.C. §102(b). Eliminating invalid patents based on available evidence is a vital public interest:

> "It is the public interest which is dominant in the patent system." *Mercoid Corp. v. Mid-Continent Inv. Co.*, 320 U.S. 661, 665, . . . (1944). "The far-reaching social and economic consequences of a patent ... give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.* , 324 U.S. 806, 816, . . . (1945). The functioning of the patent system requires that "everything that tends to a full and fair determination of the matters in controversy should be placed before the court." *Keystone Driller Co. v. Gen.Excavator Co.* , 290 U.S. 240, 244, . . . (1933) . . . .

*Cap Export, LLC v. Zinus, Inc.*, 996 F.3d 1332, 1342 (Fed. Cir. 2021)

### F.   The Factors in 19 C.F.R. §103.23 Support Production of the Import Records Sought.

Section 103.23 lists a set of "general considerations" in determining whether to disclose information pursuant to a demand such as a subpoena. Review of these factors support a decision to produce the requested Import Records.

1. **Disclosure Would Not Violate Any Laws Concerning Privilege** – The information sought is public information not governed by any privilege. Omega merely seeks Import Records that would disclose information regarding the importer, the products being imported and the destination and party receiving the imported goods. Moreover, there is a protective order in place that allows a party or witness to designate information confidential or proprietary and limit its disclosure that would address any concerns of Customs and Border Patrol. A copy of the protective order is attached as Exhibit D.

2. **Disclosure Would Not Violate the Rules of Procedure Governing the Civil Action in Federal Court in South Dakota** - The Federal Rules of Civil procedure govern the action in South Dakota. Those rules allow for fulsome discovery from any person or entity having information relevant to the claims. *See e.g.*, Fed. R. Civ. P. 45. However, Buergofol is a German company and the rules of discovery do not extend past the borders of the United States. Omega does not have full access to its records provided under the Federal Rules of Civil Procedure or a fully effective way to confirm Buergofol's claims it does not have any record of the prior art sales identified by Omega to date.

7

3. **Omega has demonstrated that the information sought:**

    (i)    Is highly relevant to Omegas claims that the patents-in-suit are invalid, unenforceable, and to Omega's counterclaim for breach of warranty under the CISG.

    (ii)   Is necessary for Omega to prove its claims regarding the sales of the claimed inventions in the United States in violation of the "on sale bar" because those sales, made prior to the critical dates of the patents-in-suit were directed to the United States and were for use in the United States.

    (iii)   Is possessed by Customs and Border Patrol which is currently the only source that Omega can realistically obtain the Import Records or evidence of the sales or intended uses was directed to the United States. Having exhausted its efforts to obtain them from Buergofol and not being able to obtain them from foreign third parties.

    (iv)   Is now limited to the manifests, applications, other forms of merchandise release, commercial invoices, pro forma invoices, and packing lists or the information these documents contain in document form or as electronically stored information (ESI) for each of the companies identified in the subpoena as "shippers" of the goods or "recipients" of the goods for the time period from January 1, 2000 to December 31, 2014 in electronic or document format. And those documents or other information that would render the information produced self-authenticating.

4. **Omega is unaware that consultation with the "originating component" is required.** The subpoena seeks the production of documents or information not testimony from a witness. Omega seeks compliance with its subpoena duces tecum to avoid imposing the burden of producing a live witness on Customs and Border Patrol. And obtaining documents or information that render the information produced self-authenticating will be sufficient.

Omega respectfully requests the consideration of the information provided herein. And respectfully requests a decision that will result in the production of the Import Records and information that renders them self-authenticating.

In the meantime, if you have any questions or wish to discuss these matters further please do not hesitate to contact me at 214-356-2170.

Sincerely,

Monte Bond

enclosures

# EXHIBIT A

# United States District Court
## District of South Dakota

United States Courthouse
Office of the Clerk
400 South Phillips, Room 128
Sioux Falls, SD 57104

Matthew W. Thelen
Clerk of Court

Telephone
(605) 330-6600

### MEMORANDUM

TO:         Plaintiffs, Removing Parties and/or their Counsel

FROM:   Matt Thelen, Clerk of Court

RE:         Notice, Consent, and Reference of a Civil Action to a Magistrate Judge

Rule 73 of the Federal Rules of Civil Procedure requires that all parties be notified of the opportunity to consent to have a magistrate judge conduct all proceedings in civil cases. The Clerk's office has prepared an AO 85 form for each party in this case.  Parties should not electronically file this form.

If you filed the Complaint or Petition in this case:

a.  You were given an AO 85 form by the Clerk's Office.
b.  You were also given an AO 85 form for any other plaintiffs in this case.  YOU must deliver an AO 85 form to *all other plaintiffs* in this case.
c.  The Clerk's Office attached an AO 85 to each of the summonses it issued in this case if summonses were requested.  An AO 85 form must be delivered to each defendant in this case.  If the United States or its agencies, corporations, officers or employees are being sued, you must comply with Fed. R. Civ. P. 4(i).

If you filed a Notice of Removal in this case:

a.  You were given an AO 85 form by the Clerk's Office.
b.  You were also given an AO 85 form for each of the other parties in this case.  It is your responsibility to deliver an AO 85 form to each of the other parties in this case.

If you filed a Waiver of Summons in this case:

a.  You were given an AO 85 form by the Clerk's Office.
b.  You were also given an AO 85 form for each of the other parties in this case.  It is your responsibility to deliver an AO 85 form to each of the other parties in this case.

Revised 1-3-18

Omega Exhibit C (p. 10 of 59)

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of South Dakota

| | |
|---|---|
| BUERGOFOL GMBH | ) |
| | ) |
| | ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | ) Civil Action No.  22-cv-4112 |
| OMEGA LINER COMPANY, INC. | ) |
| | ) |
| | ) |
| _____ | ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*
Omega Liner Company, Inc.
Kenny Moulds, Registered Agent
2800 E. 15th St.
Sioux Falls, SD 57103

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Elizabeth S. Hertz
Davenport Evans Hurwitz & Smith, LLP
206 West 14th Street
P.O. Box 1030
Sioux Falls, SD 57104

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

Date:   08/15/2022   _____
*Signature of Clerk or Deputy Clerk*

Omega Exhibit C (p. 11 of 59)

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

Omega Exhibit C (p. 12 of 59)

AO 85 (Rev. 01/09) Notice, Consent, and Reference of a Civil Action to a Magistrate Judge

# UNITED STATES DISTRICT COURT
### for the
### District of South Dakota

| | | |
|---|---|---|
| Buergofol GmbH | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  22-cv-4112 |
| Omega Liner Company, Inc. | ) | |
| *Defendant* | ) | |

## NOTICE, CONSENT, AND REFERENCE OF A CIVIL ACTION TO A MAGISTRATE JUDGE

*Notice of a magistrate judge's availability.* A United States magistrate judge of this court is available to conduct all proceedings in this civil action (including a jury or nonjury trial) and to order the entry of a final judgment. The judgment may then be appealed directly to the United States court of appeals like any other judgment of this court. A magistrate judge may exercise this authority only if all parties voluntarily consent.

You may consent to have your case referred to a magistrate judge, or you may withhold your consent without adverse substantive consequences. The name of any party withholding consent will not be revealed to any judge who may otherwise be involved with your case.

*Consent to a magistrate judge's authority.* The following parties consent to have a United States magistrate judge conduct all proceedings in this case including trial, the entry of final judgment, and all post-trial proceedings.

| *Parties' printed names* | *Signatures of parties or attorneys* | *Dates* |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

## Reference Order

**IT IS ORDERED:** This case is referred to a United States magistrate judge to conduct all proceedings and order the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

Date: _____          _____
                                                  *District Judge's signature*

                                              _____
                                                  *Printed name and title*

Note:   Return this form to the clerk of court only if you are consenting to the exercise of jurisdiction by a United States magistrate judge. Do not return this form to a judge.

# Do Not Electronically File

Omega Exhibit C (p. 13 of 59)

# EXHIBIT B

JS 44 (Rev. 04/21)    Case 4:22-cv-04112-KES   Document 1   Filed 08/15/22   Page 23 of 23 PageID #: 23

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Buergofol GMBH

### DEFENDANTS

Omega Liner Company, Inc.

**(b)** County of Residence of First Listed Plaintiff   Outside of U.S.
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Lincoln County, SD
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Davenport Evans Hurwitz & Smith
206 W 14th St, Sioux Falls SD 57104
605.336.2880

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**INTELLECTUAL PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☒ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark<br>☐ 880 Defend Trade Secrets Act of 2016 | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit (15 USC 1681 or 1692)<br>☐ 485 Telephone Consumer Protection Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 861 HIA ... placeholder |
| | | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | | | ☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another District *(specify)*   ☐ 6 Multidistrict Litigation - Transfer   ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
35 U.S.C. 271 et seq.
Brief description of cause:
Patent infringement

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE   8/15/2022

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| BUERGOFOL GMBH,<br><br>Plaintiff,<br><br>vs.<br><br>OMEGA LINER COMPANY, INC.,<br><br>Defendant. | Civil Action No.: 22-cv- 4112<br><br>**COMPLAINT FOR PATENT<br>INFRINGEMENT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, Buergofol GmbH (hereinafter "Buergofol"), through counsel, brings this complaint against Defendant, Omega Liner Company, Inc. (hereinafter "Omega"), as follows:

### PARTIES

1.      Plaintiff Buergofol is a limited liability company organized under the laws of Germany, with its principal place of business at Jahnstrasse 10, 93354 Siegenburg, Germany. The Managing Director of Buergofol is Gregor Schleicher.

2.      Defendant Omega is a South Dakota corporation with its principal place of business located in Lincoln County at 515 Noid Road, Canton, South Dakota 57013. Omega is engaged in the business of manufacturing and selling ultraviolet cured-in-place pipe liners for pipe renovation ("pipe liners"). The President and registered agent of Omega is Gary Strom.

### JURISDICTION AND VENUE

3.      This is an action for patent infringement arising under the patent laws of

- 1 -

Omega Exhibit C (p. 16 of 59)

the United States, Title 35, United States Code.

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a), as this action arises under the patent laws of the United States, 35 U.S.C. §§ 271 *et seq*.

5. Omega maintains its principal place of business in, and thus resides in, the District of South Dakota.

6. Omega has committed acts of infringement in the District of South Dakota by making and selling infringing pipe liners and has a regular and established place of business in the District of South Dakota.

7. For these reasons, personal jurisdiction exists and venue is proper in this court under 28 U.S.C. §§ 1391(b), 1391(c) and 1400(b).

U.S. PATENT NO. 9,657,882

8. U.S. Patent No. 9,657,882 (hereinafter the '882 Patent) entitled "Tubular Film and the Use Thereof" issued on May 23, 2017 to Kurt Stark, Gregor Schleicher and Abdel-Kader Boutrid. A true and correct copy of the '882 Patent is attached as Exhibit A.

9. The '882 Patent is entitled by statute to a presumption of validity.

10. Buergofol GmbH is the owner of the entire right, title and interest in and to the '882 Patent, including the right to recover for infringement thereof, by virtue of an assignment from the inventors to Buergofol recorded in the United States Patent and Trademark Office at reel/frame 033058/0817.

11. The '882 Patent describes an "insertion tube" suitable for repairing or renovating subterranean pipes such as, for example, sewer pipes. Such an insertion tube is also commonly referred to as a pipe liner. The insertion tube has three layers: 1) an inner layer, 2) a carrier layer that is impregnated with an amount of UV curable resin, and

- 2 -

3) an outer layer. A sewer pipe may be leaking and in need of repair. Rather than having to dig up the pipe to repair it, in a more cost effective fashion the novel insertion tube, in collapsed and deflated form, can be pulled through the pipe when the pipe is in place in the ground. The insertion tube is then expanded so that the outer layer of the insertion tube expands outward and makes good contact with the inner surface of the sewer pipe. A source of UV radiation and/or short-wave visible light is then moved through the insertion tube. UV radiation and/or short-wave light from this moveable source reaches the UV curable resin of the carrier layer, thereby causing the resin in the carrier layer to harden and to cure. Once the resin has hardened and cured, the inner layer is pulled out such that the inner layer releases and peels off from the carrier material layer, and is withdrawn from the renovated sewer pipe.

12.     FIG. 1 of the '882 Patent is replicated below. The "insertion tube" or "pipe liner" 1 includes an inner tubular film 2, a carrier material 4 that is impregnated with resin, and the external tubular film 5.



Fig. 1

- 3 -

Omega Exhibit C (p. 18 of 59)

13.     The UV curable resin of the carrier material layer 4 should not harden prematurely prior to insertion of the insertion tube into the sewer pipe. For example, the UV curable resin should not harden prematurely during storage. Rather, the UV curable resin should cure only when desired as a result of the moveable UV source being pulled through the insertion tube at that time the insertion tube is being installed. Accordingly, the outer film 5 of the insertion tube is made so that it reflects and/or absorbs UV radiation and/or short-wave light. This prevents the unwanted premature hardening of the resin.

14.     The UV curable resin the carrier material layer should, however, receive UV radiation from inside the insertion tube from the moveable UV radiation source, when the UV radiation source is being moved through the insertion tube while the insertion tube is being installed. The inner film 2 is therefore at least to some extent permeable to UV radiation and/or short-wave light. Accordingly, UV light and/or short-wave light from the UV radiation source can pass through the inner film 2 and can reach the UV curable resin of the carrier material 4.

15.     As described in the '882 Patent, prior art liners exhibited difficulties in enabling the inner film to satisfactorily peel off from the remaining cured portion of the insertion tube, without leaving a residue and film fragments on the inside of the renovated sewer pipe. In a novel aspect, a "coating" of the inner film includes a "migrating compound." The coating 3 is shown in FIG. 1 of the '882, which is replicated above. The migrating compound migrates outward from within the inner film to the interface between the inner film and the carrier material. After resin hardening, this migrating compound acts as a release agent that facilitates the release of the inner film 2

- 4 -

Omega Exhibit C (p. 19 of 59)

from the carrier material 4. The '882 Patent explains at column 15, lines 15-18 that in one example the migrating compound is a release wax, more particularly ethylene bis stearamide (EBS).

## U.S. PATENT NO. 8,794,269

16.     U.S. Patent No. 8,794,269 (hereinafter the '269 Patent) entitled "Multi-Layer Film Permeable To UV Radiation" issued on August 5, 2014 to Henrik Hummel. A true and correct copy of the '269 Patent is attached hereto as Exhibit B.

17.     The '269 Patent is entitled by statute to a presumption of validity.

18.     Buergofol GmbH is the owner of the entire right, title and interest in and to the '269 Patent, including the right to recover for infringement thereof, by virtue of: a) an assignment from the inventor Henrik Hummel to Huhtamaki Films Germany GmbH & Co. KG recorded in the United States Patent and Trademark Office starting at reel/frame 029817/0679, b) a name change from Huhtamaki Films Germany GmbH & Co. KG to Infiana Germany GmbH & Co. KG as referenced in the commercial register of the District Court of Bamberg, Germany recorded in the United States Patent and Trademark Office starting at reel/frame 035277/0038 and 037030/0361, c) a name change from Infiana Germany GmbH & Co. KG to Loparex Germany GmbH & Co. KG as referenced in the commercial register of the District Court of Bamberg, Germany recorded in the United States Patent and Trademark Office starting at reel/frame 052408/0363, and d) an assignment from Loparex Germany GmbH & Co. KG to Buergofol GmbH recorded in the United States Patent and Trademark Office at reel/frame 060769/0531.

19.     The '269 Patent describes an "insertion tube" that is suitable for renovation of subterranean pipes, especially sewer pipes. Such an insertion tube is also

- 5 -

Omega Exhibit C (p. 20 of 59)

commonly referred to as a pipe liner. The insertion tube has three portions: 1) an internally situated tube, 2) a support material saturated with a reactive synthetic resin, and 3) an externally situated tubular film. FIG. 1 of the '269 Patent is replicated below. The insertion tube 107 includes an internally situated tube 105, a support material 104 that is saturated with reactive synthetic resin, and an externally situated tubular film 103.



20.     A sewer pipe may be leaking and in need of repair. Rather than having to dig up the pipe to repair it, in a more cost effective fashion the novel insertion tube, in collapsed and deflated form, can be pulled through the pipe when the pipe is in place in the ground. The insertion tube is then expanded so that the outer externally situated tubular film of the insertion tube expands outward and makes good contact with the inner surface of the sewer pipe. A source of UV radiation and/or short-wave visible light is then moved through the insertion tube. UV radiation and/or short-wave light from this moveable source reaches the reactive synthetic resin, thereby causing the resin to cure and harden. Once the resin has cured and hardened, the internally situated tube of the insertion tube is pulled away from the support material of the insertion tube, such that the internally situated portion releases and peels off from the support material portion, and is

- 6 -

Omega Exhibit C (p. 21 of 59)

withdrawn from the renovated sewer pipe.

21.     The resin of the support material 104 should not harden prematurely prior to installing the insertion tube, for example, during storage. Rather, the UV curable resin should cure only when desired as a result of the moveable UV radiation source being pulled through the insertion tube at the time the insertion tube is installed. Accordingly, the externally situated tubular film 103 of the insertion tube is made so that it reflects and/or absorbs UV radiation and/or short-wave light. This prevents the unwanted premature hardening of the resin.

22.     The resin of the support material 104 should, however, receive UV radiation from inside the insertion tube from the moveable UV radiation source, when the UV radiation source is being moved through the insertion tube while the insertion tube is being installed in the pipe. The internally situated tube 105 is therefore at least to some extent permeable to UV radiation. Accordingly, UV radiation from the UV radiation source can pass through the internally situated tube 105 and can reach the UV curable resin of the support material 104.

23.     As described in the '269 Patent, in the prior art there were problems and difficulties associated with an internally situated tube being both permeable to UV radiation as well as having mechanical properties sufficient for the internally situated tube to withstand the high loads that arise during pipe renovation. In a novel aspect, the internally situated tube 105 is a multilayer film that is at least to some extent permeable to UV radiation. This multi-layer film is made of: a layer (a) comprised of at least one thermoplastic such as a polyethylene (PE), an adhesive-promoter layer (b), an internally situated layer (c) comprised of at least one polyamide (PA), an adhesive-promoter

- 7 -

Omega Exhibit C (p. 22 of 59)

layer (d), and a layer (e) comprised of at least one polyamide (PA) layer. The thermoplastic of layer (a) has a VICAT softening point of at least 100 degrees Celsius.

## FACTUAL BACKGROUND

24.    Buergofol is informed and believes and thereupon alleges that Omega has sold and/or continues to sell, offer for sale and manufacture multiple different models of an ultraviolet cured-in-place pipe (CIPP) lining named the "Omega Liner" which has an inner film, an external film, and a carrier material (between the inner and external films) that contains a reactive resin.

25.    Omega has manufactured its Omega Liner at its facility in Canton, South Dakota, as indicated in "Omega's Liner Installation Manual Rev. 1.4 October 2020", which is attached hereto as Exhibit C and which states on page 6, "The Omega Liner is a fiberglass reinforced, cured in place pipe. It consists of an inner foil material, multiple layers of fiberglass reinforcement, a fleece barrier layer and a UV protective outer foil. The reinforcement layers are vacuum impregnated with the UV activated resin material."

26.    Omega has offered for sale an ultraviolet cured-in-place pipe lining using a brochure, which is attached hereto as Exhibit D. The brochure advertises a pipe liner that includes an orange UV-resistant outer foil, middle layers of fiberglass impregnated with UV-curing resin, and a polyethylene polyamine [sic] inner foil.

27.    On information and belief, one of the models of the "Omega Liner" made and sold by Omega is a 10-inch-diameter, UV CIPP Omega Liner that has an orange external tubular film, a fleece layer, a carrier or support material layer that is impregnated with a reactive resin, and an inner tubular film. A portion of this 10-inch-diameter Omega Liner was obtained by Buergofol. This portion of the Omega Liner was

- 8 -

examined and observed to have three components (in addition to a fleece layer). A photograph of the liner portion is replicated below. The various components have been cut so that they are visible in overlapping fashion in the photograph.



The bottom layer in the photograph above is an inner tubular film. In the photograph, the inner tubular film appears as a clear or translucent film that extends from underneath the other liner components in the photograph. In the photograph, a white fibrous layer is disposed on the inner film, and a white fleece layer is disposed on the white fibrous layer. An orange-colored external tubular film is disposed on the fleece layer.

28.     The inner tubular film of the Omega Liner was tested by Buergofol and determined to include three layers. The three layers are: 1) an inner polyethylene (PE) layer, 2) a middle layer of an adhesion promoter (AP) material, and 3) an outer polyamide (PA) layer. The outer PA layer was measured to be approximately 46 microns thick and was determined to include an amount of wax, more specifically ethylene bis stearamide (EBS). This EBS wax is a migrating compound that migrates from within the PA layer to the surface of the external side of the PA layer that faces the white fibrous layer in the photograph above. If Omega's UV-curing liner functions as advertised and

- 9 -

cures in the presence of UV radiation, then the inner tubular film of the liner must, at least to some extent, be permeable to UV radiation.

29.     The white fibrous layer of the Omega Liner was examined by Buergofol and determined to be a support material (woven fiberglass) that was impregnated with, or that was saturated with, a reactive resin. Page 7 of a technical document entitled "Omega-Liner™ Product Information 2021" (attached hereto as Exhibit E) indicates that the reactive resin of the Omega Liner includes a UV-curing agent. Page 6 of Omega's Liner Installation Manual (attached hereto as Exhibit C) states, "The Omega Liner is a fiberglass reinforced, cured in place pipe. It consists of an inner foil material, multiple layers of fiberglass reinforcement, a fleece barrier layer and a UV protective outer foil. The reinforcement layers are vacuum impregnated with the UV activated resin material."

30.     The orange external tubular film of the Omega Liner was tested by Buergofol and determined to have a five-layer structure PE/AP/PA/AP/PE with the approximate layer thicknesses of 57/15/39/13/65 microns, respectively, where PE denotes polyethylene, where AP denotes adhesion promoter, and where PA denotes polyamide, as shown below in the cross-sectional annotated magnified photograph of a cross-section of the external film of the 10-inch-diameter Omega Liner.



opaque external tubular film

- 10 -

Omega Exhibit C (p. 25 of 59)

31.     On information and belief, the polyethylene (PE) layers of the orange external tubular film of the Omega Liner include a yellow pigment that reflects visible light of short wavelengths. The external film of the Omega Liner was tested and determined to reflect or absorb approximately 99.67% of visible light of short wavelengths between 400 and 500 nm. The adhesion promoter (AP) layers of the external film of the Omega Liner include a compound that absorbs UV radiation. The external film portion of the Omega Liner was tested and determined to reflect or absorb approximately 99.85% of UV radiation between 200 and 400 nm.

32.     In addition to the 10-inch-diameter Omega Liner (pictured above in paragraph 27), on information and belief Omega manufactures another model of Omega Liner that has a "7 layer polyethylene polyamine inner containment foil." A portion of the brochure (attached hereto as Exhibit D) is replicated below.



On information and belief, based on the brochure, the described Omega Liner has a

"7 layer" inner "polyethylene polyamine inner containment foil," a carrier material layer

- 11 -

of "multiple layers of high quality E-CR fiberglass," and an orange outer "UV resistent

outer foil." On information and belief, the structure of the Omega Liner pictured above is

substantially the same as the structure of the 10-inch diameter Omega Liner (pictured in

paragraph 27 above), but for the number of polyethylene (PE) and polyamide (PA) layers

of its inner tubular film (also called "inner containment foil").

COUNT I

(Infringement of U.S. Patent No. 9,657,882)

33.     Paragraphs 1-32 are incorporated here as though set forth here in full.

34.     Buergofol has not licensed or otherwise authorized Omega to make, use,

sell or offer for sale any products that embody the claimed inventions of the '882 Patent.

35.     The 10-inch-diameter Omega Liner literally infringes claim 1 of the '882

Patent because the Omega Liner embodies each and every element recited by claim 1.

36.     As indicated by the preamble of claim 1 of the '882 Patent, claim 1 recites

an "insertion tube for use in trenchless sewage pipe renovation." The 10-inch-diameter

Omega Liner is an insertion tube for use in trenchless sewage pipe renovation.

37.     The insertion tube of claim 1 of the '882 Patent is recited to comprise

three portions: 1) "an inner tubular film," 2) "a carrier material" that is "impregnated with

a reactive plastic resin," and 3) "an opaque external tubular film." On information and

belief, the 10-inch-diameter Omega Liner has an inner tubular film, a carrier material that

is impregnated with a reactive plastic resin, and an opaque external tubular film. A cross-

sectional view and a view of the four layers overlapping one another are shown below

(shown on the right) in comparison to the layers shown in an annotated portion of FIG. 1

of the '882 Patent (shown on the left). The fleece layer of the 10-inch-diameter Omega

Liner is neither recited in claim 1 nor shown in FIG. 1.

- 12 -

Omega Exhibit C (p. 27 of 59)



38.     Claim 1 of the '882 Patent recites that "the opaque external tubular film" is "impermeable to liquids and at least partially reflects or absorbs UV radiation or visible light of short wavelengths." The external tubular film of the 10-inch-diameter Omega Liner was tested and determined to have a 5-layer structure PE/AP/PA/AP/PE with the approximate layer thicknesses of 57/15/39/13/65 microns, respectively, where PE denotes polyethylene, AP denotes adhesion promoter, and PA denotes polyamide, as shown below in the cross-sectional image of only the external tubular film portion of the 10-inch-diameter Omega Liner.



On information and belief, the polyethylene (PE) layers of the external tubular film of the

- 13 -

Omega Exhibit C (p. 28 of 59)

Omega Liner include a yellow pigment that reflects visible light of short wavelengths. Approximately 99.67% of visible light of short wavelengths between 400 and 500 nm is reflected or absorbed by the external tubular film. The adhesion promoter layers of the external tubular film of the Omega Liner include a compound that absorbs UV radiation. Approximately 99.85% of UV radiation between 200 and 400 nm is reflected or absorbed by the external tubular film that reflects or absorbs ultraviolet (UV) radiation having a wavelength of 200 to 400 nm and short-wavelength visible light having a wavelength of 400 to 500 nm.

39.     The "carrier material" of claim 1 of the '882 Patent is recited to be "impregnated with a reactive plastic resin arranged between the external film and the inner tubular film." The "Omega's Liner Installation Manual Rev. 1.4 October 2020" (Exhibit C) states on page 6, "The Omega Liner is a fiberglass reinforced, cured in place pipe. It consists of an inner foil material, multiple layers of fiberglass reinforcement, a fleece barrier layer and a UV protective outer foil. The reinforcement layers are vacuum impregnated with the UV activated resin material." Accordingly, the carrier material of the 10-inch-diameter Omega Liner includes a reactive plastic resin.

40.     Claim 1 of the '882 Patent recites that the "inner tubular film" comprises one or multiple layers, an inner facing external side, an outer facing external side, and a "coating." Claim 1 of the '882 Patent further recites that the "coating" is "at least one of (1) a coating with a polysiloxane, or (2) a coating or covering with at least one migrating compound" where the coating "is applied over a section or an entire circumferential area of the outer facing external side facing the carrier material." The migrating compound must be incorporated into the inner tubular film so that it can "migrate" to the surface.

- 14 -

Thus, claim 1 must cover the disclosed embodiment in which the outer layer of the "inner tubular film" incorporates the "migrating compound" which is applied to the external side of the inner film facing the carrier material by migrating out to the surface of that external side. The 10-inch-diameter Omega Liner was tested and determined to be a three-layer film with the structure PA/AP/PE, where PA denotes polyamide, where AP denotes adhesion promoter, where PE denotes polyethylene, the where PA layer has a thickness of approximately 46 microns, and where the combined AP/PE layers have a combined thickness of approximately 162 microns. The PA layer was determined to include a migrating compound that migrates from within the PA layer to the surface of the external side of the PA layer that faces the carrier material and thereby coats or covers the external side. The migrating compound was determined to be a wax, namely ethylene bis stearamide (EBS).

41.     Upon information and belief, Omega has been, and currently is, infringing the '882 patent, either literally or under the doctrine of equivalents, by making, using, selling, and offering for sale in the United States, including within this judicial district, pipe liners that fall within the scope of at least one claim of the '882 Patent, in violation of 35 U.S.C. § 271(a).

42.     Omega's acts of infringement of the '882 Patent complained of herein have caused and will continue to cause Buergofol immediate and irreparable harm unless such infringing activities are enjoined by this Court pursuant to 35 U.S.C. § 283. Buergofol has no adequate remedy at law for Omega's acts of infringement. As a result of Omega's infringement of the '882 Patent, Buergofol has been and continues to be damaged in an amount yet to be determined.

Omega Exhibit C (p. 30 of 59)

## COUNT II
(Infringement of U.S. Patent No. 8,794,269)

43.     Paragraphs 1-32 are incorporated here as though set forth here in full.

44.     Buergofol has not licensed or otherwise authorized Omega to make, use, sell or offer for sale any products that embody the claimed inventions of the '269 Patent.

45.     The Omega Liner with the 7-layer inner containment foil (pictured in the brochure of Exhibit D) literally infringes claim 1 of the '269 Patent because the Omega Liner embodies each and every element recited by claim 1.

46.     As indicated by the preamble of claim 1 of the '269 Patent, claim 1 claims an "insertion tube" that is "suitable for the renovation of subterranean pipes, optionally subterranean sewer pipes." The Omega Liner (pictured in the brochure of Exhibit D) is an insertion tube for use in trenchless sewage pipe renovation. The brochure refers to the insertion tube as "The Contractor's Choice ULTRAVIOLET CURED IN PLACE PIPE LINING."

47.     The insertion tube of claim 1 of the '269 Patent is recited to comprise three portions: 1) an "internally situated tube," 2) a "support material" with a "reactive synthetic resin," and 3) an "externally situated single- or multilayer tubular film." On information and belief, the Omega Liner (pictured in the brochure of Exhibit D) has an "internally situated tube," 2) a "support material" with a "reactive synthetic resin," and 3) an "externally situated single- or multilayer tubular film." The Omega Liner, as pictured in the brochure of Exhibit D, is shown below in annotated form to identify the three portions.

- 16 -



**Externally Situated Single- or Multilayer Tubular Film**

**Support Material**

**Internally Situated Tube**

48.     Claim 1 of the '269 Patent recites that the "internally situated tube" is an "optionally nonconditioned multilayer film that is impermeable to liquids and that is at least to some extent permeable to UV radiation."  On information and belief, the Omega Liner (pictured in the brochure of Exhibit D) has substantially the same structure as does the 10-inch-diameter Omega Liner pictured above in paragraph 27, but for the number of polyethylene (PE) and polyamide (PA) layers of its inner tubular film (also called its "internally situated tube").  If Omega's UV-curing liner functions as advertised and cures in the presence of UV radiation, then the internally situated tube of the Omega Liner must, at least to some extent, be permeable to UV radiation, as recited in claim 1.

49.     Claim 1 of the '269 Patent recites that the "multilayer film" of the internal situated tube is made of 1) a layer "a" comprised of at least one "thermoplastic" polymer, 2) an adhesive-promoter layer "b", 3) an internally situated layer "c" comprised of at least one "homo- and/or copolyamide," 4) an adhesive-promoter layer "d", and 5) a layer "e" comprised of at least one "homo- and/or copolyamide."  On information and

- 17 -

Omega Exhibit C (p. 32 of 59)

belief, the Omega Liner (pictured in the brochure of Exhibit D) has substantially the same structure as does the 10-inch-diameter Omega Liner pictured above in paragraph 27, but for the number of polyethylene (PE) and polyamide (PA) layers of its inner tubular film (also called its "internally situated tube"). Whereas the inner tubular film of the 10-inch-diameter Omega Liner was tested and determined to be a three-layer film with the structure PA/AP/PE (where PA denotes polyamide, AP denotes adhesion promoter, and PE denotes polyethylene), on information and belief the inner-layer film of the Omega Liner (pictured in the brochure of Exhibit D) has seven layers as indicated on the brochure, where in addition to the three PA/AP/PE layers of the 10-in-diameter Omega Liner, four additional layers are present between the AP and the PE layers. The four additional layers of the 7-layer inner tubular film of Exhibit D are the layers PA/AP/PE/PE disposed between the AP and PE layers of the PA/AP/PE layers of the 10-in-diameter Omega Liner, which results in the 7-layer film PA/AP/PA/AP/PE/PE/PE.

     50.    Upon information and belief, the 7-layer inner tubular film **PA**/**AP**/**PA**/**AP**/PE/PE/**PE** of the Omega Liner offered for sale in the brochure of Exhibit D includes the five layers recited in claim 1 of the '269 Patent, which are bolded and underscored in the preceding layer designations. From right to left in the preceding layer designations, the bolded and underscored layers include 1) a PE layer comprised of at least one "thermoplastic" polymer, 2) an adhesive-promoter layer AP, 3) an internally situated layer PA comprised of at least one "homo- and/or copolyamide," 4) an adhesive-promoter layer AP, and 5) a layer PA comprised of at least one "homo- and/or copolyamide."

     51.    Claim 1 of the '269 Patent recites that "the VICAT softening point of the

- 18 -

thermoplastic olefin homo- or copolymer of the layer (a) is at least 100° C." On information and belief, the Omega Liner (pictured in the brochure of Exhibit D) has substantially the same structure as does the 10-inch-diameter Omega Liner pictured above in paragraph 27, but for the number of polyethylene (PE) and polyamide (PA) layers of its inner tubular film (also called its "internally situated tube"). The external thermoplastic olefin polymer layers of the 3-layer and 7-layer inner films are substantially the same. The VICAT softening point of the thermoplastic layer of the inner tubular film of the 10-inch-diameter Omega Liner (pictured above in paragraph 27) was tested by Buergofol and determined to be greater than one hundred degrees Celsius.

52.    Claim 1 of the '269 Patent recites that the externally situated tubular film "reflects and/or absorbs UV radiation and/or short-wave, visible light." On information and belief, the Omega Liner (pictured in the brochure of Exhibit D) has substantially the same structure as does the 10-inch-diameter Omega Liner pictured above in paragraph 27, but for the number of polyethylene (PE) and polyamide (PA) layers of its inner tubular film (also called its "internally situated tube"). The "external tubular film" of the 10-inch-diameter Omega Liner (pictured above in paragraph 27) was tested by Buergofol. Approximately 99.67% of visible light of short wavelengths between 400 and 500 nm is reflected or absorbed by the external tubular film. The adhesion promoter layers of the external tubular film of the Omega Liner include a compound that absorbs UV radiation. Approximately 99.85% of UV radiation between 200 and 400 nm is reflected or absorbed by the external tubular film that reflects or absorbs ultraviolet (UV) radiation having a wavelength of 200 to 400 nm and short-wavelength visible light having a wavelength of 400 to 500 nm.

- 19 -

Omega Exhibit C (p. 34 of 59)

53.     Claim 1 of the '269 Patent recites that the "support material" is "saturated with a reactive synthetic resin." On information and belief, the Omega Liner (pictured in the brochure of Exhibit D) has substantially the same structure as does the 10-inch-diameter Omega Liner pictured above in paragraph 27, but for the number of polyethylene (PE) and polyamide (PA) layers of its inner tubular film (also called its "internally situated tube"). The fiberglass layer of the Omega Liner pictured in the brochure of Exhibit D therefore is saturated with resin as is the fiberglass layer of the 10-inch-diameter Omega Liner (pictured above in paragraph 27). Page 4 of the technical document entitled "Omega-Liner™ Product Information 2021" (attached hereto as Exhibit E) lists "Unsaturated Polyester" and "Vinyl Ester" as the "Resin System(s)" of the Omega Liner. Under "Resin System Data" on page 7, the curing agents of the Omega Liner are described as "UV-curing: UV-initiators."

54.     Upon information and belief, Omega has been, and currently is, infringing the '269 patent, either literally or under the doctrine of equivalents, by making, using, selling, and offering for sale in the United States, including within this judicial district, pipe liners that fall within the scope of at least one claim of the '269 Patent, in violation of 35 U.S.C. § 271(a).

55.     Omega's acts of infringement of the '269 Patent complained of herein have caused and will continue to cause Buergofol immediate and irreparable harm unless such infringing activities are enjoined by this Court pursuant to 35 U.S.C. § 283. Buergofol has no adequate remedy at law for Omega's acts of infringement. As a result of Omega's infringement of the '269 Patent, Buergofol has been and continues to be damaged in an amount yet to be determined.

- 20 -

Omega Exhibit C (p. 35 of 59)

### PRAYER FOR RELIEF

WHEREFORE, Buergofol requests judgment against Omega as follows:

1.    Adjudging that Omega has infringed the '882 Patent in violation of 35 U.S.C. § 271(a);

2.    Granting an injunction permanently enjoining Omega, as well as its owners, employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries and assigns, and all of those in active concert and participation with any of the foregoing persons or entities from infringing, contributing to the infringement of, and/or inducing infringement of the '882 Patent;

3.    Ordering Omega to account to Buergofol and pay damages to compensate Buergofol for Omega's infringement of the '882 Patent, with pre-judgment and post-judgment interest and costs, pursuant to 35 U.S.C. § 284; and

4.    Adjudging that Omega has infringed the '269 Patent in violation of 35 U.S.C. § 271(a);

5.    Granting an injunction permanently enjoining Omega, as well as its owners, employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries and assigns, and all of those in active concert and participation with any of the foregoing persons or entities from infringing, contributing to the infringement of, and/or inducing infringement of the '269 Patent;

6.    Ordering Omega to account to Buergofol and pay damages to compensate Buergofol for Omega's infringement of the '269 Patent, with pre-judgment and post-judgment interest and costs, pursuant to 35 U.S.C. § 284; and

Omega Exhibit C (p. 36 of 59)

7.    Awarding such other and further legal and equitable relief as this Court

deems just and proper.

## DEMAND FOR JURY TRIAL

Buergofol hereby requests a trial by jury on all issues so triable pursuant to

Rule 38 of the Federal Rules of Civil Procedure.

Dated this 15th day of August, 2022

**DAVENPORT, EVANS, HURWITZ**
**& SMITH, L.L.P.**

By  /s/ Elizabeth S. Hertz
   Elizabeth S. Hertz
   P.O. Box 1030
   206 West 14th Street
   Sioux Falls, SD 57101-1030
   Phone (605) 357-1263
   Fax (605) 335-3639
   Email ehertz@dehs.com

   Attorneys for Plaintiff Buergofol

Omega Exhibit C (p. 37 of 59)

# EXHIBIT C



US008794269B2

(12) **United States Patent**
Hummel

(10) **Patent No.:** US 8,794,269 B2
(45) **Date of Patent:** Aug. 5, 2014

(54) **MULTI-LAYER FILM PERMEABLE TO UV RADIATION**

(71) Applicant: **Huhtamaki Films Germany GmbH & Co. KG.**, Forchheim (DE)

(72) Inventor: **Henrik Hummel**, Leipzig (DE)

(73) Assignee: **Huhtamaki Films Germany GmbH & Co. KG**, Forchheim (DE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/690,076**

(22) Filed: **Nov. 30, 2012**

(65) **Prior Publication Data**

US 2013/0126029 A1 May 23, 2013

**Related U.S. Application Data**

(63) Continuation of application No. PCT/EP2011/002685, filed on May 31, 2011.

(30) **Foreign Application Priority Data**

Jun. 15, 2010 (DE) ......................... 10 2010 023 764

(51) **Int. Cl.**
*F16L 55/16* (2006.01)
(52) **U.S. Cl.**
USPC ................................. **138/98**; 138/97; 428/35.2
(58) **Field of Classification Search**
USPC ................................. 138/97, 98; 428/35.2
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,679,966 B1 * | 1/2004 | Brandenburger ............. | 156/190 |
| 8,361,580 B2 * | 1/2013 | Stark et al. ............. | 428/36.91 |
| 2002/0015810 A1 | 2/2002 | Piper et al. | |

| | | | |
|---|---|---|---|
| 2003/0017352 A1 | 1/2003 | Dayrit et al. | |
| 2009/0139593 A1 | 6/2009 | Papp | |
| 2010/0047416 A1 | 2/2010 | Oblozski et al. | |
| 2011/0083765 A1 * | 4/2011 | Stark et al. ............. | 138/97 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 29700236 U1 | 5/1998 |
| DE | 198 17 413 A1 | 10/1998 |
| DE | 199 24 251 | 11/2000 |
| DE | 60212816 T2 | 11/2006 |

(Continued)

OTHER PUBLICATIONS

International Search Report dated Aug. 19, 2011, mailed Aug. 31, 2011.

(Continued)

*Primary Examiner* — Patrick F Brinson
(74) *Attorney, Agent, or Firm* — Norris McLaughlin & Marcus PA

(57) **ABSTRACT**

A multilayer film that is impermeable to liquids and is to some extent permeable to UV radiation, optionally in the form of a tubular film, having a layer sequence of a layer (a) comprising at least one thermoplastic olefin homo- or copolymer, as one of the external layers, an adhesive-promoter layer (b), an internal layer (c) comprising at least one homo- and/or copolyamide, an adhesive-promoter layer (d), and a layer (e) comprising at least one homo- and/or copolyamide, as one of the external layers, wherein the VICAT softening point of the thermoplastic olefin homo- or copolymer of the layer (a) is at least 100° C., and the use of said multilayer film as internally situated tube of an insertion tube for the renovation of subterranean pipes, an insertion tube of this type, and a pipe-renovation system suitable for the renovation of subterranean pipes.

**10 Claims, 1 Drawing Sheet**



## US 8,794,269 B2

Page 2

(56)  **References Cited**

### FOREIGN PATENT DOCUMENTS

| DE | 60030706 T2 | 9/2007 |
| DE | 102006047779 A1 | 4/2008 |
| DE | 102009041841 A1 | 7/2010 |
| EP | 0267742 A2 | 5/1988 |
| EP | 0342897 A2 | 11/1998 |
| EP | 1155256 B1 | 1/2003 |
| WO | 2007054350 A1 | 5/2007 |

### OTHER PUBLICATIONS

Translation of International Search Report dated Aug. 19, 2011, mailed Aug. 31, 2011.

The Request for Cancellation for the Corresponding German Utility Model, dated Apr. 30, 2012.

Cancellation Procedure Document D2. Technical Datasheet PRIEX Resins, PRIED 30101 Maleic Anthydride Modified Ionomeric HDPE, Jan. 2011.

Cancellation Procedure Document D4. Kunststoff-Folien, Herstellung—Eigenschaften—Anwendung, Carl Hanser Verlag Munich Austria, 2006.

Cancellation Procedure Document D13. "Ansprechpartner, Kommunikation, Schriftwerkehr, Q-Anforderung, 0- Aufzeichnung, Belegmuster/Rücklagenmuster, Prüfzeetifikat-Coexfilm, Reklamationsablauf, . . .", Buergofol GmbH, Feb. 2006.

Cancellation Procedure Document N2, Plastic News, Plastics Co., Jul. 2008.

Cancellation Procedure Document N3, Wärmeformbestandigkeit, Sep. 2011.

Cancellation Procedure Document N4, "Produktfolder mit 2 × 6 Flyer (deutsch, englisch) zum Einlegen Konzeption und Gestaitung, Fotoshooting, Druckvorbereitung, Druck", die agentur, Übertrag, Jan. 2006.

Cancellation Procedure Document N5, Fachbegriffe und Anwendungsbeispiele von Experten erklärt, Verpackungs Lexikon, 2010.

* cited by examiner

Omega Exhibit C (p. 40 of 59)

**U.S. Patent**          Aug. 5, 2014          US 8,794,269 B2



Omega Exhibit C (p. 41 of 59)

US 8,794,269 B2

1

## MULTI-LAYER FILM PERMEABLE TO UV RADIATION

This application is a continuation of International Application PCT/EP2011/002685 filed May 31, 2011, which claims priority to German application 10 2010 023 764.7 filed Jun. 15, 2010.

The present invention relates to a multilayer film that is impermeable to liquid and that is at least to some extent permeable to UV radiation, preferably in the form of a tubular film, comprising a layer sequence made of a layer (a) based on at least one thermoplastic olefin homo- or copolymer, as one of the external layers, an adhesive-promoter layer (b), an internally situated layer (c) based on at least one homo- and/or copolyamide, an adhesive-promoter layer (d), and a layer (e) based on at least one homo- and/or copolyamide, as one of the external layers, where the VICAT softening point of the thermoplastic olefin homo- or copolymer of the layer (a) is at least 100° C., to the use of this type of multilayer film as internally situated tube of an insertion tube for the renovation of subterranean pipes, to an insertion tube of this type, and to a pipe-renovation system suitable for the renovation of subterranean pipes, preferably subterranean sewer pipes.

### BACKGROUND OF THE INVENTION

The prior art has already disclosed multilayer films which are permeable to UV radiation and inter alia can be used in the renovation of pipes.

By way of example, EP-A-0 342 897 describes a multilayer film which has a polyamide layer as a first surface layer and an ionomer sealing layer as a second surface layer. If the multilayer film is used for pipe renovation, the polyamide layer is bonded to a fibrous nonwoven by heating, and this is then saturated with a hardenable resin. After conditioning of the film, this is applied, together with the resin that, after the saturation process, is located on the surface, onto the region requiring renovation on the internal wall of the pipe, over the entire pipe circumference. After hardening of the resin by means of UV radiation, a stable pipe section at the internal pipe wall requiring renovation is obtained. The two ends of the film are then sealed to one another by way of the ionomer sealing layer.

In another known process for the renovation of subterranean pipes, a flexible insertion tube is provided, and is drawn into the pipe requiring renovation. Said insertion tube comprises two tubes, preferably plastics tubes, with different diameter, between which a support material saturated with a reactive synthetic resin has been introduced. After the introduction of the collapsed insertion tube into the pipe and inflation of the insertion tube to the diameter of the pipe, the synthetic resin is hardened between the two tubes in order to obtain, after removal of the internal tube, a stable pipe at the internal pipe wall requiring renovation. The hardening can be achieved via irradiation with UV radiation. In order to prevent undesired premature hardening of the synthetic resin prior to introduction into the pipe requiring renovation, it is necessary that the externally situated tube of the insertion tube has a protective layer or is composed thereof, in order to prevent premature exposure to external UV radiation and thus premature curing of the resin. In contrast, the internally situated tube of this type of insertion tube has to have permeability to UV radiation, in order to permit, in the inflated condition, the hardening procedure.

The internally situated tube of this type of insertion tube, or a corresponding multilayer film, preferably in the form of a tube, used for pipe renovation and as disclosed by way of

2

example in EP-A-0 342 897, is subject to stringent mechanical requirements, in order that it can withstand loads arising during its handling, for example those occurring during introduction into the pipe requiring renovation, during the inflation of the respective film within the pipe, or—after successful renovation—during removal from the pipe.

A disadvantage of a multilayer film disclosed in EP-A-0 342 897 is that it has a point of weakness at least in the region of the seal seam, and/or a disadvantage with conventional tubular films which are used as internally situated tubes of an insertion tube during pipe renovation is that these do not have the mechanical properties required in order to withstand the loads described above. To this end, conditioning can optionally be used in order to achieve an improvement in conventional films, where these have at least one layer based on a polyamide.

There is therefore a need for multilayer films which do not have the abovementioned disadvantages.

It was therefore an object of the present invention to provide a multilayer film, in particular in the form of a tubular film, which is suitable as internally situated tube of an insertion tube for the renovation of subterranean pipes, preferably subterranean sewer pipes, since it has not only the necessary permeability to UV radiation but also mechanical properties that are sufficiently good for it to withstand the high loads that arise during pipe renovation.

### SUMMARY OF THE INVENTION

Said object is achieved via provision of the multilayer film of the invention that is impermeable to liquids and that is at least to some extent permeable to UV radiation, preferably in the form of a tubular film, comprising a layer sequence made of

(a) a layer (a) based on at least one thermoplastic olefin homo- or copolymer, as one of the external layers, or surface layers,

(b) an adhesive-promoter layer (b),

(c) an internally situated layer (c) based on at least one homo- and/or copolyamide,

(d) an adhesive-promoter layer (d), and

(e) a layer (e) based on at least one homo- and/or copolyamide, as one of the external layers, or surface layers,

where the VICAT softening point of the thermoplastic olefin homo- or copolymer of the layer (a) is at least 100° C.

Surprisingly, it has been found that the multilayer film of the invention features an excellent barrier effect in relation to drying-out of the resin used for pipe renovation, and therefore in relation to the loss, i.e. migration, of monomers or of other saturation means. It has moreover been established, surprisingly, that the multilayer film of the invention, in particular in the form of a multilayer tubular film, or else in the form of a multilayer film sealed to give a tube, features very good mechanical properties, in particular very good extensibility, in such a way that it withstands the loads that arise during the renovation of subterranean pipes, in particular during inflation within the pipe system, during the preceding transport, the preceding storage, and the entry into the pipe requiring renovation, and moreover, after the hardening of the resin, can be withdrawn therefrom without any break-off, splitting or tearing. It has moreover been found, surprisingly, that the multilayer film of the invention has the very good mechanical properties even without prior conditioning, thus rendering a conditioning step unnecessary.

Omega Exhibit C (p. 42 of 59)

# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| BUERGOFOL GMBH, | 4:22-CV-04112-KES |
| Plaintiff, | |
| vs. | PROTECTIVE ORDER |
| OMEGA LINER COMPANY, INC., | |
| Defendant. | |

In accordance with the court's order granting in part and denying in part Omega's motion for a protective order, it is

ORDERED that the following protective order is entered in this matter.

1.    PURPOSES AND LIMITATIONS

Disclosure and discovery activity in this action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation may be warranted. The parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles.

This Protective Order is issued to facilitate document disclosure and production under the Local Rules of this Court and the Federal Rules of Civil Procedure. Information subject to this Protective Order may be used only for the purposes of this litigation. Unless modified pursuant to the terms contained in this Protective Order, this Protective Order shall remain in effect through the conclusion of this litigation.

2.    DEFINITIONS

2.1    Challenging Party: a Party or Non-Party that challenges the designation of information or items under this Protective Order.

2.2    "CONFIDENTIAL" Information or Items: information (regardless of how it is generated, stored or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c).

2.3    Counsel (without qualifier): Outside Counsel of Record and House Counsel (as well as their support staff).

2.4    Designated House Counsel: House Counsel who seek access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information in this matter.

2.5    Designating Party: a Party or Non-Party that designates information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY".

2.6    Disclosure or Discovery Material: all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery in this matter.

2.7    Expert: a person with specialized knowledge or experience in a matter pertinent to the litigation who (1) has been retained by a Party or its Counsel to serve as an expert witness or as a consultant in this action, (2) is not a past or current employee of a Party or of a Party's competitor, and (3) at the time of retention, is not anticipated to become an employee of a Party or of a Party's competitor.

2.8    "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items: extremely sensitive "Confidential Information or Items," disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means.

2.9    House Counsel: attorneys who are employees of a party to this action. House Counsel does not include Outside Counsel of Record or any other outside counsel.

2.10   Non-Party: any natural person, partnership, corporation, association, or other legal entity not named as a Party to this action.

2

2.11  Outside Counsel of Record: attorneys who are not employees of a party to this action but are retained to represent or advise a party to this action and have appeared in this action on behalf of that party or are affiliated with a law firm which has appeared on behalf of that party.

2.12  Party: any party to this action, including all of its officers, directors, employees, consultants, retained experts, and Outside Counsel of Record (and their support staffs).

2.13  Producing Party: a Party or Non-Party that produces Disclosure or Discovery Material in this action.

2.14  Professional Vendors: persons or entities that provide litigation support services (e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

2.15  Protected Material: any Disclosure or Discovery Material that is designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."

2.16  Receiving Party: a Party that receives Disclosure or Discovery Material from a Producing Party.

3.     SCOPE

The protections conferred by this Protective Order cover not only Protected Material (as defined above), but also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel that might reveal Protected Material. However, the protections conferred by this Protective Order do not cover the following information: (a) any information that is in the public domain at the time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through trial or court filings or otherwise; and (b) any information known to the Receiving Party prior to the disclosure or obtained by the Receiving Party after

3

Omega Exhibit C (p. 46 of 59)

the disclosure from a source who obtained the information lawfully and under no obligation of confidentiality to the Designating Party. Any use of Protected Material at trial shall be governed by a separate agreement or order.

4.    DURATION

Even after final disposition of this litigation, the confidentiality obligations imposed by this Protective Order shall remain in effect until a Designating Party agrees otherwise in writing or a court order otherwise directs. Final disposition shall be deemed to be the later of (1) dismissal of all claims and defenses in this action, with or without prejudice; and (2) final judgment herein after the completion and exhaustion of all appeals, rehearings, remands, trials, or reviews of this action, including the time limits for filing any motions or applications for extension of time pursuant to applicable law.

5.    DESIGNATING PROTECTED MATERIAL – OVERDESIGNATION
      PROHIBITED

5.1    Exercise of Restraint and Care in Designating Material for Protection. Each Party or Non-Party that designates information or items for protection under this Protective Order must take care to limit any such designation to specific material that qualifies under the appropriate standards. To the extent it is practical to do so, the Designating Party must designate for protection only those parts of material, documents, items, or oral or written communications that qualify – so that other portions of the material, documents, items, or communications for which protection is not warranted are not swept unjustifiably within the ambit of this Protective Order.

Overdesignation Prohibited: Mass, indiscriminate, or routinized designations are prohibited. Designations that are shown to be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily encumber or retard the case development process or to impose unnecessary expenses and burdens on other parties) expose the Designating Party to sanctions.

If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection at all or do not

4

Omega Exhibit C (p. 47 of 59)

qualify for the level of protection initially asserted, that Designating Party must promptly notify all other Parties that it is withdrawing the mistaken designation.

    5.2   Manner and Timing of Designations. Except as otherwise provided in this Order (see, e.g., second paragraph of Section 5.2(a) below), or as otherwise stipulated or ordered, Disclosure or Discovery Material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced.

    Designation in conformity with this Order requires:

    (a) for information in documentary form (e.g., paper or electronic documents, but excluding transcripts of depositions or other pretrial or trial proceedings), that the Producing Party affix the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" to each page that contains protected material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins) and must specify, for each portion, the level of protection being asserted.

    A Party or Non-Party that makes original documents or materials available for inspection need not designate them for protection until after the inspecting Party has indicated which material it would like copied and produced. During the inspection and before the designation, all of the material made available for inspection shall be deemed "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." After the inspecting Party has identified the documents it wants copied and produced, the Producing Party must determine which documents, or portions thereof, qualify for protection under this Order. Then, before producing the specified documents, the Producing Party must affix the appropriate legend ("CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY") to each page that contains Protected Material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins) and must specify, for each portion, the level of protection being asserted.

Omega Exhibit C (p. 48 of 59)

(b) for testimony given in deposition or in other pretrial or trial proceedings, that the Designating Party identify on the record, before the close of the deposition, hearing, or other proceeding, all protected testimony and specify the level of protection being asserted. When it is impractical to identify separately each portion of testimony that is entitled to protection and it appears that substantial portions of the testimony may qualify for protection, the Designating Party may invoke on the record (before the deposition, hearing, or other proceeding is concluded) a right to have up to 21 days after receipt of the deposition transcript to identify the specific portions of the testimony as to which protection is sought and to specify the level of protection being asserted. Only those portions of the testimony that are appropriately designated for protection within the 21 days shall be covered by the provisions of this Protective Order.

Parties shall give the other parties notice if they reasonably expect a deposition, hearing, or other proceeding to include Protected Material so that the other parties can ensure that only authorized individuals who have signed the "Acknowledgment and Agreement To Be Bound" (Exhibit A) are present at those proceedings. The use of a document as an exhibit at a deposition shall not in any way affect its designation as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."

Transcripts containing Protected Material shall have an obvious legend on the title page that the transcript contains Protected Material, and the title page shall be followed by a list of all pages (including line numbers as appropriate) that have been designated as Protected Material and the level of protection being asserted by the Designating Party. The Designating Party shall inform the court reporter of these requirements. Any transcript that is prepared before the expiration of a 21-day period for designation shall be treated during that period as if it had been designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" in its entirety unless otherwise agreed. After the expiration of that period, the transcript shall be treated only as actually designated.

6

(c) <u>for information produced in some form other than documentary and for any other tangible items</u>, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information or item is stored the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY". If only a portion or portions of the information or item warrant protection, the Producing Party, to the extent practicable, shall identify the protected portion(s) and specify the level of protection being asserted.

5.3     <u>Inadvertent Failures to Designate</u>. If timely corrected, an inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. Upon timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

6.     <u>CHALLENGING CONFIDENTIALITY DESIGNATIONS</u>

6.1     <u>Timing of Challenges</u>. Any Party or Non-Party may challenge a designation of confidentiality at any time. Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable, substantial unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

6.2     <u>Meet and Confer</u>. The Challenging Party shall initiate the dispute resolution process by providing written notice of each designation it is challenging and describing the basis for each challenge. The parties shall attempt to resolve each challenge in good faith and must begin the process by conferring directly (in voice-to- voice dialogue; other forms of communication are not sufficient) within 14 days of the date of service of notice. In conferring, the Challenging Party must explain the basis for its belief that the confidentiality designation was not proper and must give the Designating Party an opportunity to review the designated material, to reconsider the

7

circumstances, and, if no change in designation is offered, to explain the basis for the chosen designation. A Challenging Party may proceed to the next stage of the challenge process only if it has engaged in this meet and confer process first or establishes that the Designating Party is unwilling to participate in the meet and confer process in a timely manner.

6.3     Judicial Intervention. If the Parties cannot resolve a challenge without court intervention, the Designating Party shall file and serve a motion to retain confidentiality within 21 days of the initial notice of challenge or within 14 days of the parties agreeing that the meet and confer process will not resolve their dispute, whichever is earlier. Each such motion must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed in the preceding paragraph. Failure by the Designating Party to make such a motion including the required declaration within 21 days (or 14 days, if applicable) shall automatically waive the confidentiality designation for each challenged designation.

In addition, the Challenging Party may file a motion challenging a confidentiality designation at any time if there is good cause for doing so, including a challenge to the designation of a deposition transcript or any portions thereof. Any motion brought pursuant to this provision must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed by the preceding paragraph.

The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Frivolous challenges and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the Challenging Party to sanctions. Unless the Designating Party has waived the confidentiality designation by failing to file a motion to retain confidentiality as described above, all parties shall continue to afford the material in question the level of protection to which it is entitled under the Producing Party's designation until the court rules on the challenge.

8

7.    ACCESS TO AND USE OF PROTECTED MATERIAL

7.1    Basic Principles. A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in connection with this case only for prosecuting, defending, or attempting to settle this litigation. Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When the litigation has been terminated, a Receiving Party must comply with the provisions of Section 14 below (FINAL DISPOSITION).

Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

7.2    Disclosure of "CONFIDENTIAL" Information or Items. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

(a)  the Receiving Party's Outside Counsel of Record in this action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation. The Receiving Party's Outside Counsel of Record, as well as their employees, are bound by this Protective Order and are not required to sign the "Acknowledgment and Agreement To Be Bound" that is attached hereto as Exhibit A;

(b)  the officers, directors, and employees (including House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement To Be Bound" (Exhibit A);

(c)  Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement To Be Bound" (Exhibit A);

(d)  the court and its personnel;

(e)  court reporters and their staff;

9

(f)  professional jury or trial consultants, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement To Be Bound" (Exhibit A); and

(g) during their depositions, witnesses in the action to whom disclosure is reasonably necessary and who have signed the "Acknowledgment and Agreement To Be Bound" (Exhibit A), unless otherwise agreed by the Designating Party or ordered by the court.  Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Protective Order.

(h) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information.

7.3    Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" only to:

(a) the Receiving Party's Outside Counsel of Record in this action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation.  The Receiving Party's Outside Counsel of Record, as well as their employees informed of their obligations under the Protective Order, are bound by this Protective Order and are not required to sign the "Acknowledgment and Agreement To Be Bound" that is attached hereto as Exhibit A;

(b) Experts of the Receiving Party (1) to whom disclosure is reasonably necessary for this litigation and (2) who have signed the "Acknowledgment and Agreement To Be Bound" (Exhibit A);

(c) the court and its personnel;

(d) court reporters and their staff;

(e) professional jury or trial consultants, and Professional Vendors to whom disclosure is reasonably necessary for this

10

litigation and who have signed the "Acknowledgment and Agreement To Be Bound" (Exhibit A); and

(f)  the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information.

## 8.   PATENT PROSECUTION BAR

Absent written consent from the Producing Party, if Darien Wallace receives access to the Producing Party's materials designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" that are directed to non-public technical information, excluding financial information, non-technical business information, or information that can be obtained through reverse engineering, he shall not prepare, prosecute, or assist in the preparation or prosecution of any patent application relating to UV cured-in-place pipe (CIPP) liners and the processes and materials used to make UV CIPP liners, including without limitation the patents asserted in this action and any patent or application claiming priority to or otherwise related to the patents asserted in this action, before any foreign or domestic agency, including the United States Patent and Trademark Office ("the Patent Office"). To avoid any doubt, "prosecution" as used in this paragraph does not include representing a party challenging a patent before a domestic or foreign agency (including, but not limited to, a reissue protest, ex parte reexamination or inter partes reexamination). This Patent Prosecution Bar shall begin when access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" non-public technical information, excluding financial information, non-technical business information, or information that can obtained through reverse engineering, is first received by the affected individual and shall end two (2) years after a final judgment from the District Court for the District of South Dakota in this matter.

## 9.   PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION

If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any information or items designated in

11

this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," that Party must:

(a) promptly notify in writing the Designating Party. Such notification shall include a copy of the subpoena or court order;

(b) promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order. Such notification shall include a copy of this Protective Order; and

(c) cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.[1]

If the Designating Party seeks a protective order within ten (10) days of receiving notice of the subpoena or court order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material – and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another court.

## 10. A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION

(a) The terms of this Order are applicable to information produced by a Non-Party in this action and designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." Such information produced by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Order. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

---

[1] The purpose of imposing these duties is to alert the interested parties to the existence of this Protective Order and to afford the Designating Party in this case an opportunity to try and protect its confidentiality interests in the court from which the subpoena or order issued.

(b)      In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

    1.      promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

    2.      promptly provide the Non-Party with a copy of the Protective Order in this litigation, the relevant discovery request(s), and a reasonably specific description of the information requested; and

    3.      make the information requested available for inspection by the Non-Party.

(c)      If the Non-Party fails to object or seek a protective order from this court within 14 days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the court.[2] Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this court of its Protected Material.

11.   UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Protective Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or

---

[2] The purpose of this provision is to alert the interested parties to the existence of confidentiality rights of a Non-Party and to afford the Non-Party an opportunity to protect its confidentiality interests in this court.

persons to execute the "Acknowledgment and Agreement To Be Bound" that is attached hereto as Exhibit A.

12.    ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

For any person required by the terms of this Protective Order to sign and execute the "Acknowledgment and Agreement To Be Bound" (Exhibit A) prior to receiving Protected Material, Outside Counsel of Record for the Receiving Party shall communicate to Outside Counsel of Record for each other party to this lawsuit a copy of the "Acknowledgment and Agreement To Be Bound," properly executed by the person, prior to the Protected Material being disclosed to the person.

13.    INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL

When a Producing Party gives notice to Receiving Parties that certain inadvertently produced material is subject to a claim of privilege or other protection, the obligations of the Receiving Parties are those set forth in Federal Rule of Civil Procedure 26(b)(5)(B). This provision is not intended to modify whatever procedure may be established in an e-discovery order that provides for production without prior privilege review. Pursuant to Federal Rule of Evidence 502(d) and (e), insofar as the parties reach an agreement on the effect of disclosure of a communication or information covered by the attorney-client privilege or work product protection, the parties may incorporate their agreement in the stipulated protective order submitted to the court.

14.    MISCELLANEOUS

13.1    Right to Further Relief. Nothing in this Order abridges the right of any person to seek its modification by the court in the future.

13.2    Right to Assert Other Objections. By the entry of this Protective Order, no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Protective Order. Similarly, no Party waives

14

Omega Exhibit C (p. 57 of 59)

any right to object on any ground to use in evidence of any of the material covered by this Protective Order.

13.3   Filing Protected Material. Without written permission from the Designating Party or a court order secured after appropriate notice to all interested persons, a Party may not file in the public record in this action any Protected Material. Protected Material may be filed under seal pursuant to local court rules.

15.   FINAL DISPOSITION

Within 60 days after the final disposition of this action, as defined in Section 4, each Receiving Party must return all Protected Material to the Producing Party or destroy such material. As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Section 4 (DURATION).

Dated June 7, 2023

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

15

Omega Exhibit C (p. 58 of 59)

## EXHIBIT A

### ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____ [print or type full name],
of _____ [residence address], declare
under penalty of perjury that I have read in its entirety and understand the
Protective Order that was issued by the United States District Court for the
District of South Dakota in the case of Buergofol GmbH v. Omega Liner
Company, Inc. (22-cv-04112-KES). I agree to comply with and to be bound by
all the terms of this Protective Order, and I understand and acknowledge that
failure to so comply could expose me to sanctions and punishment in the
nature of contempt. I solemnly promise that I will not disclose in any manner
any information or item that is subject to this Protective Order to any person
or entity except in strict compliance with the provisions of this Order. I
further agree to submit to the jurisdiction of the United States District Court
for the District of South Dakota for the purpose of enforcing the terms of this
Protective Order, even if such enforcement proceedings occur after
termination of this action.

I hereby appoint _____ [print or type full name] of

_____ [print or type full address and
telephone number] as my South Dakota agent for service of process in
connection with this action or any proceedings related to enforcement of this
Protective Order.

Signature: _____ Date: _____

Printed Name: _____

Mailing Address: _____

City and State where sworn and signed: _____

16

Omega Exhibit C (p. 59 of 59)