UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| BUERGOFOL GMBH,<br><br>Plaintiff,<br><br>vs.<br><br>OMEGA LINER COMPANY, INC.,<br><br><br>Defendant. | 4:22-CV-04112-KES<br><br><br>ORDER GRANTING IN PART AND DENYING IN PART OMEGA'S MOTION TO AMEND AND DENYING BUERGOFOL'S MOTION TO STRIKE AND DISMISS |

Plaintiff, Buergofol GmbH, filed an amended complaint on July 13, 2023, alleging that defendant, Omega Liner Company, Inc., is infringing two of its patents—the '882 Patent and the '269 Patent. Docket 163. On July 27, 2023, Omega filed an answer and counterclaims to the amended complaint. Docket 179. On September 1, 2023, Buergofol moved to strike a number of Omega's defenses and dismiss Omega's counterclaims—Omega's fifth and sixth affirmative defenses and counterclaims (alleging the patents in-suit are unenforceable for inequitable conduct) and Omega's seventh (breach of warranty under the CISG), eighth (fraud/fraudulent concealment and/or deceit), and ninth (negligent misrepresentation and/or omission) counterclaims. Docket 211; Docket 212 at 7-8. Buergofol also moved to strike the letters Omega attached to its pleading. Docket 212 at 45. Omega opposed the motions and moved to amend its answer and counterclaims. Dockets 251, 253. Buergofol opposes Omega's motion to amend/correct. Docket 289. After

considering the record and the parties' arguments, the court issues the following order.

## LEGAL STANDARD

The "Federal Circuit provides controlling precedent on substantive legal issues when a plaintiff's complaint asserts a claim arising under federal patent law." *HydraAssist LLC v. RK P'ship LLC*, No. 4:22-CV-04004-RAL, 2022 WL 10552362, at *2 (D.S.D. Oct. 18, 2022) (citing *Schinzing v. Mid-States Stainless, Inc.*, 415 F.3d 807, 811 (8th Cir. 2005)). Eighth Circuit law, however, "controls on procedural issues raised by a motion to dismiss a patent infringement action." *Id.* (citing *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1346 (Fed. Cir. 2018)).

## I.    Omega's Motion to Amend

Omega moves to amend its answer and counterclaims under Federal Rule of Civil Procedure 15(a), which authorizes amendment "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Under Federal Rule of Civil Procedure 15(a)(2), "[t]he court should freely give leave [to amend] when justice so requires." The Eighth Circuit has liberally construed this standard, finding that "[u]nless there is a good reason for denial, 'such as undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment, leave to amend should be granted.'" *Becker v. Univ. of Neb. at Omaha*, 191 F.3d 904, 907-08 (8th Cir. 1999) (quoting *Brown v. Wallace*, 957 F.2d 564, 566 (8th Cir. 1992)).

2

An amendment is futile if the court determines the amended complaint would not survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Zutz v. Nelson*, 601 F.3d 842, 850 (8th Cir. 2010). When determining futility, the court accepts as true the well-pleaded factual allegations contained in the complaint. *See Hillesheim v. Myron's Cards and Gifts, Inc.*, 897 F.3d 953, 955 (8th Cir. 2018).

To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true to state a claim to relief that is plausible on its face." *Aschroft v. Iqbal*, 556 U.S. 662, 678 (2007) (internal quotation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## A. Inequitable Conduct—Omega's Fifth and Sixth Counterclaims and Defenses

Omega's proposed amended answer and counterclaims include both counterclaims and defenses for inequitable conduct. *See* Docket 251-1 at 14-32, 60-79. As a general matter, "[i]nequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011) (en banc). It is a judge-made doctrine evolved from the "doctrine of unclean hands to dismiss patent cases involving egregious misconduct[.]" *Id.*

Modernly, the doctrine is rooted in the enforcement of the duty of candor and good faith that those associated with filing and prosecuting patents have to

the United State Patent and Trademark office (USTPO). *See* 37 C.F.R. § 1.56 ("Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office."). "This duty is held by attorneys who prepare or prosecute the patent application, as well as by each inventor named in the application." *Deere & Co. v. Kinze Mfg., Inc. AG Leader Tech., Inc.*, 2023 WL 9472300, at *6 (S.D. Iowa May 1, 2023) (citing 37 C.F.R. § 1.56(c)). "A breach of [the] duty [of candor]—including affirmative misrepresentations of material facts, failure to disclose material information, or submission of false material information—coupled with an intent to deceive, constitutes inequitable conduct." *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.,* 488 F.3d 982, 999 (Fed. Cir. 2007). "[I]nequitable conduct regarding any single claim renders the entire patent unenforceable[] [and] [u]nlike other deficiencies, inequitable conduct cannot be cured by reissue or reexamination[.]" *Therasense,* 649 F.3d at 1288 (cleaned up and internal citations omitted). Here, Omega asserts that a number of individuals associated with filing Buergofol's patents committed inequitable conduct because they withheld specific, important information from the USPTO. *See* Docket 251-1 at 14-32, 60-79.

Inequitable conduct has two substantive elements: materiality and intent. In order to prevail on an inequitable conduct claim, the proponent must prove the patent applicant (1) "made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information" and (2) "intended to deceive the [USPTO]." *Lazare Kaplan*

4

*Int'l, Inc. v. Photoscribe Techs., Inc.*, 628 F.3d 1359, 1377–78 (Fed. Cir. 2010) (quoting *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008)). *See also Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011) ("To prevail on the defense of inequitable conduct, the accused infringer must prove that the applicant misrepresented or omitted material information with the specific intent to deceive the [US]PTO."). The party asserting inequitable conduct bears the burden of proof. *Polaris Indus. Inc. v. Arctic Cat Inc.*, 2015 WL 4636544, at *4 (D. Minn. Aug. 4, 2015) (citing *Ulead Sys., Inc. v. Lex Computer & Mgmt. Corp.*, 351 F.3d 1139, 1146 (Fed. Cir. 2003)).

Although inequitable conduct is a broader concept than fraud, it must be pleaded in accordance with the particularity standard set forth in Rule 9(b). *Exergen Corp. v. Wal–Mart Stores, Inc.*, 575 F.3d 1312, 1326 (Fed. Cir. 2009). Federal Rule of Civil Procedure 9(b) requires that when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Whether inequitable conduct has been pleaded with particularity under Rule 9(b) is a question governed by Federal Circuit law." *Exergen,* 575 F.3d at 1318.

In *Exergen*, the Federal Circuit outlined the essential pleading components for an inequitable conduct claim. *See Exergen*, 575 F.3d at 1328. There, the court held that in order "to plead the 'circumstances' of inequitable conduct with the requisite 'particularity' under Rule 9(b), the pleading must identify the specific who, what, when, where, and how of the material

5

misrepresentation or omission committed before the PTO. *Id. Exergen* explained that pleading "must [also] include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO." *Id.* at 1328-29. Within this context, "[a] reasonable inference is one that is plausible and that flows logically from the facts alleged . . ." *Id.* at 1329 n.5.

Two years after *Exergen*, the Federal Circuit again tightened the restraints on inequitable conduct claims, this time in the summary judgment context. *Therasense*, 649 F.3d at 1292. *Therasense* held that, "the materiality required to establish inequitable conduct is but-for materiality." *Id.* at 1291. To determine whether withheld information is material, *Therasense* instructed district courts to "determine whether the [US]PTO would have allowed the claim if it had been aware of the undisclosed reference" using a preponderance of the evidence standard and giving claims "their broadest reasonable construction." *Id.* at 1292.

*Therasense* explained that inequitable conduct claims were an "atomic bomb" threat in patent litigation—threatening to invalidate not only the patent at issue, but also the associated, related patents. *Id.* at 1288. As such, the court was focused on ensuring patents be invalidated only where misconduct actually impacted the final claim because the patentee "obtains no advantage from misconduct if the patent would have issued anyway." *Id.* at 1292.

6

*Therasense* clarified that "intent and materiality are separate requirements," and that district courts "should not use a 'sliding scale,' where a weak showing of intent may be found sufficient based on a strong showing of materiality, and vice versa." *Id.* at 1290. "In short, a district court may not infer intent solely from materiality." *Id.*

The *Therasense* court went on to hold, with regard to the intent requirement, "[b]ecause direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence." *Id.* But "to meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.' " *Id.*

Here, the parties disagree as to the affect *Therasense* has on the inequitable conduct pleading standards. Buergofol seems to combine both the *Exergen* and *Therasense* standards—often messily switching between arguing Omega has failed to pleaded facts to the clear and convincing standard and that Omega has not plead facts for the court to reasonably infer specific intent to deceive. *See* Docket 289 at 16 (arguing "[t]he proposed pleading pleads no specific facts upon which this Court could conclude any of those things to the clear and convincing standard.  Moreover Omega has pleaded no specific facts upon which this Court could reasonably infer. . . . a specific intent to deceive the Patent Office."). By contrast, Omega argues that because *Therasense* involved a merits determination on a claim of inequitable conduct, it has no effect on the pleading requirements set out by *Exergen.* Docket 310 at 7-10.

7

District courts are admittedly split as to the exact role *Therasense* plays in the pleading stage. *See Deere & Co. v. Kinze Mfg., Inc. AG Leader Tech., Inc.*, 2023 WL 9472300, at \*6 (S.D. Iowa May 1, 2023) (collecting cases); *Front Row Techs., LLC v. NBA Media Ventures, LLC*, 163 F. Supp. 3d 938, 986 (D.N.M. 2016).

The majority of courts recognize that *Therasense* altered the extent to which materiality must be pleaded and require a party to allege facts that allow for a reasonable inference that "but-for" the omission of the material information, the USPTO would not have issued the patent. *Wyeth Holdings Corp. v. Sandoz, Inc.*, 2012 WL 600715, at \*6 (D. Del. Feb. 3, 2012); *see, e.g., Flypsi, Inc. v. Dialpad, Inc.*, 2022 WL 3593132, at \*3 (W.D. Tex. Aug. 22, 2022) (noting *Therasense*'s but-for materiality requirement applies to the pleading stage); *Power Integrations, Inc. v. ON Semiconductor Corp.*, 2018 WL 1438767, at \*3 (N.D. Cal. Jan. 17, 2018) (explaining that "courts have considered the "but-for materiality" requirement at the pleadings stage[]"); *Front Row,* 163 F. Supp. 3d at 983 (recognizing, even at the pleading stage that *Therasense,* rather than *Exergen,* is the leading case governing materiality determinations); *Polaris Indus. Inc. v. Arctic Cat Inc.*, 2015 WL 4636544, at \*5 (D. Minn. Aug. 4, 2015) (requiring but-for materiality recognizing that "in order to adequately plead its inequitable conduct claim, [the claimant] must allege sufficient facts for the [c]ourt to infer that the" patent would not have been issued if the alleged material information had properly been filed).

But at the pleading stage, most courts do not apply *Therasense*'s requirement that "the specific intent to deceive must be the single most reasonable inference able to be drawn from the evidence." *Therasense*, 649 F.3d at 1290 (quotation omitted); *see also Front Row*, 163 F. Supp. 3d at 987 (referencing the majority position and collecting cases). This court agrees with the majority for three reasons.[1] First, *Therasense*'s "single most reasonable inference requirement is an *evidentiary* standard that must be satisfied at the proof stage, not a pleading standard." *Wyeth Holdings*, 2012 WL 600715, at *7 (internal quotation marks omitted). As the court in *Wyeth Holdings* explained, the phrase is "couched strictly in terms of the ultimate evidentiary analysis, in which a district court determines whether under. . . the clear and convincing evidence standard[], deceptive intent is the single most reasonable inference to be drawn. This form of analysis clearly contrasts with the pleading stage analysis required by *Iqbal*[.]" *Id.* "After all, courts 'do not inquire whether a plaintiff will ultimately prevail when considering a motion to dismiss, only whether the plaintiff is *entitled to offer evidence to support his or her claims.*' " *Id.* (quoting *Grier v. Klem,* 591 F.3d 672, 676 (3d Cir. 2010) (emphasis added).

---

[1] The court is aware that it has previously applied *Therasense*'s heightened standard to the pleading stage. *See Hansen Mfg. Corp. v. Enduro Sys., Inc.,* 2011 WL 5526627, at *4 (D.S.D. Nov. 14, 2011) ("*Therasense* tightened the *standard for pleading* so that specific intent to deceive must be the single most reasonable inference able to be drawn from the evidence.") (emphasis added and cleaned up). This court, however, is not bound by its prior decisions. *See M.N. ex rel. Nieman v. SmithKline Beecham Corp.*, 2015 WL 62739, at *3 (D.S.D. Jan. 5, 2015).

Second, *Therasense* addressed the merits of an inequitable conduct claim, not the pleading stage. In *Exergen*, the Federal Circuit made clear that the pleading stage calls for a lesser showing than what is required to succeed on the merits. *Exergen*, 575 F.3d at 1329 n.5. There, the court noted that

> [i]n contrast to the pleading stage, to prevail on the merits, the accused infringer must prove both materiality and intent by clear and convincing evidence. *Whereas an inference of deceptive intent must be reasonable and drawn from a pleading's allegations of underlying fact to satisfy Rule 9(b), this inference must be the single most reasonable inference able to be drawn from the evidence to meet the clear and convincing standard.*

*Id.* (emphasis added and internal citations and quotations omitted). "To read *Therasense* as disturbing this well-established dichotomy would be to collapse inequitable conduct into a mini-trial on the pleadings, and to ignore the clear holdings from both *Star Scientific* and *Exergen*." *Wyeth Holdings,* 2012 WL 600715, at *8.

Third, post-*Therasense*, the Federal Circuit has not applied the "most reasonable inference" standard when addressing whether an inequitable conduct claim has been sufficiently pleaded. Instead, in *Delano Farms*, the court elected to employ the *Exergen* standard. *See Delano Farms Co. v. California Table Grape Comm'n*, 655 F.3d 1337, 1350 (Fed. Cir. 2011) (citing both *Therasense* and *Exergen* in stating a claim for "inequitable conduct based on failure to disclose will survive a motion to dismiss only if the plaintiff's complaint recites facts from which the court may reasonably infer that a specific individual both knew of invalidating information that was withheld

from the [US]PTO and withheld that information with a specific intent to deceive the [US]PTO.").

Thus, in considering the adequacy of Omega's proposed amended inequitable conduct defenses and counterclaims,[2] the court will consider whether Omega sufficiently alleges: (1) the who, what, when, where, and how of the alleged conduct; (2) the but-for materiality of the alleged conduct; and (3) the Buergofol actors' knowledge of the material information and whether such actors specifically intended to deceive the USPTO. *See Exergen*, 575 F.3d at 1328-29; *Therasense*, 649 F.3d at 1292. As to the scienter requirements, Omega need only plead enough facts for the court to reasonably infer such knowledge, materiality, and intent. *See Exergen*, 575 F.3d at 1328-29; *Therasense*, 649 F.3d at 1292.

Additionally, Omega is permitted to plead facts on information and belief "when essential information lies uniquely within [Buergofol]'s control, but only

---

[2] Courts have recognized that the Rule 9(b) standard that was expounded upon in *Exergen* and *Therasense* applies in equal force to inequitable conduct counterclaims and defenses. *See e.g., Emerson Elec. Co. v. Suzhou Cleva Elec. Appliance Co.*, 2014 WL 3600380, at *4 (E.D. Mo. July 22, 2014) (recognizing "courts have applied *Exergen's* pleading requirements to the affirmative defense of inequitable conduct"). Thus, because each counterclaim is factually identical to the defense bearing the same number, the court will consider the sufficiency of the paired counterclaim and defense together. *See St. Jude Med., Cardiology Div., Inc. v. Volcano Corp.,* 2014 WL 2622240, at *1 n. 1 (D. Del. June 11, 2014) ("Because both an affirmative defense and a counterclaim asserting inequitable conduct must meet the particularity requirements dictated by Rule 9(b), [the defendant's] counterclaim and affirmative defense for inequitable conduct rise or fall together.").

if the pleading sets forth the specific facts upon which the belief is reasonably based." *Exergen,* 575 F.3d at 1330. In short, Omega must present "sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind." *Id.* at 1327.

### 1. Omega's Fifth Defense and Counterclaim

Omega alleges individuals associated with obtaining Buergofol's '882 patent intentionally deceived the USPTO in failing to disclose material prior-art. Docket 251-1 at 16-18.

First, in relevant part, Claim 1 of Buergofol's '882 patent includes a claim limitation of "a coating of at least. . . (2) a coating or covering with at least one migrating compound, and wherein the coating is applied over a section of or an entire circumferential area of the external side faces facing the carrier material[.]" Docket 251-1 at 15. Claim 10 of the '882 patent, which is dependent on Claim 1, requires "wherein the coating is a coating or covering with at least one migrating compound, and the migrating compound is one of: (1) a lipophilic compound from the group of a wax, paraffin, fatty acid, or a fat." *Id.*

When the USPTO issued its Notice of Allowance with regard to the '882 Patent to Buergofol on January 25, 2017, it included a section titled "Reasons for Allowance." *Id.* at 14-15. There, pursuant to 37 C.F.R. § 1.104(e), "the examiner [ ] set forth such reasoning" to "make clear his or her reasons for allowing" the '882 Patent. The examiner explained it allowed the '882 Patent application because

> WO 98/12465 is the closest prior art but does not disclose wherein the inner tubular film comprises one or multiple layers an inner facing external side and an outer facing external side facing the carrier material, a coating of at least one of (1) a coating with a polysiloxane, or (2) a coating or covering with at least one migrating compound, and wherein the coating is applied over a section of or an entire circumferential area of the external side faces facing the carrier material.

*Id.* at 14. Although applicants or subsequent patent owners can "file a statement commenting on the reasons for allowance," 37 C.F.R. § 1.104(e), Omega alleges that "Buergofol did not file with the USPTO any statements or comments (a) relating to the examiner's Reasons for Allowance in the Notice of Allowance, (b) setting forth any disagreement with the examiner's reasons for allowance, or (c) clarifying or correcting the examiner's reasons for allowance." Docket 251-1 at 15.

Omega's proposed amended fifth defense and counterclaim allege that several individuals associated with Buergofol, Kurt Stark, Gregor Schleicher, Abdel-Kader Boutrid, and Dr. Franz Schleicher, knew of the existence and materiality of 2008 and 2011 Prior Art Film sales and shipments to the United States, and intentionally deceived the USPTO by not disclosing such prior art because they knew disclosure would have prevented the issuance of the '882 Patent.

### a. Who and when

Under *Exergen,* in a pleading alleging inequitable conduct, the party must specifically identify "who" is guilty of the alleged misconduct. 575 F.3d at 1328–29. The pleading must "name the specific individual associated with the

13

filing or prosecution of the application . . . who both knew of the material information and deliberately withheld or misrepresented it." *Id.* at 1329. Additionally, the "when" requirement asks when the relevant inequitable conduct occurred. *Exergen,* 575 F.3d at 1328.

In its proposed amended fifth counterclaim and defense, Omega clearly outlined the "who" it alleges was guilty of misconduct—Kurt Stark, Gregor Schleicher, Abdel-Kader Boutrid, and Dr. Franz Schleicher. Docket 251-1 at 15. Omega asserts these individuals "were all substantively involved in the preparation and prosecution of the application for the '882 Patent." *Id.* Thus, Omega has adequately pleaded the "who and when" requirements in stating Kurt Stark, Gregor Schleicher, Abdel-Kader Boutrid, and Dr. Franz Schleicher, specifically, thought their involvement in the patent prosecution are guilty of the alleged misconduct. *See Targus Int'l LLC v. Victorinox Swiss Army, Inc.,* 2021 WL 2291978, at *5 (D. Del. June 4, 2021) (finding the claimant had effectively pleaded the who and when requirements by naming the investors involved in the prosecution).

### b.  What and where

To satisfy the "what and where" elements, pleaders must "identify which claims, and which limitations in those claims, the withheld references are relevant to, and where in those references the material information is found— i.e., the 'what' and the 'where' of the material omissions." *Exergen*, 575 F.3d at 1329. When a claimant alleges the party withheld material prior art, the

allegations in the pleading must specifically identify the location in the prior art where the material information can be found. *Id.*

First, the court concludes that Omega has sufficiently identified "what" claims and claim limitations upon which its inequitable conduct claim hinge. Omega's proposed amended counterclaim and defense point to Claim 1 of the '882 Patent, specifically its limitation, and Claim 10. *See* Docket 251-1 at 16-18. In relevant portion, Claim 1 of Buergofol's '882 patent includes a claim limitation of "a coating of at least. . . (2) a coating or covering with at least one migrating compound, and wherein the coating is applied over a section of or an entire circumferential area of the external side faces facing the carrier material[.]" *Id.* at 15. Claim 10 of the '882 patent, which is dependent on Claim 1, requires "wherein the coating is a coating or covering with at least one migrating compound, and the migrating compound is one of: (1) a lipophilic compound from the group of a wax, paraffin, fatty acid, or a fat." *Id.*

Omega also points to the USPTO's Reasons for Allowance. *Id.* In this case, when USPTO issued its Notice of Allowance with regard to the '882 Patent to Buergofol on January 25, 2017, it included a section titled "Reasons for Allowance." *Id.* There, pursuant 37 C.F.R. § 1.104(e), "the examiner [ ] set forth such reasoning" to "make clear his or her reasons for allowing" the '882 Patent. The examiner explained it allowed the '882 Patent application, in part, for the following reason:

> WO 98/12465 is the closest prior art but does not disclose wherein the inner tubular film comprises one or multiple layers an inner facing external side and an outer facing external side facing the

> carrier material, a coating of at least one of (1) a coating with a polysiloxane, or (2) a coating or covering with at least one migrating compound, and wherein the coating is applied over a section of or an entire circumferential area of the external side faces facing the carrier material.

*Id.* at 14. Despite the fact that applicants or subsequent patent owners can "file a statement commenting on the reasons for allowance," 37 C.F.R. § 1.104(e), "Buergofol did not file with the USPTO any statements or comments (a) relating to the examiner's Reasons for Allowance in the Notice of Allowance, (b) setting forth any disagreement with the examiner's reasons for allowance, or (c) clarifying or correcting the examiner's reasons for allowance." Docket 251-1 at 15.

Second, Omega has adequately pleaded "where" the relevant prior art can be found. Omega claims that prior to applying for the '882 patent, in 2008, Buergofol "sold and shipped multilayer inner tubular film having multiple layers to International Pipelining located in the United States pursuant to Order No. 10802804 ('2008 Prior Art Film')." *Id.* at 16. Omega also contends that in 2011 Buergofol again "sold and shipped multilayer inner tubular film having multiple layers to Light Stream Inc. located in the United States pursuant to Order No. 11104751 ('2011 Prior Art Film')." *Id.* According to Omega, "[t]he 2008 Prior Art Film and the 2011 Prior Art Film . . . all included a 'migrating compound' within the outer layer (a polyamide layer) of the inner tubular film that faces the carrier material of the UV CIPP liner." *Id.* Even more specifically, Omega asserts "[t]he 'migrating compound' within the outer layer of the 2008 Prior Art Film was a wax[]" and this wax "migrated to the external

side of the inner tubular film facing the carrier material thereby creating a 'coating' that covered the entire circumferential area of the external side of the 2008 Prior Art Film facing the carrier material of the UV CIPP liner."[3] *Id.*

Buergofol's issues with Omega's pleading contentions in regard to the 2008 and 2011 Prior Art Film primarily center upon the information Omega failed to include. For example, Buergofol argues that Omega has provided no evidence that the 2008 or 2011 sales and shipments were completed to companies in the United States, noting the sales could have taken place in Germany, with the United States company taking possession of the film in Germany. Docket 289 at 17.

But, at this stage, Omega is not required to *prove* anything. Omega need only point to the relevant claims and the relevant prior art. *Exergen,* 575 F.3d at 1329. And here, as noted above, Omega has explicitly hinged its contentions on the limitation and Claim 1 and Claim 10 and explained the relevant prior art—down to the order number under which the relevant prior art was sold. At the pleading stage, the court must assume the claimant can prove the facts alleged in its pleading. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 588 n.8 (2007). Thus, the court accepts as true that the 2008 and 2011 Prior Art Film was indeed shipped to the United States.

---

[3] In its proposed amended fifth counterclaim and defense Omega does not specifically allege what the migrating compound present in the 2011 Prior Art's outer layer was. *See* Docket 251-1 at 15-17. But later in the document, Omega indicates the 2011 Prior Art had a migrating compound of wax in the outer polyamide layer. *See id.* at 23.

Buergofol also attacks the sufficiency of Omega's descriptions of the relevant prior art. Buergofol highlights that Omega's pleading does not reference any "coating," explain how thick the coating was, what it was made of, or how exactly it knows the coating was present. First, the court notes that Omega's description does include reference to a "coating" and specifically alleges it was made of wax. Docket 251-1 at 16 (alleging wax "migrated to the external side of the inner tubular film facing the carrier material thereby creating a 'coating' that covered the entire circumferential area of the external side of the 2008 Prior Art Film facing the carrier material of the UV CIPP liner"); *see also id.* at 23 (claiming that prior to March 11, 2012, Buergofol shipped inner tubular film including wax within the outer polyamide layer to Light Stream[]"). But as to Buegofol's other complaints, the court recognizes that Omega is not required to plead every possible fact associated with the coating, so long as Omega provides enough information for the court to determine the alleged prior art is pertinent and to put Buergofol on notice of its claims. *See Iqbal*, 556 U.S. at 678 (holding a party need only "plead[ ] factual content that allows the court to draw the reasonable inference that the [the opposition] is liable for the misconduct alleged[]"); *L.L. Nelson Enters. v. Cty. of St. Louis*, 673 F.3d 799, 805 (8th Cir. 2012) ("[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." (quotation omitted)).

Buergofol relies on *Hansen Mfg. Corp. v. Enduro Sys.*, 2011 WL 5526627, at *4, for the proposition that conclusory allegations should be eliminated

18

before the court begin analyzing whether inequitable conduct has been appropriately pleaded. Docket 289 at 11. First, as the court noted above, the *Hansen* court applied the heightened *Therasense* standard rather than the *Exergen* standard at the pleading stage, which this court now declines to do. *See Hansen,* 2011 WL 5526627, at *4. Second, in *Hansen* the claimant simply argued, for example, that certain "inconsistent" documents were not submitted to the USPTO for review and that such documents were "but-for material." Unlike Omega, the *Hansen* defendant did not describe how the documents were inconsistent with those submitted for the patent or why they were material.

Most analogous to this case is *Pensmore Reinforcement Techs., LLC v. Cornerstone Mfg. & Distribution*, 609 F. Supp. 3d 1092, 1103 (C.D. Cal. 2022). There, the defendant brought an inequitable conduct counterclaim, alleging the plaintiff intentionally deceived the USPTO in withholding relevant prior art sales. *Id.* at 1100. The plaintiff moved to dismiss for failure to state a claim, arguing the defendant's counterclaim did not meet the pleading standards under Rule 9(b). *See id.* Relevant here, the plaintiff argued materiality had not been sufficiently pleaded. Defendant alleged plaintiff had sold prior art in the United States that was "identical to the subsequent product" plaintiff later patented in that it also contained "a microfiber, about one inch in length with a wire-thin diameter" as described in claim 3 of the plaintiff's '881 Patent and claim 1 of its '970 Patent. *See id.* at 1100-02. Plaintiff maintained that this characterization was inadequate becasue it failed to "identify a specific sale, or provide any measurements, qualities, characteristics or specifications" of the

19

previously sold prior art. *Id.* at 1100. The court rejected plaintiff's argument, despite a reference to *specific* sales in the United States, finding defendant's pleading clearly articulated that plaintiff had sold the relevant products for years before applying for the implicated patents. *See id.* at 1104. Additionally, the court recognized the defendant had clearly indicated which claims—claim 1 and claim 3—the prior art embodied. *Id.*

Here too Omega has met the burden under Rule 9(b)—it clearly pointed to the relevant prior art, going so far as to include the order number under which the prior art was sold and articulated the aspects of the prior art that correspond to the claims in the '882 Patent.

### c. Why and how (materiality)

A party pleading inequitable conduct must explain "both 'why' the withheld information is material and not cumulative, and 'how' an examiner would have used this information in assessing the patentability of the claims." *Exergen,* 575 F.3d at 1329-30. Essentially, "[t]he materiality requirement is thus also known as the 'how' and 'why' requirements." *Front Row,* 163 F. Supp. 3d at 983 (quoting *Milwaukee Elec. Tool Corp. v. Hitachi Koki Co.,* 2012 WL 1952977, at *8 (E.D. Wis. May 29, 2012) (internal quotation marks omitted)). *Therasense* heightened the materiality standard to "but for" materiality. *See id.* at 983-84.

Omega adequately articulated the "why" and "how" in stating

Dr. Kurt Stark, Gregor Schleicher, Abdel-Kader Boutrid and Dr. Franz Schleicher knew that if the 2008 Prior Art Film and the 2011 Prior Art Film were disclosed to the USPTO during prosecution of

the application for the '882 Patent, the USPTO examiner would have used the 2008 Prior Art Film and the 2011 Prior Art Film with the "migrating compound" of wax within the outer layer to find at least independent claim 1 unpatentable in view of the cited prior art references disclosing CIPP liners including International Publication No. WO 98/12465.

Docket 251-1 at 18. Omega also explained the 2008 and 2011 prior art films were "but for" material and not cumulative because,

in Reasons for Allowance in the Notice of Allowance[,] [ ] the following limitation in independent claim 1 was missing from the prior art references:

wherein the inner tubular film comprises one or multiple layers an inner facing external side and an outer facing external side facing the carrier material, a coating of at least one of (1) a coating with a polysiloxane, or (2) a coating or covering with at least one migrating compound, and wherein the coating is applied over a section of or an entire circumferential area of the external side faces facing the carrier material.

*Id.* at 18-19. Omega alleged "[t]he 2008 . . . and the 2011 Prior Art Film sold and shipped into the United States prior to the . . . critical date of the '882 Patent both include this missing limitation because of the "migrating compound" (i.e., wax) within the outer polyamide layer that faces the resin and carrier material."

*Id.* at 19. Thus, "[t]he 2008 . . . and the 2011 Prior Art Film are material prior art to the '882 Patent and the USPTO would not have allowed at least independent claim 1 of the '882 Patent but for the intentional withholding" of such information by Dr. Kurt Stark, Gregor Schleicher, Abdel-Kader Boutrid and Dr. Franz Schleicher. *Id.* at 18. As such, the court finds Omega has effectively alleged the why, how, and materiality requirements.

21

### d. Knowledge and Intent to Deceive

As decided above, at the pleading stage, Omega is not required to allege facts supporting the conclusion that specific intent to deceive is the single most reasonable inference to be drawn from the factual allegations. *See, e.g. Deere & Co.*, 2023 WL 9472300, at *8; *Wyeth Holdings,* 2012 WL 600715, at *8. Instead, in determining whether a party has adequately pleaded the scienter requirement of inequitable conduct, courts "have asked whether the court could reasonably infer knowledge of the materiality of an allegedly withheld reference." *Deere & Co.*, 2023 WL 9472300, at *8 (collecting cases). Generally, it is enough that the defendant plead sufficient facts from which it may be inferred that the applicant knew of withheld material information and withheld that information with the specific intent to deceive the USPTO. *Exergen,* 575 F.3d at 1327.

Buergofol argues that Omega has failed to sufficiently allege that the relevant players involved in submitting the '882 Patent application had the necessary knowledge and intent for inequitable conduct. Docket 289 at 14-17. First, Buergofol asserts that with respect to the allegations against Dr. Stark, Omega neglected to plead that Dr. Stark knew of the existence of the 2008 or the 2011 prior art sales, knew such prior art included a "migrating compound," or knew of the materiality of such prior art. *Id.* at 16. According to Buergofol, Omega's statement that Dr. Stark " 'has in-depth knowledge' of product development, sales and shipments is vague and meaningless, and does not

establish to the clear and convincing standard that Dr. Stark knew of any particular film sale or shipment." *Id.* at 18.

The court disagrees. First, Omega need not provide evidence to meet the clear and convincing standard at the pleading stage. Second, Omega's factual allegations are enough to satisfy the Rule 9(b) standard. Omega claims that Dr. Stark, by virtue of his position as "Director of Business Development at Buergofol from October 2011 until at least the May 23, 2017" has "in-depth knowledge of the product development, composition, sales and shipments of Buergofol's inner tubular film for CIPP liners. . . including the 2008 Prior Art Film and the 2011 Prior Art Film." Docket 251-1 at 17-18. Omega also alleged Dr. Stark knew the prior art contained a migrating compound, that prior compound was wax, and that the prior art was material to the determination of patentability. *Id.* at 18.

The same is true for Omega's contentions as they relate to Gregor Schleicher, Abdel-Kader Boutrid and Dr. Franz Schleicher. Omega's counterclaim and defense highlights that each of these individuals had personal knowledge of the 2008 and 2011 prior art films, understood the materiality of such prior art, and acted with the specific intent to deceive the USPTO in withholding such information. *Id.* at 17-19. Similar to its claims regarding Dr. Stark, Omega alleges that Gregor Schleicher (as a named inventor and Technical Manager of Buergofol since March 2004 to present), Abdel-Kader Boutrid (as a named inventor and Head of Research and Development at Buergofol since 1998 to present) and Dr. Franz Schleicher (as

23

owner and CEO of Buergofol since at least 1998 to present) through their various positions at Buergofol had "in-depth knowledge of the product development, composition, sales and shipments of Buergofol's inner tubular film for CIPP liners prior to the March 11, 2012 critical date of the '882 Patent including the 2008 Prior Art Film and the 2011 Prior Art Film." *Id.* at 16-17.

Based on the alleged positions each of these individuals holds and viewing the facts in the light most favorable to Omega, the court can reasonably infer each of them had knowledge of the 2008 and 2011 prior art film sales. *See Targus Int'l LLC v. Victorinox Swiss Army, Inc.*, 2021 WL 2291978, at *5 (D. Del. June 4, 2021) (inferring knowledge where "the inventors held positions within [the organization] from which it could reasonably be inferred that they had knowledge of the specifics of the actual products [the company] was selling at the time, including the [relevant] [p]roducts.").

With regard to Dr. Schleicher, Buergofol argues Omega did not plead facts to establish Dr. Schleicher was substantially involved in the prosecution of the applications for the '882 Patent. Docket 289 at 16-17. Generally, only inventors and those substantially involved in preparing or prosecuting the application owe a duty of candor to the USPTO. *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 343 F. Supp. 2d 272, 310 (D. Del. 2004), *aff'd,* 488 F.3d 982 (Fed. Cir. 2007). Thus, in order to maintain a claim for inequitable conduct, Omega must put forth enough facts for the court to reasonably infer Dr. Schleicher was substantially involved. In its proposed

amended answer and counterclaims, Omega asserted that Dr. Schleicher "who is an owner of Buergofol, was [ ] substantively involved in the preparation and prosecution of the application for the '882 Patent." Docket 251-1 at 15. This, paired with the allegation that Dr. Schleicher had in-depth knowledge of product development and composition is enough for the court to infer Dr. Schleicher was substantially involved in the prosecution for the application his company would come to own. *See Avid Identification Sys., Inc. v. Crystal Imp. Corp.*, 603 F.3d 967, 974 (Fed. Cir. 2010) (upholding a finding of inequitable conduct where the district court inferred substantial involvement based on an individual's position as owner and founder of the business and was involved in "all aspects" of the company, including its research in development).

As a whole, Omega alleges that the relevant players "intentionally deceived the USPTO by not disclosing to the USPTO" the material 2008 and 2011 prior art film sales, "which they knew were material to the patentability of the '882 Patent and would have prevented issuance of the '882 Patent." Docket 251-1 at 16. Viewing these allegations in the light most favorable to Omega and recognizing the Federal Circuit's guidance that "direct evidence of deceptive intent is rare," the court concludes that Omega has pleaded sufficient facts from which a reasonable inference of intent to deceive may be drawn. *See Therasense,* 649 F.3d at 1290.

Although Buergofol challenges the allegations that Omega makes "on information and belief," the court finds any such allegations are sufficient under Rule 9(b), because Omega has provided adequate facts upon which its

25

belief has been formed. That is—Omega alleged Dr. Stark, Gregor Schleicher, Abdel-Kader Boutrid, and Dr. Schleicher, by virtue of their positions at Buergofol knew of the 2008 and 2011 prior art, understood the materiality of such prior art to the '882 Patent, and acted with the specific intent to deceive the USPTO. To conclude, Omega will eventually have to prove inequitable conduct by clear and convincing evidence, but at the pleading stage Omega has plead sufficient facts to give rise to a reasonable inference. *See Zadro Prods., Inc. v. SDI Techs., Inc.*, 2019 WL 1100470, at *5 (D. Del. Mar. 8, 2019) (recognizing that an inequitable conduct claim "is rarely disallowed at the pleading stage due to failure to adequately allege scienter[]").

## 2. Sixth Counterclaim and Defense

Omega argues the '269 Patent is also invalid due to inequitable conduct because William C. Gerstenzang,[4] the patent prosecution counsel who was responsible for the '269 Patent application, failed to properly disclose Russian Patent No. RU2182999C1 (the Russian Patent). *See* Docket 251-1 at 21-22. Specifically, Omega claims the "Russian Patent [ ] is material to the patentability of claim 1 of the '269 Patent because it discloses the layer sequence claimed in independent claim 1 of the '269 Patent and that identified

---

[4] Gerstenzang acted as the patent prosecution counsel for Loparex. Docket 251-1 at 21. Loparex is Buergofol's predecessor-in-interest, which "filed U.S. Application No. 13/690,076, which claimed priority to German Application No. DE 102010023764 and eventually issued as U.S. Patent No. 8,794,269." *Id.* at 38. Buergofol acquired the '269 Patent from Loparex prior to filing this action. *Id.* at 11.

by the USPTO examiner in the Reasons for Allowance section of the Notice of Allowance." *Id.* at 24.

On January 30, 2014, the examiner at the USPTO stated in the Reasons for Allowance that the patent application that resulted in the '269 Patent was allowed because:

> After a review of the prior art of record, it is believed that the present invention is novel and non-obvious wherein no reference discloses a tube comprising a layer sequence including at least one thermoplastic olefin homo-or copolymer, an adhesion promoter layer, an internally situated layer comprised of at least one homo and/ or copolyamide, a second adhesive-promoter layer and a layer of at least one homo and/ or copolyamide, as an external layer all in the form of a tubular film, with the VICAT softening point of the thermoplastic olefin homo or copolymer of the first layer is at least 100°C, and an externally situated single or multilayer tubular film which is impermeable to liquids and reflects and/ or absorbs UV radiation and/ or short-wave, visible light and a support material situated therebetween and saturated with a reactive synthetic resin, as recited by claim 1.

*Id.* 20. After receiving the notice of allowance, Gerstenzang did not file any statements or comments disagreeing with, supplementing, or clarifying the examiner's reasons for allowance. *Id.* at 21.

On April 11, 2014, the Chinese Patent Office issued an Office Action that cited to the Russian Patent as the major prior art reference in rejecting Loparex's Chinese Patent Application CN201180029444, the Chinese counterpart to the '269 Patent. *Id.* at 20. Omega alleges that on April 23, 2014, Gerstenzang paid the Issue Fee for the application for the '269 Patent and before he did so Gerstenzang did not file an Information Disclosure Statement

through any of the various available avenues or file a petition to withdraw the '269 Patent application. *Id.* at 21.

On July 14, 2014, Gerstenzang filed with the USPTO an Information Disclosure Statement that identified the Russian Patent. *Id.* at 22. The disclosure statement included a copy of the Russian Patent in Russian language and an English translation of the Abstract of Russian Patent. *Id.* Omega alleges that Gerstenzang improperly submitted the Information Disclosure Statement because "37 CFR § 1.97 does not allow for filing of an Information Disclosure Statement after payment of the Issue Fee unless an applicant files the Information Disclosure Statement pursuant to 37 CFR § 1.97(d) which Mr. Gerstenzang did not do." *Id.* Thus, the USPTO never considered the Russian Patent. Omega also highlights that "Gerstenzang did not provide to the USPTO (a) a concise explanation of the relevance of Russian Patent [], (b) a complete translation of Russian Patent [], or (3) the April 11, 2014 Office Action issued by the Chinese Patent Office in Chinese Application[.]" *Id.*

### a. Who and when

Omega has satisfied the "who" and "when" requirements in pleading that Gerstenzang, specifically, is guilty of the alleged misconduct, due to his failure to properly disclose the Russian Paten in his July 14, 2014 Information Disclosure Statement. *Id.* at 32; *see also Exergen,* 575 F.3d at 1328–29; *Targus Int'l LLC v. Victorinox Swiss Army, Inc.*, 2021 WL 2291978, at *5 (D. Del. June 4, 2021).

### b.  What and where

Omega also satisfied the "what and where" elements in explaining that the Russian patent is material to the "patentability of at least claim 1 of the '269 Patent because Russian Patent. . . disclosed the three major layers that were missing in the prior art references as stated by the USPTO examiner in the Reasons for Allowance of the Notice of Allowance." *Id.* at 22; *see also Exergen*, 575 F.3d at 1329 (to plead the "what and where" elements, a claimant must "identify which claims, and which limitations in those claims, the withheld references are relevant to, and where in those references the material information is found"). Omega cites the relevant portions of the Russian Patent and Omega explains that

> Claim 1 of the '269 Patent claims a five-layer sequence inner tubular film having the following specific five-layer sequence not shown in the information of record at the USPTO:
>         (a) a layer (a) comprised of at least one thermoplastic olefin homo- or copolymer, *as one of the external layers,*
>         (b) an adhesive-promoter layer (b),
>         (c) an internally situated layer
>         (c) comprised of at least one homo- and/or copolyamide,
>         (d) an adhesive-promoter layer (d), and (e) a layer (e) comprised of at least one homo- and/or copolyamide, *as one of the external layers.*

*Id.* at 23-24 (emphasis in original). Omega claims the Russian patent discloses this layer sequence. *Id.* at 24. And Omega expressly points to a wide breadth of information relevant to claim 1 of the '269 Patent that the Russian Patent discloses. *Id.* at 24-29. For example, Omega asserts the Russian Patent

"discloses material for layer (a) that has a VICAT softening point of at least 100 degrees Celsius as recited in independent claim 1." *Id.* at 24.

Buergofol argues that Omega's factual allegations are flatly untrue— claiming Omega's pleading is "rank speculation and conjecture." Docket 289 at 21. According to Buergofol, the Russian Patent discloses neither the VICAT softening point or the sequence of five layers recited in claim 1 of the '269 Patent. *Id.* As such, Buergofol claims that a person of ordinary skill reading the Russian Patent would not draw the necessary conclusions to clue them in on the information in claim 1 of the '269 Patent. *Id.*

Buergofol's arguments are essentially factual disputes that are not appropriate at this time. *See Kowouto v. Jellum L., P.A.*, 672 F. Supp. 3d 699, 704 (D. Minn. 2023) (noting factual disputes are "not appropriate for disposition under Rule 12(b)(6)"). As explained above, at this stage the court must accept as true all of the factual allegations in the complaint. *Iqbal*, 556 U.S. at 678. "The sole exception to this rule lies with allegations that are sufficiently fantastic to defy reality as we know it[.]" *Id.* at 696 (Souter, J., dissenting). The court must also draw all reasonable inferences in the claimant's favor. *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 853 (8th Cir. 2010). Here, the court accepts Omega's allegations as true. Omega painstakingly discussed the information disclosed in the Russian Patent and how that information could be used by a person of ordinary skill in the relevant art to understand the data recited by claim 1 of the '269 Patent. *See* Docket 251-1 at 24-29. This is sufficient at the pleading stage. Whether a person of

ordinary skill in the relevant art truly could draw the conclusions Omega alleges is a valid factual issue that Buergofol will have the opportunity to address at the proper time.

### c. Why and how (materiality)

Omega has adequately pleaded the but-for materiality of the Russian Patent through the *Exergen* elements of why and how. *See Front Row*, 163 F. Supp. 3d at 983 ("[t]he materiality requirement is [ ] also known as the 'how' and 'why' requirements."). In the proposed amended answer and counterclaims, Omega explains " 'why' the [Russian Patent] is material and not cumulative."[5] Docket 251-1 at 31-32; *see also Exergen,* 575 F.3d at 1329. Omega asserted the Russian Patent "is not cumulative of any of the information of record considered by the examiner. None of the information considered by the examiner in the information of record within the '269 Patent discloses the inner tubular film having a five-layer sequence as claimed in independent claim 1." *Id.* at 31. Omega also stated the Russian Patent "is material to the patentability of independent claim 1 because . . . [it] discloses and makes obvious at least claim 1 of the '269 Patent." *Id.* at 32.

Omega also pleaded " 'how' an [USPTO] examiner would have used [the Russian Patent] in assessing the patentability of" claim 1 of the '269 Patent.

---

[5] Buergofol dedicates several pages to arguing that the Chinese Office Action did not need to be submitted by Gerstenzang because it is cumulative of the Russian Patent. Docket 289 at 18-20. Omega, however, clarifies in its brief that it does not assert an inequitable conduct claim based on the failure to disclose the Chinese Office Action. Docket 310 at 29 n.4. Thus, the court need not consider Buergofol's arguments.

Docket 251-1 at 32; *see also Exergen,* 575 F.3d at 1330. Specifically, Omega claims that based on the information provided in the Reasons for Allowance, which emphasizes the novelty of the five-layer sequence in claim 1 of the '269 Patent, the examiner would have used the Russian Patent to conclude that claim 1 was not patentable. Docket 251-1 at 31-32. Thus, the court finds that Omega has adequately pleaded that "[b]ut for [ ] Gerstenzang's deliberate choice of filing of the Information Disclosure Statement and [the] Russian Patent [ ] in a manner that would not be considered by the USPTO, at least claim 1 of the '269 patent would not have been allowed by the USPTO." *Id.* at 32.

### d. Knowledge and intent to deceive

In order to maintain a claim for inequitable conduct, a party must plead sufficient facts from which the court may reasonably infer that the applicant both knew of withheld material information and withheld such information with the specific intent to deceive the USPTO. *Exergen,* 575 F.3d at 1327. Omega's proposed amended answer and counterclaims outline that Gerstenzang knew about the Russian Patent, and understood its materiality, which is evidenced by Gerstenzang's disclosure of it via the July 14, 2014 Information Disclosure Statement. Docket 251-1 at 31. Moreover, the pleading asserts that Gerstenzang's method of disclosure allows for the reasonable inference of an intent to deceive because Gerstenzang submitted the Russian Patent in a way "that he reasonably expected would result in the USPTO not considering the reference." *Id.*

Buergofol argues that Omega's claim fails because Omega has not pleaded facts that establish Gerstenzang had the specific intent to deceive the USPTO in withholding the Russian Patent because Gerstenzang did, in fact disclose the Russian Patent. *See* Docket 289 at 18-20. Thus, Buergofol asserts that Omega's pleading does not "prove by clear and convincing evidence that the applicant knew of the [prior art] reference, knew that it was material, and made a deliberate decision to withhold it[ ]" because nothing was withheld. *Id.* (quoting *Therasense*, 649 F.3d at 1290) (emphasis removed).

Buergofol relies on *Bridgestone Americas Tire Operations, LLC v. Speedways Tyres Ltd.*, 2023 WL 5105776, at *4 (N.D. Tex. Aug. 9, 2023) for the proposition that the "manner in which that information is disclosed cannot support the 'intent to deceive' pleading requirement of inequitable conduct." Docket 289 at 18. *Bridgestone*, however, is distinguishable. There, the applicant submitted the most relevant prior art in a "sea of less relevant material[.]" *Bridgestone*, 2023 WL 5105776, at *3. The court found that simply sticking the relevant art in a voluminous batch of other documents did not constitute "withholding or misrepresenting" the prior art. *Id.* (formatting omitted). Additionally, the claimant did not assert that the USPTO would have denied the patent if it had reviewed the relevant prior art nor did the claimant provide any evidence beyond the method of the disclosure for the court to infer an intent to deceive. *See id.* at 3-4. Most importantly, the claimant in *Bridgestone* did not claim that the relevant prior art had been submitted in an

33

improper manner. *See generally id.* Instead, the claimant simply asserted that applicant had tried to hide the prior art within proper submissions. *See id.*

Here, by contrast, Omega's proposed amended answer and counterclaims clearly state that Gerstenzang submitted the Russian Patent in a way that he knew would not be considered by the examiner. Docket 251-1 at 31. Because 37 C.F.R. § 1.97 does not allow for the filing of an Information Disclosure Statement after an applicant has paid the issue fee, unless it is filed pursuant 37 CFR § 1.97(d) which Gerstenzang's was not, the Russian Patent was not considered by the examiner. 37 C.F.R. § 1.97(i); *Ironburg Inventions Ltd. v. Valve Corp.*, 418 F. Supp. 3d 622, 634 n.20 (W.D. Wash. 2019) ("[I]f an information disclosure statement does not comply with 37 C.F.R. §§ 1.97 and 1.98 (because it is untimely or deficient), 'it will be placed in the file but will not be considered by the Office.' " (quoting 37 C.F.R. § 1.97(i)); *see also Protecting Patents from the Beginning: The Importance of Information Disclosure Statements During Patent Prosecution*, 82 J. Pat. & Trademark Off. Soc'y 577, 583–84 (2000) ("[D]espite identifying, collecting and submitting the information, if it is not timely submitted, the [Information Disclosure Statement] afford[s] no protection if the patent is challenged.").

In *Bayer AG v. Dr. Reddy's Lab'ys, Ltd.*, the applicant submitted the relevant prior art to the USPTO after prosecution had closed and the Notice of Allowability had been received and the issue fee had been paid. 518 F. Supp. 2d 617, 632 (D. Del. 2007). The applicant claimed that because the prior art had been disclosed, albeit late, it could not form the basis for inequitable

conduct. *Id.* The court disagreed, explaining that because the information was submitted in a way that did not conform with the rules, and, as a result, the examiner did not consider it during the prosecution of the patent, the court "decline[d] to find that the [prior art] references were disclosed to the [US]PTO in a manner which would preclude their assertion in an inequitable conduct case." *Id.* at 632-33.

Although the *Bayer* decision is slightly different from the current case based on the timing of the relevant disclosure, here too Gerstenzang's submission of the Russian Patent through an improper means "was a constructive withholding which supports a finding of inequitable conduct." *Id.* at 633. Thus, the court rejects Buergofol's argument that Gerstenzang's eventual disclosure bars an inequitable conduct claim. Disclosure will not offer protection where it was done in a way such that the information cannot actually be considered. *See id.*

Ultimately, the court can reasonably infer both Gerstenzang's knowledge of the materiality of the Russian Patent, which is evidenced by his submission of the improper Information Disclosure Statement—he would not have submitted the Russian Patent at all if he did not realize on some level that it was material to the patentability of the '269 Patent. Moreover, Gerstenzang's improper method of disclosure allows the court to infer that Gerstenzang had the specific intent to deceive the USPTO because Gerstenzang chose to submit the Russian Patent in a way that did not comply with 37 C.F.R. § 1.97, rather

than withdraw the application or file a proper Information Disclosure Statement under 37 C.F.R. § 1.97(d).

In conclusion, the court finds that in light of *Exergen* and *Therasense*, Omega has pleaded sufficient facts to maintain both the fifth and sixth counterclaims and defenses.

### B. Omega's Seventh Counterclaim—Breach of Warranty under the CISG

In its seventh counterclaim, Omega claims Buergofol breached a warranty that was incorporated into its sales contracts with Buergofol by the United Nations Convention on Contracts for the International Sale of Goods (CISG). Docket 251-1 at 79-83. Buergofol moves to dismiss this counterclaim under Rule 12(b)(6), alleging Omega failed to state a claim upon which relief can be granted.[6] Docket 212 at 30. According to Buergofol, the "General Sales and Delivery Terms of Buergofol Gmbh" expressly waive the warranties provided by the CISG. Docket 212 at 30-34. In its proposed amended answer and counterclaims, however, Omega specifically states, "For all purchases of film products from Buergofol, Omega never waived any warranties or rights under the CISG." Docket 251-1 at 80. Thus, the court must first address whether it can consider the contents of the General Sales and Delivery Terms in deciding Omega's motion to amend.

---

[6] Buergofol incorporates its argument in favor of dismissing the counterclaim, which it articulated in Docket 212, into its response in opposition to Omega's motion to amend, stating the court should find the amendment futile for the same reasons the court should dismiss the claim under 12(b)(6). Docket 289 at 6.

### 1. Whether the Court can consider the General Sales and Delivery Terms

Buergofol argues the General Sales and Delivery Terms embody the contract upon which Omega's breach of contract claim arises. Docket 212 at 32 (stating "it is undisputed between the parties that the 'General Sales and Delivery Terms' apply to all 'purchase order agreements' mentioned in Omega's . . . Seventh Counterclaim."). As such, Buergofol contends the Sales and Delivery Terms is "integral to the complaint" and, thus, the court may consider its contents in deciding Buergofol's motion to dismiss. *Id.* at 31. Omega, on the other hand, asserts that the court should not consider this document because "Omega has in no way indicated that the 'General Sales and Delivery Terms' are part of the purchase agreements between Omega and Buergofol." Docket 253 at 13.

Federal Rule of Civil Procedure 12(d) generally requires that Rule 12(b)(6) motions containing materials outside of the pleadings be converted into motions for summary judgment. *Hughes v. City of Cedar Rapids*, 840 F.3d 987, 998 (8th Cir. 2016). As such, typically a "Rule 12(b)(6) motion will succeed or fail based upon the allegations contained on the face of the complaint." *Gibb v. Scott*, 958 F.2d at 816. But "the court has complete discretion to determine whether or not to accept any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion." *Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 701 (8th Cir. 2003) (quotation omitted).

Unless the court elects to convert a motion to one for summary judgment, it may not consider "any written or oral evidence in support of or in opposition to the pleading that provides some substantiation for and does not merely reiterate what is said in the pleadings." *BJC Health Sys. v. Columbia Cas. Co.*, 348 F.3d 685, 687 (8th Cir. 2003) (quoting *Gibb,* 958 F.2d at 816. Instead, the court may "consider 'those materials that are necessarily embraced by the pleadings.' " *Hughes*, 840 F.3d at 998 (quoting *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014)).

Such materials include those "incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned[.]" *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012) (quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004)).

Here, there is no question that Omega did not attach the General Sales and Delivery Terms to its original or amended answer and counterclaims. *See generally* Dockets 179, 251-1. It is similarly uncontested that the General Sales and Delivery Terms are not "subject to judicial notice, matters of public record, orders, items appearing in the record of the case." *See generally* Dockets 212, 253, 287; *Miller*, 688 F.3d at 931 n.3. Thus, the question is whether the document is "incorporated by reference or integral" to Omega's counterclaim. *Miller*, 688 F.3d at 931 n.3.

Buergofol relies on *Faloni & Assocs., LLC v. Citibank N.A.* for the proposition that "[o]n a motion to dismss for breach of contract, courts look . . . at the contract itself, which by definition is integral to the [pleading]." Docket 212 at 31 (quoting *Faloni*, 2020 WL 4698475, at *3 (D.S.D. Aug. 13, 2020) (emphasis omitted)). Buergofol's contention is true, but only in cases such as *Faloni*, where both parties agree that the submitted contract governs the breach of contract claim. *See, e.g., Faloni*, 2020 WL 4698475, at *3 (considering a contract, though it was not attached to the complaint, in deciding a Rule 12(b)(6) motion, because "the parties agreed that the contract is authentic and is the operative and controlling agreement pertaining to the claims" (cleaned up)).

Here, by contrast, Omega disputes the application of the General Sales and Delivery Terms to its contract claim. Docket 253 at 13. Moreover, courts find documents "integral" to a pleading when the pleading " 'relies heavily upon [the document's] terms and effect.' " *Rosa v. MiTek Inc.*, 2021 WL 5371251, at *3 (E.D. Mo. Nov. 18, 2021) (quoting *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020)); *see also Hodges v. S.D. Sch. of Mines and Tech.*, 647 F.Supp.3d 761, 768-69 (D.S.D. 2022) (refusing to consider contract of employment in non-breach of contract claim because, although plaintiff referenced existence of contract, "the contract [was] not attached to the complaint and nowhere in the complaint d[id] [plaintiff] allege the *contents* of the employment contract." (emphasis added)). Omega did not rely on the contents of the General Sales and Delivery Terms—in fact, Omega made absolutely no reference to the General

Sales and Delivery Terms in either its answer or its proposed amended answer. *See* Docket 251-1 at 79-84. Instead, Omega's breach of contract arises from the purchase orders it attached to its amended answer and counterclaims. [7] *See id.* at 80, 294-306. No where does Omega even admit that the General Sales and Deliver Terms apply to any of its contracts with Buergofol. *See generally*, Docket 251-1 at 79-84.

In *BJC*, the Eighth Circuit found it improper for a district court to consider an alleged contract submitted by an opposing party when such documents are not indisputably the contract that the plaintiff alleges the defendant breached. *See BJC,* 348 F.3d at 688. There, the plaintiff brought a breach of contract action against the defendant and when the defendant moved to dismiss, it attached three alleged agreements, which the district court relied on in making its decision. The Eighth Circuit determined that the district court erred in considering the documents, noting "the [three submitted] documents may or may not be the only legal agreements relevant to [plaintiffs'] alleged contract with [defendant], and their significance is disputed." *Id.*

The court recognized that typically "the plaintiff must supply any documents upon which its complaint relies, and if the plaintiff does not provide such documents the defendant is free to do so." *Id.* But, in *BJC*, the documents provided by the defendant "were provided 'in opposition to the pleading[]' " and

---

[7] The court acknowledges that there is some disagreement over whether the General Sales and Delivery Terms were utilized by Buergofol at the time of the relevant sales Omega references, despite the 2020 date that appears on the submitted version of the terms. *See* Docket 287 at 18-20. But that is a factual dispute not suited for the court's examination at this time.

intended "to discredit and contradict [plaintiff]'s allegations[.]" *Id.* As such, it was improper to consider the documents because they "were neither undisputed nor the sole basis for" the plaintiff's claim. *See id.; see also OfficeMax Inc. v. Cnty. Qwik Print, Inc.,* 802 F. Supp. 2d 271, 278-79 (D. Me. 2011) (declining to consider a contract provided by the opposition in deciding a motion to dismiss because, although the pleading mentioned a contract, it was unclear whether the alleged contract "constitute[d] the entirety of the [agreement]" or whether the contract was later amended or superseded.)

Similarly here, Buergofol, even in advocating for the court to consider the General Sales and Delivery Terms, notes that the document is "*one* such contract document[.]" Docket 212 at 31. This, in addition to Omega's staunch denial of the authenticity[8] and application of the documents, renders unclear whether the General Sales and Delivery Terms form the basis of Omega's breach of contract claim. Thus, the court declines to consider the document's contents in deciding whether Omega's seventh counterclaim asserts a claim upon which relief can be granted. *See OfficeMax Inc.,* 802 F. Supp. 2d at 278 ("The Court is wary of ruling prematurely when the allegations in the [pleading] can reasonably be interpreted as raising factual questions about whether the [opposition's alleged controlling contract] is dispositive. . . . The more prudent

---

[8] Buergofol argues that Omega has admitted the accuracy of the General Sales and Delivery Terms because Omega relied on the document while making arguments in briefing on other issues. *See* Docket 212 at 32. Omega's statements regarding the document, however, did not indicate Omega believed it to represent a contract between the parties. *See* Docket 251 at 12-14. Thus, the court does not find this argument persuasive.

course is to allow the parties to engage in discovery and revisit the legal issue based on a more fully developed record.). In so doing, the court disregards Buergofol's arguments as they relate to the forum selection clause found in the General Sales and Delivery Terms.

## 2. Whether amendment would be futile

Omega alleges Buergofol breached warranties incorporated into the parties' agreements by the CISG. Docket 251-1 at 79-84. The CISG is an international treaty that sets out "substantive provisions of law to govern the formation of international sales contracts and the rights and obligations of the buyer and seller." *Usinor Industeel v. Leeco Steel Products, Inc.,* 209 F.Supp.2d 880, 884 (N.D. Ill. 2002). "The CISG applies to contracts of sale of goods between parties whose places of business are in different States . . . when the States are Contracting States." *Forestal Guarani S.A. v. Daros Int'l, Inc.,* 613 F.3d 395, 397 (3d Cir. 2010) (ellipsis in original) (quoting CISG Article l(l)(a)). Because both the United States, which ratified in CISG in 1986, and Germany are "signatories to the CISG and the alleged contract at issue involves the sale of goods. . . the CISG governs[]" unless the contracting parties expressly opt out. *Roser Techs., Inc. v. Carl Schreiber GmbH*, 2013 WL 4852314, at *7 (W.D. Pa. Sept. 10, 2013) (quoting *Forestal Guarani S.A.,* 613 F.3d at 397); *see also Caterpillar, Inc. v. Usinor Industeel*, 393 F. Supp. 2d 659, 673 (N.D. Ill. 2005) (noting the CISG is self-executing and applies unless the contracting parties expressly opt out of coverage). Based on the allegations in Omega's claim, the parties did not opt out of the CISG. *See* Docket 251-1 at 81.

To prove a prima facie case for breach of contract under the CISG, a plaintiff must show "the traditional four elements of a breach of contract claim: formation, performance, breach and damages." *Dingxi Longhai Dairy, Ltd. v. Becwood Tech. Grp., LLC*, 718 F. Supp. 2d 1019, 1022 (D. Minn. 2010)); *see also Dingxi Longhai Dairy, Ltd. v. Becwood Tech. Grp. LLC*, 635 F.3d 1106, 1108 (8th Cir. 2011).

Like common law, a contract under the CISG is formed upon offer and acceptance. *See Chateau des Charmes Wines Ltd. v. Sabate USA Inc.*, 328 F.3d 528, 531 (9th Cir. 2003). Here, Omega alleges it and Buergofol entered into a contract by which Omega would indicate which of Buergofol's films it wanted to purchase, Buergofol would then provide Omega pricing information, and Omega would accept through a purchase order specifying the amount of film it wanted to purchase at Buergofol's provided price. Docket 251-1 at 80. Buergofol would then manufacture and ship the ordered films once it received payment. *Id.*; *see also* CISG, art. 23. ("A contract is concluded at the moment when an acceptance of an offer becomes effective.").

As to breach, Omega's proposed amended pleading claims, pursuant Article 42 of the CISG, Buergofol warranted that the film provided under the purchase orders would be delivered to Omega "free from any right or claim of a third party based on . . . intellectual property, of which at the time of the conclusion of the contract [Buergofol] knew or could not have been unaware[.]" Docket 251-1 at 81 (quoting CISG, art. 42). Buergofol allegedly knew that Omega intended to use the film to manufacture and sell UV CIPP liners in the

United States. *Id.* at 82. Additionally, at the time of the contract, Buergofol knew of the existence of the '269 and the '882 Patents, and now claims Omega infringed such patents by "making, using, selling, and offering for sale in the United States UV CIPP liners that use Buergofol's film." *Id.* Omega, by contrast, was not aware of either patent. *Id.* at 83. Finally, Omega also delineates exactly how it has been damaged by Buergofol's breach. *See id.* (pointing to consequential and incidental damages, attorney's fees, expert fees and costs, loss of reputation and goodwill).

This combination of events, if proven true, would constitute the formation of a contract under the CISG, performance, breach of a warranty implied under Article 42 of the CISG, and damages. *Dingxi Longhai Dairy, Ltd.*, 635 F.3d at 1108. Buergofol's only argument in regard to whether Omega has pleaded sufficient facts to assert a CISG claim, centers around Omega's alleged failure to include an "essential term" of the contract—the forum selection clause. Docket 287 at 14-16. As such, Buergofol again tries to include the forum selection clause from the General Sales and Delivery Terms to rebut Omega's claims. *Id.* at 17. But for the same reasons as stated above (the most important being Omega's assertion that the document is not an authentic representation of the parties' contract), the court rejects this argument. Buergofol also attempts to persuade the court to view the forum selection clause through invoices from June 2017, which allegedly includes by reference the General Sales and Delivery Terms. Docket 287 at 19. The court also rejects this attempt. Omega has not relied specifically on the June 2017 invoices, nor

44

has it agreed to the authenticity of or application of such invoices. The discussion above applies here in full force--because it is unclear whether the invoices embody the contract Omega claims Buergofol breached, the court declines to consider them.

Thus, because the factual allegations appear sufficient on the face of the proposed amended pleading, and because Buergofol bears the burden "to prove that no legally cognizable claim for relief exists[,]" the court finds Omega has stated a claim upon which relief can be grated. As such, amendment as to counterclaim seven would not be futile and Omega's motion to amend is granted.

### C. Omega's Eighth and Ninth Counterclaims

Buergofol argues that amendment as to Omega's eighth and ninth counterclaims would be futile. *See* Docket 212 at 42; Docket 289 at 5-6. These counterclaims allege fraud and negligent misrepresention/failure to disclose. Docket 251-1 at 84-87. To succeed on either action, Omega must prove that Buergofol had a duty to disclose the relevant information. *See Sacred Heart Health Servs. v. MMIC Ins., Inc.*, 675 F. Supp. 3d 937, 986 (D.S.D. 2023) (listing a defendant's duty to disclose as an element of a fraud claim under SDCL § 20-10-2(3)); *Taggart v. Ford Motor Credit Co.*, 462 N.W.2d 493, 499 (S.D. 1990) (explaining a cause of action for negligent misrepresentation based on the non-disclosure of information is possible only where the defendant had a duty to disclose).

Essentially, these counterclaims center on the fact that Buergofol sold films to Omega knowing Omega intended to use them to manufacture and sell UV CIPP liners in the United States. Buergofol, relying on *Schwartz v. Morgan,* argues that these claims fail because, under South Dakota law, there is no duty to disclose in arms-length transactions. Thus, because Omega did not provide facts supporting or even allege a fiduciary relationship, Buergofol contends the claims should be dismissed.

But Buergofol mischaracterizes South Dakota's view on the issue. In *Schwartz,* the South Dakota Supreme Court explained that the duty to disclose is generally not present in an arm's-length business transaction, "absent an employment or fiduciary relationship." 776 N.W.2d 827, 831 (S.D. 2009) (quoting *Taggart v. Ford Motor Credit Co.,* 462 N.W.2d 493, 499 (S.D. 1990) (emphasis omitted)). The court recognized, however, that in some situations "anyone, including those in arms-length transactions, could have a duty to disclose under SDCL 20–10–2(3)." *Id.* Namely, a party has a duty to disclose "facts basic to the transaction, if he [or she] knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts." *Id.* (quoting *Ducheneaux v. Miller,* 488 N.W.2d 902, 913 (S.D. 1992)).

The Court went on to explain that this duty to disclose is limited to instances in which the information not disclosed was not discoverable by reasonable care, because a party can usually be expected to make its "own

46

investigation, draw [its] own conclusions and protect [it]self." *Id.* (quoting Restatement (Second) Torts § 551(2)(e)(cmt k)); *see also Hoven v. Banner Assocs., Inc.*, 993 N.W.2d 562, 574-75 (S.D. 2023) (applying this framework). Additionally, the Court highlighted that this analysis should be limited to cases where

> the advantage taken of the [claimant]'s ignorance is so shocking to the ethical sense of the community, and is so extreme and unfair, as to amount to a form of swindling, in which the [claimant] is led by appearances into a bargain that is a trap, of whose essence and substance he [or she] is unaware.

*Id.* (quoting Restatement (Second) Torts § 551(2)(e)(cmt l)).

Here, Omega claims that Buergofol sold Omega films, knowing that Omega planned to use them to manufacture and sell its UV CIPP liners, even though Buergofol "knew of and/or was the owner of the '269 and '882 Patents and Buergofol knew that Omega's use of Buergofol's film in Omega's UV CIPP liners, according to Buergofol, would practice one or more claims of the '269 Patent or the '882 Patent." Docket 251-1 at 84. Omega asserts that such facts were basic to the transactions between Buergofol and Omega for the sale of films, and Omega reasonably expected Buergofol would disclose such facts. *Id.*; *see also Schwartz*, 776 N.W.2d at 831. According to Omega, "Buergofol's actions [ ] constitute a willful, shocking, unethical and intentional effort to deceive Omega into making a bargain," with the ultimate goal of entrapping "Omega in a patent infringement suit[.]" *Id.* at 86-87.

Omega has not, however, pleaded facts to establish that the relevant patents would not have been discovered by reasonable care. *Lindskov v.*

*Lindskov*, 800 N.W.2d 715, 719 (S.D. 2011) (noting a party only has a duty to disclose in an arm's-length transaction where the information "is not otherwise discoverable by reasonable care[]"); *see also Wine Ry. Appliance Co. v. Enterprise Ry. Equip. Co.,* 297 U.S. 387, 393 (1936) (the "issuance of a patent and recordation in the Patent Office constitute notice to the world of its existence[]"); *Cont'l W. Ins. Co. v. Tony's Finer Foods Enterprises, Inc.*, 2023 WL 4351469, at *10 (N.D. Ill. July 5, 2023) ("patents are publicly available information" (citing 37 C.F.R. § 1.11 (2021)).

Based on the alleged facts, it is unclear why Omega, in deciding to manufacture and sell its UV CPP liners, failed to independently investigate and discover the relevant patents at issue. Thus, because parties in an arm's-length transaction do not have a duty to disclose reasonably discoverable information, and Omega has not pleaded the patents could not reasonably have been discovered, the court finds amendment as to the eighth and ninth counterclaim would be futile under the Rule 12(b)(6) standard. As such, Omega's motion to amend is denied.

**II. Buergofol's Motion to Strike Attachments**

Buergofol also moves under Federal Rule of Civil Procedure 12(f) to strike seven letters attached to Omega's proposed amended answer and counterclaims because they are not an operable "written instrument" under Rule 10(c). Docket 212 at 45.[9] Omega asserts the letters should not be stricken

---

[9] Buergofol also mentions that the letters are not a "short and plain statement" as required by Rule 8(a). Docket 212 at 45; *see also* Docket 287 at 32 ("the

because they are not "redundant, immaterial, impertinent, or scandalous[.]" Docket 253 at 20 (quoting Fed. R. Civ. P. 12(f)).

Under Rule 12(f), upon motion or on its own, "courts may strike from a pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "Judges enjoy liberal discretion to strike pleadings under Rule 12(f)." *BJC*, 478 F.3d at 917; Fed. R. Civ. P. 12(f). Although courts enjoy broad discretion in determining whether to strike materials, striking is "an extreme measure, and, as a result, . . . [m]otions to strike under Fed. R. Civ. P. 12(f) are viewed with disfavor and are infrequently granted." *Stanbury Law Firm v. IRS*, 221 F.3d 1059, 1063 (8th Cir. 2000) (internal quotation marks omitted). "[E]ven matters that are not 'strictly relevant' to the principal claim at issue should not necessarily be stricken, if they provide 'important context and background' to claims asserted or are relevant to some object of the pleader's suit." *Anderson v. Wells Fargo Bank, N.A.*, 266 F. Supp. 3d 1175, 1195 (D.S.D. 2017) (quoting *FDIC v. Dosland*, 298 F.R.D. 388, 393 (N.D. Iowa 2013)). Generally, a motion to strike should be denied unless the challenged matter has "no possible relation or logical connection to the subject matter of the

---

personal letters from Omega's pleadings . . . include verbose addenda and exhibits in violation of Rule 8(a)"). This argument, however, is entirely undeveloped. In fact, Buergofol only mentions Rule 8(a) in the text of its two briefs regarding the motion to strike twice in total—both times in a conclusory, matter of fact manner, and without any citation to legal authority. Thus, the court will not address this argument. *See Aulston v. Astrue*, 277 F. App'x 663, 664–65 (8th Cir. 2008) (declining to consider undeveloped arguments).

controversy." *See Infogroup, Inc. v. Database LLC*, 95 F. Supp. 3d 1170, 1194 (D. Neb. 2015).

Here, the attached exhibits are not "redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Instead, they provide context and background to Omega's proposed amended answer and counterclaims. Additionally, the Eighth Circuit has interpreted Rule 10(c)'s "written instrument" requirement broadly, to simply include all "*materials* attached to the complaint as exhibits" when construing the sufficiency of a complaint on a motion to dismiss. *See Meehan v. United Consumers Club Franchising Corp.*, 312 F.3d 909, 913 (8th Cir. 2002) (emphasis added); *see also Ballinger v. Gustafson*, 2022 WL 16758558, at *3 (D. Neb. Oct. 19, 2022) (recognizing the competing interpretations of Rule 10(c) and characterizing the Eighth Circuit's interpretation in *Meehan* as "broad[]"). Thus, Buergofol's motion to strike is denied.

### III. Buergofol's Motion to Dismiss and Motion to Strike

Prior to Omega filing its proposed amended answer and counterclaims, Buergofol moved to dismiss several counterclaims and strike several defenses in Omega's original pleading. *See* Dockets 211-12. "[I]t is common practice for a party to seek leave to amend in response to a motion to dismiss." *Dakota Provisions, LLC v. Hillshire Brands Co.*, 226 F. Supp. 3d 945, 951 (D.S.D. 2016) (quoting *Ireland v. Anderson*, 2014 WL 3732014, at *2 (D.N.D. July 25, 2014) (formatting in original)). The Eighth Circuit has noted that most courts, "as a matter of course, treat an amended [pleading] as mooting a pending motion to

dismiss the original [pleading]." *Cartier v. Wells Fargo Bank, N.A.*, 547 F. App'x 800, 803–04 (8th Cir. 2013) (collecting cases); *see also Janis v. Nelson*, 2009 WL 4505933 (D.S.D. Nov. 24, 2009) (holding that the motion to dismiss was rendered moot after plaintiff filed an amended complaint). Thus, in light of Omega's amended answer and counterclaims, the court denies Buergofol's motion to dismiss Omega's counterclaims and strike its defenses as moot.[10]

**Conclusion**

Thus, for the reasons stated above, it is

ORDERED that

(1) Omega's motion to amend (Docket 251) is granted in part and denied in part. Omega's motion is granted as to Omega's fifth, sixth, and seventh counterclaims and Omega's fifth and sixth defenses. Omega's motion is denied as to its eighth and ninth counterclaims.

(2) Buergofol's motions to dismiss and strike (Docket 211) are denied as moot.

Dated July 25, 2024.

BY THE COURT:

*/s/ Karen E. Schreier*

KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

---

[10] It bears mentioning again that the court did consider Buergofol's arguments encapsulated in its briefing on its motions to dismiss and strike when considering the futility of amendment under Rule 12(b)(6), because the motion to dismiss and futility analysis are governed by the same standard. *See Zutz*, 601 F.3d at 850.