UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| BUERGOFOL GMBH, <br><br> Plaintiff, <br><br> vs. <br><br> OMEGA LINER COMPANY, INC., <br><br> Defendant. | 4:22-CV-04112-KES <br><br><br> ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRESERVATION ORDER, GRANTING MOTION TO COMPEL, AND DENYING MOTION FOR ADVERSE INFERENCE |

Plaintiff, Buergofol, makes three motions: a motion for a preservation order, a motion to compel, and a motion for adverse inference. Dockets 361, 363. Specifically, Buergofol requests the court order defendant, Omega, to preserve a six-inch sample of each dry liner it creates and turn over the samples to Buergofol for testing. Docket 363 at 15-17. With regard to the motion to compel, Buergofol requests the court require Omega to fully comply with request for production (RFP) 30 and turn over a sample of each liner Omega currently has in its possession. *See* Docket 398 at 9-10. And lastly, Buergofol moves for an adverse inference order instructing the jury to infer that each liner Omega failed to produce would have fallen within the scope of the '882 Patent. Docket 363 at 27-30. Omega opposes the motions, arguing (1) the burden of preserving a portion of every liner it makes is too high, (2) RFP 30 only requires Omega to produce representative samples, which Omega did, and

1

(3) an adverse inference sanction is not warranted. *See generally* Docket 390. The court addresses each motion in turn.

## I.    Motion for Preservation Order

Buergofol moves for a preservation order, requiring Omega to keep a six-inch sample of each liner it manufactures. Docket 363 at 15, 17. Omega opposes the motion, arguing that the order would place too heavy of a burden on Omega. Docket 390 at 30-31.

As an initial matter, the parties disagree on which standard applies to motions for preservation orders. *Id.* at 32-37 (Omega arguing the court should use the standard for preliminary injunction); Docket 363 at 11 (Buergofol arguing the court should use a lesser standard). The Eighth Circuit has not articulated a standard, but the majority of district courts within the circuit look to the Eighth Circuit's standards for injunctive relief as a backdrop when considering the issue. *Ingersoll v. Farmland Foods, Inc.*, 2013 WL 461918, at *2 (W.D. Mo. Feb. 6, 2013).

Some courts wholesale adopt the Eighth Circuit's preliminary injunction standard. *See Waters v. Cafesjian Fam. Found., Inc.*, 2012 WL 2904806, at *1 n.1 (D. Minn. June 27, 2012) (stating that a motion for preservation order is properly examined as if it were a motion for a temporary restraining order or preliminary injunction). Such courts consider: "(1) the threat of irreparable harm to the moving party if an injunction is not granted[;] (2) the harm suffered by the moving party if injunctive relief is denied as compared to the effect on the non-moving party if the relief is granted[;] (3) the public interest[;] and (4)

the probability that the moving party will succeed on the merits." *Id.* (citing *Dataphase Sys. Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)); *see also Ingersoll*, 2013 WL 461918, at *2.

But other "courts relax the standard so that [the moving party] do[es] not have to demonstrate likelihood of success on the merits of the litigation, as such consideration is not appropriate for evidence preservation[.]" *Ingersoll*, 2013 WL 461918, at *2 (collecting cases). Those courts slightly adapt the preliminary injunction factors and balance "(1) [t]he level of concern for the maintenance and integrity of the evidence in the absence of a preservation order; (2) [a]ny irreparable harm likely to result to the party seeking such order; and (3) [t]he capability of the party to maintain the evidence sought to be preserved."[1] *Hallan v. Hy-Vee Inc.*, 2019 WL 1958333, at *1 (D.S.D. May 2, 2019) (quoting *Ingersoll*, 2013 WL 461918, at *2); *see also City of Wyoming, Minnesota v. Procter & Gamble Co.*, 2016 WL 6908110, at *2 (D. Minn. Oct. 7, 2016); *EOX Tech. Sols. v. Galasso*, 2023 WL 3478445, at *1 (S.D. Fla. May 16, 2023); *Haraburda v. Arcelor Mittal USA, Inc.*, 2011 WL 2600756 at *2 (N.D. Ind. June 28, 2011). *But see True the Vote, Inc. v. Internal Revenue Serv.*, 2014 WL

---

[1] Some district courts outside the Eighth Circuit merely ask whether "the [preservation] order is necessary and not unduly burdensome." *In re M/V Rebekah*, 2024 WL 3552357, at *2 (W.D. Wash. July 26, 2024) (quoting *Fluke Elecs. Corp. v. CorDEX Instruments, Inc.*, 2013 WL 566949, at *12 (W.D. Wash. Feb. 13, 2013)). But courts have recognized that the difference between this test and the three-factor balancing test "is more apparent than real." *Id.* (quoting *Fluke*, 2013 WL 566949, at *12); *see also EOX Tech. Sols. v. Galasso*, 2023 WL 3478445, at *1 (S.D. Fla. May 16, 2023).

4347197, at *5 (D.D.C. Aug. 7, 2014) (expressly rejecting the three-factor balancing test and requiring a showing of likely success on the merits).

This court has and will again apply the majority approach. *See Hallan*, 2019 WL 1958333, at *1. In doing so, the court is guided by the dictates of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 1 (requiring the "just, speedy, and inexpensive determination of every action and proceeding"); Fed. R. Civ. P. 26(b)(1) (requiring courts to consider "the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information . . . the importance of the discovery in resolving the issues, and whether the burden or expense of the . . . discovery outweighs its . . . benefit").

## A. The level of concern for the maintenance and integrity of the evidence in the absence of a preservation order

Generally, preservation orders are not necessary because litigants have a pre-imposed duty to preserve relevant information. *See Kendall v. Bausch & Lomb, Inc.*, 2006 WL 8453961, at *4 (D.S.D. May 10, 2006); *EOX Tech. Sols.*, 2023 WL 3478445, at *2. Thus, preservation orders are not warranted unless the movant shows that the other party has already or will fail to preserve relevant evidence. *Hess v. Biomet, Inc.*, 2018 WL 3127162, at *3 (N.D. Ind. Feb. 16, 2018); *see also Pepsi-Cola Bottling Co. of Olean v. Cargill, Archer-Daniels-Midland Co.*, 1995 WL 783610, at *4 (D. Minn. Oct. 20, 1995) ("[A] [p]reservation [o]rder is warranted only upon a showing that one is needed.") (citation omitted). Here, it is unclear that Omega will preserve a sample of each of its liners absent a preservation order. *See generally* Docket 390.

4

**B. Irreparable harm**

Buergofol asserts that it will be irreparably harmed if this preservation order is not granted because, without the samples, it cannot adequately determine whether each individual liner infringes the patents in suit. Docket 363 at 16. Generally, "it becomes a judicial duty to protect a party from likely harm by acting to prevent the loss or destruction of evidence, thereby ensuring that the party may prosecute or defend its case in a court of law." *Ingersoll*, 2013 WL 461918, at *4 (quoting *Capricorn Powers Co., Inc. v. Siemens Westinghouse Power Corp.,* 220 F.R.D. 429, 435 (W.D. Penn. 2004)).

Buergofol claims that it needs a sample of each dry liner produced by Omega because "[t]wo inner films made by the same film manufacturer may have different compositions such that one film will exhibit a coating, whereas another film will not." Docket 363 at 16. Omega argues, however, that the inner film present in its dry liners has the same structure and composition. Docket 390 at 14-17. Since 2019, Omega has received its inner liners from two companies: Viaflex and Sudpack. Docket 390 at 11; Docket 391 ¶ 6.[2] Roughly 95% of Omega's liner sales include inner and outer films obtained from Viaflex (the Viaflex Version). Docket 391 ¶ 6. The remaining 5% of Omega's liners are made using inner and outer films produced by Sudpack (the Sudpack Version). *Id.* Omega argues that it does not need to preserve a sample of each of its liners because such discovery is unreasonably cumulative and duplicative. Docket

---

[2] Until 2019, Buergofol also supplied Omega with inner and outer film. Docket 390 at 11; Docket 391 ¶ 4.

390 at 28. Omega asserts that "all the inner film it has purchased from Viaflex has the same composition and structure for purposes of analyzing infringement of both the '882 Patent [and the '269 Patent.]" *Id.* at 17. Although the liners Omega ships to its customers may "vary in diameter and length, the structure and composition of each version does not differ for the purposes of an infringement analysis." *Id.* at 14-15. In short, Omega contends that a Viaflex Version of the Omega liner is representative of the inner film present in all Omega liners made with Viaflex film and a Sudpack Version of the Omega liner is similarly representative. *Id.* at 15.

In reply, Buergofol points to instances in which Omega allegedly stated the opposite—specifically, when answering requests for admissions, Omega refused to admit its liner contained an inner film with the "same" structure and composition as the film samples Omega had provided to Buergofol. Docket 398 at 28. Omega argues it responded to the request under the assumption that it was asking whether the films were "identical." Docket 390 at 16. Although it could not assure Buergofol that liners produced were identical, because the thickness of the layers may vary during manufacturing, Omega is steadfast in its assertion that the inner films purchased from its suppliers have the same structure and composition as all other films from the same supplier. Docket 390 at 17. Statements from Viaflex support Omega's assertion. *Id.*; Docket 392 ¶ 6 (Viaflex's Director of Engineering stating that Viaflex has not changed the ingredients in its inner film since 2018).

6

It seems that, at least at some points in the past, Buergofol also subscribed to the theory that all Omega liners are the same for infringement purposes. *See, e.g.*, Docket 66 at 10 (stating that Omega sells a single product and that all of the liners made by Omega are accused of infringing); Docket 160-2 at 5 (stating "every instance of OMEGA LINER included an inner film that met the limitations of claim 1"). *But see* Docket 238 at 36-37 (Buergofol stating at the hearing before Magistrate Judge Duffy that there was some indication that the humidity and temperature in the factory may affect the inner film composition such that "perhaps in the summer months the liners will infringe and in the winter months they won't"). Now, however, Buergofol claims that four of the eleven dry liner samples Omega produced had a coating on their inner film, but no coating could be determined on the remainder of the samples.[3] Docker 398 at 29. Thus, Buergofol asserts that it "must test the inner film from each liner because only some liners have inner film with the recited coating or covering" and believes that if it can test 1000 samples, it may be able to discern "a pattern as to which liners are likely to have inner film with the recited coating or covering." *Id.* at 29-30.

Buergofol has not, however, established that the necessary information is present only in the samples provided by Omega. Buergofol briefly mentioned that it cannot seek films from Omega's suppliers, Viaflex and Sudpack, because it cannot be established that those samples come from an identified

---

[3] Omega argues it produced a total of 55 samples, consisting of various versions of its liners and inner films from its suppliers, including Buergofol. Docket 390 at 13-14; Docket 364-9.

7

liner. Docket 398 at 28-29. The court agrees—seeking wholly unrelated films would disclose little relevant information. But that does not mean Buergofol cannot seek data, records, or other insights as to the structure and composition of the inner films from Omega's suppliers. Nor does it mean that Buergofol cannot obtain samples from Omega's suppliers of film sent to Omega to produce its liners and ask Omega which liners were produced using that particular film. Buergofol offers no argument against these methods. Thus, the court is not convinced that Buergofol can only get the answers it needs via 1,000 samples of the Omega liner. As such, it is unclear whether Buergofol will be irreparably harmed by the denial of a preservation order.

### C. Capability of the party to maintain the evidence sought to be preserved

Omega produces about two liners per day.[4]  Omega claims that it would cost Omega roughly $287,361.54 to retain a sample of each liner it produces over an 18-month period. *See* Docket 390 at 27.[5] Omega's cost was calculated

---

[4] Buergofol's initial memorandum in support of this motion and its reply state that Omega produces two liners per day. *See* Docket 363 at 30; Docket 398 at 10. Neither reference, however, provides a citation to the record to support that assertion. But because Omega did not refute the claim, the court assumes that Omega produces two liners per day for the purposes of this motion. *See also* Docket 390 at 27 (Omega estimating that about 637 liners will be made in the next year).

[5] In its responsive brief, Omega calculated its costs based on its understanding that Buergofol's motion called for Omega to preserve liners until the completion of litigation. *See* Docket 390 at 26-27. Thus, Omega's calculations are based on a 48-month period. *Id.* In its reply, Buergofol clarified that it was asking for Omega to retain liner samples during an anticipated 18-month stay. Docket 398 at 17. But the court denied the motion for stay. Docket 403. After the stay was denied, Buergofol did not file any supplemental briefing, so the court presumes that Buergofol still requests the court order Omega to preserve

by considering lost material costs, labor costs associated with cutting the samples from the liners, increased health risks to employees, and lost sales during peak production (presumably referring to the lost production time spent obtaining a sample from a finished liner). *Id.*

First, Buergofol argues that the cost of maintaining the samples is irrelevant and the court should focus only on Omega's capability to maintain the samples. Docket 398 at 16 (Buergofol stating "the party's capability to maintain the evidence is considered as opposed to the burden on that party to maintain the evidence") (emphasis removed). The court disagrees. Courts have articulated that the "capacity" evaluation requires courts to look to the "capability of a[] . . . party to maintain the evidence sought to be preserved, not only as to the evidence's original form, condition or contents, but also the physical, spatial and financial burdens created by ordering evidence preservation." *City of Wyoming*, 2016 WL 6908110, at *2; *see, e.g., In re M/V Rebekah*, 2024 WL 3552357, at *3 (W.D. Wash. July 26, 2024) (stating that in evaluating this factor courts must also consider the burden and cost of preserving the evidence). Thus, the cost to Omega is not irrelevant and the court dismisses Buergofol's arguments to the contrary.

Second, Buergofol asserts that a number of Omega's claimed costs are inflated. Namely, Buergofol argues that Omega's material costs are eight times

---

samples of each dry liner for an 18-month period. As such, the court added Omega's estimated costs for the first year ($179,362.14) and half of the total cost for the second year ($215,998.80 ÷ 2= $107,999.40) to get an 18-month cost of $287,361.54. *See* Docket 390 at 27 (figures listed).

what they should be because they contemplate removing the liner from the assembly line and wasting material in making "surgically straight cut[s]." Docket 398 at 18-19. Buergofol also points out issues in Omega's claimed labor costs—noting that Omega's anticipated sample gathering process includes unnecessary steps, such as cleaning up resin, bagging and labeling each sample, and transporting the samples to a secure location. *Id.* at 19-22. Buergofol also calls into question Omega's claimed increased health-risks because Omega employees already regularly cut liners without masks. *Id.* at 23.

The court agrees with Buergofol that any costs or time associated with cleaning up resin should not be considered, because Buergofol is only requesting samples of dry liners. *See id.* at 21. The court also agrees that any increased health risks to Omega's employees will be minimal. *See City of Wyoming*, 2016 WL 6908110, at *4 (dismissing plaintiff's argument regarding potential health risks involved in collecting samples because "[p]laintiff's employees . . . are trained professionals who encounter th[e] material on a routine basis when performing" their regular duties). It is difficult, however, to determine the validity of Buergofol's other arguments, given that the court cannot be certain of the exact set-up of Omega's facility or its production line. Moreover, the court is wary of opining that Omega should forego surgically straight cuts, meticulous labeling, and sample preservation (through bagging the sample and storage), when, given the litigious nature of this action, it is foreseeable that the sampling process and the samples themselves may later be

called into question by Buergofol. Thus, the court, at the very least, acknowledges that the cost of preserving the samples is substantial—particularly when considering Buergofol's claimed damages of $4 million. Docket 398 at 27*; see also* Fed. R. Civ. P. 26 (stating that discovery must be proportional to the needs of the case).

After considering the above factors, the court grants Buergofol's motion for a preservation order in part and denies it in part. The court recognizes that Buergofol has serious questions it needs answered regarding the structure and composition of the inner film present in the Omega liner. It is also clear that Omega has unfettered access to its liners, while Buergofol's ability to obtain the liners—in their complete form (as opposed to film from Omega's suppliers)—is limited. "Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." *City of Wyoming*, 2016 WL 6908110, at *2 (quoting *Hickman v. Taylor*, 329 U.S. 495, 507 (1947)). And here, "[w]ithout a preservation protocol, [Buergofol] do[es] not have the ability to access the same universe of facts as [Omega]." *Id.*

But collecting a sample of each liner would be a costly undertaking for Omega and Buergofol can likely seek at least some of the information it needs from Omega's inner film suppliers. Additionally, the court is wary of issuing such an expansive preservation order when it is unclear whether it is even feasible for Buergofol to test the 1,000 samples it requests. As highlighted by Omega, Buergofol has previously represented to the court that "the analytical testing of *each inner film sample* to determine the identity of the migrating

11

compound on the external side of the inner film costs 5,000 Euros." *See* Docket 66 at 13-14. When Omega questioned the feasibility of testing so many samples at such a steep cost, Buergofol simply asserted that it is not required to demonstrate that it will test each dry liner sample Omega produces. Docket 398 at 31. Thus, the court is not convinced that it is feasible or even likely that Buergofol will test all 1,000 of the requested samples at 5,000 Euros a piece, especially when considering Buergofol is only seeking $4 million in damages. *See* Docket 398 at 27.

As such, the court orders Omega to preserve a sample of each liner it produces in the three months (90 days) following this order. The court finds that three months of liners are proportional to the needs of this case and this timing would not interfere with Omega's peak production period (April to September). *See* Docket 390 at 27. If at the conclusion of the three-month period Buergofol wants additional samples, Buergofol must bear Omega's costs to preserve such samples. *See Treppel v. Biovail Corp.,* 233 F.R.D. 363, 373 (S.D.N.Y. 2006) ("If the demanding party seeks the preservation of information that is likely to be of only marginal relevance but is costly to retain, then rather than deny a preservation order altogether, a court may condition it upon the requesting party assuming responsibility for part or all of the expense.") (citation omitted).

## II.    Motion to Compel

Buergofol moves pursuant to Federal Rule of Civil Procedure 37 to compel Omega to fully respond to Buergofol's Request for Production (RFP) No.

12

30. Docket 363 at 17. Under Rule 37, a party that believes the opposing party has failed to properly respond to a discovery request may "move for an order compelling disclosure or discovery." Fed. R. Civ. P. 37(a)(1). "[A]n evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(4). "A proper discovery response must either answer the request fully or state with specificity the grounds for objecting to the request." *Toyota Motor Sales, U.S.A., Inc. v. Allen Interchange LLC*, 2024 WL 3617141, at *2 (D. Minn. Aug. 1, 2024), *aff'd,* 2024 WL 4524481 (D. Minn. Oct. 18, 2024) (citing Fed. R. Civ. P. 33(b), 34(b)(2)). "Objections must be stated with specificity and in relation to specific requests; any ground 'not stated in a timely objection is waived unless the party's failure to object is excused by the court for good cause.' " *Id.* (quoting *Cargill, Inc. v. Ron Burge Trucking, Inc.*, 284 F.R.D. 421, 424 (D. Minn. 2012)).

Buergofol served RFP 30 on June 19, 2023. Docket 364-1 at 7. The request asks Omega to produce "[o]ne representative physical sample of each OMEGA DRY LINER. Each physical sample should be a tube of the OMEGA DRY LINER that is at least 6 inches long." *Id.* at 5. Omega responded on July 19, 2023, stating that it objected generally to the request as overly broad and burdensome. Docket 364-2 at 5, 17. More specifically, Omega stated, "the production of samples of each individual dry liner will not disclose any additional information related to the parties' claims and defenses that is not already available to Buergofol." *Id.* But Omega went on to state that it would "produce one representative physical sample of each OMEGA DRY LINER based

on the pipe liner diameter." *Id.* Omega later produced one sample of each size of liner it produces. Docket 364-9 at 4-5; Docket 364-10 at 2.

Buergofol subsequently filed this motion arguing that Omega failed to comply with RFP 30 because Omega did not turn over a sample of each and every liner Omega produced since receiving the RFP. Docket 363 at 17-24. Omega argues that it fully complied with RFP 30 by turning over a sample of each size of liner that Omega produces. Docket 390 at 12. To support its argument, Omega points to a request for production that Buergofol made to Subsurface, where Buergofol asked for "[a] physical sample of each OMEGA LINER . . . in the possession, custody, or control of Subsurface." *Id.* at 9 (quoting Docket 85-4 at 11). Omega argues that if Buergofol had truly wanted a sample of every single liner in Omega's possession, then it could have requested the samples using the same language it employed in its Subsurface request. *Id.*

The court disagrees with Omega. Buergofol's discovery request clearly defines "Omega Liner" as "a UV CIPP . . . pipe liner . . . made, used, sold and/or offered for sale by Omega." Docket 364-1 at 3. And RFP 30 does not request a sample that is representative of each *size* of liner that Omega produces, but rather a representative sample of *each* liner "made, used, sold and/or offered for sale by Omega." *Id.* at 3, 5. Although the language is slightly murky, particularly when compared to the clarity of Buergofol's request to

14

Subsurface, the meaning is discernable. Additionally, after the request was served, Buergofol made its intentions clear. Docket 364-8 at 2.[6]

But, as with all discovery requests, the court must determine whether the discovery sought is relevant and proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). "[E]ven if relevant, discovery is not permitted where no need is shown, or compliance would be unduly burdensome, or where harm to the person from whom discovery is sought outweighs the need of the person seeking discovery of the information." *Miscellaneous Docket Matter No. 1 v. Miscellaneous Docket Matter No. 2*, 197 F.3d 922, 925 (8th Cir. 1999) (citation omitted)). "A party claiming requests are unduly burdensome cannot make conclusory allegations, but must provide some evidence regarding the time or expense required." *Vallejo v. Amgen, Inc.*, 903 F.3d 733, 743 (8th Cir. 2018) (citation omitted). Parties must make "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Gen.*

---

[6] Despite several communications between the parties after RFP 30 was served on June 19, 2023 (and Omega responded on July 19, 2023), Buergofol did not clearly reject Omega's interpretation of RFP 30 until December 20, 2023. *See* Docket 364-3 at 2 (October 27, 2023 email from Buergofol indicating it anticipates a sample of each Omega liner produced since RFP 30 had been served); Docket 364-4 at 2 (November 3, 2023 email from Omega stating it believed it complied with RFP 30); Docket 364-5 at 2 (December 8, 2023 email from Buergofol asking Omega what its position is on responding to RFP 30, which "request[s] a sample of each dry liner and wet liner manufactured by Omega"); Docket 364-7 at 2 (December 20, 2023 email from Omega stating that in the absence of Buergofol saying otherwise, Omega presumed that Buergofol was content with Omega's response to RFP 30); and Docket 364-8 at 2 (December 20, 2023 email from Buergofol clarifying that it needs "a physical sample of each individual OMEGA LINER that was or is in the possession, custody or control of OMEGA").

15

*Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d 1204, 1212 (8th Cir. 1973) (internal quotation marks omitted).

As noted above, in responding to RFP 30, Omega generally objected, stating that the request was overbroad and burdensome. Docket 364-2 at 5. Omega also objected on relevance grounds—claiming that the samples would not reveal any information not already available to Buergofol. *Id.* The court rejects Omega's objections and the arguments submitted in Omega's briefing on this issue. First, to the extent that Omega offered any argument in support of its conclusory objection that RFP 30 was too broad or imposed too heavy a burden, Omega's arguments center entirely on the perception that RFP 30 asks for samples of liner on an on-going basis. *See* Docket 390 at 27 (Omega discussing the expenses associated with producing a sample of each liner produced in the upcoming years). But RFP 30 only calls for samples of liner that Omega already has in its possession, custody, or control. *See* Docket 364-1 at 5; Docket 398 at 9-10. Omega has not explained why it would be burdensome or costly to produce a sample of the liners Omega currently has in its possession, custody, or control. Second, as to Omega's argument that the liners are not relevant because they would not provide Buergofol with any unique information, the court has already recognized that the liners are relevant, given Buergofol's belief that the structure and composition of the inner film may differ from liner to liner.

16

Thus, the court grants Buergofol's motion to compel and orders Omega to comply with RFP 30. Omega must produce a six-inch sample of each dry Omega Liner it has in its possession, custody, or control.

## III.    Motion for Adverse Inference

Finally, Buergofol moves for an adverse inference instruction stating that the fact finder may infer that any dry liner Omega made after December 20, 2023, for which Omega did not retain a sample, a test of the sample would have shown the liner falls within the scope of the '882 Patent. Docket 363 at 27. Buergofol asserts that as of at least December 20, 2023, Omega was on notice that it should be preserving a sample of each liner it produced in response to RFP 30. *Id.*

"A court's inherent power includes the discretionary 'ability to fashion an appropriate sanction for conduct which abuses the judicial process.' " *Stevenson v. Union Pac. R. Co.*, 354 F.3d 739, 745 (8th Cir. 2004) (quoting *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44-45 (1991)). As such, courts enjoy significant latitude to craft appropriate sanctions when a party has spoliated evidence after litigation has commenced. *See id.*; *Sherman v. Rinchem Co.*, 687 F.3d 996, 1006 (8th Cir. 2012) ("[T]he authority to impose sanctions for spoliated evidence arises not from substantive law but, rather, from a court's inherent power to control the judicial process.") (citation omitted)).

"Spoliation of evidence refers to 'the intentional destruction, mutilation, alteration, or concealment of evidence.' " *Sys. Spray-Cooled, Inc. v. FCH Tech, LLC*, 2017 WL 10154221, at *3 (W.D. Ark. Feb. 22, 2017) (quoting *Florilli*

17

*Transp., LLC v. W. Express, Inc.*, 2015 WL 12804273, at *2 (W.D. Mo. Dec. 29, 2015)). Courts may sanction parties who spoliate evidence with an adverse inference instruction. *Morris v. Union Pac. R.R.*, 373 F.3d 896, 900 (8th Cir. 2004). An adverse inference instruction is a severe sanction, *Stepnes v. Ritschel*, 663 F.3d 952, 965 (8th Cir. 2011), and

> a powerful tool in a jury trial. When giving such an instruction, a federal judge brands one party as a bad actor, guilty of destroying evidence that it should have retained for use by the jury. It necessarily opens the door to a certain degree of speculation by the jury, which is admonished that it may infer the presence of damaging information.

*Morris*, 373 F.3d at 900.

Thus, to warrant an adverse inference instruction, "there must be a finding of *intentional destruction* indicating a desire to suppress the truth." *Sherman*, 687 F.3d at 1006 (quoting *Stevenson*, 354 F.3d at 746). It is not strictly necessary for the court to make a finding of bad faith, but courts have the discretion to consider the non-moving party's intent to ensure a sanction is suitably tailored to remedy any spoliation. *See, e.g.*, *Hallmark Cards, Inc. v. Murley*, 703 F.3d 456, 461 (8th Cir. 2013) ("[A] district court is entitled to fashion appropriate sanctions for such evasive litigation tactics—even absent an explicit bad faith finding.") (citation omitted). But "where a court expressly finds . . . that there is no evidence of intentional destruction of evidence to suppress the truth, then the [] court also acts within its discretionary limits by denying sanctions for spoliation of evidence." *Home Instead, Inc. v. Florance*,

2014 WL 12914304, at *4 (D. Neb. Apr. 24, 2014) (citing *Morris*, 373 F.3d at 901).

"A finding of intent is a highly contextual exercise." *Morris*, 373 F.3d at 902. "Intent is rarely proved by direct evidence, and a district court has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors." *Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032, 1035 (8th Cir. 2007) (citation omitted). "When a corporation is involved, the inquiry depends in part on corporate policies, but also to some extent on the intent of corporate employees, not all of whom will play the same role in every case." *Morris*, 373 F.3d at 902-03.

Here, the court finds that to the extent Omega failed to preserve a sample of each liner produced since December 2023, Omega did not do so with the intention of suppressing the truth. Omega has consistently argued that it believes all the inner films it uses in its liner have the same structure and composition (provided they come from the same supplier). Docket 390 at 14-15 (stating that "the structure and composition of each version [of Omega Liner] does not differ for the purposes of an infringement analysis"). Omega's belief was further supported by Omega's primary film supplier, Viaflex, which explicitly stated it has not changed the ingredients in its inner film since 2018. Docket 392 ¶ 6. The only evidence Omega has that the liners somehow differ is Buergofol's insistence that they do—but Buergofol has steadfastly refused to

explain how it knows each of the liners are each unique. *See* Docket 398 at 29-30.

Buergofol asks the court "to impose adverse inferences that go to the heart of the merits of th[is] complex case[]." *A.O.A. v. Rennert*, 2018 WL 1251827, at *1 (E.D. Mo. Mar. 12, 2018). The court finds, however, that "imposing adverse inferences is more draconian than necessary." *Id.* Thus, Buergofol's motion for adverse inference is denied.

## IV.    Attorneys' Fees

Both Buergofol and Omega move for attorneys' fees. Docket 398 at 34; Docket 390 at 43. The court may award attorneys fees pursuant to its own inherent power, but the "court ordinarily should rely on the Federal Rules rather than its inherent power" when conduct can be addressed under the rules and "the [r]ules are [] up to the task." *Schlafly v. Eagle F.*, 970 F.3d 924, 936 (8th Cir. 2020) (quoting *Chambers*, 501 U.S. at 50) (cleaned up).

Federal Rule of Civil Procedure 37(a)(5)(A) provides that when a discovery motion is granted, the court must "require the party . . . whose conduct necessitated the motion . . . to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees" unless the court finds "the motion was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(5)(A).[7] "The party resisting sanctions

---

[7] Omega's motion is pursuant Rule 37(a)(5)(B), which mirrors 37(a)(5)(A), providing that when a discovery motion is denied, the court may "require the movant, the attorney filing the motion, or both to pay the party . . . who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees[,]" unless the court finds "the motion was

bears the burden of showing that its position was substantially justified." *Jim Hawk Truck-Trailers of Sioux Falls, Inc. v. Crossroads Trailer Sales & Serv., Inc.*, 2022 WL 3010143, at *8 (D.S.D. July 29, 2022) (citation omitted).

A position is "substantially justified" if it "was justified in substance or in the main—that is, justified to a degree that could satisfy a reasonable person. To warrant such a characterization, the position must have reasonable basis both in law and fact." *In re Nat'l Hockey League Players' Concussion Inj. Litig.*, 2017 WL 3276873, at *2 (D. Minn. July 31, 2017) (quoting *Conklin v. Astrue*, 282 F. App'x 488 (8th Cir. 2008)). At its core, "substantial justification means that 'reasonable minds could differ as to whether the party was justified in resisting the discovery sought.' " *Jim Hawk*, 2022 WL 3010143, at *8 (quoting *Kirschenman v. Auto-Owners Ins.*, 2012 WL 1493833, at *2 (D.S.D. Apr. 27, 2012)).

The court denies both motions for fees, finding that each party was substantially justified in making and opposing the underlying motions in this matter. First, Buergofol was justified in seeking its preservation order, its motion to compel, and its adverse inference instruction. Though the court did not grant the motion for preservation order in its entirety or the motion for adverse inference, it is clear that the motions were not meritless. And, given the court's determination on the issues, it is also clear that Omega was substantially justified in opposing the motions.

---

substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(5)(B).

Although the court granted Buergofol's motion to compel, the court finds that Omega was substantially justified when it opposed the motion and refused to comply with RFP 30 because, despite what Buergofol claims, Buergofol has never been entirely clear on what RFP 30 really calls for. RFP 30, served on June 19, 2023, requests that Omega produce "[o]ne representative physical sample of each OMEGA DRY LINER. Each physical sample should be a tube of the OMEGA DRY LINER that is at least 6 inches long." Docket 364-1 at 5. And in its reply, Buergofol states that the RFP simply requests a sample of each dry liner in Omega's custody, possession, or control. *See* Docket 398 at 9-10. The court read the RFP the same and granted the motion to compel based on that interpretation. But in its earlier communications with Omega, on December 20, 2023, Buergofol stated that in order to comply with RFP 30, Omega must not only produce the samples that were in Omega's possession, custody or control since June 19, 2023, but also told Omega that it was required to continuously supplement its response to RFP 30 by sending a sample of each liner it produced "at least after the requests were served on June 19, 2023." Docket 363 at 28; Docket 364-8 at 2; Docket 364-16 at 2. Omega's response argued that RFP 30 only called for dry liner samples for each of the liner diameters manufactured by Omega and that the cost of producing a sample of each liner it manufactures over 18-months would be roughly $1.5 million. Docket 364-9 at 6-8.

Buergofol's December 20, 2023, email made clear that RFP 30 requested a sample of each and every dry liner, but it also said that samples must be

retained "of each OMEGA DRY LINER and each OMEGA LINER that was made at least after the requests were served on June 19, 2023." Docket 363 at 28. Further, it seems that all of Buergofol's communications with Omega perpetuated that broad reading of RFP 30. *See* Docket 364-8 at 2; Docket 364-9 at 2; Docket 364-16 at 2; Docket 364-19 at 2-3. In fact, even Buergofol's opening brief on the instant set of motions suggests a continuing duty to supplement RFP 30 with a sample of each dry liner Omega manufactures. *Compare* Docket 363 at 26 ("Buergofol is requesting an order compelling Omega to produce such 6-inch-long samples of all dry liners that Omega has in its possession and to retain a 6-inch sample of each dry liner that Omega manufactures going forward."), *with* Docket 398 at 7 ("Buergofol moves the [c]ourt to compel Omega to produce a sample of each and every liner that is in Omega's possession, custody or control."), *and* Docket 398 at 9-10 (stating that Buergofol's motion for a preservation order calls for samples of liners Omega procures in the future, as opposed to Buergofol's motion to compel, which "could potentially cover just a few samples" currently in Omega's possession).

Buergofol argues that Omega failed to timely raise objections to RFP 30, but Omega could not have reasonably been expected to meaningfully object to RFP 30 in its initial response, when Omega misunderstood what RFP 30 truly asked for. But as early as November 3, 2023, Omega outlined the costs and relevancy of producing a sample of each liner it manufactured. Docket 364-4 at 3. And after Buergofol clarified that RFP 30 requested a sample of each liner on December 20, 2023, Docket 364-8 at 2, Omega responded with detailed

23

objections, Docket 364-9. Thus, the court finds that Omega was substantially justified in opposing Buergofol's motion to compel.

**CONCLUSION**

Based on the foregoing, it is

ORDERED that

 1. Buergofol's motion for preservation order is granted in part and denied in part. Omega must preserve one sample of each dry Omega Liner it manufactures in the three months (90-days) following the issuance of this order. The parties will coordinate pickup and/or delivery of the samples. Buergofol will pick up the samples or pay for their delivery;

 2. Buergofol's motion to compel is granted. Pursuant to RFP 30, Omega must provide Buergofol with a sample of each dry liner it has in its possession, custody, or control; and

 3. Buergofol's motion for adverse inference is denied.

Dated November 25, 2024.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE