UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| BUERGOFOL GMBH,<br><br>Plaintiff,<br><br>vs.<br><br>OMEGA LINER COMPANY, INC.,<br><br>Defendant. | 4:22-CV-04112-KES<br><br>ORDER DENYING MOTION FOR ORDER TO SHOW CAUSE AND FOR SANCTIONS AND DENYING MOTION TO STRIKE |

Plaintiff, Buergofol, moves for an order to show cause as to why Omega's counsel—Michael Neustel and Monte Bond—should not be held in contempt of court for violating the court's previous order (Docket 56) "by contacting Dr. Kurt Stark and soliciting privileged and confidential information from him." Docket 523 at 1. Buergofol also moves for sanctions against Omega's counsel. *Id.* Omega opposes the motion, Docket 558, and later filed a supplement to its response, Docket 580. Buergofol moves to strike the supplement on the grounds that the supplement was improperly filed. Docket 581. In the alternative, Buergofol moves for an extension of time in which to respond to the supplement. *Id.* The court issues the following order.

## BACKGROUND

On November 29, 2022, Buergofol filed a motion for a protective order, seeking to prevent Omega from having any *ex parte* communications with

Buergofol's former employee, Dr. Kurt Stark.[1] Docket 19. On January 27, 2023, Magistrate Judge Veronica Duffy denied the motion, reasoning that "[South Dakota] Rule 4.2 does not prohibit Omega's lawyer from contacting Dr. Stark." Docket 56 at 9. The order also listed five guidelines for both parties to follow during *ex parte* informal communications with each other's former employees. *Id.* at 9-10. As relevant here, Rule No. 4 states:

> Counsel must inform the former employee to avoid the disclosure of any privileged or confidential corporate information. Counsel shall not attempt to solicit privileged or confidential information and shall terminate the interview if it appears the former employee may reveal privileged or confidential matters.

*Id.* at 10.

On July 3, 2023, Omega's counsel, Michael Neustel, emailed Dr. Stark. Docket 558-1 at 2. In the email, Neustel identified himself as counsel for Omega, indicated that the "purpose of this communication is solely to determine if you [Dr. Stark] are represented by legal counsel," and explained that in responding to his email, Dr. Stark should "not provide any privileged or confidential information relating to Buergofol." *Id.* Dr. Stark replied on July 5, 2023, providing Neustel with contact information for his attorney, Benjamin Eismann. Docket 558-2 at 2. In an email sent to Eismann on July 6, 2023, Neustel inquired whether Eismann would be available for a Teams meeting the following week and provided Eismann with a copy of the court's January 27, 2023, order. Docket 558-3 at 2, 6-16. On December 8, 2023, Neustel and

---

[1] Dr. Stark previously worked for Buergofol as its Director of Business Development, Docket 524 at 3, and is one of the listed inventors of the '882 patent, Docket 56 at 5.

2

Eismann agreed to hold a videoconference on December 23, 2023. Docket 558-4 at 2.

At the December 23rd videoconference, Eismann and Neustel discussed Dr. Stark's availability for a remote meeting. Docket 559 ¶ 2. Dr. Stark was not present at the meeting. *Id.* Neustel reminded Eismann that Omega was not seeking any privileged or confidential information from Dr. Stark. *Id.* ¶ 3. Eismann informed Neustel that Dr. Stark was willing to meet, was fluent in English, and was currently involved in multiple lawsuits with Buergofol, "involving compensation, licenses, and patent royalties." *Id.*

Counsel for Omega had no further communications with Eismann until June 17, 2024. *Id.* ¶ 4. On that date, Neustel emailed Eismann to arrange a potential deposition of Dr. Stark in the United States. Docket 558-5 at 2. Neustel again attached the court's January 27, 2023, protective order. *Id.* Receiving no response, Neustel sent a follow-up email on June 20, 2024. Docket 558-6 at 2.

On June 21, 2024, Buergofol sent Dr. Stark a draft declaration prepared by Buergofol's counsel, Darien Wallace. Docket 525 ¶ 4; Docket 525-2 at 7-22. Later that same day, Dr. Stark sent Neustel an email and attached the draft declaration he had received from Buergofol. Docket 558-7. In his email, Dr. Stark stated that the declaration shows "how Buergofol is trying to intimidate me [Dr. Stark]," and that Buergofol asked him "to a sign a declaration that puts words in my [Dr. Stark's] mouth." *Id.* at 2. Neustel emailed Eismann, indicating

3

that he received the email from Dr. Stark,[2] and asked whether Dr. Stark and Eismann would be available for a videoconference. Docket 558-8 at 5.

After receiving a videoconference invite from Dr. Stark for a meeting set for June 26, 2024, Neustel emailed Eismann, requesting Eismann to remind Dr. Stark that his "participation in this meeting is entirely voluntary and that [Dr. Stark] is to avoid the disclosure of any privileged or confidential corporate information relating to Buergofol during this meeting." *Id.* at 2. Neustel also cc-ed his co-counsel, Monte Bond, on the email. *Id.*

The June 26th videoconference involved Neustel, Bond, Eismann, and Dr. Stark. Docket 559 ¶ 6; Docket 560 ¶ 2. At the start of the meeting, Neustel reminded Dr. Stark that they were not seeking any of Buergofol's privileged or confidential information. Docket 559 ¶ 7; Docket 560 ¶ 3. Additionally, both Eismann and Dr. Stark confirmed that the attachments sent in Dr. Stark's email were not privileged or confidential, that the draft declaration contained public information, and that Dr. Stark had obtained Eismann's permission to send the attached files to Neustel prior to sending them. *Id.* Dr. Stark further explained that he would not sign the draft declaration Buergofol sent him because most of the statements were incorrect, and he was asked in the declaration to confirm events that never occurred. Docket 559 ¶ 8; Docket 560 ¶ 4. Dr. Stark did not specifically identify which statements he believed were incorrect. *Id.* Dr. Stark also indicated that he would be willing to appear for a

---

[2] In their declarations, Omega's counsel, Neustel and Bond, indicated that they did not review the files attached in Dr. Stark's June 21, 2024, email until after the June 26, 2024, meeting. Docket 559 ¶ 9; Docket 560 ¶ 5.

deposition in the United States but would be unavailable in July and August due to travel. *Id.*

Following the videoconference, Dr. Stark sent Neustel, Bond, and Eismann, a marked-up copy of the draft declaration. *See* Docket 525-2 at 24-46. In his email, Dr. Stark stated, "please see my comment[s] attached, as discussed in our video conference." *Id.* at 24. Dr. Stark indicated that the draft declaration included statements: (1) he could not confirm, (2) he could potentially confirm based on "a certain definition of what is meant," and (3) he could confirm. *Id.* Counsel for Omega never responded to Dr. Stark's email and did not discuss the mark-ups with Eismann or Dr. Stark. Docket 559 ¶ 11.

On June 27, 2024, during the parties' *Inter Partes* Review (IPR) before the Patent Trial and Appeal Board (PTAB), Buergofol filed two declarations of other co-inventors for the '882 patent. *See* Docket 558-10; Docket 558-11. In its reply brief, filed on October 7, 2024, Omega attached the marked-up declaration Dr. Stark had sent to Omega in support of its argument that Buergofol made false statements in the two declarations. *See* Docket 558-12 at 15-21 (describing where the false statements are in the two declarations).

On October 10, 2024, Buergofol sent Omega a letter, notifying Omega's counsel that they were in violation of the court's previous order because they obtained confidential information from Dr. Stark and were tortiously interfering with a contract between Buergofol and Dr. Stark. *See* Docket 558-13. In response, Omega denied Buergofol's allegations as "baseless" and indicated that its counsel had complied with the court's prior order. Docket 558-14. On

5

October 22, 2024, Buergofol sent Omega another letter claiming that Omega's counsel had obtained its work product information in the form of the draft declaration. Docket 558-15 at 2-3. The next day, Buergofol filed its motion for an order to show cause. Docket 523.

## LEGAL STANDARD

The "contempt power is a substantial one, it should be used sparingly and not be lightly invoked." *Hartman v. Lyng*, 884 F.2d 1103, 1106 (8th Cir. 1989); *see also Indep. Fed'n of Flight Attendants v. Cooper*, 134 F.3d 917, 920 (8th Cir. 1998) (citation omitted) (noting that the court's civil contempt power "is a most potent weapon, and therefore it must be carefully and precisely employed"). "A party seeking civil contempt bears the initial burden of proving, by clear and convincing evidence, that the alleged contemnors violated a court order." *Chicago Truck Drivers Union Pension Fund v. Bhd. Labor Leasing*, 207 F.3d 500, 505 (8th Cir. 2000). If the party successfully meets this initial burden, then the nonmoving party must show an inability to comply with a court order. *Id.* To demonstrate an inability to comply, the nonmoving party must show "(1) that they were unable to comply, explaining why categorically and in detail, (2) that their inability to comply was not self-induced, and (3) that they made in good faith all reasonable efforts to comply." *Id.* at 506.

## DISCUSSION

### I. Motion to Strike

Buergofol moves to strike Omega's supplement (Docket 580) on the grounds that it is procedurally improper under D.S.D. Local Rule 7.1, and that

6

the timing of the filing "puts a considerable burden on Buergofol" because it contains new arguments. Docket 581. In the alternative, Buergofol requests that the court extend the time in which it can respond to Omega's "new arguments." *Id.* Omega opposes the motion to strike and argues that its supplement was filed solely to provide notice to the court of relevant decisions made by the PTAB and does not raise any new arguments. Docket 591 at 6-8. Omega requests that if the court is inclined to strike the supplement, the court "either (a) exercise its inherent authority to retain Notice of PTAB Orders in the record, or (b) allow Omega to file a motion for leave." *Id.* at 8-9.

District courts enjoy an inherent authority to control their dockets to "achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991); *see also Lunsford v. United States*, 570 F.2d 221, 227 n.11 (8th Cir. 1977) (recognizing the court's authority to strike materials on its own initiative). This inherent authority allows courts "to strike improper or untimely briefs and otherwise to enforce their local rules," *Libault v. Mamo*, 2023 WL 1474853, at *1 (D. Neb. Feb. 2, 2023), and "to strike evidence or pleadings that are not in compliance with its orders," *McClurg v. Mallinckrodt, Inc.*, 2017 WL 2880350, at *3 (E.D. Mo. July 6, 2017). Because the court's "inherent powers must be exercised with restraint and discretion," *Chambers*, 501 U.S. at 44, courts generally disfavor striking materials from the docket, *see WWP, Inc., v. Wounded Warriors, Inc.*, 2008 WL 150234, at *1 (D. Neb. Jan. 14, 2008).

Here, the court refuses to strike Omega's supplement under its inherent authority. While Buergofol is correct that Local Rule 7.1 does not expressly provide for supplementation, *see* D.S.D. L.R. 7.1, Omega's supplement solely consists of filings in the parties' proceedings before the PTAB regarding Buergofol's motion to seal Dr. Stark's declaration, *see* Docket 580 at 1-2, 5; Docket 580-1 at 3. The court finds that the orders and motions in the PTAB's proceedings disclosed in the supplement are relevant to the parties' briefings regarding Buergofol's pending motion for an order to show cause. As such, the court need not exercise its inherent authority to strike Omega's supplement.

Further, after reviewing Omega's supplement, the court finds that Omega did not raise any new argument that would prejudice Buergofol. Omega's supplement explains what each of the six PTAB filings contain, *see* Docket 580 at 1-2, 5, and quotes relevant portions from the PTAB's decisions as they relate to Buergofol's present motion for an order to show cause, *see id.* at 2-4, 6. Buergofol fails to specifically identify where in Omega's supplement it believes new arguments are raised. *See* Docket 581. The court also finds relevant that Buergofol had access to the PTAB's order denying its motion for sanctions on December 13, 2024, *see* Docket 591 at 5, one week prior to Omega filing its supplement, *see* Docket 580. Because the court finds that Omega's supplement did not prejudice Buergofol, the court denies Buergofol's motion to strike.[3]

---

[3] The court also denies Buergofol's request for an extension of time in which to respond because Buergofol has already addressed the filings in Omega's supplement. *See* Docket 583 at 29-30. (Buergofol arguing in its reply brief that the court should not consider the PTAB's rulings because they "have no

8

## II. Motion for Order to Show Cause

Buergofol argues that this court should issue an order to show cause because Omega's counsel violated Rule No. 4 in the court's previous order by "solicit[ing] privileged or confidential information from Dr. Stark," and obtaining Buergofol's "work-product draft declaration." Docket 524 at 10-12. Buergofol further asserts that Omega's counsel violated the court order by soliciting "confidential corporate information from Dr. Stark in the form of Dr. Stark's comments on the work product draft declaration." *Id.* at 13. Omega argues that the information Dr. Stark shared was not confidential. Docket 558 at 13-18. Omega also argues that the draft declaration is not work product, *id.* at 20-23, and that even if the declaration was work product, Buergofol waived the privilege when it disclosed the declaration to Dr. Stark, *id.* at 24-26. To determine if Omega violated Rule No. 4 in the court's previous order, the court first addresses whether Omega's counsel solicited or obtained any confidential information from Dr. Stark.

### A. Whether Omega's counsel solicited or obtained Buergofol's confidential information

Buergofol alleges that Omega obtained confidential business information when Dr. Stark sent Omega his commentary on Buergofol's draft declaration. Docket 524 at 13. Buergofol argues that this commentary constitutes confidential information because "Dr. Stark was obligated to keep them confidential by (1) his statutory duty of loyalty under the German Employee

---

bearing on whether [Omega's counsel] solicited work product privileged information from Dr. Stark in the form of the draft Stark declaration.").

9

Invention Act, (2) his contractual duty under his employment agreement with Buergofol, and (3) his contractual duty under the assignment agreement of the '882 Patent." Docket 583 at 15; *see also* Docket 524 at 13-15.

Omega asserts that Buergofol has failed to show that any of the information from Dr. Stark is confidential. Docket 558 at 13-15. The court agrees. Buergofol's arguments regarding confidentiality revolve around its assertion "that all matters that came into Dr. Stark's knowledge in the course of his work at Buergofol are confidential." Docket 524 at 14. But this blanket statement, which would prohibit Omega from speaking with Dr. Stark as to any matter arising during Dr. Stark's employment, is at odds with the court's previous order permitting Omega to contact Dr. Stark so long as Omega follows the court's guidelines to avoid soliciting confidential or privileged information. *See* Docket 56 at 9. Further, in its opening brief, Buergofol fails to identify any information in the draft declaration or in Dr. Stark's commentary that is confidential information. *See generally* Docket 524. In its reply brief, Buergofol attempts to offer more specificity as to what exactly it claims is confidential information. *See* Docket 583 at 16, 19 -21 (arguing that information concerning areas such as the "development of the invention and the unexpected results," customer complaints, and experiments with ways to form coatings and coverings, constitute confidential business information). But as Omega points out, most of the information corresponding to Buergofol's identified general categories were already disclosed in Buergofol's patent

10

application for the '882 patent or in its filings before the PTAB. *See* Docket 594 at 4-6.

Additionally, Dr. Stark and his attorney confirmed at the June 26th meeting that the declaration did not contain confidential or privileged information, and that the information in the declaration was public. *See* Docket Docket 559 ¶ 7; Docket 560 ¶ 3. The court finds it relevant that Buergofol did not seek to seal the purportedly confidential information contained in Dr. Stark's marked-up draft declaration, filed on October 7, 2024, until October 24, 2024. *See* Docket 558 at 19. The court also finds relevant the fact that the two unsealed declarations Buergofol filed in the IPR proceedings contain "the same or repackaged statements" as those in the draft declaration sent to Dr. Stark. *See* Docket 558 at 11-12 (Omega providing a chart matching multiple statements in Dr. Stark's declaration with similar statements made in the two filed declarations). Based on the above, the court concludes that Buergofol has failed to show that Omega obtained any confidential information from Dr. Stark.

The court is also not convinced that Omega solicited the confidential information from Dr. Stark. Omega, on numerous occasions, informed Dr. Stark and his attorney that Omega was not seeking privileged or confidential information. *See* Docket 558-1 at 2 (Omega's initial email to Dr. Stark indicating that it was not seeking confidential or privileged information); Docket 558-3 at 2, 6-16 (Omega's email to Dr. Stark's attorney with attachment of court's order); Docket 559 ¶ 3 (Omega reminding Dr. Stark's

11

counsel that it was not seeking confidential or privileged information); Docket 558-5 (Omega's second email to Dr. Stark's attorney with attachment of the court's order); Docket 558-8 (Omega's email requesting Dr. Stark's counsel remind Dr. Stark not to reveal confidential or privileged information); Docket 559 ¶ 7 (Omega's counsel stating that Omega reminded Dr. Stark not to reveal confidential or privileged information during the June 26th videoconference). Instead, Dr. Stark, of his own volition, shared the draft declaration and the marked-up declaration with Omega. *See* Docket 558 at 7 (Omega describing Dr. Stark's email with the draft declaration as "unsolicited"). And as Omega has explained, its purpose in contacting Dr. Stark was to arrange a potential deposition in the United States,[4] not to obtain Buergofol's privileged or confidential information. *See* Docket 558-5; Docket 558-8. At every turn, Omega has demonstrated its compliance with Rule No. 4 of the court's previous order. Thus, the court finds that Omega did not obtain or solicit confidential information in violation of the court's prior order.

---

[4] In its reply brief, Buergofol argues that Omega's counsel attempted to solicit confidential and privileged information from Dr. Stark by "offering to buy Dr. Stark's fact testimony with financial compensation." Docket 583 at 23, 25. But as Omega explains, it offered to "reimburse [Dr. Stark] for his reasonable expenses and time for attending the deposition in the United States – which is allowed under the ABA Model Rules and is completely ethical." Docket 594 at 9. Because Omega has demonstrated its repeated attempts to comply with the court's prior order, the court rejects Buergofol's argument that Omega's counsel attempted to solicit Dr. Stark for confidential information by offering financial compensation for his testimony.

### B. Whether Omega solicited or obtained privileged information from Dr. Stark

Buergofol also argues that even if the underlying facts in the draft declaration are not confidential, Omega still violated the court's order because the declaration constitutes work product. Docket 524 at 12-13; Docket 583 at 11. Omega argues that the draft declaration is not work product, and that even if the declaration was Buergofol's work product, Buergofol waived the work product privilege in two ways. Docket 558 at 20-26. First, in disclosing the draft declaration to Dr. Stark, "Buergofol unequivocally waived any claim of work product immunity it might have had." *Id.* at 24-25. Second, when Buergofol filed two declarations from its other inventors during the parties' IPR proceedings, Buergofol impliedly "waived any claim to work product protection for that subject matter."[5] *Id.* at 25-26.

The work product doctrine "is not absolute and may be waived." *Pamida Inc. v. E.S. Originals, Inc.*, 281 F.3d 726, 732 (8th Cir. 2002). "The Eighth Circuit has clearly held that waiver occurs when there has been disclosure of work product to an adversary or disclosure of work product to a third party

---

[5] Buergofol argues that "there exists no subject matter waiver for the opinion work product contained in a draft declaration." Docket 583 at 28-29. But district courts in the Eighth Circuit have applied the subject matter waiver to the work product doctrine. *See, e.g. Lahart v. BNSF Railway Co.*, 2017 WL 5634148, at *5 (S.D. Iowa Mar. 28, 2017) (noting that "[c]ourts narrowly construe subject-matter waiver, and only employ it when the situation implicates unfairness"); *Thomas v. Marshall Pub. Schs.*, 690 F. Supp. 3d 941, 957 (D. Minn. 2023) (applying subject matter waiver to intentionally disclosed work product documents). Because the court finds that Buergofol waived the work product privilege when it disclosed the declaration to Dr. Stark, the court need not determine whether Buergofol also "waived any claim to work product protection for that subject matter." Docket 558 at 25-26.

with the actual intention that it be disclosed to an opposing party." *United States v. Dico, Inc.*, 2017 WL 9049852, at *6 (S.D. Iowa Mar. 27, 2017); *see also Gundacker v. Unisys Corp.*, 151 F.3d 842, 848 n.6 (8th Cir. 1998) ("Although disclosure to an adversary ordinarily waives work product protection, there must be an intention that the opposing party see the work product."). The Eighth Circuit's requirement that a party intend for an opposing party to "access the work product prevents the waiver doctrine from extending to inadvertent disclosures made by human error in the process of discovery." *Dico*, 2017 WL 9049852, at *6 n.3. The work product privilege is also waived where disclosure of the work product document "substantially increased the opportunities for potential adversaries to obtain the information." *In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 2017 WL 5188342, at *5 (D. Minn. Mar. 7, 2017) (quoting 8 Wright & Miller, *Federal Practice & Procedure § 2024* (3d ed.)); *see also Murphy v. Kmart Corp.*, 259 F.R.D. 421, 431 n.9 (D.S.D. 2009).

      Assuming, without deciding, that the draft declaration sent to Dr. Stark is Buergofol's work product, the court concludes that any work product privilege has been waived. Buergofol argues that because it did not intend for Omega to see the draft declaration, it did not waive the work product privilege over the declaration. Docket 582 at 27. Buergofol cites to *Gundacker v. Unisys Corporation* in support of its argument. *Id.* The court finds that *Gundacker*'s rule does not apply here, however, because Buergofol did not make an inadvertent disclosure when it sent the draft declaration to Dr. Stark. *See*

14

*Gundacker*, 151 F.3d at 848 (holding that a party's inadvertent disclosure did not waive the work product privilege because the party did not intend for the opposing party to see the document). Instead of sending a declaration to a former employee, Buergofol sent a draft declaration to an adverse party who Buergofol had previously attempted to prevent Omega from contacting. *See* Docket 19.

At the time Buergofol sent Dr. Stark the declaration, Dr. Stark and Buergofol were "involved in multiple lawsuits against each other." Docket 20 at 13; *see also* Docket 349 at 9 (Buergofol describing Dr. Stark as adverse to Buergofol because the parties are involved in several lawsuits). Buergofol has indicated that Dr. Stark "cannot be trusted," Docket 34 at 9, and "is likely to divulge Buergofol's privileged information," Docket 20 at 10. Further, in a prior briefing, Buergofol described an instance where it argues Dr. Stark divulged Buergofol's "business secrets to a competitor." Docket 34 at 4-5. And despite knowing that Dr. Stark had allegedly revealed confidential information to its competitors in the past, Buergofol failed to obtain Dr. Stark's consent to keep the declaration confidential between the parties before sending the declaration to him. *See* Docket 525-2 at 3 (Buergofol, in requesting Dr. Stark to sign the draft declaration, only reminded Dr. Stark that "as a co-inventor and former employee, [Dr. Stark] is obliged to provide support and cooperation").

In disclosing a draft declaration to an adverse party such as Dr. Stark, who Buergofol claims has previously disclosed information to a competitor, Buergofol took the risk that Dr. Stark would share the draft declaration with

15

Omega. *See In re Bair*, 2017 WL 5188342, at *5 (finding that a party waived work product protection over documents sent in a mass email where counsel "took the risk that one of [the] unknown recipients could share the documents with their adversary"). Such an action "substantially increased" the likelihood that Omega would receive a copy of the draft declaration. *See id.*; *see also McKenzie L. Firm, P.A. v. Ruby Receptionist, Inc.*, 333 F.R.D. 638, 648 (D. Or. 2019) (finding emails and draft declarations shared with former adverse employee waived work product privilege because it "substantially increased the opportunity for the adverse party . . . to obtain these emails" from the former employee).

    While Buergofol may not have intended for Omega to see the draft declaration, Buergofol voluntarily sent the draft declaration to Dr. Stark—an adverse party. This created a circumstance in which there was a significant likelihood that Omega would obtain the draft declaration. Thus, Buergofol waived any work product privilege it had over the draft declaration in disclosing it to Dr. Stark.[6] *See Wells Fargo & Co. v. United States*, 2013 WL 2444639, at *37 (D. Minn. June 4, 2013) ("A party waives the privilege when it intentionally discloses work product to its adversaries . . . [which] holds true even when the party seeking the information is not the adversary to whom the initial disclosure was made[.] [I]n other words, a waiver to one adversary is a waiver to

---

[6] Because the court denies Buergofol's motion for an order to show cause, the court denies Buergofol's motion to impose sanctions on Omega's counsel. *See* Docket 524 at 18-20. The court also denies Omega's request for attorney's fees. *See* Docket 558 at 25.

16

all."); *see also In re Chrysler Motors Corp.*, 860 F.2d 844, 846-47 (8th Cir. 1988) (granting the government access to its opposing party's work product where the opposing party had disclosed the work product to third party adversaries in a prior civil action). As such, the court concludes that Omega's counsel did not solicit or obtain Buergofol's privileged information from Dr. Stark.

## CONCLUSION

Because Omega's counsel did not solicit or obtain confidential or privileged information from Dr. Stark, the court concludes that Omega's counsel did not violate Rule No. 4 of the court's previous order (Docket 56). Thus, it is

ORDERED that Buergofol's motion for order to show cause and for sanctions (Docket 523) is DENIED. It is

FURTHER ORDERED that Buergofol's motion to strike (Docket 581) is DENIED.

DATED June 24, 2025.

BY THE COURT:

/s/ *Karen E. Schreier*

KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE