UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| BUERGOFOL GMBH, | 4:22-CV-04112-KES |
| Plaintiff and Counter Defendant, | ORDER GRANTING MOTION TO STAY DISCOVERY AND DISPOSITIVE MOTIONS AND GRANTING MOTION TO CONSOLIDATE BUERGOFOL'S MOTION TO COMPEL WITH OMEGA'S MOTION TO DISMISS |
| vs. | |
| OMEGA LINER COMPANY, INC., | |
| Defendant and Counter Claimant. | |

Defendant, Omega, moves this court, pursuant to Federal Rule of Civil Procedure 26(c) and the court's inherent authority, to stay all discovery and dispositive motions until the court resolves Omega's pending motion to dismiss (Docket 864). Docket 880 at 1. Omega also moves to consolidate Buergofol's recently filed motion to compel (Docket 876) with Omega's motion to dismiss. *Id.* Buergofol opposes both motions. *See* Docket 890; Docket 907. The court issues the following order.

**BACKGROUND**

**I.    Parties' Communications Regarding TransPerfect's Forensic Inspection**

On June 26, 2025, a representative from TransPerfect[1] emailed both parties stating that TransPerfect wanted "to schedule a brief call between our

---

[1] The court's ESI order required the parties to jointly select a neutral, third-party ESI expert to forensically inspect certain data within Buergofol's control.

forensic expert and the Buergofol representative that is providing access, credentials and technical support to ensure expectations are aligned and that the collection workflow proceeds expeditiously and successfully." Docket 822-1 at 33. On July 3, 2025, Omega emailed TransPerfect and Buergofol stating that because TransPerfect's retainer was paid, "Buergofol must now provide access to its ESI within seven days of payment," and asked that TransPerfect "[p]lease let [Omega] know [TransPerfect's] expected timing for beginning the forensic inspection at Buergofol's facility." *Id.* at 24. Omega also proposed dates for the brief conference call between the parties and TransPerfect. *Id.* On July 14, 2025, Omega again indicated its availability for the conference call. *Id.* at 22.

On July 15, 2025, TransPerfect emailed the parties and indicated that it received the parties' retainer payment and would reach out to find an agreeable time for the conference call. *Id.* at 20. On July 17, 2025, Omega sent a follow-up email to see what dates and times TransPerfect and Buergofol would be available for the pre-forensic inspection conference call. *Id.* at 19-20. The following day, TransPerfect emailed both parties stating that after its review of the parties' correspondence "concerning the scope and execution of the forensic expert services ordered in the ESI Discovery Order," it wanted to schedule two calls, "one with counsel for the parties to discuss the various disagreements concerning the scope and execution of the [ESI] Order, and one with the

---

*See* Docket 725 at 5-8. TransPerfect is the court-appointed ESI expert tasked with (1) forensically copying Buergofol's entire January 1, 2013, email backup pursuant to Section III.2, and (2) generating a film orders and shipments report from Buergofol's Navision system pursuant to Section III.5. *See id.*

appropriate IT representative from Buergofol so that [TransPerfect] can obtain a more detailed understanding of the target data sources and, in turn, design the forensic workflow to execute on the Order." *Id.* at 18.

On July 21, 2025, Buergofol "decline[d] [TransPerfect's] offer to participate in telephone conference calls," mainly because "nowhere does the [ESI] Order require Buergofol to hold telephone discussions with TransPerfect." *Id.* at 17. Buergofol explained that because TransPerfect received its retainer payment, its expert "should simply show up at the Buergofol facility and complete the two tasks set forth in Sections III.2 and III.5 of the [ESI] Order." *Id.* TransPerfect responded the next day and indicated that it required the "advance call with a qualified IT representative from Buergofol" before it could proceed with the forensic inspection because it is TransPerfect's "standard operating procedure and it is mandatory for all on-site collections that [TransPerfect] perform[s]." *Id.* at 16. TransPerfect also explained the conference call was necessary to determine whether an encryption key will be present, what underlying operating systems are in use, available and target database fields, file extraction formats, and related technical issues prior to its forensics team appearing at Buegofol's facility. *Id.*

The same day, Buergofol again denied that it had any obligation to participate in any type of conference call and stated that "TransPerfect is to show up at the Buergofol facility and do its job." *Id.* at 15. Buergofol further stated that it would "provide access, and all necessary credentials, usernames, passwords . . . [and] a qualified person to assist the expert in retrieving the

data and identifying all backups of the Navision system." *Id.* The following day, TransPerfect responded to Buergofol's email stating that the conference call is "non-negotiable" to ensure that TransPerfect's forensic inspection "is executed professionally, successfully, and in a forensically defensible manner." *Id.* at 14. In response, Buergofol stated that TransPerfect "is needlessly delaying and preventing TransPerfect from doing the tasks [it] was paid to do." *Id.* at 13. Buergofol also informed TransPerfect that its technical assistance would be limited to Klaus de Groote, who Buergofol stated "is the only person at Buergofol with access to, and any working knowledge of, the archaic Navision/COEX2 system." *Id.* Buergofol clarified that de Groote would not be assisting TransPerfect in generating the film shipments report because "TransPerfect are supposed to be the 'experts.' " *Id.*

Buergofol sent a follow-up email the next day. *Id.* at 12-13. In that email, Buergofol requested that TransPerfect "stop making excuses" about its "self-imposed requirements, using phony terms like the 'engagement' and 'qualified IT representative' and such." *Id.* at 12. Buergofol reiterated that de Groote had very little memory of the "old archaic, unused" Navision system. *Id.* Buergofol also demanded that TransPerfect get their expert over to Buergofol's facilities within the next five days "without further excuses." *Id.* at 13. In an email sent on July 25, 2025, TransPerfect responded and requested that Buergofol allow the pre-forensic conference call with de Groote to allow TransPerfect to "provide the expert services" it was hired to complete under the court's ESI order. *Id.* at 11.

4

Instead of agreeing to the pre-forensic conference call, Buergofol again demanded that TransPerfect "simply show up and perform the report-generating task." *Id.* at 10 (Buergofol stating that TransPerfect needs to "[w]ithout further delay and excuses, have [TransPerfect's] European-based 'expert' get in a car, drive to the Buergofol Siegenburg facility at the address that has been provided to [TransPerfect], and generate the report"). Despite these demands for compliance, TransPerfect indicated that Buergofol's emails had "not convinced [TransPerfect] to forego [its] mandatory quality assurance protocol, including having a brief advance phone call with whomever at Buergofol is most knowledgeable about these two target data sources, before [TransPerfect] shows up at [Buergofol's] facilities in Germany." *Id.* at 7. TransPerfect also indicated that based on Buergofol's "hostile, condescending and accusatory conduct in response to [TransPerfect's] very simple and basic request for a brief telephone call, TransPerfect [was] no longer comfortable sending a single forensic resource to [Buergofol's] offices in Germany to execute this engagement." *Id.* at 7-8. TransPerfect indicated that if the forensic inspection proceeded, it would be sending two forensic experts to Buergofol's facilities in order "to have a second witness present in the event this vitriolic conduct continues during the actual collection." *Id.* at 8.

On July 28, 2025, Buergofol emailed TransPerfect and stated that de Groote did not wish to speak with TransPerfect because there was "widespread resentment about [TransPerfect's] attempt to bully Buergofol personnel into undergoing [TransPerfect's] interrogation." *Id.* at 5-6. Buergofol did request that

TransPerfect provide a date and time to conduct a phone call with Buergofol's counsel so that TransPerfect could explain what TransPerfect believed its "expert is going to be doing on Buergofol's computer system," and whether TransPerfect's expert "has any actual true experience porting Tobit/David emails from a strongbox file into eml files." *Id.* at 6. Buergofol last suggested that it could have an "Epiq expert do the Navision task, and terminate the TransPerfect engagement with respect to Navision." *Id.* at 7. TransPerfect offered several potential times for a scheduled phone call with Buergofol and Omega, *see id.* at 5, but Buergofol canceled its request to have a phone call with TransPerfect because it did not want to have communications with both TransPerfect and Omega, *id.* at 4. TransPerfect responded on July 30, 2025, and indicated that it could not participate in a phone call with only Buergofol because *ex parte* communications were prohibited per the terms of the parties' contract with TransPerfect. *Id.* at 3.

On August 6, 2025, because Buergofol failed to respond to TransPerfect's July 30, 2025, email, Omega emailed both TransPerfect and Buergofol and requested that TransPerfect confirm whether it was unable to proceed because it was "clear that the forensic process was at an impasse and that a call with Buergofol's most knowledgeable IT representative was necessary to overcome this impasse." *Id.* at 2-3. That same day, TransPerfect confirmed that it "cannot in good faith proceed without a brief preparatory call with whomever at Buergofol is most knowledgeable about these two target data sources." *Id.* at 2.

On August 12, 2025, Buergofol advised that it would contact de Groote to find out whether he was willing to speak with TransPerfect. Docket 867-17 at 10. Buergofol reiterated that "Mr. de Groote is not an expert in Navision and has never done any programming of the Navision system." *Id.* That same day, Omega responded that because "[i]t is beyond dispute that [Buergofol's IT Manager, Anton Hoffman,]—not Mr. de Groote—is the only Buergofol employee qualified to assist TransPerfect," Buergofol was violating the court's ESI order by solely providing de Groote to assist TransPerfect. *Id.* at 9. The next day, Buergofol indicated that while de Groote "definitely does not want to talk with [TransPerfect,]" he would take a "brief call," but only if the attorneys for both sides were not involved. *Id.* at 8. TransPerfect agreed to this arrangement, *id.* at 7, but Omega objected, noting that the parties' contract with TransPerfect expressly prohibits *ex parte* calls, *id.* at 6-7.

On August 14, 2025, TransPerfect indicated that because it "is not in a position to adjudicate the disputes between the parties, or to undertake actions that either side objects to," it requested that both parties resolve their disagreements or seek court intervention. *Id.* at 5-6. In response, Omega reiterated its concerns against allowing *ex parte* communications and that Buergofol continued to refuse to produce Anton Hoffmann, who Omega stated is "the sole custodian of the 2013 email backup and the individual most familiar with the Navision/COEX database systems." *Id.* at 4-5. Omega further stated that for the forensic inspection to proceed, it would "not attend the initial call between TransPerfect and Mr. de Groote if the discussion is

7

transcribed and the transcript is immediately provided to Omega without redactions." *Id.* at 5.

On August 15, 2025, TransPerfect agreed to Omega's suggestion, *id.* at 4, but Buergofol objected, arguing that the initial call should not be recorded or transcribed because Omega could then use this transcription in court, *id.* at 3. On August 18, 2025, Omega stated that "[i]n the interest of moving matters forward, Omega will not require transcription of the call with Mr. de Groote . . . [but] strongly encourage[d] TransPerfect, for the benefit of all parties, to take detailed notes of the discussion so there is a clear and reliable record of the call." *Id.* at 2.

On August 29, 2025, TransPerfect emailed both parties confirming that it held a brief preparatory call with de Groote the previous day. Docket 867-18 at 11-12. TransPerfect stated that while "Mr. de Groote was unable to provide additional information about the target data sources," it was willing "to proceed with this limited information," and further suggested dates when it could travel to Germany to conduct the forensic inspection. *Id.* at 12. That same day, Omega requested that TransPerfect "specify what information Mr. de Groote was unable to provide and identify any information he did provide." *Id.* at 10. Omega further expressed concern with TransPerfect's willingness to proceed with the forensic inspection at Buergofol's facilities provided its "repeated insistence that it must first speak with a 'qualified IT representative from Buergofol' to ensure the inspection is executed 'professionally, successfully and in a forensically defensible manner.' " *Id.* (emphasis omitted). Because of its

8

concern that the forensic inspection may not acquire the targeted information identified in the court's ESI order, Omega requested that TransPerfect meet jointly with both parties before it conducted the inspection. *Id.* at 11.

In an email sent on September 3, 2025, TransPerfect indicated that it was amenable to a call between the parties to discuss next steps but reiterated that it was still available to conduct the forensic inspection should the call not occur. *Id.* at 9. TransPerfect further stated that although its forensic inspection might not be successful given the lack of information provided by de Groote, TransPerfect concluded that "there is little more that we can do other than execute the onsite collection to the best of our abilities and report back to the parties on the results." *Id.* TransPerfect explained that because the Strongbox (.stbox) file "is an exceptionally rare file format and . . . cannot be easily processed in an e-discovery platform for searching," while its "analysts might be able to convert the .stbox file into a searchable format . . . [it] will require custom engineering, and still might not be successful." *Id.* (emphasis omitted). TransPerfect further stated that it might not be able to search the .stbox file because it did not "know if that file is encrypted or not and, if it is, who has the encryption key." *Id.* But because Buergofol informed TransPerfect that de Groote was the most knowledgeable IT person at Buergofol concerning the Navision/COEX2 system, TransPerfect felt that its requirement for a preparatory phone call was satisfied. *Id.*

On September 4, 2025, Buergofol emailed TransPerfect and Omega stating that de Groote would be available on September 9, 2025, to assist

9

TransPerfect with its forensic inspection. *Id.* at 8. Buergofol also declined Omega's request to conduct a call between the parties and TransPerfect because it asserted it was Omega's latest "attempt to delay and obstruct the implementation" of the ESI order. *Id.* TransPerfect replied and indicated that because the parties disagreed as to "whether the forensic collection should proceed next week or await a call amongst the parties," it had to "stand down until this issue is resolved." *Id.* at 7.

Later that same day, Omega emailed both Buergofol and TransPerfect and stated that it had "no interest in delaying this inspection," and was only seeking to ensure that the forensic inspection is "facilitate[d in] an efficient, cost-effective, and forensically sound process to ensure proper implementation of the court's ESI Discovery Order." *Id.* at 4-5. Omega further reiterated its concerns that TransPerfect "received no additional information from Klaus de Groote regarding the two key data sources: (1) the 2013 email backup in .stbox format and (2) the Navision/COEX database(s) system." *Id.* at 5. Omega was specifically concerned that de Groote was unable to inform TransPerfect whether the .stbox file was encrypted because the Tobit David Tech Briefing page indicated that .stbox files are encrypted. *See id.* Thus, Omega stated that without Buergofol providing TransPerfect an encryption password and direct access to the Tobit David Administrator software, "the inspection of the encrypted .stbox file is guaranteed to fail from the outset." *Id.* at 5-6.

In its email, Omega also raised concerns regarding the Navision/COEX database(s) system because de Groote provided no information regarding the

system and Buergofol "expressly restricted TransPerfect's ability to even investigate the location of the target data." *Id.* at 6. Omega further stated that because Buergofol was refusing to supply TransPerfect with the actual individual who had the most IT knowledge at Buergofol—Anton Hoffmann—Buergofol's "obstruction has not only delayed and crippled the ESI process—it has ensured its failure." *Id.* Omega indicated that "[u]nless Buergofol immediately provides TransPerfect with (1) the encryption password or key for the .stbox file, (2) direct access to the Tobit David Administrator software that created and encrypted the .stbox file, and (3) a pre-inspection call with Anton Hoffmann to provide the necessary technical support for both the 2013 email backup and the Navision/COEX database(s), Omega will seek relief from the [c]ourt." *Id.*

In response, Buergofol demanded that Omega "immediately . . . retract [its] instruction to TransPerfect not to go to Buergofol on [September 9th] to perform the two tasks TransPerfect is supposed to do." *Id.* at 4. Buergofol argued that because Omega has instructed TransPerfect not to perform the forensic inspection, Omega was "obviously obstructing compliance with the ESI Order." *Id.* Buergofol further argued that Omega's "pseudo-technical arguments about why TransPerfect will not be able to access data from the 2013 Email Backup or the Navision system" were "categorically and demonstrably false." *Id.* Omega responded and indicated that if Buergofol was "genuinely interested in moving the forensic inspection forward in an efficient—and successful manner," it should address the three issues Omega raised in its previous email.

11

*See id.* at 3. The next day, Buergofol again demanded that Omega "[r]etract [its] instruction to TransPerfect not to go to Buergofol" on September 9th. *Id.* at 2.

## II.    Parties' Ongoing Disputes and Pending Motions

On September 23, 2025, Omega filed a motion to dismiss "the entirety of Buergofol's claims against Omega, due to Buergofol's violations of the [c]ourt's orders, fabrication of evidence and submissions of false declarations, and/or spoliation of evidence." Docket 864. The motion further sets out several independent grounds that Omega argues warrants dismissal under Rules 11, 37(b)(2), and 41(b). *Id.*; *see generally* Docket 865.

A week later, Buergofol filed a motion to compel Omega to stop obstructing implementation of the court's ESI Order (Docket 725). Docket 876. Specifically, Buergofol's motion to compel seeks a court order requiring Omega's counsel, Michael Neustel, "to transmit a written communication to its ESI expert TransPerfect indicating that TransPerfect has Omega's permission to visit the Buergofol facility in Siegenburg and while there to undertake the two tasks the ESI expert is supposed to perform pursuant to Sections III.5 and III.2 of the ESI Order." *Id.* at 1.

On October 2, 2025, Omega filed a motion to stay all discovery and dispositive motions until the court resolves its motion to dismiss. *See* Docket 880; Docket 881. Omega also seeks to consolidate Buergofol's motion to compel with Omega's motion to dismiss. *See id.* Omega argues that consolidation is appropriate because Buergofol's motion is a direct response "to one of Omega's seven grounds for dismissal." Docket 880 at 1. As such, Omega argues that

12

"[a]ddressing the two motions separately would only create duplicative briefing and impose needless burden on the [c]ourt and Omega." Docket 881 at 15. Buergofol opposes the motion for a stay and the motion to consolidate. *See generally* Docket 890.

On October 10, 2025, Buergofol filed a response to Omega's motion to stay and motion to consolidate, titling the brief as "Buergofol's Opposition to Omega's Motion for an Extension of Time to File an Opposition to Buergofol's Motion to Compel."[2] *See* Docket 890. In that brief, while Buergofol asserts that it opposes a stay because "the last thing this case needs is more delay in implementation of the ESI Order," *id.* at 6, most of its opposition is directed toward seeking a prompt order on its motion to compel so that TransPerfect may complete its forensic inspection, *see id.* at 7-12 (arguing that Buergofol's motion to compel "should be granted immediately so that the ESI Order will finally be implemented with respect to the 2013 Email Backup and the Navision report"). Omega subsequently replied to Buergofol's responsive brief on October 15, 2025, and argued that Buergofol's brief "mischaracterizes Omega's motion to consolidate." Docket 891 at 5. Omega indicated that its "motion is not a request for an extension of time," but rather, a motion "for

---

[2] At the time Buergofol filed this responsive brief, Omega had not filed a motion for an extension of time to file its responsive brief to Buergofol's motion to compel. Instead, in Omega's motion to consolidate, it requested a court order consolidating the briefing schedule for Omega's motion to dismiss and Buergofol's motion to compel. *See* Docket 880; Docket 881. Omega filed a motion to extend the time to file its responsive brief to Buergofol's motion to compel on October 16, 2025. *See* Docket 892. On October 17, 2025, the court granted Omega's motion to extend. *See* Docket 896.

consolidation of overlapping motions addressing the same issue: Buergofol's obstruction of the [c]ourt's ESI Discovery Order." *Id.*

On October 23, 2025, Buergofol filed another responsive brief to Omega's motion to stay and motion to consolidate, titling it "Buergofol's Opposition to Omega's Cross-Motion to Stay Discovery and Dispositive Motions, and to Consolidate Motion to Compel (Dkt. 876) With Motion to Dismiss (Dkt. 843)." *See* Docket 907. In that responsive brief, Buergofol again argued that "[t]he last thing this case needs is a stay, and Omega's motions for a stay and to delay Buergofol's motion through 'consolidating' should be denied." *Id.* at 3. Buergofol clarified that its "present brief is Buergofol's opposition," because it was filed within 21 days of Omega's motion to stay. *Id.* at 7. Buergofol also argued that because Omega filed a reply brief prior to Buergofol's present opposition brief, it would ignore Omega's reply brief. *Id.*

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 26(c), a court may stay discovery upon a showing of good cause. Fed. R. Civ. P. 26(c); *see also TE Connectivity Networks, Inc. v. All Sys. Broadband, Inc.*, 2013 WL 4487505, at *1 (D. Minn. Aug. 20, 2013). Good cause exists where the order would "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1).

In determining whether good cause exists to grant a stay pending resolution of a motion to dismiss, courts "use a balancing test . . . weighing the moving party's potential burden against the opposing party's interest in

14

discovery at issue." *Wells Fargo Ins. Servs. USA, Inc. v. Kyle King & Sherman Ins. Agency, Inc.*, 2016 WL 6892108, at *3 (D. Minn. July 29, 2016). And while "[t]he mere filing of a motion to dismiss the complaint [alone] does not constitute 'good cause' for the issuance of a stay," *Danger v. Nextep Funding, LLC*, 2019 WL 4917181, at *2 (D. Minn. Jan. 22, 2019) (citation omitted), "a stay of discovery is appropriate pending resolution of a potentially dispositive motion where the motion appears to have substantial grounds or, stated another way, does not appear to be without foundation in law," *Horn v. Firstcomp Ins. Co.*, 2017 WL 11573970, at *1 (D.S.D. Nov. 2, 2017); *see also In re CenturyLink Sales Pracs. & Sec. Litig.*, 2018 WL 2122869, at *1 (D. Minn. May 8, 2018) ("When a pending motion to dismiss would dispose of all or substantially all of the case, it 'appears to have substantial grounds,' and is 'not unfounded by law,' courts have stayed discovery during the pendency of the motion.") (quoting *Anti-Monopoly, Inc. v. Hasbro, Inc.*, 1996 WL 101277, at *4 (S.D.N.Y. Mar. 7, 1996)). As such, "a stay of discovery pending the determination of a dispositive motion is an eminently logical means to prevent wasting the time and effort of all concerned, and to make the most efficient use of judicial resources." *Horn*, 2017 WL 11573970, at *1 (internal quotation marks and citation omitted).

Additionally, "[a] district court's 'power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.' " *Physicians Home Health Infusion, P.C. v. UnitedHealthcare of the*

15

*Midwest, Inc.*, 2019 WL 4644021, at *2 (E.D. Mo. Sept. 24, 2019) (quoting *Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936)); *see also Horn*, 2017 WL 11573970, at *1 ("A district court has broad powers of case management, including the power to limit discovery to relevant subject matter and to adjust discovery as appropriate to each phase of litigation.") (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803-04 (Fed. Cir. 1999)). Pursuant to Rule 26(d), this includes the power to "control the timing and sequence of discovery." *Horn*, 2017 WL 11573970, at *1 (quoting *Johnson v. New York Univ. Sch. of Educ.*, 205 F.R.D. 433, 434 (S.D.N.Y. 2002).

Under the court's inherent power to stay a case, district courts have considered various factors, including "(1) whether the movant has shown a likelihood of success on the merits of the dispositive motion; (2) hardship or inequity to the moving party if the matter is not stayed; (3) prejudice to the non-moving party [if the matter is stayed]; and (4) the conservation of judicial resources." *Dufrene v. ConAgra Foods, Inc.*, 2016 WL 10651947, at *2 (D. Minn. Apr. 7, 2016)); *see also Jason M Hatfield, P.A. v. Ornelas*, 2022 WL 3129069, at *1 (W.D. Ark. Aug. 4, 2022). These courts also consider "the breadth of the pending discovery; the balancing of harms in delaying discovery against the possibility that the motion to dismiss will dispose of the case; and the public interest." *Physicians Home Health Infusion*, 2019 WL 4644021, at *2 (cleaned up). But "the decision whether to stay discovery is a practical matter left largely to the court's discretion." *Danger*, 2019 WL 4917181, at *2.

## DISCUSSION

### I.    Motion to Stay

Omega argues there is good cause to stay discovery because (1) a stay will "stop Buergofol from driving up Omega's legal fees and costs through baseless filings, particularly when it continues to defy the [c]ourt's orders and its discovery obligations," and (2) Buergofol's "ongoing obstruction of discovery—including its repeated refusals to even meet and confer—demonstrate that additional motions to compel will not secure Buergofol's compliance with its discovery obligations and will only replicate past cycles of briefing, discovery [and sanctions] orders, [and] continued violations of the discovery [and sanctions] orders." Docket 881 at 6-12. Omega specifically points to seven instances of "Buergofol's ongoing obstruction of discovery for which Omega has not yet sought court intervention" as support for its argument that continuing discovery would be futile. *See id.* at 8-12. Omega also argues that in addition to the above reasons, good cause exists to stay all dispositive motions because the court has previously denied without prejudice two of Buergofol's motions for summary judgment under Rule 56(d). *Id.* at 12-14. Omega argues that because "Buergofol continues to withhold discovery essential to Omega's noninfringement and invalidity defenses," Omega's ability to respond to future motions for summary judgment will be similarly hampered. *Id.* at 13.

Buergofol argues that Omega has failed to demonstrate that good cause exists to grant a stay and that "the last thing this case needs is more delay in

17

implementation of the ESI Order." Docket 890 at 6; Docket 907 at 3. Rather than grant Omega's motion for a stay, Buergofol requests that the court promptly and immediately grant its motion to compel so that TransPerfect, who has already been paid $100,000 to perform the ESI data collection tasks, be permitted to conduct its forensic inspection at Buergofol's facility. *See* Docket 890 at 6-11.

The court finds that Omega has established good cause under Rule 26(c) for the court to grant a temporary stay of all discovery and all dispositive motions in this case. First, the court finds that Omega's motion to dismiss is potentially dispositive of all of Buergofol's claims. *See* Docket 864 (moving to dismiss all of Buergofol's claims). Additionally, although the court does not have the benefit of full briefing on the motion to dismiss, and without determining the merits of Omega's motion to dismiss, the court finds that the motion to dismiss is raised on substantial grounds and with a foundation in the law. *See id.*; Docket 865 at 14-98. Omega's motion raises several grounds that it argues warrant dismissal under Rules 11, 37(b)(2), and 41(b). Docket 864 at 1. These grounds include alleged actions by Buergofol for discovery violations by Buergofol, including "deliberate violations of the ESI Order," submitting fabricated documentation and false declarations, and spoliation of evidence. *See id.*; Docket 865 at 14-94. Several of these grounds, if the court ultimately sides with Omega, would warrant dismissal of Buergofol's claims. For example, this court has previously found that dismissal of a complaint is warranted as a sanction under Rule 11 where the plaintiff falsifies evidence.

18

*See Rindahl v. Daugaard*, 2011 WL 4549151, at *6-7 (D.S.D. Sept. 29, 2011). As such, if the court were to find Omega's argument that Buergofol's submitted exhibits and declarations constituted falsified evidence in violation of Rule 11, it may warrant dismissal of Buergofol's claims. *See id.*

Second, the court finds that granting Omega's request for a stay will limit the expense of "potentially unnecessary litigation[]." *See Danger*, 2019 WL 4917181, at *4 (noting that generally, "courts . . . disfavor the proliferation of litigation costs associated with potentially unnecessary litigation[]"). The court has repeatedly awarded Omega its attorneys' fees for bringing and responding to Buergofol's motion practice and discovery delay tactics. *See* Docket 828 at 8 (discussing the attorneys' fees awards this court has awarded to Omega). This court has also sanctioned Buergofol eight times. *See id.* (discussing previous court orders awarding Omega attorneys' fees and sanctioning Buergofol). Granting Omega's motion for a stay will temporarily stop all unnecessary motion practice that the court has found Buergofol to have engaged in numerous times. *See id.* (order recognizing that Buergofol "has engaged in dilatory and obstructive discovery practices . . . [that] has unnecessarily delayed the proceedings in this case and has needlessly increased the costs of litigation"). This will save both parties time and money, a concern that Buergofol has previously raised before this court. *See* Docket 609 at 5 (Buergofol arguing that because "the parties have already spent about $4 million during the fact discovery phase . . . it would not be proportional to the

needs of the case to spend more litigating it" when the case is valued at $4 million).

Third, the court finds that a temporary stay of discovery will not prejudice Buergofol. Buergofol argues that it will be prejudiced because stopping discovery and delaying the time in which Omega must respond to Buergofol's motion to compel will prevent Buergofol from revealing that its ESI never contained invalidating prior art. Docket 890 at 10. Buergofol further disputes Omega's discovery futility argument on the basis that evidence does not exist for four of Omega's discovery requests and it does not have an obligation to respond to the other three discovery requests under Rules 33 or 34. *See* Docket 907 at 13, 20-27. Buergofol argues that staying discovery and all dispositive motions would be prejudicial because Buergofol "is ready to move under Rule 56 for partial summary adjudication regarding Omega's hoax that there existed prior art that Omega has designated 'SAERTEX LINER.' " Docket 890 at 11.

Although Buergofol argues that a stay would prevent it from engaging in discovery, such as having TransPerfect perform the two forensic inspection tasks at its facility, *see id.*, as evidenced throughout this case, Buergofol has typically been the party to cause delays in discovery, *see, e.g.*, Docket 828 (order issuing sanctions against Buergofol and recognizing that this court has previously sanctioned Buergofol seven times and awarded Omega attorneys' fees nine times). Even solely considering the TransPerfect dispute, while Buergofol currently blames Omega for preventing TransPerfect from completing

20

the forensic inspection, *see* Docket 890 at 9 (blaming Omega's counsel for "obstructing the implementation of the ESI Order"), Buergofol's argument ignores that in the months leading up to Omega's objection, it was Buergofol who refused to provide TransPerfect its requested pre-forensic conference call with knowledgeable IT support, *see* Docket 822-1 at 4-18 (emails from Buergofol denying TransPerfect's request to hold a pre-forensic conference call). This dispute between Buergofol and TransPerfect, and the alleged lack of information Buergofol has supplied to TransPerfect, appears to have prompted Omega's objection to having the forensic inspection proceed and has thus prevented the forensic inspection from moving forward. *See, e.g.*, *id.* at 2 (TransPerfect confirming for Omega that it was at an impasse because Buergofol denied its requests to have a pre-inspection conference call).

Additionally, the court is not convinced by Buergofol's arguments that this court should reject Omega's contention that continuing discovery would be futile because such evidence is either "nonexistent" or nonresponsive to Omega's discovery requests. Docket 907 at 12-14. This court has denied two of Buergofol's motions for partial summary judgment without prejudice under Rule 56(d). *See* Docket 825; Docket 826. In denying Buergofol's motions, the court recognized the need for Omega to proceed with more discovery. *See* Docket 825 at 8; Docket 826 at 7. Buergofol now argues that it will be prejudiced because a stay of all discovery and all dispositive motions would prevent it from filing another motion for partial summary judgment. Docket 890 at 11; Docket 907 at 13. But based on the number of discovery disputes

21

pending court resolution, *see, e.g.*, Docket 784 (Buergofol's motion to amend/correct the ESI order); Docket 800 (Omega's motion to compel Buergofol to produce documents); Docket 838 (Omega's motion for protective order), it does not appear that the circumstances surrounding Buergofol's willingness to engage in discovery have changed much since the court previously denied Buergofol's motions for partial summary judgment. Thus, the court finds there is good cause to grant Omega's request for a temporary stay of all discovery and all dispositive motion practice.

Fourth, the conservation of judicial resources weighs in favor of granting a temporary stay. Throughout this litigation, the parties have been engaged in several highly contentious discovery disputes. The delays have resulted in numerous extensions in the time in which the parties have to complete discovery. *See* Docket 136 (original scheduling order setting the discovery deadline as May 20, 2024); Docket 837 at 1 (order granting motion to amend scheduling order setting the discovery deadline as April 30, 2026). The numerous motions concerning the parties' discovery disputes have also greatly consumed the court's time and attention with little indication that the parties are making much progress in discovery. *See* Docket 881 at 8-12 (Omega noting several "examples of Buergofol's ongoing obstruction of discovery for which Omega has not yet sought court intervention").

Based on the contentious and lengthy history of discovery disputes between the parties, and with several motions involving additional discovery disputes currently pending before the court, *see, e.g.*, Docket 660 (Omega's

22

motion to compel Rule 30(b)(6) witness deposition); Docket 784 (Buergofol's motion to amend/correct ESI Order); Docket 800 (Omega's motion to compel production of documents), it is apparent that without a stay these discovery disputes will continue. Further, several of the pending motions can be dealt with in the court's consideration of Omega's motion to dismiss. *Compare* Docket 865 at 14-41 (Omega's motion raising issues with Buergofol's compliance with the court's ESI Order), *with* Docket 784 (Buergofol's motion to amend/correct ESI Order) *and* Docket 838 (Omega's motion for protective order regarding Buergofol's first email search queries under the ESI Order). Thus, to conserve judicial resources, and "to secure the just, speedy, and inexpensive determination," Fed. R. Civ. P. 1, the court finds that imposing a temporary stay pending resolution of Omega's motion to dismiss will ensure that the court is not inundated with further motions concerning future discovery disputes and can instead, turn its focus to addressing the parties' pending motions.

Based on the foregoing, the court finds under Rule 26(c) and its inherent authority that it is appropriate to grant Omega's motion to stay all fact and expert discovery, including expert reports and related motions, and all dispositive motions until the court resolves Omega's motion to dismiss.

## II.    Motion to Consolidate

Omega also moves to consolidate the briefing, hearing, and ruling on Buergofol's motion to compel and Omega's motion to dismiss. Docket 880; Docket 881 at 15. Omega argues that Buergofol's motion to compel, which seeks to compel Omega's counsel to "stop obstructing implementation of the

ESI Order," Docket 876, "mirrors Section III.B.2 of Omega's Motion to Dismiss and functions as a cross-motion directly responding to that section rather than as an independent filing," Docket 881 at 15. Omega concludes that "[a]ddressing the two motions separately would only create duplicative briefing and impose needless burden on the [c]ourt and Omega." *Id.*

Buergofol opposes the motion to consolidate on the grounds that its motion to compel "should be granted immediately so that the ESI Order will finally be implemented" and that any delay in addressing its motion to compel would greatly prejudice Buergofol. Docket 890 at 9, 11. Buergofol argues that Omega's motion to consolidate is Omega's attempt to prevent Buergofol from revealing Omega's "perpetrat[ion of] a hoax and a fraud on the [c]ourt by misrepresenting that there is critical evidence of patent invalidity and inequitable conduct present in Buergofol's ESI." *Id.* at 7. Additionally, Buergofol argues that once TransPerfect is allowed to perform its forensic inspections, it "will then confirm that it cannot transfer bulk email data to an e-discovery platform" and that "[t]he Navision report will result in the discovery of no instances of sales or shipments of Buergofol film that could be used in any prior art liner." *Id.* at 7-8.

In determining whether consolidation of the motions is appropriate, the court needs to determine whether Buergofol's requested relief—ordering Omega's counsel to direct TransPerfect to conduct the forensic inspection at Buergofol's facilities—would resolve TransPerfect's inability to proceed with the forensic inspections pursuant to the court's ESI Order. After reviewing both

24

motions, the court agrees with Omega that addressing the motions at the same time is "logical and necessary" due to the overlapping issues raised in both motions. Docket 891 at 3.

In the weeks and months leading up to Omega's objection to TransPerfect's examination going forward, Buergofol and TransPerfect engaged in numerous back-and-forth emails. *See* Docket 822-1 (containing emails between Buergofol, Omega, and TransPerfect from June 25, 2025, to August 6, 2025). In those emails, before TransPerfect would go to Buergofol's facility to perform the specific forensic inspections, TransPerfect requested to have a pre-forensic preparatory call with a Buergofol representative knowledgeable of Buergofol's IT systems. *See id.* at 33 (requesting a "brief call between [TransPerfect's] forensic expert and Buergofol representative that is providing access, credentials, and technical support"). TransPerfect repeatedly requested this pre-forensic inspection conference call. *See id.* at 7-8, 11, 14, 16, 18, 20, 33. Despite TransPerfect explaining to Buergofol that it needed the pre-forensic conference call because it was TransPerfect's standard practice and the call would ensure that its forensic collection was done in "a successful and forensically defensibl[e] manner," *see id.* at 7-8, 11, 14, 16, Buergofol denied TransPerfect's request for a conference call at every turn, *see id.* at 5-7, 12-15, 17-18, (declining the pre-forensic conference call on the basis that the ESI Order "does [not] require Buergofol to hold telephone discussions with TransPerfect"). While Buergofol eventually acquiesced and set up a pre-forensic call between de Groote and TransPerfect, as TransPerfect made clear, de Groote

25

provided little to no additional information to aid TransPerfect in its forensic inspection. *See* Docket 867-18 at 12.

In its motion to dismiss, Omega argues that Buergofol's denial of the pre-forensic inspection conference call with a knowledgeable IT expert at Buergofol and its failure to inform TransPerfect whether the .stbox file is encrypted, among other actions, would prevent a successful forensic extraction pursuant to the court's ESI Order. *See* Docket 865 at 31-41. As such, to determine the feasibility of Buergofol's requested relief in its motion to compel, the court first needs to address Omega's arguments regarding Buergofol's actions in potentially failing to provide TransPerfect with sufficient information to conduct the two forensic inspection tasks laid out in the court's ESI Order. Thus, it is apparent to the court that Buergofol's motion to compel and Omega's motion to dismiss raise similar issues that would best be resolved in conjunction with each other. Given the court's "broad powers of case management," *Horn*, 2017 WL 11573970, at *1, and "to secure the just, speedy, and inexpensive determination," Fed. R. Civ. P. 1, the court grants Omega's motion to consolidate and will address Buergofol's motion to compel at the same time it rules upon Omega's motion to dismiss.

## CONCLUSION

Upon careful review, the court finds that pursuant to Rule 26(c) and its inherent authority, good cause exists to enter a temporary stay of all discovery and all dispositive motions until Omega's motion to dismiss is resolved. Thus, it is ORDERED:

1. That Omega's motion to stay all discovery and related dispositive motions (Docket 880) is granted. All discovery, including but not limited to the service of new discovery requests or responses to discovery requests, all depositions, expert reports and disclosures, third-party discovery, motions to compel, motions for protective orders, and motions to enforce prior discovery rulings, is stayed until this court rules on Omega's motion to dismiss.

2. That the filing of all dispositive motions in this case is stayed until this court rules on Omega's motion to dismiss.

3. That Omega's motion to consolidate Buergofol's motion to compel and Omega's motion to dismiss (Docket 880) is granted. Omega's responsive brief to Buergofol's motion to compel (Docket 876) is due at the same time as Omega's reply in support of its motion to dismiss (Docket 864).

Dated November 25, 2025.

BY THE COURT:

*/s/ Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE