UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| BUERGOFOL GMBH,<br><br>　　　　Plaintiff and<br>　　　　Counter Defendant,<br><br>vs.<br><br>OMEGA LINER COMPANY, INC.,<br><br><br>　　　　Defendant and<br>　　　　Counter Claimant. | 4:22-CV-04112-KES<br><br><br>ORDER ON CLAIM<br>CONSTRUCTION |

This case involves claims by plaintiff, Buergofol, of alleged infringement of U.S Patent No. 8,794,269 ('269 Patent) by defendant, Omega. Docket 163 at 16-21. Pending before the court are the parties' dueling constructions of certain terms in claim 1 of the '269 Patent. *See* Docket 553-1 at 1-4; Docket 868; Docket 869. Following a claim construction hearing, *see* Docket 925, the court issues the following order.

**BACKGROUND**

**I.     Description of the Invention**

The '269 Patent concerns an invented solution to a common problem in the field of multilayer film used in cured-in-place-pipe (CIPP) liners. *See* Docket 871 ¶ 54; Docket 163 at 6-7. Specifically, the '269 Patent describes an "insertion tube," commonly referred to as pipe liner, that is used to renovate subterranean pipes, particularly sewer pipes. Docket 163 at 5-6; *see* Docket 868 at 6. In instances where a sewer pipe needs repair, rather than digging up

the pipe to repair it, a deflated, uncured insertion tube can be pulled through the damaged pipe while the pipe remains in the ground. Docket 163 at 6; Docket 869 at 4. The insertion tube is then "inflated to be expanded against the pipe wall, and cured in place to form a new, durable lining for the pipe." Docket 869 at 4; *see also* Docket 163 at 6.

The '269 Patent discloses the following figure of the insertion tube:



Docket 1-2 at 4. The insertion tube (107) is pulled through a sewer pipe (101) to repair that pipe's areas of damage (102). Docket 869 at 6. The insertion tube consists of three parts: (1) 105 - "an internally situated tube," (2) 104 - "a support material saturated with a reactive synthetic resin," and (3) 103 - "an externally situated tubular film." Docket 163 at 5-6; Docket 868 at 6. To cure the reactive synthetic resin contained within the support material (104), a moveable ultraviolet (UV) light source is pulled through the cavity (106). Docket 868 at 7. To allow UV radiation to pass through the internally situated tube (105), the internally situated tube "is at least to some extent permeable to UV radiation." *See* Docket 1-2 at 14:47-48. Additionally, to avoid the unwanted premature hardening of the resin in the support material (104), the externally

situated tubular film (103) "is made so that it reflects and/or absorbs UV radiation and/or short-wave light." Docket 163 at 7. As the UV light source is moved through the insertion tube, "[t]he UV radiation causes the support material [(104)] . . . to harden." Docket 868 at 7. After curing the resin, "the hardened resin forms a new inner layer that restores the pipe." Docket 869 at 5. Once the resin is cured and hardened, the internally situated tube (105) is pulled away from the support material (104) and is withdrawn from the renovated sewer pipe (108). Docket 163 at 6-7.

The internally situated tube (105) is a multilayer film "comprising a layer sequence made of" layer (a), layer (b), layer (c), layer (d), and layer (e). *See* Docket 1-2 at 2:32-47. Layer (a) is "comprised of at least one thermoplastic olefin homo- or copolymer." *Id.* at 14:50-52. Additionally, "the VICAT softening point of the thermoplastic olefin homo- or copolymer of the layer (a) is at least 100ºC." *Id.* at 14:60-62. Layers (b) and (d) are "adhesive promoter layer[s]." *Id.* at 14:53, 56. Layers (c) and (e) are "comprised of at least one homo- and/or copolyamide." *Id.* at 14:54-55, 57-58. Layer (b) binds the olefin homo- or copolymer of layer (a) to the polyamide of layer (c) and layer (d) binds the polyamide of layer (c) to the polyamide of layer (e). *See id.* at 14:50-58; *see also* Docket 868 at 7. Additionally, the '269 Patent requires that both layer (a) and layer (e) must be "one of the external layers" in the internally situated tube, Docket 1-2 at 14:50-52, 57-58, and that layer (c) be "internally situated," *id.* at

54-55. Throughout this litigation, the parties have repeatedly represented this five-layer sequence as "PA/AP/PA/AP/PE."[1] *See, e.g.*, Docket 869 at 23-24.

The externally situated tubular film (103) of the '269 Patent "is impermeable to liquids, and which reflects and/or absorbs UV radiation and/or short-wave, visible light." Docket 1-2 at 14:64-67. The '269 Patent defines UV radiation as "electromagnetic radiation in a wavelength range from 200 to 400nm." *Id.* at 3:7-9. The '269 Patent further defines short-wave, visible light as "electromagnetic radiation in a wavelength range from 400 to 500nm." *Id.* at 3:19-22.

As noted in the '269 Patent, "there were problems and difficulties associated with an internally situated tube being both permeable to UV radiation as well as having mechanical properties sufficient for the internally situated tube to withstand the high loads that arise during pipe renovation." Docket 163 at 7; *see also* Docket 1-2 at 2:25-27 (providing that the invention in the '269 Patent consists of a multilayer film that is "permeab[le] to UV radiation but also has mechanical properties that are sufficiently good for it to withstand the high loads that arise during pipe renovation"). To address these problems, the '269 Patent discloses an invention entailing:

> A multilayer film that is impermeable to liquids and is to some extent permeable to UV radiation, optionally in the form of a tubular film, having a layer sequence of a layer (a) comprising at least one thermoplastic olefin homo- or copolymer, as one of the external layers, an adhesive-promoter layer (b), and internal layer (c) comprising at least one homo- and/or copolyimide, an adhesive-

---

[1] PA stands for "polyamide," AP stands for "adhesion promoter," and PE stands for "polyethylene." *See* Docket 869 at 23-24. PE represents layer (a), AP represents layers (b) and (d), and PA represents layers (c) and (e). *Id.*

promoter layer (d), and a layer (e) comprising at least one homo- and/or copolyamide, as one of the external layers, wherein the VICAT softening point of the thermoplastic olefin homo- or copolymer of the layer (a) is at least 100ºC., and the use of said multilayer film as internally situated tube of an insertion tube for the renovation of subterranean pipes, an insertion tube of this type, and a pipe-renovation system suitable for the renovation of subterranean pipes.

Docket 1-2 at 2.

## II.    Claim 1 of the '269 Patent

The parties dispute three terms within claim 1 of the '269 Patent.[2]

Docket 553-1 at 1-4. Claim 1 of the '269 Patent is included in its entirety below and the specific terms that are disputed by the parties are shown in bold.

1.    An insertion tube suitable for the renovation of subterranean pipes, optionally subterranean sewer pipes, comprising

an optionally nonconditioned multilayer film that is impermeable to liquids and that is at least to some extent permeable to UV radiation, comprising **a layer sequence made of**

(a)    A layer (a) comprised of at least one thermoplastic olefin homo- or co-polymer, as one of the external layers,

(b)    An adhesive-promoter layer (b),

(c)    An internally situated layer (c) comprised of at least one homo- and/or copolyamide,

(d)    An adhesive-promoter layer (d), and

---

[2] The court need only construe terms that the parties dispute. *See Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1321 (Fed. Cir. 2016) ("[A] sound claim construction need not always purge every shred of ambiguity.") (quoting *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007)); *see also Vivid Techs., Inc. v. Am. Science & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) ("[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.").

(e)    A layer (e) comprised of at least one homo- and/or copolyamide, as one of the external layers,

in the form of a tubular film,

**wherein the VICAT softening point of the thermoplastic olefin homo- or copolymer of the layer (a) is at least 100°C.;**

as internally situated tube, and

an externally situated single- or multilayer tubular **film** which is impermeable to liquids, and **which reflects and/or absorbs UV radiation and/or short-wave, visible light,** as externally situated tube, and

a support material situated therebetween and saturated with a reactive synthetic resin.

Docket 1-2 at 14:41-67 and 15:1-2.

## LEGAL STANDARD

During claim construction, the court's job is to construe the scope of a patent's claims. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995); *see also O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."). Proper claim construction requires an examination of "the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification, and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (emphasis omitted); *see also Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1340 (Fed. Cir. 2020). In all instances, however, the court must "look first to the claim language itself." *Victronics Corp.*, 90 F.3d at 1582; *see also Clare v. Chrysler*

6

*Grp. LLC*, 819 F.3d 1323, 1327 (Fed. Cir. 2016) ("The language of the claims determines what the patentee regards as the invention and defines what the patentee is entitled to exclude.").

Claims terms "are generally given their ordinary and customary meaning," *Vitronics*, 90 F.3d at 1582, which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention," *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). Unless compelled to do otherwise, a court "must presume that the terms in the claim mean what they say, and . . . give full effect to the ordinary and accustomed meaning of the claim terms." *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999). And a court should construe claim terms "consistently with its appearance in other places in the same claim or in other claims of the same patent." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001).

Because claim terms are part of "a fully integrated written instrument," *Markman*, 52 F.3d at 978, claim terms must also be read in view of the specification, which is "the single best guide to the meaning of a disputed term," *Phillips*, 415 F.3d at 1315 (quoting *Vitronics*, 90 F.3d at 1582). The court's review of the specification "confirm[s] that the patentee's use of the disputed terms is consistent with the meaning given to it by the court." *Rexnord Corp.*, 274 F.3d at 1342. Reviewing the specification is necessary for several reasons. First, in some instances, "the specification may reveal a special definition given to a claim term by the patentee that differs from the

7

[ordinary] meaning it would otherwise possess." *Phillips*, 415 F.3d at 1316. In those cases, by "set[ting] out a [specific] definition," a patentee "acts as his own lexicographer." *See Thorner v. Sony Comput. Ent. Am. L.L.C.*, 669 F.3d 1362, 1365-66 (Fed. Cir. 2012).

Second, because construing a claim term in a way that excludes a preferred embodiment "is rarely, if ever, correct," *Vitronics*, 90 F.3d at 1583, the court must "examine the written description and the drawings to determine whether the preferred embodiment falls within the scope of a construed claim," *Rexnord Corp.*, 274 F.3d at 1342. But in reviewing the specification, courts must avoid importing a limitation from the specification into the claim itself. *See, e.g., CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1231 (Fed. Cir. 2005) ("In examining the specification for proper context, however, this court will not at any time import limitations from the specification into the claims."). "To avoid importing limitations from the specifications into the claims, it is important to keep in mind that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode of doing so." *Phillips*, 415 F.3d at 1323.

After examining the specification, "the same confirmatory measure must be taken with the prosecution history, since statements made during the prosecution of a patent may affect the scope of the invention." *Rexnord*, 274 F.3d at 1343. The prosecution history "consists of the complete record of the proceedings before the [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. While

8

less useful than the specification for purposes of claim construction, "the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*; *see also Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution." (internal quotation marks and citation omitted)).

As such, the prosecution history may reveal "whether the patentee has 'relinquished a potential claim construction in an amendment to the claim or in an argument to overcome or distinguish a reference.' " *Dow Chem. Co. v. Sumitomo Chem. Co., Ltd.*, 257 F.3d 1364, 1373 (Fed. Cir. 2001) (quoting *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001)). In these cases, the patentee "disavows the full scope of a claim term," *Thorner*, 669 F.3d at 1365, and the "intentional disclaimer, or disavowal, of claim scope by the inventor . . . is regarded as dispositive," *Phillips*, 415 F.3d at 1316. This disavowal doctrine also applies to *Inter Partes Review* (IPR) proceedings before the Patent Trial and Appeal Board (PTAB). *See Aylus Networks, Inc. v. Apple, Inc.*, 856 F.3d 1353, 1360 (Fed. Cir. 2017) ("Extending the prosecution disclaimer doctrine to IPR proceedings will ensure that claims are not argued one way in order to maintain their patentability and in a different way against accused infringers."). But any disclaimer must be a clear

9

and unmistakable surrendering of claim scope. *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1322 (Fed. Cir. 2013).

Consideration of intrinsic evidence alone will often "resolve any ambiguity in a disputed claim term." *Vitronics*, 90 F.3d at 1583. But "in the rare circumstances that the court is unable to determine the meaning of the claims after assessing the intrinsic evidence, it may look to additional extrinsic evidence to help resolve any lack of clarity." *Dow Chem. Co.*, 257 F.3d at 1373. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317 (quoting *Markman*, 52 F.3d at 980). "Dictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words." *Id.* at 1322; *see also Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015) (explaining that extrinsic evidence may also help the court understand "the background science or the meaning of a term in the relevant art during the relevant time period").

Similarly, "expert testimony can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318. But courts must reject extrinsic evidence "that is clearly at odds with the claim

10

construction mandated by the claims themselves, the written description, and the prosecution history." *Key Pharms. v. Heron Lab'ys. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998). And "[w]hile extrinsic evidence can shed useful light on the relevant art—and thus better allow the court to place itself in the shoes of a person of ordinary skill in the art—the 'intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language.' " *Vanderlande Indus. Nederland BV v. I.T.C.*, 366 F.3d 1311, 1318 (Fed. Cir. 2004) (quoting *Victronics*, 90 F.3d at 1582).

## DISCUSSION

The parties dispute the meaning of three terms in claim 1 of the '269 Patent: (1) "wherein the VICAT softening point of the thermoplastic olefin homo- or copolymer of the layer (a) is at least 100° C," (2) "a layer sequence made of," and (3) "film . . . which reflects and/or absorbs UV radiation and/or short-wave, visible light." Docket 553-1 at 1-4; Docket 868 at 5; Docket 869 at 3. The court addresses each of the three terms in turn.

**I.    Disputed Term: "wherein the VICAT softening point of the thermoplastic olefin homo- or copolymer of the layer (a) is at least 100° C"**

The parties' proposed constructions of the disputed term are as follows:

Buergofol: "a layer (a) of a multilayer film is comprised of at least one thermoplastic olefin homo- or copolymer that has a VICAT softening point of at least 100°C."

Omega: "[t]he VICAT softening point of the combined composition of the thermoplastic olefin homo- or copolymer(s) in layer (a) is at least 100°C."

*See* Docket 553-1 at 2. The parties do not dispute that layer (a) may include more than one "thermoplastic olefin homo- or copolymer." Instead, they

11

disagree as to whether the 100°C VICAT limitation applies to layer (a) as a whole or to just one polymer within layer (a).[3] *Compare* Docket 869 at 16 (Omega arguing that "when layer (a) contains more than one polymer, the 100°C VICAT softening point requirement applies to the combined composition of the layer, not just [] one selected polymer in the layer"), *with* Docket 868 at 13-15 (Buergofol arguing that the plain language of the claim means that layer (a) only requires one polymer to have a VICAT softening point of at least 100°C).

The '269 Patent first uses the term "thermoplastic olefin homo- or copolymer" in the phrase "a layer (a) comprised of *at least one thermoplastic olefin homo- or copolymer*, as one of the external layers." Docket 1-2 at 14:50-52 (emphasis added). The term is next used to describe "wherein the VICAT softening point of *the thermoplastic olefin homo- or copolymer* of the layer (a) is at least 100°C." *Id.* at 14:60-62 (emphasis added).

Buergofol argues that its construction is supported by the plain and ordinary meaning of the phrase such that only one "thermoplastic olefin homo- or copolymer" in layer (a) must have a VICAT softening point of at least 100°C. Docket 868 at 13-15. Buergofol argues that because the term "thermoplastic olefin homo- or copolymer" is used twice in claim 1, it must have the same meaning throughout. *Id.* at 13-14. As such, Buergofol asserts that "[w]here a

---

[3] "The VICAT softening point is a metric of a polymer's short-term resistance to heat. It is measured by penetrating the material of interest with a needle at depth of 1 mm into the material of interest under controlled heating and mechanical loading conditions." Docket 871 ¶ 42.

claim term is first introduced in a claim with the indefinite article 'a' and later appears with the definite article 'the,' the terms share an antecedent basis relationship, and the latter occurrence of the term with the definite article must refer back to the first use of the same term."[4] Docket 868 at 13. Buergofol concludes that based on this antecedent basis, "the first limitation means that a layer (a) of the multilayer film is comprised of at least one thermoplastic olefin homo- or copolymer that has a VICAT softening point of at least 100°C." *Id.* at 15. Buergofol also argues that "nothing in the other claims, in the specification, or in the prosecution history of the '269 Patent . . . is inconsistent with this plain meaning interpretation." *Id.*

In contrast, Omega argues that "when layer (a) contains more than one polymer, the 100°C VICAT softening point requirement applies to the combined composition of the layer, not just [] one selected polymer in the layer." Docket 869 at 16. Omega argues this construction is proper based on both the term's ordinary meaning and the '269 Patent's prosecution history. *See id.* at 16-22; Docket 887 at 4-14. Based on the patent's prosecution history, Omega argues that Buergofol disclaimed the construction it now seeks this court to adopt as evidenced by the several representations Buergofol made before the European

---

[4] Buergofol argues that "the term 'at least one' is used in the same manner as the common usage of the indefinite article 'a' in the patent claims." Docket 868 at 14. Buergofol thus, impliedly concludes, that the rule for antecedent bases should apply. *See id.* at 13-15.

Patent Office, the PTAB during the parties' IPR, and this court.[5] *See* Docket 869 at 16-22; Docket 887 at 4-8.

The Federal Circuit considered a similar claim construction dispute in *Biagro Western Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296 (Fed. Cir. 2005). There, the Federal Circuit addressed whether a district court properly construed the claim language of "at least one phosphorous-containing acid or salt thereof . . . wherein said phosphorous-containing acid or salt thereof is present in an amount of about 30 to about 40 weight percent." *Biagro*, 423 F.3d at 1304. The district court construed the claim language to mean "a fertilizer containing more than one acid or salt would satisfy the limitation only if the aggregate amount of acids or salts falls within the claimed range." *Id.* On appeal before the Federal Circuit, the patent owner argued that the claim language only required one acid or salt be present in the claimed amount, even if other acids or salts were present in the fertilizer. *Id.*

The Federal Court rejected this argument based on the patent's written description and the prosecution history. *Id.* Specifically, the Federal Circuit noted that "it is apparent from the written description that all phosphorous-containing acids or salts in the fertilizer serve the same purpose such that the total amount of such acids or salts is important." *Id.* Additionally, the Federal

---

[5] Because any statements concerning the definition of the disputed claim terms made by Buergofol's attorneys before this court are not intrinsic evidence of the '269 Patent, the court will not consider such statements in its claim construction analysis. *See, e.g.*, *Sprint Commc'ns. Co. LP v. Charter Commc'ns, Inc.*, 2019 WL 7037656, at *11 (D. Del. Dec. 20, 2019) ("Attorney statements made in district court litigation years after the inventor filed the patent are not intrinsic evidence and are not useful.").

Circuit cited to the patentee's statements during reexamination where "the patentee distinguished the invention over prior art by emphasizing that the claimed fertilizer 'must be concentrated' and that the 'concentration has now been specified as an amount of about 30 to about 40 weight percent.' " *Id.* (emphasis omitted). Thus, the Federal Circuit held that the district court "correctly construed the claim to require an *aggregate amount* of such acids or salts to be between about 30 and about 40 weight percent." *Id.* (emphasis added).

Turning first to the claim language, the court notes that as the Federal Circuit has previously held, "[t]he phrase 'at least one' in patent claims typically is construed to mean 'one or more.' " *Id.* Thus, the claim language makes clear that there can be one or more thermoplastic olefin homo- or copolymers in the layer (a). While Buergofol argues that the first use of "thermoplastic olefin homo- or copolymer" is the antecedent basis for the later use of the term "polymer," *see* Docket 868 at 13-14, as Omega notes, adopting Buergofol's argument would result in a construction that neither party proposes, *see* Docket 887 at 10-11, and which the court agrees would be an improper construction.[6]

---

[6] Omega argues that adopting Buergofol's antecedent basis argument would improperly read in the words "at least one" into the VICAT claim limitation. Docket 887 at 10. In such cases where there is more than one polymer in layer (a), Buergofol's approach would result in a construction where each polymer would individually have to meet the 100ºC VICAT softening point requirement. *See id.* at 11.

In looking at the patent's specification, the court concludes that the written description supports Omega's construction of applying the VICAT softening point requirement to the combined composition of the polymers within layer (a). As stated above, "[t]he VICAT softening point is a metric of a polymer's short-term resistance to heat." Docket 871 ¶ 42. The written description of the '269 Patent indicates the importance of the invention's heat resistance by stating that "[t]he multilayer film of the invention is practically not shrinkable, in particular not even by heating," Docket 1-2 at 6:16-18, and that it is preferable that "each component of the combination is stable at temperatures up to 300°C," *id.* at 10:20-22. Comparable to the claim language in *Biagro*, the claim language imposing a VICAT softening temperature requirement of at least 100°C indicates the importance of using polymers that have a high VICAT temperature. As such, the written description of the '269 Patent indicates that the one or more thermoplastic olefin homo-or copolymer(s) within layer (a) "serve the same purpose" such that the VICAT temperature of all thermoplastic olefin polymers present in layer (a) are "important." *Biagro*, 423 F.3d at 1304.

Similarly, the prosecution history of the '269 Patent supports a construction applying the VICAT softening point requirement to the combined composition of layer (a). In support of its arguments for disclaimer based upon the patent's prosecution history, Omega cites to several representations Buergofol has made regarding the VICAT softening point of the invention

disclosed in the '269 Patent. *See* Docket 869 at 16-22; *see also* Docket 887 at 4-8.

Omega first points to Buergofol's statements made in challenging the European Counterpart Application for the '269 Patent in the European Patent Office. *See* Docket 869 at 20-21. There, Buergofol stated:

> The VICAT softening temperature is a measure of heat resistance. It goes without saying that the film should not melt or stick uncontrollably when the resin is cured by UV radiation, and that for this purpose a high VICAT softening temperature of each of the film components must be required.

Docket 870-2 at 7. While Buergofol correctly notes that the Federal Circuit "cautions against indiscriminate reliance on the prosecution of corresponding foreign applications in the claim construction analysis," Docket 889 at 18 (quoting *AIA Eng'g Ltd. v. Magotteaux Intern. S/A*, 657 F.3d 1264, 1279 (Fed. Cir. 2011)), the Federal Circuit has also found that "statements made before foreign patent offices are sometimes relevant to interpreting the claims," *Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 858 (Fed. Cir. 2014); *see also Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005) (finding statements made by patentee before the European Patent Office relevant in construing claims).

Thus, while the court agrees with Buergofol that the above representation cannot be a clear and unmistakable disclaimer of claim scope, *see 3M Innovative Props.*, 725 F.3d at 1322, the statement is still relevant to the court's claim construction analysis because it demonstrates the importance of maintaining a high VICAT softening point to avoid the premature heating of

17

the resin from applied UV radiation. Docket 870-2 at 7. As such, Buergofol's representations before the European Patent Office provide another indication that the VICAT softening point requirement should apply to the entirety of layer (a) because to avoid uncontrollable, premature melting or sticking of the resin, "a high VICAT softening temperature of *each of the film components must be required.*" Docket 870-2 at 7 (emphasis added).

Omega also argues that Buergofol's representations in its preliminary response to the PTAB in opposing Omega's petition for IPR of the '269 Patent "convinced the PTAB not to institute review of the '269 Patent." Docket 869 at 17-20. Specifically, Omega argues that Buergofol represented that "claim 1 of the '269 Patent was distinguishable from the prior art because the 100°C VICAT requirement applied to the 'combined VICAT' of layer (a)—not to a single minor component of that layer." *Id.* at 18-19.

The Federal Circuit has held that statements made prior to the institution of an IPR before the PTAB can be considered when determining whether prosecution disclaimer exists. *Aylus Networks, Inc.*, 856 F.3d at 1362. In such cases,

> the patent owner can define claim terms and otherwise make representations about claim scope to avoid prior art for the purposes of either [(1)] demonstrating that there is not a reasonable likelihood that the claims are unpatentable on the asserted grounds or [(2)] demonstrating that the challenger has not shown by a preponderance of the evidence that the claims are unpatentable on the asserted grounds. Regardless of when the statements are made during the proceeding, the public is entitled to rely on those representations when determining a course of lawful conduct, such as launching a new product or designing around a patented invention.

*Id.* (internal quotation marks omitted). The Federal Circuit extended prosecution disclaimer to IPR proceedings to "ensure that claims are not argued one way in order to maintain their patentability and in a different way against accused infringers." *Id.* at 1360. As such, "[w]hen the patentee unequivocally and unambiguously disavows a certain meaning to obtain a patent, the doctrine of prosecution history disclaimer narrows the meaning of the claim consistent with the scope of the claim surrendered." *Id.* at 1359 (quoting *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013)).

In its petition to institute an IPR, Omega argued that the prior art reference, Khramenkov, disclosed the VICAT softening temperature requirement in claim 1 because it disclosed an inner layer "containing as thermoplastic polymeric material mixture of polyethylene with polypropylene." Docket 248-5 at 57-58. Omega further noted that the Khramenkov layer containing a polyethylene-polypropylene mixture "comprises a mixture of polyethylene in the amount of 20-40 wt.% with polypropylene in the amount of 80-60 wt.%." *Id.* at 57, 62. Omega argued that because "[p]olypropylene has a higher VICAT than polyethylene," if 60% by weight of polypropylene was used—the lowest amount possible—the inner layer disclosed in Khramenkov would have a VICAT of approximately 120°C. *Id.* at 62. Because 120°C is greater than 100°C, Omega concluded that Khramenkov inherently disclosed the VICAT softening temperature limitation in claim 1. *Id.* at 62-63.

In its preliminary response before the PTAB, Buergofol asserted that Omega arbitrarily selected a polypropylene with a high VICAT softening temperature when "a [person of ordinary skill in the art] POSITA would have been free to select any polypropylene for use in Khramenkov's system." *See* Docket 683-2 at 43-44. As an example of polypropylenes with lower VICAT softening temperatures, Buergofol contended that a mixture of two polymers— one with a VICAT softening temperature of 111°C and the other with a VICAT of 70°C—would result in a "combined VICAT softening temperature [that] is below 100°C." *See id.* at 43. Specifically, Buergofol argued that

> [f]or example, Closson . . . discloses the use of a blend of a highly crystalline polypropylene having a VICAT softening temperature of 111°C, and a medium crystalline polypropylene having a VICAT softening temperature of 70°C. . . . Even assuming an additive VICAT, as [Omega's] expert has assumed . . . if the preferred combination of polypropylenes of Closson were used (70% highly crystallinity and 30% medium crystallinity), the combined VICAT softening temperature is below 100°C.

*Id.* Buergofol also argued that

> mixtures or blends of polypropylene and polyethylene can have a wide range of VICAT softening temperatures, ranging from 60-150°C. . . . It is clear that neither polypropylene nor mixtures of polypropylene and polyethylene necessarily satisfy the claimed VICAT softening temperature. Rather, the claimed VICAT softening temperature can only be realized by [Omega's] selection of a specific type of polypropylene that has the highest VICAT softening temperature of all polypropylenes, and then using a certain amount of polypropylene in the mixture.

*Id.* at 44-45. Buergofol concluded that Omega "failed to carry its burden of proving that Khramenkov's mixture of polypropylene and polyethylene

necessarily has the claimed VICAT softening temperature" of at least 100ºC.[7] *Id.* at 45.

The PTAB did not institute IPR of the '269 Patent, finding that Omega failed to demonstrate a reasonable likelihood that it would prevail in showing that claim 1 of the '269 Patent would have been obvious. *See* Docket 683-1 at 396-401. In denying Omega's petition, the PTAB stated that

> no express claim construction is necessary. This Decision turns on the sufficiency of [Omega's] showing that the asserted prior art suggests an internally situated tube having a layer (a), as specified in claim 1, which is characterized by a VICAT softening point that is at least 100ºC. . . . Neither party argues that the result would change in this case based on the meaning applied to those terms.

*Id.* at 394 (cleaned up). More specifically, the PTAB found that Omega failed to demonstrate that any prior art references, such as Khramenkov, met the VICAT softening point limitation laid out in claim 1 of the '269 Patent. *See id.* at 396-401.

Buergofol argues that it was not disavowing claim scope, but rather, was merely criticizing Omega's asserted invalidity theory. *See* Docket 868 at 16-19 (stating Buergofol was only arguing "against an erroneous Omega argument for invalidity based on Omega's erroneous claim construction"); Docket 889 at 13.

---

[7] In addition to these statements, Omega also argues that a figure submitted by Buergofol, which identified "Layer (a) – thermoplastic olefin homo- or copolymer – VICAT softening Temp. at least 100ºC," constitutes a prosecution disclaimer. Docket 887 at 10 (quoting Docket 683-2 at 14). The court finds that this figure does not establish a "clear and unmistakable" disclaimer because it is unclear from the figure whether Buergofol intended the "VICAT softening Temp. at least 100ºC" to refer solely to "Layer (a)" or to "thermoplastic olefin homo- or copolymer.

Nonetheless, Buergofol distinguished the claimed invention from the prior art reference on the basis that Omega failed to show that a mixture of polymers would satisfy the claimed VICAT softening temperature, *see* Docket 683-2 at 44-45, and thus indicated what the VICAT softening temperature requirement covered. *See, e.g.*, *SpeedTrack, Inc. v. Amazon.com*, 998 F.3d 1373,1380 (Fed. Cir. 2021) ("An applicant's argument that a prior art reference is distinguishable on a particular ground can serve as a disclaimer of claim scope even if the applicant distinguishes the reference on other grounds as well.") (internal quotation marks omitted). Although a disavowing statement must be clear and unmistakable, *see 3M Innovative Props. Co.*, 725 F.3d at 1322, the court finds no reasonable interpretation for Buergofol's statements other than to distinguish the '269 Patent from prior art—by highlighting the fact that Omega failed to demonstrate that the prior art reference's disclosure of a combination of polymers would fail to meet the VICAT softening temperature requirement, *see* Docket 683-2 at 42-45 (Buergofol arguing that Omega "fails to prove that Khramenkov's mixture of polypropylene and polyethylene necessarily has the claimed VICAT softening temperature"). Thus, Buergofol's statements distinguishing the prior art references limits the scope of the VICAT softening temperature requirement in claim 1.

Based on the plain and ordinary meaning, the specification, and the patent's prosecution history, the court is persuaded to adopt Omega's construction. Thus, the court construes the phrase "wherein the VICAT softening point of the thermoplastic olefin homo- or copolymer of the layer (a) is

at least 100ºC" to mean "the VICAT softening point of the combined composition of the thermoplastic olefin homo- or copolymer(s) of layer (a) is at least 100ºC."

## II.  Disputed Term: "a layer sequence made of . . . "

The parties' proposed constructions for the disputed term "a layer sequence made of" are as follows:

> Buergofol: "a film 'comprising a layer sequence made of' the layers (a), (b), (c), (d) and (e) has layers at least including the layers (a), (b), (c), (d), and (e) in that sequence (order), but may also include other layers as well."

> Omega: "[a] specific order of consecutive extrusions of material with no intervening extrusion(s) of material."

*See* Docket 553-1 at 1.

The parties essentially dispute the meaning of the term "layer" and the term "sequence." Omega argues that the term "layer" means "a single extrusion of material," Docket 869 at 27-29, whereas Buergofol argues that the "recited layers of claim 1 can include different materials," Docket 868 at 23-24. Omega argues that the term "sequence" signifies "a specific order of consecutive items with no intervening item(s)." Docket 553-1 at 1; *see also* Docket 869 at 23-27. In comparison, Buergofol reasons that even if other layers are added within the (a), (b), (c), (d), and (e) sequence order, the layers would be in the "same 'sequence' regardless of whether there [are] additional layers or not . . . [because] there is no language in the claim precluding there being additional layers." Docket 553-1 at 1-2.

Buergofol argues that its construction is correct because the Federal Circuit construes the term "comprising" to be "open-ended and boundless," so that the phrase "a layer sequence made of" does not exclude unrecited elements. *See* Docket 868 at 20, 23; Docket 889 at 20. Buergofol concludes that based on the open-ended meaning of comprising, the "layer sequence made of" layers (a), (b), (c), (d), and (e), can "also include the additional elements (z), (y), (x), (w), and (v) interspersed among the layers (a), (b), (c), (d), and (e), as for example (a), (z), (y), (b), (x), (c), (w), (d), (v), and (e), without disrupting the sequence at which the layers (a), (b), (c), (d), and (e) appear." Docket 868 at 22-23.

Omega argues that its construction is supported by the plain and ordinary meaning of the claim language and the specification. *See* Docket 869 at 24-25. Because the term "sequence" is not further defined by the patent, Omega argues that a POSITA would apply the common dictionary definitions for the term "sequence." *Id.* For example, Omega cites Dictionary.com to define "sequence" as "the following of one thing after another; succession," and "a continuous or connected series," *id.* (quoting Docket 683-8 at 1), and cites the Merriam-Webster dictionary to define "sequence" as "a continuous or connected series," *id.* (quoting Docket 683-9 at 1).

Omega argues that Buergofol's proposed construction of the term "comprising" improperly "negates the expressly recited sequence limitation," essentially treating the term "sequence" as "surplusage." *Id.* at 25-26. Omega further asserts that adopting Buergofol's construction would "render the claim

24

boundless, vague, and impossible to apply in any principled way" because its construction "wipes out the limitation 'layer sequence made of.' " *Id.* at 27. Instead, Omega contends that when properly read, "the term 'comprising' refers to the makeup of the entire 'optionally nonconditioned multilayer film,' . . . [i]n other words, the multi[]layer film must include the recited 'layer sequence' specifically described, but, outside of and separate from that layer sequence . . . the multilayer film can also 'comprise' additional unrecited elements." *Id.* at 26 (emphasis omitted).

In response, Buergofol argues that Omega's construction is improper because it seeks to interpose additional terms, such as "extrusions," "consecutive," "intervening," or "specific order," which do not appear in the claim terms or the specification. Docket 889 at 19-21. Buergofol also asserts that "[w]hile it is true that the first use in claim 1 of the term 'comprising' modifies 'multilayer film' in the recitation 'comprising an optionally nonconditioned multilayer film', it is the second use of the term 'comprising' that modifies 'layer sequence' in the recitation 'comprising a layer sequence made of.' " *Id.* at 22.

The relevant part of claim 1 of the '269 Patent provides:

1. An insertion tube suitable for the renovation of subterranean pipes, optionally subterranean sewer pipes, comprising

an optionally nonconditioned multilayer film that is impermeable to liquids and that is at least to some extent permeable to UV radiation, comprising a layer sequence made of

(a) A layer (a) comprised of at least one thermoplastic olefin homo- or co-polymer, as one of the external layers,

25

> (b) An adhesive-promoter layer (b),
>
> (c) An internally situated layer (c) comprised of at least one homo- and/or copolyamide,
>
> (d) An adhesive-promoter layer (d), and
>
> (e) A layer (e) comprised of at least one homo- and/or copolyamide, as one of the external layers,
>
> in the form of a tubular film.

Docket 1-2 at 14:43-59.

Turning first to the claim language, the court is not persuaded by Buergofol's argument that the term "comprising a layer sequence made of" in claim 1 of the '269 Patent permits the inclusion of additional layers to break up the sequence of layer (a), (b), (c), (d), and (e). Buergofol is correct that "[t]he word 'comprising' transitioning from the preamble to the body signals that the entire claim is presumptively open-ended." *Gillette*, 405 F.3d at 1371; *see also MagSil Corp. v. Hitachi Global Storage Tech., Inc.*, 687 F.3d 1377, 1383 (Fed. Cir. 2012) ("The transition 'comprising' creates a presumption that the recited elements are only a part of the device, that the claim does not exclude additional, unrecited elements." (quoting *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001)). But while "the term 'comprising' is [generally] an open-ended transitional term that allows for additional steps," *Eye Therapies, LLC v. Slayback Pharma, LLC*, 141 F.4th 1264, 1269 (Fed. Cir. 2025), the Federal Circuit has also warned that the term

" '[c]omprising' is not a weasel word with which to abrogate claims limitations," *Spectrum Intern., Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1380 (Fed. Cir. 1999).

When the term "comprising" is contained in the body of the claim and not used as a transitional phrase, "comprising" should be "interpreted according to the normal rules of claim interpretation." *See Moleculon Res. Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 n.8 (Fed. Cir. 1986) (" 'Comprising' is not used here as a transitional phrase and has no special legal effect as such. Hence, it should not be interpreted according to the normal rules of claim interpretation."); *Med. Res. Institute v. Bio-Engineered Supplements & Nutrition, Inc.*, 2007 WL 128937, at *4 (E. D. Tex. Jan. 12, 2007) (concluding that when "comprising" is used within the body of the claim, "the term should be construed according to normal construction rules"). Under such circumstances, "[t]he definition of 'comprising,' separated from the legal effect given to such term when used as a transition, is 'to consist of' or 'to make up.' " *Barnes & Nobles, Inc. v. LSI Corp.*, 2014 WL 1365422, at *23 (N.D. Cal. Apr. 7, 2014); *see also Araujo v. E. Mishan & Sons, Inc.*, 2022 WL 2342111, at *9 (S.D.N.Y. June 29, 2022) ("Under normal rules of claim construction, the term 'comprises,' when not used as a transitional term, means 'to be made up of,' 'compose,' and 'constitute.' ") (citation omitted).

The court finds that adopting Buergofol's construction of "comprising" would improperly read out the claim limitation of "a layer sequence made of." As the Federal Circuit has previously explained,

27

> [t]he purpose of a patent claim is to define the precise scope of a claimed invention. . . . Allowing a patentee to argue that physical structures and characteristics specifically described in a claim are merely superfluous would render the scope of the patent ambiguous, leaving examiners and the public to guess at which claim language the drafter deems necessary to his claimed invention and which language is merely superfluous, nonlimiting elaboration. For that reason, claims are interpreted with an eye toward giving effect to all terms in the claim.

*Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006).

Construing "comprising" as Buergofol suggests would negate the notice function of the claim limitation and make the limitation of "a layer sequence made of" superfluous. Moreover, the language of claim 1 requires that certain layers within the sequence fall within certain positions. For example, layer (a) and layer (e) must be "one of the external layers" and layer (c) must be "internally situated." Docket 1-2 at 14:50-58. Further,

> [t]he manner in which the multilayer film of the invention is used as internally situated tube in the insertion tube of the invention is preferably such that the resin requiring hardening, or the support material saturated with a resin requiring hardening, is directly adjacent to the external layer or surface layer (e) of the internally situated tube.

*Id.* at 7:42-47. Based on the above, the claim language makes clear that certain layers with the identified sequence maintain certain positions within the multilayer film. Thus, the court is not convinced the claim language permits or contemplates the inclusion of additional layers beyond layers (a)-(e).

Moreover, even if the court were to construe the language in claim 1 to include layers beyond the claimed layers (a)-(e), "when the preferred embodiment is described in the specification as the invention itself, the claims

28

are not necessarily entitled to a scope broader than that embodiment." *Chimie*, 402 F.3d at 1379; *see also Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1330 (Fed. Cir. 2009) (construing claimed "graft" devices to all be intraluminal because "the only devices described in the specification are intraluminal" and "the specification frequently describes 'an intraluminal graft' as 'the present invention' or 'this invention' "); *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (construing claim term to include fuel filter because "[o]n at least four occasions, the written description refers to the fuel filter as 'this invention' or 'the present invention' "). As such, "[w]here the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001).

The '269 Patent's specification frequently describes the claimed invention as solely involving layers (a), (b), (c), (d), and (e). *See, e.g.*, Docket 1-2 at 1:8-16 (providing that the "present invention relates to a multilayer film . . . comprising a layer sequence made of a layer (a)[-layer (e)]"); *id.* at 2:31-45 (providing object of the invention "is achieved via provision of the multilayer film . . . comprising a layer sequence made of" layers (a)-(e)); *id.* at 5:34-38 (providing that in "one very preferred embodiment, the multilayer film of the invention has five layers, i.e. consists of the layers (a), (b), (c), (d), and (e)"); *id.*

29

at 5:47-50, 54-57, 62-64, 65-67 (providing preferred embodiments involving "all of the layers, preferably layers (a), (b), (c), (d), and (e)"). Column 5 in the '269 Patent states that "[t]he layers (a), (c), and (e), and also the adhesive-promoter layers (b) and (d), of the multilayer film *of the invention* can, if necessary, respectively mutually independently comprise additives selected from the group." *Id.* at 5:13-16 (emphasis added). The Abstract to the '269 Patent also describes a multilayer film "having a layer sequence of" layers (a)-(e). *Id.* at 2. The specification further provides that "[t]he multilayer films *of the invention of inventive examples* 1-4 (IE1-IE4) respectively consist of five layers. The individual layers of the multilayer films are respectively immediately adjacent to one another in the sequence in which they have been listed below." Docket 1-2 at 12:67 –13:4 (emphasis added); *see also id.* at 13:20-14:40 (detailing an invention of layer structure (a), (b), (c), (d), and (e)).

The specification also distinguishes aspects of the claimed invention over the prior art. In addition to the provided inventive examples, the specification describes comparative examples (CE1-CE3) which "consist of three (CE2), four (CE1) or five layers (CE3)." *Id.* at 12:65-66. The comparison table provided with the specification indicates that the inventive examples (IE1-IE4) all have higher extensibility[8] than the comparative examples (CE1-CE3). *See id.* at 14:30-40. The '269 Patent cites higher extensibility as one of the improvements of the

---

[8] "The extensibility of a multilayer film is determined . . . by means of an inflation test." Docket 1-2 at 12:7-9. In the inflation test, "compressed air is used to inflate the tubular film or the tube until it bursts." *Id.* at 12:22-23. Extensibility is measured by the width of the tubular film upon inflation until bursting. *See id.* at 12:23-36.

claimed invention over the prior art. For example, in the summary of the invention, the '269 Patent states

> [i]t has moreover been established, surprisingly, that the multilayer film of the invention . . . features very good mechanical properties, in particular very good extensibility, in such a way that it withstands the loads that arise during the renovation of subterranean pipes, in particular during inflation within the pipe system, during the preceding transport, the preceding storage, and the entry into the pipe requiring renovation, and moreover, after the hardening of the resin, can be withdrawn therefrom without any break-off, splitting, or tearing.

*Id.* at 2:52-64; *see also id.* at 3:23-25 ("The multilayer film of the invention features excellent mechanical properties . . . in particular by virtue of very good extensibility."); *id.* at 6:51-54 (providing that it is unnecessary to condition the multilayer film of the invention due its "good mechanical properties i.e. good extensibility").

In discussing the disadvantages of certain prior art structures, the '269 Patent indicates that "[a] disadvantage of a multilayer film . . . is that these do not have the mechanical properties required in order to withstand the loads" present when renovating a sewer pipe. *Id.* at 2:7-14. The '269 Patent further indicates that the "object of the present invention [is] to provide a multilayer film . . . [which has] mechanical properties that are sufficiently good for it to withstand the high loads that arise during pipe renovation." *Id.* at 2:20-27. In demonstrating that the inventive examples maintain a higher extensibility in contrast to the comparative examples, the specification indicates the advantages of the '269 Patent's claimed five-layer sequence of layer (a), (b), (c), (d), and (e). As such, the specification distinguishes the prior art by pointing

out the advantages of the claimed five-layer sequence of layers (a)-(e) and demonstrates the patentee's intent to claim a five-layer sequence of layers (a)-(e) as the invention of the '269 Patent. *See SciMed Life Sys. Inc.*, 242 F.3d at 1342-43 (construing claimed invention to only include catheters having coaxial lumens, in part, because the specification distinguished the claimed invention from the prior art by pointing out the advantages of the coaxial lumens used in the catheters); *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1159 (Fed. Cir. 1998) (finding that statements distinguishing prior art and promoting advantages of conical shaped cup for use in an artificial hip device in patent's specification "make clear that that [patent] discloses only conical shaped cups and nothing broader") (emphasis omitted).

The court also rejects Buergofol's argument that the doctrine of claim differentiation requires that "a layer sequence made of" layers (a)-(e) in claim 1, Docket 1-2 at 14:48-58, be read differently from an "insertion tube . . . consists of the layers (a)-(e)" claimed in dependent claim 7, *id.* at 16:8-12; *see also* Docket 889 at 23-24. The doctrine of claim differentiation provides that "[w]hen different words or phrases are used in separate claims, a difference in meaning is presumed." *Nystrom v. TREX Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005). In such cases, "the independent claims are presumed to be broader," *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1376 (Fed. Cir. 2014), and "limitations stated in dependent claims are not to be read into the independent claim," *Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 972 (Fed. Cir. 1999). But

> simply noting the difference in the use of claim language does not
> end the matter. Different terms or phrases in separate claims may
> be construed to cover the same subject matter where the written
> description and prosecution history indicate that such a reading of
> the terms or phrases is proper.

*Nystrom*, 424 F.3d at 1143; *see also Forest Lab'ys., LLC v. Sigmapharm Lab'ys., LLC*, 918 F.3d 928, 932-33 (Fed. Cir. 2019) (finding that limitation contained in patent's dependent claim 4 also applied to patent's independent claim 1 based on language in the patent's specification despite the fact that the claim language of claim 1 did not contain the limitation).

Despite the doctrine of claim differentiation, the written descriptions in the specification, in conjunction with the claim language, leads this court to conclude that claim 1 contemplates a "layer sequence made of" a specific sequence order of layers (a), (b), (c), (d), and (e). As noted above, the written description repeatedly refers to a layer sequence of layers (a), (b), (c), (d) and (e) as "the present invention" and "the multilayer film of the invention." *See* Docket 1-2 at 2:31-45, 5:13-16, 5:62-64. The inventive examples further indicate that "[t]he multilayer films *of the invention of inventive examples* 1-4 (IE1-IE4) respectively consist of *five layers*" that are "*immediately adjacent to one another in the sequence* in which they have been listed below." *Id.* at 12:65-13:4 (emphasis added). Additionally, the specification distinguishes prior art by touting the advantages of the specific layer sequence of layers (a), (b), (c), (d), and (e) by emphasizing that this layer sequence generates mechanical properties able to withstand the substantial loads encountered during pipe

renovations. *Id.* at 2:20-27. Thus, the court construes the term "sequence" to mean "a specific order of consecutive layers with no intervening layers."

The advantages of the specific layer sequence of layers (a), (b), (c), (d), and (e) also informs the court's construction of the term "layer." Neither the claim language nor the specification provide a special definition for the term "layer." *See generally* Docket 1-2 at 14:41-67. But claim 1's requirement of certain polymers within its recitation of layers, such as the requirement that layer (a) contain "at least one thermoplastic olefin homo- or copolymer," indicates the import of a layer's structure and position in the layer sequence. *Id.* at 14:50-51; *see also* Docket 868 at 7 (Buergofol explaining that layer (b) bind layers (a) and (c), and layer (d) binds layers (c) and (e)); Docket 1-2 at 5:35-39 (providing preferred embodiment were there is "bonding between the two polyamide layers (c) and (e) by way of an adhesive-promoter layer (d)"). The specification also provides embodiments for the structure and composition of certain layers. For example, layers (c) and (e) comprise at least one homo- and/or copolyamide, preferably "PA 6, PA 12, PA 66, PA 61, PA 6T, or corresponding copolymers, or a mixture of at least two of the polyamides mentioned." *Id.* at 4:25-44. In one preferred embodiment, layers (c) and (e) have an identical layer structure, such as "identical layer thickness, and/or identical polyamide components, and/or an identical composition." *Id.* at 4:45-49. Alternatively, layers (c) and (e) preferably have a different layer structure, such as "different layer thickness, and/or different polyamide components, and/or an [sic] [different] composition." *Id.* at 4:50-54.

34

To achieve a certain layer structure, the specification indicates that the "multilayer films of the invention can be produced by known, conventional processes." *Id.* at 5:44-45. The specification further discloses that "the production of all of the individual layers, preferably layers (a), (b), (c), (d), and (e), of the multilayer film of the invention can also be achieved via (co)extrusion, particularly preferably by blown-film (co)extrusion, or by cast (co)extrusion," *id.* at 5:62-6:1, or "[a]s an alternative, it is also possible to produce individual layers of the multilayer film of the invention in the form of a layer composite by (co)extrusion." *Id.* at 6:4-6.

Layers in the layer sequence may also contain multiple polymers as long as the specific layer contains the identified polymer listed in the claim language. For example, layer (a) must contain "at least one thermoplastic olefin homo- or copolymer" and layers (c) and (e) must contain "at least one homo- and/or copolyamide," Docket 1-2 at 14:50-52, 54-55, 57-58, but beyond those recited polymers, there is no limitation preventing the additional of other polymers within an individual layer. Although a specific layer in the layer sequence may contain more than one polymer, the individual layers (a), (b), (c), (d), and (e) are distinguishable from each other based on the layer's structure, considering such characteristics as the layer's thickness, polymer components, and composition. *See, e.g.*, *id.* at 4:45-54. As such, while the court agrees with Buergofol that the individual layers in the '269 Patent may contain more than one polymer, *see* Docket 868 at 23-24, the court does not adopt Buergofol's construction of the term "layer" because it fails to explain how a POSITA would

distinguish one layer from another, *see* Docket 869 at 28 (Omega arguing that under Buergofol's construction "all film would consist of a single layer, no matter how many layers of different materials they contain" (emphasis omitted)).

Instead, the court concludes that the claim language and specification indicate that a layer is distinguishable from another layer not only by the polymers required to produce the necessary characteristics claimed in claim 1 but also based on characteristics such as the layer's thickness and composition. *See, e.g.*, Docket 1-2 at 4:45-54. Such characteristics are created during the manufacture of the specific layer, which the specification indicates is completed by some form of extrusion, such as blown-film extrusion, cast extrusion, or coextrusion. *See id.* at 5:44-45, 62-6:6. Thus, because the extrusion process is used to determine a specific layer's structure and composition, the court construes the term "layer" to mean an "extrusion of material." Thus, taking both constructions together, the court adopts Omega's construction of the term "a layer sequence made of" to mean "a specific order of consecutive extrusions of material with no intervening extrusion(s) of material."

### III.  Disputed Term: "film . . . which reflects and/or absorbs UV radiation and/or shortwave, visible light."

The parties' proposed constructions of the term are as follows:

Buergofol: "film that reflects and/or absorbs electromagnetic radiation having ultra-violet wavelengths and/or short wavelengths of visible light preferably to an extent of more than 90%."

Omega: "[f]ilm that blocks the transmission of UV radiation and/or short-wave, visible light."

Docket 553-1 at 3. Because the specification clearly defines "UV radiation" and "short-wave, visible light," *see* Docket 1-2 at 3:7-9, 19-22, the parties' dispute centers around the meaning of the term "reflects and/or absorbs," *see* Docket 553-1 at 3; Docket 868 at 25-27; Docket 869 at 29-32.

Buergofol argues that based on "the embodiments disclosed in the specification, the claim language 'reflects and/or absorbs' must be interpreted to reflect and/or absorb the recited wavelength range 'preferably to an extent of more than 90%.'" Docket 868 at 26. Buergofol derives support for its construction from column 8 of the '269 Patent, which states

> [i]t is preferable that the simple- or multilayer tubular film used as externally situated tube in the invention comprises at least one organic or inorganic color pigment or at least one organic or inorganic dye . . .. It is preferable that the organic or inorganic color pigment or the organic or inorganic dye absorbs and/or reflects short-wave, visible light in the wavelength range from 400 to 500 nm, particularly preferably in the wavelength range from 400 to 450 nm, preferably respectively to an extent of more than 90%.

Docket 1-2 at 8:11-14, 39-44. Buergofol also cites column 10 of the '269 Patent, which states

> [i]t is preferable that the organic or inorganic compound reflects and/or absorbs UV radiation in a wavelength range from 200 to 400 nm, particularly preferably from 300 to 400 nm, preferably in each case to an extent of more than 90%.

*Id.* at 10:1-4.

In response, Omega asserts that Buergofol's insertion of the 90% threshold "improperly broaden[s] the scope" of the term to allow the "transmission of UV [radiation] and/or [short-wave, visible light]." Docket 869 at 31 (emphasis omitted); *see also* Docket 887 at 26 (Omega arguing that the

37

90% threshold improperly broadens the term "reflects and/or absorbs" to mean partial reflection "when no [such] qualifying language is used in the claim"). Omega argues that "none of the dyes, pigments, or compounds that may *partially* 'reflect and/or absorb' are found in independent claim 1 or any of the dependent claims 2-10." Docket 887 at 26. Omega also notes that "[w]hen it came to claiming the 'externally situated' film, the patentee did not use the term 'permeable' or the phrase 'at least to some extent,' or other qualifying language that allowed for *some* transmission of UV radiation or short-wave visible light through the 'externally situated' film." *Id.* at 26-27.

Instead, in construing the phrase "reflects and/or absorbs," Omega argues that a POSITA would understand the phrase to mean "to block." *Id.* at 27; *see* Docket 869 at 30. Omega argues that such a construction is supported by the terms' plain and ordinary meaning, *see* Docket 887 at 27, and supported by descriptions of the external film in the specification, *see id.* at 23-27 (citing multiple examples from the '269 Patent's specification where the external layer is described as "reflects and/or absorbs UV radiation and/or short-wave, visible light" without further qualification).

The court first turns to the claim language. In claim 1, where the patentee intended for the internally situated film to allow for some transmission of UV radiation and/or short-wave, visible light, the patentee used language such as "permeable" and "at least to some extent." *See, e.g.* Docket 1-2 at 14:47-49 (claiming "an optionally nonconditioned multilayer film that is impermeable to liquids and that is at least to some extent permeable to

38

UV radiation"). Claims 2-9 of the '269 Patent also use the language of "at least to some extent permeable to UV radiation" in claiming aspects of the internally situated film. *See, e.g., id.* at 15:7-9 (claim 2 providing "layer (a) of the multilayer film that is . . . at least to some extent permeable to UV radiation"). Because "[o]ther claims of the patent in question . . . can also be valuable sources of enlightment as to the meaning of a claim term," *Phillips*, 415 F.3d at 1314, the court finds it relevant that where claim 1 describes the externally situated film, the patentee did not use such limiting language, *see e.g.*, Docket 1-2 at 14:64-67.

In turning to the specification, absent the preferred embodiments involving organic or inorganic compounds or dyes, *see, e.g., id.* at 8:40-44, the '269 Patent does not use language allowing the partial transmission of UV radiation or short-wave, visible light. Despite Buergofol's citations to the preferred embodiments involving organic or inorganic compounds or dyes in describing the external film, the court finds that Buergofol's construction of the term "reflects and/or absorbs" improperly reads a limitation from the specification into the claim term. Docket 887 at 22-23; *see also Phillips*, 415 F.3d at 1323 (recognizing that courts must "avoid the danger of reading limitations from the specification into the claim"). If the court were to interpret the term "reflects and/or absorbs" to include the 90% threshold, the court would improperly "limit the claims to the particular preferred embodiments described in the specification." *Astrazeneca AB, Aktiebolaget Hassle, KBI-E, Inc. v. Mutual Pharm. Co., Inc.*, 384 F.3d 1333, 1340 (Fed. Cir. 2004); *see also*

*Phillips*, 415 F.3d at 1323 (noting that "although the specification often describes very specific embodiments of the invention, [the Federal Circuit has] repeatedly warned against confining the claims to those embodiments") (internal quotation marks omitted). Additionally, the specific references to the 90% threshold identified by Buergofol refer to organic or inorganic compounds and dyes, which are not identified in independent claim 1 of the '269 Patent. *See* Docket 1-2 at 8:39-44, 10:1-4.

But finding nothing dispositive in the claim language or the specification of the '269 Patent concerning the meaning of the term "reflects and/or absorbs," the court turns to extrinsic evidence, specifically dictionary definitions to obtain guidance on "the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314; *see also Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008) ("When the intrinsic evidence is silent as to the plain meaning of a term, it is entirely appropriate for the district court to look to dictionaries or other extrinsic sources for context—to aid in arriving at the plain meaning of a claim term.") Courts may "rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Phillips*, 415 F.3d at 1322-23.

In support of its argument that "reflects and/or absorbs" means "to block," Omega notes that the Merriam-Webster Dictionary defines "reflects" as "to block or redirect (light, sound, etc.)," Docket 871 ¶ 104, and that the

40

Britannica Dictionary defines "absorbs" as "to prevent (something harmful or unwanted) from passing through," *id.* The dictionary definitions provided by Omega conform with the claim language and specification in the '269 Patent. Specifically, the claim language and specification indicate that the purpose of the term "reflects and/or absorbs" is to prevent the premature hardening of the synthetic curable resin.

For example, the specification of the '269 Patent states that

[i]n order to prevent undesired premature hardening of the synthetic resin prior to introduction into the pipe requiring renovation, it is necessary that the externally situated tube of the insertion tube has a protective layer or is composed thereof, in order to prevent premature exposure to external UV radiation and thus premature curing of the resin.

Docket 1-2 at 1:55-61. The specification further provides that "[i]n contrast, the internally situated tube of this type of insertion tube has to have permeability to UV radiation, in order to permit, in the inflated condition, the hardening procedure." *Id.* at 1:61-64. The specification further provides that

[i]n one preferred embodiment, at least one of the internally situated layers of the multilayer tubular film used as externally situated tube in the invention comprises the combination which is made of at least one organic or inorganic color pigment or dye and of at least one organic or inorganic compound, and which reflects and/or absorbs the detrimental radiation.

*Id.* at 11:9-15. The specification doubles down on the reference to "detrimental radiation" by providing that

[e]ach of the adhesive-promoter layers of the multilayer tubular film used as externally situated tube in the invention can preferably comprise the combination which is made of at least one organic or inorganic color pigment or dye and of at least one organic or inorganic compound, and which reflects and/or absorbs detrimental radiation.

41

*Id.* at 11:18-24.

The specification of the invention indicates that the purpose in reflecting and/or absorbing UV radiation and/or short-wave, visible light is to prevent the premature hardening of the reactive synthetic resin before the curing process begins. *See, e.g.*, *id.* at 1:55-61. The purpose identified by the specification in preventing the premature hardening of the resin conforms with the dictionary definitions identified by Omega. *See* Docket 871 ¶ 104 (defining "reflects" as to block and "absorbs" as to prevent something from passing through). As such, claim 1 of the '269 Patent contemplates an externally situated tubular film that does not allow the transmission of UV radiation or short-wave, visible light to pass through to prevent the premature hardening of the reactive curable resin. Thus, the court concludes that the proper construction of the phrase "film . . . which reflects and/or absorbs UV radiation and/or shortwave, visible light" is "film which does not allow the transmission of UV radiation and/or shortwave, visible light."

**CONCLUSION**

Based on the foregoing, it is

ORDERED that the disputed terms are construed as follows:

1. The term "wherein the VICAT softening point of the thermoplastic olefin homo- or copolymer of the layer (a) is at least 100º C," is defined as "the VICAT softening point of the combined composition of the thermoplastic olefin homo- or copolymer(s) of layer (a) is at least 100ºC."

42

2. The term "a layer sequence made of" means "a specific order of consecutive extrusions of material with no intervening extrusion(s) of material."

3. The term "film . . . which reflects and/or absorbs UV radiation and/or shortwave, visible light" is defined as "film which does not allow the transmission of UV radiation and/or shortwave, visible light."

Dated January 20, 2026.

BY THE COURT:

*/s/ Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

43