UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| BUERGOFOL GMBH,<br><br>  Plaintiff and<br>  Counter Defendant,<br><br>vs.<br><br>OMEGA LINER COMPANY, INC.,<br><br>  Defendant and<br>  Counter Claimant. | 4:22-CV-04112-KES<br><br>ORDER GRANTING OMEGA'S MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART BUERGOFOL'S MOTION TO AMEND/CORRECT ESI ORDER, AND DENYING BUERGOFOL'S MOTION TO STOP OMEGA FROM OBSTRUCTING IMPLEMENTATION OF THE ESI ORDER |

## TABLE OF CONTENTS

I.  Whether Buergofol's Alleged Fabrication of Documents and False .............. 6

Declarations Warrants Dismissal ................................................................. 6

  A.  Legal Standards ....................................................................... 7

    1.  Rule 11 ........................................................................... 7

    2.  Rule 26(g) ......................................................................... 8

    3.  The Court's Inherent Authority .......................................... 9

  B.  Background ............................................................................ 10

  C.  Analysis................................................................................. 26

II.  Whether Buergofol's Alleged Violations of the Court's Orders Warrants

Dismissal .................................................................................................. 42

  A.  Legal Standards ....................................................................... 43

    1.  Rule 37(b)(2)(A)................................................................ 43

    2.  Rule 41(b) ........................................................................ 44

  B.  Buergofol's Refusal to Use an E-Discovery Platform to Search Emails

Under Sections II, III.1, and III.3 of the ESI Order.................................. 44

    1.  Background........................................................................ 44

    2.  Omega's Motions to Strike ................................................ 53

3.    Parties' Arguments .................................................................. 60

4.    Omega's ESI Expert Declarations...................................... 62

5.    Buergofol's ESI Expert Declarations................................. 68

6.    Analysis ................................................................................ 70

C.    Buergofol's Refusal to Use an E-Discovery Platform to Search its Files Pursuant to Sections II and III.3 of the ESI Order ..................................... 78

D.    Buergofol's Refusal to Search Custodian Email Accounts, Run Search Queries, and to Search its Databases ...................................... 81

1.    Buergofol's Refusal to Search for and Produce Responsive Emails in Dr. Schleicher's Email Accounts ............................................. 81

2.    Buergofol's Refusal to Run Omega's Search Queries ......................... 85

3.    Buergofol's Refusal to Search its Databases.................................. 90

4.    Buergofol's Refusal to Produce Records of its Performed Searches Pursuant to Section IV.1 .......................................................... 94

E.    Buergofol's Alleged Obstruction of ESI Expert's Forensic Inspections and Buergofol's Motion to Order Omega's Counsel to Stop Obstructing Implementation of the ESI Order ............................................... 96

1.    Background.......................................................................... 96

2.    Parties' Arguments and Analysis................................... 112

F.    Buergofol's Failure to Produce Anton Hoffmann for Deposition ........ 122

1.    Background.......................................................................... 122

2.    Parties' Arguments ............................................................ 125

3.    Analysis ............................................................................ 126

G.    Buergofol's Alleged Violations of Seven Orders on Prior Art .............. 130

1.    Background.......................................................................... 130

2.    Parties' Arguments and Analysis................................... 137

H.    Buergofol's Alleged Violations of Five Orders on Film Composition and Structure .................................................................................. 149

1.    Background.......................................................................... 150

2.    Parties' Arguments ............................................................ 154

3.    Analysis ............................................................................ 155

III.    Whether Buergofol's Alleged Spoliation of Evidence Warrants Dismissal .........................................................................................158

A.    Background .......................................................................... 159

B.      Legal Standard ............................................................... 163

C.      Analysis........................................................................... 164

   1.      Duty to Preserve Evidence ........................................... 164

   2.      Intentional Destruction of Evidence and Bad Faith ...................... 171

   3.      Prejudice ...................................................................... 178

IV.   Appropriate Sanctions ................................................... 183

V.     Whether an Evidentiary Hearing is Warranted................................. 193

VI.   Attorney's Fees ............................................................... 194

Defendant, Omega Liner Company, Inc., moves to dismiss with prejudice the entirety of plaintiff, Buergofol GmbH's, claims against Omega pursuant to Federal Rules of Civil Procedure 11, 37(b)(2), 41(b), and this court's inherent authority. Docket 864. Omega argues that dismissal is proper due to Buergofol's (1) fabrication of evidence and submission of false declarations, (2) violations of various court orders, and (3) spoliation of evidence. *Id.* Buergofol opposes the motion to dismiss. Docket 949. The court has also consolidated consideration of Buergofol's pending motions to amend/correct the court's ESI order (Docket 784) and Buergofol's motion to stop Omega's obstruction of implementation of the court's ESI Order (Docket 876) with Omega's motion to dismiss. *See* Docket 932 at 27; Docket 944 at 5. The court issues the following order.

**BACKGROUND**

Omega manufactures and sells ultraviolent cured-in-place pipe (CIPP) liners for the purpose of pipe renovation at its facility in Canton, South Dakota. Docket 163 ¶¶ 2, 25. From June 2017 to August 2019, Omega purchased and

received inner and outer tubular film used in its Omega Liner from Buergofol.[1]

*See, e.g.,* Docket 635-1 at 1 (noting that Omega's first order for film was made on June 13, 2017); *id.* at 3-4 (Buergofol's list of inner and outer film shipments to Omega starting on August 16, 2017, and ending on August 16, 2019). Omega last ordered inner film from Buergofol in August 2018 and began purchasing inner film from another supplier. Docket 478-1 at 49 (Omega stating that it last ordered inner film from Buergofol in August of 2018 and that by "early 2018, Omega had more than one supplier of inner film"). In August of 2019, Omega received Buergofol's last shipment of outer film and started purchasing outer film from another supplier. Docket 635-1 at 1-4 (indicating that Buergofol's last shipment of outer film was in August of 2019); Docket 867-38 at 2 (Omega stating that it purchased outer film from a company that was going out of business). *But see* Docket 867-35 at 14 (emails between the parties indicating that Buergofol's last shipment to Omega was in July of 2019).

On August 15, 2022, Buergofol filed suit against Omega, alleging that Omega infringed two of its patents, U.S. Patent No. 9,657,882 ('882 Patent)[2] and U.S. Patent No. 8,794,269 ('269 Patent). Docket 1; *see also* Docket 163

---

[1] Buergofol is a limited liability company organized under German law, with its principal place of business in Siegenburg, Germany. Docket 163 ¶ 1.

[2] On March 14, 2025, the Patent Trial and Appeal Board (PTAB) found claims 1, 3-7, and 10-13 of the '882 Patent unpatentable under 35 U.S.C. § 103. Docket 668-1. Buergofol has appealed this decision to the Federal Circuit, Docket 741, and the court had stayed all motions regarding the '882 Patent pending resolution of this appeal, *see* Docket 723.

¶¶ 33-57 (Buergofol's amended complaint). Buergofol argues that "all liners made by Omega of diameter greater than 21 inches that were made using inner film made by Buergofol infringe" the claims of the '269 Patent. Docket 668-2 at 5 (Buergofol's first amended infringement contentions). Omega has filed several counterclaims against Buergofol, asserting non-infringement, invalidity, and unenforceability of the '882 and '269 Patents. Docket 432 at 57-79. Omega also asserts a counterclaim for breach of contract under Article 42 of the United Nations Convention on Contracts for the International Sale of Goods. *Id.* at 79-83.

Since the filing of this case, discovery between the parties has been protracted and highly contentious. As a result, the court has issued several discovery orders. *See, e.g.*, Dockets 164, 181, 229, 230, 233, 234, 341, 435, 614, and 616. Buergofol also has moved for clarification or reconsideration of several of the court's orders. *See, e.g.*, Dockets 165, 352, 402, 480, 708, and 728. The court has also sanctioned Buergofol eight times, *see* Dockets 303, 335, 342, 360, 402, 464, 466, and 828, and awarded Omega its attorney's fees in several orders, *see* Dockets 164, 402, 464, 466, 748, 752, 756, 777, 809, 946, and 979. On August 28, 2025, in granting Omega's most recent motion for sanctions against Buergofol, the court noted that "Buergofol has engaged in dilatory and obstructive discovery practices" throughout this litigation. Docket 828 at 7. The court also warned Buergofol that "if less severe sanctions are unable to deter future sanctionable conduct," the court would consider potentially dismissing Buergofol's claims. *Id.* at 8.

On September 23, 2025, Omega filed its motion to dismiss Buergofol's claims with prejudice for repeated violations of the court's orders, submission of fabricated evidence and false declarations, and spoliation of evidence. Docket 864. In its motion to dismiss, Omega identifies several independent grounds it argues warrants dismissal under Rules 11, 37(b)(2), and 41(b), and the court's inherent authority. *Id.*; *see generally* Docket 865. On November 10, 2025, Omega filed a supplement to its motion to dismiss after gathering additional facts it argues supports its motion. *See* Docket 926. The court provides a more detailed explanation of the specific discovery disputes identified in Omega's motion to dismiss below.

## DISCUSSION

Omega argues that dismissal of Buergofol's claims is warranted for three reasons. First, Omega argues that Buergofol's fabrication of documents and submission of false declarations warrants dismissal under Rules 11 and 41(b) and this court's inherent authority. Docket 865 at 86-87. Second, Omega argues that Buergofol's numerous violations of the court's prior discovery orders warrants dismissal under Rules 37(b)(2) and 41(b) and this court's inherent authority. *Id.* at 65. Third, Omega argues that dismissal of Buergofol's claims is warranted because Buergofol has spoliated evidence in bad faith. *Id.* at 95.

## I.    Whether Buergofol's Alleged Fabrication of Documents and False Declarations Warrants Dismissal

Omega alleges that Buergofol produced a fabricated document, BF2793, and submitted four false declarations averring that BF2793 was a responsive

6

Buergofol business record made in May of 2018. Docket 865 at 71; Docket 969 at 12. Buergofol rejects Omega's arguments and asserts that "BF2793 is demonstrably an accurate cross-sectional image of an actual physical sample of the 11801841/3 film [sold to Omega] that was kept in the ordinary course of business." Docket 949 at 55. In reply, Omega argues that Buergofol's opposition brief presents new facts that reveal additional false representations made in Buergofol's submitted declarations. Docket 969 at 12-13. The court provides a factual background surrounding BF2793 and Buergofol's submitted declarations before addressing the parties' arguments below.

### A.    Legal Standards

#### 1.    Rule 11

A violation of Rule 11 occurs when a pleading, motion, or other paper is presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation, Fed. R. Civ. P. 11(b)(1), contains claims or contentions not warranted by existing law or by a nonfrivolous argument for extension or reversal of existing law, Fed. R. Civ. P. 11(b)(2), contains allegations or factual contentions that lack evidentiary support, Fed. R. Civ. P. 11(b)(3), or contains denials of factual contentions that are not warranted on the evidence, Fed. R. Civ. P. 11(b)(4); *see also Clark v. United Parcel Serv., Inc.*, 460 F.3d 1004, 1008 (8th Cir. 2006). Upon a party's motion, if the court determines that sanctions are warranted, "the court may award to the prevailing party the reasonable expenses including attorney's fees, incurred for the motion." Fed. R. Civ. P. 11(c)(2). A court may impose sanctions

7

when an attorney, law firm, or party violates these requirements. Fed. R. Civ. P. 11(c)(1).

The standard for imposition of Rule 11 sanctions is generally that the conduct of the party or its counsel was objectively reasonable. *See Clark*, 460 F.3d at 1009; *Norsyn, Inc. v. Desai*, 351 F.3d 825, 831 (8th Cir. 2003). Further, when evaluating a Rule 11 motion for sanctions, the court may consider factors such as "the wrongdoer's history, experience and ability, the severity of the violation, [and] the degree to which malice or bad faith contributed to the violation." *Pope v. Fed. Express Corp.*, 49 F.3d 1327, 1328 (8th Cir. 1995).

### 2. Rule 26(g)

Rule 26(g) imposes similar certification requirements as Rule 11 but applies these requirements to "every discovery request, response, or objection." Fed. R. Civ. P. 26(g)(1). On a party's motion or on its own, the court must impose sanctions "when the signing of [a discovery] response is incomplete, evasive or objectively unreasonable under the circumstances." *St. Paul Reinsurance Co., Ltd. v. Com. Fin. Corp.*, 198 F.R.D. 508, 515 (N.D. Iowa 2000); *see also* Fed. R. Civ. P. 26(g). Sanctions under Rule 26(g) are designed "to deter abuse and compensate the opposing party for 'all expenses, whenever incurred, that would not have been sustained had the opponent conducted itself properly.'" *Johnson Int'l Co. v. Jackson Nat'l Life Ins. Co.*, 19 F.3d 431, 439 n.10 (8th Cir. 1994) (quoting *In re Stauffer Seeds, Inc.*, 817 F.2d 47, 50 (8th Cir. 1987)).

Because Rule 26(g) "explicitly encourage[es] the imposition of sanctions," the rule acts as "a deterrent to both excessive discovery and evasion by imposing a certification requirement that obliges each attorney to stop and think about the legitimacy of a discovery request, a response thereto, or an objection." Fed. R. Civ. P. 26(g), advisory committee's notes to 1983 amendment. Moreover, "[t]he most obvious situation where sanctions are appropriate [under Rule 26(g)] occurs where a party or its attorney submits a false discovery document." *Books Are Fun, Ltd. v. Rosebrough*, 239 F.R.D. 532, 551 (S.D. Iowa Jan. 19, 2007); *see also Perkins v. Gen. Motors Corp.*, 965 F.2d 597, 600 n.5 (8th Cir. 1992) ("The court shall impose a sanction upon the party and/or her attorney when a false discovery document is signed.").

### 3.    The Court's Inherent Authority

The Eighth Circuit has previously held that "[a] district court is vested with discretion to impose sanctions upon a party under its inherent disciplinary power." *See Bass v. Gen. Motors Corp.*, 150 F.3d 842, 851 (8th Cir. 1998); *Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 280 (8th Cir. 1995); *Dillon v. Nissan Motor Co., Ltd.*, 986 F.2d 263, 267 (8th Cir. 1993). This inherent power is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (internal quotation marks omitted). But "[b]ecause of the potency of inherent powers, '[a] court must exercise its inherent powers with restraint and discretion, and a primary aspect of that discretion is the ability to

9

fashion an appropriate sanction.' " *Plaintiffs' Baycol Steering Comm. v. Bayer Corp.*, 419 F.3d 794, 802 (8th Cir. 2005) (quoting *Harlan v. Lewis*, 982 F.2d 1255, 1262 (8th Cir. 1993)).

The court's inherent power "include[s] the ability to dismiss actions, assess attorney's fees, and to impose monetary or other sanctions appropriate 'for conduct which abuses the judicial process.' " *Harlan*, 982 F.2d at 1259 (quoting *Chambers*, 501 U.S. at 44-45); *see also Keefer v. Provident Life & Acc. Ins. Co.*, 238 F.3d 937, 941 (8th Cir. 2000) ("When a litigant's conduct abuses the judicial process, the remedy of dismissal is within the inherent powers of the court."). But before a court may dismiss a case as a sanction under its inherent powers, "it must find that there is clear and convincing evidence of bad faith conduct." *Ascentium Cap. LLC v. Littell*, 2021 WL 6095550, at *2 (W.D. Mo. Dec. 22, 2021); *see also Martin v. DaimlerChrysler Corp.*, 251 F.3d 691, 694-95 (8th Cir. 2001) (upholding dismissal of plaintiff's claims after finding that the district court determined by clear and convincing evidence that the plaintiff acted in bad faith).

### B.   Background

On February 6, 2023, Buergofol emailed Omega a 172-page set of documents (BF2668-BF2839) responsive to "Omega's request for production of documents and things (Set One) (Nos. 1-14)." Docket 867-30 at 2; *see also* Docket 867-31. Included within Buergofol's response was a two-page invoice for Order No. 11801841 dated May 29, 2018 (BF2791-92), Docket 67-2, and a one-page document showing a cross-sectional film image labeled as item 3 on

Order No. 11801841, Docket 67-1; Docket 867-29. This cross-sectional image, identified as BF2793, includes a cross-sectional image and a header asserting that the "Mikrotomschnitt"[3] came from Order No. 11801841/3 on May 9, 2018, for a 30-inch inner film sold to Omega. Docket 867-29. The header also lists the cross-sectional image's layer structure as "PA/HV/PA/HV/PE/PE/PE." *Id.*

On February 16, 2023, Dr. Abdel-Kader Boutrid[4] filed his first declaration in support of Buergofol's reply brief (Docket 66) to its motion to compel (Docket 42). Docket 67. Buergofol attached BF2793 and the May 29, 2018, invoice as exhibits to Dr. Boutrid's first declaration. *See* Docket 67-1; Docket 67-2. In his first declaration, Dr. Boutrid describes BF2793 as follows:

> As an example of a delivery of a 7-layer inner film supplied to Omega, I found a quality control image of one of the deliveries in the business records of Buergofol. I have knowledge that the image was taken contemporaneously with the production of the 7-layer inner film on May 9, 2018. The quality control image is a high resolution, cross-sectional image of the inner film. Attached hereto as Exhibit A is a true and correct copy of the cross-sectional image of the inner film, which is marked with production number BF2793.

Docket 67 ¶ 7 (emphasis omitted). Dr. Boutrid also states that the header information at the top of BF2793 includes the film's purchase order number ("AuftragNr"), thickness ("Stärke/Breite"), production date ("ProdDatum"), and

---

[3] The term "mikrotomschnitt" refers to the physical cross-sectional slice of film from which the cross-sectional image in BF2793 was made. *See* Docket 949 at 56; Docket 950 ¶ 8.

[4] Dr. Boutrid has been employed by Buergofol since 1998 and served as Buergofol's Head of Research and Development. Docket 635 ¶ 2. In April of 2024, Dr. Boutrid transitioned from an employee to a senior consultant at Buergofol. Docket 732 ¶ 4. Dr. Boutrid is tasked with "product development and quality control," Docket 635 ¶ 2, and "overseeing how blown extrusion films are manufactured by Buergofol," Docket 732 ¶ 4.

11

layer structure ("Aufbau"). *Id.* ¶¶ 8-9. Dr. Boutrid later states in his declaration that BF2793 "is a cross-sectional image of the 7-layer inner film produced by Buergofol in response to Item No. 3 of Omega's Purchase Order No. 11801841, as described in the" May 29, 2018, invoice. *Id.* ¶ 10.

On January 21, 2023, Omega served its second set of requests for production of documents and things (Nos. 15-97) on Buergofol. *See* Docket 74-3. RFPs 23 and 24 sought documents and manufacturing specifications for the structure of film composition Buergofol supplied to Omega. *Id.* at 8. On March 30, 2023, Buergofol moved for a protective order to limit discovery into its film's composition and structure, alleging that the discovery constituted trade secrets. *See* Docket 72. In support of its motion, Buergofol submitted a declaration from Dr. Franz Schleicher, the owner of Buergofol. Docket 73 ¶ 2. In his declaration, Dr. Schleicher stated that

> [f]or the limited purpose of proving Omega's infringement of Buergofol patents . . . [he] authorized the release . . . of a limited amount of confidential information pertaining to the structure and composition of the specific Buergofol UV CIPP films (inner films and outer films) that were sold to Omega during the 2017-2019 time period.

*Id.* ¶ 7. Dr. Schleicher further indicated that he "also authorized the production to Omega's lawyers of a cross-sectional 'Mikrotomschnitt' photograph (bearing production number BF2793) that shows the thickness of various layers of a 7-layer UV CIPP inner film product that Buergofol sold to Omega." *Id.* In reliance on Dr. Schleicher's representations, Buergofol argued in its briefing that additional discovery was not necessary because it had produced "adequate" information "indicating the structure and composition of each and every inner

and outer film Buergofol sold to Omega." Docket 75 at 12.

In response, Omega filed a motion to compel Buergofol's response to RFPs 23 and 24. *See* Docket 92. On September 18, 2023, Magistrate Judge Duffy issued an order granting Omega's motion to compel, specifically stating that "Buergofol shall produce documents responsive to these requests within 30 days." Docket 234; *see also* Docket 238 at 166. Pursuant to Magistrate Judge Duffy's order, on October 18, 2023, Buergofol sent Omega Dr. Boutrid's second declaration with two attached exhibits. Docket 867-32; *see also* Docket 635; Docket 635-1; Docket 635-2. Dr. Boutrid's second declaration, dated October 16, 2023, again included BF2793 as an attached exhibit. Docket 635-2. Dr. Boutrid reiterated that BF2793 is "a cross-sectional image of a 7-layer inner film supplied to Omega with Buergofol order no. 11801841/3 . . . [which] was taken at the time the film was manufactured and supplied to Omega." Docket 635 ¶ 9. Dr. Boutrid stated that he "retained the one-page document BF2793 for future reference." *Id.* Dr. Boutrid further explained that "[t]he 7-layer inner film was made on May 9, 2018, and had a layer structure of PA/HV/PA/HV/PE/PE/PE." *Id.*

On February 21, 2025, Buergofol filed a motion for partial summary judgment on the issue of infringement of the '269 Patent. Docket 621. In support of this motion, Buergofol filed Dr. Boutrid's second and third declarations. Docket 628; Docket 635. Dated February 20, 2025, Dr. Boutrid's third declaration reaffirms that he was the individual who signed the second Boutrid declaration and that he "oversaw Buergofol's manufacture of all film

13

that was supplied to Omega." Docket 628 ¶¶ 2, 5. On March 18, 2025, Omega emailed Buergofol notifying it that BF2793 contained a subdocument and requested the native files for BF2793, including all associated metadata, such as the (1) original word processing file for BF2793; (2) original PDF file for BF2793; (3) cross-sectional digital image; (4) original word processing file for the sub-document; and (5) original image file for the sub-document. Docket 867-33 at 15-17. Omega followed up on March 21, 2025, after failing to receive a response from Buergofol. *Id.* at 15.

The next day, Omega sent Buergofol another email, requesting that Buergofol confirm whether it took cross-sectional images for either Order No. 11801841/2 or Order No. 11801841/4. *Id.* at 14-15. Omega requested that Buergofol produce those images, if such cross-sectional images existed, no later than March 25, 2025. *Id.* at 14-15. That same day, Buergofol emailed Omega stating that it would not answer Omega's questions because they were discovery requests. *Id.* at 13-14. Instead, Buergofol suggested that "[i]f Omega has a question about [BF2793], or about your imagined cross-sectional images of other orders, then Omega needs either to serve an interrogatory, or take a deposition." *Id.* at 14. In response, Omega pointed to previously served RFPs 20 and 81, which Omega asserted "request[s] documents relating to testing of Omega's inner film (and outer film)." *Id.* at 12. Omega then again requested that Buergofol confirm whether any other cross-sectional images of the inner film sold to Omega existed. *Id.* at 12-13.

On March 29, 2025, Omega served three requests for production of

14

documents (RFPs 350-352) requesting the native electronic files for BF2793, including all associated metadata, documents relating to BF2793, and documents relating to the cross-sectional image shown in BF2793. Docket 747-3 at 6-7. Later, on April 8, 2025, Omega also served requests for admission (RFAs 95-98) on Buergofol, seeking information related to the creation of BF2793 and the cross-sectional image. *See* Docket 747-7 at 8. In that set of requests for admission, RFA 95 requested that Buergofol admit that Dr. Boutrid created the entirety of the BF2793 document. *Id.* RFA 96 requested that Buergofol admit that BF2793 existed prior to August 15, 2022. *Id.* Similarly, RFAs 97 and 98 requested that Buergofol admit that the cross-sectional image either did or did not exist prior to August 15, 2022. *Id.* On August 25, 2025, Buergofol objected to RFPs 350-352 and refused to produce documents in response. *See* Docket 747-7 at 4-8.

Following the court's entry of the ESI Discovery Order, Omega emailed Buergofol on April 29, 2025, requesting that Buergofol produce BF2793 in its native format pursuant to Section IV.2 of the ESI Order.[5] Docket 867-33 at 11-12. On May 7, 2025, Buergofol emailed Omega a document, identified as BF15154, which Buergofol asserted was BF2793 "in native format pursuant to the ESI Discovery Order." *Id.* at 11. The following day, Omega emailed Buergofol stating that "the metadata for the Word file (BF15154) demonstrates that this is not the original native file for BF2793, as it reflects that you

---

[5] Section IV.2 of the ESI Order required the parties to produce previously produced documents in native format within 10 days of an opposing party's request. Docket 725 at 8.

[Buergofol's counsel Darien Wallace] modified the Word file on May 7, 2025[,] in some unknown manner." *Id.* at 10. Omega again requested that Buergofol produce the native file for BF2793. *Id.* at 11.

On May 8, 2025, Buergofol served its responses to Omega's RFAs 95-98. *See* Docket 747-8. In its responses, Buergofol objected to RFAs 95 and 96 on the grounds that the requests were "vague and ambiguous," due to "the overbroad definition of 'DOCUMENT.' " *Id.* at 21. After defining the term "document" to include its PDF form, Buergofol denied both RFAs 95 and 96, reasoning that the PDF generated by Buergofol's counsel was created after August 15, 2022. *Id.* at 21-22. Buergofol also objected to RFAs 97 and 98, arguing that the phrase "the cross-sectional image shown in Bates No. BF2793" is "vague and ambiguous" because Buergofol could not determine whether Omega was referring to the cross-sectional image or the Mikrotomschnitt. *Id.* at 22-23. In response to RFA 97, Buergofol admitted that the cross-sectional image in BF2793 did not exist prior to August 15, 2022, because it was the Mikrotomschnitt that existed prior to August 15, 2022. *Id.* at 22.

On May 12, 2025, Buergofol filed Dr. Boutrid's fourth declaration. Docket 732. In his fourth declaration, Dr. Boutrid stated that he

> discovered an inaccuracy in paragraph 9 [of his second declaration]. Whereas the paragraph states, "The cross-sectional digital image was taken at the time the film was manufactured and supplied to Omega. I retained the one-page document BF2793 for future reference," what was retained was not the cross-sectional image but rather a small piece of the film of Buergofol order no. 11801841/3. This small sample of film was retained with the extrusion and recipe

16

> documents for order no. 11801841/3, which were produced as BF8007-BF8008. In 2023, I retrieved the small film sample, had a slide with a cross sectional slice made, and used a microscope to look at the slide. The microscope image of BF2793 was generated, and the image was annotated in the image program to add "Omega Liner 11801841/3" above the cross-sectional image and "1 PA 36 µm . . . gesamt: 141 µm" below the cross-sectional image. Then I typed the text "AuftragNr.: 11801841/3 . . . Mikrotomschnitt:" above the annotated image to generate what appears as the page of BF2793. To the best of my knowledge, I then sent the text and annotated image of BF2793 to a Buergofol attorney, who generated a document and added the BF2793 production number that appears at the bottom right of the page. As of the May 2025 signing of this declaration, the slide/sample still exists and is in the possession of Buergofol.

*Id.* ¶ 21.

On May 19, 2025, the parties held a meet and confer call regarding BF2793. Docket 867-33 at 7-8. Following the meet and confer, Buergofol provided Omega with the native files (Word document and jpeg file) for BF2793. *Id.* at 9. In an email to Buergofol that same day, Omega stated that one of Buergofol's attorneys represented that "Dr. Boutrid (1) printed the cross-sectional image, (2) then scanned the printed cross-sectional image, (3) added annotations to the image using Microsoft Paint, and (4) sent the annotated image to Darien [Wallace]" and that Wallace "then created the Word document for BF2793 by adding Dr. Boutrid's annotated image and adding header text at the top portion." *Id.* at 8. Omega noted that these representations were inconsistent with Dr. Boutrid's fourth declaration because in that declaration, Dr. Boutrid claims that he added the header text while Buergofol's counsel added the BF2793 designation prior to converting it to a PDF. *Id.* Due to this inconsistency, Omega requested that Buergofol confirm whether Wallace or Dr.

Boutrid entered the header text in BF2793. *Id.* In addition to this request, Omega noted that Buergofol's counsel agreed he would check on the following:

(1) Existence of the printed cross-sectional image;

(2) Existence of the native unannotated/unedited cross-sectional image prior to annotations being added;

(3) Existence of the film sample used for BF2793 and whether Buergofol has produced a sample from the film sample; [and]

(4) Existence of the "Mikrotomschnitt" used for BF2793[.]

*Id.* Additionally, because the jpeg file Buergofol previously sent failed to include any metadata, Omega requested that Buergofol send the native file for the sub-document with its associated metadata and the native word processing file used to create the sub-document. *Id.*

In response, Buergofol reiterated that "there is no discrepancy in what [Dr.] Boutrid said in his supplemental declaration and what I [Buergofol's counsel] told you [Omega] in our meet-and-confer." *Id.* at 7. Buergofol also stated that "all the text found in BF2793 comes from [Dr. Boutrid]" as Buergofol's counsel is the one who generated the document in Microsoft word with the image and text provided by Dr. Boutrid. *Id.* Buergofol also indicated that it would follow up on Omega's other requests when it had the information. *Id.* Omega later emailed Buergofol and noted another inconsistency between Dr. Boutrid's fourth declaration and Buergofol's responses to RFAs 97 and 98. *Id.* at 6. Specifically, Omega pointed out that Dr. Boutrid stated that "[i]n 2023, [he] retrieved a small film sample, [and] had a slide with a cross-sectional slice made." *Id.* (quoting Docket 732 ¶ 21). In response to RFA 97, Buergofol admitted that the mikrotomschnitt existed prior to August 15, 2022. *Id.*; *see*

18

*also* Docket 947-8 at 22. Omega reasoned that "[i]f Buergofol's response to RFA 97 is accurate, then Dr. Boutrid's claim in his declaration that he had the cross-sectional slice created in 2023 is plainly incorrect." Docket 867-33 at 6. As such, Omega requested that Buergofol confirm whether Buergofol's response to RFA 97 or Dr. Boutrid's fourth declaration was correct. *Id.*

On May 25, 2025, Buergofol emailed Omega to notify it that it was mailing Omega "documents and things regarding the 7-layer inner film that Buergofol sold to Omega under Order No. (Auftragsnummer) 11801841/3." *Id.* at 5. Included within these documents was a physical sample of 7-layer film 11801841/3, identified as BF15155, a slide with a cross-sectional slice of 7-layer film 11801841/3, identified as BF15156, and a slide made in January 2023 with a cross-sectional slide of 7-layer film 11801841/3, identified as BF15159. *Id.*; *see also* Docket 973-3 at 2-6. Buergofol indicated that the "images and samples should assuage [Omega's] fixation on meta data and ESI regarding BF2793 and conclusively disprove [Omega's] false assertion that all inner film that Buergofol sold to Omega had three layers." Docket 867-33 at 5.

In its June 2, 2025, response, Omega first noted that Buergofol failed to provide it with promised follow-up information, specifically the native file for the sub-document image file with its associated metadata or the native word processing file used to create the sub-document. *Id.* at 3-4. Omega also raised concerns about the newly supplied documentation because Buergofol did "not clarify how BF2793 was created, nor [did it] shed light on the structure/composition of the film Buergofol sold to Omega." *Id.* at 4. More

19

specifically, Omega noted that Buergofol failed to (1) identify how BF15155's film sample was manufactured; (2) explain why BF15155's film sample was not previously produced in response to RFP 10; and (3) explain the "purpose and origin" of BF15156 and BF15159. *Id.*

The parties held another meet-and-confer on June 26, 2025, regarding discovery issues involving BF2793. *Id.* at 2; *see also* Docket 867 ¶ 2. In a follow-up email sent on August 8, 2025, Omega stated that Buergofol's counsel "refused to answer any questions about BF2793 or the film sample used to generate the image for BF2793, including what year the film was made (2018, 2022, or 2023) and who took the sample." Docket 867-33 at 2. Omega further noted that the native file for BF2793 indicates that "it was created by Buergofol's counsel just one day before its production on February 6, 2023." *Id.* at 2, 10 (providing that the Word document identified as BF15154 was created on February 5, 2023). Due to the remaining issues surrounding BF2793, Omega requested that the parties hold another meet-and-confer to discuss "BF2793, the related film sample, the native file for [the jpeg file], . . . Order Nos. 11801841/2 and 11801841/4," and Omega's RFPs 20, 81, and 350-352. *Id.* at 2-3. Buergofol did not respond to Omega's email. Docket 867 ¶ 41.

On January 9, 2026, in support of its opposition brief to Omega's motion to dismiss and to address Omega's arguments surrounding BF2793, Buergofol filed a fifth declaration from Dr. Boutrid, Docket 950, a declaration from Anika Peter, one of Buergofol's laboratory employees, Docket 954 ¶ 2, and a declaration from Buergofol's counsel, Darien Wallace, Docket 951. In her

declaration, Peter indicates that in January of 2023, she "received a physical sample of film from Dr. Boutrid" and made "a Mikrotomschnitt slice of the film and put the slice on a glass microscope slide." Docket 954 ¶ 4. Peter further states that she used "Zeiss microscope software to mark, with green vertical bars, the various layers of the film" and later "took a screenshot of the resulting image and inserted that screenshot into a blank single-page Word .doc file." *Id.* Peter states that she "added the text 'Omega Liner 11801841/3' above the screenshot, . . . [the] layer information and dimensions below the screenshot, . . . [and] the text '31.01.2023 AP' " at the bottom of the page. *Id.* Peter explained that "AP" stands for Anika Peter, which is her "standard practice" and "indicates that [she is] the person who made the screenshot and reported the layers and dimensions." *Id.* Peter stated that after creating the single-page Word document, she sent the attached file to Dr. Boutrid by email on January 31, 2023. *Id.* ¶ 5; *see also* Docket 950-2; Docket 973-2.

In his fifth declaration, Dr. Boutrid states that the "image of BF2793, to the best of my knowledge, came about as follows":

> Along with the production documents for some of the CIPP film that Buergofol made and supplied to Omega Liner Company, Inc. ("Omega"), there were quality control documents and a piece of film. These documents and the film were retained by Buergofol in a transparent plastic sheet protector. The transparent plastic sheet protector is of the type that is typically placed in a ring binder.

Docket 950 ¶ 5. Dr. Boutrid explains that within the sheet protector for Order No. 11801841/3 was a film sample, an extrusion sheet, a "rezaptur" sheet, and a profile report. *Id.* ¶¶ 6-7. Dr. Boutrid states that "he retrieved the sheet protector for order 11808841/3 [sic] from the binder before the binders for

production runs in 2018 were discarded in about 2020." *Id.* ¶ 7. Dr. Boutrid

further asserts that the three production documents and the film sample "are

all contemporaneous 2018 business records that Buergofol kept in the ordinary

course of business." *Id.*

> Dr. Boutrid explains that in January of 2023, he
>
> obtained the piece of inner film from the sheet protector, and gave either the entire film or a piece of the film to Ms. Anika Peter, who works for me in Buergofol's laboratory. I asked Ms. Peter to make a Mikrotomschnitt slice of the film and to make a microscope image of the slice. Ms. Peter did as I asked. Ms. Peter sent me an email dated 1/31/2023 10:08 AM titled "Omega Liner 11801841/3 Mikrotomschnitt." Attached to the email was a single-page Microsoft Word .doc file, named "Omega Liner 11801841_3.doc."

*Id.* ¶ 9. After receiving Peter's email, on January 31, 2023, Dr. Boutrid sent

Buergofol's counsel, Darien Wallce an email "about a number of issues." *Id.*

¶ 11; *see also* Docket 950-3; Docket 973-1. Dr. Boutrid further indicates that

> I titled my email "attorney-client privileged communication: samples." I made a screenshot of the top portion of Ms. Peter's Word .doc file (I omitted the "31.01.2023 AP" at the bottom of the page), and I inserted that screenshot into my email. I then added, in text, some information above the screenshot. I also added some information below the screenshot.

*Id.* The additional text Dr. Boutrid added above the screenshot included

information such as the Order No. 11801841/3, a production date of

09.05.2018, and a layer structure of "PA Tie PA Tie PE PE PE." Docket 950-3 at

4; Docket 973-1 at 4. Dr. Boutrid further states that "[i]t is and was my

understanding that the work Ms. Peter did for me was for preparation of

Buergofol's litigation case, and was something confidential according to United

States law called 'work product.'" Docket 950 ¶ 10.

Dr. Boutrid further states that on February 11, 2023, he received an email from Darien Wallace entitled "declaration to explain Mikrotomschnitt image of 7-layer inner film." *Id.* ¶ 12; *see also* Docket 950-4 at 2. Attached to the email was a draft of Dr. Boutrid's first declaration with BF2793 attached as Exhibit A. Docket 950 ¶ 12; *see also* Docket 950-4 at 8. In his email to Dr. Boutrid, Wallace requested that Dr. Boutrid "[p]lease confirm that the Mikrotomschnitt image was taken on the date of production (May 9, 2018) as opposed to now from an old sample of the inner film made on May 9, 2018." Docket 950-4 at 2. Dr. Boutrid signed the declaration and sent it back to Wallace without making any changes or answering Wallace's request for confirmation. Docket 950 ¶ 13; *see also* Docket 951 ¶ 13.

In his newest declaration, Dr. Boutrid also addresses the "incorrect statement[s]" made in his previous declarations. Docket 950 ¶¶ 14-17. Dr. Boutrid asserts he signed his first declaration not "realiz[ing] that there was anything wrong with the declaration." *Id.* ¶ 13. Dr. Boutrid indicated that up until 2025, he "did not know that [his] earlier declaration contained any incorrect statement about when and how the image of BF2793 was made." *Id.* ¶ 14. Dr. Boutrid further states that "had [he] known that there was anything incorrect in the declaration, [he] would not have signed it," but because he "was in Morocco on vacation at the time and [was] quite ill," he "did not have access to good communication or to a printer and scanner where I was staying in Morocco. I did my best." *Id.* ¶ 13.

Dr. Boutrid further explains that the statement in his first declaration

"that the image of Exhibit A was taken contemporaneously with the production of the film . . . is not correct." *Id.* ¶ 14. Instead, "[i]t is the film sample shown in Exhibit 1 and produced to Omega as BF15155, from which the cross-sectional slice and image were made, that was taken contemporaneously with the production of the film on May 9, 2018." *Id.* Dr. Boutrid also notes that his second declaration contains "the incorrect statement that the BF2793 image was taken at the time the film was manufactured, and the incorrect statement 'I retained the one-page document BF2793 for future reference.' " *Id.* ¶ 15. Dr. Boutrid further states that "had [he] known that there was anything incorrect in the [second] declaration, [he] would not have signed it." *Id.* Dr. Boutrid also seeks to clarify that when he stated in his fourth declaration that "[i]n 2023, I retrieved the small film sample, had a slide with a cross-sectional slice made, used a microscope to look at the slide," and added text around the cross-sectional image, Docket 732 ¶ 21, it was actually Peter who used a Zeiss microscope to annotate the image with green distance bars and added the text above and below the cross-sectional image, Docket 950 ¶ 17.

In his declaration, Wallace also asserts that "until approximately May of 2025, I did not know that there was any error in any declaration of Dr. Boutrid pertaining to the document of BF2793" and that until that time, Wallace "believed and understood that the cross-sectional Mikrotomschnitt image appearing in the document BF2793 was made in 2018 contemporaneously with Buergofol's manufacture of the film (Order No. 11801841/3)." Docket 951 ¶¶ 3-4. Wallace explains the creation of BF2793 as follows:

> In communication with Dr. Boutrid, I learned that Dr. Boutrid was in possession of a piece of Buergofol inner film of an order that had been shipped to Omega. I also learned of the existence of a cross-sectional image report of that film. My conversation with Dr. Boutrid was oral, in German, and over the telephone. I understood Dr. Boutrid to say something to the effect that he found it in Buergofol's records. I received a[n] email dated 1/31/2023 6:09 AM from Dr. Boutrid titled "attorney-client privileged communication; samples."
>
> . . . Upon receiving the attorney-client privileged email, I understood the image seen in the email portion to be a cross-sectional Mikrotomschnitt image of the inner film of Order No. 11801841/3 that had been made in 2018 contemporaneously with Buergofol's manufacture of the film. I understood the image in the email to be quality control information that Buergofol had retained in electronic format, about the film of Order No. 11801841/3, as a Buergofol business record. I believed that in addition to this electronic version of the information, there existed a paper print out of the information, although I was in California and had not seen the paper print out.

*Id.* ¶ 6.

Upon receiving Dr. Boutrid's email containing the cross-sectional image, Wallace then

> prepared a single-page document for production by opening a Word .doc file and inserting into that Word file the screenshot and the surrounding text from the email I had received from Dr. Boutrid. The text beginning "Omega Liner 11801841/3" was part of the screenshot, whereas the surrounding text beginning "AuftragNr.: 11801841/3" could be copied as individual characters. I inserted into the Word .doc file the information from Dr. Boutrid's email that I believed to be a contemporaneously made image and analysis report, which I understood to be Buergofol business record information made in 2018. I then converted the Word .doc file into a PDF file for production, with the PDF sheet having a Buergofol production number of "BF2793" at the bottom right.

*Id.* ¶ 7.

Wallace also states that Dr. Boutrid was the one who typed the text beginning with "AuftragNr: 11801841/3," and that Wallace only "cut and pasted into the Word document the text appearing above the screenshot

25

image." *Id.* ¶ 8. After converting the Word document into a PDF, Wallace prepared a draft declaration for Dr. Boutrid's signature and attached BF2793 as Exhibit A. *Id.* ¶ 11. Wallace sent Dr. Boutrid the draft declaration on February 11, 2023. *Id.* ¶ 12; *see also* Docket 950-4 at 2-11. After receiving the signed declaration from Dr. Boutrid, Wallace then filed the declaration on February 16, 2023. Docket 951 ¶ 13; *see also* Docket 67. Wallace states that upon receiving Dr. Boutrid's signed declaration, he took this "signature as [Dr Boutrid's] confirmation that the image of Exhibit A (BF2793) was taken in 2018 on the date of film production." Docket 951 ¶ 13.

## C.    Analysis

Omega asserts that "Buergofol intended to deceive the [c]ourt into believing that BF2793 . . . was a contemporaneous 2018 business record proving that the film sold to Omega met the layer sequence required by the '269 Patent." Docket 865 at 84. Omega also notes that while Buergofol had multiple opportunities throughout this litigation to correct the record, Buergofol failed to properly inform the court that BF2793 "was not an authentic business record." *Id.* at 84-86. Omega contends that Buergofol's fraud upon the court warrants dismissal of its claims. *Id.* at 86-87.

Buergofol argues that BF2793 is not a fabricated document and instead accuses Omega of lying to the court.[6] Docket 949 at 55-56. Buergofol asserts

---

[6] Buergofol asserts that Omega made an "affirmative misrepresentation" to the court by stating that Buergofol only sold three-layer film to Omega. *See* Docket 949 at 55-57. But because this issue is not relevant to the question of whether Buergofol has submitted a fraudulent exhibit, the court will not address

26

that "[i]t is a verifiable fact, which Buergofol can corroborate with testimony and production documents, that the film seen in the image of BF2793 is Buergofol's inner film of Order No. [11801841/3], and that this [11801841/3] film was supplied to Omega." *Id.* at 56. Buergofol further asserts that "[i]t is not important, nor is it material to any legal issue in this case, whether the cross-sectional image of BF2793 happens to have been made back on May 9, 2018[,] contemporaneously with the manufacture of the film, or whether the image of BF2793 was made in 2023." *Id.* at 56-57 (emphasis omitted).

In reply, Omega argues that Buergofol's actions regarding BF2793 are legally significant because Buergofol committed litigation misconduct. Docket 969 at 49-50. More specifically, Omega alleges that

> (1) Buergofol fabricated and produced the BF2793 document to appear to be a business record, (2) repeatedly referred to it as a business record, (3) repeatedly swore to the [c]ourt that it was made "contemporaneously" with the manufacture of the film in 2018, and (4) exploited the document in this litigation . . . to maintain that BF2793 . . . is credible evidence regarding the structure and composition of its film and that Omega had infringed the '269 Patent.

*Id.* In support of these allegations, Omega points to the Supreme Court's decision in *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944), *overruled on other grounds by Standard Oil Co. v. United States*, 439 U.S. 17 (1976), and the Eighth Circuit's decision in *Pope v. Fed. Exp. Corp.*, 974 F.2d 982 (8th Cir. 1992). *Id.* at 50-51.

In *Hazel-Atlas Glass Co.*, the Supreme Court held that a party's reliance

Buergofol's arguments regarding Omega's representations as to the number of film layers.

27

on fabricated evidence justified the denial of all relief to that party. There, in support of its patent application, a patent attorney submitted an article purportedly signed by a disinterested expert before the United States Patent and Trademark Office (PTO). 322 U.S. at 240. The article, however, was written by the patent attorney and the patent attorney had paid a third party to provide an affidavit falsely stating that he had written the article. *Id.* After the patent was issued, the patentee pursued an infringement case based on the patent. *Id.* at 241. The Third Circuit, in reliance upon the article, held that the patent was infringed. *Id.* Upon discovering the fraud committed before the PTO and Third Circuit, the Supreme Court reversed and directed the Third Circuit to set aside the judgment. *Id.* at 250-51. In reversing the Third Circuit's decision, the Supreme Court reasoned that "[t]he total effect of all this fraud, practiced both on the Patent Office and the courts, calls for nothing less than a complete denial of relief to [the patentee] for the claimed infringement of the patent thereby procured and enforced." *Id.* at 250.

In *Pope*, the Eighth Circuit affirmed a district court's dismissal of a plaintiff's Title VII claim with prejudice. 974 F.2d at 986. There, during discovery, the plaintiff submitted a document allegedly written by her supervisor as evidence supporting her claim of sexual harassment. *Id.* at 983. The document was a "computer generated report to which an allegedly handwritten note with sexual overtones had been added." *Id.* The plaintiff also falsely testified at her deposition regarding the origin of the document. *Id.* Upon discovering that the note was not handwritten by the supervisor and that the

28

plaintiff lied during her deposition, the district court imposed Rule 11 sanctions against the plaintiff and the plaintiff's attorney and dismissed the plaintiff's claim with prejudice under Rule 41(b). *Id.* at 283-84. In affirming the district court's dismissal, the Eighth Circuit reasoned that "manufactured evidence and perjured testimony had been introduced in an attempt to enhance the case through fraudulent conduct." *Id.* at 984. The Eighth Circuit noted that "[w]hen a litigant's conduct abuses the judicial process," the Supreme Court has recognized that dismissal is "a remedy within the inherent power of the court." *Id.*

Here, the court agrees with Omega that Buergofol's submission of BF2793 and Dr. Boutrid's declarations warrants sanctions under Rule 11 and Rule 26(g).[7] Both Rule 11 and Rule 26(g) impose upon a party and its counsel the duty to make a reasonable inquiry that the pleading, motion, or discovery response is well-grounded in fact. *See* Fed. R. Civ. P. 11(c); Fed. R. Civ. P. 26(g)(1). Thus, in determining whether sanctions are appropriate under both Rule 11 and Rule 26(g), the court must consider whether Buergofol and its counsel's conduct was objectively reasonable. *Clark*, 460 F.3d at 1010 (affirming district court's finding that attorney violated "objective unreasonableness standard of Rule 11"); *St. Paul Reinsurance Co., Ltd.*, 198

---

[7] While Omega only moves for sanctions under Rule 11 regarding BF2793 and Dr. Boutrid's declarations, *see* Docket 864, the court finds that sanctions under Rule 26(g) are also warranted given that Buergofol first provided BF2793 as a responsive document to Omega's request for production, *see* Docket 867-30; Docket 867-31. Thus, the court, sua sponte, determines that sanctions may be warranted under Rule 26(g). *See* Fed. R. Civ. P. 26(g)(3) (applying to "every discovery request, response, or objection").

F.R.D. at 515 ("[Rule 26(g)] allows the court to impose sanctions on the signer of a discovery response when the signing of the response is incomplete, evasive or objectively unreasonable under the circumstances."). But as described below, the court finds that Buergofol's and its counsel's conduct fell woefully below the standard of objective reasonableness.

First, Buergofol made multiple false representations as to BF2793 that were repeatedly reaffirmed in Dr. Boutrid's declarations. For example, Buergofol and Dr. Boutrid repeatedly represented that the cross-sectional image in BF2693 was taken "contemporaneously" with the production the of 7-layer film on May 9, 2018. *See* Docket 67 ¶ 7; Docket 635 ¶ 9 (Dr. Boutrid stating that at the time film for Order No. 11801841 was produced, he "retained the one-page document BF2793 for future reference"). It was not until Dr. Boutrid's fourth declaration in May of 2025 that Buergofol admitted that BF2793 was not created in 2018, but rather, was generated in 2023. *See* Docket 732 ¶ 21; *see also* Docket 747-8 at 22 (Buergofol admitting that the cross-sectional image in BF2793 did not exist prior to August 15, 2022).

Second, Buergofol also falsely held out BF2793 as a Buergofol business record. BF2793 was first produced in response to Omega's document request and placed after the invoice for Order No. 11801841, giving the appearance that BF2793 was a contemporaneous business record tied to the invoice. *See* Docket 867-31 at 125-27. In his first declaration, Dr. Boutrid states that he "found a quality control image of one of the deliveries [to Omega] in the business records of Buergofol." Docket 67 ¶ 7. Dr. Boutrid reiterated that the

30

entirety of BF2793 was a business record in his second declaration by indicating that he "retained the one-page document BF2793 for future reference." *See* Docket 635 ¶ 9. Even after it was revealed that BF2793 was not in existence as a one-page document in 2018, Buergofol attempted to demonstrate the trustworthiness of BF2793 in Dr. Boutrid's fourth declaration, where he states that the film sample used to create the cross-sectional image in BF2793 was kept with the extrusion and recipe documents for order no. 11801841/3. Docket 732 ¶ 20. In his fifth declaration, Dr. Boutrid also states that the "film sample is a business record that Buergofol kept in the ordinary course of business." Docket 950 ¶ 23. But in that same declaration, Dr. Boutrid also states that the creation of the cross-sectional image done by Peter "was for preparation of Buergofol's litigation case" as work product. *Id.* ¶ 10.

Buergofol defends BF2793 by arguing that it is merely an exhibit containing an accurate cross-sectional image of film that Buergofol supplied to Omega in 2018. *See* Docket 949 at 55-70 (describing BF2793 as "an exhibit to a declaration," and referring to it as a "single-page exhibit"). Buergofol concludes that it matters little if the entirety of BF2793 is considered a business record because "it remains true" that the cross-sectional image of the mikrotomschnitt contained in BF2793 was taken from film supplied to Omega in 2018. *Id.* at 68. But Buergofol's attempt to downplay the falsities in Dr. Boutrid's declarations ignores the fact that it has relied upon those representations that BF2793 was a business record throughout this case as key evidence supporting its claims of infringement.

31

For example, soon after Buergofol first disclosed BF2793 to Omega, Buergofol argued that Dr. Boutrid's first declaration and BF2793 were sufficient to demonstrate the composition and structure of all film it sold to Omega. *See, e.g.,* Docket 75 at 12 (Buergofol arguing that BF2793 was "adequate" discovery "indicating the structure and composition of each and every inner and outer film Buergofol sold to Omega"); Docket 73 ¶ 7; Docket 351 at 10 (arguing that Dr. Boutrid's first declaration is "sufficient to show the structure and composition of each component part of each product"). At that time, Buergofol refused to disclose other discovery in its possession demonstrating the structure and composition of film it sold to Omega. *See, e.g.,* Docket 72 (Buergofol moving for a protective order to avoid responding to RFPs 23 and 24). Buergofol thus used BF2793 to try and limit discovery into the structure and composition of the film it sold to Omega, arguing that Omega had everything it needed because it was in possession of Dr. Boutrid's first declaration and BF2793. *See* Docket 238 at 125-26, 146 (Buergofol arguing that after Omega received Dr. Boutrid's first declaration and BF2793, it had "all the evidence that Omega needs" on the issues of invalidity and infringement).

Additionally, Buergofol relied upon Dr. Boutrid's first three declarations and BF2793 to demonstrate that the structure and composition of film it sold to Omega infringed the '269 Patent. *See* Docket 636 at 17-20; *see also* Docket 628 ¶ 2 (using BF2793 to support Buergofol's motion for partial summary judgment on the issue of infringement of the '269 Patent). Again, at that time,

32

Buergofol was refusing to disclose responsive discovery to Omega's discovery requests that sought other information regarding the structure and composition of film Buergofol sold to Omega. *See* Docket 616 at 6-7 (denying Buergofol's objections to Magistrate Judge Duffy's sanctions order); Docket 743 at 12 (requiring Buergofol to fully respond to RFPs 23 and 24). By holding out BF2793 as a trustworthy business record for roughly two years,[8] Buergofol was able to wield Dr. Boutrid's first three declarations and BF2793 as the key evidence supporting its infringement claims while, at the same time, denying Omega relevant discovery to challenge Buergofol's claims. Thus, Buergofol's claims that BF2793 is a mere exhibit or that its misrepresentations are legally irrelevant minimizes the large role this document—held out to be a business record—and Dr. Boutrid's first three declarations have played in this case.

Buergofol's arguments that the film sample used to create the cross-sectional image in BF2793 is a business record kept in the ordinary course of business also fail. *See* Docket 949 at 60. Buergofol explains that after keeping film samples for a year, in "rare situations," some smaller pieces of the film samples are then placed in the clear sheet protectors containing other production documents. *Id.* at 60-61. Buergofol asserts that because the film sample was kept in the ordinary course of business with the extrusion sheet (BF8007), recipe sheet (BF8008), and profile report (BF15162) in the clear

---

[8] The court notes that while Buergofol is now claiming that it was the film sample, and not the entirety of BF2793 that is a business record, on May 8, 2025, when Buergofol was aware of the issues surrounding BF2793, Buergofol still claimed that the entirety of BF2793 was a business record. *See* Docket 747-8 at 21-23.

sheet protector, the film sample itself is an authentic business record. *See id.* at 62-69 (arguing that the three documents demonstrate the authenticity of BF2793). But Buergofol does not provide legal or evidentiary support for its claim that these "rare situations" constitute business activity occurring in the ordinary course of business. *See id.* Instead, Buergofol's evasive behavior surrounding the film sample does not demonstrate to the court that Buergofol's conduct was objectively reasonable. It also does not persuade the court to adopt Buergofol's reasoning that the mere existence of the film sample alongside the three production documents is sufficient to demonstrate the film sample's authenticity. *See id.* at 56-57, 68-69.

For instance, Buergofol does not explain why the film sample used to create the cross-sectional image in BF2793 was not turned over to Omega until May 25, 2025, even though Omega previously served requests for production on Buergofol requesting such film samples. Two months before Dr. Boutrid stated that he retrieved the film sample from the sheet protector, *see* Docket 950 ¶ 7, Omega served Buergofol with RFP 8, which requested each Omega Inner Foil within Buergofol's possession, custody, or control, Docket 74-1 at 6. In response to RFP 8, Buergofol did not produce the film sample from Order No. 11801841/3. Docket 969 at 60. Additionally, on January 31, 2023—the same day that Dr. Boutrid sent Wallace an email containing the cross-sectional image found in BF2793—Omega served its second set of requests for production on Buergofol. Docket 74-3. Included within this second set was Omega's RFP 16, which requested "[e]ach physical Omega Inner Foil in the

possession, custody, or control of Buergofol." *Id.* at 7; *see also* Docket 950-3 at 5. In response, on March 31, 2023, Buergofol stated that it "had already produced a piece of all responsive nonwork product 'Omega Inner Foils' (two samples, 2021 Sample and 2022 Sample) in Buergofol's possession, and Buergofol will be producing nothing more in response to RFP 16." Docket 93-4 at 4-5.

The court also finds it concerning that Buergofol failed to mention the existence of the film sample in either of Dr. Boutrid's first three declarations. *See* Docket 67; Docket 628; Docket 632. Even at the status conference on August 28, 2025, Buergofol failed to mention that it possessed a film sample within the same production binders in which it kept the extrusion and recipe sheets. *See* Docket 726 at 39. At that hearing, Buergofol's counsel represented to the court that Buergofol "produced everything we have. So it's an extrusion sheet and a recipe sheet." *Id.* Yet roughly a month later, Buergofol produced BF15155, which it held out to be the physical sample of Order No. 11801841/3's 7-layer film. *See* Docket 867-33 at 5; *see also* Docket 973-3 at 2-6. Based on Buergofol's conduct and failure to mention or produce the film sample to Omega until May of 2025, the court finds that Buergofol has failed to show that BF2793 or the film sample are trustworthy business records. *See Kay v. Lamar Advert. of S.D., Inc.*, 2009 WL 2731054, at *2 (D.S.D. Aug. 21, 2009).

Moreover, even if Buergofol satisfactorily showed that the cross-sectional image in BF2793 came from film it produced and supplied to Omega in 2018,

35

this would not excuse the fact that it fabricated BF2793, misrepresented what BF2793 is, and submitted fraudulent statements contained in Dr. Boutrid's declarations. As the Supreme Court explained in *Hazel Atlas Glass Co.*, the patentee should not "be permitted to escape the consequences of [the plaintiff's] deceptive attribution of authorship . . . on the ground that what the article stated was true." *Hazel Atlas Glass Co.*, 322 U.S. at 247. The Supreme Court further rejected the patentee's contentions that the fabricated article was immaterial because it did not influence the court's decision, reasoning that because the patentee and its attorneys "thought the article material . . . they are in no position now to dispute its effectiveness." *Id.* For similar reasons, despite Buergofol's claims that it can show that the cross-sectional image was taken from film produced and provided to Omega in 2018, *see* Docket 949 at 68-73, the court will not allow Buergofol to excuse its conduct by now asserting that the cross-sectional image is accurate.

The court also does not find Wallace's and Dr. Boutrid's explanations for how the mistakes in Dr. Boutrid's first three declarations occurred objectively reasonable.[9] Wallace explains that during a phone conversation with Dr. Boutrid, he first "learned of the existence of a cross-sectional image report of that film" and "understood Dr. Boutrid to say something to the effect that he found it in Buergofol's records." Docket 951 ¶ 6. Based on the emails between

---

[9] "While a determination of credibility is generally a factual matter within the province of a jury; the 'fact-dependent legal standard mandated by Rule 11' is an issue for the district court to determine." *Pope*, 974 F.2d at 984 (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 402 (1990)).

Wallace and Dr. Boutrid, it appears that this phone conversation took place on January 30, 2023. *See* Docket 973-1 at 4 (Dr. Boutrid stating to Wallace that "[w]e also spoke yesterday about the 7-layer film that we produced for Omega"). If the phone conversation between Dr. Boutrid and Wallace took place on January 30, 2023, then this was before Peter created the cross-sectional image found in BF2793. *See* Docket 954 ¶¶ 4-5 (providing that Peter made the cross-sectional image on January 31, 2023). Thus, it is not reasonable to conclude that on the day before it was created, Dr. Boutrid conveyed to Wallace that he was in possession of a cross-sectional image report of the 7-layer film.

Wallace also insinuates that he misunderstood Dr. Boutrid because his communications with Dr. Boutrid were in German. Docket 951 ¶ 6; *see also* Docket 949 at 58 (arguing that "counsel's misunderstanding was due to less-than-perfect, long-distance, German-language communication between Dr. Boutrid" and Wallace). But Dr. Schleicher previously represented, in January of 2023, that "Mr. Wallace has lived and worked in Germany, speaks excellent German so that I [Dr. Schleicher] can discuss patent and legal issues with him in German." Docket 50 ¶ 8. This court recognized that "Buergofol's owner relies on Darien Wallace's guidance given [his] language abilities, his comparative patent law expertise, and his understanding of Buergofol's technology." Docket 130 at 11. As such, it is not objectively reasonable to conclude that there was a miscommunication between Dr. Boutrid and Wallace based on Wallace's inability to understand Dr. Boutrid's German.

Further, the steps Dr. Boutrid and Wallace took to create BF2793

indicate that they created a document both knew was not a Buergofol business record. For instance, if BF2793 was a one-page document created in 2018 retained "for future reference" as represented in Dr. Boutrid's first three declarations, *see* Docket 67 ¶ 7; Docket 635 ¶ 9; Docket 628, then Wallace would not have had to "prepare[] a single-page document for production by opening a Word .doc file and inserting into that Word file the screenshot and surrounding text from" Dr. Boutrid's email, *see* Docket 951 ¶ 7. Instead, Wallace simply would have provided a single-page document that was already in existence.

Further, even if the court were to accept as true that Wallace believed the cross-sectional screenshot Dr. Boutrid sent was a contemporaneous business record made in 2018, *see* Docket 949 at 68, 70, Wallace knew that the text he cut and pasted from Dr. Boutrid's email and the text that he himself added to the Word file were not created in 2018. Because Wallace was aware he was adding and changing text on the document that eventually became BF2793, it is not objectively reasonable for him to draft Dr. Boutrid's first and second declarations to reflect that the entirety of BF2793 was in existence in 2018. Thus, the court agrees with Omega that Wallace cannot credibly claim that the entirety of BF2793 was a Buergofol business record made in May of 2018 contemporaneously with the production of film for Order No. 11801841. *See* Docket 969 at 30-31.

Wallace also points to his email to Dr. Boutrid, in which he requests that Dr. Boutrid confirm that the cross-sectional image in BF2793 was taken on the

38

same day as the film for Order. No. 11801841 was produced before Dr. Boutrid's first declaration was signed. Docket 951 ¶ 12; *see also* Docket 950-4 at 2. Dr. Boutrid acknowledges that he received Wallace's request, but he does not indicate that he ever responded, Docket 950 ¶ 13, and Wallace states that he treated Dr. Boutrid's signature of the first declaration as confirmation of his request, Docket 951 ¶ 13. This is alarming, however, because Dr. Boutrid previously represented in his fourth declaration that although his "understanding of spoken English is not good . . . I believe I am, however, able to fully understand the content of this simple written declaration, due to the time I have had to study it, and assistance I have had in translating parts of it I did not at first fully understand." Docket 732 ¶ 5. Wallace admits in his declaration that at that time, he was aware that Dr. Boutrid was ill and did not have great access to communication resources because he was in Morocco. Docket 951 ¶ 12. Provided Dr. Boutrid's self-declared limitations in understanding written English and without access to communication resources so that someone, such as Buergofol's counsel, could explain to him what the confirmation email and the declaration said in German, the court is not convinced by Wallace's or Dr. Boutrid's explanation that their actions in creating BF2793 and the first three Dr. Boutrid declarations was objectively reasonable. And again, even if Dr. Boutrid's signature can be treated as confirmation from him that the cross-sectional image was generated in May of 2018, this does not excuse Wallace's actions in creating BF2793 and later holding that document out as a Buergofol business record.

39

Other inconsistencies with how BF2793 was created and why it took so long for Buergofol to correct the record remain. Buergofol had multiple opportunities to explain to Omega the origins of BF2793's creation, but rather than correct the record, Buergofol engaged in a pattern of evasive and deceptive conduct. For example, when notified in March of 2025 by Omega's counsel that BF2793 contained a subdocument, Buergofol ignored Omega's requests for BF2793's metadata. *See* Docket 867-33 at 15-18. Additionally, rather than provide the metadata and related documents for BF2793 in response to Omega's RFPs 350-352, Buergofol objected and refused to produce anything. *See* Docket 747-4. Buergofol later produced BF15154, which Buergofol represented was BF2793 in native format. Docket 867-33 at 11-12. But after Omega reviewed BF15154, it became clear that it was not the native file for BF2793 because Buergofol's counsel had modified the file the day before producing the document. *Id.* at 10-11. Similarly, after Omega served RFAs 95-98 on Buergofol, seeking information as to when and who created BF2793 and the cross-sectional image it contained, Buergofol's responses were evasive and provided conflicting information that later proved to be false. *Compare* Docket 747-8 at 22-23 (Buergofol's responses to RFAs 97-98 stating that the mikrotomschnitt existed prior to August 15, 2022), *with* Docket 732 ¶ 21 (Dr. Boutrid stating that the mikrotomschnitt was created in January of 2023). Even Dr. Boutrid's fourth declaration, which Buergofol holds out as correcting the record on BF2793's creation, *see* Docket 949 at 58-59, contains inconsistent and unexplained statements about when and who created

40

BF2793. Additionally, Dr. Boutrid's only explanation for why he signed his second declaration was that he signed it "without recognizing the error." *See* Docket 950 ¶ 15. This pattern of behavior leads the court to conclude that Buergofol, rather than take the necessary steps to correct the record when it first became aware of issues regarding BF2793, engaged in evasive behavior to hide the false statements in Dr. Boutrid's first three declarations and the fraudulent nature of BF2793.

Buergofol has also failed to completely correct the record on how BF2793 was created. Throughout four of Dr. Boutrid's declarations, he held himself out as the creator of the cross-sectional image and the text found in BF2793. Dr. Boutrid's fourth declaration, which was meant to correct the "inaccuracy" found in his previous three declarations, conveyed that he generated and annotated the cross-sectional image found in BF2793. *See* Docket 732 ¶ 21. But both Dr. Boutrid's fifth declaration and Peter's declaration confirm that it was Peter, and not Dr. Boutrid, who generated and annotated the cross-sectional image found in BF2793. *See* Docket 950 ¶ 9; Docket 954 ¶ 4. Neither Buergofol nor Dr. Boutrid explain why Peter's involvement in the creation of BF2793 was previously excluded from his prior declarations.

Additionally, Dr. Boutrid's fifth declaration and Darien Wallace's declaration, as it relates to BF2793, also fail to explain another inconsistency in how the text found in BF2793 was created. In Dr. Boutrid's fifth declaration, Dr. Boutrid states that he typed the text that appears above the cross-sectional image on BF2793. Docket 950 ¶ 11. Included within that text was the line

41

"Aufbau: PA Tie PA Tie PE PE PE." Wallace attests that upon receiving Dr. Boutrid's email of BF2793, he simply "cut and pasted into the Word document the text appearing above the screenshot image." Docket 951 ¶ 8; *see* Docket 950-3 at 4. But in the version of BF2793 Wallace sent to Dr. Boutrid as an attachment to Dr. Boutrid's first declaration, that line was changed to "Aufbau: PA/HV/PA/HV/PE/PE/PE." Docket 950-4 at 8. Neither Wallace nor Dr. Boutrid explain how this text was changed in the final version of BF2793.

Buergofol and its counsel, Darien Wallace, knew or their reasonable inquiry into the factual matters should have revealed that Dr. Boutrid's declarations contained false statements and that BF2793 was not a business record made in 2018. As such, the court finds that the false statements made and reaffirmed in Dr. Boutrid's first four declarations constitute violations of Rule 11. Similarly, the court finds that because BF2793 is a fabricated document and was falsely held out as a business record, both Buergofol and its counsel, Darien Wallace, have violated Rule 11 and Rule 26(g). As such, the court finds that sanctions are warranted under Rules 11 and 26(g).

## II.    Whether Buergofol's Alleged Violations of the Court's Orders Warrants Dismissal

Omega cites several court orders it argues Buergofol has violated. *See* Docket 865 at 16-65. These orders include the court's ESI Discovery Order (Docket 725), a court order requiring Buergofol to produce Anton Hoffmann for deposition (Docket 799), seven orders compelling Buergofol to produce prior art (Dockets 164, 181, 234, 303, 360, 464, and 748), and five orders compelling Buergofol to produce documents and information related to the structure and

42

composition of film Buergofol sold Omega (Dockets 180, 234, 402, 616, and 778). *Id.* The court provides a detailed background, the parties' arguments, and analyses of whether Buergofol has willfully violated each of the court's orders below.

### A.   Legal Standards

#### 1.   Rule 37(b)(2)(A)

Federal Rule of Civil Procedure 37(b)(2)(A) permits the court to sanction a party for failure "to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a)." Fed. R. Civ. P. 37(b)(2)(A). Included within the list of possible sanctions is dismissal of the action in whole or in part. Fed. R. Civ. P. 37(b)(2)(A)(v). "To justify a sanction of dismissal, Rule 37 requires: '(1) an order compelling discovery, (2) a willful violation of that order, and (3) prejudice to the other party.' " *Sentis Grp., Inc. v. Shell Oil Co.*, 559 F.3d 888, 899 (8th Cir. 2009) (quoting *Schoffstall v. Henderson*, 223 F.3d 818, 823 (8th Cir. 2000)). While "a district court [has] wide discretion to impose sanctions for a party's failure to comply with discovery requests," *United States v. Big D. Enters., Inc.*, 184 F.3d 924, 936 (8th Cir. 1999), the court's "discretion is bounded by the requirement of Rule 37(b)(2) that the sanction be 'just' and relate to the claim at issue in the order to provide discovery," *Avionic Co. v. Gen. Dynamics Corp.*, 957 F.2d 555, 558 (8th Cir. 1992). Before dismissing a case, "fairness requires a court to consider whether a lesser sanction is available or appropriate," *Keefer*, 238 F.3d at 941, unless "the party's failure

was deliberate or in bad faith," *Comstock v. UPS Ground Freight, Inc.*, 775 F.3d 990, 992 (8th Cir. 2014) (citation omitted).

### 2.   Rule 41(b)

Federal Rule of Civil Procedure 41(b) permits courts to dismiss an action if the plaintiff fails "to comply with these rules or a court order." Fed. R. Civ. P. 41(b). The Eighth Circuit has recognized that ordering dismissal under Rule 41(b) "is an extreme sanction that should be used only in cases of willful disobedience of a court order or where a litigant exhibits a pattern of intentional delay." *Hunt v. City of Minneapolis*, 203 F.3d 524, 527 (8th Cir. 2000). A district court need not find that the plaintiff acted in bad faith, but rather, "only that [the plaintiff] acted intentionally as opposed to accidentally or involuntarily." *Id.* (internal quotation marks omitted).

### B.   Buergofol's Refusal to Use an E-Discovery Platform to Search Emails Under Sections II, III.1, and III.3 of the ESI Order

### 1.   Background

During a status conference held on April 28, 2025, this court noted that it has "entered multiple orders in this case where [the court] found that Buergofol was evasive, nonresponsive to discovery requests, [and] has engaged in foot-dragging." Docket 726 at 43. The court found that because "[t]his is just another instance where Omega has tried to discover evidence through ESI, and Buergofol has been unable or unwilling to comprise, to discuss, to talk, to figure out a plan that would work for both parties," the court would adopt Omega's proposed ESI plan. *Id.*; *see also* Docket 724. That same day, this court entered an ESI Discovery Order. Docket 725. In adopting the ESI order, the

44

court reasoned that

> this case has faced multiple discovery issues and Buergofol has continually blocked Omega from obtaining necessary discovery. As such, the court ordered that Omega's proposed ESI plan be adopted with a few changes: (1) the cost of the ESI expert's search and report generation is capped at $200,000 and (2) Buergofol will bear 75% of the cost and Omega will bear 25% of the cost.

Docket 724 at 1.

Section II of the ESI Discovery Order requires the parties to "collect ESI in a manner that preserves metadata and familial relationships (e.g., emails and attachments) to meet the search and production requirements of Section III." Docket 725 at 4. The Order further provides that "[t]he producing party shall use an e-discovery platform[10] capable of indexing emails and email attachments by extracting and converting non-searchable text (e.g., from scanned PDFs or images) into searchable text."[11] *Id.*

Section III.1 of the ESI Discovery Order, entitled "Custodian Email Accounts," provides that a requesting party may submit up to 20 search queries per custodian "for searching the email accounts of custodians listed in

---

[10] An e-discovery platform "is a specialized legal technology software that helps manage the process of identifying, collecting, preserving, processing, reviewing, and producing electronically stored information (ESI)." Docket 866 ¶ 13. An e-discovery software also "indexes text and metadata so that it can more easily be searched." *Id.* ¶ 14. For example, it includes software capable of converting non-searchable text with image files into searchable text. *Id.* E-discovery platforms also automatically filter out duplicates and allows for Boolean searches or "more complex searches using keywords, dates, senders, authors, and other metadata fields to pinpoint relevant information." *Id.* ¶¶ 15-16.

[11] The term "indexing refers to the process of extracting and converting non-searchable text (such as text from images files, e.g., PDF, JPG) into searchable text." Docket 821 ¶ 11 n.2.

Attachments 1 and 2."[12] *Id.* The order also permits Omega to provide German language equivalents of the 20 search queries without the German language equivalents counting toward the 20 search queries limit. *Id.* The order requires that within 14 days of receiving a search query, the producing party shall "generate and produce a hit report directly from its e-discovery platform in CSV or Excel format." *Id.* Within 30 days of receiving a search query, the producing party must produce all non-privileged emails, including all attachments to the produced emails. *Id.* at 2.

Section III.3 of the ESI Order, entitled "Files," allows a requesting party to provide up to 20 search queries to search (1) the unstructured data repositories in Attachments 1 and 2,[13] and (2) ESI from five custodians identified by the requesting party, including all computers of the five custodians. *Id.* at 6. Within 14 days of receiving the search queries, the producing party must run the "searches and provide a hit report from the e-discovery platform in CSV or Excel format." *Id.* at 7.

On May 2, 2025, Buergofol moved for clarification of the court's ESI

---

[12] Attachments 1 and 2 lists Omega's and Buergofol's structured and unstructured data repositories and each parties' ESI custodians. *See* Docket 725 at 10-12. Attachment 2 includes a list of 19 Buergofol ESI custodians. *Id.* at 11-12.

[13] Attachment 2 lists the following as Buergofol's structured data repositories (databases): (1) Navision/COEX2; (2) DS-Software; (3) FoxPro/COEX1; (4) Synology Network Attached Storage (NAS); and (5) Accounting System. Docket 725 at 11. Attachment 2 also lists the following as Buergofol's unstructured data repositories (emails and file systems): (1) Tobit David Email Server; (2) File Server; (3) Backup Email Server; (4) 700 Emails from Dr. Stark; and (5) Email Account: dr.fs@t-online.de. *Id.*

Discovery Order. *See* Docket 728 at 7-19. On June 9, 2025, the court denied the motion, reasoning that Buergofol's motion for clarification was "merely Buergofol's attempt to relitigate a result it dislikes." Docket 760 at 3.

Following the denial of Buergofol's motion for clarification, Omega emailed Buergofol and requested the parties meet and confer regarding implementation of the court's ESI Order. Docket 867-2 at 5. Omega also submitted four search queries to be applied to Buergofol's 19 ESI custodians. *Id.* at 5-7. The search queries included Boolean search prompts. *See, e.g., id.* at 5 (providing first search query for Dr. Franz Schleicher as "ergo.vac*34*0004 or vac*34*0004*"). Omega also requested that Buergofol inform Omega if it did not plan to search Dr. Franz Schleicher's email accounts, dr.fs@t-online.de and franz.schleicher@buergofol.de. *Id.* at 7.

On June 24, 2025, Buergofol provided hit reports pursuant to Section III.1 of the ESI Order. *Id.* at 5; *see also* Dockets 822-4, 822-5, 822-6, and 822-7 (Buergofol's submitted hit reports). After reviewing Buergofol's submitted hit reports, Omega sent Buergofol a letter "regarding Buergofol's failure to comply with the [c]ourt's ESI Discovery Order . . . and other discovery issues." Docket 867-2 at 4; *see also* Docket 822-8. In the letter, Omega addressed several discovery issues concerning the ESI Order, including Buergofol's (1) refusal to permit TransPerfect[14] direct access to servers and backup systems, (2) failure

[14] The parties jointly selected TransPerfect to be the neutral, ESI expert to perform the tasks set out in Section III.2 and Section III.5 of the ESI Order. *See* Docket 725 at 5-8; Docket 867-19 at 2. The court discusses the parties' arguments concerning TransPerfect below. *See infra* Part II.E.

to use Optical Character Recognition (OCR) and search email attachments, (3) failure to search Dr. Schleicher's email accounts at dr.fs@online.de or dr.fs@t-online.de, (4) failure to search emails after August 15, 2022, (5) failure to run requested search queries, (6) failure to include Bcc recipients in hit reports, (7) failure to recover and search email accounts, and (8) concealment of pre-2014 emails in Buergofol's active email accounts. Docket 822-8 at 2-5. Omega also noted that Buergofol "disregarded the use of wildcards [and Boolean operators] that were part" of Omega's search queries and instead only used one-word variations of the search queries. *Id.* at 4.

During a June 26, 2025, meet and confer between the parties, Omega's counsel asked what e-discovery platform Buergofol was using to generate the hit reports. Docket 867 ¶ 2; Docket 822-8 at 2. Buergofol's counsel indicated that the attachments in Buergofol's active email system were image-based files, such as JPEGs or PDFs, and that the image-based files were not searchable unless OCR[15] was performed on them. Docket 867 ¶ 2. Buergofol's counsel also stated that Buergofol was not performing OCR on the body of emails or files attached to emails. *Id.* When Omega's counsel directed Buergofol's counsel to the ESI Order's requirement that an e-discovery platform be used, Buergofol's counsel allegedly stated that "I am not going to spend tens of thousands of dollars just to find some text in images." *Id.*; *see also* Docket 822-8 at 3. Without receiving a response from Buergofol, Omega emailed Buergofol on July

---

[15] Optical Character Recognition, or OCR, is "software that converts images and scanned documents into searchable text." Docket 865 at 16 n.4.

48

8, 2025, indicating that if Omega did not receive a response from Buergofol by the end of the week, Omega would "assume Buergofol does not intend to respond and does not plan to correct the identified deficiencies." Docket 867-2 at 3-4. A week later, Omega sent its second submission of search queries for Buergofol's custodian email accounts pursuant to Section III.1. Docket 822-12 at 3-7.

On July 8, 2025, Omega notified Buergofol that Buergofol had not provided hit reports for its ESI custodians, Anton Hoffmann and Klaus de Groote. Docket 867-2 at 4. On July 10, 2025, Buergofol provided Omega with a link in response to "Omega's first four search queries under Section III.1," but explained that it would not produce any emails in response to Omega's search queries "Navision" and "COEX" for Hoffmann or de Groote because each query returned more than 5,000 emails. *Id.* at 3. Omega disagreed with "Buergofol's unsupported assertion that a search query yielding more than 5,000 hits is improper or need not be reported" because the ESI Order "contains no such limitation, and imposing one would be both unfounded and illogical." *Id.* at 2. Omega further stated that because Buergofol had already run the search queries for Hoffmann and de Groote, it should provide the resulting hit reports and that once Omega receives the hit reports, it was "fully willing to confer regarding whether any search queries should be refined." *Id.* Omega requested that Buergofol provide the hit reports for Hoffmann and de Groote by July 16, 2025, *id.*, but Buergofol did not produce the hit reports, Docket 867 ¶ 9.

On July 2, 2025, Omega sent Buergofol its first search queries for

49

Buergofol's search of its file system pursuant to Section III.3 of the ESI Order. Docket 786-3. On July 16, 2025, Buergofol sent Omega an email and letter with its responses to Omega's search queries under Section III.3. Docket 867-1 at 4; Docket 786-4. In its letter, Buergofol explained that Omega's search queries were "not technically feasible to perform" because it required Buergofol "to search hundreds of search terms 'across all of Buergofol's unstructured data repositories,' which includes searching through all of the emails on Buergofol's current Tobit email server." Docket 786-4 at 1. Buergofol stated that because its Tobit David email server contains about 3 TB of emails, it was not "technically possible within 14 days to decompress, convert and export 3 TB of emails as .eml files so that the emails can be searched using a separate search platform." *Id.* Despite these logistical hurdles, Buergofol indicated that it "made a valiant attempt" to search "the Tobit client as well as converting Tobit data to .eml files," but it was unsuccessful. *Id.*

Buergofol further explained that because "ingestion" of its Tobit email system into an e-discovery platform was estimated to cost over $100,000, Buergofol wanted to "wait to see how TransPerfect solves the technical problem of converting 3.5 TB of Tobit emails into .eml format." *Id.* at 4. As an example of Tobit system search issues, Buergofol stated that while it conducted a search for the term "Loparex," the single search term ran for over a day.[16] *Id.* at 5.

---

[16] Buergofol did provide Omega with the hit reports for its email searches of the term "Loparex" pursuant to Section III.3 of the ESI Order on August 4, 2025. Docket 822-13 at 2; *see also* Dockets 822-14 and 822-15 (Buergofol's provided hit reports). But Buergofol stated that creating the hit reports for "Loparex" took "more than two weeks of work." Docket 822-13 at 2.

Buergofol stated that after searching, it "converted the Tobit-format emails to .eml and placed them in a Windows folder." *Id.* From the Windows folder, Buergofol indicated that it could then generate the necessary hit reports. *Id.* But Buergofol reiterated that because this was a "redundant search," Buergofol would cease searching unless TransPerfect "comes up with a cost-efficient way to export bulk emails from a Tobit system." *Id.*

Later that day, Omega emailed Buergofol explaining that Omega believed Buergofol to be in violation of the ESI Order because Buergofol refused to use an e-discovery platform. Docket 867-1 at 3. Omega then requested that the parties meet and confer. *Id.* The parties held a meet and confer regarding Omega's Interrogatory No. 21 on July 17, 2025, at which counsel for Buergofol indicated that it would not meet and confer "regarding Buergofol's non-compliance with the ESI Discovery Order." Docket 822-10 at 2. Omega sent a follow-up email confirming that Buergofol was unwilling to meet and confer. *Id.*

On July 29, 2025, Buergofol filed its motion to amend/correct the ESI Order. Docket 784. In its motion, Buergofol requested that the court modify the ESI Order "to limit ESI email discovery that is not reasonably accessible, that is not proportional to the needs of the case, and the vast majority of which is not relevant to any party's claims or defenses." *Id.* More specifically, Buergofol requested that the ESI Order be modified to indicate "that the searching under Section III.3 does not apply to searches of emails," and that the court adopt Buergofol's proposed modification to Section III.1. *See* Docket 785 at 18. Buergofol admitted that because the email searching requirement in the court's

51

"ill-advised" and "unfortunate" ESI Order was impossible for Buergofol to comply with, Buergofol "is in violation of the [ESI] order." *Id.* at 3-4. In support of this conclusion, Buergofol argued that it has "no technically feasible way to export bulk emails from the Tobit [email] system to a separate, external search platform." *Id.* at 6. And because it takes Buergofol "more than 24 hours to perform a search for just a single search term" using its Tobit email system, "it is impossible for Buergofol to perform 20 search query searches within the 14 days ordered." *Id.* Buergofol also argued that it "is even more impossible . . . because the order gives the producing party Buergofol only 30 days to 'produce all non-privileged email,' and it takes even more time to review the tens of thousands of [email] hits." *Id.* at 7. Thus, Buergofol asserted that "[f]or the reasons of impossibility and extreme burden, it is not possible for Buergofol to comply with the email searching order, and Buergofol therefore will not be complying." *Id.*

In a letter sent on August 1, 2025, Omega informed Buergofol that it reviewed Buergofol's motion to amend/correct the ESI Order (Docket 784). Docket 822-11. In the letter, Omega relayed its concerns that it "does not agree that queries under Section III.3 must be run on all email accounts or the 2013 email backup," and that Buergofol continues to refuse to use an e-discovery platform with OCR functionality as required by Section II of the ESI Order. *Id.* at 2-3. Omega indicated that it was amenable to giving Buergofol a reasonable extension of the discovery deadlines in the ESI Order if Buergofol agreed to use an e-discovery platform. *Id.* at 3. Omega again requested that the parties meet

and confer, but Buergofol rejected Omega's request for a meet and confer and declined to address Omega's other concerns. Docket 867-1 at 2.

### 2.    Omega's Motions to Strike

Before addressing the parties' arguments, the court first discusses Omega's motion to strike Buergofol's surreply and Rushton's second declaration because the court's order granting Buergofol leave to file the surreply was violated. *See* Docket 1013; Docket 1014. Omega argues that the court's order was violated by Buergofol because its surreply raises arguments outside the scope of discussing the IMAP-based support issue relating to BitRecover, MailStore, and Microsoft Outlook. Docket 1014 at 5. As such, Omega argues that Buergofol's violation warrants additional sanctions under Federal Rule of Civil Procedure 16(f) and this court's inherent authority. *Id.*

In response, Buergofol contends that the arguments raised in its surreply and Rushton's declaration are proper because the court's order authorized it to discuss every statement in Suing and Paloth's declarations. *Id.* at 8-9 (arguing that the order permitted Buergofol's surreply to cover topics in the declarations such as Tobit emails, Tobit's email search functions, .stbox files, password protections for .stbox files, and converting and exporting data from Tobit emails). Buergofol also raises an assortment of arguments explaining why Omega's motion to strike is improper. *See id.* at 14-31. Buergofol's arguments, however, are misplaced because the court order did not permit Buergofol to discuss every statement in Suing's and Paloth's declarations, and its remaining

53

arguments simply reargue the issue of whether it complied with the email searching requirements set out in Sections III.1 and III.3 of the ESI Order.

Federal Rule of Civil Procedure 16(f) provides for sanctions when a party fails to abide by a scheduling or pretrial order. Fed. R. Civ. P. 16(f); *see also Firefighter's Inst. for Racial Equality ex rel. Anderson v. City of St. Louis*, 220 F.3d 898, 902 (8th Cir. 2000) (providing that Rule 16 "permits the district court to set deadlines for the disclosure of evidence and to impose sanctions on a party failing to meet a deadline"). The applicable sanctions, set forth in Rule 37(b)(2)(A), include dismissal of the action, striking the pleadings, or default judgment. Fed. R. Civ. P. 16(f); Fed. R. Civ. P. 37(b)(2)(A)(ii)-(vi). "Instead of or in addition to any other sanction, the court must order the party, its attorney, or both to pay the reasonable expenses—including attorney's fees—incurred because of any noncompliance with this rule, unless the noncompliance was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 16(f)(2); *see also Firefighter's Inst.*, 220 F.3d at 902 (providing that a court may sanction a party unless the party's failure to comply with Rule 16(f) "was either harmless or substantially justified").

In its order granting Buergofol's motion for leave to file a surreply, the court ruled that the "surreply is strictly limited to the IMAP-based export issue relating to BitRecover, MailStore, and Microsoft Outlook identified on pages 66-76 of Omega's reply brief (Docket 969), Jens Suing's declaration (Dockets 972, 972-1, 972-2, and 972-3), and Jubith Paloth's declaration (Dockets 975 and 975-1)." Docket 995 at 10. The court also held that "Buergofol's surreply is

54

expressly limited to addressing the IMAP based export issue relating to BitRecover, MailStore, and Microsoft Outlook." *Id.* at 9. The court denied Buergofol's requests to file a surreply covering such topics as "the restored .stbox issue" or arguments addressing Miciotto's declaration. *Id.* at 9 n.5. Given the explicit statements above, Buergofol's contention that the court's order permitted it to file a surreply discussing issues outside the IMAP export issue is unpersuasive.

Moreover, Buergofol's argument that the order permitted it to respond to the entirety of Paloth's and Suing's declarations is unconvincing because many of the non-IMAP export arguments raised in Buergofol's surreply are not raised in either declaration. For example, in its surreply, Buergofol raises arguments regarding its search for the term "Loparex" in its Tobit David email system, *see* Docket 1001 at 23-24, 27-28, 39, 63, the Itacom tool, *id.* at 6-7, 13-14, 29-30, and the scope of certain sections of the ESI Order, *id.* at 21, 37-40. But Suing and Paloth did not discuss such matters in their declarations. *See generally* Docket 972-3; Docket 971; Docket 975-1. Thus, Buergofol's reliance on the declarations to justify adding arguments outside the IMAP-export issue is unreasonable.

But not only is Buergofol's justification unreasonable, Buergofol included arguments in its surreply that were expressly excluded in the court order. For instance, the order denied Buergofol's request to file a surreply regarding "the restored .stbox issue." Docket 995 at 8-9 n.4. Yet, in its surreply, Buergofol discusses the issue of whether it could export its Tobit David email data from

55

its restored .stbox file. Docket 1001 at 31-35. Rather than comply with the court's order, Buergofol blatantly ignored the court's express limitation placed on the scope of the surreply and instead submitted the surreply it had initially requested the court grant. *See* Docket 991 at 22, 26 (Buergofol's motion for leave to file a surreply that requested a surreply responding to the "entirety of Omega's 175-page reply brief" and the entirety of Paloth's and Suing's declarations).

Unfortunately, this is not the first time that Buergofol has selectively relied on or disregarded portions of this court's previous orders to support its own purposes. And the court has repeatedly rejected Buergofol's attempts to do so. *See* Docket 614 at 6 (finding that because "Buergofol completely ignore[d] . . . several pages of discussion and analysis . . . the court will not permit Buergofol to read paragraph 7 in isolation, particularly when doing so completely invalidates the purpose of the court's order"); Docket 828 at 6 ("Buergofol cannot cherry-pick certain statements to limit the scope of the court's order."). But Buergofol's surreply goes beyond simply cherry-picking statements from the court's order.

Here, Buergofol blatantly ignored and disregarded the court's express limitation restricting Buergofol's surreply to only include a discussion of the IMAP-export issue. Rather than focus on Omega's argument that IMAP in conjunction with BitRecover, MailStore, and Microsoft Outlook could be used to export Buergofol's Tobit David email data to an e-discovery platform, Buergofol raised such arguments as whether the Itacom tool could be used to

export its Tobit David email data, Docket 1001 at 10-12, 19-20, 26-27, whether it searched its Tobit David email data in good faith as evidenced by its "Loparex" search, *id.* at 20, 36, 59-60, whether its emails could be exported from its restored .stbox, *id.* at 31-35, whether its 2013 Email Backup required an encryption password, *id.* at 55-62, and whether it used the conventional search function in Tobit David, *id.* at 62-63. These arguments are not even tangentially related to the question of whether IMAP in conjunction with BitRecover, MailStore, or Microsoft Outlook could be used to export Buergofol's Tobit David email data to an e-discovery platform.

Additionally, Buergofol's and Rushton's references to IMAP do not actually address the merits of Omega's IMAP-export arguments or Suing's and Paloth's testing. Rushton did not actually test the methods Suing and Paloth proposed.[17] *See generally* Docket 1002. Instead, Rushton simply concludes

---

[17] Rather than test the IMAP-methods proposed by Suing and Paloth, Rushton said Chan and he "have been attempting to develop our own method, protocol and tool for converting and exporting, in a verifiable and forensically sound manner, Buergofol's bulk Tobit email data." Docket 1002 ¶¶ 9-10. This protocol involves using "(1) Tobit's email assembly function, (2) Tobit's IMAP functionality, and (3) the forensic investigations and e-discovery software tool FEC (Forensic Email Collector)." *Id.* ¶ 11. Rushton stated that despite their best efforts, they have "so far not successfully converted Buergofol's Tobit bulk email data to an exact copy in a standard format that can be loaded into an e-discovery platform." *Id.* ¶ 13. Rushton's FEC method attempts to create a forensic copy of Buergofol's Tobit David email data. *See id.* ¶ 14. While this method uses IMAP, it does not actually address the merits of whether Suing's and Paloth's methods are viable because it imposes a requirement that does not exist under the ESI Order. Additionally, in his third declaration, when Rushton ran tests of the proposed MailStore method, he was able to successfully export Buergofol's actual Tobit David email data. *See* Docket 1023 ¶ 22.

that because none of the four methods would satisfy all of the requirements under the ESI Order, compliance was impossible. *Id.* ¶¶ 33-48, 65-71, 79-81. Thus, rather than address the merits of Omega's IMAP arguments, Buergofol and Rushton argue that Section I of the ESI Order requires Buergofol to create a "forensically . . . identical copy" of Buergofol's entire Tobit David email data before exporting and ingesting into an e-discovery platform. *See* Docket 1001 at 8-9, 35 (arguing that Section III.1 required Buergofol to export and ingest its Tobit David email data into an e-discovery platform in a "forensically sound manner"); Docket 1002 ¶¶ 32, 59-60, 64, 74 (stating that Suing's and Paloth's methods are not "forensically sound"). Both Buergofol and Rushton conclude that because they are unable to create this identical copy, compliance with Section I is impossible. *See* Docket 1001 at 8-9; Docket 1002 ¶¶ 6-8, 32-34, 36, 39-40, 44, 49, 59-67, 69, 73-76, 81-87. But a quick read of Section III.1 reveals that there is no such requirement.[18] *See* Docket 725 at 4-5. Thus, Buergofol's attempt to explain the impossibility of complying with the ESI Order by imposing additional, nonexistent requirements, *see, e.g.*, Docket 1001 at 14-18, 20-21, 30-32, 38-40, 45-53; *see also* Docket 1002 (Rushton detailing the impossibility of complying with the ESI Order), fails to address the merits of

---

[18] Buergofol appears to conflate the requirements imposed under Sections III.2 and III.5 to explain why it failed to comply with the email searching provisions of Section III.1. *See* Docket 725 at 5-6, 7-8 (providing that, under Sections III.2 and III.5 of the ESI Order, a neutral ESI expert must perform a forensic inspection of Buergofol's 2013 Email Backup and Buergofol's Navision system).

Omega's IMAP-export methods.[19] And it appears Buergofol and Rushton relied upon these new requirements to avoid addressing or testing the merits of these methods because as even Buergofol conceded, "it is possible to export Tobit emails, for example using Omega's new methods . . . that use IMAP synchronization." Docket 1001 at 24; *see also* Docket 1023 ¶ 22 (Rushton explaining, in his third declaration, that he was able to successfully export some of Buergofol's actual Tobit David email data).

Given the pervasiveness of Buergofol's non-responsive arguments in its surreply and in Rushton's second declaration, *see* Docket 1015-1; Docket 1015-2, even assuming that some of Buergofol's remaining arguments fall within the scope of the court's order or are otherwise related to the IMAP-export issue, Buergofol's clear violation of the court's order granting leave to file a surreply convinces the court that striking the entirety of Buergofol's surreply is the only appropriate sanction under Rule 16(f). Buergofol's blatant disregard for the court's order, and the pervasive inclusion of arguments outside the scope of the court's order makes selective striking of portions of Buergofol's brief ineffective. As such, the court grants Omega's motion to strike the entirety

---

[19] Buergofol and Rushton's reliance upon what Rushton terms the "Epiq Method" also does not address the IMAP-export issues raised by Suing and Paloth. *See* Docket 1001 at 12, 48, 54-55; Docket 1002 ¶¶ 82-91 (Rushton detailing the Epiq Method). The Epiq Method attempts to create a forensic, identical copy of the entirety of Buergofol's Tobit David email data, *see* Docket 1002 ¶¶ 32-34, 47-49, 59-69, 73-76, 82-87, which again, is not required under Section III.1 of the ESI Order, Docket 725 at 4-5.

of Buergofol's surreply and Rushton's second declaration.[20] Further, because Buergofol's noncompliance with the court's order granting it leave to file a surreply was not substantially justified, the court grants Omega's request for attorney's fees. *See* Fed. R. Civ. P. 16(f)(2).

### 3.    Parties' Arguments

Omega first argues that dismissal is warranted because Buergofol refuses to comply with the ESI Order's directive that Buergofol "shall use an e-discovery platform capable of indexing emails and email attachments by extracting and converting non-searchable text."[21] Docket 865 at 16 (quoting Docket 725 at 4). Rather than migrating its 19 custodian emails from Tobit David to an e-discovery platform, Omega argues that Buergofol continues to use its Tobit David email system to conduct search queries. *Id.* at 17. Omega further argues that Buergofol's claim that it is "impossible" to search its emails

---

[20] Because the court grants Omega's motion to strike Rushton's declaration for violating the court's order granting Buergofol leave to file a surreply, the court denies as moot Omega's motion to exclude and strike the opinions and testimony of Kris Rushton under Federal Rule of Evidence 702.

[21] Omega also argues that Buergofol has violated the ESI Order by failing to produce hit reports for Hoffmann or de Groote. Docket 865 at 22-23. Buergofol explains that it "did not produce hit reports [for Hoffmann's or de Groote's email accounts] for the tens of thousands of hits for '[N]avision' and 'COEX' because the Tobit system cannot generate hit reports, the email data could not be exported to an e-discovery platform, and the hit reports for the excessive number of hits would have had to be manually generated." Docket 949 at 43. The court will not impose sanctions under Rule 37(b) for Buergofol's failure to produce hit reports for de Groote or Hoffmann under Section III.1 of the ESI Order because Buergofol sought to limit the number of searches in its motion to amend/correct the ESI Order, *see* Docket 785 at 18, which the court has not yet ruled on. Thus, at this stage, the court finds that Buergofol's violation was not willful.

on Tobit David "is a fabricated, self-created excuse." *Id.* at 18.

In response, Buergofol argues that Section III.1 of the ESI Order makes compliance impossible. Docket 949 at 15-16. Specifically, Buergofol argues that "the requirement that an e-discovery platform be used for searching, together with the size and structure of the email data that is in Buergofol's Tobit email system, [and] together with the time constraints imposed by the ESI Order, made compliance impossible." *Id.* at 16. Buergofol asserts that it is "impossible for Buergofol to convert and export the amount of bulk email contained in about 19 Buergofol user accounts to an e-discovery platform and then to search that email data and to generate hit reports, all within 14 days." *Id.*

Buergofol raises a similar argument in its motion to amend/correct the ESI Order. *See* Docket 785 at 5-7; Docket 850 at 4. Buergofol has previously admitted that its Tobit email system has "limited searching functionality," Docket 785 at 10-11; Docket 850 at 8-9, is "difficult to search," and "doesn't have advanced search tools," Docket 586-1 at 147. Buergofol argues that searching its Tobit David email system is difficult because Tobit is not capable of performing Boolean searches or searches involving wildcards, Docket 786 ¶¶ 17-18; Docket 850 at 4, and as such, Buergofol can only run single-word searches using Tobit. Buergofol also asserts that searching through 3 TB of Tobit emails with a single search query takes more than 24 hours and requires periodic monitoring to ensure the search is still running. *Id.* Buergofol states that "it is simply a fact that it is not possible to export 3 TB of email in bulk

from a Tobit email system (where the emails reside) out of Tobit in a format that can be ingested into a so-called 'e-discovery platform.' " *Id.* at 5. Buergofol asserts "that the proprietary .stbox export format is the only export format for bulk email data supported by Tobit." Docket 875 at 4.

Based on the parties' arguments, to determine if Buergofol has willfully violated Sections II and III.1 of the ESI Discovery Order, the court first must determine whether it was feasible for Buergofol to export its Tobit email data to an e-discovery platform in compliance with the ESI Order. Both parties have submitted several declarations from ESI experts to demonstrate the feasibility of complying with Section III.1 of the ESI Order. The court summarizes the declarants' testimony below.

### 4.  Omega's ESI Expert Declarations

Omega's expert witness, Jamie Brown,[22] agrees that "[w]ithout an ESI platform and properly formatted data, it is not possible for Buergofol to search and produce all relevant ESI." Docket 866 ¶ 17. As Brown explains, "Tobit-David is not an e-discovery platform and does not have even the most basic capabilities to support e[-d]iscovery search and retrieval." *Id.* ¶ 18. For instance, Brown asserts that Tobit David cannot perform OCR on images. *Id.* ¶ 13. But as Brown notes, because there are third-party tools "specifically built for the Tobit David system [to] facilitate the export of data . . . the data can

---

[22] Jamie Brown is an attorney and legal consultant, who specializes in information law, which includes e-discovery. Docket 821 ¶ 1. She is currently employed as the Vice President of Strategic Consulting Services at Lighthouse. *Id.*

then easily be ingested into an e-discovery tool for processing and review." Docket 821 ¶ 15.

As an example of one of these third-party tools, Brown suggested that Buergofol could use Itacom's third-party software migration tool, "which is specifically designed to (a) export emails from a Tobit Dabid email system to a file by converting them into a more usable format, such as a .pst file, that can then be uploaded to another email system or an e-discovery platform, or (b) migrate emails from Tobit David to another email system, such as Microsoft Outlook." Docket 927 ¶¶ 10, 22. Following a meeting with Arthur Hornig, a Technical Support Specialist at Itacom, Brown stated that Itacom's tool could "support the export of 19 email accounts from Buergofol's active Tobit David email system and conversion of data into .pst files, which can then be uploaded to an e-discovery platform." *Id.* ¶¶ 25-28. Brown also attacked Kris Rushton's declaration for failing to investigate the feasibility of using Itacom's Tobit David tool. *See id.* ¶¶ 31-34.

Omega submitted a declaration from Jubith Paloth,[23] regarding "the export of approximately 300 GB of email data across 19 email accounts from a Tobit David email system to .PST files." Docket 971 ¶ 1. To conduct the tests,

---

[23] Jubith Paloth has served as the Principal Technical Consultant at BitRecover since March 2016. Docket 971 ¶ 5. BitRecover offers "software products [that] specialize[] in providing email migration, data conversion, and data recovery software solutions and related services." *Id.* ¶ 4. Paloth indicated that she has 10 years of hands-on experience in exporting and migrating emails across diverse platforms and file formats, which had included her involvement in more than 100 email export and migration projects. *Id.* ¶ 3.

63

Paloth installed the "current version of Tobit David on a server, create[d] 19 email accounts in Tobit David, and upload[ed] test emails into the 19 email accounts to equal approximately 300 GB of Tobit David email data." *Id.* ¶ 10. Paloth enabled Internet Message Access Protocol (IMAP)[24] and granted IMAP access to individual user mailboxes. *Id.* ¶ 12. Because Paloth determined that running the migration on a single computer was "time-inefficient given the total data volume involved," he employed five separate systems to execute the migration in parallel. *Id.* ¶ 15. This "reduc[ed] overall completion time and balance[ed] the processing workload." *Id.* Additionally, Paloth uploaded "email data migrated from various existing mailboxes under [his] control" to make the user mailboxes realistic because they now contained "folder structures, message volumes, attachments, and metadata." *Id.* ¶ 16. Paloth uploaded a total mailbox size of approximately 322 GB and split the 322 GB into five batches of about 64 GB of data. *Id.* ¶¶ 17-18. Each of the approximately 64 GB batches of data were assigned to one of the five computers.[25] *Id.* As a result,

---

[24] IMAP "is a standard email retrieval protocol that enables users to access and manage email messages directly on a mail server." Docket 971 ¶ 25. IMAP "supports folder hierarchy synchronization, selective message downloading, server-side search, and metadata preservation, making it suitable for enterprise and multi-device environments." *Id.* "When IMAP is enabled and user-level remote access permissions are granted, mailboxes can be accessed and downloaded using any IMAP-compliant client or migration tool." *Id.* ¶ 27.

[25] Paloth stated that this "parallel-processing methodology is a standard practice in large-scale migration projects to reduce total execution time." Docket 971 ¶ 37. This process also aids in "accelerat[ing] large-volume migrations while maintaining controlled monitoring and validation across distributed processing nodes." *Id.* ¶ 38.

Paloth created 19 user mailboxes, about 322 GB of data, 2,260 folders, and 866,682 email messages. *Id.* ¶ 19.

Paloth then used BitRecover Email Backup Wizard, a software "specifically designed to export, convert, and back up email data from a wide range of email services and protocols," to migrate the Tobit David email data into a .pst file.[26] *Id.* ¶¶ 20, 32. Paloth explained that BitRecover Email Backup Wizard works as follows:

> BitRecover Email Backup Wizard connects to an email account via the IMAP protocol by authenticating with the user's credentials and establishing a session with the remote mail server. Once connected, the software traverses the mailbox hierarchy, enumerates folders, and retrieves messages directly from the server. Messages are downloaded in their original structure and format across selected folders. The tool supports batch processing and can preserve message metadata (such as sender/recipient fields, timestamps, attachments, and folder organization) during export.

*Id.* ¶ 22. Once the user selects the specific folders to export, the user chooses what format to save the export in, such as a .pst file. *Id.* ¶ 31. The user then selects the destination path where the resulting .pst file will be saved. *Id.*

Paloth indicated that under standard test conditions, the application can process approximately 1 GB of email data in about 30 minutes. *Id.* ¶ 33. Paloth ran the migration during non-business hours to avoid user activity on the Tobit David system and network, which reduced the risk of performance degradation

---

[26] A .pst file "is a proprietary data file format developed by Microsoft for use with Microsoft Outlook. A .PST file is used to store copies of email messages, attachments, calendar items, contacts, tasks, notes, and other mailbox data locally on a user's computer. It functions as a structured database file that maintains folder hierarchy, message metadata (such as sender, recipient, subject, timestamps), and embedded attachments." Docket 971 ¶ 29.

during the conversion process. *Id.* ¶ 39. Paloth was able to complete the entire IMAP-to-PST migration process of the 322 GB of Tobit David email data to .pst files in approximately 14 hours. *Id.* ¶¶ 40, 46. Following the initial export, Paloth ran a delta conversion to "capture any residual or newly synchronized items and to ensure that no emails were missed during the primary migration phase." *Id.* ¶ 41. This took approximately one hour. *Id.* After completing the delta conversion, Paloth also conducted a post-conversion validation procedure, which consisted of (1) reviewing for any failed or skipped emails or folders; (2) verifying folder integrity within the .pst files; (3) cross-checking email counts and folder structures with the source mailboxes; and (4) spot-verifying the email content and attachments. *Id.* ¶ 42. This process took approximately five hours. *Id.* During the export process, 20 .pst files were generated, which included 2,260 folders and 866,682 email messages. *Id.* ¶ 47.

Paloth recommended using the same procedure to convert Tobit David email data of up to approximately 500 GB into .pst files. *Id.* ¶ 49. Paloth concluded that when the BitRecover Email Backup Wizard is utilized within the same local network as the mail server, the average download speed is approximately 1 GB per 15 minutes. *Id.* ¶ 50. At this speed, exporting 322 GB of Tobit David email data would take approximately 14 hours using five computers. *Id.* But when BitRecover Email Backup Wizard is used to perform migration outside the local network, the average download speed is approximately 1 GB per 30 to 45 minutes. *Id.* ¶ 51. Thus, exporting approximately 300 GB of Tobit David email data would take roughly 50 hours.

66

*Id.*

Omega also supplied a declaration from Jens Suing, who has 23 years of experience using the Unified Messaging software "David" from Tobit Software. Docket 972-3 ¶¶ 7-11. Suing indicated that while "not an expert in exporting data from Tobit David and/or migrating to other messaging and/or groupware solutions," he is "familiar with some of the possibilities and ha[s] conducted several tests with various tools in the past." *Id.* ¶ 13. Suing also noted that the Tobit David Server offers the IMAP server, "which can be used to make any folder and even the entire data repository . . . available for retrieval via an IMAP-capable client." *Id.* ¶ 24.

Suing conducted various tests to explore the possibility of exporting data from Tobit David using the IMAP protocol using Microsoft Outlook for 365, Microsoft Outlook 2019, and MailStore. *Id.* ¶ 28. For both versions of Microsoft Outlook, the data is stored in an .ost file while the data in MailStore is stored in an internal archive file system that can later be exported to various formats, such as a .pst file. *Id.* ¶ 29. For the test, Suing used his own David server and his personal mailbox, which is 23.8 GB in size, contains 180 folders, and has approximately 89,000 entries. *Id.* ¶ 31. The export of 23.8 GB of Tobit David email data took approximately 70 minutes for Microsoft 365 and approximately 40 minutes for Outlook 2019. *Id.* ¶ 30. Each version of Microsoft successfully exported about 89,000 records in a single .ost file, which was approximately 14 GB in size. *Id.* For MailStore, Suing first spent 2.5 hours importing the Tobit David email data into MailStore's archive format and then spent another hour

67

converting the archive format into a .pst file. *Id.* Because MailStore does not store duplicates,[27] the archive format exported 82,055 records or about 18.6 GB of data. *Id.* The .pst file contained 82,228 exported records or about 17.8 GB of data.[28] *Id.*

### 5.    Buergofol's ESI Expert Declarations

Buergofol's expert, Kris Rushton,[29] was hired "to find a way to convert and export Tobit email data in bulk from the .stbox format to a standard format that can be ingested into an e-discovery platform." Docket 851 ¶ 5. Rushton and his partner forensic consultant, Ian Chan,[30] reviewed various tools for converting and exporting bulk Tobit email data but determined that none were suitable. *Id.* ¶ 7. Instead, Rushton noted that the tools he identified "are suitable solely for performing migrations, whether from individual email accounts, workstations or servers." *Id.* ¶ 8. After determining that there was no

---

[27] MailStore has a special feature that performs a deduplication process, which "means that emails and/or attachments with identical content are stored only once in the archive to save disk space. Nevertheless, every unique email remains in the archive—just without duplicates." Docket 972-3 ¶ 47.

[28] Suing was unsure why the .pst file had 173 more records present than were present in the archive format. Docket 972-3 ¶ 30 n.2.

[29] Kris Rushton is a Forensics Manager at Epiq Global GmbH, which is an affiliate of a global technology-enabled services leader to the legal industry and corporations. Docket 851 ¶ 1. Rushton has "extensive experience working on mobile phone[s], Mac, Windows, and email investigations." *Id.* ¶ 3.

[30] Buergofol also submitted a declaration from Ian Chan in support of its opposition brief to Omega's motion to dismiss. Docket 952. Chan's declaration provides the same information as Rushton's declaration. *Compare* Docket 851 (Rushton's declaration), *with* Docket 952 (Chan's declaration).

migration or forensic tool that could convert bulk Tobit email data into a standard format for ingestion into an e-discovery platform, Rushton and Chan attempted to create their own protocol to export the Tobit email data. *Id.* ¶ 11. Even after Buergofol provided Rushton with a 3,085 GB .stbox file, which contained Buergofol's entire current email data as of April 2025, Rushton was unsuccessful in finding a way to convert this .stbox file into a standard format. *Id.* ¶¶ 4, 14. Rushton also represented that "an .stbox format, which is proprietary to the German email vendor Tobit Software GmbH . . . is a compressed file format in which bulk email data is exported from the Tobit email system." *Id.* ¶ 4.

Buergofol's expert witness, Dirk Hagemeister,[31] stated that after his "summary study of 'the emails' of the 19 custodians to be exported," he determined that the emails "are so voluminous and are stored in such a way . . . that exporting 'the emails' using Itacom's migration tool would be a complex manual job requiring weeks of effort by a person or persons having experience with and knowledge of Tobit David, as well as knowledge and expertise with Itacom's migration tool." Docket 953 ¶ 15. Hagemeister further stated that "Buergofol cannot 'easily export' all the emails from the Tobit David email accounts of the 19 Buergofol custodians, into an e-discovery platform, so

---

[31] Dirk Hagemeister is the Managing Director and Owner of Itacom GmbH, which is an information technology company that developed a specialized software tool for migrating or exporting email data from Tobit David email systems to Microsoft email servers. Docket 953 ¶ 2. Itacom GmbH primarily provides IT services and consulting, including to Tobit David system users. *Id.*

that the exported emails could then be searched on the e-discovery platform."
*Id.* ¶ 16.

### 6.    Analysis

To justify sanctions under Rule 37, there must be "(1) an order compelling discovery, (2) a willful violation of that order, and (3) prejudice to the other party." *Sentis Grp., Inc.*, 559 F.3d at 899 (internal quotation marks omitted). Sections II, III.1 and III.3 of the ESI Order require Buergofol to use an e-discovery platform before conducting the listed searches in both sections. *See* Docket 725 at 4-5, 7. Thus, there is an order compelling Buergofol to use an e-discovery platform to search certain ESI.

Buergofol has already admitted that it has violated Sections III.1 and III.3 by failing to use an e-discovery platform. *See* Docket 785 at 4. Thus, the main issue is whether Buergofol's failure to use an e-discovery platform was willful. Sections III.1 and III.3 of the ESI Order, as it pertains to email searching, require Buergofol to search different ESI sources. More specifically, Section III.1 is limited to the "email accounts of custodians listed in Attachments 1 and 2," Docket 725 at 4, whereas Section III.3 includes Buergofol's "Tobit David Email Server" in its list of unstructured data repositories, *id.* at 6-7, 11. For Section III.3, the parties disagree whether the Tobit David email server requires Buergofol to export all 3 TB compressed email data from its active server. *See, e.g.*, Docket 949 at 25 (Buergofol arguing that it cannot comply with Section III.3 because it is impossible to export all Buergofol's Tobit David email); Docket 969 at 91 (Omega arguing that Buergofol "had no legitimate reason to

70

search an entire 3TB system—rather than the 19 custodian accounts required" under Section III.1).

Here, the court finds that Buergofol's interpretation of Section III.3 is unreasonable. First, Buergofol's interpretation would create duplicative searching, because Section III.1 already contemplates searching its active email accounts for certain custodians. Second, both parties agree that exporting the entirety of Buergofol's Tobit David email server for later ingestion to an e-discovery platform is largely unworkable. *See* Docket 949 at 25; Docket 969 at 91. Third, Buergofol's interpretation makes little sense because Omega explicitly told Buergofol that it did not interpret Section III.3 of the ESI Order in that manner. *See* Docket 822-11 at 2 ("Omega does not agree that queries under Section III.3 must be run on all email accounts or the 2013 email backup. Had Buergofol agreed to meet and confer as requested, Omega could have addressed and corrected Buergofol's misunderstanding."). Despite the ESI Order's requirement that the parties may only "seek relief from this Order after first conferring in good faith with the opposing party," Docket 725 at 9, Buergofol filed its motion to amend/correct the ESI order without conferring with Omega in good faith, Docket 784. Thus, the court finds that Buergofol's interpretation of Section III.3 and its corresponding failure to confer with Omega in good faith regarding the discoverability of ESI, did not comply with Section III.3. But because Buergofol moved to modify Section III.3 of the ESI Order to reflect that Section III.3's inclusion of Buergofol's "Tobit David Email Server" did not pertain to email searching, *see* Docket 785 at 18, and the court

has not yet ruled on that request, the court finds that Buergofol's violation of Section III.3, as it pertains to email searching, was not a willful violation.[32]

But Section III.1 warrants a different conclusion. As outlined by Omega's declarants' testimony above, conversion of Buergofol's Tobit David email data from its 19 custodians for later ingestion to an e-discovery platform is possible by using IMAP in conjunction with BitRecover, MailStore, and Microsoft Outlook. Buergofol has not presented convincing evidence to challenge this conclusion.[33]  But Buergofol still contends that because it was impossible for Buergofol to export the Tobit email data for its 19 ESI custodians in such a way as to retain the folder structure, it would be impossible for it to then use an e-discovery platform to generate the required hit reports under Section III.1. Docket 949 at 25.

While Paloth and Suing never state that Buergofol could have perfectly complied with Section III.1 in the ESI Order, both Paloth and Suing indicate that their methods preserve email folder structures. *See* Docket 971 ¶¶ 22, 32 (noting that the applied methods "preserve message metadata" during export

---

[32] For these reasons, the court also grants in part Buergofol's motion to modify/amend the ESI Order to reflect that Section III.3 does not pertain to email searching.

[33] Even if the court did not strike Buergofol's surreply and Rushton's second declaration, Buergofol and Rushton did not present compelling evidence to challenge this conclusion. *See generally* Docket 1001; Docket 1002. In fact, Buergofol conceded that conversion of its Tobit David email data was possible using Omega's suggested IMAP methods. *See* Docket 1001 at 24 ("[I]t is possible to export Tobit emails, for example using Omega's new methods . . . that use IMAP synchronization."). And in his third declaration, Rushton performed a test of the MailStore method and was able to successfully export a single subfolder of Kurt Stark's email data. Docket 1023 ¶ 22.

and "preserv[e] folder hierarchy"); *id.* ¶ 42 (noting that a "structured validation procedure" must be completed, which included "[c]ross-checking email counts and folder structure against the source mailboxes"); Docket 972-3 ¶ 27 (noting that IMAP "synchronize[s] email data and email folder structures residing on a mail server with an email client"). Additionally, both Paloth's and Suing's methods indicate that certain sizes of Tobit David email can be converted in a relatively short period, undermining Buergofol's claims that the 14-day requirement makes compliance impossible.

Based on the above, the court finds that Buergofol's failure to use an e-discovery platform to search its Tobit David email data was a willful violation of Section III.1 of the ESI Order. Buergofol had ample opportunity to comply with Section III.1, but rather than work to find ways to successfully export its Tobit David email data to an e-discovery platform, Buergofol has steadily placed additional requirements upon itself to excuse its noncompliance with Section III.1. *See* Docket 1014 at 6-7 (Omega summarizing Buergofol's arguments explaining why it could not comply with the e-discovery provision of the ESI Order). At every turn, Buergofol responded to Omega's proposed avenues of compliance by offering yet another reason why compliance was impossible. *See id.* And based on the testing proposed by Suing and Paloth, *see* Docket 972-3; Docket 975-1, and the successful export of some of Buergofol's Tobit David email data by Rushton, *see* Docket 1023 ¶ 22, the court fails to see how Buergofol's actions indicate an accidental violation or inability to comply with Section III.1 of the ESI Order.

Moreover, this willful failure to use an e-discovery platform to perform email searches under Section III.1 prejudiced Omega. Buergofol's continued refusal to turn over basic discovery has harmed Omega's ability to defend itself and test the merits of Buergofol's claims. *See In re O'Brien*, 351 F.3d 832, 839 (8th Cir. 2003) ("A finding of 'prejudice' under Rule 37(b) is proper if the failure to make discovery impairs an opponent's ability to determine the factual merits of a party's claim."). As such, the court finds that sanctions under Rule 37(b) are warranted.

Additionl issues arise from Buergofol's conduct regarding the e-discovery platform requirement in Sections III.1 and III.3. As discussed below, Buergofol's conduct indicates a persistent pattern of intentional delay. *See Hunt*, 203 F.3d at 527. Buergofol's failure to use an e-discovery platform, based on its claims of impossibility, has again prevented Omega from obtaining responsive discovery to support its defenses and counterclaims. Buergofol's conduct has also caused further delay and needlessly increased the time and effort Omega has expended to obtain ESI discovery. The court entered the ESI Order only after finding that Buergofol, throughout this case, has been repeatedly evasive and non-responsive in responding to Omega's discovery requests. *See* Docket 726 at 43.

As an example, Buergofol, for the first time, provided information on the actual volume of email data for some of its ESI custodians. *See* Docket 1001 at 44; *see also* Docket 820 at 20 (Omega noting that "Buergofol has provided no information on the actual volume of emails or data for those custodians, which

74

is unquestionably far smaller than 3 TB"). Buergofol now represents that its Tobit David email data for 15 of its custodians is approximately 645 GB.[34] *See id.* at 44. But previously, Buergofol represented that Buergofol's 19 custodian email accounts contain about 300 GB of compressed Tobit email data. Docket 949 at 25 (arguing that it is "impossible for Buergofol to export the approximately 300 GB of Tobit emails in the 19 custodian accounts as .pst files to an e-discovery platform and then to search those emails within two weeks and generate a hit report"). Buergofol does not explain this difference nor why it was not previously disclosed to Omega.

Additionally, when the court was considering whether to issue the ESI Order, Buergofol's only objection, after it represented it spoke with two e-vendors, was that the plan was too costly. *See* Docket 726 at 33-34. Buergofol did not object on the grounds that it was unable to export and ingest its Tobit David email data to an e-discovery platform. And even when Buergofol first started claiming that it was impossible to convert and ingest its bulk Tobit email data, *see* Docket 785 at 10; Docket 786 ¶ 14, Buergofol did not provide evidence that it had made reasonable inquiries to determine the plausibility of ingesting its Tobit email data into an e-discovery platform. It was only once Omega started offering potential solutions to Buergofol's claim of impossibility that Buergofol began providing evidence supporting its contention that compliance was impossible. *See, e.g.,* Docket 851 ¶¶ 13-19 (Rushton's

---

[34] Buergofol does not specify whether this figure signifies compressed or uncompressed email data. *See generally* Docket 1001.

declaration attacking Brown's declaration that stated Buergofol could easily migrate bulk emails from Tobit David to an e-discovery platform).

Buergofol informed the court that it has paid over $140,000 to Epiq "to create an identical email archive" of Buergofol's Tobit bulk email data, Docket 1023 ¶ 4, which it asserts demonstrates its good faith efforts to comply with the ESI Order's e-discovery provision, Docket 1020 at 19. But the court is not persuaded by such an argument. Buergofol does not explain why it solely focused on generating an identical archive of all of Buergofol's Tobit email data rather than focus on doing so for the smaller subset of data contemplated by Section III.1. This is problematic because after Omega's submission of Suing's and Paloth's declarations, Buergofol conceded that such IMAP methods could be used to export and ingest some Tobit emails into an e-discovery platform. Docket 1001 at 24. Thus, if Buergofol's contention that it "never claimed that it [was] impossible to export Tobit emails," is true, *id.* at 24-25, then it is unclear why Buergofol would avoid attempting to export and ingest this smaller subset of data into an e-discovery platform unless it was intentionally seeking ways to avoid complying with the ESI Order, *see Hunt*, 203 F.3d at 527 (finding that to impose Rule 41(b) sanctions, a district court need only find that a plaintiff "acted intentionally as opposed to accidentally or involuntarily").

Additionally, in its motion to amend/correct the ESI Order, Buergofol puts forth arguments that further indicate its intent to completely avoid the court's order requiring it to turn over responsive discovery. For example, Buergofol claimed, multiple times, that it is impossible to use Boolean or

wildcard search functions in Tobit David, *see* Docket 785 at 11; Docket 949 at 45, but as discussed further in Part II.C.3, Omega has presented evidence that Tobit David has a search function with Boolean and wildcard search capabilities, *see* Docket 972-3 ¶¶ 76-79. Based on this evidence, in order to create the conditions Buergofol describes in its motion to amend/correct the ESI Order and its opposition brief to the motion to dismiss, Buergofol would have had to deactivate the search function in Tobit David that uses Boolean and wildcard search capabilities and specifically activate the search function that does not have these capabilities and takes much longer to run searches. *Id.* ¶¶ 81, 84-85. This all appears to be an attempt by Buergofol to manufacture a claim of impossibility and demonstrates an intent to completely avoid having to turn over responsive discovery. Based on Buergofol's statements and actions, it is apparent that it created specific circumstances to find ways to purposefully avoid complying with the ESI Order's e-discovery requirement.[35] Thus, under these facts, the court finds that sanctions are warranted under Rule 41(b). *See Hunt,* 203 F.3d at 527.

---

[35] For similar reasons, the court denies in part Buergofol's motion to modify/amend the ESI Order (Docket 784). Buergofol admitted that converting some Tobit email data to an e-discovery platform using the IMAP methods proposed by Suing and Paloth is possible. Docket 1001 at 24. Thus, Buergofol's arguments in its motion to amend/correct, which mainly rely upon the limitations of searching within Tobit David, do not demonstrate to the court that the ESI Order needs to be amended. Additionally, because it appears that Buergofol created specific circumstances to support its claim of impossibility, the court denies Buergofol's motion to amend Section III.1 of the ESI Order.

### C.   Buergofol's Refusal to Use an E-Discovery Platform to Search its Files Pursuant to Sections II and III.3 of the ESI Order

In addition to Buergofol's failure to search its emails using an e-discovery platform, Omega argues that dismissal is warranted because Buergofol refuses to use an e-discovery platform to search its file servers in violation of Sections II and III.3 of the ESI Order. Docket 865 at 20-22. Section III.3 of the ESI Order provides that, for files contained in a party's unstructured data repositories, the producing party must, within 14 days of receiving the requesting party's search queries, search and "provide a hit report from the e-discovery platform in CSV or Excel format, identifying the search query and the following information for each document hit: (i) folder path, (ii) file name, (iii) creator, and (iv) date created." Docket 725 at 7.

On July 2, 2025, Omega sent Buergofol its first search queries for a search of Buergofol's files in its file system. Docket 786-3. In response, Buergofol informed Omega that instead of using an e-discovery platform, Buergofol had hired an IT consultant to customize a search program to extract the requested information. Docket 786-4 at 6. But Buergofol noted that because its file system contained about 1.5 TB of data, "and it is impossible to generate a hit report manually for the potentially tens of thousands of files that might include one or more of the hundreds of search terms in Omega's search request," it would take another week, and "probably take many more days" for Buergofol to run the search program on all of Omega's search terms on the file server. *Id.* As such, Buergofol stated that it needed additional time to generate

78

the hit reports for the searches under Section III.3. *Id.* at 7.

On August 1, 2025, Omega offered Buergofol a reasonable extension of time if Buergofol agreed to use an e-discovery platform to search its file system. *See* Docket 822-11 at 3. But later that same day, Buergofol rejected Omega's proposal. Docket 867 ¶ 7; Docket 867-1 at 2. Omega indicated that as of September 22, 2025, it had not received hit reports from Buergofol for searches of Buergofol's file server. Docket 867 ¶ 5.

Omega alleges that Buergofol's actions regarding its file system violate Section III.3 in three ways. Specifically, Omega argues that (1) "a Windows search is not an e-discovery platform," (2) "a custom program cannot substitute for the Order's mandate that Buergofol 'provide a hit report from the e-discovery platform,'" and (3) "a Windows search does not index or OCR image files . . . or on images embedded in word-processing documents." Docket 865 at 21. As a result, Omega concludes that "Buergofol's search using Microsoft Window search functionality excludes large categories of highly relevant documents," many of which only exist as JPG images. *Id.* at 22.

Buergofol does not address Omega's arguments regarding its failure to search its file system in its opposition brief. *See* Docket 949. Instead, Buergofol only addresses Omega's arguments surrounding Section III.3's inclusion of Buergofol's Tobit David email server in its list of unstructured data repositories. *See, e.g., id.* at 25. (arguing that "it is impossible for Buergofol to comply with Section III.3 by using an e-discovery platform to search emails"). Additionally, Buergofol does not raise the file system issue in its motion to

79

amend/correct the ESI Order. *See* Docket 784; Docket 785 (asking the court "to indicate that the searching under Section III.3 does not apply to searches of emails"). As such, Buergofol has not made a showing that it was impossible for it to comply with Section III.3 of the ESI Order as it relates to its failure to search its file system.

The court concludes that Section III.3 of the ESI order compelled Buergofol to search its file system and to "provide a hit report from the e-discovery platform." Docket 725 at 7. Buergofol's custom programing and use of native searching on Microsoft Windows are not equivalent to searching on an e-discovery platform. *See* Docket 866 ¶¶ 19, 21-22. Thus, the court finds that Buergofol has not complied with that section of the ESI Order, and Buergofol has failed to raise an argument demonstrating that its noncompliance was not willful. Further, the court finds that Buergofol's willful violation of Section III.3, as it concerns searching its file system on an e-discovery platform, has prejudiced Omega. To find prejudice "[w]hen a party fails to comply with a discovery order, it is generally enough that the noncompliance 'impairs an opponent's ability to determine the factual merits of [the] party's claim.' " *EDF Renewables Distrib. Sols., Inc. v. Southard*, 2020 WL 5913520, at *4 (D. Minn. Oct. 6, 2020) (quoting *In re O'Brien*, 351 F.3d at 839). As Buergofol's custodian of records testified, Buergofol's file system contains its technical and sales documents saved as Microsoft Word documents, PDFs, Excel, and image files, Docket 586-1 at 41, some of which require OPR and indexing through an e-discovery platform to be captured in a party's search, *see* Docket 866 ¶ 14. As

such, without the use of an e-discovery platform, Buergofol's custom programmed search fails to include all relevant information in Omega's submitted search queries, thus hindering its ability to conduct and obtain responsive discovery. Thus, the court finds that sanctions are warranted under Rule 37(b).

### D.    Buergofol's Refusal to Search Custodian Email Accounts, Run Search Queries, and to Search its Databases

Omega also points to several additional instances in which Buergofol has failed to comply with the ESI Discovery Order. *See* Docket 865 at 22-30. Omega first argues that Buergofol failed to search for or produce emails for Dr. Franz Schleicher's custodian account. *Id.* at 23-24. Omega next argues that Buergofol refused to properly run Omega's search queries. *Id.* at 24-27. Omega asserts that Buergofol refused to search its databases listed in Attachment 2 of the ESI Order, *id.* at 27, and that Buergofol refused to produce records of the searches performed, as required by Section IV.1 of the ESI Order, *id.* at 30. Omega concludes that all these violations support dismissal of Buergofol's claims. *See id.* at 22-30.

### 1.    Buergofol's Refusal to Search for and Produce Responsive Emails in Dr. Schleicher's Email Accounts

In a letter sent on June 27, 2025, Omega notified Buergofol of its failure to search Dr. Schleicher's email accounts at dr.fs@online.de and dr.fs@t-online.de. *See* Docket 822-8 at 3. Omega requested that Buergofol identify all of Dr. Schleicher's email accounts. *See, e.g.,* Docket 822-2 at 11-13 (asking Buergofol if Dr. Schleicher has any other email account besides dr.fs@t-

online.de or has used any other email account since January 1, 2000); *id.* at 4-8 (Omega renewing its request that Buergofol identify all of Dr. Schleicher's email accounts). In the only response Omega received regarding these inquiries, Buergofol stated that "Dr. Franz Schleicher used the email account franz.schleicher@buergofol.de." *Id.* at 12. Additionally, in four hit reports Buergofol produced to Omega on June 24, 2025, it represented that "there is no current email account: dr.fs@t-online.de." Docket 822-4 at 2; Docket 822-5 at 2; Docket 822-6 at 2; Docket 822-7 at 2. In response, Omega notified Buergofol that the dr.fs@t-online.de email account remained active. *See* Docket 822-8 at 3.

In its motion to dismiss, Omega argues that Buergofol has violated the ESI Order by only searching franz.schleicher@buergofol.de (Buergofol email account) and not Dr. Schleicher's email accounts at dr.fs@t-online.de and dr.fs@online.de. Docket 865 at 24. Omega argues that because Dr. Schleicher used both email addresses for Buergofol business, by failing to search these accounts, "Buergofol and its counsel are knowingly concealing his business communications." *Id.*

Buergofol asserts that it has complied with the ESI Order because it has searched Dr. Schleicher's Buergofol email account and has provided to Omega hit reports for this email account. Docket 949 at 44. Buergofol further argues that it need not search dr.fs@t-online.de because it is Dr. Schleicher's private email account and because dr.fs@online.de is not listed in Attachment 2 of the

ESI Order.[36] *Id.* Buergofol last argues that if Omega wanted Buergofol to search these private email accounts, it should have brought a motion to compel. *Id.* at 44-45.

In response, Omega argues that Dr. Schleicher "overwhelmingly uses dr.fs@online.de for business communications, rather than his Buergofol email account." Docket 969 at 69. As evidenced by Buergofol's privilege log, Omega points out that "1,221 of 2,135 emails (57%) involving Dr. Schleicher used dr.fs@online.de, while only 58 emails (3%) used franz.schleicher@buergofol.de." *Id.*; *see also* Docket 822-16. Buergofol's hit report for the search query "Loparex" also indicates that Dr. Schleicher used his dr.fs@online.de account 56% of the time whereas his Buergofol email account was used 0.0009% of the time. Docket 969 at 69; *see also* Docket 822-14. Omega also points to other search reports showing responsive emails from 2004 to 2010 where Dr. Schleicher used the dr.fs@online.de account. Docket 969 at 69; *see also* Docket 822-4 at 2; Docket 822-6 at 2.

Omega also argues that Buergofol's assertion that dr.fs@online.de need not be searched because it is not listed on Attachment 2 is "wrong" because Section III.1 of the ESI Order does not limit discoverable email accounts to those listed in Attachment 2. Docket 969 at 71. Omega asserts that concluding otherwise would reward Buergofol's refusal to identify Dr. Schleicher's email accounts and would be illogical because "[s]everal custodians listed in

---

[36] Based on the information it had at the time, Omega only included dr.fs@t-online.de as an email account listed for Dr. Schleicher on Attachment 2 of the ESI Order. *See* Docket 725 at 11.

Attachment 2 have no email address identified at all." *Id.* Thus, Omega argues that adopting Buergofol's logic would allow it to "evade email discovery entirely for those custodians." *Id.*

Buergofol's failure to search Dr. Schleicher's email accounts at dr.fs@online.de and dr.fs@t-online.de falls under Section III.1 of the ESI Order, which required Buergofol to turn over hit reports for its custodians' email accounts. *See* Docket 725 at 4-5, 11-12. Buergofol's attempts to justify its failure to search Dr. Schleicher's three email accounts are unpersuasive and further demonstrate Buergofol's continued noncompliance with the ESI Order. For instance, Klaus de Groote's email address is listed as "unknown" on Attachment 2 of the ESI Order, *id.* at 12, but this did not prevent Buergofol from searching de Groote's email account, *see* Docket 867-2 at 3. Additionally, the court agrees with Omega that concluding otherwise would allow Buergofol to "evade email discovery entirely for those custodians." Docket 969 at 71. As such, Buergofol's assertion that it need not search dr.fs@online.de because it is not listed on Attachment 2 is not a good faith objection.

Similarly, Buergofol's argument that the two email accounts are private is also unpersuasive. As evidenced by Buergofol's privilege logs, it is apparent that Dr. Schleicher routinely used these two email accounts when communicating with Buergofol's customers and suppliers. *See* Docket 822-14; Docket 822-16. But rather than search these two email accounts, which obviously contain relevant business communications that fall within the scope of Section III.1, Buergofol has put forth last-minute objections in an attempt to

84

justify its non-compliance with the ESI Order. Because Buergofol's objections are not made in good faith and instead reflect a deliberate refusal to comply with the ESI Order, the court finds that Buergofol's violation was willful. *See Johnson v. Sullivan*, 2025 WL 2347109, at *6 (D. Minn. Apr. 3, 2025), *report and recommendation adopted by Johnson v. Sullivan*, 2025 WL 2337027 (D. Minn. Aug. 13, 2025) (reasoning that plaintiff willfully violated a court order because plaintiff's actions were "deliberate and intentional" and not "accidental []or involuntary").

The court also finds that Buergofol's failure to search Dr. Schleicher's email accounts has prejudiced Omega. This is another instance where Buergofol has unilaterally determined that certain discovery need not be searched and turned over in direct violation of the court's ESI Order. Buergofol's obstruction prejudices Omega's ability to defend itself in this case and as such, the court finds that sanctions under Rule 37(b) are warranted.

## 2. Buergofol's Refusal to Run Omega's Search Queries

Omega argues that Buergofol is in violation of the ESI Order because it "refuses to run most of Omega's search queries in *any* manner." Docket 865 at 25. Omega notes that "[f]or four of the five queries it did run on limited email accounts, Buergofol modified Omega's search queries to remove the Boolean connectors and wildcard characters, reducing them to only a Buergofol-selected, single-word variation of Omega's search query." *Id.* Omega argues that Buergofol has prejudiced Omega by "preventing a proper search of its emails and eliminating large numbers of highly relevant documents." *Id.* at 26-

85

27.

To justify its refusal to search using Omega's search queries as written, Buergofol argues that (1) the ESI Order does not require a responding party to search using wildcard characters, (2) "it was impossible for Buergofol to conduct email searches using wildcard characters," and (3) Omega's search queries were overbroad. Docket 949 at 45. As Buergofol notes, it filed its motion to amend/correct the ESI Order to explain to the court that it is not "technically feasible to search emails using an e-discovery platform and that the Tobit search functionality does not support wildcard search terms" or Boolean connectors. *Id.* at 46-47; *see also* Docket 785 at 11; Docket 850 at 4, 20; Docket 786 ¶¶ 17-18 (Buergofol's counsel stating that "there is no way to cause the Tobit email system to perform a Boolean 'OR' [or 'AND] keyword search for emails"). Buergofol concludes that because its motion to amend/correct was filed before Omega's motion to dismiss, and has not yet been ruled on, "Buergofol's failure to search in the manner Omega desires cannot constitute a willful violation of the ESI Order that could support a motion to dismiss" *Id.* at 48.

In reply, Omega argues that Buergofol (1) "mispresents to the court that Tobit David's native search functionality does not support standard Boolean connectors," (2) falsely claims "that email attachments can be searched in Tobit David," and (3) "falsely represents that it required 'two solid 24-hour days' to perform a single keyword search for 'Loparex' across its entire Tobit David email system." Docket 969 at 84-91. In support of these assertions, Omega

86

submitted Suing's declaration, in which Suing explained that Tobit David's native search functionality supports the use of Boolean connectors, such as "AND" or "OR," and wildcard characters. Docket 972-3 ¶¶ 76, 79, 86, 88. Suing further noted that there are three ways to search emails in Tobit David: (1) QuickFinder, (2) Conventional Search, and (3) Full-Text Search. *Id.* ¶ 76. As Suing explained,

> The 'QuickFinder' is a function for filtering the contents of the currently open folder (entry list) and is executed in near real-time as each letter is typed. The outdated 'Conventional Search' is a search function for finding emails and their contents across multiple folders, but . . . it lacks advanced features such as Boolean operators (AND, OR), wildcards (*), phrase searches, etc. Attachment filenames and contents are not searched. The modern, database-driven 'Full-Text Search' also works across multiple folders or the entire data structure. It can search the To, From, Subject, and Body fields of a message (again, attachments are not searched) and additionally supports Boolean operators such as AND and OR, wildcard searches using the * symbol (only at the end of a search term), phrase searches, and combinations thereof.

*Id.* Suing noted the full-text search "has the advantage of a much higher speed compared" to the conventional search.[37] *Id.* ¶ 77. But Suing clarified that none of the three search options can search the text of email attachments or perform OPR on images. *Id.* ¶¶ 76, 78, 85, 87.

Suing stated that these three different search functions have been

---

[37] Suing also conducted a comparison speed test between the conventional search and full-text search features. *See* Docket 972-3 ¶¶ 88-90. After searching for the term "mengeneinheit (unit of measure)" in about 60 GB of data, it took less than 2 seconds using the full-text search, approximately 70 seconds using conventional search without content, and approximately 9 minutes using conventional search with content. *Id.* ¶ 89.

available since the release of Tobit David.fx Edition 2011 in September 2010.[38]
*Id.* ¶ 76. The conventional search option is deactivated by default and must be
activated by a Tobit David user to be used. *Id.* ¶¶ 81, 84. On the other hand,
Suing noted that Tobit David's full-text search has been the default search
since September 2010 and must be deactivated if a party does not want to use
it. *Id.* ¶¶ 84-85.

Here, the court finds that the ESI Order compels a producing party,
within 14 days of receiving a requesting party's search query, to search certain
structured and unstructured data repositories listed in Attachments 1 and 2.
Docket 725 at 4, 6, 10-12. While Buergofol is correct that the ESI Order does
not specifically use the terms Boolean or wildcard characters, *see* Docket 949
at 45, as Brown points out, Buergofol's argument improperly equates the terms
"search query" and "keyword," *see* Docket 821 ¶ 9. Brown further explains that
"[w]ithin the field of e-discovery, the term query refers to specific search criteria
used to identify relevant [ESI], often by using 'Boolean' logic, keyword
combinations, and other conditions such as timeframe or custodians." *Id.* ¶ 8.
As such, the fact that the ESI Order does not specifically mention Boolean or
wildcard characters does not mean that its usage was not contemplated by the

---

[38] Suing indicated that reply or forward emails created in Tobit David "always
contain a type of signature . . . that provides a rough indication of the David
version being used." Docket 972-3 ¶ 91. The Tobit David.fx12, released on
December 12, 2012, used "david®" as its signature. *Id.* As evidenced by
Buergofol's Tobit David emails, Buergofol uses a Tobit David version from
2012. *See* Docket 867-12 at 2 (indicating that Buergofol's emails use "david®"
as its signature); Docket 867-11 at 2, 4 (indicating that Buergofol's emails have
been processed by David.fx12).

ESI Order. Thus, to comply with the ESI Order, Buergofol was required to search Omega's search queries as provided, including the use of Boolean and wildcard characters.

Further, the court finds that Buergofol's self-imposed technical limitations demonstrate its willingness to violate the ESI Order. Suing's declaration demonstrates that to use the conventional search function, Buergofol had to purposely activate this feature and deactivate the quicker full-text search option. *See* Docket 972-3 ¶¶ 81, 84-85. Such actions would allow Buergofol to then back up its arguments in its motion to amend/correct the ESI Order that it takes more than 24 hours to run a single one-word search through its 3 TB of Tobit David email data. *See* Docket 785 at 10-11. And as Suing's declaration makes clear, Buergofol's representations to the court and to Omega that Tobit David cannot perform wildcard or Boolean searches are untrue. Buergofol's misrepresentations are particularly troubling because they appear to have been made in an effort to justify its assertion that compliance with the ESI Order was "impossible." Such conduct was not undertaken in good faith and instead demonstrates Buergofol's deliberate effort to avoid complying with the ESI Order. Buergofol's repeated and unsupported justifications further demonstrate its continued unwillingness to produce responsive discovery to Omega in accordance with the ESI Order. Thus, the court finds that Buergofol willfully violated the ESI Order by failing to run Omega's search queries. *See Johnson*, 2025 WL 2347109, at *6.

The court also finds that Buergofol's willful violation in failing to run

89

Omega's provided search queries has prejudiced Omega. The whole purpose of the ESI Order was to correct Buergofol's evasive behavior and overall "foot-dragging" during the discovery process. *See* Docket 726 at 43 (the court stating that it would adopt the ESI Order because "[t]his is just another instance where Omega has tried to discover evidence through ESI, and Buergofol has been unable or unwilling to comprise, to discuss, to talk, to figure out a plan that would work for both parties"). But Buergofol's efforts to avoid complying with the ESI Order have further delayed these proceedings and needlessly increased the motion practice required for Omega to obtain discovery. As a result, the court finds that sanctions under Rule 37(b) are warranted for Buergofol's willful refusal to properly run Omega's search queries.

### 3. Buergofol's Refusal to Search its Databases

Omega argues that Buergofol has violated the ESI Order by failing to search its databases as required by Section III.4. Docket 865 at 27-30. Omega also argues that Buergofol's responses to its RFPs 347-349[39] and RFPs 384-386[40] indicate Buergofol's refusal to search its databases. *See id.* at 27. But Omega mainly attacks Buergofol's failure to search its Navision/COEX2

---

[39] Served on March 14, 2025, RFPs 347-349 requested documents in Buergofol's various databases, such as film recipes, manufacturing specifications for films, sales information, and the structure and composition of film sold to certain companies. *See* Docket 867-4 at 11-12.

[40] Served on July 24, 2025, RFPs 384-386 requested reports from Buergofol's electronic databases containing all sales, recipes, and recipe checklists for inner and outer film sold to CIPP liner companies from 2000 to the present. *See* Docket 867-7 at 8-9.

system, which Omega contends includes information such as Buergofol's film recipes and its films' layer sequence. *Id.*; *see also* Docket 670 at 11-12 (Buergofol stating that its trade secret recipes going back to 2014 exist "as ESI in the COEX2 system").

Buergofol first argues that it has sufficiently answered Omega's RFPs 347-349 and 384-386 and asserts that if Omega was unhappy with its responses, it should have filed a motion to compel.[41] Docket 949 at 39. Buergofol also rejects Omega's argument that Buergofol should have produced recipes from its Navision database in response to RFPs 347-349 because RFPs 347-349 "request documents, not data." *Id.* at 40. Buergofol thus concludes that "no recipe documents exist in the Navision database." *Id.* Buergofol also contends that the Navision/COEX2 database only contains recipe templates, not recipes. *Id.* at 41. Buergofol last notes that it validly objected to Omega's RFPs 384-386 and that Markus Fink's report is responsive to RFP 384. *Id.* at 42.

---

[41] The court is not persuaded by Buergofol's argument that Omega should have filed a motion to compel if it "believed that there existed responsive documents that Buergofol was withholding without a proper basis." Docket 949 at 39-40. This case has been littered with the parties' motions to compel responsive discovery, *see, e.g.,* Docket 42 (Buergofol motion to compel); Docket 62 (Omega motion to compel); Docket 100 (Omega motion to compel); Docket 127 (Omega motion to compel), and even when the court orders Buergofol to turn over responsive discovery, it routinely disregards and ignores said orders, *see, e.g.,* Docket 341 (granting in part motion for sanctions against Buergofol for its failure to comply with court's order requiring it to disclose information responsive to RFPs 23 and 24); Docket 464 (granting motion for sanctions against Buergofol for its failure to comply with two court orders requiring the disclosure of prior art); Docket 828 (granting motion for sanctions against Buergofol for failing to comply with court order denying Buergofol's motion to retain confidentiality).

Section III.4 of the ESI Order requires that both parties

> conduct a reasonable search of their structured data repositories (e.g., databases), including those listed in Attachments 1 and 2, for data responsive to the other party's discovery requests. The parties shall also conduct a reasonable search of structured data repository backups if they may contain unique ESI. If structured data from proprietary or commercial structured data repositories (e.g., databases, ERP systems) can be produced in a reasonably usable, delimited report format (e.g., Excel or CSV), the parties shall produce it in that format. If such a format is unavailable, the parties shall meet and confer to agree on an alternative form of production based on the data's content and structure.

Docket 725 at 7. Thus, the court finds that Section III.4 of the ESI Order requires Buergofol, upon receiving Omega's discovery requests, to search its structured data repositories, which include its Navision/COEX2, DS-Software, FoxPro/CoEX1, Synology Network Attached Storage (NAS), and Accounting System. *See id.* at 7, 11.

Further, Buergofol's objections to and its failure to respond to Omega's discovery requests, RFPs 347-349 and 384-386, by properly searching its databases was a willful violation of the court's ESI Order. Magistrate Judge Duffy has already addressed Buergofol's argument that documents are not data in a prior order granting sanctions against Buergofol. *See* Docket 360 at 7-10. In her order, Magistrate Judge Duffy determined that Buergofol's position was not supported by the law, *see id.* at 9-10, and imposed sanctions because Buergofol's responses were either evasive or incomplete and not in compliance with the court's previous order, *id.* at 10. Buergofol does not cite to any opposing legal authority supporting its contention that documents do not include data. *See* Docket 949 at 39-40. Thus, because the court already ruled

92

against Buergofol's objection, Buergofol's objection that documents are not data was not raised in good faith.

Buergofol also attempts to demonstrate its compliance with the ESI Order by pointing to Fink's report. *See* Docket 949 at 42. But as explained in greater detail below, *see infra* Part II.E.2.a pp. 106-08, Fink's report suffers from several deficiencies.[42] These deficiencies include the fact that the report excludes certain sales that would have appeared in the report had Fink fully searched Buergofol's databases. *See* Docket 969 at 137-38; Docket 973-6; Docket 973-7. Additionally, Fink's report does not include a search of all the databases contemplated in the ESI Order, *see* Docket 725 at 11, and as such, would not fully respond to RFP 384. Thus, by failing to search its databases as ordered by the ESI Order, Buergofol has willfully violated Section III.4.

Additionally, the court finds that Buergofol's refusal to search its databases has prejudiced Omega. As explained further below, these databases contain relevant information concerning the structure and composition of film Buergofol sold to Omega. This information is crucial to Omega's infringement and invalidity defenses and counterclaims. Without this information, Omega has been prejudiced because its ability to defend itself and test the merits of Buergofol's claims has been impaired. *In re O'Brien*, 351 F.3d at 839. Based on

---

[42] Betina Andersen Miciotto's declaration also identifies numerous issues with Fink's declaration and his report. *See* Docket 970 ¶¶ 34-41. Such issues include Fink's failure to (1) identify what Navision database he searched; (2) determine what the historical scope of the available data was; (3) identify the specific methodology used to complete the report, such as his search criteria, filters, and parameters; and (4) identify any object source code, which prevents technical validation of the report. *Id.*

the above, the court finds that sanctions are warranted under Rule 37(b) for Buergofol's willful violation of Section III.4.

### 4. Buergofol's Refusal to Produce Records of its Performed Searches Pursuant to Section IV.1

Omega argues that Buergofol is in violation of Section IV.1 of the ESI Order, which requires both parties to "maintain a record of its ESI searches . . . [and to] provide this record at the time of ESI production." Docket 725 at 8. Omega argues that "Buergofol's refusal to produce records showing which ESI sources it searched, when the searches occurred, and who conducted them severely prejudices Omega." Docket 865 at 30.

In response, Buergofol asserts that it "has expended tremendous effort since May 2025 attempting to comply with the searching requirements of the ESI Order." Docket 949 at 48 (emphasis omitted). Buergofol also asserts that it did not record its ESI searches because most of its searches were unsuccessful, recording the searching "was not required, and also because recording hundreds of search attempts would be unduly burdensome, disproportionate to the needs of the case, and produce no useful information." *Id.*

As indicated above, Section IV.1 of the ESI Order requires both parties to "maintain a record of its ESI searches, including: (i) the ESI source searched, (ii) search date, (iii) individual(s) conducting the search, and (iv) search queries and parameters used. Each party must provide this record at the time of ESI production." Docket 725 at 8.

94

Buergofol does not deny that it has failed to comply with Section IV.1 but rather asserts that having to produce these records would be unduly burdensome. *See* Docket 949 at 48-49. But Buergofol has not demonstrated that this requirement is unduly burdensome or disproportionate to the needs of the case. As already stated, this court issued the ESI Order because of Buergofol's past evasive conduct during discovery. *See* Docket 726 at 43. The requirements set out in Section IV.1 were meant to increase the transparency of discovery proceedings, *see, e.g. Beef Prods., Inc. v. Hesse*, 2019 WL 6841362, at *8 (D.S.D. Dec. 16, 2019) ("Parties are entitled to know what search criteria was used in retrieving relevant ESI." (citation omitted)), requirements that Buergofol has again decided to ignore. As such, Buergofol's conclusory statement that Section IV.1 is unduly burdensome lacks merit and does not convince the court that Buergofol has not willfully violated this section of the ESI Order.

Further, the court finds that Buergofol's violation of Section IV.1 has prejudiced Omega. As Omega notes, without the information ordered to be turned over in Section IV.1, "Omega cannot verify that Buergofol is searching all known ESI sources or that the searches are being properly performed, creating a serious risk that Buergofol is concealing critical documents." Docket 865 at 30. The court agrees. Thus, the court deems that sanctions under Rule 37(b) are warranted.

95

**E.      Buergofol's Alleged Obstruction of ESI Expert's Forensic Inspections and Buergofol's Motion to Order Omega's Counsel to Stop Obstructing Implementation of the ESI Order**

Omega argues that Buergofol has willfully violated Sections III.2 and III.5 of the ESI Order by failing to provide (1) direct access to the targeted ESI sources and (2) technical support to the neutral ESI expert. Docket 865 at 30-31. The court first outlines the parties' disagreements surrounding Sections III.2 and III.5 before turning to the parties' arguments.

### 1.      Background

Section III.2 of the ESI Discovery Order ordered the parties, within 14 days of the order, to agree upon a "neutral, third-party ESI expert, or if unable to agree, submit proposed experts to the Court for appointment," for the purposes of searching Buergofol's January 1, 2013, email backup (2013 Email Backup).[43] Docket 725 at 5. This section further required Buergofol, within seven days of the expert's appointment, to "provide access to the 2013 Email Backup for forensic copying and preservation [and to] fully cooperate by providing access, credentials, and technical support." *Id.* Section III.5 also required the parties to agree on a neutral, third-party ESI expert to search Buergofol's "Navision system and all backups using the 10 CIPP customer

---

[43] The existence of the 2013 Email Backup was not disclosed to Omega until December of 2024, when Buergofol's Rule 30(b)(6) witness admitted that the 2013 Email Backup existed but indicated that it was difficult to search. Docket 586-1 at 149. Prior to that time, Buergofol regularly stated that it had "no emails prior to 2014." *See, e.g.,* Docket 238 at 141; Docket 262-4 at 6; Docket 262-6 at 5-7; Docket 284 at 18-19; Docket 350-1 at 3, 6; Docket 350-2 at 7, 13. *But see* Docket 331-2 at 2, 4; Docket 331-3 at 6, 11 (Buergofol stating that it "looked and found no responsive emails prior to March 11, 2013").

names identified by Omega and generate a hit report of all film orders and shipments to those customers before January 1, 2015." *Id.* at 7. Buergofol was required "to provide a qualified person to assist the expert in retrieving the data and identifying all backups of the Navision system." *Id.* at 7-8. The parties jointly selected TransPerfect to complete the two tasks outlined in the ESI Order. *See* Docket 725 at 5-8; Docket 867-19 at 2.

On June 26, 2025, a representative from TransPerfect emailed both parties stating that TransPerfect wanted "to schedule a brief call between our forensic expert and the Buergofol representative that is providing access, credentials and technical support to ensure expectations are aligned and that the collection workflow proceeds expeditiously and successfully." Docket 822-1 at 33. On July 3, 2025, Omega emailed TransPerfect and Buergofol stating that because TransPerfect's retainer was paid, "Buergofol must now provide access to its ESI within seven days of payment," and asked that TransPerfect "[p]lease let [Omega] know [TransPerfect's] expected timing for beginning the forensic inspection at Buergofol's facility." *Id.* at 24. Omega also proposed dates for the brief conference call between the parties and TransPerfect. *Id.* at 22, 24.

On July 15, 2025, TransPerfect emailed the parties and indicated that it received the parties' retainer payment and would reach out to find an agreeable time for the conference call. *Id.* at 20. On July 17, 2025, Omega sent a follow-up email to see what dates and times TransPerfect and Buergofol would be available for the pre-forensic inspection conference call. *Id.* at 19-20. The following day, TransPerfect emailed both parties stating that after its review of

the parties' correspondence "concerning the scope and execution of the forensic expert services ordered in the ESI Discovery Order," it wanted to schedule two calls, "one with counsel for the parties to discuss the various disagreements concerning the scope and execution of the [ESI] Order, and one with the appropriate IT representative from Buergofol so that [TransPerfect] can obtain a more detailed understanding of the target data sources and, in turn, design the forensic workflow to execute on the Order." *Id.* at 18.

On July 21, 2025, Buergofol "decline[d TransPerfect's] offer to participate in telephone conference calls," mainly because "nowhere does the [ESI] Order require Buergofol to hold telephone discussions with TransPerfect." *Id.* at 17. Buergofol explained that because TransPerfect received its retainer payment, its expert "should simply show up at the Buergofol facility and complete the two tasks set forth in Sections III.2 and III.5." *Id.* In response, TransPerfect stated that it required the "advance call with a qualified IT representative from Buergofol" before it could proceed with the forensic inspection because it is TransPerfect's "standard operating procedure and it is mandatory for all on-site collections that [TransPerfect] perform[s]." *Id.* at 16. TransPerfect also explained the conference call was necessary to determine whether an encryption key will be present, what underlying operating systems are in use, available and target database fields, file extraction formats, and related technical issues prior to its forensics team appearing at Buergofol's facility. *Id.*

The same day, Buergofol again denied that it had any obligation to participate in any type of conference call and stated "TransPerfect is to show up

98

at the Buergofol facility and do its job." *Id.* at 15. Buergofol further stated that it would "provide access, and all necessary credentials, usernames, passwords . . . [and] a qualified person to assist the expert in retrieving the data and identifying all backups of the Navision system." *Id.* The following day, TransPerfect emailed Buergofol, stating that the conference call is "non-negotiable" to ensure that TransPerfect's forensic inspection "is executed professionally, successfully, and in a forensically defensible manner." *Id.* at 14. In response, Buergofol stated that TransPerfect "is needlessly delaying and preventing TransPerfect from doing the tasks [it] was paid to do." *Id.* at 13. Buergofol also informed TransPerfect that any technical assistance would be limited to Klaus de Groote, who Buergofol stated "is the only person at Buergofol with access to, and any working knowledge of, the archaic Navision/COEX2 system." *Id.* Buergofol clarified that de Groote would not be assisting TransPerfect in generating the film shipments report because "TransPerfect are supposed to be the 'experts.' " *Id.*

Buergofol sent a follow-up email the next day. *Id.* at 12-13. In that email, Buergofol requested that TransPerfect "stop making excuses" about its "self-imposed requirements, using phony terms like the 'engagement' and 'qualified IT representative' and such." *Id.* at 12. Buergofol reiterated that de Groote had very little memory of the "old archaic, unused" Navision system and demanded that TransPerfect get their expert over to Buergofol's facilities within the next five days "without further excuses." *Id.* at 13. In an email sent on July 25, 2025, TransPerfect requested that Buergofol allow the pre-forensic conference

99

call with de Groote to allow TransPerfect to "provide the expert services" it was hired to complete under the court's ESI order. *Id.* at 11.

Instead of agreeing to the pre-forensic conference call, Buergofol again demanded that TransPerfect "simply show up and perform the report-generating task." *Id.* at 10 (Buergofol stating that TransPerfect needs to "[w]ithout further delay and excuses, have [TransPerfect's] European-based 'expert' get in a car, drive to the Buergofol Siegenburg facility at the address that has been provided to [TransPerfect], and generate the report"). Despite these demands for compliance, TransPerfect indicated that Buergofol's emails had "not convinced [TransPerfect] to forego [its] mandatory quality assurance protocol, including having a brief advance phone call with whomever at Buergofol is most knowledgeable about these two target data sources, before [TransPerfect] shows up at [Buergofol's] facilities in Germany." *Id.* at 7. TransPerfect also indicated that based on Buergofol's "hostile, condescending and accusatory conduct in response to [TransPerfect's] very simple and basic request for a brief telephone call, TransPerfect [was] no longer comfortable sending a single forensic resource to [Buergofol's] offices in Germany to execute this engagement." *Id.* at 7-8. TransPerfect stated that if the forensic inspection proceeded, it would be sending two forensic experts to Buergofol's facilities in order "to have a second witness present in the event this vitriolic conduct continues during the actual collection." *Id.* at 8.

On July 28, 2025, Buergofol emailed TransPerfect and stated that de Groote did not wish to speak with TransPerfect because there was "widespread

100

resentment about [TransPerfect's] attempt to bully Buergofol personnel into undergoing [TransPerfect's] interrogation." *Id.* at 5-6. Buergofol requested that TransPerfect provide a date and time to conduct a phone call with Buergofol's counsel so that TransPerfect could explain what TransPerfect believed its "expert is going to be doing on Buergofol's computer system," and whether TransPerfect's expert "has any actual true experience porting Tobit/David emails from a strongbox file into eml files." *Id.* at 6. Buergofol last suggested that it could have an "Epiq expert do the Navision task, and terminate the TransPerfect engagement with respect to Navision." *Id.* at 7. TransPerfect offered several potential times for a scheduled phone call with Buergofol and Omega, *see id.* at 5, but Buergofol canceled its request to have a phone call with TransPerfect because it did not want to have communications with both TransPerfect and Omega, *id.* at 4. TransPerfect responded on July 30, 2025, and indicated that it could not participate in a phone call with only Buergofol because *ex parte* communications were prohibited per the terms of the parties' contract with TransPerfect. *Id.* at 3.

On August 6, 2025, because Buergofol failed to respond to TransPerfect's July 30, 2025, email, Omega emailed both TransPerfect and Buergofol and requested that TransPerfect confirm whether it was unable to proceed because it was "clear that the forensic process was at an impasse and that a call with Buergofol's most knowledgeable IT representative was necessary to overcome this impasse." *Id.* at 2-3. That same day, TransPerfect confirmed that it "cannot

101

in good faith proceed without a brief preparatory call with whomever at Buergofol is most knowledgeable about these two target data sources." *Id.* at 2.

On August 12, 2025, Buergofol advised that it would ask de Groote whether he was willing to speak with TransPerfect, but reiterated that "de Groote is not an expert in Navision and has never done any programming of the Navision system." Docket 867-17 at 10. That same day, Omega stated that because "[i]t is beyond dispute that [Buergofol's IT Manager, Anton Hoffmann,]—not Mr. de Groote—is the only Buergofol employee qualified to assist TransPerfect," Buergofol was violating the court's ESI order by solely providing de Groote to assist TransPerfect. *Id.* at 9. The next day, Buergofol indicated that while de Groote "definitely does not want to talk with [TransPerfect,]" he would take a "brief call," but only if the attorneys for both sides were not involved. *Id.* at 8. TransPerfect agreed to this arrangement, *id.* at 7, but Omega objected, noting that the parties' contract with TransPerfect expressly prohibits ex parte calls, *id.* at 6-7.

On August 14, 2025, TransPerfect stated that because it "is not in a position to adjudicate the disputes between the parties, or to undertake actions that either side objects to," it requested that both parties resolve their disagreements or seek court intervention. *Id.* at 5-6. In response, Omega reiterated its concerns against allowing ex parte communications and that Buergofol continued to refuse to produce Anton Hoffmann, who Omega stated is "the sole custodian of the 2013 email backup and the individual most familiar with the Navision/COEX database systems." *Id.* at 4-5. Omega further

102

stated that for the forensic inspection to proceed, it would "not attend the initial call between TransPerfect and Mr. de Groote if the discussion is transcribed and the transcript is immediately provided to Omega without redactions." *Id.* at 5.

On August 15, 2025, TransPerfect agreed to Omega's suggestion, *id.* at 4, but Buergofol objected, arguing that the initial call should not be recorded or transcribed because Omega could then use this transcription in court, *id.* at 3. On August 18, 2025, Omega stated that "[i]n the interest of moving matters forward, Omega will not require transcription of the call with Mr. de Groote . . . [but] strongly encourage[d] TransPerfect, for the benefit of all parties, to take detailed notes of the discussion so there is a clear and reliable record of the call." *Id.* at 2.

On August 29, 2025, TransPerfect emailed both parties confirming that it held a brief preparatory call with de Groote the previous day. Docket 867-18 at 11-12. TransPerfect stated that while "Mr. de Groote was unable to provide additional information about the target data sources," it was willing "to proceed with this limited information," and further suggested dates when it could travel to Germany to conduct the forensic inspection. *Id.* at 12. That same day, Omega requested that TransPerfect "specify what information Mr. de Groote was unable to provide and identify any information he did provide." *Id.* at 10. Omega further expressed concern with TransPerfect's willingness to proceed with the forensic inspection at Buergofol's facilities provided its "repeated insistence that it must first speak with a 'qualified IT representative from

103

Buergofol' to ensure the inspection is executed 'professionally, successfully and in a forensically defensible manner.' " *Id.* (emphasis omitted). Because of its concern that the forensic inspection may not acquire the targeted information identified in the court's ESI order, Omega requested that TransPerfect meet jointly with both parties before it conducted the inspection. *Id.* at 11.

In an email sent on September 3, 2025, TransPerfect indicated that it was amenable to a call between the parties to discuss next steps but reiterated that it was still available to conduct the forensic inspection should the call not occur. *Id.* at 9. TransPerfect further stated that although its forensic inspection might not be successful given the lack of information provided by de Groote, TransPerfect concluded that "there is little more that we can do other than execute the onsite collection to the best of our abilities and report back to the parties on the results." *Id.* TransPerfect explained that because the Strongbox (.stbox) file "is an exceptionally rare file format and . . . cannot be easily processed in an e-discovery platform for searching," its "analysts might be able to convert the .stbox file into a searchable format . . . [but it] will require custom engineering, and still might not be successful." *Id.* (emphasis omitted). TransPerfect further stated that it might not be able to search the .stbox file because it did not "know if that file is encrypted or not and, if it is, who has the encryption key." *Id.* But because Buergofol informed TransPerfect that de Groote was the most knowledgeable IT person at Buergofol concerning the Navision/COEX2 system, TransPerfect felt that its requirement for a preparatory phone call was satisfied. *Id.*

On September 4, 2025, Buergofol emailed TransPerfect and Omega stating that de Groote would be available on September 9, 2025, to assist TransPerfect with its forensic inspection. *Id.* at 8. Buergofol also rejected Omega's request to conduct a call between the parties and TransPerfect because it asserted it was Omega's latest "attempt to delay and obstruct the implementation" of the ESI order. *Id.* In reply, TransPerfect indicated that because the parties disagreed as to "whether the forensic collection should proceed next week or await a call amongst the parties," it had to "stand down until this issue is resolved." *Id.* at 7.

Later that same day, Omega emailed both Buergofol and TransPerfect and stated that it had "no interest in delaying this inspection," and was only seeking to ensure that the forensic inspection is "facilitate[d in] an efficient, cost-effective, and forensically sound process to ensure proper implementation of the court's ESI Discovery Order." *Id.* at 4-5. Omega further reiterated its concerns that TransPerfect "received no additional information from Klaus de Groote regarding the two key data sources: (1) the 2013 email backup in .stbox format and (2) the Navision/COEX database(s) system." *Id.* at 5. Omega was specifically concerned that de Groote was unable to inform TransPerfect whether the .stbox file was encrypted because the Tobit David Tech Briefing page indicated that .stbox files are encrypted. *See id.* Thus, Omega stated that without Buergofol providing TransPerfect an encryption password and direct access to the Tobit David Administrator software, "the inspection of the encrypted .stbox file is guaranteed to fail from the outset." *Id.* at 5-6.

In its email, Omega also raised concerns regarding the Navision/COEX2 database because de Groote provided no information regarding the system and Buergofol "expressly restricted TransPerfect's ability to even investigate the location of the target data." *Id.* at 6. Omega further stated that because Buergofol was refusing to supply TransPerfect with the actual individual who had the most IT knowledge at Buergofol—Anton Hoffmann—Buergofol's "obstruction has not only delayed and crippled the ESI process—it has ensured its failure." *Id.* Omega indicated that "[u]nless Buergofol immediately provides TransPerfect with (1) the encryption password or key for the .stbox file, (2) direct access to the Tobit David Administrator software that created and encrypted the .stbox file, and (3) a pre-inspection call with Anton Hoffmann to provide the necessary technical support for both the 2013 email backup and the Navision/COEX database(s), Omega will seek relief from the [c]ourt." *Id.*

In response, Buergofol demanded that Omega "immediately . . . retract [its] instruction to TransPerfect not to go to Buergofol on [September 9th] to perform the two tasks TransPerfect is supposed to do." *Id.* at 4. Buergofol argued that because Omega instructed TransPerfect not to perform the forensic inspection, Omega was "obviously obstructing compliance with the ESI Order." *Id.* Buergofol further argued that Omega's "pseudo-technical arguments about why TransPerfect will not be able to access data from the 2013 Email Backup or the Navision system" were "categorically and demonstrably false." *Id.* Omega responded that if Buergofol was "genuinely interested in moving the forensic inspection forward in an efficient—and successful manner," it should address

the three issues Omega raised in its previous email. *See id.* at 3. The next day, Buergofol again demanded that Omega "[r]etract [its] instruction to TransPerfect not to go to Buergofol" on September 9th. *Id.* at 2.

On September 30, 2025, Buergofol filed a motion to compel Omega to stop obstructing implementation of the court's ESI Order. Docket 876. Specifically, Buergofol's motion to compel seeks a court order requiring Omega's counsel, Michael Neustel, "to transmit a written communication to its ESI expert TransPerfect indicating that TransPerfect has Omega's permission to visit the Buergofol facility in Siegenburg and while there to undertake the two tasks the ESI expert is supposed to perform pursuant to Sections III.5 and III.2 of the ESI Order." *Id.* at 1.

On October 15, 2025, Buergofol emailed TransPerfect an offer to hire it as an EXI expert, separate from the parties' agreement, to (1) locate an .stbox file, the 2013 Email Backup, and make a copy of the file onto a portable SSD drive; and (2) search Buergofol's "Navision system and all backups using 10 CIPP customer names . . . and generate a report of all film orders and shipments to those customers before January 1, 2015." Docket 973-7 at 11-12. Buergofol stated that this arrangement "would avoid the current arguments regarding the requirements of the ESI Order." *Id.* at 11. Buergofol further indicated that if TransPerfect was able to complete this job, it could then repeat the job pursuant to the ESI Order. *Id.* at 13.

On October 22, 2025, TransPerfect stated that it would be willing to accept Buergofol's proposal subject to two caveats. *Id.* at 9-10. First,

TransPerfect noted that while the parties' agreement allows either Omega or Buergofol to hire TransPerfect separately, this provision was limited to "services outside the scope of the ESI Discovery Order." *Id.* at 10. As such, because TransPerfect believed that the tasks for which Buergofol sought TransPerfect's expertise fell within the scope of the ESI Order, it required Omega's consent before proceeding. *Id.* Second, TransPerfect indicated that should Omega consent, it would need to use a new forensics team to avoid any conflicts. *Id.* That same day, Buergofol emailed TransPerfect and requested that TransPerfect confirm that it would not complete the two tasks "unless [TransPerfect] get[s] Omega's consent." *Id.* at 9. Additionally, Buergofol indicated that there was no need for a conflict wall because Buergofol was intending to disclose the report generated by TransPerfect. *Id.*

In response, Omega stated that because "TransPerfect was appointed by the [c]ourt as the neutral, third-party ESI expert for the tasks set out in the ESI Discovery Order . . . [a]ny separate engagement by Buergofol for the same or overlapping work is fundamentally inconsistent with that neutral role." *Id.* at 7. In addition, Omega listed several issues that it found could not be resolved by its consent to the additional engagement. *Id.* at 7-8. While Omega indicated that it would not consent to the additional engagement with TransPerfect, it noted that Buergofol could hire a different vendor to perform the same tasks. *Id.* at 8. Omega also requested that if TransPerfect went forward with the additional engagement, that TransPerfect terminate the parties' agreement and withdraw as the neutral ESI expert. *Id.* That same day, TransPerfect indicated

that without Omega's consent or a formal conflict wall, "TransPerfect was not in a position to accept Buergofol's proposed side engagement." *Id.* at 6-7.

Buergofol eventually hired Markus Fink, an employee at Avanito GmbH, to (1) "examine Buergofol's Navision system . . . to prepare a report for all orders from and shipments to [each of the 10 identified CIPP film] customers before January 1, 2015," and (2) "locate an email backup file (the '2013 Email Backup' file) in the .stbox file format, to copy that file onto an SSD drive, and to mail the SSD drive to TransPerfect."[44] Docket 940-1 ¶¶ 3, 8. Fink indicated that he "prepared the ESI Report of Film Orders and Shipments without any assistance from Anton Hoffmann and without communicating with him." *Id.* ¶ 7. Fink also stated that he downloaded the 2013 Email Backup without using an encryption key and had "no knowledge that there is any encryption key or password for the Email Backup file." *Id.* ¶ 56.

On November 11, 2025, TransPerfect sent the parties an email stating that it had received a letter and accompanying hard drive from Fink. Docket 973-7 at 6. TransPerfect stated that while it appeared that Buergofol hired Fink, TransPerfect was "surprised to receive this delivery and do not know what is expected of [TransPerfect]." *Id.* TransPerfect placed the hard drive in its secure evidence locker and awaited the parties' joint instructions before taking any further action. *Id.* In response, Omega proposed that (1) Buergofol provide TransPerfect with the encryption credentials for the encrypted 2013 Email

---

[44] The 10 CIPP customers were Light Stream, International Pipe Lining (IPL), Reline, Saertex, Impreg, Brandenburger, BKP Berolina, Insituform, Pacific Multilining, and Applied Felts. Docket 940-2 at 4.

Backup; (2) TransPerfect retain Itacom GmbH to assist with restoring the 2013 Email Backup to an active Tobit David system and then export the emails into a .pst file; and (3) TransPerfect ingest the exported emails into an e-discovery platform. *Id.* at 5.

In an email sent that same day, Buergofol stated that Omega's counsel must "STOP OBSTRUCTING TransPerfect from visiting the Buergofol facility." *Id.* at 3. Buergofol also objected to Omega's proposed plan. *Id.* ("Under no conditions shall TransPerfect allow Itacom . . . access to the 2013 Email Backup .stbox file that was just supplied to TransPerfect."). In response, Omega noted that because Buergofol claimed it had "already extracted the emails from the '2013 Email Backup .stbox file'—apparently without encryption credentials, third-party export software, or any 'custom engineering' . . . then TransPerfect should likewise be allowed to determine whether it can open" and access the emails in the 2013 Email Backup. *Id.* at 2. As such, Omega requested that Buergofol indicate whether it had any objection to TransPerfect attempting to access the emails in the 2013 Email Backup. *Id.*

In an email sent to TransPerfect and Buergofol on January 12, 2026, Omega again requested that TransPerfect "determine whether it can access and view all the contents of the encrypted 2013 Email Backup .stbox file provided by Buergofol . . . without the use of encryption credentials." Docket 973-8 at 6. Omega made this request because whether the 2013 Email Backup. stbox file could be opened without encryption credentials "is an issue concerning one of the grounds for dismissal currently before the [c]ourt." *Id.* At the end of its

110

email, Omega requested that TransPerfect confirm that it can proceed with its analysis "[i]n light of Buergofol's representations to the [c]ourt." *Id.* On January 13, 2026, TransPerfect stated that it was ready to proceed once it obtained Buergofol's explicit consent and requested that Buergofol confirm whether it approved. *Id.* at 3-4.

In response, Buergofol requested that TransPerfect confirm whether it would come to Buergofol to copy the 2013 Email Backup pursuant to Section III.2 of the ESI Order. *Id.* at 3. Buergofol indicated that the task TransPerfect was hired for "has nothing to do with the specific .stbox file Mr. Markus Fink of Avanita GmbH was nice enough to copy." *Id.* In its email sent on January 14, 2026, Omega noted that Buergofol was requesting TransPerfect "to perform a discovery task in furtherance of the ESI Discovery Order, which would violate the [c]ourt's stay order." *Id.* at 2. Omega reiterated that because Buergofol's counsel stated that "he was able to access and view all the email data contained in the 2013 Email Backup .stbox file" without using any encryption credentials,[45] Omega wanted TransPerfect to confirm that this was possible. *Id.* Omega again requested that Buergofol indicate whether it had "any objection to

---

[45] Omega was referring to a declaration submitted by Buergofol's counsel, Darien Wallace, in which Wallace states that he

> personally mounted the 2013 email backup .stbox file into the Tobit server/client running on my laptop computer without entering any password or key of any type. After mounting the 2013 email backup .stbox file, I was able to access and view all of the email data contained in the .stbox file, including but not limited to folders, emails and attachments.

Docket 940-3 ¶ 6.

TransPerfect performing this limited, straightforward verification," but Buergofol did not respond to Omega's request. *Id.*

### 2.    Parties' Arguments and Analysis

Omega argues Buergofol has violated Sections III.2 and III.5 of the ESI Order because it has failed to "provide both (1) direct access to the target ESI sources and (2) technical support to the neutral expert." Docket 865 at 30-31. The court first addresses Section III.2 before turning to Section III.5.

### a.    Section III.2

Omega argues that Buergofol has failed to provide TransPerfect with the necessary technical assistance and information it needs to perform the task set out in Section III.2. *See id.* at 33-40. For instance, despite stating that the emails in the 2013 Email Backup "are in an encrypted and compressed '.stbox' file format," Docket 850 at 3, Buergofol has failed to provide TransPerfect or Omega with the encryption password, *see* Docket 865 at 39.

In response, Buergofol asserts that Fink's declaration demonstrates it was in full compliance with the ESI Order because it provided the necessary access, credentials, and technical support necessary for TransPerfect to perform the task set out in Section III.2. Docket 949 at 35-36, 50-51. In fact, Buergofol asserts that Omega has obstructed TransPerfect from completing the two tasks set out in the ESI Order. *Id.* at 36; Docket 877 at 4-5. Buergofol further asserts that it is in compliance with Section III.2 and that the court may not rely on "Omega's false statements that Buergofol's 2013 email backup .stbox file has an encryption password." Docket 949 at 29. Instead, Buergofol

112

argues that the declarations from Fink, Chan, and Wallace demonstrate that "the 2013 Email Backup .stbox file has no encryption password, and no encryption password is required either to copy the backup file or to access and view the contents of the file." *Id.* at 29-30.

In reply, Omega argues that Fink's declaration cannot be relied upon because (1) Fink has failed to demonstrate any knowledge or experience using Navision, (2) the record suggests that Fink only had remote access and did not visit Buergofol's facility, (3) Fink does not claim that he personally copied or shipped the 2013 Email Backup to TransPerfect, (4) Fink never indicated that he accessed, viewed, or extracted any email from the 2013 Email Backup, and (5) Fink does not identify what assistance de Groote provided him. Docket 969 at 104-08. Moreover, Omega argues that Buergofol's framing of its obligations under Section III.2—that Buergofol need "only to provide access, credentials, and minimal technical assistance to copy the 2013 Email Backup"—"misstates the order and ignores its express requirements." *Id.* at 111. Instead, Omega argues that Section III.2 requires Buergofol to provide "credentials and technical support necessary to enable successful extraction of the emails from the 2013 Email Backup." *Id.*

To determine if sanctions should be imposed under Rule 37(b), the court must first determine what Section III.2 required Buergofol to do. Buergofol contends that Section III.2 only requires it to provide the necessary credentials, access, and technical support to allow TransPerfect to successfully make a copy of the 2013 Email Backup. *See* Docket 949 at 50-51. Omega argues that

113

copying alone is not enough under Section III.2 because it requires Buergofol to provide access, credentials, and technical support necessary to decrypt and extract emails from the 2013 Email Backup. *See* Docket 969 at 111. The court finds that under Section III.2, Buergofol was ordered to provide the neutral ESI expert, TransPerfect, with the necessary "access, credentials, and technical support" to enable TransPerfect to fulfill the tasks laid out in Section III.2. Docket 725 at 5. These tasks included copying, indexing all emails and attachments, and running search queries on the indexed emails located in the 2013 Email Backup. *Id.* at 5-6. As such, if the 2013 Email Backup requires an encryption key or password for TransPerfect to view and access the emails, then Buergofol's failure to provide such credentials violates Section III.2.

The main issue surrounding the determination of whether Buergofol has complied with Section III.2 relates to whether the 2013 Email Backup can be accessed without encryption or password credentials. Both parties agree that TransPerfect could have successfully copied the 2013 Email Backup without encryption credentials, Docket 949 at 30; Docket 969 at 111, but disagree as to whether any encryption credentials are needed to access and view the 2013 Email Backup, *see* Docket 949 at 30; Docket 969 at 112. Suing, Omega's declarant, indicated that if the encryption function was activated when the 2013 Email Backup .stbox file was created, a password must be provided to access the file. Docket 972-3 ¶¶ 62-66. Under such circumstances, if a password is not provided, then a user cannot mount or access the content of the file. *Id.* ¶¶ 66-69.

114

The issue, however, is that Buergofol has provided conflicting representations as to whether the 2013 Email Backup .stbox file requires a password. Despite TransPerfect's and Omega's questions about the encryption status of the file, Buergofol repeatedly refused to answer. *See, e.g.*, Docket 867-18 at 1-8; Docket 867-17 at 21 (Buergofol's counsel stating that Buergofol would not be providing TransPerfect "with general information about Buergofol's computer system in general, operating systems, encryption, and will not be providing you advance information in any advance meeting"). In its reply in support of its motion to amend/correct the ESI Order, Buergofol stated that "[e]mails in [the 2013 Email Backup] are in an encrypted and compressed '.stbox' file format."[46] Docket 850 at 3. But now, in its opposition brief to the motion to dismiss, Buergofol states that "[t]he 2013 Email Backup .stbox file has no encryption password, and no encryption password is required either to copy the backup file or to access and view the contents of the file." Docket 949 at 30. Buergofol also provided declarations from Ian Chan and Dirk Hagemeister in which both state that they were able to access and view emails in the 2013 Email Backup .stbox file without using an encryption password.[47]

---

[46] Buergofol faults Omega for conflating the concepts of encryption with password protection. *See* Docket 987 at 22-23. As such, Buergofol argues that whether the 2013 Email Backup is system-level encrypted or not is not relevant to determining whether it can be accessed and viewed without an encryption password. *Id.* at 24.

[47] The arguments raised in Buergofol's reply brief and the evidence identified in Chan's and Hagemeister's second declarations prompted Omega to move for leave to file a surreply to Buergofol's reply in support of its motion to order Omega's counsel to stop obstructing implementation. Docket 1004 at 1. A court may, in its discretion, allow a surreply to be filed. *See Lightner v. Catalent*

115

Docket 988 ¶¶ 6-12; Docket 989 ¶¶ 5-12. But strangely, rather than allow TransPerfect to confirm that Buergofol's claim was true, Buergofol refused to consent to TransPerfect determining whether it could access or view emails on the copy of the 2013 Email Backup sent to it by Fink without an encryption key or password. *See* Docket 973-7 at 2-6.

Buergofol's refusal to provide a clear answer on this question conforms with the litigation tactics Buergofol has practiced throughout this case.[48] For instance, until December of 2024, Buergofol indicated that it did not possess

---

*CTS (Kansas City), LLC*, 89 F.4th 648, 655 (8th Cir. 2023). But a surreply is generally "unwarranted where the reply responds to the arguments in the resistance and does not raise new arguments." *Fleshner v. Tiedt*, 2019 WL 271619, at *2 (N.D. Iowa Jan .18, 2019). Because Buergofol's reply brief and submitted declarations substantively respond to Omega's opposition brief and do not raise new arguments, *see generally* Dockets 987, 988, 989, and because the parties have already submitted excessive briefing on this issue, *see, e.g.*, Dockets 865, 949, 877, 969, 987, the court denies Omega's motion for leave to file a surreply.

[48] It is for this same reason that the court denies Buergofol's motion to order Omega's counsel to stop obstructing implementation of the ESI Order (Docket 876). Buergofol has not demonstrated that it was solely Omega's fault for obstructing implementation of Sections III.2 and III.5. *See* Docket 877; Docket 987. As the background section indicates, Buergofol, for over a month, refused to engage in a pre-forensic call that should have provided TransPerfect with the basic information it required to conduct successful forensic inspections as laid out in Sections III.2 and III.5. Buergofol's actions delayed TransPerfect's performance of these two tasks despite Section III.2's requirement that within seven days of TransPerfect's appointment, "Buergofol shall provide access." Docket 725 at 5. Additionally, although Buergofol blames Omega for preventing TransPerfect from carrying out the forensic inspections due in part to the parties' disagreement over whether the 2013 Email Backup requires a password to access the emails, *see* Docket 987 at 24, Buergofol could have ended the dispute by either providing a clear answer on whether a password was required or by allowing TransPerfect to test the copy of the 2013 Email Backup file sent to it by Fink. But Buergofol did neither and instead seeks to shift the blame onto Omega.

pre-2014 emails. *See, e.g.*, Docket 238 at 141 (Buergofol's counsel indicating that he could not find emails prior to 2014). It was only later in this litigation that Buergofol revealed the existence of the 2013 Email Backup. *See* Docket 586-1 at 138, 149 (Buergofol's custodian of records testifying that the 2013 Email Backup exists).[49] Thus, despite declarations from Buergofol's counsel, Hagemeister, and Chan now indicating that the 2013 Email Backup file does not require an encryption password to access and view emails, Buergofol's repeated lack of disclosure makes it difficult to take Buergofol at its word.

Moreover, the court finds that Fink's report is not reliable in assessing whether Buergofol has fully complied with Sections III.2. For one, Buergofol repeatedly represented that Fink physically visited Buergofol's facility in Siegenburg to perform the tasks under Section III.2 and III.5. *See* Docket 949 at 36-39. But Fink's declaration does not state that he physically visited Buergofol's facility, *see generally* Docket 940-1, and the screenshots in his report suggest that he only had remote access to Buergofol's computers, *see* Docket 940-2 at 8-12. As Suing's declaration points out, the screenshots in Fink's report include a collapsed session panel for TeamViewer, which is "a

---

[49] Omega also attacks Buergofol for misrepresenting the size of the 2013 Email Backup. *See* Docket 949 at 110-11 (arguing that because Buergofol represented the 2013 Email Backup file contains 338,165,025 KB of *compressed* data, the file is 300 GB, "less than 9% of the size [Buergofol] repeatedly represented to the [c]ourt when opposing the ESI Discovery Order." *Id.* at 110. But it appears that when Buergofol stated that the 2013 Email Backup was 3.5 TB, it meant it was 3.5 TB of *uncompressed* email data. *See* Docket 987 at 24-25 n.2. Thus, Buergofol's prior representation that the file contains 338,165,025 KB of compressed data does not indicate that Buergofol misrepresented the size of the 2013 Email Backup file.

117

software solution . . . used worldwide for remote access." Docket 972-3 ¶¶ 92-96; *see also* Docket 940-2 at 8-12 (screenshots from Fink's report containing the collapsed session panel for TeamViewer). It also appears that the screenshots in Fink's report were made on October 29, 2025, Docket 940-2 at 8-12, 57, whereas the images of the computer at Buergofol appear to be taken on October 30, 2025, *id.* at 6-7. Fink's declaration also does not indicate that he was the one who took these photos and screenshots. *See* Docket 940-1; Docket 940-2 at 5-12, 56-57.

Further, while Fink states that "[t]he second task is to locate an email backup file (the '2013 Email Backup' file) in the .stbox file format, to copy that file onto an SSD drive, and to mail the SSD drive to TransPerfect," Docket 940-1 ¶ 8, Fink does not state that he was the one who personally took these steps, *see generally id.* Moreover, Fink does not indicate whether he was able to access or view any of the emails on the 2013 Email Backup. *See generally id.* Instead, Fink stated that "the Email Backup file was downloaded without using any encryption key." *Id.* ¶ 9. But because the parties agree that the copying task could have been completed without an encryption key or password, Fink's statement does not provide a clear answer on whether emails in the 2013 Email Backup can be accessed or viewed without inputting an encryption key.

But because TransPerfect has not yet attempted to perform the task set out under Section III.2, the court cannot conclusively determine whether Buergofol has provided the necessary access and credentials. As such, the court cannot determine whether Buergofol has willfully violated this section of

the ESI Order. Thus, the court finds that dismissing Buergofol's claims as a sanction under Rule 37(b) for Buergofol's alleged failure to comply with Section III.2 would be improper at this stage. But the court finds that Buergofol's tactics to delay execution of Section III.2 is relevant to its discussion of whether sanctions should be imposed under Rule 41(b) and the court's inherent authority below. *See Hunt*, 203 F.3d at 527 (finding that dismissal as a sanction under Rule 41(b) should only be available where there is "willful disobedience of a court order or *where a litigant exhibits a pattern of intentional delay*" (emphasis added)); *see also Siems v. City of Minneapolis*, 560 F.3d 824, 826 (8th Cir. 2009).

### b.    Section III.5

The parties raise two arguments regarding Buergofol's compliance with Section III.5. First, the parties dispute whether Section III.5 requires Buergofol to provide "direct access" to its Navision system. *See* Docket 865 at 41 (Omega arguing that "[d]irect access is indispensable for a successful and defensible forensic inspection"); Docket 949 at 54 (Buergofol arguing that "direct access" is a term fabricated by Omega). Second, the parties dispute whether Buergofol has adequately complied with Section III.5's provision that Buergofol must "provide a qualified person to assist [TransPerfect] in . . . identifying all backups of the Navision system." Docket 725 at 7-8; *see also* Docket 949 at 51-53; Docket 969 at 125-28. Buergofol contends that it can comply with Section III.5 because it will make de Groote available during TransPerfect's inspection. Docket 949 at 51-52.

119

Just as with Section III.2, the court must first determine what Section III.5 of the ESI Order required Buergofol to do. Section III.5, entitled "Forensic Inspection of Buergofol's Navision System," clearly orders that "Buergofol shall provide a qualified person to assist the expert in retrieving the data and identifying all backups of the Navision system." Docket 725 at 6-7. Thus, if Buergofol failed to provide a qualified person to assist TransPerfect or failed to provide the necessary access for TransPerfect to conduct its forensic inspection of Buergofol's Navision system, then it is in violation of Section III.5 of the ESI Order.

The court next addresses whether Buergofol has complied with Section III.5. The court finds that Fink's report does not demonstrate that Buergofol complied with Section III.5 of the ESI Order. Fink stated that he was hired to "examine Buergofol's Navision system . . . to prepare a report of all orders from and shipments to customers before January 1, 2015." Docket 940-1 ¶ 3. But Fink's declaration fails to identify whether he searched any of the Navision/COEX2 backups or whether he searched the COEX2 database. *See id.* ¶¶ 3, 5-6 (mentioning only the Navision system). Omega stresses that this omission is crucial because Buergofol has previously indicated that COEX2 is a separate application from its Navision system and as such, the COEX2 system cannot be searched using the Navision system. *See* Docket 969 at 124-26; *see also* Docket 695 at 20-21; Docket 726 at 31, 34.

But for similar reasons as discussed above, the court cannot, at this stage, determine whether Buergofol has willfully violated Section III.5. For all

intents and purposes, it appears that Buergofol was not going to follow through on the requirements of Section III.5. For example, Buergofol informed TransPerfect that it would not be accessing the COEX2 application to make its report. *See* Docket 867-17 at 18-19 (Buergofol's counsel stating that "TransPerfect will be using the Navision application as opposed to the COEX2 application to access the order and shipment information"). Buergofol also failed to identify whether any backups to the Navision/COEX2 database existed. *See, e.g.*, Docket 867-18 at 12 (TransPerfect indicating that de Groote failed to provide new information). And despite Buergofol's claims that Omega invented the term "direct access," Buergofol previously informed TransPerfect that "Buergofol will not provide 'direct physical access' to any server." Docket 822-1 at 34. This is problematic because other courts have recognized the uniqueness of providing physical access to ESI sources during a forensic inspection. *See, e.g., TK Elevator Corp. v. Abels*, 2022 WL 17551765, at *10 (D. Neb. Dec. 9, 2022) (recognizing that a forensic inspection of a party's electronic devices can be "highly intrusive"); *PlayUp, Inc. v. Mintas*, 350 F.R.D. 47, 52 (D. Nev. 2025) ("Forensic examination is unlike the traditional discovery process in that the subject party is required to open its physical premises and electronic systems to a third-party expert."). Despite these issues, because TransPerfect has not yet visited Buergofol's facility to conduct the forensic inspection, the court finds that it would be improper to hold that Buergofol has willfully violated Section III.5 of the ESI Order. But as stated before, the court finds that Buergofol's conduct in delaying execution of Section III.5 of the ESI Order is

relevant in its discussion of whether sanctions are warranted under Rule 41(b) and the court's inherent authority below.

### F.    Buergofol's Failure to Produce Anton Hoffmann for Deposition

Omega argues that Buergofol has willfully violated the court's order requiring Buergofol to produce Anton Hoffmann for deposition. Docket 865 at 41-44.

### 1.    Background

On September 18, 2023, Judge Duffy ordered Buergofol to produce a representative for a custodian of record deposition within 30 days "so that someone within Buergofol can explain to Omega what documents are kept, how they're kept, how long they're kept, [and] what's available." Docket 238 at 168. On December 4, 2024, Buergofol produced Daniel Eaton, an attorney who has served as litigation counsel for Buergofol's counsel, as its Rule 30(b)(6) custodian of records. Docket 586-1 at 9-13. During his deposition, Eaton testified that he was prepared for the deposition by Anton Hoffmann, who "manages the IT department" at Buergofol. *Id.* at 15-16. Eaton also identified Hoffmann as the custodian for Buergofol's email backups, including the 2013 Email Backup .stbox file. *See id.* at 197, 270-71.

On December 9, 2024, Omega reached out to Buergofol to communicate its intent to depose Hoffmann. Docket 658-2 at 6. Initially, Omega offered to hold Hoffmann's deposition remotely and requested that Buergofol confirm Hoffmann's availability. *Id.* Buergofol informed Omega that Hoffmann is an independent contractor, and therefore Buergofol is not authorized to accept

122

notice of Omega's intent to depose him. *Id.* at 5-6. Buergofol asserted that because Hoffmann is a German citizen living in Germany, he is beyond the court's subpoena power, and the procedures of the Hauge Convention would serve as the only avenue to depose him. *Id.* Nevertheless, on December 23, 2024, Omega served Buergofol with a Notice of Deposition of Anton Hoffmann. Docket 658 ¶ 2; Docket 658-1 at 3-5. Buergofol responded that the deposition notice was "legally inoperative" and that it would take no action nor forward it on to Hoffmann. Docket 658-2 at 4-5.

Because Buergofol was unwilling to provide Hoffmann for deposition and Omega was unsatisfied with Eaton's answers at the Rule 30(b)(6) deposition, on March 10, 2025, Omega filed a motion to compel Buergofol to produce Anton Hoffmann for deposition, Docket 656, and a motion to compel Buergofol to produce a prepared Rule 30(b)(6) witness, to reconvene the Rule 30(b)(6) deposition, and for sanctions, Docket 660.[50] On August 6, 2025, the court granted Omega's motion to compel Hoffmann's deposition. Docket 799 at 16. In its order, the court determined that Hoffmann was a managing agent at Buergofol and "encourage[d] the parties to reach an agreement in deposing Hoffmann remotely." *Id.* at 14.

Following issuance of the court's order, Omega emailed Buergofol asking for Hoffmann's availability for his deposition and whether Hoffmann would require an interpreter. Docket 867-20 at 3-4. In response, Buergofol informed

---

[50] Omega's motion to compel Buergofol to produce a prepared Rule 30(b)(6) witness, to reconvene the Rule 30(b)(6) deposition, and for sanctions is still pending before the court. *See* Docket 660.

123

Omega that "Buergofol cannot be 'compelled' to produce Mr. Hoffmann," and as such, the court's order granting Omega's motion to compel "has no merit." *Id.* Additionally, Buergofol stated that Hoffmann "cannot be a managing agent for multiple reasons" and that the court's order "overstep[ed] its jurisdiction and authority in trying to pressure an individual the [c]ourt knows is outside the [c]ourt's jurisdiction to submit to a deposition against that person's will." *Id.* Beyond these issues, Buergofol noted that the order "presents a conflict" of interest for Buergofol's counsel because "if [Buergofol's counsel] is representing Mr. Hoffmann (or his company) in this matter, and were not representing Buergofol, then we [Buergofol's counsel] as Hoffmann's lawyers    . . . would advise Mr. Hoffmann to ignore [the court's] order." *Id.* Buergofol then lists several reasons why it would advise Hoffmann to ignore the court's order. *Id.* Buergofol also informed Omega that because of the "sufficient magnitude" of this conflict, Buergofol's attorneys were no longer going to communicate with Hoffmann and instead, would only communicate with Hoffmann's counsel, Ferdinand von Stumm.[51] *Id.* at 3.

In a letter to von Stumm, Buergofol attached the court's order granting Omega's motion to compel Hoffmann's deposition and stated that "in order to comply with the [o]rder, [Buergofol's counsel was] requesting on behalf of Buergofol that Mr. Hoffmann appear for a deposition." Docket 867-21. Buergofol further advised von Stumm to "be aware that U.S. lawyers for the

---

[51] Ferdinand von Stumm, on behalf of Buergofol as its German counsel, previously warned a third-party witness to avoid speaking with Omega because it could subject them to "criminal consequences." *See* Docket 85-1 at 2-3.

party Omega in that litigation are seeking to depose Mr. Hoffmann in a U.S.-style deposition despite Mr. Hoffmann's stated desire not to appear for any deposition." *Id.* On September 4, 2025, von Stumm sent Omega a letter and informed that Hoffmann "is not willing and not able . . . to depose. [Hoffmann] is convinced that the [o]rder . . . Omega refer[s] to is not binding [on Hoffmann], as he is a German citizen, living in Germany and thus not under the jurisdiction of US or (South) Dakota law." Docket 867-22 at 2-3. The letter further indicated that because Hoffmann "is under the German law not an employee of Buergofol or as the US-court thinks a 'managing agent' . . . Buergofol has no right to order [Hoffmann] to depose and [Hoffmann] is under no obligation to follow this [c]ourt [o]rder [Omega] refer[s] to." *Id.* at 3.

### 2.    Parties' Arguments

In its motion to dismiss, Omega argues that because the court determined that Hoffmann was Buergofol's managing agent, "Buergofol became legally obligated to produce him for deposition without a subpoena, regardless of location or personal willingness to appear." Docket 865 at 43. But Omega asserts that Buergofol's conduct "goes beyond failing to produce Mr. Hoffmann for deposition . . . [as] Buergofol and its counsel actively encouraged Mr. Hoffmann not to testify in violation of the [c]ourt's order." *Id.* (emphasis omitted). Thus, Omega concludes that "[n]o sanction short of dismissal with prejudice under Rules 37 and 41(b) can remedy the misconduct." *Id.* at 44.

In response, Buergofol argues that it is not in violation of any court order pertaining to Hoffmann because "a careful reading of that order indicates that

125

it actually does not order Buergofol to do anything with respect to Mr. Hoffmann." Docket 949 at 89. Despite noting that the court granted Omega's motion to compel Hoffmann's deposition, Buergofol asserts that the order "does not order Buergofol to 'produce' Mr. Hoffmann for deposition." *Id.* Buergofol suggests that if the court order had ordered it to produce Hoffmann for deposition, it "would have had to determine how to respond and seek relief from an improper impossible-to-comply-with order." *Id.* Buergofol also asserts that due to an ethical conflict, Buergofol's counsel cannot communicate directly with Hoffmann. *Id.* at 91.

### 3.    Analysis

Federal Rule of Civil Procedure 37(d)(3) requires the court to impose sanctions on "the party failing to act, the attorney advising that party, or both" if a managing agent fails to appear at a properly noticed deposition. Fed. R. Civ. P. 37(d)(3); *see also Calderon v. Experian Info. Sols., Inc.*, 287 F.R.D. 629, 632 n.1 (D. Idaho Oct. 31, 2012) ("Rule 37 subjects a party to sanctions if a 'managing agent' fails to appear for his or her deposition."). And as laid out above, to justify sanctions under Rule 37, there must be "(1) an order compelling discovery, (2) a willful violation of that order, and (3) prejudice to the other party." *Sentis Grp., Inc.*, 559 F.3d at 899 (internal quotation marks omitted).

The first step of this analysis is straightforward. This court issued an order determining that Hoffmann was a managing agent of Buergofol and granting Omega's motion to compel Hoffmann's deposition. *See* Docket 799 at

126

14, 16. Thus, to comply with the order, Buergofol should have produced Hoffmann for a deposition.

Second, the court finds that Buergofol has willfully violated its order granting Omega's motion to compel Hoffmann's deposition. Rather than comply with the court's order, Buergofol filed a notice arguing that the order "contains no statement ordering or compelling Buergofol to take any particular action." Docket 806 at 1. Buergofol, once again, has elected to cherry-pick certain phrases of the court's order to demonstrate its "compliance" with the court's order.[52] *See id.* (interpreting the court's statement in its order granting Omega's motion to compel Hoffmann's deposition that "the court finds Hoffmann would likely give testimony at Buergofol's request," to mean that Buergofol is only required to "make a request of Mr. Hoffmann that Mr. Hoffmann appear and submit to have his deposition taken"). Buergofol's actions here ignore the fact that the court determined that Hoffmann was a managing agent and that the court granted Omega's motion to compel his deposition.

Further, Buergofol's contentions that it merely had to request Hoffmann's appearance for a deposition, *see* Docket 949 at 89, fail upon

---

[52] In granting Omega's most-recent motion for sanctions against Buergofol, the court warned Buergofol that it "cannot cherry-pick certain statements to limit the scope of the court's order." Docket 828 at 6. In the sanctions order, the court discussed Buergofol's attempt to limit which specific complaints it was required to remove its AEO designation from as ordered in a previous court order. *Id.* at 4-5. In its sanctions order, the court determined that Buergofol's reliance upon statements made in the background section of the previous order, "ignore[d] the bulk of the court's order," and was "not a proper reason to retain the AEO designation over complaints [Buergofol] deems as falling outside the scope of the court's order." *Id.* at 5-6.

127

examination of Buergofol's email to Omega, which indicates Buergofol's intent to disregard the court's order. For example, in addition to stating its disagreement with the court's determination that Hoffmann was a managing agent, Buergofol also indicated that "were we [Buergofol's counsel] representing Mr. Hoffmann as his attorneys, we would advise Mr. Hoffman[n] to ignore the [o]rder and not to respond to any demand that he sit for any deposition." 867-20 at 2. Buergofol's email to Omega further demonstrates it understood that the court's order granting Omega's motion to compel Hoffmann's deposition required Buergofol to produce Hoffmann for deposition. Buergofol asserts that "[t]he granting of a 'motion to compel,' makes no sense to me [Buergofol's counsel]. Buergofol cannot be 'compelled' to produce Mr. Hoffmann. The 'motion to compel' that was granted has no merit." *Id.* If Buergofol truly believed that the court order did not order it to produce Hoffmann for deposition, Buergofol's counsel would not argue that the court order "has no merit" or that the court was "overstepping its jurisdiction and authority in trying to pressure an individual . . . to submit to a deposition against that person's will." *Id.* Thus, the court finds that Buergofol's disregard for the court's order compelling Hoffmann's deposition was deliberate and intentional. *See Johnson*, 2025 WL 2347109, at *6 (reasoning that plaintiff willfully violated a court order because plaintiff's actions were "deliberate and intentional" and not "accidental []or involuntary").

Nor is there any question that Omega has suffered prejudice. The unreasonable delay caused by Buergofol's conduct has already led to a

128

needless waste of time and effort on Omega's part and caused great delay in these proceedings. Magistrate Judge Duffy ordered Buergofol, back in September of 2023, to produce a document custodian to explain to Omega "how documents are stored, where they are stored, and how they may be searched." Docket 234. Omega has been harmed by its inability to take Hoffmann's deposition, who Buergofol's custodian of records represented as the go-to person responsible for managing Buergofol's IT department and data storage. Docket 586-1 at 15-16, 62, 81. Preventing Omega from directly questioning Hoffmann about the specifics of Buergofol's ESI databases, among other information, has allowed Buergofol to hide behind a wall of non-disclosure of its ESI sources and databases for years. *See, e.g.*, Docket 969 at 139 (discussing that "Buergofol has never disclosed what pre-2014 data th[e Navision/COEX2] backups contain or whether it has searched them at all"). Because "[d]iscovery is not supposed to be a shell game, where the hidden ball is moved round and round and only revealed after so many false guesses are made and so much money is squandered," *Smith v. Smith*, 2025 WL 2779201, at *2 (D.S.D. Sept. 30, 2025) (internal quotation marks omitted), the court finds that the subsequent delay and non-disclosure caused by Buergofol's actions has prejudiced Omega. Under these circumstances, the court concludes that sanctions are warranted under Rule 37(b) for Buergofol's failure to comply with the court's order granting Omega's motion to compel Hoffmann's deposition.

129

### G.    Buergofol's Alleged Violations of Seven Orders on Prior Art

Omega argues that Buergofol has willfully violated seven court orders requiring Buergofol to produce prior art responsive to Omega's Interrogatory No. 4 (ROG 4), Request for Production No. 6 (RFP 6), Request for Production No. 7 (RFP 7), and Request for Production No. 13 (RFP 13). Docket 865 at 44-57. The court has issued three orders regarding RFPs 6 and 7, *see* Dockets 234, 303, 360, and four orders on ROG 4 and RFP 13, *see* Dockets 164, 181, 464, and 748.

### 1.    Background

On November 23, 2022, Omega served Buergofol with ROG 4, which requested that Buergofol "[i]dentify every item of PRIOR ART to each of the PATENTS-IN-SUIT now known to Buergofol." Docket 64-1 at 5. That same day, Omega served Buergofol with RPFs 6, 7, and 13. *See* Docket 74-1 at 6-7. RFPs 6 and 7 sought all documents relating to characteristics of all inner and outer "foil made or offered for sale by BUERGOFOL prior to March 11, 2013." *Id.* at 6. RFP 13 sought all documents and things within Buergofol's control that could qualify as prior art to either the '882 or '269 Patents. *Id.* at 7. Both ROG 4 and RFP 13 defined "prior art" as "in accordance with the meaning given to the term in Title 35 of the United States Code, and interpretations thereof provided by the federal judiciary." Docket 64-1 ¶ G; Docket 74-1 ¶ I.

In its response to ROG 4 and RFP 13, Buergofol objected on the basis that the requests were "absurdly overbroad." Docket 64-3 at 11; Docket 64-4 at 11. For both requests, Buergofol reasoned that because the term prior art "is

130

an all-encompassing term that includes all subject matter that existed before the priority date in the form of one of the categories of disclosures enumerated in 35 U.S.C. § 102," each request was unduly burdensome. Docket 64-3 at 11-12; Docket 64-4 at 12-13. In addition to the several objections Buergofol raised in response to RFPs 6 and 7, Buergofol also stated that it would produce responsive documents to RFP 6 if discovered during a reasonable search and that after conducting a reasonable search for documents responsive to RFP 7, Buergofol found no responsive documents. Docket 64-4 at 8-9.

### a.    RFPs 6 and 7

Three months after filing its responses, Buergofol moved "for a protective order relieving Buergofol of any obligation to produce any documents responsive" to RFPs 6 and 7. Docket 72 at 1. On April 20, 2023, Omega filed a motion to compel Buergofol's responses to RFPs 6 and 7. Docket 92. After consideration of Omega's motion to compel, on September 18, 2023, Magistrate Judge Duffy ordered Buergofol to file revised responses to RFPs 6 and 7 "making [it] unequivocally clear what documents are retained by it and that no documents or information responsive to these requests is available." Docket 234; *see also* Docket 238 at 145. In its revised responses, Buergofol stated that it has "looked for reasonably accessible documents responsive to [RFPs 6 and 7] and did not find any such documents." Docket 262-6 at 5-7. Buergofol further stated that it "possesses binders of manufacturing documentation regarding film," but that it could not find any manufacturing documentation older than 2018 or any emails older than 2014. *Id.* Buergofol also indicated

131

that after searching its DS system, it could not find any "invoices, orders, shipping documents or other commercial documents older than 2014." *Id.*

Finding Buergofol's revised responses inadequate, Omega moved for sanctions against Buergofol for its failure to comply with the court's discovery order. Docket 261. On December 13, 2023, Magistrate Judge Duffy granted Omega's motion for sanctions and found that Buergofol's revised responses were not in compliance with the court's September 18, 2023, order. Docket 303 at 8-9. Additionally, Magistrate Judge Duffy ordered Buergofol to respond to RFPs 6 and 7 either stating "clearly and unequivocally" that the documents responsive to the requests did not exist or to file a response identifying "ESI which Buergofol believes to be reasonably inaccessible." *Id.* at 9.

In its Fourth and Fifth Supplemental Responses to RFPs 6 and 7, Buergofol stated that "[a]fter a reasonable search in the currently used 'DS' system, an obsolete predecessor system to the 'DS' system, and all backup data for the 'DS' system and the predecessor system, Buergofol found no invoices, orders, shipping documents or other commercial documents older than 2014."[53] Docket 331-2 at 2-4 (Buergofol's Fourth Supplemental Responses to FRPs 6 and 7); Docket 350-1 at 3-4, 6 (Buergofol's Fifth Supplemental Responses to FRPs 6 and 7). On January 19, 2024, Omega again moved for sanctions, arguing that Buergofol improperly limited its search for "commercial

---

[53] Omega argues that the reference to the "obsolete processor system" is a reference to Buergofol's COEX2/Navision database. Docket 969 at 136-37; *see also* Docket 865 at 57 (arguing that "[t]he unnamed 'obsolete processor system' could be COEX1, COEX2, Microsoft Navision, COEX2/Navision, or another unknown database").

documents." Docket 325; Docket 331 at 24. Buergofol argued that its responses complied with Magistrate Judge Duffy's order because RFPs 6 and 7 only required it to produce "documents" and not data or information stored in its databases. Docket 349 at 22-23. On March 28, 2024, Magistrate Judge Duffy granted Omega's second motion for sanctions, finding that Buergofol's responses were either evasive or incomplete. Docket 360 at 10. In her order, Magistrate Judge Duffy rejected Buergofol's definition of "documents," finding that "the term embraces any information stored on a computer, electronic storage device, or any other medium." *Id.* at 9-10 (quoting *Document*, BLACK'S LAW DICTIONARY (11th ed. 2019)). As such, Magistrate Judge Duffy ordered Buergofol, within 30 days of the order, to supplement its responses to RFPs 6 and 7 by conducting a search for all responsive documents. *Id.* at 10.

On April 26, 2024, Buergofol served its Sixth Supplemental Responses to RFPs 6 and 7. *See* Docket 648-7. In its responses, Buergofol stated that it "possesses binders of paper manufacturing documentation regarding film," but that Buergofol found no documentation older than 2017. *Id.* at 4, 7. Buergofol further explained that while it learned that it had company emails older than 2014, it did not find any responsive emails to RFPs 6 and 7. *Id.* Additionally, Buergofol indicated that

> [a]fter a reasonable search in the currently used "DS" system and all backup data for the "DS" system, Buergofol found no documents, material, data, or information stored on any medium older than 2014, and consequently no documents, material, data, or information stored on any medium exist that refer to the qualities, characteristics, specifications, capabilities, properties, composition, additives used in and/or layers of [inner or outer] foil made or offered

133

> for sale by Buergofol prior to March 11, 2013, including no "extrusion sheets, ESI used in or from extrusion sheets, recipes and manufacturing/production specifications for film, ESI related to recipes and specifications for film, etc."

*Id.* at 5, 7-8. Buergofol also explained that its "old, custom-made predecessor system to the 'DS' system that Buergofol used prior to 2014 and all computer files and backup data from the predecessor system no longer exist." *Id.* at 4, 7.

On December 1, 2025, Buergofol produced Fink's report, entitled "ESI Report of Film Orders and Shipments from Buergofol's Navision System." Docket 940-2 at 2. Fink indicated that his report "sets forth the results of searching of the Buergofol Navision system, for each of the 10 identified CIPP film customers, of all orders received from the customer before January 1, 2015[,] and of all shipments made to the customer before January 1, 2015." Docket 940-1 ¶ 5. Fink's report contains at least 205 CIPP film sales and recipes used before 2014. *See* Docket 940-2 at 13, 15-22, 31-38, 44-45, 51.

### b. ROG 4 and RFP 13

In an email to Buergofol on December 27, 2022, Omega stated that "[t]o ensure there is no misunderstanding[ ] going forward," the definition of prior art in ROG 4 and RFP 13 included "all documents, information, acts, or things that qualify as prior art under any subsection of 35 U.S.C. §§ 102 and 103, including all systems, methods, apparatus, publications, patents, or uses." Docket 64-6 at 6. After failing to receive a response about its clarified definition from Buergofol, Omega sent another email, again clarifying the definition of prior art. Docket 69-1 at 3-4. This time, Omega defined prior art as the following:

> "PRIOR ART" includes any references that are reasonably related to the claimed invention of the patent. A reference is reasonably related if it is in the same field as the claimed invention or is from another field to which a person of ordinary skill in the field would look to solve the problem addressed by the patent.

*Id.* at 4. Omega's email further noted that "[t]he '269 Patent identifies the field of invention as relating to 'multilayer film that is impermeable to liquid and that is at least to some extent permeable to UV radiation[,]' " and that the '882 Patent "identifies the field of invention as related to 'a tubular film with one or more layers.' " *Id.*

Because Buergofol maintained that ROG 4 was "ridiculously overbroad," and that it "would not apply the definition of prior art that Omega provided," Docket 64 ¶ 9, on February 13, 2023, Omega filed a motion to compel, challenging Buergofol's definition of prior art, Docket 62; Docket 63 at 4. On July 13, 2023, the court granted Omega's motion to compel and ordered Buergofol to respond to ROG 4 and RFP 13. Docket 164 at 17. Four days later, Buergofol filed a motion for clarification of the court's order. Docket 165. In its August 3, 2023, order regarding Buergofol's motion for clarification, the court ordered Buergofol to respond to ROG 4 and RFP 13 with responsive anticipatory prior art within 21 days of the order and with responsive analogous prior art within 28 days of the order. Docket 181 at 5-6. Additionally, the court ordered that "the definition of prior art applicable to [ROG 4 and RFP 13] is inclusive of both anticipatory prior art and analogous prior art. The definition is not limited to anticipatory prior art, and it is not limited to 'references.' " *Id.* at 5.

135

In its supplemental responses to ROG 4 and RFP 13, Buergofol again objected, claiming the court's definition of prior art, as stated in the clarification, is legally erroneous. Docket 250-1 at 5; Docket 250-2 at 6. In its response to ROG 4, Buergofol provided Omega with a litany of lists—first, Buergofol provided a list of prior art categories, *see* Docket 250-1 at 6-13, and second, Buergofol provided lists of patents identified through a keyword search, which contained a total of 65,872 patents, *see* Docket 305-1. In its response to RFP 13, Buergofol produced lists of prior art and a few documents, most of which Omega claimed it had already identified. *See* Docket 250-2; Docket 250 at 10. And, in making its supplemental responses, Buergofol stated that it was unable to conduct more than a few employee interviews to determine their knowledge of analogous prior art. Docket 250-1 at 13; Docket 250-2 at 8.

After receiving Buergofol's supplemental responses, Omega moved for sanctions, arguing that Buergofol violated the court's discovery order by failing to disclose relevant prior art—namely, information regarding its liner sales to Saertex and Light Stream, and instead provided Omega with tens of thousands of references to seemingly unrelated and irrelevant patents and documents. *See generally* Docket 250. The court granted Omega's motion for sanctions, finding that Buergofol improperly inserted its own definitions of prior art in place of the court's definitions and provided Omega with non-responsive information. Docket 464 at 6-7, 16-17. The court ordered Buergofol to produce "any prior art films or descriptions of films sold to Light Stream and/or Saertex

136

and any other evidence of prior art within its knowledge, custody, control, or possession." *Id.* at 20.

On September 11, 2024, Buergofol moved for clarification on ten issues and reconsideration of several factual and legal conclusions in the court's order granting Omega's motion for sanctions. Docket 480; Docket 481. On May 28, 2025, this court denied Buergofol's motion and again ordered Buergofol to "supplement its responses to ROG 4 and RFP 13, as clarified in this order, and in accordance with the orders in Dockets 164, 181, and 464, within 21 days." Docket 748 at 19.

In its third supplemental responses to ROG 4, Buergofol again objected to ROG 4 as "absurdly overbroad and therefore unanswerable." Docket 867-23 at 4. Buergofol made a similar objection in its seventh supplemental responses to RFP 13. Docket 867-25 at 4 (stating that RFP is "absurdly overbroad"). Additionally, in its responses, Buergofol cites to several places in the court's most recent order at Docket 748, which it argues "clarifies" its disclosure requirements. For example, Buergofol stated that it is only addressing "commercial documents for film sold by Buergofol to Saertex and Light Stream." Docket 867-23 at 9; Docket 867-25 at 9. Buergofol also argued that it need not fully respond to ROG 4 and RFP 13 because TransPerfect will search the 2013 Email Backup. Docket 867-23 at 9; Docket 867-25 at 9.

### 2. Parties' Arguments and Analysis

#### a. RFP 6

Omega argues that Buergofol, in deleting reference to its "obsolete

137

predecessor system" in its sixth supplemental responses to RFP 6, "falsely claim[s] compliance with the [c]ourt's second sanctions order." Docket 865 at 57. In its sixth supplemental responses, Buergofol stated that after searching its currently used DS system, it was unable to find documents older than 2014. Docket 648-7 at 5, 7-8. But as Omega notes, because the DS system has only existed since 2021, the omission of the COEX2/Navision database and its backups allowed Buergofol to misleadingly state that it couldn't find any pre-2014 documents. Docket 969 at 136. Omega asserts that Buergofol deliberately made this omission because it knows that these databases contain "hundreds of sales and recipe data for films it sold before 2014." *Id.* at 137. Buergofol does not address Omega's arguments in its opposition brief. *See generally* Docket 949.

Here, Magistrate Judge Duffy ordered Buergofol to respond to Omega's RFP 6 in three separate orders. *See* Docket 234; Docket 303 at 9; Docket 360 at 10. In her latest order compelling Buergofol's response to RFP 6, Magistrate Judge Duffy ordered Buergofol, within 30 days of the court's order, to conduct a search for all responsive documents, which included "any information stored on a computer, electronic storage device, or any other medium." Docket 360 at 9-10. Magistrate Judge Duffy's order also required Buergofol to provide new responses to RFP 6 "that unequivocally tell Omega whether Buergofol found any responsive documents," and if it found such responsive documents, Buergofol was ordered to "produce copies of them or make them available for inspection to Omega." *Id.* at 10.

The court finds that Buergofol has not complied with Magistrate Judge Duffy's orders. Rather than comply with the court orders requiring Buergofol to conduct a search for *all* responsive documents, Buergofol omitted from its sixth supplemental responses to RFP 6 the reference to its COEX2/Navision database. *Compare* Docket 648-7 at 5 (sixth supplemental response to RFP 6 omitting "obsolete predecessor system to the 'DS' system"), *with* Docket 350-1 at 4-6 (fifth supplemental response to RFP 6 including reference to "obsolete predecessor system to the 'DS' system"). As evidenced by Fink's report, there are at least 205 CIPP film sales and recipes used before 2014 in its Navision/COEX2 database. *See* Docket 940-2 at 13, 15-22, 31-38, 44-45, 51. Buergofol does not explain the contradiction between its sixth supplemental responses to RFP 6, omitting the presence of such sales, and the Fink report. *See generally* Docket 949.

Additionally, the court finds this violation to be willful. Despite being sanctioned twice for failing to comply with Magistrate Judge Duffy's orders, Buergofol continues to engage in evasive behavior. Buergofol has made conflicting representations to the court and Omega as to whether pre-2014 sales data exists in its databases. *See, e.g.*, Docket 238 at 140 (denying that any information exists prior to 2018); Docket 331-2 at 2, 4 (stating that there was "unreadable data from prior to 2014 from an old, custom-made system that no longer exists"). But Fink's report and disclosure of at least 205 pre-2014 sales, asserted to be a search of Buergofol's Navision database, *see* Docket 949 at 100, clearly demonstrates that Buergofol's representations are

false.

Further, it appears that Fink's report omits certain sales that Omega alleges would demonstrate the invalidity of Buergofol's patents. *See* Docket 969 at 99-100. As Omega points out, Fink's report omits at least 39 sales within the United States to LightStream LP and Reline America, LLC, all of which took place before the critical date for the '882 Patent. Docket 973 ¶¶ 7-8; *see also* Docket 973-5. Omega also notes that Fink's report started reporting sales on June 10, 2020, merely five days before the June 15, 2010, filing date for the '269 Patent. Docket 969 at 99. The court fails to see how the omission of these sales could have been accidental. Instead, it appears that Buergofol, to further delay turning over responsive discovery to RFP 6, edited its sixth supplemental responses to give the appearance of compliance while it intended to conceal responsive discovery. Thus, the court concludes that Buergofol's violation was willful. *See Anderson v. Home Ins. Co.*, 724 F.2d 82, 84 (8th Cir. 1983) ("[D]eliberateness includes failure to respond to discovery requests . . . and failure to provide full information after a court order.").

Further, the court finds that Omega has been prejudiced by Buergofol's willful violation of Magistrate Judge Duffy's orders. Omega has sought responsive discovery to RFP 6 since November 23, 2022. *See* Docket 74-1 at 6-7. But by submitting evasive discovery responses to RFP 6, Buergofol has avoided disclosure of responsive discovery that is relevant to Omega's defenses and counterclaims. As Omega explains, this "block[s] Omega from uncovering prior art potentially invalidating both the '882 and '269 Patents," Docket 969 at

140

100, which is an issue directly relevant to Buergofol's claims of infringement. Thus, the court finds that Buergofol's willful violation of the three prior art orders compelling disclosure of responsive information to RFP 6 has prejudiced Omega. *See Smith*, 2025 WL 2779201, at *4. As such, the court finds that sanctions are warranted under Rule 37(b).

### b.    ROG 4 and RFP 13

Omega argues that there are numerous flaws with Buergofol's third supplemental responses to ROG 4 and RFP 13. First, Omega argues that Buergofol has not produced "responsive documents predating the June 15, 2010[,] filing date of the '269 Patent for UV CIPP film, thermally cured CIPP film, or food product film." Docket 865 at 51. Second, Omega argues that Buergofol "blatantly misinterprets and distorts the [c]ourt's order" at Docket 748 to narrow the definition of "analogous prior art" used in prior orders. *Id.* at 46-48. Third, Omega argues that Buergofol improperly narrowed its third supplemental responses to only include commercial documents for Saertex and LightStream. *Id.* at 48-51. Fourth, Omega asserts that Buergofol improperly limited its search to interviewing four employees and restricting its inquiry to "individual shipments of film to just Saertex and Light Stream, and only if its employees can recall every specific ingredient (down to the brand of polymer) for each of the five or seven layers." *Id.* at 52-53. And fifth, Omega argues that Buergofol refuses to search its COEX1 database. *Id.* at 54-56.

In response, Buergofol argues that it has not improperly narrowed the definition of analogous prior art as it is using the court's definition. Docket 949

141

at 93-94. Buergofol also rejects Omega's argument that the field of endeavor for the '269 Patent includes thermally cured CIPP liners. *Id.* at 94-95 (arguing that the "field of endeavor is definitely limited to UV CIPP liners"). Buergofol also asserts that it need not turn over prior art sales for its customers other than Saertex or Light Stream because the other sales do not constitute prior art. *Id.* at 96-97. Buergofol dismisses the remainder of Omega's arguments as "irrelevant complaints." *Id.* at 97-100.

In reply, Omega argues that Buergofol "attempts to relitigate settled rulings, rewrites the governing definition of 'prior art,' and advances a definition so artificially narrow that it strips the term of any meaning." Docket 969 at 135. Specifically, Omega argues that Buergofol attempts "to narrow the scope of analogous prior art by (1) improperly narrowing the 'field of endeavor' to only UV-cured CIPP liners to exclude thermally-cured CIPP liners, and (2) limit art not within the field of endeavor to only art that relates only to the 'same problem' to exclude prior art that is 'reasonably pertinent to the particular problem.' " *Id.* at 140-41.

This court has issued four orders concerning ROG 4 and RFP 13 in which the court repeatedly ordered Buergofol to turn over responsive anticipatory and analogous prior art. *See* Docket 164 at 17; Docket 181 at 5-6; Docket 464 at 20; Docket 748 at 19. In the third order, the court determined that Buergofol violated the court's prior two orders. *See* Docket 464 at 14, 16-20 (finding that Buergofol violated "the court's order at Docket 164 and clarification at Docket 181" by not providing Omega with the films or

142

descriptions of film sold to LightStream or Saertex and by disclosing over 65,000 non-responsive patent references). Further, in the court's latest order, it determined that Buergofol's motion for reconsideration and clarification was not substantially justified and awarded Omega its attorney's fees. Docket 748 at 18-19. And in that order, this court stated that Buergofol must "supplement its responses to ROG 4 and RFP 13, as clarified in this order, and in accordance with the orders in Dockets 164, 181, and 464, within 21 days." *Id.* at 19.

But rather than comply with the court's order denying Buergofol's motion for reconsideration and clarification, Buergofol has ignored the court's previous three orders and has again cherry-picked and misconstrued certain statements in the court's most recent order to enable it to avoid fully responding to ROG 4 and RFP 13. This behavior is exactly what the court warned Buergofol not to do in its most-recent order granting sanctions. *See* Docket 828 at 6 ("Buergofol cannot cherry-pick certain statements to limit the scope of the court's order."). The court's latest order on ROG 4 and RFP 13 reinforced, several times, that the definition of prior art in its past orders was controlling. *See, e.g.*, Docket 748 at 7 ("[T]he court rejects Buergofol's legal objection to the court's definition of anticipatory and analogous prior art and clarifies that Buergofol must disclose responsive analogous prior art and responsive anticipatory prior art to the patents-in-suit requested by ROG 4 and RFP 13, *as it has previously ruled.*" (emphasis added)), *id.* at 17-18. As such, the court is not going to engage in further analysis of again defining "prior art." *See also id.* at 6-7 n.1 (finding

that it was a "disingenuous effort on Buergofol's part to now seek clarification on whether the term 'prior art' is limited to only include analogous prior art" where the court already ruled that prior art includes both anticipatory and analogous prior art).

The court is also not going to engage in further analysis of redefining the "field of endeavor" or "reasonably pertinent" tests. The court has previously ruled that an item may be analogous prior art if it is either "(1) 'from the same field of endeavor,' or field of invention, 'regardless of the problem addressed' or (2) 'not within the field of the inventor's endeavor, [but] still is reasonably pertinent to the particular problem with which the inventor is involved.' " Docket 164 at 11-12 (quoting *In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004)). Additionally, this court previously rejected Buergofol's argument that "any fields of endeavor outside of UV CIPP liners, such as food packaging" cannot constitute analogous prior art. *See* Docket 748 at 7-8 (noting and rejecting Buergofol's "clarification" request that the court "reconsider its prior decision that analogous prior art" includes more than UV CIPP films).

The court finds that Buergofol has willfully violated the court's orders. In its third supplemental responses, Buergofol improperly redefined certain terms, such as what qualifies as "prior art," to limit the scope of court-ordered disclosures. *See* Docket 867-23; Docket 867-25. For example, Buergofol limited its disclosures of prior art to exclude categories such as food packaging and thermally cured CIPP liners by using the phrase "relates to the same problem" rather than apply the reasonably pertinent test. *See* Docket 867-23 at 6;

144

Docket 867-25 at 6. But as stated above, Buergofol's determination that it need not disclose analogous prior art on the basis that it falls within a non-CIPP liner category is a direct violation of the court's previous orders. *See, e.g.*, Docket 164 at 11-12; Docket 181 at 3-4; Docket 464 at 7.

In other sections of its third supplemental responses, Buergofol attempts to limit its disclosure requirements by declaring that certain discovery is irrelevant or nonresponsive. For example, Buergofol asserts that it need not search and turn over responsive commercial documents, such as invoices, purchase orders, and delivery notes, because it deems them irrelevant to the "elements of the patents-in-suit." Docket 867-23 at 9 (emphasis omitted); Docket 867-25 at 9 (emphasis omitted); *see also* Docket 949 at 95 (arguing that Buergofol does not need to turn over prior art dealing with thermally cured CIPP liners because such discovery would be "irrelevant"). Buergofol also decided to search for only some commercial documents and only for Saertex and LightStream. *See* Docket 867-23 at 9; Docket 867-25 at 9. Buergofol attempts to defend this position by arguing that none of Buergofol's foreign sales qualify as prior art although Buergofol also concedes that the court has already rejected such an argument.[54] *See* Docket 949 at 96; *see also* Docket 464 at 11; Docket 748 at 15. Buergofol cannot unilaterally declare the scope of relevant discovery, especially in the face of court orders requiring it to turn over

---

[54] Buergofol again attempts to rely upon Fink's Report to compensate for its lack of disclosure and failure to comply with the court's orders. *See* Docket 949 at 97. But as previously noted, Fink's report contains several omissions and deficiencies that fails to excuse Buergofol's non-compliance.

such discovery. *See Sentis Grp., Inc. v. Shell Oil Co.*, 763 F.3d 919, 926 (8th Cir. 2014) (rejecting party's argument that it could "declare evidence undiscoverable and irrelevant merely because it does not fit into their own theory of the case"). Buergofol's attempts to limit the scope of discovery, even when noting that it would be in direct violation of a court order, indicates that its third supplemental responses were not accidental or involuntary.

Buergofol also limited its disclosures by using the "critical dates" for the '882 and '269 Patents (March 11, 2012, and June 15, 2009, respectively) in place of the "priority dates," here presumed to be the filing dates of the '882 and '269 Patents (March 11, 2013, and June 15, 2010, respectively). *See* Docket 867-23 at 4; Docket 867-25 at 4. This substitution allowed Buergofol to limit the scope of prior art discovery by one year. Buergofol offers no explanation for the discrepancy between its earlier responses to ROG 4 and RFP 13 that used the filing date rather than the critical date. *See* Docket 867-24 at 2; Docket 867-26 at 2. Instead, Buergofol argues that because Omega previously represented to the court that the critical date for the '269 Patent is June 15, 2009, Omega cannot now "contend that responsive prior art documents can be dated later than June 15, 2009." Docket 949 at 98. But Buergofol has also recognized that prior art, as governed by pre-AIA 35 U.S.C. § 102, includes all prior art published prior to the filing date of a certain patent. *See, e.g.*, Docket 68 at 6-7 ("The pre-AIA version of 35 U.S.C. § 102 defines what constitutes 'prior art' to a patent."); Docket 167 at 2 ("Title 35 of the U.S. Code does not limit prior art based on relevance but rather only by

146

date and category of information. As Buergofol explained, the Gutenberg Bible is prior art to all U.S. patents because it was published prior to the filing date of all U.S. patents and because it is a printed publication."). Thus, Buergofol's use of "critical dates" in its most recent supplemental responses is another indicator of Buergofol's scheme to rewrite definitions and substitute terms to find ways to limit the discovery it needed to turn over to Omega in response to ROG 4 and RFP 13. Such actions are deliberate and willful. *See Anderson*, 724 F.2d at 84.

The court also finds that Buergofol willfully violated the court's orders by failing to conduct a reasonably diligent search in answering ROG 4 and RFP 13. *CPI Card Grp., Inc. v. Dwyer*, 2018 WL 5919985, at *4 (D. Minn. Nov. 13, 2018) ("A company has a duty to conduct [a] reasonable investigation, make reasonable inquiries of its employees, and fully respond to the interrogatories posed to the company." (internal quotation marks omitted)). For example, Buergofol refuses to interview more than four of its employees regarding their knowledge of responsive prior art based on the self-imposed limitations that "[n]o employee of Buergofol currently has knowledge of the ingredients used to make each layer of the film for any roll of film sold to Saertex or Light Stream over a decade ago prior to March 11, 2012." Docket 867-23 at 10. For the four employees it interviewed, Buergofol uses the same limitations to conclude that its witnesses have no knowledge of any prior art. *See id.* As Omega notes, this limitation "restrict[ed Buergofol's] inquiry to individual shipments of film to just Saertex and Light Stream, and only if its employees can recall every specific

147

ingredient (down to the brand of polymer) for each of the five or seven layers."

Docket 865 at 53. Despite previously warning Buergofol that it "failed to show

that it undertook a reasonably diligent search of its own records or

meaningfully interviewed its own employees in finding and disclosing prior art

that was responsive to ROG 4 and RFP 13," Docket 748 at 12; *see also* Docket

464 at 16 ("There is no evidence that Buergofol searched its own records or

meaningfully interviewed its own employees."), Buergofol's newly created

limitations and lackluster investigation do not demonstrate good-faith

compliance with the court's previous prior art orders.

Additionally, Buergofol also refuses to search its databases for responsive

discovery. In its third supplemental responses to ROG 4 and RFP 13, Buergofol

indicated that its COEX1 system no longer existed, Docket 867-23 at 8; Docket

867-25 at 8, and reiterated this position in its opposition brief to the motion to

dismiss, *see* Docket 949 at 99-100. Buergofol further explained that it cannot

search the COEX1 data "because no hardware exists on which 'the COEX1

data' is stored."[55] *Id.* at 100. But as Omega points out, Buergofol's assertions

that the COEX1 system no longer exists does not address the question of

whether the COEX1 data exists in some form, particularly where Buergofol has

been adamant that "there [has been] no data loss of COEX1 data of any kind."

Docket 969 at 149 (quoting Docket 695 at 28) (emphasis omitted). Buergofol

---

[55] Buergofol makes a similar claim for the COEX2 database. *See* Docket 949 at 100 (stating that "[d]ata in the abstract, such as 'COEX2 data' and 'COEX2', cannot be searched; only hardware containing data can be searched. There is no COEX2 hardware").

148

appears to rely upon this confusion to avoid dismissal of its claims, *see* Docket 949 at 99 (Buergofol arguing that Omega's "false assertion" that COEX1 data still exists "cannot be relied upon by this [c]ourt in ruling on Omega's motion to dismiss"), but Buergofol's failure to explain why it has not searched the COEX1 data, beyond its assertions that the COEX1 system no longer exists, is insufficient to demonstrate its compliance with the court's previous prior art orders. Thus, for the above reasons, the court finds that Buergofol has willfully violated the court's orders requiring Buergofol to fully respond to ROG 4 and RFP 13.

The court also finds that Buergofol's willful violations of the court's orders have prejudiced Omega. As stated above, ROG 4 and RFP 13 seek information on whether any prior art existed that invalidate Buergofol's infringement claims under the '882 and '269 Patents. As such, Buergofol's refusal to comply with these orders has hindered Omega's "ability to determine the factual merits of [Buergofol's] claim[s]." *See in re O'Brien*, 351 F.3d at 839. Thus, the court finds that Buergofol's willful violation of the seven court orders compelling it to provide responsive discovery pursuant to ROG 4 and RFP 13 warrants sanctions under Rule 37(b).

### H.    Buergofol's Alleged Violations of Five Orders on Film Composition and Structure

Omega argues that Buergofol continues to withhold discovery on the composition and structure of the film it sold to Omega despite five court orders requiring Buergofol to turn over this discovery as requested in Omega's

Requests for Production Nos. 23 and 24 (RFPs 23 and 24). Docket 865 at 57-65.

### 1. Background

On January 31, 2023, Omega served RFPs 23 and 24 on Buergofol. Docket 93-3 at 8. RFP 23 requested that Buergofol produce "[d]ocuments related to each product (including each version thereof) sold by Buergofol to Omega Liner Company, Inc. sufficient to show the structure and composition of each component part of each product (or version thereof)." *Id.* RFP 24 required Buergofol to produce "[m]anufacturing specifications for each product (including each version thereof) sold by Buergofol to Omega." *Id.*

Buergofol served its responses on March 31, 2023. Docket 93-4. For both RFPs 23 and 24, Buergofol objected and declined to produce any responsive documents, arguing that disclosure of such information would require Buergofol to disclose its trade secrets. *Id.* at 9-13. In response to RFP 23, Buergofol stated that it "is already providing information to Omega indicating the structure and composition of each and every inner and outer film Buergofol sold to Omega" pursuant to Omega's Interrogatory No. 10. *Id.* at 10. Further, in response to RFP 24, Buergofol argued that responding would impose an undue burden because it would require "a needle-in-the-haystack type search estimated to involve about 10 minutes to review each of the approximately 1,000 existing binders of old production paperwork." *Id.* at 13.

On March 30, 2023, Buergofol moved for a protective order to relieve Buergofol from producing documents under RFPs 23 and 24, again arguing

that it would require disclosure of Buergofol's trade secrets. Docket 72 at 1. The court denied Buergofol's motion because Buergofol failed to meet and confer with Omega. Docket 180 at 17. Omega later filed a motion to compel Buergofol's responses to RFPs 23 and 24. Docket 92. On September 18, 2023, Magistrate Judge Duffy granted Omega's motion and ordered Buergofol to turn over the responsive documents within 30 days. Docket 234; *see also* Docket 238 at 166. Magistrate Judge Duffy also ordered that the documents should be designated for attorney's eyes only (AEO) pursuant to the court's protective order. Docket 238 at 166.

Buergofol made disclosures pursuant to Magistrate Judge Duffy's order, Docket 351 at 9, but on January 19, 2024, Omega moved for sanctions against Buergofol, arguing that the disclosures failed to "provide the . . . information regarding the structure, composition, and manufacturing specifications for Buergofol's products" necessary to address Buergofol's infringement claims, Docket 324 at 3, 8-12; Docket 323. Omega also requested that the court order Buergofol to immediately produce all documents responsive to RFPs 23 and 24. Docket 323 at 1. On May 31, 2024, Magistrate Judge Duffy granted Omega's motion for sanctions, finding that Buergofol "must supplement its responses to [RFPs 23 and 24] by disclosing all responsive documents including trade secret documents to Omega with the [AEO] designation" within 30 days of the court's order. Docket 402 at 21.

On June 14, 2024, Buergofol filed objections to Magistrate Judge Duffy's order. Docket 410. Buergofol argued that Magistrate Judge Duffy's order was

an abuse of discretion because it failed to employ the proper analysis in *In re Remington Arms Co., Inc.*, 952 F.2d 1029 (8th Cir. 1991) before ordering the disclosure of trade secrets. *Id.* at 8-10. On February 13, 2025, this court overruled Buergofol's objections, finding that Buergofol's objections were untimely. Docket 616 at 6-7. Roughly two weeks later, Buergofol filed a motion to stay the court's order so that it could seek a writ of mandamus from the Federal Circuit. Docket 644 at 1.

At a status conference held on April 28, 2025, the court heard oral arguments from the parties regarding the relevancy, need, and danger of disclosing the documents sought by RFPs 23 and 24. Docket 726 at 51-61. Additionally, the court received trade secrets documents from Buergofol and reviewed them in camera. Docket 705; Docket 726 at 43-44. Following the status conference, this court denied Buergofol's motion to stay. Docket 743 at 12. In that order, the court also conducted an analysis under *In re Remington* and found that disclosure of Buergofol's trade secrets under the court's protective order AEO provision was proper. *Id.* at 4-11. As such, the court held that Buergofol must fully respond to RFPs 23 and 24. *Id.* at 12. On May 29, 2025, Buergofol filed its petition for a writ of mandamus to the Federal Circuit. Docket 750; Docket 758-1. On July 22, 2025, the Federal Circuit denied Buergofol's petition for a writ of mandamus and denied Buergofol's motion to stay discovery on trade secrets. Docket 778-1.

Following the Federal Circuit's denial of Buergofol's petition, Omega emailed Buergofol stating that "Buergofol must produce all documents—

152

including all ESI—responsive to Omega's discovery requests without withholding them based on trade secret objections." Docket 867-10 at 4. In its email, Omega demanded the following: (1) production of unredacted versions of BF10817-BF10841;[56] (2) production of other unredacted trade secret documents; (3) production of database information; (4) withdrawal of trade secret objections and full production to Omega's previously served discovery requests; and (5) identification of Buergofol's accounting systems and records. *Id.* at 4-6. Regarding Omega's request to produce database information, Omega noted that Buergofol's databases, such as Microsoft Navision, "contain[s] critical information about the composition and structure of its film sold to Omega and to other CIPP liner companies." *Id.* at 4. But Omega stated that "Buergofol has neither searched these databases nor produced the responsive information, despite numerous discovery requests." *Id.* at 5 (listing discovery requests). Omega also requested a meet-and-confer to discuss Buergofol's production of information. *Id.* at 6.

After failing to receive a response from Buergofol, Omega sent Buergofol another email a week later. *Id.* at 2. In its email, Omega stated that "[w]hile Buergofol has selectively produced BF10817-BF10841 solely to support its summary judgment motion on the '269 Patent, it continues to withhold other critical documents that Omega knows exist." *Id.* Omega reiterated that "Buergofol's own ESI production confirms that the Microsoft Navision and

---

[56] The court reviewed BF10817-BF10841 in camera before ordering that Buergofol turn over the documents to Omega. Docket 743 at 4.

COEX databases contain highly relevant film recipes, recipe identifiers, layer sequences, and related data." *Id.* Omega then again requested that the parties set up a time to meet and confer to resolve these discovery issues. *Id.* at 3. Buergofol did not respond to Omega's email. Docket 867 ¶ 18.

### 2. Parties' Arguments

Omega argues that despite the five court orders and the Federal Circuit's denial of Buergofol's petition for mandamus, it "still lacks access to any of the data in Buergofol's databases—recipes, layer sequences, and other information directly tied to the films Buergofol claims infringe the '269 Patent." Docket 865 at 61. Omega asserts that based on recent screenshots of Buergofol's COEX2/Navision database, it knows additional responsive discovery is in Buergofol's possession. *See id.* at 61-63; Docket 969 at 150-52; *see also* Docket 867-10 at 2-5; Docket 867-11; Docket 867-12; Docket 867-13.

In response, Buergofol asserts that it is in full compliance with all court orders relating to RFPs 23 and 24 and that once the Federal Circuit denied its petition, it "produced all of the existing recipe sheets, extrusion sheets, and production documents (even trade secrets) for film that Buergofol supplied to Omega." Docket 949 at 101-02. Buergofol also disagrees with Omega's assertion that it is concealing information in its Navision system because none of the information in that system is "responsive to any of Omega's requests for production of documents." *Id.* at 105. Buergofol states that "[i]nformation from the Navision/COEX2 database was used from 2014 through 2021 to generate recipe sheets" but asserts that it need not turn over the recipe templates

because "[t]he recipe templates from 2017-2018 have been overwritten without retaining any backup, older version, or earlier information." *Id.* at 106-07. Buergofol last argues that Fink's report "demonstrates that Buergofol has not been concealing any recipes and that the Navision system contains no information on film orders or shipments prior to June 15, 2009." *Id.* at 109.

In reply, Omega reiterates that Buergofol is concealing information in its Navision/COEX2 system relating to films it sold to Omega, including such information as "(1) the recipe used, (2) the layer sequence structure, and (3) the composition of each layer." Docket 969 at 150. Omega argues that rather than deny that such information exists in its Navision/COEX2 system, Buergofol only "offers diversionary arguments to deflect from its concealment." *Id.* at 152. More specifically, Omega first notes that Buergofol is again attempting to argue that database data is not a document. *Id.* Second, Omega points out that "Buergofol deliberately refers only to the 'Navision system,' omitting the 'COEX2' component of the database it otherwise describes as 'COEX2/Navision.' " *Id.* Third, Omega argues that Buergofol's assertion that its recipe templates could have been modified is insufficient to prevent disclosure of the information. *Id.* at 153. And lastly, Omega argues that Buergofol's reliance on Fink's report is misplaced because the report does not address the composition and structure of films sold to Omega. *Id.* at 153-54.

### 3. Analysis

As outlined above, there were five court orders requiring Buergofol to turn over discovery responsive to RFPs 23 and 24. *See* Docket 180 at 17;

155

Docket 234; Docket 402 at 21; Docket 616 at 6-7; Docket 743 at 12. Magistrate Judge Duffy previously determined that Buergofol failed to comply with the order at Docket 234. *See* Docket 402 at 20; *see also* Docket 616 at 13 (overruling Buergofol's objections and denying Buergofol's motion for reconsideration of Magistrate Judge Duffy's order). Despite Buergofol's claim that it had "every right to resist improper overbroad discovery requests," Docket 949 at 101, once the Federal Circuit denied its petition for a writ of mandamus, Buergofol was obligated to comply with the court's orders requiring Buergofol to fully respond to RFPs 23 and 24, *see, e.g.*, Docket 743 at 12.

Further, the court finds that Buergofol has willfully violated the court's orders. While Buergofol asserts that it has produced all responsive documents to RFPs 23 and 24, *see* Docket 949 at 101, the court finds that Buergofol's justifications are insufficient to explain why it has not searched or disclosed information in its Navision/COEX2 database. First, as discussed in Section I.G.1.a, *see supra* pp. 133-34, Magistrate Judge Duffy already denied Buergofol's argument that database "data" is not a document, *see* Docket 360 at 9-10. Again, Buergofol does not present an argument to suggest this is legally erroneous. Thus, based on Magistrate Judge Duffy's earlier ruling, Buergofol's objection on this ground is insufficient to justify why it would withhold this discovery.

Additionally, Buergofol's contention that the Navision/COEX2 database no longer contains the recipe and layer sequence information for film sold to Omega because the recipe templates could have been modified does not excuse

156

its production requirements. Buergofol does not offer support for its contention that the recipe templates were modified other than pointing to its custodian of records' testimony that the data in the Navision database can be changed. *See* Docket 949 at 107; *see also* Docket 586-1 at 76-77. But the mere fact that the information could have been modified does not warrant Buergofol's complete nondisclosure. Moreover, Buergofol's modification objection makes little sense because Buergofol also seeks to rely upon the accuracy of Fink's report, which included "all orders from and shipments to [10 identified CIPP film] customers before January 1, 2015" from the Navision database. Docket 940-1 ¶¶ 3, 5; *see also* Docket 940-2. Seemingly, the information obtained and provided in the Fink report would suffer the same danger of modification Buergofol represents has affected the recipe templates for film sold to Omega because both are in the Navision/COEX2 database. Yet Buergofol does not shy away from relying upon the Fink report to support its arguments that it has complied with the court's various orders. *See, e.g.*, Docket 949 at 109-10 (arguing that the Fink report "demonstrates that Buergofol has not been concealing any recipes and that the Navision system contains no information on film orders or shipments prior to June 15, 2009" for 10 CIPP customers). Fink's report also cannot be used to indicate Buergofol's responsiveness to RFPs 23 and 24 because the report is limited to sales occurring before 2015—well before Buergofol first sold film to Omega. *See* Docket 940-2 at 3.

Buergofol's objections to turning over information it has deemed nonresponsive to RFPs 23 and 24 were not raised in good faith and fails to

157

indicate that it omitted this information accidentally. Instead, Buergofol's actions indicate carefully considered attempts to find new ways to justify why it should not have to turn over critical information dealing squarely with its claims of infringement. As such, the court finds that Buergofol has willfully violated the court's orders requiring it to turn over discovery relating to the structure and composition of its film sold to Omega in response to RFPs 23 and 24.

The court also finds that Buergofol's violations have prejudiced Omega. The documents sought by RFPs 23 and 24 bear directly on Omega's noninfringement and invalidity defenses and counterclaims under the '269 Patent. Additionally, Buergofol's refusal to comply with these orders has hindered Omega's "ability to determine the factual merits of [Buergofol's] claim[s]." *See in re O'Brien*, 351 F.3d at 839. As such, the court determines that Omega has made an adequate showing of prejudice to warrant sanctions under Rule 37(b).

### III.    Whether Buergofol's Alleged Spoliation of Evidence Warrants Dismissal

Omega alleges that because Buergofol only preserved 10 and destroyed 107 of "its printed documents disclosing the structure and composition of the films sold to Omega during a time when Buergofol knew or should have known that documents were relevant to future or current litigation," Buergofol has spoliated the evidence. Docket 865 at 88. Omega contends that because the destruction of this evidence has "irreparably deprived Omega of the evidence necessary to confront Buergofol's infringement claims . . . no sanction short of

158

dismissal can address Buergofol's abuse of the [c]ourt's judicial process." *Id.* at 89. The court provides a short factual background before addressing the parties' arguments.

## A.    Background

Between July 2017 and August 2019, Buergofol sold Omega inner and outer film for Omega to use in its UV CIPP liners. Docket 865 at 88; *see also* Docket 635-1 (detailing Buergofol's shipments of inner and outer film to Omega from August 2017 to August 2019); Docket 780-2 at 9 (indicating that Buergofol manufactured inner film for Omega on July 3, 2017). Buergofol last manufactured inner film for Omega in 2018. Docket 969 at 168 n.27; Docket 949 at 75; *see also* Docket 635-1 at 2, 4. Buergofol sent Omega the inner and outer film in 12 separate shipments. *See* Docket 635-1 at 3-4. Additionally, the inner and outer film produced for Omega was made over 117 production runs,[57] *see id.* at 1-4, with each production run generating its own set of production documents, consisting of extrusion and recipe sheets, Docket 969 at 173 n.28.

---

[57] Buergofol notes that only 39 of these production runs were for inner film and only 23 of the 39 production runs are at issue, Docket 949 at 75, because Buergofol alleges that Omega Liner with a diameter greater than 21 inches using Buergofol inner film infringes the claims of the '269 Patent, *see* Docket 668-2 at 5. As such, Buergofol implies that only the production documents for these 23 inner film orders should matter to the court's spoliation analysis. But in its response to Omega's Interrogatory No. 14, made on April 24, 2023, Buergofol contended that "all instances of the OMEGA LINER product fall within the literal scope of claim 1 of the '882 Patent." Docket 160-2 at 5. Because "all instances" would include Omega Liner which used Buergofol's inner and outer film, the court considers whether all 107, and not just 23, production documents were spoliated.

At a hearing before Magistrate Judge Duffy in September of 2023, Buergofol's counsel, in explaining why Buergofol did not have responsive documents to Omega's RFPs 6 and 7, represented to the court that Buergofol kept its film production documents in "about 1,000 binders," in two storage rooms. Docket 238 at 140. Buergofol's counsel further explained that "when the film is produced in the factory, the information goes in those binders. When the rooms fill up, then the older binders are thrown away." *Id.* Buergofol's counsel also stated that he visited Buergofol and confirmed that "there is no information prior to 2018." *Id.* Buergofol's counsel later confirmed, multiple times, that Buergofol only retained the film production documents from 2018 on. *Id.* at 141 ("Those production documents go back to 2018."), *id.* at 149 (confirming, upon questioning from the court, that the production documents only exist "from 2018 to now"), *id.* at 153 ("[T]here are none of the production documents before 2018."). Buergofol's counsel also explained that the binders are organized "based on order number and machine," and not chronologically. *Id.* at 140, *see also id.* at 149 (confirming that "[t]he production documents [for Buergofol's food-packaging film and industrial-use film] are all together in those binders based on order number").

On December 28, 2023, in its fourth supplemental responses to Omega's RFPs 6 and 7, Buergofol stated that "Buergofol possesses binders of paper manufacturing documentation regarding film. Buergofol looked and found no manufacturing documentation older than 2017." Docket 324-5 at 2, 4; *see also* Docket 350-1 at 3, 6 (providing same in Buergofol's fifth supplemental

160

responses to RFPs 6 and 7 served on February 22, 2024). Buergofol later stated in an opposition brief to Omega's motion for sanctions that the above statement did not mean that "production documents exist for 2017." Docket 351 at 27.

On December 4, 2024, Omega conducted a deposition of Buergofol's Rule 30(b)(6) custodian of records, Daniel Eaton. *See* Docket 586-1 (transcript of deposition). Eaton identified Dr. Boutrid, Peter Langhammer, and Florian Boettcher as the custodians of the printed binders. *Id.* at 90, 271-72. Eaton explained that the storage room where the binders are kept is locked and any entry to the storage room is logged. *Id.* at 90-91, 271. Eaton also indicated that Boettcher has the storage room's key and controls access to the storage room. *Id.* at 90, 272. The binders are arranged serially by production number, and each production number is barcoded and included in Buergofol's DS Database. *Id.* at 93, 271-72. Eaton stated that "when you look at the binders, you can see what the earliest year is by looking at the outside marking on the binder." *Id.* at 201. While Eaton was unsure what the earliest date range was on the binders, he also stated that because "there's two or three years of document storage in those rooms," the oldest binders "get destroyed as new ones are created." *Id.* at 94. Buergofol's custodian of records deposition notes identifies Dr. Boutrid as the only individual who "participated in the destruction of paper form documents (Storage room paper documents)." *Id.* at 283. Eaton also represented that while Buergofol had a litigation hold in place "as early as February 5, 2022," documents from the storage room were still being destroyed

161

in the fall of 2022. *Id.* at 95.

In support of its motion for partial summary judgment of infringement of the '269 Patent, Buergofol submitted ten redacted extrusion and recipe sheets. *See* Dockets 628-2 and 628-3. The sheets, identified as BF10820-BF10824 and BF10828-BF10832, consist of ten extrusion and recipe sheets detailing individual Buergofol shipments of film to Omega. *See* Docket 780-2 at 5-9, 13-17 (unredacted versions of extrusion and recipe sheets). These sheets detail the structure and composition of films Buergofol sold to Omega. *Id.* Three of the sheets are from film shipments Buergofol sent to Omega in July of 2017, *see id.* at 5, 9, 14, four of the sheets are from September and December of 2017, *id.* at 6, 13, 15-16, and three of the sheets are from February and April of 2018, *id.* at 7-8, 17. At a status conference held before this court on April 28, 2025, Buergofol explained that Dr. Boutrid "had a premonition and pulled some of the Omega extrusion sheets before the binders were discarded and new binders went into the room." Docket 726 at 39. Buergofol further explained that those sheets had been produced to Omega in redacted form and that those were the only sheets that were still in Buergofol's possession. *Id.* (Buergofol's counsel stating that "[Buergofol] produced everything [it] ha[s]").

At the status conference, Buergofol's counsel indicated that the extrusion and recipe sheets are not ESI because "they are physical pieces of paper." *See id.* Buergofol's counsel further explained that "after about three years, [the binders are] discarded." *Id.* Buergofol also indicated that because this has "been the policy forever . . . when this case started, there was nothing before

162

2018." *Id.*

On July 3, 2025, in response to Omega's Interrogatory No. 21, Buergofol again reiterated that

> [t]he paper form recipes were kept in binders in file rooms for about three years before they were discarded. When this case began, the oldest paper form recipes were from 2018. Some paper form recipes that are more than three years old and that relate to film made for Omega were removed from the binders and retained before the old binders were discarded. These limited number of paper form recipes relating to film made for Omega were retained by Dr. Boutrid. Redacted versions of the paper form recipes have been produced.

Docket 867-28 at 7-8. Following the Federal Circuit's denial of Buergofol's petition for mandamus, Buergofol provided Omega with unredacted versions of the ten extrusion and recipe sheets. *See* Docket 780-2.

## B.     Legal Standard

"Spoliation is 'the intentional destruction, mutilation, alteration, or concealment of evidence.' " *Blazer v. Gall*, 2019 WL 3494785, at *2 (D.S.D. Aug. 1, 2019) (quoting *Spoliation, Black's Law Dictionary* (11th ed. 2019)). "Prejudice, bad faith, and evidence of an effort to suppress the truth are all required to impose a sanction of dismissal based upon spoliation." *Sentis Grp., Inc.*, 763 F.3d at 924 n.1; *see also Menz v. New Holland N.A., Inc.*, 440 F.3d 1002, 1006-07 (8th Cir. 2006) ("[T]o warrant dismissal as a sanction for spoliation of evidence 'there must be a finding of intentional destruction indicating a desire to suppress the truth.' " (quoting *Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 746 (8th Cir. 2004)).

"[I]f the corporation knew or should have known that the documents would have been material at some point in the future then such documents

163

should have been preserved . . . a corporation cannot blindly destroy documents and expect to be shielded by a seemingly innocuous document retention policy." *South Dakota Wheat Growers Ass'n v. Chief Indus., Inc.*, 337 F. Supp. 3d 891, 914 (D.S.D. 2018) (internal quotation marks omitted). But "[t]he ultimate focus for imposing sanctions for spoliation of evidence is the intentional destruction of evidence indicating a desire to suppress the truth, not the prospect of litigation." *Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032, 1035 (8th Cir. 2007).

### C. Analysis

#### 1. Duty to Preserve Evidence

"The initial determination the court must make is a determination of when the [plaintiff's] duty to preserve evidence was triggered." *E*Trade Sec. LLC v. Deustche Bank AG*, 230 F.R.D. 582, 587 (D. Minn. 2005). "The obligation to preserve evidence begins when a party knows or should have known that the evidence is relevant to future or current litigation." *Id.* at 588; *see also Stevenson*, 354 F.3d at 746. A plaintiff's duty to preserve evidence "is almost always triggered a substantial period before litigation is actually commenced," and typically arises "when the plaintiff becomes aware of facts from which it is reasonably foreseeable that the plaintiff will commence litigation." *Valspar Corp. v. Millennium Inorganic Chems., Inc.*, 2016 WL 6902459, at *5 (D. Minn. Jan. 20, 2016) (collecting cases).

As indicated above, Omega alleges that Buergofol destroyed 107 sheets detailing the structure and composition of film Buergofol sold to Omega from

164

August 2017 to August 2019. *See* Docket 865 at 88-95. Omega argues that by June 28, 2017, or at the latest, September 30, 2019, Buergofol knew that litigation was reasonably foreseeable regarding film it sold to Omega. *Id.* at 92. Omega also asserts that with Buergofol's litigation hold on February 5, 2022 and its represented three-year document-retention policy, Buergofol should have at least retained the sheets for orders after February 5, 2019.[58] *Id.* at 93.

In response, Buergofol argues that "Omega's allegations of spoilation are all bogus." Docket 949 at 74. Buergofol asserts that it discards old production document binders "in the ordinary course of business after about two years from the date of each production run." *Id.* at 75. Due to this document-retention policy, Buergofol argues that "all production documents associated with inner film orders for Omega would have been discarded in the ordinary course of business by about May 2020 if Dr. Boutrid had not retained some documents for his own quality control purposes before May 2020." *Id.* at 75-76. As such, Buergofol argues that because August 2021 was the earliest Buergofol could have anticipated litigation, the fact that the 107 production documents were destroyed before that date is not indicative of any spoilation on Buergofol's part. *Id.* at 76.

As support for its argument that Buergofol should have known litigation was reasonably foreseeable in June 28, 2017, or at the latest, September 30,

---

[58] Omega notes that it made nine different film orders in August 2019, but Buergofol has not produced an extrusion or recipe sheet for any of these orders. Docket 865 at 93; *see also* Docket 635-1 at 3 (detailing that Omega made nine orders for outer film in August 2019).

2019, Omega points to Buergofol's privilege logs, which contain emails detailing investigations into the potential infringement of Omega liners. Docket 865 at 90-92; *see also* Docket 822-16 at 2, 7. For example, Omega points to a June 28, 2017, internal email in which Buergofol described an investigation of "potential infringers in Europe, China, and US of Buergofol's patents, including Omega, in anticipation of litigation." Docket 822-16 at 2. In its privilege log, Buergofol categorized this June 28, 2017, email as protected work product. *Id.* Omega also notes four other internal emails identified on Buergofol's privilege log, dated September 30, 2020, with "Omega Liner" in the subject line with the subject matter described as "investigate amount of damages in preparation for anticipated patent litigation." *See id.* at 7. Buergofol also categorized these four emails as work product. *Id.*

Additionally, Omega points to Buergofol's response to Omega's Interrogatory No. 7 (ROG 7), in which Buergofol described four emails, ranging from September 30, 2019, to November 3, 2020, sent by its employee, Dr. Kurt Stark. Docket 176-23 at 7. In the four emails, Dr. Stark indicated that he believed Omega was infringing at least one of Buergofol's patents, the 8,361,580 Patent (the '580 Patent). *Id.* In an email sent on September 30, 2019, Dr. Stark explained to Omega that he believed its liner made with the orange outer film fell completely within the scope of the '580 Patent. Docket 867-34 at 2-3. Additionally, in an internal email sent on May 19, 2020, from Dr. Stark to Dr. Franz Schleicher and Tobias Goth, Dr. Stark expressed his belief that Omega was infringing the '580 Patent and stated that Buergofol will "have to

166

consider how best to take action against the patent infringer." Docket 867-37 at 2.

In several back-and-forth emails between Dr. Stark and Omega, the parties discussed the pricing of Buergofol's films and Omega's purchase of films from other companies. *See* Docket 867-35 at 2, Docket 867-36 at 2; Docket 867-38 at 2. On May 13, 2020, Dr. Stark emailed Omega indicating that Omega was no longer purchasing inner and outer film from Buergofol. Docket 867-35 at 14. In an email sent to Dr. Stark on May 15, 2020, Omega indicated that because Buergofol's pricing on its inner and outer film was too high, Omega was not interested in purchasing Buergofol's film. Docket 867-36 at 2. In reply, Dr. Stark reminded Omega that "[f]or the outer film please keep in mind, that this film is patented in the United States, and also all the liners co[n]taining this film, are patented, too." *Id.* On September 30, 2020, Dr. Stark emailed Omega, warning Omega to not buy "the orange outer film from anyone else . . . as this is a patented product in the United States and also the whole liner is covered by this patent." Docket 867-35 at 2. Dr. Stark also attached a copy of the '580 Patent. *See id.* at 3-13. Dr. Stark further stated that Buergofol would provide Omega with new pricing on the inner film and expected Omega to order more of Buergofol's outer film soon. *Id.* at 2. On November 3, 2020, Omega informed Dr. Stark that it did not need to reorder outer film from Buergofol because it still had some of Buergofol's outer film from past orders and because Omega purchased outer film from a company that was going out of business. Docket 867-38 at 2. That same day, Dr. Stark again warned

Omega to "please be careful" because the "kind of liner and films" Omega was buying from other companies "are patented in the United States." *Id.*

On August 11 and 17, 2021, Dr. Schleicher sent Omega two emails stating that Buergofol was "interested in doing business with Omega liner not to create court cases" but that it could not "accept [Omega] purchasing inner and outer film from a competitor which is a[] patent infringement." Docket 867-39 at 2; *see also* Docket 867-40 at 2 (explaining that Omega needed a license to produce and sell its liner, which was a situation Buergofol "disclosed . . . a couple of years ago"). On August 17, 2021, Buergofol sent Omega a cease-and-desist letter, asserting that without Omega obtaining a license to Buergofol's '580 Patent, "Omega Liner could potentially be liable to past owners of the '580 Patent for past infringement." Docket 867-41 at 2. On August 29, 2021, Dr. Schleicher sent Omega another email explaining why Omega's liner was covered under the '882 Patent. Docket 176-23 at 8. Buergofol's privilege logs also reveal internal emails sent on September 2, 2021, regarding "att[orney] provide opinion on Omega's infringement of patents, including '455, '269 and '882 patents." Docket 291-2 at 7. Similarly, the privilege logs identify September 24, 2021, "emails and attachments," regarding "att[orney] providing legal analysis as to claim scope for anticipated litigation with '882, '455, '580 and '242 patents." *Id.*

Here, the court agrees with Buergofol that although the June 28, 2017, email details an investigation into potential infringers "of Buergofol's patents, including Omega, in anticipation of litigation," Docket 822-16 at 2, it was not

yet reasonably likely that Buergofol would commence litigation because Omega had not yet received its first shipment of Buergofol film, *see* Docket 635-1 at 4 (providing that first shipment was sent on August 16, 2017). It is also unlikely that Buergofol was aware of facts in June 2017 that would make it reasonably foreseeable for it to conclude that it would commence litigation against Omega. *See Valspar Corp.*, 2016 WL 6902459, at *5.

But by May 19, 2020, the court finds that it was reasonably foreseeable that Buergofol would bring an infringement suit against Omega. On September 30, 2019, Dr. Stark informed Omega that its orange outer film liner fell completely within the scope of Buergofol's '580 Patent. Docket 867-34 at 2. By May 19, 2020, Buergofol knew that Omega was not interested in purchasing any inner or outer film from Buergofol. Docket 867-35 at 14; Docket 867-36 at 2; Docket 867-34 at 2. Additionally, on May 15, 2020, Dr. Stark warned Omega that it should not purchase its orange outer film from competing companies because it was a patented product. Docket 867-35 at 2. Buergofol's internal communications on May 19, 2020, also reflect Buergofol's belief that Omega was infringing the '580 Patent and that action would be required. *See* Docket 867-37 at 2 (stating that Buergofol will "have to consider how best to take action against the patent infringer"). In the following months, Buergofol continued to warn Omega about its liners and purchase of competing films. *See* Docket 867-38 at 2. Buergofol's email to Omega on September 19, 2019, and these later developments confirm that by May 2020, Buergofol believed

169

Omega was infringing at least one of its patents[59] and that it intended to take further action against Omega. As such, Buergofol "knew or should have known" that evidence relating to the structure and composition of its film products and its dealings with Omega would be relevant to anticipated litigation.

Further, Buergofol's contention that litigation was not reasonably foreseeable until August 2021 is unpersuasive. *See* Docket 949 at 80-81. The record demonstrates that Buergofol had already accused Omega of patent infringement nearly two years earlier. Additionally, Buergofol's four internal emails, dated September 30, 2020, entitled "investigate amount of damages in preparation for anticipated litigation," regarding Omega, confirms the likelihood of litigation at a time prior to August 2021. Docket 822-16 at 7. The court also notes that Buergofol has claimed the work product privilege over these four emails. *See id.* Some "[c]ourts have concluded that the duty to preserve attaches on the date a party begins asserting work product protection." *N. Am.*

---

[59] Although the emails sent in September 2019 and May 2020 dealt with the '580 Patent, "[t]he duty to preserve evidence is triggered when the party knows or should have known that the evidence is relevant to current or future litigation." *Great Am. Ins. Co. v. Twin Cities Dance & Enter. Co. LLC*, 2025 WL 1754485, at *3 (D. Minn. Mar. 5, 2025), *report and recommendation adopted by Great Am. Ins. Co. v. Twin Cities Dance & Enter. Co. LLC*, 2025 WL 1772802 (D. Minn. June 27, 2025) (internal quotation marks omitted). Buergofol admitted that the '580 Patent shares claim elements with the '269 Patent and the '882 Patent. *See* Docket 176-23 at 7 ("The '580 patent[] includes claims with some of the same claim elements present in the claims of the '882 and '269 patents."). It stands to reason the evidence of the structure and composition of film Buergofol sold to Omega would be as relevant to a claim of infringement under the '580 Patent as it is to Buergofol's current claims of infringement under the '882 and '269 Patents.

*Sci. Assocs., LLC v. Conforti*, 2024 WL 4903753, at *19 (D. Minn. Nov. 27, 2024); *see also Great Am. Ins. Co. v. Twin Cities Dance & Enter. Co. LLC*, 2025 WL 1754485, at *5-6 (D. Minn. Mar. 5, 2025), *report and recommendation adopted by Great Am. Ins. Co. v. Twin Cities Dance & Enter. Co. LLC*, 2025 WL 1772802 (D. Minn. June 27, 2025); *Escamilla v. SMS Holdings Corp.*, 2011 WL 13243580, at *37 (D. Minn. June 28, 2011) (reasoning that party's duty to preserve arose when the party asserted that the work product privilege attached because the party "cannot assert that it was anticipating litigation . . . and then maintain it had no duty to preserve documents bearing on that anticipated litigation"). As such, the court is unconvinced by Buergofol's argument that its duty to preserve arose no earlier than August 2021.

### 2.  Intentional Destruction of Evidence and Bad Faith

A spoliation of evidence sanction requires "some indication of an intent to destroy the evidence for the purpose of obstructing or suppressing the truth." *Stevenson*, 354 F.3d at 747. Because the intentional destruction of evidence "is rarely proved by direct evidence . . . a district court has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors." *Greyhound Lines, Inc.*, 485 F.3d at 1035 (internal quotation marks omitted). "When a corporation is involved, the inquiry depends in part on corporate policies, but also to some extent on the intent of corporate employees, not all of whom will play the same role in every case." *Morris v. Union Pac. R.R.,* 373 F.3d 896, 902-03 (8th Cir. 2004).

Omega alleges that Buergofol "selectively kept only the 10 printed extrusion and recipe sheets it believed proved the five-layer sequence required to infringe the '269 Patent, while deliberately destroying the other 107 printed sheets." Docket 865 at 90. Buergofol argues that sanctions are not justified because it destroyed the 107 production documents in good faith pursuant to its routine document retention policy "in the ordinary course of business." Docket 949 at 74. Buergofol also asserts that "Omega's story of spoliation . . . depends on it being a fact that Buergofol retained film production documents for each Omega order for a period of three years, but Omega does not know and does not have evidence that Buergofol actually kept production documents for three years." Docket 949 at 81. Buergofol, in the same brief, denies that it has an official retention policy and instead claims that it "simply does what it does with its unwanted binders of old production documents." *Id.* at 81-82.

The court finds that there are several circumstances present that indicate Buergofol intentionally destroyed the 107 production documents with a desire to suppress the truth. First, as noted above, by May 2020, Buergofol had a duty to preserve the 117 production documents. Buergofol's failure to take reasonable steps to prevent the destruction of these production documents at that time is indicative of an intent to suppress the evidence. *See Great Am. Ins. Co.*, 2025 WL 1754485, at *8 ("While the timing of the destruction alone may not demonstrate intent, it's a factor that the Court may consider."). The court also finds relevant Eaton's testimony that production documents were still being destroyed in the fall of 2022—after Buergofol

172

initiated a litigation hold and commenced the current lawsuit. Again, this demonstrates that Buergofol has failed to take reasonable steps to preserve documents in this case even after litigation was initiated.

Second, Buergofol makes various conflicting representations as to how long it retained and when it destroyed the extrusion and recipe sheets. As outlined above, prior to its opposition brief, Buergofol represented to the court and to Omega that it retained these documents for roughly three years. *See, e.g.*, Docket 726 at 39 (Buergofol's counsel stating that "after about three years, [the binders are] discarded. And that's been the policy forever"); Docket 867-28 at 7-8 (Buergofol stating that "[t]he paper form recipes were kept in binders in file rooms for about three years before they were discarded"); *see also* Docket 586-1 at 93 (Eaton testifying that the binders "go back two or three years"). Additionally, throughout this litigation, Buergofol has represented, several times, that it retained production documents from 2018 on. *See* Docket 238 at 140-41, 149, 153; Docket 726 at 39 (Buergofol's counsel stating that "when this case started, there was nothing before 2018"); Docket 867-28 at 7-8 ("When this case began, the oldest paper form recipes were from 2018."). But now, in its opposition brief, Buergofol asserts that it only has a two-year document retention policy. *See* Docket 949 at 81-82. And Buergofol also now claims that the 107 production documents, even those that would have existed from 2018 on, were destroyed "in about 2020," *id.* at 61, "in 2020 and 2021," *id.*, "by 2020," *id.* at 62, "after about two years," *id.* at 62, 75, and "by about May 2020," *id.* at 76.

173

Buergofol's shifting narratives are not only problematic, but its story of when the extrusion and recipe sheets were destroyed does not align with statements made by Dr. Boutrid, the individual Eaton identified as being solely responsible for destroying these production documents. According to Dr. Boutrid, he retained the 10 sheets "[i]n about 2020-2021 when the old binders with production documents from Omega orders in 2018-2019 would have been discarded." Docket 950 ¶ 24. But if Dr. Boutrid's account is correct, then Buergofol's previous assertions that production documents only existed from 2018 on cannot be true. As evidenced by Dr. Boutrid's testimony and Buergofol's disclosure of the 10 production sheets, 7 of those sheets are from 2017. *See* Docket 780-2 at 5-6, 9, 13-16 (providing that 3 of the sheets are from film shipments Buergofol sent to Omega in July of 2017, and 4 of the sheets are from September and December of 2017). Because 7 of the sheets Dr. Boutrid retained sometime in 2020 or 2021 are from 2017, *see id.*, Buergofol's representations that documents prior to 2018 did not exist and that Omega cannot prove with evidence that production documents from 2017 existed past August 2019 are untrue, *see* Docket 949 at 82.

Dr. Boutrid's account also conflicts with Buergofol's newly claimed two-year document retention policy. As Omega explains, "[i]f Omega's July 2017 production documents were not preserved until '2020-2021,' then documents from July 2017—more than two years old by July 2019—would already have been destroyed under the newly claimed policy and thus could not have been preserved." Docket 969 at 169. As such, "Buergofol would have retained the

[production] documents for *over* three years if Dr. Boutrid retrieved them in late 2020 or 2021." *Id.* at 170. Thus, Dr. Boutrid's account of retaining the 10 sheets sometime in 2020-2021 aligns with Buergofol's representations made throughout this case: mainly, that it retains these production documents for roughly three years, which has been its "policy forever." *See* Docket 726 at 39. Based on the above, Buergofol's changing explanations of when the production documents were destroyed and how long Buergofol typically retains such documents indicates an intent to deprive Omega of this information. *See Greyhound Lines, Inc*, 485 F.3d at 1035.

Third, Buergofol's explanations for the selective preservation of 10 of the extrusion and recipe sheets out of the 117 also demonstrates an intent to suppress the evidence. Eaton indicated that Buergofol keeps a tight leash over entry to its storage rooms, and that a specific Buergofol employee retains sign-in logs detailing who enters the storage rooms. *See* Docket 586-1 at 90-91, 271. Buergofol has not produced these logs, or any other supporting documentation, to confirm Dr. Boutrid's story that he retained the 10 production documents sometime in 2020 to 2021. Instead, beyond citing an interest in preserving these 10 sheets for warranty and quality control purposes, *see* Docket 949 at 61; Docket 950 ¶ 23, Buergofol fails to explain why Dr. Boutrid did not retain more of the sheets. And as Omega notes, such an explanation "is not credible," because Buergofol's one-year warranty over inner film sold to Omega would have expired by 2019. Docket 969 at 168 n.27. Further, because Buergofol was no longer manufacturing film for Omega in

175

2020, Buergofol "would have no on-going concerns about quality control" at the time Dr. Boutrid retrieved the 10 production sheets sometime in 2020 to 2021. *Id.* Thus, Buergofol's and Dr. Boutrid's listed justifications for why only 10 of the 107 production documents were retained does not convince the court that Dr. Boutrid did not just "cherry-pick" certain production documents and destroy the rest.

Further, to the extent Buergofol suggests that it would have been difficult for Dr. Boutrid to retain more than the 10 sheets because trying to find a single production document in the 1,000 binders would be like finding a "needle-in-the-haystack," Docket 74 ¶ 9; *see also* Docket 949 at 104-05, the court does not find this argument justifiable. Eaton's testimony that the binders are arranged by production number with the years on the outside of the binder, Docket 586-1 at 93-94, 198, does not correspond to a high difficulty when searching for Buergofol projects, *see* Docket 949 at 104-05. Further, because Buergofol "knew or should have known that the documents would have been material at some point in the future," it cannot "blindly [retain some and] destroy [the remaining] documents and expect to be shielded by a seemingly innocuous document retention policy." *South Dakota Wheat Growers Ass'n,* 337 F. Supp. 3d at 914.

For similar reasons, the court also finds that Buergofol has acted in bad faith. Bad faith can be implied by a party's behavior, such as when a party (1) "selectively preserve[s] some evidence while failing to retain other [evidence]," or (2) "use[s] . . . the same type of evidence to their advantage in

176

prior instances." *E\*Trade Sec. LLC*, 230 F.R.D. at 588; *see also Stevenson*, 354 F.3d at 748 (inferring an intent to destroy where spoliating party destroyed one type of evidence but preserved a different type of evidence).

As outlined above, Buergofol selectively chose to retain only 10 of the 117 documents. The failure to retain the other 107 production documents is evidence of its bad faith. *See Stevenson*, 354 F.3d at 748 (finding that defendant acted in bad faith by "preserv[ing] other types of evidence but not the voice tape"); *Paisley Park Enters. Inc. v. Boxill*, 330 F.R.D. 226, 235 (D. Minn. 2019) ("[C]ourts have] concluded that the failure to preserve some types of ESI while destroying others is a reasonable basis to infer that the destroying party acted with bad faith."). Additionally, because Buergofol has failed to provide a concrete date on when the production documents were destroyed, Eaton's admission that Buergofol was still destroying documents after its litigation hold was in place and after this lawsuit was commenced is particularly problematic. If Buergofol's repeatedly represented three-year retention policy is applied, then on February 5, 2022, when Buergofol initiated its litigation hold, it still should have had the nine production documents for Omega orders made after February 5, 2019. But Buergofol has not turned over these nine production documents and represents that they were destroyed sometime in 2020 or 2021. Buergofol's shifting narratives on exactly when the production documents were destroyed and its deviation from its long-held position that three years of retention has been its "policy forever," indicates its bad faith.

177

Further, like the plaintiff's conduct in *Sentis Group, Inc. v. Shell Oil Co.*, 763 F.3d 919 (8th Cir. 2014), Buergofol's pattern of evasive and deceptive conduct in this case is evidence of its bad faith. *See id.* at 924 (upholding district court's finding that spoliation of evidence on plaintiff's computer "following [plaintiff's] pattern of evasiveness and obfuscation" constituted bad faith). As outlined above, *see supra* Part II.H.1., Buergofol has resisted turning over discovery regarding the structure and composition of its film since January 31, 2023. Additionally, Buergofol used BF2793 and Dr. Boutrid's first declaration, which the court determined contain false statements, to argue that Omega had everything it needed concerning the structure and composition of Buergofol film sold to Omega. *See, e.g.*, Docket 351 at 10. As such, Buergofol attempted to use falsified evidence to limit the amount of discovery to which Omega was entitled and relied upon this same evidence to support its claims of infringement. Consequently, Buergofol's attempts to prevent Omega from obtaining this information from other sources leads the court to conclude that Buergofol's pattern of discovery violations and inconsistent representations supports an inference that it acted in bad faith and with the intent to deprive Omega from using this information at trial.

### 3. Prejudice

In addition to intent, "[t]here must be a finding of prejudice to the opposing party before imposing a sanction for destruction of evidence." *Stevenson*, 354 F.3d at 748. A finding of prejudice requires "that the evidence is both relevant and not available to the party through any other means."

178

*Pioneer Civ. Constr., LLC v. Ingevity Ark., LLC*, 2023 WL 7413336, at *3 (W.D. Ark. Nov. 9, 2023); *see also Greyhound Lines, Inc.*, 485 F.3d at 1035 (finding no prejudice from party's failure to preserve evidence because there was other relevant evidence available); *Koons v. Aventis Pharms., Inc.*, 367 F.3d 768, 780 (8th Cir. 2004). "If the missing evidence would be different or more helpful to the party claiming spoliation than the evidence that already exists, there is likely prejudice." *Anderson v. BNSF Ry. Co.*, 681 F. Supp. 3d 899, 914 (S.D. Iowa July 6, 2023).

Omega argues that it has been severely prejudiced by the destruction of the 107 production documents. Docket 865 at 94; Docket 969 at 172-74. Omega notes that other than the 10 production sheets, Buergofol has not produced any other discovery relating to the structure and composition of the film it sold to Omega. Docket 969 at 173. As an example of this prejudice, Omega points to Dr. Boutrid's second declaration, used in support of Buergofol's motion for summary judgment of infringement of the '269 Patent. Docket 865 at 94; *see also* Docket 635 (Dr. Boutrid's second declaration). In his second declaration, Dr. Boutrid stated that a 60-inch roll of inner film sold to Omega in Order No. 11801841/4 had 7 layers. Docket 635-1 at 2. In response, Omega tested film on a roll of 60-inch Buergofol film. Docket 865 at 94. This test revealed that the roll of film only had 3-layers, and not the 7-layers that Buergofol claimed that roll had. *See id.* In response to Omega's test, Buergofol submitted another declaration from Dr. Boutrid, in which Dr. Boutrid noted that he had made an "error" in his previous declaration and

179

clarified that the 60-inch film was a 5-layer film, not a 7-layer film. Docket 732 ¶ 19. Buergofol also attacked Omega's test as "sham evidence," and asserted that Omega's expert did not actually test Buergofol film. *See* Docket 731 at 16-22. Omega argues that because Buergofol destroyed the production documents for Order No. 11801841/4, among others, it has been "crippled" in its "ability to defend itself and pursue its counterclaims." Docket 865 at 94.

Buergofol argues that Omega has not been prejudiced because other information of the structure and composition of Buergofol's films sold to Omega exists in other sources. Docket 949 at 85-86. Buergofol argues that the 10 extrusion sheets Omega currently possesses "are representative of all the Buergofol film supplied to Omega." *Id.* at 85. Buergofol also argues that because Dr. Boutrid "personally oversaw all of Buergofol's manufacturing of the inner and outer film it supplied to Omega," Dr. Boutrid's declarations establish the structure and composition of Buergofol film sold to Omega. *Id.* Buergofol last asserts that the destroyed production documents would only be "additional redundant cumulative extrusion and recipe sheets . . . because the structure and composition of all Omega Liners . . . is the same for the purpose of an infringement analysis." *Id.* at 86.

The court is not convinced by Buergofol's assertion that the information in the production documents is available from other sources. As outlined above, the court has determined that BF2793 was a manufactured document and that Dr. Boutrid has provided various conflicting and false statements throughout his submitted declarations. Thus, Omega should not have to rely

180

upon false and manufactured information instead of the actual production documents to determine the structure and composition of film Buergofol sold to Omega. *Sentis Grp., Inc.,* 763 F.3d at 926. As such, because the production documents appear to be the only source of information detailing the structure and composition of Buergofol film sold to Omega,[60] the court finds that Omega has been prejudiced by the spoliation of the 107 production documents. *See Anderson,* 681 F. Supp. 3d at 914 (reasoning that prejudice existed where spoliated evidence "was the only such evidence of its kind"); *Stevenson,* 354 F.3d at 748 (finding party was prejudiced by the destruction of a voice tape because it was "the only recording of conversations between the engineer and dispatch contemporaneous with the accident").

The court also finds Buergofol's claims that the 107 production documents "would not just further confirm Omega's infringement of the '269 patent" or that they would be "still more redundant cumulative production documents" similarly unavailing. *See* Docket 949 at 85-86. Buergofol cannot unilaterally determine what evidence is relevant and non-prejudicial to Omega.

---

[60] It is unclear from the parties' representations whether information about the structure and composition of film Buergofol sold to Omega is present in Buergofol's COEX2/Navision database. *See* Docket 949 at 106 (Buergofol arguing that its "Navision/COEX2 database does not contain any recipe sheet or even data to generate a particular recipe sheet, such as a recipe for an Omega film roll"); Docket 969 at 156-57 (Omega arguing that information about the structure and composition of Buergofol film sold to Omega exists in the COEX2/Navision database). But because Buergofol denies that such responsive information exists in its Navision database and instead points to other sources in which it argues the information exists, *see* Docket 949 at 85-86, 105-06, for purposes of the spoliation analysis, the court finds that the production documents are the only source of this information.

181

*See Sentis Grp., Inc.*, 763 F.3d at 926 (rejecting party's argument that it could "declare evidence undiscoverable and irrelevant merely because it does not fit into their own theory of the case"); *see also* Docket 726 at 41-42 (This court noting that Omega is "entitled to do discovery" and "do[es]n't need to just rely on [Buergofol's] word."). While the court is unable to determine the contents of the 107 production documents, this alone does not warrant a finding that prejudice does not exist. *See, e.g., Paisely Park Enters.*, 330 F.R.D. at 236 (finding prejudice when defendants' spoliation rendered it "impossible to determine precisely what the destroyed documents contained or how severely the unavailability of these documents might have prejudiced" plaintiffs (internal quotation marks omitted)).

Without the production documents indicating the structure and composition of Buergofol film sold to Omega, Buergofol has put Omega in a position where it must solely rely upon Buergofol's word. For example, the parties' dispute regarding Omega's testing of the 60-inch roll of film and the absence of the production documents has put Omega in a position where it cannot defend itself from Buergofol's accusations of falsified evidence because the very evidence which could support Omega's statements has been destroyed. *See* Docket 969 at 174 ("Omega expects that the destroyed extrusion and recipe sheets for that 60-inch film in order no 11801841/4 would have confirmed what Omega's test results showed."); Docket 949 at 87-88 (Buergofol alleging that Omega "is the bad-faith spoliator of evidence concerning the structure and composition of Buergofol film from the 11801841/4 order.").

182

Thus, the court finds that by preserving only 10 of the 117 production sheets, which Buergofol believes is helpful to its claims of infringement, Buergofol's destruction of the 107 sheets has prejudiced Omega. Based on the foregoing, the court finds that sanctions are warranted for Buergofol's spoliation of the 107 production documents.

## IV.    Appropriate Sanctions

Having determined that sanctions are warranted for Buergofol's submission of fabricated evidence and falsified declarations, *see supra* Part I, Buergofol's various violations of the court's orders, *see supra* Part II, and Buergofol's spoliation of evidence, *see supra* Part III, the court must now determine whether dismissal of Buergofol's claims with prejudice is the appropriate sanction. But after careful review of the record and the parties' arguments, the court finds that there are several independent grounds under which the dismissal of Buergofol's claims with prejudice is warranted.

First, the court finds that dismissal is warranted under Rule 37(b). While the law does not require the "least onerous sanction available," *Chrysler Corp. v. Carey*, 186 F.3d 1016, 1022 (8th Cir. 1999), it does reserve dismissal for the most "dilatory and contumacious conduct," *Keefer*, 238 F.3d at 941. Courts should "weigh [the] need to advance [a] burdened docket against the consequences of irrevocably extinguishing [a] litigant's claim[s]." *Hutchins v. A.G. Edwards & Sons, Inc.*, 116 F.3d 1256, 1260 (8th Cir. 1997). If a lesser sanction could effectively punish the violation and deter future violations, then it is worth considering. *See Chrysler Corp.*, 186 F.3d at 1022. Thus, "[i]n this

183

circuit, before dismissing a case under Rule 37(b)(2) the court must investigate whether a sanction less extreme than dismissal would suffice, *unless* the party's failure was deliberate or in bad faith." *Bergstrom v. Frascone*, 744 F.3d 571, 576 (8th Cir. 2014) (internal quotation marks omitted).

The court finds that lesser sanctions would prove ineffective or impractical. The court has already employed lesser sanctions throughout this case in response to Buergofol's violations of court orders. For example, the court has already issued several orders requiring Buergofol to pay Omega's attorney's fees. *See* Docket 164 at 17, Docket 402 at 22, Docket 464 at 20-21, Docket 466, Docket 748 at 19, Docket 752 at 12-14, Docket 756 at 12-14, Docket 777 at 17-18, Docket 809 at 11-13, Docket 946, Docket 979. But Buergofol has demonstrated that a monetary sanction, even a substantial one, has little effect on its behavior during discovery. *See also* Docket 828 at 7-8 (finding that the court's attorney's fees awards "appear to have proven ineffective in curbing Buergofol's obstructive discovery practices").

Further, because Buergofol's willful violations of the court's discovery orders are so wide-ranging, any sanction short of dismissal with prejudice would be futile and ineffective in resolving Buergofol's violations. Under Federal Rule of Civil Procedure 37(b)(2)(A), the court may impose other sanctions such as designating certain facts as established, prohibiting a party from supporting or opposing designated claims or defenses, or striking pleadings in whole or in part. Fed. R. Civ. P. 37(b)(2)(A)(i)-(iii). But imposing these sanctions to correct Buergofol's discovery failures would not meaningfully preserve Buergofol's

184

infringement claims because Buergofol's non-disclosures pervade core issues in this case. As such, imposing these sanctions would be tantamount to a sanction of dismissal.

Additionally, "staying further proceedings until the order is obeyed," *id.* 37(b)(2)(A)(iv), would only cause further delay in this case, prejudice Omega, and effectively reward Buergofol's behavior. Buergofol has demonstrated throughout these proceedings its unwillingness to abide by court orders or engage in the discovery process. And staying these proceedings to give Buergofol additional time to respond to discovery requests would be ineffective because Buergofol has proven that it will not turn over responsive discovery to Omega. Thus, the court finds that any alternative sanction to dismissal would prove ineffective.

But even if lesser sanctions would suffice, the court need not impose a lesser sanction because Buergofol's failures to provide discovery in this case have been deliberate and in bad faith. *See Bergstrom*, 744 F.3dd at 576. Buergofol has ignored multiple court orders and repeatedly failed to produce information critical to Omega's counterclaims and defenses. *See Comstock*, 775 F.3d at 992. Additionally, Buergofol has made conflicting representations as to the existence of its ESI sources and often, after it denies that certain discovery exists, Buergofol will later use that allegedly "non-existent" discovery to support its own arguments. *See supra* Part II.G.2.a. (discussing that Fink's report revealed that Buergofol concealed pre-2014 sales in its Navision database). Further, Buergofol refuses to allow Omega to depose its IT manager,

185

Anton Hoffmann, about Buergofol's ESI sources, despite a court order compelling his deposition. *See* Docket 799 at 14, 16. Not only has Buergofol concealed its ESI sources, but rather than run Omega's search queries pursuant to the ESI Order, Buergofol created self-imposed limitations to support its claim that it was "impossible" to comply with the ESI Order. *See supra* Part II.D.2 (discussing Buergofol's claims of impossibility while searching emails in Tobit David); *supra* Part II.B.6 (analyzing Buergofol's claims of impossibility justifying why it failed to export its email data to an e-discovery platform).

Buergofol has also unreasonably interpreted the proper scope of discovery requests and this court's discovery orders to delay production of plainly relevant documents. As just one example, Buergofol purposefully omitted reference to its Navision/COEX2 database in its sixth supplemental responses to RFP 6 to feign compliance with a sanctions order. *See supra* Part II.G.2.a. The tactics Buergofol employed to avoid compliance with court orders, and its decision to ignore the court's prior sanctions orders, indicate its repeated, willful failure to participate in discovery in good faith. *Coop. Fin. Ass'n, Inc. v. Garst*, 917 F. Supp. 1356, 1375-76 (N.D. Iowa 1996) (finding that a party's violation is in bad faith and willful where "the non-complying party had repeatedly failed to produce discovery in response to counsel's repeated requests and court orders").

Moreover, Omega has had to go to extraordinary lengths to obtain even the most basic discovery in this case, and in many instances, still does not

186

have responsive discovery to its discovery requests. Even after the court issued the ESI Discovery Order to correct Buergofol's past behavior in failing to turn over discovery and for failing to comply with this court's orders, *see* Docket 724 at 1 (reasoning that the ESI Order was intended to stop Buergofol from "continually block[ing] Omega from obtaining necessary discovery"), Buergofol continued to drag its feet, choosing not to conduct proper searches as laid out in the ESI Order and finding other ways to delay turning over responsive discovery. This, and its many other manufactured excuses to explain its non-compliance, has allowed Buergofol to continue its practice of nondisclosure of relevant discovery in this case. And as outlined above, such evasive behavior has greatly prejudiced Omega. *See Smith*, 2025 WL 2779201, at *4 (collecting Eighth Circuit cases that "have concluded that causing a party to 'hound' another for discovery materials, thereby increasing expense to obtain compliance with discovery requests, may constitute prejudice").

In short, the history of this litigation demonstrates that Buergofol has abused the judicial process by disobeying court orders, failed to comply with discovery obligations, and delayed production of relevant information. The court does not have confidence that Buergofol has provided all or even most of the discovery to which Omega is entitled. And Buergofol's refusal to comply with Section IV.1 of the ESI Order, which would allow the court to determine if Buergofol was conducting proper searches, prevents the court from assessing Buergofol's attempts to comply with the ESI Order beyond having to take Buergofol at its own word. Thus, based on these circumstances, the court finds

187

that it is appropriate to dismiss Buergofol's claims with prejudice under Rule 37(b)(2)(A)(v).

Second, Buergofol's persistent pattern of delay during discovery and its failure to comply with the Federal Rules of Civil Procedure convinces the court that dismissal with prejudice is an appropriate sanction under Rule 41(b) and the court's inherent authority. *See Hunt*, 203 F.3d at 527-28 (upholding dismissal of plaintiff's claims because plaintiff "engaged in a persistent pattern of intentional delay by willfully disregarding court orders and violating the Federal Rules"); *Smith*, 2025 WL 2779201, at *2 ("[D]ismissal of a party's claims may be appropriate when a party demonstrates a blatant disregard of the [c]ourt's orders and the discovery rules, which prevents the opposing party from fairly litigating its case." (internal quotation marks omitted)). Buergofol's abusive conduct surrounding TransPerfect, *see supra* Part II.E, and its creation of circumstances to justify its failure to use an e-discovery platform, *see supra* Part II.B.6 and Part II.C, also demonstrates its intentional disregard for court orders and intent to avoid turning over responsive discovery to Omega.

The Eighth Circuit has recognized that dismissal may not be warranted where a plaintiff "failed to follow only one or two of the court's specific instructions." *Hunt*, 203 F.3d at 528. But the court does not face such a problem here. Instead, the record reveals that Buergofol routinely and willfully ignored multiple court orders. *See supra* Part II. Despite being sanctioned eight prior times and being warned that its claims may be dismissed if it continued to fail to comply with court orders, Buergofol continued to willfully violate and

188

grossly distort the court's orders to falsely claim compliance. In conjunction with Buergofol's failure to comply with court orders and its fabrication and spoilation of evidence, the court is left with no other option but to conclude that Buergofol has no intention of complying with this court's orders as lesser sanctions have proved futile.

Third, the court finds that Buergofol's fabrication of BF2793 and its submission of false statements in Dr. Boutrid's declarations warrants dismissal as a sanction under Rule 11, Rule 26(g), and this court's inherent authority. As relevant here, the Eighth Circuit has upheld dismissal as a sanction where a plaintiff has manufactured evidence and provided perjured testimony pursuant to this court's inherent authority and Rule 41(b). *Pope*, 974 F.2d at 984. Further, this court has previously imposed dismissal with prejudice as a Rule 11 sanction when a plaintiff submitted fabricated documents as exhibits to his complaint. *See Rindahl v. Daugaard*, 2011 WL 4549151, at *6 (Sept. 29, 2011); *see also Interpreter Servs., Inc. v. BTB Techs., Inc.*, 2011 WL 6935343, at *8 (D.S.D. Dec. 29, 2011) (reasoning that "[d]ismissal would unquestionably be warranted if it could be determined with reasonable certainty that [the plaintiff] fabricated the emails, or that [the plaintiff] was complicit in their fabrication.").

Here, Buergofol used BF2793 and Dr. Boutrid's first three declarations to enhance its claims of infringement through fraudulent conduct. Buergofol also relied upon these documents, numerous times, to argue that Omega had been supplied with all the necessary information it needed regarding the structure and composition of film it sold to Omega to try and further limit discovery.

189

Further, it was not reasonable for Buergofol or its counsel to represent that BF2793 was a business record made in 2018. As evidenced by the record, both Buergofol's counsel and Dr. Boutrid understood such statements were false. Despite knowing the falsity of these statements, both later used these statements to mislead the court and Omega. Other courts have found that such conduct warrants the "complete denial of relief," and the court sees no reason to find otherwise. *See Hazel-Atlas Glass Co.*, 322 U.S. at 250; *see also Pope*, 974 F.2d at 986.

In addition, when Omega notified Buergofol that there were issues with BF2793, rather than immediately correct the record, Buergofol ignored and rejected Omega's requests for clarification and filed discovery responses that later proved to be false. This is clearly bad faith conduct, and severe sanctions are warranted. *See, e.g.*, *Chrysler Corp*, 186 F.3d at 1021 (upholding sanction under court's inherent authority when the offending party "repeatedly lied during the discovery process"). Even Dr. Boutrid's fourth declaration, which Buergofol asserts completely corrected the record, omits reference to Peter and fails to explain how text on BF2793 was changed from the screenshot Dr. Boutrid sent to Wallace when compared to the final version of BF2793. These are not the actions of a party who made a simple mistake. Instead, the court finds that Buergofol's fabrication of evidence and submission of false statements in Dr. Boutrid's declarations is an abuse of the judicial process, was done in bad faith, and warrants dismissal of its infringement claims. *Pope*, 974 F.2d at 984 ("When a litigant's conduct abuses the judicial process, the

190

Supreme Court has recognized dismissal of a lawsuit to be a remedy within the inherent power of the court.").

Fourth, the court finds that dismissal of Buergofol's claims with prejudice as a sanction for spoliation of evidence is appropriate. The Eighth Circuit has held that "[t]he district court, familiar with the case and counsel, receives substantial deference in determining sanctions." *Greyhound Lines, Inc.*, 485 F.3d at 1035. "The authority for such a sanction, however, ultimately lies with the court's inherent authority to redress conduct that 'abuses the judicial process.' " *Sentis Grp., Inc.*, 763 F.3d at 924 n.1 (quoting *Stevenson*, 354 F.3d at 745).

Buergofol's spoliation has resulted in the irreparable loss of key evidence and substantial prejudice to Omega. Buergofol's destruction of the 107 production sheets and its failure to provide substitute evidence of this information severely undermines Omega's ability to defend itself and prove its counterclaims. As noted above, Buergofol's conflicting narrative on the destruction of these documents and its selective preservation of only 10 sheets indicates its "intentional destruction indicating a desire to suppress the truth" *Menz*, 440 F.3d at 1006 (citation omitted). The sanction of dismissal is commensurate to the damage caused by Buergofol's spoliation and the severity of its abuse of the judicial process.

Dismissal is also appropriate to punish and deter Buergofol, whose pattern and practice of misconduct is well documented. Despite receiving multiple court sanctions for withholding evidence and failing to comply with

court orders, Buergofol engaged in the same type of misconduct here by destroying key evidence, thus preventing Omega from obtaining evidence to support its counterclaims. Additionally, as noted above, lesser sanctions would not sufficiently punish Buergofol, meaningfully deter it from engaging in future bad faith spoliation, or remedy the extreme prejudice to Omega. *See Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976) (reasoning that dismissal as a sanction "must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent"). As such, because the court finds that Buergofol intentionally destroyed the 107 production documents with the intent to suppress the truth in bad faith, and that this spoliation has prejudiced Omega, the court finds that dismissal of Buergofol's claims with prejudice is an appropriate sanction.

While "[t]here is a strong policy favoring a trial on the merits," *Fox v. Studebaker-Worthington, Inc.*, 516 F.2d 989, 995-96 (8th Cir. 1975), the court finds that the special circumstances here warrant dismissal of Buergofol's claims with prejudice. Thus, considering Buergofol's sustained, willful violations of multiple court orders, its fabrication and spoliation of critical evidence, the demonstrated ineffectiveness of lesser sanctions, and the substantial, irreparable prejudice to Omega, the court exercises its authority under Rule 37(b)(2)(A)(v), Rule 41(b), Rule 11, Rule 26(g), and its inherent authority to dismiss Buergofol's infringement claims with prejudice. This

192

sanction both redresses the abuses to the judicial process and deters similar misconduct by similarly situated parties.

## V.    Whether an Evidentiary Hearing is Warranted

In its response to the motion to dismiss, Buergofol requests that this court hold an evidentiary hearing so that Buergofol can "present live testimony of fact witnesses so that those witnesses can refute under oath the various falsehoods and baseless accusations that Omega's counsel has been telling about them and has written into Omega's motion brief." Docket 949 at 112. Buergofol later filed a motion for an evidentiary hearing, requesting "the opportunity to present important oral live testimonial evidence relevant to dispute issues of fact" regarding Omega's motion to dismiss. Docket 1027 at 1. Buergofol's initial request for an evidentiary hearing seems mostly directed to provide evidence to refute Omega's claims regarding the fabrication of BF2793 and Dr. Boutrid's declarations. *See, e.g.*, Docket 949 at 72-73 (detailing that at an evidentiary hearing the court "can investigate the facts regarding BF2793, confirm the authenticity and business record nature of the image of BF2793, and explore the actual state of mind, intentions and honesty of Buergofol's personnel and counsel"). In its motion for an evidentiary hearing, Buergofol seeks to submit testimonial evidence from Dr. Boutrid regarding BF2793 and his declarations, and testimony from Rushton and Fink regarding Buergofol's compliance with the ESI Order. *See* Docket 1028 at 5-14.

But the Eighth Circuit has "previously held that no hearing is necessary before sanctions are imposed where the record demonstrates a willful and bad

faith abuse of discovery and the non-cooperating party could not be unfairly surprised by the sanction." *Chrysler Corp.*, 186 F.3d at 1022; *see also Comiskey v. JFTJ Corp.*, 989 F.2d 1007, 1012 (8th Cir. 1993). As discussed above, the record amply demonstrates Buergofol's bad faith conduct throughout this case. And Buergofol was previously warned that failure to comply in good faith with the court's orders could result in dismissal of its claims. *See* Docket 828 at 8. Buergofol also fails to address why an evidentiary hearing is needed where its proposed witnesses have all submitted several declarations regarding the matters Buergofol indicates each would testify to at the proposed evidentiary hearing. Additionally, the court finds that Buergofol has had plenty of opportunities to explain its questionable conduct concerning BF2793 and Dr. Boutrid's declarations before sanctions were imposed. Thus, the court finds that it need not hold an evidentiary hearing before issuing sanctions against Buergofol and denies Buergofol's motion for an evidentiary hearing.

## VI.   Attorney's Fees

Omega also moves for its attorney's fees and costs. Docket 865 at 95-98. Federal Rule of Civil Procedure 37(b)(2)(C) provides that upon finding failure to comply with a court order, "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C). "The party resisting sanctions bears the burden of showing

194

that its position was substantially justified." *Jim Hawk Truck-Trailers of Sioux Falls, Inc. v. Crossroads Trailer Sales & Serv., Inc.*, 2022 WL 3010143, at *8 (D.S.D. July 29, 2022) (quotation omitted).

A position is "substantially justified" if it "was justified in substance or in the main—that is, justified to a degree that could satisfy a reasonable person. To warrant such a characterization, the position must have reasonable basis both in law and fact." *In re Nat'l Hockey League Players' Concussion Inj. Litig.*, 2017 WL 3276873, at *2 (D. Minn. July 31, 2017) (quoting *Conklin v. Astrue*, 282 F. App'x 488, 489 (8th Cir. 2008)). "[S]ubstantial justification means that 'reasonable minds could differ as to whether the party was justified in resisting the discovery sought.' " *Jim Hawk*, 2022 WL 3010143, at *8 (quoting *Kirschenman v. Auto-Owners Ins.*, 2012 WL 1493833, at *1 (D.S.D. Apr. 27, 2012)).

In addition to Rule 37(b), a "district court's inherent power to govern the practice of lawyers appearing before it 'encompasses, among other things, the authority to police lawyer conduct and to guard and to promote civility and collegiality among the members of its bar.' " *Wescott Agri-Prods., Inc. v. Sterling State Bank, Inc.*, 682 F.3d 1091, 1095-96 (8th Cir. 2012) (quoting *Sahyers v. Prugh, Holliday & Karatinos, P.L.*, 560 F.3d 1241, 1244 (11th Cir. 2009)). As such, while the calculation of fees is "primarily to reimburse rather than to punish, the court is free to consider the value such an order may have as a deterrent, both in the case before it and in other litigation." *Romero v. Wounded Knee, LLC*, 2018 WL 4178174, at *4 (D.S.D. Aug. 30, 2018) (citations omitted).

195

The court finds that awarding Omega its attorney's fees for bringing its motion to dismiss is appropriate. As explained in detail above, *see supra* Part II.A-H, Buergofol's numerous violations of this court's orders are not substantially justified. Buergofol has been sanctioned eight previous times in this case for similar conduct but refused to change its behavior in response. Moreover, Buergofol's and its counsel's creation of BF2793 and its false representations as to its authenticity as a business record and Buergofol's spoliation of evidence convinces this court that an award of attorney's fees to Omega reflects both the severity of Buergofol's bad faith misconduct and the prejudice Omega has suffered. *See Chambers*, 501 U.S. at 46 (finding that bad faith is present "if a court finds that fraud has been practiced upon it, or that the very temple of justice has been defiled," or if "a party shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order." (citation omitted and cleaned up)). Thus, Omega's request for attorney's fees is granted.

## CONCLUSION

Based on the foregoing, the court grants Omega's motion to dismiss Buergofol's complaint due to Buergofol's willful violations of this court's orders, Buergofol's submission of fabricated and falsified evidence, and Buergofol's spoliation of evidence. The court also grants Omega's request for reasonable attorney's fees and costs. Thus, it is

ORDERED that Omega's motion to dismiss (Docket 864) is granted. Buergofol's infringement claims are dismissed with prejudice. It is

196

FURTHER ORDERED that Buergofol's motion to amend/correct the ESI Order (Docket 784) is granted in part and denied in part. Section III.3 of the ESI is amended to reflect that it does not apply to email searching. It is

FURTHER ORDERED that Buergofol's motion to compel (Docket 876) is denied. It is

FURTHER ORDERED that Omega's motion for leave to file a surreply and objections to Buergofol's reply brief in support of its motion to Order Omega's Counsel to Stop Obstructing Implementation of the ESI Order (Docket 1004) is denied. It is

FURTHER ORDERED that Omega's motion to exclude and strike the opinions and testimony of Kris Rushton (Docket 1010) is denied as moot. It is

FURTHER ORDERED that Omega's motion to strike (Docket 1013) Buergofol's surreply (Docket 1001) and Rushton's Declaration (Docket 1002) for violation of the court's order (Docket 1013) is granted. It is

FURTHER ORDERED that Buergofol's motion for an evidentiary hearing (Docket 1027) is denied. It is

FURTHER ORDERED that Omega shall file an affidavit including a detailed accounting of the time spent preparing and litigating its motion to dismiss. This affidavit also shall set forth a reasonable rate for attorney's fees to which Omega believes it is entitled. Buergofol shall have twenty-one (21) days to respond in opposition thereto. Omega may file a reply within fourteen (14) days. It is

197

FURTHER ORDERED that Omega shall file an affidavit including a detailed accounting of the time spent preparing its motion to strike Buergofol's surreply and Rushton's Second Declaration for violation of the court's order (Docket 1013). This affidavit also shall set forth a reasonable rate for attorney's fees to which Omega believes it is entitled. Buergofol shall have twenty-one (21) days to respond in opposition thereto. Omega may file a reply within fourteen (14) days. It is

FURTHER ORDERED that the stay of all discovery and dispositive motions ordered at Docket 932 is lifted.

Dated July 29, 2026.

BY THE COURT:

*/s/ Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

198